## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

-----------------------------------------------------------------

**JOHN A. ABRAHAM, M.D.,** | **Civil Action No.**

            **Plaintiff,** |

    -against- | **JURY TRIAL DEMANDED**

**THOMAS JEFFERSON UNIVERSITY** |
**and THOMAS JEFFERSON UNIVERSITY** |
**HOSPITALS, INC.** |
           **Defendants.** |

-----------------------------------------------------------------

## COMPLAINT

Plaintiff John A. Abraham, M.D. ("Plaintiff" or "Dr. Abraham"), by his attorneys Nesenoff & Miltenberg, LLP, and Rogers Castor as and for his Complaint against Defendants, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.     Plaintiff brings this action to obtain relief against Defendants Thomas Jefferson University ("TJU") and Thomas Jefferson University Hospitals, Inc. ("TJUH") (collectively "Defendants") based on causes of action for violation of Title IX of the Education Amendments of 1972, breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress, and tortious interference by Defendants with Plaintiff's business relations with Rothman Orthopaedics.

2.     At all points relevant herein, TJU and TJUH operated as agents of each other.  As detailed below, the operations of TJU and TJUH are substantially consolidated.

3.      Prior to the events described herein, Plaintiff was a renowned orthopedic surgeon with an unblemished professional reputation. Plaintiff held clinical privileges and a faculty appointment at TJUH.

4.      On June 23, 2018, Plaintiff hosted his annual party at his residence to thank various members of the hospital community, including his operating staff.

5.      After the party, Plaintiff and Jane Roe[1] (hereinafter "Jane Roe," "Roe," or "complainant"), a resident physician at TJUH, had a sexual encounter.

6.      Plaintiff was intoxicated, and allegedly incapacitated as that term is defined under the TJU/TJUH Sexual Misconduct Policy, at the time of the sexual encounter.

7.      On the night in question, immediately preceding and during the encounter, Roe exhibited sexually aggressive behavior toward Plaintiff and disregarded Plaintiff's statements that he did not consent to the sexual activity.

8.      Following the sexual encounter, on June 26, 2018, Roe and her husband, R.P., attempted to extort money from Dr. Abraham.

9.      That same day, Dr. Abraham reported Roe's alleged sexual misconduct and extortion attempt to his TJU/TJUH supervisor.

10.      Upon information and belief, having learned that Dr. Abraham had already reported her alleged misconduct, Roe filed a false complaint with TJU/TJUH against Dr. Abraham for non-consensual sexual intercourse in retaliation.

11.      Despite Dr. Abraham's repeated reports to TJU/TJUH officials that i) he had a complaint against Roe for sexual misconduct against him, and ii) Roe's false complaint against him was retaliatory, Defendants took no action to investigate his allegations against Roe.

---

[1] Roe is referred to herein pseudonymously.

12.     Worse, on June 27, 2018, TJUH coerced Dr. Abraham into taking a leave of absence. By contrast, no interim action was ever taken against Roe, despite Dr. Abraham's complaints against her.

13.     TJU then conducted a superficial, flawed and gender-biased investigation into Roe's allegations against him.

14.     Throughout the investigation, Defendants engaged in substantial errors in violation of federal law, state law, and Defendants' own policies. A non-exhaustive list of Defendants' wrongful actions includes the following:

   a.  Failing to investigate Dr. Abraham's allegation that Roe had engaged in non-consensual sexual intercourse with him;

   b.  Failing to investigate whether Roe's allegation against Dr. Abraham was retaliatory, given that it occurred, after Dr. Abraham made a report of Roe's misconduct with his supervisor, and on information and belief, following a failed extortion attempt carried out by Roe and her husband, R.P., against Dr. Abraham;

   c.  Depriving Dr. Abraham the opportunity to review the investigative report produced by TJU in this matter, Roe's initial complaint to the Title IX Office as well as any evidence and witness statements collected.  There is no written basis in Defendants' Sexual Misconduct Policy for depriving Dr. Abraham of the opportunity to review these materials;

   d.  Defendants failed to pursue potentially exculpatory information on behalf of Dr. Abraham; and

   e.  The investigation was concluded without allowing Dr. Abraham a full and fair opportunity to provide a statement, to present over twenty-nine material witnesses

along with witness statements, and to offer other evidence on his behalf, such as the threatening voicemail left by R.P., Roe's husband.

15.     Fearing that the bias that pervaded the investigation would likewise taint any hearing in this matter, and having exhausted his savings during his leave of absence, with full reservation of his rights, Dr. Abraham relinquished his clinical privileges and faculty appointment at TJU/TJUH in December, 2018.

16.     Thereafter, on January 8, 2019, the Title IX investigation of Roe's allegations against him was concluded without any findings issued against Dr. Abraham.

17.     Yet, when Dr. Abraham returned to practice through his contractual relationship with Rothman Orthopaedics in January, 2019, TJU and TJUH continued to wrongfully interfere with his ability to practice his medical specialty, to retain and re-build his patient base, and subjected him to further reputational harm and emotional distress.

18.     Defendants' conduct herein has subjected Dr. Abraham to significant economic harm, including without limitation lost earnings, loss of future earnings, and loss of career prospects. Defendants' conduct will continue to have long-term and severe consequences for Dr. Abraham.

19.     Dr. Abraham has suffered from depression, anxiety, and suicidal ideation, for which he has required treatment, due to the Defendants' mishandling of the events in question.

20.     Due to Defendant's mishandling of the disciplinary proceeding described herein, Dr. Abraham has now been labeled a "rapist" and has been ostracized by professional colleagues, referring physicians, and residents. Dr. Abraham has suffered and will continue to suffer ongoing reputational harm due to Defendants' conduct. Prior to the events described herein, Dr. Abraham's reputation was unblemished.

21.     For the foregoing reasons, Dr. Abraham now seeks judicial intervention to address Defendants' wrongful conduct as more fully described herein.

## THE PARTIES

22.     Plaintiff is a natural person whose permanent residence is in the Commonwealth of Pennsylvania.

23.     During the events described herein, Plaintiff held a faculty appointment and clinical privileges at TJUH.

24.     Defendant TJUH is a Pennsylvania corporation with its principal place of business located at 111 S. 11th Street, Philadelphia, Pennsylvania 19107.

25.     Defendant TJUH receives federal funding. The total amount of annual federal funding received by the TJUH is not publicly available.

26.     Defendant TJU is a private university organized under the laws of the Commonwealth of Pennsylvania.  Defendant TJU has a principal place of business at 1020 Walnut Street, Philadelphia, Pennsylvania 19107.

27.      Defendant TJU receives federal funding. The total amount of annual federal funding received by the TJU is not publicly available.

28.     Defendants TJU and TJUH do business collectively under the marketing name "Jefferson Health."

29.     The operations of Defendants TJU and TJUH are substantially consolidated. By way of example, not limitation, of Defendants' consolidated operations, Defendants maintain connected websites. The "Jefferson Health" website, https://www.jeffersonhealth.org/index.html, contains a "University" link, which connects to the TJU website, https://www.jefferson.edu/.  The TJU website likewise links to the Jefferson Health website. The TJUH website,

[5]

https://hospitals.jefferson.edu/ also links to the TJU website. (Websites last accessed on May 5, 2020).

30.     At all times material to this Complaint, Defendants TJU and TJUH acted by and through their authorized agents, servants, and employees.  These authorized agents, servants, and employees were operating within the scope and course of their employment with Defendants and in furtherance of Defendants' business.

## JURISDICTION AND VENUE

31.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the claims herein arise under federal law; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

32.     This Court has personal jurisdiction over TJU and TJUH on the grounds that Defendants are conducting business within the Commonwealth of Pennsylvania.

33.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.      Background: The Effect of the "April 2011 Dear Colleague Letter" Of The Department of Education's Office for Civil Rights on University Sexual Misconduct Policies.**

34.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

35.     The DCL advised recipients that sexual violence constitutes sexual harassment

[6]

within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

36.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

37.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study, and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

38.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized

due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11)

39.    The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" (DCL at 15) and focus on victim advocacy.  For example, it stated (DCL at 12) that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy. Additionally, the DCL stated that schools must take steps to protect the complainant, as necessary, including taking interim steps before the final outcome of the investigation.  Such steps include transferring alleged perpetrators, if necessary, away from shared courses or housing. (DCL at 15-16)

40.    The DCL (p. 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

41.    Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

42.    Before the DCL, colleges and universities generally did not use their disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the DCL.

43.    After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

44.    On April 29, 2014, OCR issued additional directives to colleges and universities in

the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." http://www2.ed/gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf. OCR's April 2014 at 9,12.

45.    The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

46.    In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.  For example, the document states that schools:

(a)    "must not require a complainant to be present" at sexual misconduct disciplinary hearings (p. 30);

(b)    may decide to eliminate all opportunities for "cross-examination" (p. 31); and

(c)    must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 25).

47.     Neither OCR's April 2014 Q&A nor the DCL were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the DCL constituted substantive decision-making.

48.     In the same month that the OCR issued its April, 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at*

[9]

https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

49.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office For Civil Rights, U.S. Department Of Education (June 26, 2014),   https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

50.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited June 7, 2020).

51.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.   In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, . . . .  It's really a surreal situation, I think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, National Public Radio (Aug. 12, 2014),   https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention.  Neal explained that "schools are

[10]

running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

52.     Robert Dana, Dean of Students at the University of Maine, echoed the sentiment that a fear of governmental intervention and withdrawal of funds could lead colleges to rush to judgment against male students in disciplinary proceedings. *See* Tovia Smith, *Some Accused of Sexual Assault on Campus Say System Works Against Them*, National Public Radio (Sept. 3, 2014), https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them. Dana told NPR, "[c]olleges and universities are getting very jittery about it." *Id.*

53.     Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students. *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529. For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

54.     Notably, a recent study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates, and has no negative impact on securing donations. *See* Jason M. Lindo et al., *Any Press is Good Press?*

[11]

*The Unanticipated Effect of Title IX Investigations on University Outcomes*, National Bureau of Economic Research, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852.

55.     The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university.  Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students." *Id.*  The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . data suggests that federal Title IX investigations have no detectable effects on donations." *Ibid.*  In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases, and nothing to lose.

56.     Colleges, universities, and teaching hospitals, including TJU and TJUH, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, like TJU and TJUH, have limited procedural protections afforded to males, like Dr. Abraham, in sexual misconduct cases.

57.     On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many."  Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

58.     DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." *Id.*

59.     Acknowledging the massive pressure placed on universities and educational programs, including graduate medical residency programs, by the DCL, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington." *Id.*

60.     With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." *Id.* She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." *Id.*

61.     As one college administrator observed shortly thereafter, "I think that [DeVos's] reference to due process is because of her overall assessment that the pendulum has swung too far in favor of complainants as a result of the directives in the Dear Colleague Letter." Sarah Asch, *Federal Changes to Title IX on Sexual Assault Could Impact Middlebury*, The Middlebury Campus (Sept. 20, 2017), https://middleburycampus.com/36090/features/federal-changes-to-title-ix-on-sexual-assault-could-impact-middlebury/.

62.     On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

63.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure

upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*."  Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (citations omitted) (emphasis added).

64.     In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

65.     The 2017 Q&A cautions that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially," and the same standard applies for "[d]ecision-making techniques or approaches."  2017 Q&A at 4, 5.

66.     The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and *equitable* resolution of complaints of sex discrimination, including sexual misconduct." *Id.* at 3 (emphasis added).  In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable[] includ[e] . . . ensur[ing] an *adequate, reliable, and impartial* investigation of complaints." *Ibid.* (emphasis added).

67.     The 2017 Q&A also requires investigators to "synthesize *all available evidence*— including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id.* at 4 (emphasis added).

68.     The 2017 Q&A also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

69.     Likewise the 2017 Q&A, in a significant departure from the DCL, states: "The

findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings. *Id.* at 4; *see also id.* footnote 19 at 4.

70. The 2017 Q&A suggests that the policies and procedures in place at TJU and TJUH at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

71. On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all.

72. Despite a different direction announced by the Trump Administration, colleges universities, and educational programs including TJU and TJUH have mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX.

73. In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, *"Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct."* (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct) The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual

misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

74.     In a process governed by the enforcement of Title IX gender equality, and in which overwhelming the majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

75.     On May 6, 2020, the United States Department of Education released new Title IX regulations, which will carry the force and effect of law as of August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html)

76.     The new Title IX regulations will provide respondents procedural rights that Dr. Abraham was deprived of during his own disciplinary proceeding, including without limitation: i) a presumption of innocence until a finding of responsibility is made; ii) the right to be provided with a copy of the investigative report produced in the matter and a minimum of ten days in which to respond to the investigative report. (*See* "Summary of Major Provisions of the Department of

Education's       Title       IX       Final       Rule," available       at

https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf)

**B.**     **TJU's Sexual Misconduct Policy and Contract with Dr. Abraham**

77.     Plaintiff, like any other employee or agent of TJU/TJUH was bound by the University's policies and procedures, including its Sexual Misconduct Policy (the "Policy").

78.     On information and belief, and as detailed below, Defendants continued to apply the Policy in a manner consistent with the rescinded 2011 Dear Colleague Letter.

79.     The Policy describes the process by which TJU receives, investigates, responds to, and resolves complaints of sexual misconduct, stalking, relationship abuse or violence.

80.     The Policy notes that the majority of TJU employees are required to report information they receive concerning an incident to Campus Security and the Title IX Coordinator, in this matter, Zoe Gingold.  The Policy specifically notes that staff with significant responsibility to student and campus activities are mandatory reporters of incidents. (*See Policy*, VI "Initial Procedures" (A)(2) at 7-8.)

81.     In the matters described herein, Roe was treated as the "complainant," and Dr. Abraham was treated as the "respondent."

82.     Upon receiving a report of alleged misconduct, the Title IX Coordinator will determine whether an investigation into the alleged misconduct will occur. (*See Policy*, VII "Investigation and Disciplinary Process" at 10-11).

83.     If the Title IX Coordinator determines that an investigation will commence, a "Notice of Concern" is issued. (*See id.*).

[17]

84.     The "Notice of Concern" issued in the matter described below, indicated that Dr. Abraham would be assigned a TJU representative as his "advisor."  TJU assigned Jennifer Fogerty to be Dr. Abraham's Title IX advisor in this matter.

85.     The Notice of Concern also informed Dr. Abraham of his right to have a "support person" who would not be able to have a speaking role in any of the ensuing proceedings.

86.     Under the Policy, within two business days of receiving the Notice of Concern, both the complainant and the respondent will be asked to identify any "significant conflicts" that would affect the timing of the investigation and any potential hearing.  (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

87.     The issuance of the Notice of Concern marks the commencement of the "Formal Investigation" phase of the disciplinary matter. (*See id.*).

88.     Under the Policy, investigations may be performed by "appropriate authorities including, but not limited to, trained University personnel. (*See id.*).

89.     The Policy provides no further information concerning the substance of the alleged training received by University Personnel.

90.     As detailed below, in the matter at hand, TJU assigned a third-party investigator, Gaetan Alfano, Esq. ("Investigator Alfano").

91.     No information is publicly available as to the training received by Investigator Alfano on conducting sexual misconduct investigations.

92.     No information is available as to any training specifically offered by TJU to Investigator Alfano on the Policy or conducting sexual misconduct investigations generally.

[18]

93.     The Policy indicates that investigations "may" include interviews of the parties, and any material witnesses presented by either party as well as the review of any material evidence. (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

94.     The Policy specifically provides that both parties "will have the opportunity to present written statements, witnesses and other evidence during the process. (*Id.* at 11).

95.     Following an investigation, the Policy indicates that there may be several potential outcomes, such as a No Charge Decision, Non-Hearing Resolution, or Charge Decision. (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

96.     Relevant to the instant matter are the following outcomes discussed in greater detail below: i) Non-Hearing Resolution; and ii) Charge Decision.

97.     A Non-Hearing Resolution is appropriate where the Title IX Coordinator "concludes that a reasonable Sexual Misconduct Board could find, by a preponderance of the evidence, that the alleged Sexual Misconduct occurred, but there is not a significant dispute among the parties and the Title IX Coordinator about the proper outcome of the matter (including administrative remedies and disciplinary sanctions)…"   (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

98.     At TJU, the "Sexual Misconduct Board" is a pool of faculty and staff "specially trained" in matters related to sexual misconduct. (*See Policy*, VII "Investigation and Disciplinary Process" at 13).  No further details are provided as to the substance or frequency of the training received by the Sexual Misconduct Board.

99.     When a sexual misconduct case must be decided, a hearing panel is assembled from faculty and staff on the Sexual Misconduct Board. (*See Policy*, VII "Investigation and Disciplinary Process" at 13).

[19]

100.    The second potential outcome relevant to this matter is the "Charge Decision." When the Title IX Coordinator determines that a Non-Hearing Resolution is not feasible, and that a reasonable Sexual Misconduct Board could find, by a preponderance of the evidence, that the alleged sexual misconduct occurred, the Title IX Coordinator will issue a "Charge Letter." (*See id.* at 11-12.)

101.    The "Charge Letter" will recite the specific allegations of "Prohibited Conduct" as defined under the Policy, and the applicable Policy provisions. (*See id.*). The Charge Letter refers the matter to a Sexual Misconduct Board for adjudication. (*See id.*).

102.    Under the Policy, hearings are to be conducted in accordance with the TJU's "Community Standards" process and may include the presentation of evidence and witnesses at a live hearing. (*see* Policy VII "Investigation  and Disciplinary Process" at 13; *see generally,* "Community    Standards"    available    at    https://www.jefferson.edu/university/academic-affairs/schools/student-affairs/student-handbooks/university-policies/code-of-conduct.html   (last accessed June 7, 2020).

103.    On or about July 9, 2018, Dr. Abraham sent an email to his TJU-appointed Title IX advisor, Jennifer Fogerty. Citing to Section VII of the Policy, Dr. Abraham pointed out that hearings in Title IX matters are to be conducted in accordance with the "Community Standards" process. Dr. Abraham requested a copy of the "Community Standards" procedures.

104.    Without citing to a specific provision of the Policy as the basis of her conclusion, Ms. Fogerty indicated that a hearing through the Sexual Misconduct Board only occurred where the respondent was a student or medical resident at TJU/TJUH.

105.    Ms. Fogerty then indicated that a "Jefferson employee or agent" found to have violated the Policy would be subject to "appropriate disciplinary and/or corrective action under

applicable policies." According to Ms. Fogerty, the applicable policies included the TJU Code of Conduct, Policy Prohibiting Unlawful Discrimination, Harassment and Retaliation, and potentially the Bylaws of the Sidney Kimmel Medical College and/or the TJUH Medical Staff. However, at no point during the course of the investigation was Dr. Abraham ever provided with a hard copy or link to these policies.

106.    Under the Policy, both complainant and respondent have the right to appeal based on either i) violation of TJU's hearing procedures or ii) misinterpretation of the policies alleged to be violated. (*See* Policy VII "Investigation and Disciplinary Process" at 13).

107.    The Title IX Coordinator will seek to resolve a case, by either reaching a Non Hearing Resolution or completing a hearing within 60 days from the date the Notice of Concern was issued.  (*See* Policy VII "Investigation and Disciplinary Process" at 11).

108.    The Policy defines "sexual assault" as "any non-consensual sexual act, however slight, with any object, by a person upon another person that is without consent and/or by force." (*See* Policy V "Prohibited Behaviors" at 4).

109.     The Policy specifically notes that the following behaviors are deemed "sexual assault" when consent is not present: (i) "sexual intercourse (anal or vaginal); (ii) "sexual activity with another person who is not able to give consent due to intoxication, incapacitation, unconsciousness, helplessness, or other inability." (*See id.* at 4).

110.    The Policy notes that "consent to engage in sexual activity must be obtained from each partner and must exist from beginning to end of each instance of sexual activity." (*See* Policy IV "Consent" at 3).

111.    Consent may be demonstrated through "mutually understandable words and/or actions that clearly indicate a willingness to engage in sexual activity." (*Id.*)

[21]

112.    The Policy notes that consent is "not effective" "if the person is too incapacitated to provide informed, knowing and voluntary consent." (*Id.*)  The "use of alcohol or drugs shall not diminish one's responsibility to obtain consent, but may diminish one's ability to consent." (*Id.*)

113.    Retaliation is also prohibited under the Policy.  Retaliation may occur when someone engages in actions "intended to punish, seek retribution against or otherwise adversely affect a person who, in good faith, makes an allegation or report of Sexual Misconduct or participates or cooperates in [TJU's] process for addressing allegations and/or incidents of Sexual Misconduct…." (*See* Policy V "Prohibited Behaviors" at 7)

114.    As detailed below, TJU violated its own policies and procedures during its investigation of the sexual encounter between Dr. Abraham and Jane Roe on the night of June 23, 2018, including without limitation:

   a.  Denying Dr. Abraham a fair and equal opportunity to present written statements, witnesses and other evidence during the investigatory process. (*See* Policy VII "Investigation and Disciplinary Process" at 11).

   b.  Denying Dr. Abraham a fair and equal opportunity (or any opportunity at all) to identify any "significant conflicts" that would affect the timing of the investigation and any potential hearing.  (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

   c.  Failing to investigate Dr. Abraham's complaint that Roe had engaged in non-consensual sexual intercourse with him.

   d.  Failing to investigate whether Roe's complaint against Dr. Abraham was retaliatory, given that it occurred, on information and belief, following a failed extortion attempt carried out by Roe and her husband, R.P., against Dr. Abraham.

   e.  Failing to provide Dr. Abraham with a hard copy of, or link to, the specific policies and procedures which were applicable to any hearing in his matter.  The failure to provide this information prejudiced Dr. Abraham's ability to weigh his options for the resolution of this matter, i.e. whether to proceed to a hearing or pursue a non-hearing resolution.

[22]

## PLAINTIFF IS WRONGLY ACCUSED OF
## A SEXUAL ASSAULT THAT HE DID NOT COMMIT

**A.**     **Plaintiff's Background**

115.     At the time of the events giving rise to this Complaint, Plaintiff, Dr. John A. Abraham, was the Director of the Musculoskeletal Oncology Center for TJUH. In addition, Dr. Abraham was Service Chief of Orthopedic Oncology at the Rothman Orthopaedic Institute (hereinafter "Rothman Orthopaedics").

116.     At all times relevant herein, Dr. Abraham was a partner at Rothman Orthopaedics. Dr. Abraham's relationship with Rothman Orthopaedics was contractual in nature as it was governed by a partnership agreement.

117.     Dr. Abraham received his undergraduate degree in Biochemistry and Molecular Biology *Magna cum Laude* from Harvard University in 1996, and his medical degree with *High Honors* from Yale University School of Medicine in 2000.

118.     Dr. Abraham was appointed to the faculty in the Department of Orthopedic Surgery at Harvard Medical School from 2006-2010. He then served as the Assistant Professor of Orthopedic Surgery and Radiation Oncology at TJU from 2010 to 2015. Beginning in 2015, and until the events recounted in this Complaint, Dr. Abraham served as the Associate Professor of Orthopedic Surgery and Radiation Oncology at TJU.

119.     As part of his educational/teaching role as Associate Professor of Orthopedic Surgery and Radiation Oncology at TJU, Dr. Abraham had resident physicians rotate with him, participated as an attending physician in multiple weekly "tumor board" and other Orthopedic Oncology meetings to discuss various patient cases, and taught an "Oncology Review" for the Orthopedic In-Training Exam.

120.     Until the wrongful disciplinary proceeding described herein, Dr. Abraham was a well-liked and highly-respected member of the TJU/TJUH community.  He had never been involved in any type of disciplinary proceeding before, at TJU/TJUH or elsewhere.

121.     Dr. Abraham has received approximately 30 honors and awards including multiple listings as "Top Docs" at both the local and national level. Dr. Abraham also holds a national board certification.

122.     Dr.  Abraham  has  authored  approximately  40  peer-reviewed  professional publications.  He has edited or authored chapters in approximately 15 published medical texts and lectured extensively throughout the United States and internationally in his fields of expertise.

**B.     Jane Roe and Dr. Abraham's Initial Interactions**

123.     At all times relevant herein, Jane Roe was an Orthopedic Surgery resident physician at TJUH.  Dr. Abraham did not directly supervise Jane Roe.

124.     Prior to June 23, 2018, Dr. Abraham had only two interactions with Jane Roe.  On one occasion, Roe spoke to Dr. Abraham concerning a patient that she was managing while she was "on call."  On another occasion, Roe attended a professional journal club meeting, along with other guests, held at Dr. Abraham's home.

**C.     Jane Roe's Behavior at Dr. Abraham's Annual Party on June 23, 2018**

125.     On June 23, 2018, beginning at approximately 6:00 p.m., Dr. Abraham hosted a party at his home. Prior to the events described herein, Dr. Abraham held this party annually to thank his operating room team and residents for their hard work.

126.     About 50 guests attended the party, including senior and junior residents, nurses, physicians, one of Plaintiff's Rothman Institute partners, and a few personal friends.

127.     The party included catered food, a tended bar, and a live band.

[24]

128.    Plaintiff's wife and children were not at Plaintiff's residence on June 23, 2018, as Plaintiff and his then-wife were in the process of divorcing. In past years, Plaintiff's wife helped host this annual party.

129.    Prior to the commencement of the party, Dr. Abraham instructed the bartender to dilute all of Dr. Abraham's drinks to approximately "half" strength.  Dr. Abraham issued this instruction to ensure he would not become intoxicated and would be able to carry out his duties as host.

130.    Dr. Abraham greeted the guests as they arrived. Though she was not specifically invited, Jane Roe was among the guests.

131.    During the early portion of the party, Jane Roe spoke briefly to Dr. Abraham about the field of orthopedic oncology.

132.    Roe told Dr. Abraham that Roe had spoken to an orthopedic oncologist in Oregon who knows of Dr. Abraham and who said Dr. Abraham was well known.  Roe continued, stating something to the effect of: "you really need to know your stuff and give up a good part of your life" to be successful in this particular field.

133.    Strangely, Roe then alluded to Dr. Abraham's salary, stating that he had one of the best orthopedic oncology jobs in the country.

134.    Jane Roe went on to state that she had rotated onto Dr. Abraham's surgical service as a medical student.  Dr. Abraham told Roe that he did not recall that.

135.    During the party, Jane Roe encountered another party guest, A.D.[2]  A.D. was visiting from New York and spending the night at Dr. Abraham's residence.  A.D. and Roe had never met before the party.

---

[2] Individuals are referred to herein by initials only, for privacy purposes.

136.     On information and belief, A.D. and Roe spent significant time together at the party, and at one point even went on an unauthorized "tour" of Dr. Abraham's home.

137.     During the party, A.D. approached Dr. Abraham. Referring to Roe, A.D. asked something to the effect of "What is the story with this girl?"

138.     A.D. told Dr. Abraham that Roe was "DTF." Unfamiliar with the acronym, Dr. Abraham asked what "DTF" meant. A.D. told Dr. Abraham that the acronym stood for "Down to Fuck."

139.     A.D. further told Dr. Abraham that while Roe was "all over" several men at the party, Roe did not want "just anyone." A.D. told Dr. Abraham something to the effect of: "she doesn't want just anyone, she wants you, dude. I just walked around your house with her and it was very clear that she wants to fuck you."

140.     Dr. Abraham told A.D. that he had no intentions of having a sexual encounter with Roe.

141.     At a later point in the party, while Dr. Abraham was outside with his guests by the swimming pool, he looked up and saw Roe at his bedroom window. Roe had entered his bedroom, on the second floor of his home, without his permission. Other party guests in the backyard likewise noticed Roe in Dr. Abraham's bedroom for some period of time.

142.     One of the party guests wanted to go into the pool but had forgotten swimming attire. Dr. Abraham offered to find this guest some swimming attire, but having seen Roe in his bedroom, he was concerned about going into his bedroom alone. Dr. Abraham therefore asked this guest to accompany him to his bedroom.

143.     When Dr. Abraham entered the bedroom with his guest, he encountered Roe. Roe claimed that she needed something to wear in the pool and oddly stated that she had looked through

Dr. Abraham's clothes in all of his drawers, but could not find anything to wear.  Dr. Abraham informed her that he did not have any women's clothing, but she was welcome to use any clothing item that she found suitable.

144.    Roe looked Dr. Abraham in the eyes and, without his consent, put her arms around his shoulders and said words to the effect of, "I normally don't wear anything other than a thong into the pool."

145.    Uncomfortable, Dr. Abraham quickly gave a pair of swim trunks to the guest who had accompanied him and left his bedroom.

146.    Dr. Abraham then joined some of his other guests in his pool.

147.    Around midnight, the party was winding down and all but a few of the invited guests had already left. A.D. and a few other house-guests remained, as Dr. Abraham had previously invited these individuals, who had all travelled from a distance, to spend the weekend with him.

148.    Roe, however, lingered. Without permission, she went into Dr. Abraham's private liquor cabinet and poured Irish whiskey from a rare, expensive botte into one of Dr. Abraham's wine glasses.

149.    Roe then came outside and handed Dr. Abraham the almost-full glass, encouraging him to drink it.

150.    At this time, Dr. Abraham was sitting on a bench near his pool.

151.    Dr. Abraham refused the glass of alcohol, but Roe held it to his lips and started pouring it. Dr. Abraham consumed a mouthful. Roe wanted Dr. Abraham to drink more, and she became more forceful and insistent. Dr. Abraham pushed her hand away, causing the glass to fall and shatter.

152.     Dr. Abraham told Roe to leave.  A few guests witnessed this encounter and also asked Roe to leave.

153.     Dr. Abraham then said goodbye to the final remaining guests in the backyard. Seeing that there was no one left in the backyard, he believed that all guests, apart from those individuals who had previously been invited to stay for the weekend, had left.

154.     Dr. Abraham spent a few minutes putting out the torches in the backyard and closing up the garbage bins.

155.     It was around this point that Dr. Abraham noticed that he had some trouble walking due to the alcohol; nonetheless, he made it into the house safely.

156.     Upon entering his house, it was mostly dark. Dr. Abraham did not observe any of his overnight house guests.  These guests had retired to their rooms for the evening.

157.     Suddenly, Roe walked up to Dr. Abraham. Without his affirmative consent, Roe aggressively kissed Dr. Abraham on the mouth and placed her arms around him.

158.     Inebriated, Dr. Abraham attempted to push Roe away, but he was unable to do so. He told Roe that he did not want to have sexual relations with her, stating "this isn't a good idea."

159.     Roe then became even more aggressive, shouting indignantly, "don't you want to fuck me?"  Dr. Abraham again said "No, that's not a good idea."

160.     In a raised voice, Roe began repeating: "fuck me!" "Come on fuck me!" "I want you to fuck me!"

161.     Roe forcefully pulled Dr. Abraham to the floor.  She lay on her back on an area rug.

162.     Roe and Dr. Abraham proceeded to have sexual intercourse.

163.    During the intercourse, Roe continued to yell, "Fuck me! Fuck me!" Roe moaned loudly and grunted with pleasure.  Roe was so loud that one of the overnight house guests, A.D., heard her.

164.    Throughout the intercourse, Roe kissed and caressed Dr. Abraham's body. She thrust her hips and moved her body in a manner that was pleasurable to her.  With her hand, Roe guided Dr. Abraham's penis into her vagina.

165.    After the intercourse concluded, Dr. Abraham felt exhausted and dizzy.  His mind was foggy, and he could not process what had just occurred.

166.     At some point after the intercourse had concluded, Dr. Abraham told Roe that he needed to go up to bed.

167.    At no point before, during, or after the sexual encounter did Roe express any discomfort or displeasure.  To the contrary, based on Dr. Abraham's observations, she was still aroused.

168.    Dr. Abraham collected his clothes and then proceeded to his bedroom.  As he began climbing the stairs, he saw that Roe was already most of the way up the staircase.

169.    By the time Dr. Abraham entered his bedroom, Roe had already positioned herself in his bed.

170.    Short of calling the police, Dr. Abraham felt that there was nothing he could do to get Roe to leave.  He was too exhausted to take any further action, and he fell asleep immediately.

D.    **The Morning of June 24, 2018.**

171.     Dr. Abraham woke up around 7:30 a.m. on June 24, 2018.  He could not think clearly and felt as if the room was spinning.

172.    Seeing that Dr. Abraham was awake, Roe, still naked, flipped on to her stomach then rose up on her hands and knees.  She said words to the effect of: "I want you to fuck me again, this way, this is my favorite position."  She indicated that she wanted Dr. Abraham to enter her from behind.

173.    Dr. Abraham felt relieved when the telephone rang, giving him the excuse he needed to prevent any further activity with Roe.

174.    Roe then lay back down in the bed.  It was at this point that Dr. Abraham noticed that she was wearing wedding/engagement rings.

175.    Surprised, Dr. Abraham asked Roe if she had someone waiting at home for her.  Roe replied, "no" and further stated that "he" was working.

176.    Dr. Abraham asked Roe to leave.  He put his own clothes on, then went downstairs to retrieve Roe's bra.  He brought the bra to her and then went back downstairs to give Roe privacy to dress.

177.    Dr. Abraham walked Roe to her car, but as he left the house, he noticed that he was unusually sensitive to the sunlight.  He felt as though he had been drugged.

178.    As they reached Roe's vehicle, Roe put her arm around Dr. Abraham and kissed his cheek. She then got into her car and drove away.

**E.    June 26, 2018: After a Failed Attempt at Extortion, in an Effort to Save Her Career After Dr. Abraham Reports Roe's Sexual Misconduct, Roe Falsely Accuses Dr. Abraham of Rape**

**a.    Suspicious Phone Call from Roe on the Morning of June 26, 2018**

179.    On June 26, 2018, at approximately 6:40 a.m., Roe sent a text message to Dr. Abraham, requesting that he call her.

[30]

180.    Dr. Abraham called a few minutes later.  When he called, Roe picked up the phone but said that she would call him back.

181.    When Roe called Dr. Abraham back, she said she was sorry for what she did.  She further stated that the sexual encounter was "consensual."

182.    Roe next stated that she had told her husband, R.P., about the sexual encounter and that R.P. was "fucking angry."

183.    Alarmed, Dr. Abraham told Roe that he wanted something in writing that the encounter was "consensual."

184.    Roe refused this request and stated that her husband wanted to meet Dr. Abraham in person.  Fearing for his safety due to R.P.'s anger, Dr. Abraham declined.  At that point, Roe strangely told Dr. Abraham that she and her husband "did not own any firearms."  Roe assured Dr. Abraham that her husband would not physically harm Dr. Abraham, but noted that her husband needed to speak to Dr. Abraham that same day.

185.    When Dr. Abraham asked Roe why R.P. needed to speak to him, Roe indicated that R.P. wanted to propose something that could "make this better" for Roe and R.P.

186.    It became clear to Dr. Abraham that Roe was suggesting that Dr. Abraham pay off Roe and R.P.  Dr. Abraham realized that these individuals were attempting to manipulate and extort him.

187.    Dr. Abraham told Roe that he needed to make a report to his (and Roe's) supervisors, Dr. Alex Vaccaro and Dr. Jim Purtill.

188.    Suddenly, Roe raised her voice and said, "No way! Why would you do that? I don't want my career to be ruined. Can you at least wait until you hear what my husband has to say? He wants to work out a resolution with you, so that you can make this right for us."

[31]

**b.  R.P.'s Threatening Visit to Dr. Abraham's Clinic in the Mid-Afternoon of June 26, 2018**

189.    As scheduled, on June 26, 2018 at around noon, Dr. Abraham arrived at Fox Chase Hospital for work.

190.    Around 2:30 p.m., Dr. Abraham's Physician Assistant informed him that the administrative assistant had called.  Someone named "R.P." was at the hospital to meet Dr. Abraham.

191.    Dr. Abraham told the Physician Assistant to tell the administrative assistant not to let R.P. come to Dr. Abraham's location.

192.    When the Physician Assistant informed the administrative assistant of Dr. Abraham's request, she learned that the administrative assistant had already requested that Security remove R.P. from the building.  The administrative assistant was frightened by R.P. and thought he looked like he was "up to no good."

193.    Before Dr. Abraham left Fox Chase Hospital at the end of the workday, he spoke to the hospital vice president and the security officers, who confirmed that R.P. appeared dangerous, was exhibiting "controlled rage," and was removed from the hospital waiting area as a result.  Dr. Abraham requested that a formal report be written concerning this incident.

194.    When he returned to his office at Fox Chase Hospital, Dr. Abraham found that R.P. had left him a threatening voicemail.  In the voicemail, R.P. stated: "…I think I'll give you five minutes for you to come out and have the opportunity to talk to me in private. I'd appreciate that and I think it's in your best interest. Think I'll give you the five minutes...."

195.    Dr. Abraham was shaken by the events of the day and R.P.'s chilling voicemail.

### c.  Dr. Abraham reports Roe's Conduct to his Supervisor

196.  After texting his supervisor, Dr. Alex Vaccaro, at approximately 4:00 p.m. on June 26, 2018, Dr. Abraham spoke to Dr. Vaccaro between 5:30 p.m. and 6:00 p.m. that day.

197.  Dr. Abraham reported to Dr. Vaccaro that Roe had taken advantage of him at his annual party and that she had coerced him into having sexual intercourse.  He also reported that R.P. had shown up at Dr. Abraham's workplace and that he believed that R.P. and Roe were trying to extort him.

198.  Dr. Vaccaro told Dr. Abraham that he was going to speak to TJU's General Counsel concerning Dr. Abraham's report, and he further told Dr. Abraham to discuss the matter with Dr. Jim Purtill.

199.  At all times relevant herein, Dr. Purtill was the Residency Program Director at TJUH, and Roe's direct supervisor.

200.  Given that Dr. Abraham and Dr. Purtill both typically had clinic on Wednesdays[3], Dr. Abraham intended on speaking to Dr. Purtill the following morning.

### d.  Dr. Abraham's Disturbing Phone Call with R.P. in the early evening of June 26, 2018

201.  On the way home from Fox Chase Hospital after finishing up his clinical obligations, Plaintiff returned R.P.'s phone call.  Given that R.P. had come to Fox Chase Hospital looking for him, Plaintiff feared that R.P. would come after him or his family at home or elsewhere. Plaintiff therefore returned R.P.'s call to see if he could defuse R.P.'s anger.

202.  During the call, R.P. stated that Roe had told him what happened and she had said it was "consensual."

---

[3] June 27, 2018 was a Wednesday.

203.   Dr. Abraham again found the use of the word "consensual" unusual, and he interpreted it as an attempt by R.P. to convince Dr. Abraham not to report Roe for sexual misconduct.

204.   Suddenly, R.P. falsely mentioned that there were "bruises" all over Roe.

205.   R.P. also stated the Roe had a tampon inside her vagina, which was not removed during her sexual encounter with Dr. Abraham. To Dr. Abraham's knowledge, R.P.'s statements were false. To Dr. Abraham's knowledge, Roe had not been wearing a tampon during their sexual encounter.

206.   R.P. told Dr. Abraham that "we" were going to have to figure out a way to resolve the situation.

207.   At that point, Dr. Abraham clearly understood that R.P. was demanding money from him.

208.   In no uncertain terms, Dr. Abraham told R.P. that he would not negotiate with him, that Dr. Abraham had already reported the incident to his chairman, Dr. Alex Vaccaro, and that Dr. Abraham intended to meet the following morning with Dr. Jim Purtill, the residency program director and Roe's direct supervisor.

209.   Becoming very agitated, R.P. responded by loudly repeating: "We told you not to tell anyone about this!"

210.   On information and belief, R.P.'s anger escalated when he figured out that the plan to extort Dr. Abraham would not work since Dr. Abraham had already reported the incident.

211.   On information and belief, R.P. and Roe were suddenly on the defensive after learning that Dr. Abraham had already reported Roe's conduct, and that Roe's career was now in jeopardy.

212.     On information and belief, Roe now needed to switch tactics from extortion to filing a false claim of sexual assault in order to save her career.

    **e.**   **Later in the Evening of June 26, 2018: A False Accusation of Rape**

213.     Given the urgency of the situation, when Dr. Abraham arrived home, he texted Dr. Purtill.

214.     Receiving no reply to that text message, Dr. Abraham left Dr. Purtill a voicemail indicating that he needed to speak to Dr. Purtill urgently about a resident issue.

215.     Dr. Purtill did not return Dr. Abraham's call.

216.     Concerned, Dr. Abraham called Dr. Vaccaro and told him that he had called Dr. Purtill, but received no reply.

217.     Shockingly, Dr. Vaccaro told Dr. Abraham that Roe had gone directly to Dr. Purtill's home and falsely reported to him that Dr. Abraham had raped her.

218.     Dr. Abraham expressed his confusion and dismay to Dr. Vaccaro. He reminded Dr. Vaccaro that he had initially reported Roe's sexual misconduct.

219.     On information and belief, Roe made this utterly false report after her husband, R.P., learned that Dr. Abraham had already reported her sexual misconduct to Dr. Vaccaro.

220.     On information and belief, Dr. Purtill, evidencing bias in favor of the female accuser, intentionally ignored Dr. Abraham's attempts to reach him.

221.     On information and belief, Dr. Purtill was at all relevant times herein a mandatory reporter under the Policy.

**F.**   **June 27, 2018: Dr. Abraham Receives a Notice of Concern and TJUH Wrongfully Pressures Him Into Taking An Administrative Leave**

      **a.**   **Notice of Concern**

222.   On June 27, 2018, Dr. Abraham received a Notice of Concern from Title IX Coordinator Zoe Gingold ("Ms. Gingold").

223.   The Notice of Concern indicated that the Title IX office had received a report of an incident of "alleged sexual assault" and that the behavior, if substantiated would constitute a violation of TJU's Sexual Misconduct Policy (referred to herein as the "Policy").

224.   The Notice of Concern vaguely alleged that on or about the night of June 23, 2018, at a party at Dr. Abraham's residence, he engaged in "non-consensual sexual intercourse" with Roe. No further allegations as to why the intercourse was "non-consensual" were provided.

225.   At no point did Dr. Abraham receive a copy of Roe's initial report to the Title IX Office.

226.   Ms. Gingold's Notice further informed Dr. Abraham that TJU would be commencing an investigation into these allegations and that he would be assigned a University representative as his advisor.

227.   Notably, at no point during the investigation did TJU implement a "no contact" order against Dr. Abraham.

      **b.**   **Dr. Abraham's Forced Leave of Absence from TJUH**

228.   On June 27, 2018, TJUH coerced Dr. Abraham into taking a leave of absence.

229.   TJUH Chief Medical Officer, Ed Pribitkin, threatened Dr. Abraham by stating that Dr. Abraham would be suspended and reported to the Medical Staff and the National Practitioner Database ("NPDB") if he did not take an immediate leave of absence.

230. Dr. Abraham pleaded with Dr. Pribitkin that the allegation was false and told Dr. Pribitkin that there was another side to the story. Dr. Pribitkin refused to listen.

231. On information and belief, Dr. Pribitkin was at all relevant times herein a mandatory reporter under the Policy.

232. Under the threat of suspension and reporting to the NPDB, Dr. Abraham believed he had no choice but to capitulate and take a leave of absence.

233. Dr. Abraham was not given adequate time to arrange matters in his office to ensure the proper care and safety of patients, many of whom subsequently suffered as a result.

**G.     Rothman Orthopaedics Suspends Dr. Abraham**

234. As a result of Roe's false allegations, Dr. Abraham was suspended from his position at Rothman Orthopaedics.

235. Dr. Abraham was not allowed to practice in any form at any Rothman Orthopaedics location, including non-TJUH sites such as Fox Chase Hospital.

236. Dr. Abraham was prohibited from entering his Rothman Orthopaedics office and restricted from any contact with medical residents.

237. Dr. Abraham's passwords were all disabled. He was therefore unable to log on to any Rothman Orthopaedics computer system to check on his patients or perform research. He was likewise barred from logging in remotely to Continuing Medical Education, which was necessary to maintain his licensure.

238. During his suspension from Rothman Orthopaedics, Dr. Abraham's salary was cut to his base pay, which was unsustainable for the support of his family and himself.

### H.   Roe Files a Police Report

239.    On or about July 2, 2018, Roe filed a police report accusing Dr. Abraham of sexual assault.

240.    On information and belief, Roe knowingly filed a false police report.

241.    After enduring an approximately four-month-long investigation, in or about, November, 2018, the Montgomery County District Attorney declined to pursue charges against Dr. Abraham.[4]

### I.   The Flawed and Gender Biased Disciplinary Proceeding against Dr. Abraham.

#### a.   TJU Deprives Dr. Abraham of a Full and Fair Opportunity to Participate in the Investigation of Roe's Claim Against Him

242.    Given the pending criminal investigation, Dr. Abraham could not simultaneously submit a written/oral statement or otherwise participate in TJU's Title IX investigation.

243.    TJU was aware of the pending criminal investigation and was further aware that the pendency of the criminal investigation constrained Dr. Abraham's ability to fully participate in the Title IX investigation.

244.    Nonetheless, motivated by gender-bias against Dr. Abraham as a male accused of sexual assault, TJU used the existence of the criminal investigation to deprive Dr. Abraham of a full and fair opportunity to participate in the investigation.

245.    Dr. Abraham, for example, asked for an extension to prepare his written statement.

246.    The Title IX Coordinator, Ms. Gingold, refused his request by email dated October 3, 2018. Ms. Gingold stated: "Jefferson has the obligation to resolve the matter promptly." At that

---

[4] Dr. Abraham is currently pursuing a civil action against Roe and R.P. in the Pennsylvania Court of Common Pleas for various torts including without limitation slander and libel.

[38]

time, however, the matter had already been ongoing for four months and continued for yet another three months after she made this statement.

247.    Dr. Abraham hired a professional investigator, licensed by the Commonwealth of Pennsylvania, to identify and interview material witnesses.

248.    In total, Dr. Abraham's investigator identified twenty-nine separate witnesses who had material and relevant information concerning the events at issue.

249.    Numerous eye-witnesses at the party on June 23, 2018 told Dr. Abraham's investigator that Roe had displayed bizarre, sexually aggressive and sexually inappropriate behavior toward Dr. Abraham on the night in question.  By way of example, not limitation:

      a.    Witness M.T. thought Roe was acting as if she was Dr. Abraham's wife or girlfriend.  M.T. thought Roe's behavior was "weird;" and

      b.    Witness A.S. thought Roe might have been dating Dr. Abraham based on her body language. A.S. described Roe as "lurking just behind Dr. Abraham" or "too close" to him.

250.    Numerous witnesses at the June 23, 2018 party, including without limitation, C.K. and J.D., likewise told Dr. Abraham's private investigator that they saw Roe, through the window, in Dr. Abraham's bedroom.  At one point, Roe was in Dr. Abraham's bedroom, embracing another party guest, J.H.

251.    Roe engaged in sexually harassing and non-consensual sexual contact with another party guest, V.D.

252.    While V.D. was playing the piano inside Dr. Abraham's home on June 23, 2018, Roe sat next to V.D., uninvited.

[39]

253. Without consent, Roe, rubbed V.D.'s leg and nibbled his ear, making V.D. visibly uncomfortable.

254. Partygoers A.S. and C.C. observed Roe's non-consensual sexual contact with V.D.

255. On information and belief, a report was made about Roe's nonconsensual sexual contact with V.D. to TJU's Human Resources Department as well as to Chief Medical Officer Ed Pribitkin.

256. On information and belief, TJU failed to investigate the allegations of Roe's nonconsensual sexual contact with V.D.

257. Crucially, while there were no eye-witnesses to the sexual encounter between Roe and Dr. Abraham on the night of June 23, 2018, there was an "ear-witness," A.D.

258. A.D. was one of the party guests whom Dr. Abraham had previously invited to spend the night. A.D. was spending the night in a room situated directly above the room in which Dr. Abraham and Roe had their sexual encounter on June 23, 2018. The room in which A.D. spent the night is likewise adjacent to Dr. Abraham's bedroom.

259. After retiring to his room for the evening, A.D. could hear a female voice laughing and making enjoyable grunting noises. A.D. could tell that the sounds he heard were coming from the room directly below his bedroom.

260. Sometime later, A.D. heard footsteps and other sounds of two people going into Dr. Abraham's bedroom.

261. The next morning, June 24, 2018, A.D. again heard the female voice.

262. At no point did A.D. ever hear the female voice say "No," or sound in any way distressed.

263. Rather, at all points, A.D. heard the female voice making sounds of enjoyment.

[40]

264.    As discussed, Dr. Abraham could not present any of the above information as part of TJU's Title IX investigation since the criminal investigation against him was pending.

265.    Dr. Abraham likewise could not provide an oral / written statement to the Title IX Investigator concerning his sexual encounter with Roe until the criminal investigation had resolved.

266.    Nonetheless, approximately two weeks after TJU's Title IX Coordinator, Ms. Gingold, had denied Dr. Abraham's request for an extension of time to submit his written statement, Dr. Abraham received another letter from Ms. Gingold.

267.    By letter dated October 19, 2018, Ms. Gingold indicated that the University had concluded its investigation into Roe's Title IX allegations against Dr. Abraham.

268.    Shockingly, the investigation had been concluded without Dr. Abraham ever being given a full and fair opportunity to give a statement or present any evidence on his behalf.

**b.   TJU Deprived Dr. Abraham of the Ability to Review the Investigation Report and Other Key Investigation Documents**

269.    To date, TJU has never allowed Dr. Abraham to review a copy of the investigation report produced in this matter.

270.    To date, TJU has never provided with Dr. Abraham with a copy of Roe's initial complaint to the Title IX Office.   As a result, Dr. Abraham still does not know the specific allegations that Roe made against him.

271.    To date, TJU has never given Dr. Abraham the opportunity to review any evidence collected by the Title IX investigator in this matter or the opportunity to read the statements of the witnesses interviewed (if any) by the Title IX investigator in this matter.

272.    TJU proffered no basis written in the Policy to support its withholding of any of the above information or documents.

[41]

273.    TJU's actions not only prejudiced Dr. Abraham's ability to defend himself during the Title IX investigation, but have also prejudiced Dr. Abraham's ability to seek legal redress against TJU.

274.    Because the Investigation Report, any underlying evidence, and witness statements are within the exclusive possession of TJU, Dr. Abraham must make allegations concerning the defects in the investigation process on information and belief.

### c.   The Flawed, Superficial, and Gender-Biased Investigation against Dr. Abraham

275.    As detailed below, TJU performed a superficial, flawed investigation into Roe's claims against Dr. Abraham.

276.    The investigation was biased against Dr. Abraham as a male accused of sexual assault.

277.    That the investigation was concluded without allowing Dr. Abraham a full and fair opportunity to provide a statement, to present over twenty-nine material witnesses along with witness statements, and to offer other evidence on his behalf, such as the voicemail left by R.P., calls into question the thoroughness and impartiality of the investigation.

278.    Notably, evidence collected by Dr. Abraham's private investigator, including without limitation twenty-nine witness statements, was presented to Montgomery County law enforcement. On information and belief, this evidence played an important role in the determination of the Montgomery County District Attorney to close the matter against Dr. Abraham.

279.    On information and belief, Roe filed a prior false complaint, which TJU either failed to consider entirely or did not appropriately consider as part of its investigation against Dr. Abraham.  The existence of a prior false complaint is an important factor to be considered in

[42]

evaluating Roe's credibility, reliability, and motive in the Title IX investigation against Dr. Abraham.

280.    On information and belief, and as described below, TJU failed to appropriately investigate inconsistencies in Roe's narrative.

281.    Roe claimed in a letter to Rothman Orthopaedics[5] that after her sexual encounter with Dr. Abraham, there were bruises to her arms, neck, and face.

282.    Roe's claim, however, is demonstrably false.

283.    Roe and Dr. Abraham's sexual encounter occurred on June 23, 2018; Roe was scheduled to, and did, appear at the Bryn Mawr Hospital operating room on June 25, 2018.

284.    The standard attire in the operating room is "medical scrubs," which leaves visible a person's arms, neck, and face.

285.    On information on belief, TJU either made no attempt to contact any operating room staff members to question them about whether they observed any bruising on Roe on June 25, 2018, or inappropriately disregarded the testimony of operating staff members on this topic.

286.    On information and belief, TJU did not request any Bryn Mawr Hospital surveillance video from June 25, 2018 to determine the veracity of Roe's claim of bruising.

287.    On information and belief, there are no medical records to support Roe's allegation that she sustained bruising to her arms, neck and face during the sexual encounter between Roe and Dr. Abraham.

288.    On information and belief, Roe never had an examination by a Sexual Assault Nurse Examiner to have evidence preserved in the form of a "rape kit."

---

[5] As noted above, in addition to his faculty appointment at TJU, Dr. Abraham was, at all relevant times herein, a partner at Rothman Orthopaedics.

289.    On information and belief, TJU did not review or request Roe's contemporaneous social media posts or messages to determine whether Roe discussed the events at issue either publicly or privately, or to test the credibility of Roe's narrative of the events in question.

290.    Because Dr. Abraham was never allowed to review TJU's Investigation Report, he has no knowledge whether crucial witnesses such as R.P. were interviewed.  As detailed above, R.P. left Dr. Abraham a threatening voicemail, showed up uninvited and unannounced to Dr. Abraham's clinic, then attempted to extort Dr. Abraham via a phone call on June 26, 2018.  R.P.'s testimony is crucial in evaluating not only the credibility of Roe's claims but also Roe's motive for filing a false Title IX complaint against Dr. Abraham.

291.    Because Dr. Abraham was never allowed to review TJU's Investigation Report, he has no knowledge of how Roe's credibility was evaluated in this matter.  Because Dr. Abraham was not provided with a full and fair opportunity to present his statement in this matter, witnesses or other evidence on his behalf, on information and belief, Roe's credibility was inappropriately assessed.

292.    Because Dr. Abraham was never allowed to review TJU's Investigation Report, he has no knowledge of how witness credibility was evaluated in this matter.  Likewise, Dr. Abraham has no knowledge as to whether witness statements (if any exist) were properly verified, or whether witness statements were editorialized with a gender bias against him.

### d.    TJU Fails to Investigate Dr. Abraham's Allegations that Roe engaged in Non-Consensual Sexual Intercourse with Him and Fails to Investigate whether Roe's Complaint was Retaliatory.

293.    Despite Dr. Abraham's repeated attempts to report Roe's misconduct and retaliation against him, TJU took no action.

[44]

294.    As discussed, prior to Roe lodging her false complaint against him, Dr.  Abraham first reported his Complaint about Roe to Dr. Alex Vaccaro on June 26, 2018.

295.    On information and belief, Roe only lodged her complaint after the extortion attempt failed and after learning from R.P. that Dr. Abraham had already initiated a complaint against her for sexual misconduct.

296.    As discussed above, on June 26, 2018, Dr. Vaccaro told Dr. Abraham to directly report his Complaint to the Jefferson Orthopedic Residency Program Director, Dr. Jim Purtill. Despite calling Dr. Purtill directly, and sending Dr. Purtill a text message on June 26th, requesting his immediate attention to a resident problem, Dr. Abraham never heard back from Dr. Purtill.

297.    During the course of the Title IX Investigation, on or about July 2, 2018, Dr. Abraham was assigned a Title IX Advisor, Jennifer Fogerty.

298.    On or about July 6, 2018, Dr. Abraham called Ms. Fogerty and detailed his complaint against Roe. Dr. Abraham also expressed to Ms. Fogerty that Roe's complaint against him was retaliatory.

299.    Ms. Fogerty took no further action concerning Dr. Abraham's complaint for sexual misconduct against Roe or his complaint against Roe for retaliation.

**J.    TJU Encourages Roe and Dr. Abraham to Explore a "Non-Hearing Resolution."**

300.    As discussed, by letter dated October 19, 2018, Ms. Gingold, as Title IX Coordinator, informed Dr. Abraham that the investigation into Roe's Title IX allegations stemming from the events of June 23-24, 2018 had been concluded.

301.    Ms. Gingold's October 19, 2018, correspondence indicated that TJU believed "it would be in the best interest of the parties to explore whether a Non-Hearing Resolution might be feasible."

[45]

302.    While Dr. Abraham, through counsel, explored the possibility of a Non-Hearing Resolution, a Non-Hearing resolution could not be reached.

## K.    Dr. Abraham Relinquishes His Clinical Privileges and Faculty Appointment at TJUH.

303.    By December, 2018, Dr. Abraham had exhausted his savings, and he was in a financially unsustainable position. As noted above, Dr. Abraham was pressured by TJUH into administrative leave in June, 2018; Dr. Abraham was likewise suspended from Rothman Orthopedics.

304.    Additionally, given the flawed, gender-biased conduct of TJU and its agents in this matter, Dr. Abraham feared that any Title IX hearing would have a pre-determined finding of responsibility.

305.    By email dated December 21, 2018, Dr. Abraham, maintaining his innocence and reserving all rights, relinquished his faculty appointment and clinical privileges at TJU/TJUH as well as any institution in which TJU/TJUH had a controlling interest.

306.    In his December 21, 2018 email, addressed to TJU counsel, TJUH President, Rich Webster, Dr. Alex Vaccaro, and CEO of the Rothman Institute, Mike West, Dr. Abraham again indicated that i) he had a complaint against Roe and ii) Roe's complaint against him was retaliatory. Dr. Abraham again stated that neither complaint had been addressed.

307.    Dr. Abraham, in his December 21, 2018, email correspondence, complained and outlined TJU's gender-biased handling of the disciplinary matter against him.  Dr. Abraham again noted the following conduct[6] suggesting gender bias:

> a) Dr. Abraham made multiple attempts to report i) his allegations of Roe's misconduct against him and ii) that Roe's filing of a complaint against him was retaliatory. Dr. Abraham attempted to report Roe's conduct to Dr. Alex Vaccaro,

---

[6] This list is by way of example, not limitation.

[46]

Dr. Jim Purtill, and to his Title IX advisor, Ms. Fogerty.  TJU ignored his reports; no further action was taken.

b) Roe filed a false criminal report against Dr. Abraham. Due to the pendency of the criminal investigation, Dr. Abraham under advice of criminal defense counsel declined to participate in a Title IX interview until the criminal matter was resolved. Nonetheless, Dr. Abraham, through his private investigator, had collected evidence material to the Title IX Investigation.[7]

c) TJU accorded preferential treatment to Roe, due solely to her gender. Dr. Abraham noted, on information and belief, that TJU failed to investigate another claim of sexual misconduct made against Roe, stemming from her conduct on June 23-24, 2018 at Dr. Abraham's party towards another TJUH employee. Dr. Abraham likewise alleged that TJU failed to investigate patient safety concerns that had been raised in connection to Roe. Dr. Abraham also alleged that Roe had previously filed a false complaint.

308.    As previously noted, at all times relevant herein, Dr. Abraham was also a partner at Rothman Orthopaedics.

309.    Dr. Abraham relinquished his clinical privileges and his faculty appointment TJU/TJUH as well as at any institution in which TJU/TJUH had a controlling interest with the understanding that he would be able continue his employment at his prior level at any Rothman Orthopaedics office, that was not majority-owned by TJU/TJUH, at least until Roe  concluded her residency program.  At the time of Dr. Abraham's relinquishment of his clinical privileges and faculty appointment from TJU/TJUH, no other restrictions were discussed.

**L.    <u>January 8, 2019 Termination of the Title IX Investigation Against Dr. Abraham.</u>**

310.    On January 8, 2019, Dr. Abraham received a letter from the Title IX Coordinator, Ms. Gingold, indicating that TJU was terminating its processing of Roe's Title IX Complaint.

311.    Ms. Gingold indicated that Dr. Abraham's relinquishment of his faculty appointment and clinical privileges at TJU/TJUH had been reported to the Title IX Office.

---

[7] As noted, because TJU closed the investigation without fairly allowing Dr. Abraham a chance to participate, Dr. Abraham was not allowed to submit this evidence.

312.    The letter noted that since Dr. Abraham's separation from TJU represented the highest form of relief that would have been available under applicable TJU policies, there was no need for a hearing or further disciplinary inquiry or action.

313.    No findings of responsibility were made against Dr. Abraham in connection with Roe's complaint.

314.    Ms. Gingold's letter made no mention of Dr. Abraham's complaint against Roe, or Dr. Abraham's allegation that Roe's complaint against him was retaliatory in nature.

**M.**    **Following the Closure of the Title IX Investigation, TJU/TJUH Interfered With and Continues to Harm Dr. Abraham's Medical Practice and Business Relationship with Rothman Orthopaedics.**

315.    In January, 2019, Dr. Abraham returned to employment through his business relationship with Rothman Orthopaedics.  At all times relevant to this Complaint, Dr. Abraham was a partner at Rothman Orthopaedics.

316.    Dr. Abraham's relationship with Rothman Orthopaedics was contractual in nature.

317.    At all times relevant herein, TJU/TJUH through its agents and employees, were aware of Dr. Abraham's business relationship with Rothman Orthopaedics.

318.    As outlined below, TJU/TJUH, through the actions of their agents/employees, have intentionally harmed Dr. Abraham's medical practice and his business relationship with Rothman Orthopaedics.

319.    As a partner with Rothman Orthopaedics, Dr. Abraham must meet a certain productivity quota.  If he does not make this quota, a financial penalty may be imposed.

320.    Due to TJU/TJUH's improper handling of the Title IX matter as described herein, as well as improper conduct during and after Dr. Abraham's leave of absence from TJUH, Dr. Abraham was not able to meet his Rothman productivity quota for 2019.

[48]

321.    As noted above, the only restriction discussed at the time that Dr. Abraham relinquished his clinical privileges and faculty appointment at TJU/TJUH was that Dr. Abraham would not see any patients at any Rothman Orthopaedics office that was majority owned by TJU/TJUH at least until Roe's residency graduation.

322.    At all times relevant herein, Rothman Orthopaedics had approximately twenty-two offices, two of which were majority owned by TJU/TJUH. As Dr. Abraham understood it, he would have access to approximately twenty offices.

323.    Upon returning to employment at Rothman Orthopaedics, however, unwarranted and unjust restrictions, with no end dates, were placed upon Dr. Abraham. On information and belief, such restrictions originated with TJU/TJUH, and were implemented to placate TJU/TJUH.

324.    Dr. Abraham was suddenly restricted from seeing patients in any Rothman Orthopaedics office that contained TJU/TJUH orthopedic medical residents, forcing him to move out of the region where he had built his outstanding reputation for ten years.

325.    Instead of having the choice of approximately twenty offices available to him, in January, 2019, Dr. Abraham was told that only approximately three offices were available.

326.    This restriction is detrimental to the success of Dr. Abraham's practice. Dr. Abraham must maintain offices in locations that are central, allowing relatively easy access to patients coming from various locations.

327.    Dr. Abraham was wrongfully banned from 2019 TJUH Residency Graduation, in which several of the residents whom he personally taught for several years graduated. He was likewise wrongfully banned from all residency events.

328.    In addition to causing significant reputational harm, the actions of TJU/TJUH and its agents, have resulted and will continue to result in widespread economic harm. Upon graduation, residents become a major source of patient referrals.

329.    Dr. Abraham was prohibited from attending 2019 Resident Research Day, in which Dr. Abraham's studies are typically presented. Attendance at this event is mandated by Dr. Abraham's Rothman Orthopaedics practice.

330.    TJU/TJUH likewise has taken no measures to protect Dr. Abraham from continued retaliatory behavior from Roe.

331.    On or about February 18, 2019, on information and belief, Roe complained to Dr. Purtill, TJUH's Residency Program Director, that she was worried about seeing Dr. Abraham's name on the attendance board for "grand rounds[8]" lecture, when he logged into the same remotely. Further, on information and belief, Roe claimed that she would suffer "PTSD" (Post Traumatic Stress Disorder) upon seeing Dr. Abraham's name on the attendance board.

332.    On information and belief TJU/TJUH took no steps to verify Roe's claim of suffering "PTSD;" to determine whether Roe's claim against Dr. Abraham was retaliatory in nature, or to arrive at a response that protected both Dr. Abraham's and Roe's respective interests. Rather, on information and belief, Dr. Purtill informed Dr. Vaccaro, Dr. Abraham's supervisor, of Roe's complaint.

333.    Dr. Abraham was required by his Rothman Orthopaedics practice to log in to "grand rounds."

---

[8] "Grand Rounds" is a "formal meeting at which physicians discuss the clinical case of one or more patients." https://www.medicinenet.com/script/main/art.asp?articlekey=40370 (last accessed April 25, 2020).

334.    In response to these unsubstantiated allegations, however, Dr. Vaccaro prohibited Dr. Abraham from viewing the "grand rounds" lectures. These lectures constitute a critical component of Dr. Abraham's continuing medical education.

335.    TJU/TJUH's actions, as described herein, were taken in spite of the fact that no finding of responsibility was ever made against Dr. Abraham in connection to Roe's Title IX complaint.

336.    TJU/TJUH's actions, as described herein, have resulted in enduring professional harm since *inter alia* they have impacted Dr. Abraham's ability to pursue continuing medical education necessary to maintain his professional license/certifications as well as his customary level of field expertise.

## N.    Additional Harm to Dr. Abraham

337.    Dr. Abraham has suffered severe and irreparable harm, including without limitation economic harm, reputational harm, harm to his career, and emotional distress, due to the conduct of the Defendants named herein.

338.    Dr. Abraham's reputational harm is significant. Prior to the events described herein, Dr. Abraham's reputation was unblemished.  He was an accomplished surgeon, without any prior disciplinary infractions.

339.    Dr. Abraham depends on his reputation to attract patient referrals.

340.    Dr. Abraham has been labeled a "rapist" which has and will continue to harm his reputation going forward.

341.    Moreover, Dr. Abraham has been socially ostracized and has suffered widespread humiliation as a result of the events described in this Complaint.

342.     Dr. Abraham has also suffered quantifiable economic harm due to TJU/TJUH's mishandling of the disciplinary matter described herein.

343.     As noted, in June, 2018, Dr. Abraham was wrongfully pressured by TJUH into taking an administrative leave.

344.     From June, 2018 through December, 2018, Dr. Abraham was forced to exhaust his savings.

345.     During Dr. Abraham's wrongful administrative leave, TJU/TJUH's agents and employees misrepresented Dr. Abraham's status to physicians seeking to refer patients to Dr. Abraham and to existing patients seeking Dr. Abraham's services. Patients were told that Dr. Abraham had left TJUH and could not see them; patients were then referred to other doctors. Referring physicians were told that Dr. Abraham was no longer seeing patients at TJUH.

346.     TJU/TJUH's misrepresentations concerning Dr. Abraham's administrative leave directly caused a steep decline in Dr. Abraham's referral base and patient volume.

347.     As a direct result of TJU's mishandling of the disciplinary matter described herein, Dr. Abraham's patient base was significantly reduced.

348.     As a result of TJU/TJUH's unwarranted restrictions and continuing interference in Dr. Abraham's practice as described above, Dr. Abraham continues to suffer economic harm, including lost earnings and an inability to rebuild his patient base.

349.     As a result of the Defendants' wrongful conduct as described in this Complaint, Dr. Abraham has suffered and continues to suffer from mental pain and anguish, including without limitation, symptoms of anxiety, depression, "PTSD," and suicidal ideation.

350.    Defendants' wrongful conduct as described in this Complaint has resulted in both immediate and long-term economic harm.  Dr. Abraham has suffered lost earnings as well as harm to his future earning potential.

**O.    Climate Concerning Sexual Assault at TJU and TJUH.**

351.    As discussed, universities such as TJU and medical residency programs such as the one at TJUH have enacted victim-centered policies and procedures for resolution of sexual assault complaints.

352.    In doing so, these schools were guided by the now-rescinded April, 2011 Dear Colleague Letter, the threats of OCR investigations, Title IX lawsuits and the ultimate penalty--rescission of federal funds.

353.    Even following the rescission of the April, 2011 Dear Colleague Letter, TJU/ TJUH continued to selectively enforce its victim-centered policies in a gender biased manner that impermissibly denied males accused of sexual assault due process.

354.    As is evidenced in Dr. Abraham's case, TJU's policies and procedures are applied with gender bias against males accused of sexual assault.

355.    In recent years, and during the pendency of Dr. Abraham's disciplinary proceeding, TJU has faced scrutiny from OCR as well as significant pressure to make findings of responsibility against males accused of sexual assault due to two open OCR complaints dealing with alleged Title IX infractions. Both OCR complaints were commenced on May 15, 2017. *See* https://projects.propublica.org/graphics/civil-rights-violations#13737 (noting that the issues being investigated in these two complaints are, respectively, "Title IX- Admissions" and "Title IX Retaliation") (last accessed June 7, 2020).

[53]

356.    TJU and TJUH faced pressure to selectively enforce its sexual misconduct policy against males and to find against males accused of sexual misconduct due to pressure from the #MeToo Movement, Times Up HealthCare Movement, and negative publicity concerning sexual harassment of female medical students. *See generally* August 3, 2019, "#MeToo Meets Medicine: Philly Doctors fight sex harassment, pay gaps by joining Time's Up Healthcare, available at https://www.inquirer.com/business/times-up-healthcare-sexual-harassment-gender-medicine-doctors-nurses-20190803.html (noting that "Thomas Jefferson University this year ousted Charles Pollack, head of Jefferson's Lambert Center for marijuana research, after he self-reported sexually harassing a subordinate.")

357.    In June, 2018, i.e. at the time that Dr. Abraham's disciplinary proceeding was commenced, a report published by the National Academies of Science, Engineering and Medicine (NASEM) on sexual harassment gained media attention.

358.    The NASEM report found that sexual harassment in academia was more common among engineering and medical students than students in non-STEM fields. (*See* M. Thielking, "Sexual Harassment is Rampant in Science – and current Policies Aren't Cutting It, Landmark Report Finds" June 12, 2018, available at https://www.statnews.com/2018/06/12/sexual-harassment-science-nasem-report/)

359.    The media has highlighted statistics concerning sexual harassment of female medical students, putting pressure on institutions such as TJU/TJUH to appear "tough" on males accused of sexual assault. *See id.* ("In one survey, nearly half of female medical students said they had been harassed by faculty or staff"); *see also* August 3, 2019 "#MeToo Meets Medicine: Philly Doctors fight sex harassment, pay gaps by joining Time's Up Healthcare, available at https://www.inquirer.com/business/times-up-healthcare-sexual-harassment-gender-medicine-

[54]

doctors-nurses-20190803.html (quoting the same statistic: "In one survey for the [NASEM] report, almost half of female medical students reported being harassed by faculty or staff.")

360.    The media is likewise critical of how universities including TJU/ TJUH have handled sexual harassment.  *See id.* (noting "it's critical for colleges to do more than just comply with the laws such as Title IX and Title VII, which have led to policies and procedures that might protects [sic] universities but don't do much to stop harassment.")

361.    The Times Up Healthcare movement is committed to eradicating sexual harassment, including sexual assault in healthcare. The Time Up Healthcare website states the following:

> Sexual harassment and gender discrimination have no place in health care. Women make up nearly 80 percent of the health care workforce, but only 20 percent of the decision makers — including hospital leadership, executives, and association presidents — are women. And sexual harassment and gender discrimination run rampant: Researchers estimate that 50 percent of female medical students will experience harassment before they even graduate. That's unacceptable.

https://timesupfoundation.org/work/times-up-healthcare/ (last accessed June 7, 2020).

362.    Leaders of the Times Up Healthcare movement have openly criticized TJU for its handling of alleged sexual misconduct, namely the sexual misconduct allegations of Dr. Charles Pollack.   Dr. Pollack self-reported sexual harassment of his subordinate. As reported by the Philadelphia Inquirer, Esther Choo, MD, a founding member of Time's Up Healthcare stated the following of Pollack: "These people fail upward. It's not just that he kept a career going, but he had positions of prestige," said Choo. "It's called 'passing the trash.' Why can't we just take out the trash?" (*See* August 3, 2019 "#MeToo Meets Medicine: Philly Doctors fight sex harassment, pay gaps by joining Time's Up Healthcare, available at https://www.inquirer.com/business/times-up-healthcare-sexual-harassment-gender-medicine-doctors-nurses-20190803.html)

363.     In June, 2019, TJU/TJUH pledged its commitment to the core statements of Times Up Healthcare, including that "sexual harassment and gender inequity has no place in the healthcare workplace." (*See* TJU Pledge Letter, available at https://timesupfoundation.org/wp-content/uploads/2019/11/tuh-sig-jefferson.png)

364.     It is amidst this pressure and in this charged environment that the flawed and gender-biased proceeding against Dr. Abraham took place, with TJU/TJUH operating, on information and belief, in fear of negative publicity that could arise if TJU/TJUH did not demonstrate that it was "tough" on males accused of sexual assault.

365.     In addition to the foregoing, during the period in question, Dr. Abraham's superiors made gender-biased statements towards him. By way of example, not limitation, on August 20, 2018, Dr. Alex Vaccaro told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged Dr. Abraham from making any such claim.

366.     On information and belief, Defendants were responding to pressure faced from the TJU/TJUH's leadership, from media, and from movements such as #MeToo and Times Up Healthcare when they conducted a superficial, gender-biased investigation against Dr. Abraham and ignored Dr. Abraham's complaint of Roe's sexual misconduct toward him as well as his complaint that Roe's complaint against him was retaliatory.

367.     Upon information and belief, it was in part because of fears of another OCR investigation, and bad publicity, that Defendants conducted a superficial, gender-biased investigation against Dr. Abraham and ignored Dr. Abraham's complaint of Roe's sexual misconduct toward him as well as his allegation that Roe's complaint against him was retaliatory.

368.     Plainly, Defendants did not want a situation in which they could be perceived as ignoring the complaints of women on campus.

[56]

369.    Upon information and belief, Defendants have repeatedly conducted gender-biased investigations, applied unfair procedures, and imposed disproportionate sanctions against male accused of misconduct.

**COUNT I**
**(Violation of Title IX of the Education Amendments of 1972)**
**(Selective Enforcement)**
**(Against Thomas Jefferson University and Thomas Jefferson University**
**Hospitals, Inc.)**

370.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

371.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

372.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

373.    Defendant TJUH's residency program is an "educational program" under Title IX of the Education Amendments of 1972. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3d. Cir. 2017) (finding hospital residency program to be an "educational program" under Title IX of the Education Amendments of 1972).

374.    Defendants TJU and TJUH receive federal funding. The total amount of federal funding received by Defendants is not publicly available.

375.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a

motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

376.    Title IX prohibits sex discrimination against employees of universities and educational programs that receive federal funding- its protections are not limited to students.

377.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018) (emphasis added).

378.    The "prompt and equitable" procedures that a school must implement include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed; Application of the procedure to complaints alleging harassment . . .; [and] *[a]dequate, reliable, and impartial investigation of complaints*, including the opportunity to present witnesses and other evidence." Dep't of Ed., Office for Civ. Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20 (emphasis added).

379.    According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must accord "due process to both parties involved." *Id.* at 22.

380.    According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

381.    Defendants TJU and TJUH violated Title IX through gender-biased selective enforcement in Plaintiff's case. *See Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994)

[58]

(selective enforcement claim asserts "that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.") *Accord Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 824 (E.D. Pa. 2017) ( "… a plaintiff can state a claim for selective enforcement by alleging that 'the [university's] actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings.'" (internal citations omitted)

382.    To state a claim for selective enforcement, a male plaintiff must allege: i) "that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [educational institution]," and ii) "particular circumstances suggesting that gender bias was a motivating factor behind the inconsistency" *Id.* (internal quotation marks and internal citations omitted).

383.    At all points relevant herein, Defendants TJU and TJUH operated as agents of one another. As described in the Complaint, the operations of Defendants TJU and TJUH are substantively consolidated.

384.    Defendants engaged in selective enforcement under Title IX because they treated Jane Roe differently than Dr. Abraham under the Sexual Misconduct Policy.

385.    As set forth in detail above, while TJU investigated Roe's complaint against Dr. Abraham, at no point did TJU or TJUH investigate Dr. Abraham's complaint against Roe for sexual misconduct, i.e. non-consensual sexual intercourse. TJU and TJUH likewise failed to investigate whether Roe's complaint against Dr. Abraham was retaliatory.

[59]

386.    As discussed, prior to Roe lodging her false complaint against him, Dr. Abraham first reported his complaint that Roe had engaged in nonconsensual sexual intercourse with him, then attempted to extort him, to his supervisor, Dr. Alex Vaccaro, on June 26, 2018.

387.    On information and belief, Roe only lodged her complaint against Dr. Abraham in retaliation, after the extortion attempt failed and after learning from R.P. that Dr. Abraham had already initiated a complaint against her for sexual misconduct.

388.    As discussed above, on June 26, 2018, Dr. Vaccaro told Dr. Abraham to directly report his Complaint to the Jefferson Orthopedic Residency Program Director, Dr. Jim Purtill. Despite calling Dr. Purtill directly, and sending Dr. Purtill a text message on June 26th, requesting his immediate attention to a resident problem, Dr. Abraham never heard back from Dr. Purtill.

389.    On information and belief, Dr. Purtill and Dr. Vaccaro are mandatory reporters under TJU's Title IX Policy. (*See* Policy "VI. Initial Procedures" "2. Non-Confidential Reporting.").

390.    On June 27, 2018, as set forth above, Dr. Abraham met with TJUH Chief Medical Officer, Dr. Ed Pribitkin.  Dr. Abraham attempted to report Roe's misconduct to Dr. Pribitkin, but Dr. Pribitkin refused to listen.

391.    On information and belief, Dr. Pribitkin was a mandatory reporter under TJU's Title IX Policy. (*See* Policy "VI. Initial Procedures" "2. Non-Confidential Reporting.").

392.    During the course of the Title IX Investigation, Dr. Abraham was assigned a Title IX Advisor, Jennifer Fogerty.

393.    On or about July 6, 2018, Dr. Abraham called Ms. Fogerty and detailed his complaint against Roe for sexual misconduct towards him. Dr. Abraham also expressed to Ms. Fogerty that Roe's complaint against him was retaliatory.

[60]

394.    Ms. Fogerty took no further action concerning Dr. Abraham's complaint for sexual misconduct against Roe or his complaint against Roe for retaliation.

395.    Defendants also engaged in selective enforcement under Title IX because they treated Jane Roe differently than Dr. Abraham under the Sexual Misconduct Policy as follows.

396.    As noted above, in June, 2018, Dr. Abraham was wrongfully pressured by TJUH into taking an administrative leave.  However, despite Dr. Abraham's complaints against Roe, no interim action was ever taken against her.  Roe was allowed to continue with her normal routine at TJUH with no disruption to her pay.

397.    Likewise, even after the Title IX investigation against Dr. Abraham ended without any finding of responsibility against him, TJU and TJUH continued to selectively enforce the Sexual Misconduct Policy against Dr. Abraham and failed to protect Dr. Abraham from continued retaliatory behavior from Roe.

398.    On or about February 18, 2019, on information and belief, Roe complained to Dr. Purtill, TJUH's Residency Program Director, that she was worried about seeing Dr. Abraham's name on the attendance board for "grand rounds" lecture, when he logged into the same remotely. Further, on information and belief, Roe claimed that she would suffer "PTSD" (Post Traumatic Stress Disorder) upon seeing Dr. Abraham's name on the attendance board.

399.    On information and belief TJU/TJUH took no steps to verify Roe's claim of suffering "PTSD;" to determine whether Roe's claim against Dr. Abraham was retaliatory in nature, or to arrive at a response that protected both Dr. Abraham's and Roe's respective interests. Rather, on information and belief, Dr. Purtill informed Dr. Vaccaro, Dr. Abraham's supervisor, of Roe's complaint.

400.     In response to these unsubstantiated allegations, Dr. Vaccaro prohibited Dr. Abraham from viewing the "grand rounds" lectures. These lectures constitute a critical component of Dr. Abraham's continuing medical education.

401.     Particular circumstances suggest that gender-bias was a motivating factor in the inconsistent treatment of Jane Roe and Dr. Abraham.  Facts sufficient to plead the existence of this bias and its connection to Defendants' selective enforcement of the Sexual Misconduct Policy have already been alleged in the Complaint in detail and include, without limitation, the following:

    a.  Dr. Abraham's superiors made gender-biased statements towards him. By way of example, not limitation, on August 20, 2018, Dr. Alex Vaccaro told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged Dr. Abraham from making any such claim.

    b.  On information and belief, TJU and TJUH's administration and leadership exercised pressure, ideological and otherwise, to find males responsible for accusations of sexual misconduct, even where the evidence suggested otherwise.

    c.  To date, TJU has never allowed Dr. Abraham to review: i) the investigation report, ii) Roe's initial complaint to the Title IX Office; iii) any evidence collected by the Title IX investigator; and iv) any witness statements collected by the Title IX investigator. TJU proffered no basis written in the Policy to support its withholding of any of the above information or documents.

    d.  TJU performed a superficial, flawed investigation of Roe's complaint. Defendant failed to pursue potentially exculpatory information on behalf of Dr. Abraham. The investigation was concluded without allowing Dr. Abraham a full and fair opportunity to provide a statement, to present over twenty-nine material witnesses along with witness statements, and to offer other evidence on his behalf, such as the threatening voicemail left by R.P., Roe's husband.

    e.  On information and belief, Roe filed a prior false complaint, which TJU either failed to consider entirely or did not appropriately consider as part of its investigation against Dr. Abraham.  The existence of a prior false complaint is an important factor to be considered in evaluating Roe's credibility, reliability, and motive in the Title IX investigation against Dr. Abraham.

    f.  As detailed in the Complaint, TJU failed to appropriately investigate demonstrable falsities in Roe's account, such as the claim that Roe had

"bruises" following the sexual encounter on June 23, 2018. On information on belief, TJU either made no attempt to contact any operating room staff members to question them about whether they observed any bruising on Roe on June 25, 2018, or inappropriately disregarded the testimony of operating staff members on this topic. On information and belief, TJU requested no surveillance video from June 25, 2018 to determine the veracity of Roe's claims of bruising.

g.  On information and belief, TJU did not review or request Roe's contemporaneous social media posts or messages to determine whether Roe discussed the events at issue either publicly or privately, or to test the credibility of Roe's narrative of the events in question.

h.  On information and belief, Roe's credibility was not appropriately assessed in TJU's investigation. Because Dr. Abraham was never allowed to review TJU's Investigation Report, he has no knowledge of how Roe's credibility was evaluated in this matter. Dr. Abraham was not provided with a full and fair opportunity to present his statement in this matter, witnesses or other evidence on his behalf. Without this information, Roe's credibility could not have been appropriately evaluated.

i.  On information and belief, Defendants failed to investigate another complaint of sexual misconduct against Roe, made by V.D., another guest at Dr. Abraham's party on the night of June 23, 2018. On information and belief, a report was made about Roe's nonconsensual sexual contact with V.D. to TJU's Human Resources Department as well as to TJUH's Chief Medical Officer Ed Pribitkin.

402.  This disparate treatment of Roe and Dr. Abraham in this matter was a result of gender bias and a clear act of sex discrimination.

403.  In addition, the external pressure faced by Defendants to credit female claims of sexual assault and to prove that TJU and TJUH were tough on perpetrators of sexual violence is another circumstance suggesting that gender bias was a motivating factor in the inconsistent treatment of Roe and Dr. Abraham.

404.  As discussed, universities such as TJU and medical residency programs such as the one at TJUH have enacted victim-centered policies and procedures for resolution of sexual assault complaints.

405.    In doing so, these schools were guided by the now-rescinded April, 2011 Dear Colleague Letter, the threats of OCR investigations, Title IX lawsuits and the ultimate penalty-- rescission of federal funds.

406.    Even following the rescission of the April, 2011 Dear Colleague Letter, TJU/ TJUH continued to selectively enforce its victim-centered policies in a gender biased manner that impermissibly denied males accused of sexual assault due process.

407.    As is evidenced in Dr. Abraham's case, TJU's policies and procedures are applied with gender bias against males accused of sexual assault.

408.    In recent years, and during the pendency of Dr. Abraham's disciplinary proceeding, TJU has faced scrutiny from OCR as well as significant pressure to make findings of responsibility against males accused of sexual assault due to two open OCR complaints dealing with alleged Title IX infractions. Both OCR complaints were commenced on May 15, 2017. *See* https://projects.propublica.org/graphics/civil-rights-violations#13737 (noting that the issues being investigated in these two complaints are, respectively, "Title IX- Admissions" and "Title IX Retaliation") (last accessed June 7, 2020).

409.    TJU and TJUH faced pressure to selectively enforce its sexual misconduct policy against males and to find against males accused of sexual misconduct due to pressure from the #MeToo Movement, Times Up HealthCare Movement, and negative publicity concerning sexual harassment of female medical students. *See generally* August 3, 2019, "#MeToo Meets Medicine: Philly Doctors fight sex harassment, pay gaps by joining Time's Up Healthcare, available at https://www.inquirer.com/business/times-up-healthcare-sexual-harassment-gender-medicine-doctors-nurses-20190803.html (noting that "Thomas Jefferson University this year ousted Charles

[64]

Pollack, head of Jefferson's Lambert Center for marijuana research, after he self-reported sexually harassing a subordinate.")

410.    In June, 2018, i.e. at the time that Dr. Abraham's disciplinary proceeding was commenced, a report published by the National Academies of Science, Engineering and Medicine (NASEM) on sexual harassment gained media attention.

411.    The NASEM report found that sexual harassment in academia was more common among engineering and medical students than students in non-STEM fields. (*See* M. Thielking, "Sexual Harassment is Rampant in Science – and current Policies Aren't Cutting It, Landmark Report Finds" June 12, 2018, available at https://www.statnews.com/2018/06/12/sexual-harassment-science-nasem-report/)

412.    The media has highlighted statistics concerning sexual harassment of female medical students, putting pressure on institutions such as TJU/TJUH to appear "tough" on males accused of sexual assault. *See id.* ("In one survey, nearly half of female medical students said they had been harassed by faculty or staff"); *see also* August 3, 2019, "#MeToo Meets Medicine: Philly Doctors fight sex harassment, pay gaps by joining Time's Up Healthcare, available at https://www.inquirer.com/business/times-up-healthcare-sexual-harassment-gender-medicine-doctors-nurses-20190803.html (quoting the same statistic: "In one survey for the [NASEM] report, almost half of female medical students reported being harassed by faculty or staff.")

413.    The media is likewise critical of how universities including TJU/ TJUH have handled sexual harassment.  *See id*. (noting "it's critical for colleges to do more than just comply with the laws such as Title IX and Title VII, which have led to policies and procedures that might protects [sic] universities but don't do much to stop harassment.")

414.    The Times Up Healthcare movement is committed to eradicating sexual harassment, including sexual assault in healthcare. The Time Up Healthcare website states the following:

> Sexual harassment and gender discrimination have no place in health care. Women make up nearly 80 percent of the health care workforce, but only 20 percent of the decision makers — including hospital leadership, executives, and association presidents — are women. And sexual harassment and gender discrimination run rampant: Researchers estimate that 50 percent of female medical students will experience harassment before they even graduate. That's unacceptable.

https://timesupfoundation.org/work/times-up-healthcare/ (last accessed June 7, 2020).

415.    Leaders of the Times Up Healthcare movement have openly criticized TJU for its handling of alleged sexual misconduct, namely the sexual misconduct allegations of Dr. Charles Pollack.   Dr. Pollack self-reported sexual harassment of his subordinate. As reported by the *Philadelphia Inquirer*, Esther Choo, MD, a founding member of Times Up Healthcare stated the following of Pollack: "These people fail upward. It's not just that he kept a career going, but he had positions of prestige;" "It's called 'passing the trash.' Why can't we just take out the trash?" (*See* August 3, 2019 "#MeToo Meets Medicine: Philly Doctors fight sex harassment, pay gaps by joining Time's Up Healthcare, available at https://www.inquirer.com/business/times-up-healthcare-sexual-harassment-gender-medicine-doctors-nurses-20190803.html)

416.    In June, 2019, TJU/TJUH pledged its commitment to the core statements of Times Up Healthcare, including that "sexual harassment and gender inequity has no place in the healthcare workplace." (*See* TJU Pledge Letter, available at https://timesupfoundation.org/wp-content/uploads/2019/11/tuh-sig-jefferson.png)

417.    It is amidst this pressure and in this charged environment that the flawed and gender-biased proceeding against Dr. Abraham took place, with TJU/TJUH operating, on

[66]

information and belief, in fear of negative publicity that could arise if TJU/TJUH did not demonstrate that it was "tough" on males accused of sexual assault.

418.    On information and belief, Defendants were responding to pressure faced from the TJU/TJUH's leadership, from media, and from movements such as #MeToo and Times Up Healthcare when they conducted a superficial, gender-biased investigation against Dr. Abraham and ignored Dr. Abraham's complaint of Roe's sexual misconduct toward him as well as his allegation that Roe's complaint against him was retaliatory.

419.    Upon information and belief, it was in part because of fears of another OCR investigation, and bad publicity, that Defendants conducted a superficial, gender-biased investigation against Dr. Abraham and ignored Dr. Abraham's complaint of Roe's sexual misconduct toward him as well as his allegation that Roe's complaint against him was retaliatory.

420.    Plainly, Defendants did not want a situation in which they could be perceived as ignoring the complaints of women on campus.

421.    Upon information and belief, Defendants have repeatedly conducted gender-biased investigations, applied unfair procedures, and imposed disproportionate sanctions against male accused of misconduct.

422.    Defendants also engaged in selective enforcement because, upon information and belief, as compared to the number of females accused of sexual misconduct, the number of males whose cases are formally investigated and adjudicated is greater.

423.    To the extent that any females accused were subjected to disciplinary hearings, and found responsible, the sanctions issued were far less severe than those issued to comparable male respondents. These allegations are alleged upon information and belief because Plaintiff was unable to locate any data relating to the gender of students accused of sexual misconduct who were

[67]

formally investigated, found responsible and received sanctions.[9]

424.   However, as alleged by Plaintiff *supra*, Defendants engaged in a Title IX compliance strategy which targeted males and sought more severe discipline against them. This is supported by anecdotal evidence.

425.   Accordingly, TJU and TJUH violated Title IX through gender-biased selective enforcement in Plaintiff's case.

426.   As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding investigation, requiring Defendants to remove any record of the investigation of Roe's complaint and Roe's complaint from Plaintiff's employment file, and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

---

[9] Accordingly, the information that may support these allegations is *exclusively* within TJU and TJUH's possession, custody and control and is not publicly reported. *See Trustees of the U. of Penn.*, 270 F. Supp. at 824 (selective enforcement claim could proceed to discovery even though complaint alleged that comparator information in exclusive possession of university); *Doe v. Brown U.*, 166 F. Supp. 3d 177 (D.R.I. 2016) ("Requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts"); *Ritter v. Oklahoma City U.*, 2016 WL 3982554 at **2-3 (W.D. Okla. July 22, 2016) (allegations of gender bias pled on information and belief met *Twombly* standard).

**COUNT II**
**(Violation of Title IX of the Education Amendments of 1972)**
**(Deliberate Indifference**
**(Against Thomas Jefferson University and**
**Thomas Jefferson University Hospitals, Inc.)**

427.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

428.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

429.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

430.    Defendant TJUH's residency program is an "educational program" under Title IX of the Education Amendments of 1972. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3d. Cir. 2017) (finding hospital residency program to be an "educational program" under Title IX of the Education Amendments of 1972.)

431.    Defendants TJU and TJUH receive federal funding.  The total amount of federal funding received by Defendants is not publicly available.

432.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

433.    Title IX prohibits sex discrimination against employees of universities and educational programs that receive federal funding- its protections are not limited to students.

434.    Defendants TJU and TJUH violated Title IX through deliberate indifference in Plaintiff's case. Under the deliberate indifference theory of liability, a plaintiff must demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 825 (internal quotations and internal citations omitted).  A plaintiff must also establish that the defendant's response to the alleged gender bias was "clearly unreasonable in light of the known circumstances." *Id.* (internal quotations and citations omitted).

435.    Deliberate indifference claims are typically brought where, as here, a school has ignored a victim's complaint of sexual harassment or assault. *See generally Doe v. Brown Univ.* 166 F. Supp. 3d 177, 191 (D.R.I. 2016) (citing to *Marshall v. Ohio Univ.* 2015 WL1179955 at * 8 (S.D. Ohio March 13, 2015) and noting that deliberate indifference claims are usually asserted by a victim against a school or university official who failed to protect him or her from harassment or otherwise address the alleged misconduct).

436.    At all points relevant herein, Defendants TJU and TJUH operated as agents of one another. As described in the Complaint, the operations of Defendants TJU and TJUH are substantively consolidated.

437.    Defendants were deliberately indifferent under Title IX. As set forth in detail above, TJU and TJUH ignored, and failed to investigate, Dr. Abraham's complaint against Roe for sexual misconduct, i.e. non-consensual sexual intercourse. TJU and TJUH likewise ignored, and failed to investigate, whether Roe's complaint against Dr. Abraham was retaliatory.

438.     Defendants' response to alleged gender bias was clearly unreasonable under the circumstances.  Dr. Abraham tried on numerous occasions to report Roe's misconduct. Each time he was ignored.

439.     As discussed, prior to Roe lodging her false complaint against him, Dr.  Abraham first reported his complaint that Roe had engaged in a nonconsensual sexual encounter with him, then attempted to extort him, to his supervisor, Dr. Alex Vaccaro, on June 26, 2018.

440.     On information and belief, Roe only lodged her complaint against Dr. Abraham in retaliation, after the extortion attempt failed and after learning from R.P. that Dr. Abraham had already initiated a complaint against her for sexual misconduct.

441.     As discussed above, on June 26, 2018, Dr. Vaccaro told Dr. Abraham to directly report his Complaint to the Jefferson Orthopedic Residency Program Director, Dr. Jim Purtill. Despite calling Dr. Purtill directly, and sending Dr. Purtill a text message on June 26th, requesting his immediate attention to a resident problem, Dr. Abraham never heard back from Dr. Purtill.

442.     On information and belief, Dr. Purtill and Dr. Vaccaro are mandatory reporters under TJU's Title IX Policy. (See Policy "VI. Initial Procedures" "2. Non-Confidential Reporting.").

443.     On June 27, 2018, as set forth above, Dr. Abraham spoke with TJUH Chief Medical Officer, Dr. Ed Pribitkin.  Dr. Abraham attempted to report Roe's misconduct to Dr. Pribitkin, but Dr. Pribitkin refused to listen.

444.     On information and belief, Dr. Pribitkin was a mandatory reporter under TJU's Title IX Policy. (See Policy "VI. Initial Procedures" "2. Non-Confidential Reporting.").

445.     During the course of the Title IX Investigation, Dr. Abraham was assigned a Title IX Advisor, Jennifer Fogerty.

[71]

446.    Dr. Abraham called Ms. Fogerty and detailed his complaint against Roe for sexual misconduct towards him. Dr. Abraham also expressed to Ms. Fogerty that Roe's compliant against him was retaliatory.

447.    Ms. Fogerty took no further action concerning Dr. Abraham's complaint for sexual misconduct against Roe or his complaint against Roe for retaliation.

448.    As detailed above, on December 21, 2018, Dr. Abraham again indicated in an email to addressed to TJU counsel, TJUH President, Rich Webster, Dr. Alex Vaccaro, and CEO of the Rothman Institute, Mike West, that i) he had a complaint against Roe and ii) that Roe's complaint against him was retaliatory. Dr. Abraham indicated that neither of these issues had been investigated or in any way addressed by TJU/TJUH.  Dr. Abraham further specifically complained that TJU/TJUH's conduct during the disciplinary proceeding had been motivated by a gender bias against him.

449.    All of the officials to whom Dr. Abraham reported his complaints of Roe's misconduct to were in a position to initiate corrective measures, but were deliberately indifferent to Dr. Abraham's reports.

450.    At all times relevant herein the officials to whom Dr. Abraham reported his complaints of Roe's misconduct were acting as agents of Defendants TJU and TJUH.

451.    As a result of Defendants' deliberate indifference to Dr. Abraham's reports of Roe's misconduct, he suffered reputational harm, economic damages including without limitation lost earnings, loss of future earning potential, and mental pain and anguish, including without limitation, symptoms of anxiety, depression, "PTSD," and suicidal ideation.

452.    As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation,

damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding investigation, requiring Defendants to remove any record of the investigation of Roe's complaint and Roe's complaint from Plaintiff's employment file, and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

### COUNT III
### (Violation of Title IX of the Education Amendments of 1972)
### (Retaliation)
### (Against Thomas Jefferson University and
### Thomas Jefferson University Hospitals, Inc.)

453.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

454.     At all points relevant herein, Defendants TJU and TJUH operated as agents of one another. As described in the Complaint, the operations of Defendants TJU and TJUH are substantively consolidated.

455.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

456.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to

Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

457.     Defendant TJUH's residency program is an "educational program" under Title IX of the Education Amendments of 1972. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3d. Cir. 2017) (finding hospital residency program to be an "educational program" under Title IX of the Education Amendments of 1972.)

458.     Defendants TJU and TJUH receive federal funding. The total amount of federal funding received by Defendants is not publicly available.

459.     Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

460.     Title IX prohibits sex discrimination against employees of universities and educational programs that receive federal funding- its protections are not limited to students.

461.     Retaliation by a university or other educational program receiving federal funds against a person engaging in protected activity under Title IX is actionable.  To state a claim for retaliation, a plaintiff must allege that i) he or she engaged in activity protected by Title IX; ii) he or she suffered an adverse action; and iii) there was a causal connection between protected activity and adverse action. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d at 564.

462.     One day after Dr. Abraham reported Jane Roe's alleged sexual misconduct against him, i.e. nonconsensual sexual intercourse, and alleged that Roe's false complaint against him was retaliatory, he was pressured by TJUH into taking a leave of absence.

[74]

463.     As discussed, prior to Roe lodging her false complaint against him, Dr. Abraham first reported his complaint that Roe had engaged in a nonconsensual sexual encounter with him, then attempted to extort him, to his supervisor, Dr. Alex Vaccaro, on June 26, 2018.

464.     On information and belief, Roe only lodged her complaint against Dr. Abraham in retaliation, after the extortion attempt failed and after learning from R.P. that Dr. Abraham had already initiated a complaint against her for sexual misconduct.

465.     As discussed above, on June 26, 2018, Dr. Vaccaro told Dr. Abraham to directly report his Complaint to the Jefferson Orthopedic Residency Program Director, Dr. Jim Purtill. Despite calling Dr. Purtill directly, and sending Dr. Purtill a text message on June 26th, requesting his immediate attention to a resident problem, Dr. Abraham never heard back from Dr. Purtill.

466.     On information and belief, Dr. Purtill and Dr. Vaccaro are mandatory reporters under TJU's Title IX Policy. (See Policy "VI. Initial Procedures" "2. Non-Confidential Reporting.").

467.     On June 27, 2018, TJUH coerced Dr. Abraham into taking a leave of absence.

468.     TJUH Chief Medical Officer, Ed Pribitkin, threatened Dr. Abraham by stating that Dr. Abraham would be suspended and reported to the Medical Staff and the National Practitioner Database ("NPDB") if he did not take an immediate leave of absence.

469.     Dr. Abraham pled with Dr. Pribitkin that the allegation was false and told Dr. Pribitkin that there was another side to the story. Dr. Pribitkin would not listen.

470.     On information and belief, Dr. Pribitkin was at all relevant times herein a mandatory reporter under the Policy.

471.     Under the threat of suspension and reporting to the NPDB, Dr. Abraham felt he had no choice but to capitulate and take a leave of absence.

[75]

472.    Dr. Abraham engaged in activity protected under Title IX when he reported Roe's sexual misconduct towards him, i.e. non-consensual sexual intercourse, and when he alleged that Roe's false complaint against him was retaliatory.

473.    Dr. Abraham suffered adverse action the day after he initially reported these allegations of sexual assault and retaliation, when he was coerced into taking a leave of absence under threat of suspension and reporting to the NPDB.

474.    The unusual temporal proximity between the date of Dr. Abraham's report of the alleged assault and retaliation by Roe and the date that TJUH pressured him into a leave of absence demonstrates a causal connection between the protected activity and the adverse action.

475.    Moreover, Dr. Abraham's coerced leave of absence was part of a pattern of antagonistic behavior by TJU and TJUH that began when he initially reported Roe for misconduct. This pattern included without limitation:

    a.  As noted above, after Dr. Abraham reported Roe's alleged sexual misconduct to his supervisor, Dr. Vaccaro, Dr. Vaccaro directed Dr. Abraham to report the matter to Dr. Purtill, TJUH Orthopedic Residency Program Director. Dr. Purtill refused to return Dr. Abraham's call or respond to his text message on June 26, 2018.

    b.  To date, TJU has never allowed Dr. Abraham to review: i) the investigation report, ii) Roe's initial complaint to the Title IX Office; iii) any evidence collected by the Title IX investigator; and iv) any witness statements collected by the Title IX investigator. TJU proffered no basis written in the Policy to support its withholding of any of the above information or documents.

    c.  TJU was aware that Dr. Abraham was the subject of a then-pending criminal investigation, and used the existence of the same to deprive Dr. Abraham of a full and fair opportunity to participate in the Title IX investigation. When Dr. Abraham requested an extension to prepare his written statement in the Title IX investigation, Title IX Coordinator, Zoe Gingold, denied his request in an email dated October 3, 2018, stating "Jefferson has the obligation to resolve the matter promptly." At that time, however, the matter had already been ongoing for four months and continued for yet another three months after she made this statement.

[76]

    d.   The investigation was concluded without allowing Dr. Abraham a full and fair opportunity to provide a statement, to present over twenty-nine material witnesses along with witness statements, and to offer other evidence on his behalf, such as the threatening voicemail left by R.P., Roe's husband.

    e.   Dr. Abraham's superiors made gender-biased statements towards him. By way of example, not limitation, on August 20, 2018, Dr. Alex Vaccaro told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged Dr. Abraham from making any such claim.

476.    As detailed in this Complaint, the external pressure faced by TJU and TJUH to credit female claims of sexual assault and to prove that TJU and TJUH were tough on male perpetrators of sexual violence is another circumstance suggesting a causal link between Dr. Abraham's protected activity, i.e. reporting Roe's misconduct and retaliation, and the adverse action taken against him. TJU and TJUH faced such pressure from the #MeToo Movement, Times Up Healthcare Movement, and negative publicity concerning the sexual harassment of female medical students.

477.    Additionally, during the pendency of Dr. Abraham's disciplinary proceeding, TJU faced additional pressure due to two open OCR complaints dealing with alleged Title IX infractions. Both OCR complaints were commenced on May 15, 2017. *See* https://projects.propublica.org/graphics/civil-rights-violations#13737 (noting that the issues being investigated in these two complaints are, respectively, "Title IX- Admissions" and "Title IX Retaliation") (last accessed June 7, 2020). On information and belief, TJU and TJUH did not want to have a situation where they could be perceived as ignoring the complaints of women in their educational program.

478.    As a result of Defendants' retaliation, Dr. Abraham suffered reputational harm; economic damages including without limitation lost earnings and loss of future earning potential;

and mental pain and anguish, including without limitation, symptoms of anxiety, depression, "PTSD," and suicidal ideation.

479.    As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding investigation, requiring Defendants to remove any record of the investigation of Roe's complaint and Roe's complaint from Plaintiff's employment file, and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

### COUNT IV
### Breach of Contract
### (Against Thomas Jefferson University and
### Thomas Jefferson University Hospitals, Inc.)

480.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

481.    Under Pennsylvania law, to allege breach of contract, a Plaintiff must allege (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 810 (E.D. Pa. 2017) (internal citations omitted).

482.    TJU / TJUH's Sexual Misconduct Policy constituted a contract between Dr. Abraham and TJU / TJUH.

[78]

483.     Under Pennsylvania law, contracts contain an implied covenant of good faith and fair dealing.

484.     At all points relevant herein, Defendants TJU and TJUH operated as agents of one another. As described in the Complaint, the operations of Defendants TJU and TJUH are substantively consolidated.

485.     As set forth more fully in the Complaint, Defendants breached the implied covenant of good faith and fair dealing as well as at least the following duties to Dr. Abraham, set forth in the provisions of the Sexual Misconduct Policy, in their investigation of the sexual encounter between Dr. Abraham and Roe occurring on the night of June 23, 2018:

   a.  Denying Dr. Abraham a fair and equal opportunity to present written statements, witnesses and other evidence during the investigatory process. (*See* Policy VII "Investigation and Disciplinary Process" at 11).

   b.  Denying Dr. Abraham a fair and equal opportunity (or any opportunity at all) to identify any "significant conflicts" that would affect the timing of the investigation and any potential hearing. (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

   c.  Failing to investigate Dr. Abraham's complaint that Roe had engaged in non-consensual sexual intercourse with him.

   d.  Failing to investigate whether Roe's complaint against Dr. Abraham was retaliatory, given that it occurred, on information and belief, following a failed extortion attempt carried out by Roe and her husband, R.P., against Dr. Abraham.

   e.  Failing to provide Dr. Abraham with a hard copy of, or link to, the specific policies and procedures which were applicable to any hearing in his matter. The failure to provide this information prejudiced Dr. Abraham's ability to weigh his options for the resolution of this matter, i.e. whether to proceed to a hearing or pursue a non-hearing resolution.

   f.  Depriving Dr. Abraham the opportunity to review the investigative report produced by TJU in this matter, Roe's initial complaint to the Title IX Office, as well as any evidence and witness statements collected. There is no written basis in Defendants' Sexual Misconduct Policy for depriving Dr. Abraham of the opportunity to review these materials.

g.  Performing a superficial, flawed, gender biased investigation of Roe's complaint. Defendants failed to pursue potentially exculpatory information on behalf of Dr. Abraham. As detailed in the Complaint, TJU failed to appropriately investigate demonstrable falsities in Roe's account, such as the claim that Roe had "bruises" following the sexual encounter on June 23, 2018.  On information on belief, TJU either made no attempt to contact any operating room staff members to question them about whether they observed any bruising on Roe on June 25, 2018, or inappropriately disregarded the testimony of operating staff members on this topic. On information and belief, TJU requested no surveillance video from June 25, 2018 to determine the veracity of Roe's claims of bruising.

486.    As detailed in the Complaint, Plaintiff has suffered and will continue to suffer substantial economic losses as a result of the direct, proximate, and foreseeable consequence of the foregoing breaches.  Plaintiff has suffered actual and consequential damages, as a result of these breaches.

487.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

**COUNT V**
**Intentional Infliction of Emotional Distress**
**(Against Thomas Jefferson University and**
**Thomas Jefferson University Hospitals, Inc.)**

488.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

489.    At all points relevant herein, Defendants TJU and TJUH operated as agents of one another. As described in the Complaint, the operations of Defendants TJU and TJUH are substantively consolidated.

490.    To state a claim for intentional infliction of emotional distress, a plaintiff must allege: (1) the defendant's conduct was extreme or outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the plaintiff's distress is severe. *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 826–27 (E.D. Pa. 2017) (internal citations omitted).

491.    The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (internal citations omitted).

492.    Collective Defendants' conduct as more fully outlined in the Complaint was extreme, outrageous, and of such character as not to be tolerated by a civilized community, i.e. where the accused is provided no meaningful opportunity to defend himself against false accusations and where complaints of sexual misconduct and retaliation are ignored. Such conduct included but was not limited to:

a)  Repeatedly ignoring Dr. Abraham's attempts to report i) his allegations of Roe's sexual misconduct against him and ii) that Roe's filing of a complaint against him was retaliatory. Dr. Abraham attempted to report Roe's conduct to Dr. Alex Vaccaro, Dr. Jim Purtill, Ed Pribitkin, and his Title IX advisor, Ms. Fogerty. TJU ignored his reports; no further action was taken. On December 21, 2018, Dr. Abraham again indicated in an email to addressed to TJU counsel, TJUH President, Rich Webster, Dr. Alex Vaccaro, and CEO of the Rothman Institute, Mike West, that i) he had a complaint against Roe and ii) that Roe's complaint against him was retaliatory.

b)  Pressuring Dr. Abraham into taking a leave of absence, just one day after Roe had filed her complaint against him and before any substantive investigation of Roe's allegations had occurred. As detailed above, TJUH Chief Medical Officer, Ed Pribitkin, threatened Dr. Abraham by stating that Dr. Abraham would be suspended and reported to the Medical Staff and the National Practitioner Database ("NPDB") if he did not take an immediate leave of absence. By contrast, no interim action was ever taken against Roe, despite Dr. Abraham's allegations against her.

c)  Dr. Abraham's superiors made gender-biased statements towards him. By way of example, not limitation, on August 20, 2018, Dr. Alex Vaccaro told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged Dr. Abraham from making any such claim.

d)  To date, TJU has never allowed Dr. Abraham to review: i) the investigation report, ii) Roe's initial complaint to the Title IX Office; iii) any evidence collected by the Title IX investigator; and iv) any witness statements collected by the Title IX investigator. TJU proffered no basis written in the Policy to support its withholding of any of the above information or documents.

e) TJU performed a superficial, flawed investigation of Roe's complaint. Defendant TJU failed to pursue potentially exculpatory information on behalf of Dr. Abraham. The investigation was concluded without allowing Dr. Abraham a full and fair opportunity to provide a statement, to present over twenty-nine material witnesses along with witness statements, and to offer other evidence on his behalf, such as the threatening voicemail left by R.P., Roe's husband.

f) As detailed in the Complaint, TJU failed to appropriately investigate demonstrable falsities in Roe's account, such as the claim that Roe had "bruises" following the sexual encounter on June 23, 2018. On information on belief, TJU either made no attempt to contact any operating room staff members to question them about whether they observed any bruising on Roe on June 25, 2018, or inappropriately disregarded the testimony of operating staff members on this topic. On information and belief, TJU requested no surveillance video from June 25, 2018 to determine the veracity of Roe's claims of bruising.

g) On information and belief, on or about February 18, 2019, Dr. Abraham was prohibited from viewing "grand rounds" lectures, because Roe claimed that she would suffer "PTSD" upon seeing Dr. Abraham's name on the virtual attendance board, when he logged in remotely. On information and belief, TJU took no steps to verify Roe's claim, determine whether Roe's claim was retaliatory, or to develop a response that protected both Roe and Dr. Abraham. Notably, at the time that Dr. Abraham was barred from viewing "grand rounds," the Title IX investigation had already been terminated with no findings against Dr. Abraham.

h) Failing to comply with the Sexual Misconduct Policy throughout the disciplinary process.

493.    Collective Defendants' conduct as more fully outlined in the Complaint was intentional or reckless.

494.    Defendants' conduct as more fully outlined in the Complaint was for an ulterior motive or purpose, *i.e.,* in an effort to appease Roe, avoid another investigation by OCR concerning TJU's handling of Title IX matters, and to avoid bad publicity concerning the TJU and TJUH's handling of sexual assaults.

495.    Defendants' intentional conduct resulted in severe emotional distress.

496.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered emotional and psychological distress, humiliation and embarrassment, sleeplessness, anxiety,

[82]

depression, suicidal ideation, and other damages that may arise during the course of discovery and the course of trial in this matter. Plaintiff has sought treatment for such symptoms.

**COUNT VI**
**Negligent Infliction of Emotional Distress**
**(Against Thomas Jefferson University and**
**Thomas Jefferson University Hospitals, Inc.)**

497.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

498.    At all points relevant herein, Defendants TJU and TJUH operated as agents of one another. As described in the Complaint, the operations of Defendants TJU and TJUH are substantively consolidated.

499.    TJU / TJUH's Sexual Misconduct Policy constituted a contract between Dr. Abraham and TJU / TJUH.

500.    Under Pennsylvania law, contracts contain an implied covenant of good faith and fair dealing.

501.    Defendants TJU and TJUH owed a contractual duty to Plaintiff to comply with their own policies and procedures, including without limitation the Sexual Misconduct Policy.

502.    Without limitation, Defendants breached their duty to Plaintiff, through following actions and inactions:

a)  Denying Dr. Abraham a fair and equal opportunity to present written statements, witnesses and other evidence during the investigatory process. (See Policy VII "Investigation and Disciplinary Process" at 11).

b)  Denying Dr. Abraham a fair and equal opportunity (or any opportunity at all) to identify any "significant conflicts" that would affect the timing of the investigation and any potential hearing. (See Policy, VII "Investigation and Disciplinary Process" at 11).

c)  Failing to investigate Dr. Abraham's allegation that Roe had engaged in non-consensual sexual intercourse with him.

[83]

d)  Failing to investigate whether Roe's allegation against Dr. Abraham was retaliatory, given that it occurred, on information and belief, following a failed extortion attempt carried out by Roe and her husband, R.P., against Dr. Abraham.

e)  Failing to provide Dr. Abraham with a hard copy of, or link to, the specific policies and procedures which were applicable to any hearing in his matter.  The failure to provide this information prejudiced Dr. Abraham's ability to weigh his options for the resolution of this matter, i.e. whether to proceed to a hearing or pursue a non-hearing resolution.

f)  Depriving Dr. Abraham the opportunity to review the investigative report produced by TJU in this matter, Roe's initial complaint to the Title IX Office, as well as any evidence and witness statements collected.  There is no written basis in Defendants' Sexual Misconduct Policy for depriving Dr. Abraham of the opportunity to review these materials.

g)  Performing a superficial, flawed, gender biased investigation of Roe's complaint. Defendants failed to pursue potentially exculpatory information on behalf of Dr. Abraham. As detailed in the Complaint, TJU failed to appropriately investigate demonstrable falsities in Roe's account, such as the claim that Roe had "bruises" following the sexual encounter on June 23, 2018.  On information on belief, TJU either made no attempt to contact any operating room staff members to question them about whether they observed any bruising on Roe on June 25, 2018, or inappropriately disregarded the testimony of operating staff members on this topic. On information and belief, TJU requested no surveillance video from June 25, 2018 to determine the veracity of Roe's claims of bruising.

h)  On information and belief, on or about February 18, 2019, Dr. Abraham was prohibited from viewing "grand rounds" lectures, because Roe claimed that she would suffer "PTSD" upon seeing Dr. Abraham's name on the virtual attendance board, when he logged in remotely.  On information and belief, TJU took no steps to verify Roe's claim, determine whether Roe's claim was retaliatory, or to develop a response that protected both Roe and Dr. Abraham.  Notably, at the time that Dr. Abraham was barred from viewing "grand rounds," the Title IX investigation had already been terminated with no findings against Dr. Abraham.

503.   Defendants' conduct, i.e. their breaches of duty toward the Plaintiff, was the direct and proximate cause of Plaintiff's immediate and substantial physical harm.  Such harm included, without limitation emotional and psychological distress, humiliation and embarrassment, sleeplessness, anxiety, depression, suicidal ideation, for which Plaintiff has sought medical treatment.

504.     As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff has sustained significant damages, including without limitation severe emotional distress, humiliation and embarrassment, sleeplessness, anxiety, depression, suicidal ideation, and other damages that may arise during the course of discovery and the course of trial in this matter. Plaintiff has sought medical treatment for such symptoms.

**COUNT VII**
**Tortious Interference with Business Relations**
**(Against Thomas Jefferson University and**
**Thomas Jefferson University Hospitals, Inc.)**

505.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

506.     At all points relevant herein, Defendants TJU and TJUH operated as agents of one another. As described in the Complaint, the operations of Defendants TJU and TJUH are substantively consolidated.

507.     To set forth a claim for tortious interference with business relations, a plaintiff must allege: 1) a contractual relationship; 2) the purpose or intent to harm the existing relationship, 3) the absence of privilege or justification on the part of the defendant; and 4) actual damage to plaintiff as a result of defendant's conduct.

508.     At all times relevant herein, Dr. Abraham had a contractual relationship with third party, Rothman Orthopaedics.

509.     Defendants TJU and TJUH at all times relevant herein were aware of Dr. Abraham's contractual relationship with Rothman Orthopaedics. Through their agents and employees, Defendants engaged in purposeful action, specifically intended to harm Dr. Abraham's existing contractual relationship with Rothman Orthopaedics.

510.    Such purposeful action has been recited in detail in this Complaint, but includes without limitation, the following.

511.    In January, 2019, Dr. Abraham was restricted, without any end date, from any Rothman Orthopaedics office that contained TJU/TJUH residents.  On information and belief, this restriction originated with TJU/TJUH, and was implemented to placate TJU/TJUH.

512.     As noted above, the only restriction discussed at the time that Dr. Abraham relinquished his clinical privileges and faculty appointment at TJU/TJUH was that Dr. Abraham would not see any patients at any Rothman Orthopaedics offices that were majority owned by TJU/TJUH at least until Roe's residency graduation.

513.    At all times relevant herein, Rothman Orthopaedics had approximately twenty-two offices, two of which were majority owned by TJU/TJUH. As Dr. Abraham understood it, he would have access to approximately twenty offices upon his return to practice in January, 2019. Due to the above restriction, Dr. Abraham had approximately three offices available to him.

514.    Due to the above restriction, Dr. Abraham was forced to move out of the area that he had built his previously-unblemished reputation for the past ten years, causing a decline in his patient base and patient referrals.

515.    Dr. Abraham was wrongfully banned from 2019 TJUH Residency Graduation, in which several of the residents whom he personally taught for several years graduated. Dr. Abraham was also banned from all subsequent residency graduations and all other residency events.

516.    In addition to causing significant reputational harm, the actions of TJU/TJUH and its agents have resulted and will continue to result in widespread economic harm. Upon graduation, residents become a major source of patient referrals.

517.    Dr. Abraham was likewise banned from 2019 Resident Research Day, in which Dr. Abraham's studies are typically presented. Attendance at this event is mandated by Dr. Abraham's Rothman Orthopaedics practice.

518.    On or about February 18, 2019, on information and belief, Roe complained to Dr. Purtill, TJUH's Residency Program Director, that she was worried about seeing Dr. Abraham's name on the attendance board for "grand rounds" lecture, when he logged into the same remotely. Further, on information and belief, Roe claimed that she would suffer "PTSD" (Post Traumatic Stress Disorder) upon seeing Dr. Abraham's name on the attendance board.

519.    On information and belief TJU/TJUH took no steps to verify Roe's claim of suffering "PTSD;" to determine whether Roe's claim against Dr. Abraham was retaliatory in nature, or to arrive at a response that protected both Dr. Abraham's and Roe's respective interests. Rather, on information and belief, Dr. Purtill informed Dr. Vaccaro, Dr. Abraham's supervisor, of Roe's complaint.

520.    In response to these unsubstantiated allegations, Dr. Vaccaro prohibited Dr. Abraham from viewing the "grand rounds" lectures. These lectures constitute a critical component of Dr. Abraham's continuing medical education.

521.    Notably, at the time that Dr. Abraham was barred from viewing the "grand rounds" lectures, the Title IX investigation had already been terminated with no findings against Dr. Abraham.

522.    In addition to causing significant emotional distress and reputational harm, the actions of TJU/TJUH have interfered with Dr. Abraham's ability to obtain continuing medical education necessary not only for his licensure/certification but also for the maintenance of his customary level of field expertise.

523.    During Dr. Abraham's coerced leave of absence from June, 2018 through December, 2018, TJU/TJUH's agents and employees misrepresented Dr. Abraham's status to physicians seeking to refer patients to Dr. Abraham and to existing patients seeking Dr. Abraham's services. Patients were told that Dr. Abraham had left TJUH and could not see them; patients were then referred to other doctors.  Referring physicians were told that Dr. Abraham was no longer seeing patients at TJUH.

524.    TJU/TJUH's misrepresentations concerning Dr. Abraham's leave of absence directly caused a steep decline in Dr. Abraham's referral base and patient volume.

525.    Collective Defendants' actions were taken without privilege or justification.

526.    As detailed in the Complaint, Plaintiff has suffered and will continue to suffer substantial economic losses as a direct, proximate and foreseeable consequence of collective Defendants' actions.  Plaintiff's economic losses include without limitation, lost earnings, loss of earning potential, loss of patient base and loss of patient referrals.

527.    Plaintiff has suffered actual and consequential damages, as a result of Defendants' conduct.

528.    As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff has sustained significant damages, including without limitation severe emotional distress, humiliation and embarrassment, sleeplessness, anxiety, depression, suicidal ideation, and other damages that may arise during the course of discovery and the course of trial in this matter. Plaintiff has sought medical treatment for such symptoms.

529.    As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff has sustained actual harm to his reputation and is entitled to damages in an amount to be determined at trial for the same.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against

Defendants as follows:

(i)     on the first count of violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Dr. Abraham:

   (a) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, loss of future earning potential, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

   (b) injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding Title IX investigation, requiring Defendants to remove any record of the Title IX investigation of Roe's complaint and Roe's complaint from Dr. Abraham's employment file; and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

(ii)    on the second count of violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Dr. Abraham:

   (a) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, loss of future earning potential, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

   (b) injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding Title IX investigation, requiring Defendants to remove any record of the investigation of Roe's complaint and Roe's complaint from Dr. Abraham's employment file; and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

[89]

(iii)   on the third count of violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Dr. Abraham:

      (a)   damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, loss of future earning potential, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

      (b)   injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding Title IX investigation, requiring Defendants to remove any record of the Title IX investigation of Roe's complaint and Roe's complaint from Dr. Abraham's employment file; and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

(iv)   on the fourth count against Defendants TJU and TJUH for breach of contract, damages, including punitive damages, in an amount to be determined at trial plus pre-judgment interest;

(v)   on the fifth count of Intentional Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)   on the sixth count of Negligent Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)   on the seventh count of Tortious Interference with Business Relations, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, actual damages, consequential damages,  past and future economic losses, loss of future career prospects, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, loss of educational opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

[90]

(viii)   awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff John A. Abraham, MD demands a trial by jury of all issues presented herein that

are capable of being tried by a jury.

**Dated: June 19, 2020**

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**

By:   */s/ Andrew T. Miltenberg*
Andrew T. Miltenberg, Esq.
(*pro hac vice admission pending*)
Stuart Bernstein, Esq.
(*pro hac vice admission pending*)
Cindy Singh, Esq.
(*pro hac vice admission pending*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
csingh@nmllplaw.com

**ROGERS CASTOR**

By:   */s/ Bruce Castor*
Bruce Castor, Jr.
26 E. Athens Avenue
Ardmore, Pennsylvania 19003
(610) 649-1880
bruce@rogerscastor.com

*Attorneys for Plaintiff*

[91]