**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN A. ABRAHAM, M.D., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: 20-cv-02967 (MMB) |
| | : | |
| v. | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY, et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

KLEHR HARRISON HARVEY
BRANZBURG LLP

Dated: August 21, 2020

*/s/ Stephanie D. Wolbransky*
William A. Harvey (No. 25344)
Lisa A. Lori (No. 83814)
Stephanie D. Wolbransky (No. 326356)
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Telephone: (215) 569-2700
Fax: (215) 568-6603
wharvey@klehr.com
llori@klehr.com
swolbransky@klehr.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.     STATEMENT OF ALLEGED FACTS .................................................3

      A.     Background of Abraham And Roe. .............................................3

      B.     The June 23–24, 2018 Sexual Incident Between Abraham And Roe at Abraham's Pool Party..............................................................................4

      C.     Roe's Husband Finds Out About His Wife's "Sexual Encounter" With Abraham, Exhibits Outrage With Abraham, And Abraham Becomes Alarmed And Fears For His Safety.............................................................................5

      D.     TJU's Investigation Into The Events of June 27, 2018 And Abraham's Leave of Absence Pending The Investigation And Voluntary Resignation. ..........8

      E.     Abraham's Instant Complaint Against Jefferson. .....................9

III.     STANDARD OF REVIEW .................................................................10

IV.     ARGUMENT ......................................................................................10

      A.     Abraham's Complaint Should Be Dismissed For Failure To Comply With Fed.R.Civ.P. 8(a). .................................................................10

      B.     Plaintiff's Title IX Claims (Counts I, II and III) Should Be Dismissed for Failure to State Claims. ..............................................................12

            i.     Plaintiff Fails to State A Claim For Selective Enforcement ...............13

            ii.     Abraham Fails to State A Claim For Deliberate Indifference ..................16

                  1.     Abraham Has Not, and Cannot, Allege Jefferson Had Actual Knowledge of Roe's Sexual Misconduct......................................18

                  2.     Abraham Has Not and Cannot Allege That Jefferson Had Control Over The Incident. .........................................................22

                  3.     Abraham Has Alleged No Facts to Show That Jefferson's Response To His Claim Of Sexual Misconduct by Roe Was Clearly Unreasonable In Light Of The Known Circumstances. ....23

            iii.     Plaintiff Fails to State a Claim for Retaliation...........................25

                  1.     Abraham Cannot Allege Any Adverse Action By Jefferson. .........25

i

**2.**     Abraham Has Not, And Cannot, Allege Any Causation. ...............26

**C.**     This Court Should Decline to Exercise Supplemental Jurisdiction Over Abraham's State Law Claims. ...............................................................................29

**D.**     If the Court Decides to Retain Jurisdiction Over the State Law Claims, Plaintiff's Claims Should be Dismissed for Failure to State a Claim.....................................31

**i.**     Abraham Fails To State A Claim For Breach of Contract.........................31

**ii.**     Plaintiff Fails To State A Claim For Intentional Infliction of Emotional Distress.............................................................................................................32

**iii.**     Abraham Fails to State A Claim For Negligent Infliction of Emotional Distress.............................................................................................................34

**1.**     Plaintiff's Claim for Negligent Infliction of Emotional Distress is Barred by the "Gist of the Action" Doctrine ...................................34

**2.**     Abraham's Claim for Negligent Infliction of Emotional Distress Further Fails to State A Claim ......................................................35

**iv.**     Abraham Fails to State A Claim For Tortious Interference with Business Relations. ........................................................................................................36

**V.**     CONCLUSION.........................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................10, 28

*B.W. v. Career Technology Center of Lackawanna Cty.*,
    422 F.Supp.3d 859 (M.D. Pa. 2019)................................................................................17, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................................10, 16

*Black v. Community Education Centers, Inc.*,
    2014 WL 859313 (E.D. Pa. Mar. 4, 2014)............................................................................35

*Bolick v. NE Indus Servs. Corp.*,
    666 F.App'x 101 (3d Cir. 2017) ............................................................................................11

*Bostic v. Smyrna School Dist.*,
    418 F.3d 355 (3d Cir. 2005)..........................................................................................17, 18

*Brejack v. County of Bucks*,
    2004 WL 377675 (E.D. Pa. Jan. 28, 2004) ..........................................................................12

*Burks v. City of Philadelphia*,
    904 F.Supp 421 (E.D. Pa. 1995) ..........................................................................................12

*Checa v. Drexel University*,
    2016 WL 3548517 (E.D. Pa. June 28, 2016) .......................................................................26

*Clarkson v. SEPTA*,
    700 F. App'x 111 (3d Cir. 2017) ..........................................................................................25

*G.C. ex rel. Counts v. North Clackamas School Dist.*,
    654 F. Supp. 2d 1226 (D. Or. 2009) ....................................................................................17

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999)..........................................................................................17, 20, 22, 23

*Denton v. Silver Spring Nursing and Rehabilitation Center*,
    739 A.2d 571 (Pa. Super. 1999)...........................................................................................35

*Doe v. Brandeis Univ.*,
    177 F.Supp.3d 561 (D. Mass. 2016) ....................................................................................33

iii

*Doe v. Columbia College Chicago*,
  933 F.3d 849 (7th Cir. 2019) ....................................................................28

*Doe v. Galster*,
  768 F.3d 611 (7th Cir. 2014) ....................................................................17

*Doe v. Mercy Catholic Medical Center*,
  850 F.3d 545 (3d Cir. 2017)......................................................................14

*Doe v. Miami Univ.*,
  882 F.3d 579 (6th Cir. 2018) ....................................................................13

*Doe v. Princeton Univ.*,
  790 F. App'x 379 (3d Cir. 2019) ..............................................................16

*Doe v. Trustees of Bos. Coll.*,
  892 F.3d 67 (1st Cir. 2018) .......................................................................15

*Doe v. Trustees of the Univ. of Pennsylvania*,
  270 F. Supp.3d 799 (E.D. Pa. 2017) ..........................................13, 15, 24, 33

*Doe v. Univ. of Sciences*,
  961 F.3d 203 (3d Cir. 2020)......................................................................13

*Does v. Southeast Delco School District*,
  272 F. Supp.3d 656 (E.D. Pa. 2017) ..................................................19, 23

*Drysdale v. Woerth*,
  1998 WL 966020 (E.D. Pa. Nov. 18, 1998) ............................................11

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009)......................................................................10

*Frazer v. Temple University*,
  25 F. Supp.3d 598 (E.D. Pa. 2014) ..........................................................26

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998)............................................................................17, 18

*Warren ex rel. Good v. Reading School Dist.*,
  278 F.3d 163 (3d Cir. 2002)......................................................................17

*Gould Elecs., Inc. v. United States*,
  220 F.3d 169 (3d Cir. 2000)......................................................................10

*Greenwood Partners, L.P. v. Cimnet, Inc.*,
  No. 2010-CV-06624-LDD, 2003 WL 22238981 (E.D. Pa. Sept. 26, 2003)...........................29

iv

*Groeber v. Friedman & Schuman, P.C.*,
555 F. App'x 133 (3d Cir. 2014) ........................................................26

*Growth Horizons, Inc. v. Del. County, Pa.*,
983 F.2d 1277 (3d Cir. 1993).......................................................29, 30

*Gruver v. Ezon Products, Inc.*,
763 F.Supp. 772 (M.D. Pa. 1991) .....................................................31

*Gunn v. On The Boarder Acquisitions*,
LLC, 298 F. Supp.3d 811 (E.D. Pa. 2018)....................................25, 26

*Haggerty v. Burkey Mills, Inc.*,
211 F.Supp 835 (E.D.N.Y. 1962) .....................................................35

*Haidak v. University of Massachusetts-Amherst*,
933 F.3d 56 (1st Cir. 2019)...............................................................16

*Harris v. St. Joseph's Univ.*,
2014 WL 1910242 (E.D. Pa. May 13, 2014) ....................................33

*Hoy v. Angelone*,
720 A.2d 745 (Pa. 1998) ..................................................................32

*Huggins v. Coatesville Area Sch. Dist.*,
452 F. App'x 122 (3d Cir. 2011) ......................................................28

*Jones v. Se. Pa. Transp. Auth.*,
796 F.3d 323 (3d Cir. 2015)..............................................................25

*K.T. v. Culver-Stockton College*,
865 F.3d 1054 (8th Cir. 2017) ..........................................................19

*Kazatsky v. King David Memorial Park, Inc.*,
527 A.2d 988 (Pa. 1987) ..................................................................32

*Kollaritsch v. Michigan State University Board of Trustees*,
944 F.3d 613 (6th Cir. 2019) ......................................................19, 21

*Larochelle v. Wilmac Corp.*,
210 F. Supp.3d 658 (E.D. Pa. 2016) .................................................25

*McNeil v. Yale University*,
436 F.Supp.3d 489 (D. Conn. 2020)..................................................23

*MDB v. Punxsutawney Christian Sch.*,
386 F. Supp. 3d 565 (W.D. Pa. 2019)................................................34

v

*Mercy Catholic Med. Ctr.*,
   850 at 564 (3d Cir. 2017) ........................................................................................ 24

*Morosetti v. Louisiana Land & Exlp. Co.*,
   564 A.2d 151 (Pa. 1989) ......................................................................................... 31

*Nagel v. Pocono Med. Ctr.*,
   168 F.R.D. 22 (M.D. Pa. 1996) ............................................................................... 12

*Raines v. Haverford Coll.*,
   849 F.Supp. 1009 (E.D. Pa. 1994) .......................................................................... 31

*Roe v. St. Louis University*,
   746 F.3d 874 (8th Cir. 2014) .................................................................................. 22

*S.K. v. North Allegheny School District*,
   168 F.Supp.3d 786 (W.D. Pa. 2016) ....................................................................... 19

*Saravanan v. Drexel University*,
   2017 WL 5659821 (E.D. Pa. Nov. 24, 2017) ......................................................... 17

*Singletary v. Missouri Department of Corrections*,
   423 F.3d 886 (8th Cir. 2005) .................................................................................. 25

*Swanger v. Warrior Run School District*,
   346 F.Supp.3d 689 (M.D. Pa. 2018) ................................................................. 19, 20

*Tafuto v. N.J. Inst. of Tech.*,
   Civ. A. No. 10-4521, 2011 WL 3163240 (D.N.J. July 26, 2011) ........................... 14

*Tully v. Mott Supermarkets, Inc.*,
   540 F.2d 187 (3d Cir. 1976) ................................................................................... 30

*United Mine Workers v. Gibbs*,
   383 U.S. 715 (1966) ................................................................................................ 30

*United States Healthcare v. Blue Cross of Greater Phila.*,
   898 F.2d 914 (3d Cir.1990) .................................................................................... 36

*Verdu v. Trustees of Princeton*,
   2020 WL 1502849 (D.N.J. March 30, 2020) ..................................................... 14, 15

*Welsh v. Male*,
   2007 WL 906182 (E.D. Pa. Mar. 22, 2007) ........................................................... 12

vi

**Statutes**

15 U.S.C. § 37(b)(1)(B)(i) ....................................................................................................14

20 U.S.C. § 1681(a) ....................................................................................................12, 29

28 U.S.C. § 1367 ...............................................................................................................29

**Other Authorities**

3C Fed. Jury. Prac. & Instr. § 177.36 (5th ed. 2001) .......................................................18

Federal Rule of Civil Procedure 8(a) ..................................................................2, 10, 11, 12

Federal Rule of Civil Procedure 12(b)(6) ...................................................................10, 37

Federal Rule of Civil Procedure 12(f) ...............................................................................11

## I.   INTRODUCTION[1]

This action involves the alleged rape of a female student/resident physician by a male professor/attending physician at a party he hosted at his house; the professor/attending physician's counter-accusation that he, instead, was "sexually assaulted" by the student/resident at his party; and the university's investigation into that incident.  Plaintiff, John A. Abraham, M.D. ("Plaintiff" or "Abraham"), an orthopedic surgeon and former associate professor and attending physician at Thomas Jefferson University ("TJU") in its orthopedic residency program, has sued TJU and Thomas Jefferson University Hospital ("TJUH")[2] for discrimination under Title IX of the Education Amendments of 1972 ("Title IX").[3] Abraham's claims are premised upon an incident that occurred during a pool party he held at his home on the evening and early morning hours of June 23-24, 2018, wherein a resident in Abraham's orthopedic surgery department, Jane Roe ("Roe"), claimed that Abraham raped her at his party.  Abraham, subsequently, claimed that she sexually assaulted him at the party.  Abraham further contends that Roe filed her Title IX complaint with TJU, alleging rape, only after, and in retaliation for, his claim to TJU that she sexually assaulted him and (based on Abraham's paranoia and no facts whosoever), Roe and after her husband allegdly tried to extort money from him.  Abraham contends in his Complaint that TJU violated Title IX because it did not investigate his claim against Roe, and that, in the course of investigating Roe's rape claim against him, TJU conducted a flawed and gender-biased investigation.

Ultimately, Abraham took a leave of absence from his teaching and clinical roles at Jefferson and eventually voluntarily resigned.  As a result of Abraham's voluntary resignation,

---

[1] The facts set forth herein are based on Abraham's allegations in the Complaint, accepting as true all well pled allegations and all reasonable inferences that logically flow from those allegations, solely for purposes of the motion.
[2] TJU and TJUH, collectively, are referred to as "Jefferson."
[3] *See* ECF Doc. No. 1.

TJU dismissed the Title IX matter concerning the June 23-24 incident, prior to scheduling a hearing, with no adverse findings against anyone.

Apparently unhappy that TJU did not take disciplinary action against Roe, Abraham filed the instant 91-page Complaint against Jefferson.  Abraham's 91-page tome includes lengthy dissertations on Title IX, extensive conclusions of law, and unnecessary details of explicit sexual acts. Abraham's Complaint not only violates Federal Rule of Civil Procedure 8(a), it fails to state any plausible claims upon which relief can be granted.

Abraham attempts to assert three claims against Jefferson under Title IX: (i) selective enforcement, (ii) deliberate indifference and (iii) retaliation. Abraham's selective enforcement claim is deficient because Abraham has not alleged the existence of any similarly situated female in the same position as him, who was treated more favorably by Jefferson.  Roe was a student/resident, who accused Abraham, a professor and attending physician, in a position of authority over Roe, of rape. Accordingly, Roe is not similarly situated to Abraham, and his claim, therefore, is defective.

Abraham's deliberate indifference claim, likewise, is defective. Abraham has not, and cannot, allege any facts to support essential elements of the claim. Namely, he cannot allege any facts that show: (i) Jefferson's "actual notice" of sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school;" (ii) that Jefferson's response to the harassment was "clearly unreasonable in light of the known circumstances," or (iii) that Jefferson had any "control" over the specific incident that occurred at Abraham's personal residence, after hours.

Abraham's retaliation claim also is flawed because Abraham fails to allege that he suffered any adverse action, or the existence of a causal connection between a protected activity that he

engaged in and an adverse action taken against him. Accordingly, Abraham's Title IX claims should be dismissed.

Abraham also attempts to assert state law claims against Jefferson for: (i) breach of contract, (ii) intentional infliction of emotional distress, (iii) negligent infliction of emotional distress, and (iv) tortious interference. Since Abraham's Title IX claims—the only claims supporting jurisdiction in this Court— are fatally defective, this Court should decline to exercise supplemental jurisdiction over Abraham's state law claims.   In the event this Court is inclined to retain jurisdiction over Abraham's state law claims, the claims should be dismissed because, they too, fail to state claims upon which relief may be granted.

## II.    STATEMENT OF ALLEGED FACTS

Distilled to its essence, the factual allegations in Abraham's 91-page Complaint, and inferences drawn therefrom, are these:

### A.    Background of Abraham And Roe.

Abraham is a board-certified orthopedic surgeon in the greater Philadelphia area.  Compl., ¶¶3, 121.  Abraham was, and remains, a partner at Rothman Orthopaedic Institute (hereinafter "Rothman"), where he served, and currently serves, as Service Chief of Orthopedic Oncology. *Id*., ¶¶115–16.

In addition to being a partner with Rothman, Abraham had served, on a part time basis, as an Associate Professor of Orthopedic Surgery and Radiation Oncology at TJU.  *Id*., ¶118. Abraham also was an attending physician in Jefferson's orthopedic surgery residency program, where he oversaw resident physicians who were enrolled in Jefferson's residency program and had them "rotate" with him.  *Id*., ¶119.

3

Jane Roe ("Roe") was a resident in Jefferson's orthopedic surgery residency program. *Id.*, ¶123. Although Abraham alleges that he did not supervise Roe as a resident, Roe contended that "she had rotated onto Dr. Abraham's surgical service as a medical student." *Id.*, ¶¶123, 134.

**B.     The June 23–24, 2018 Sexual Incident Between Abraham And Roe at Abraham's Pool Party.**

On June 23, 2018, beginning at 6:00 p.m., Abraham hosted a pool party at his home, which included catered food, a tended bar, and a live band (all paid for by Abraham). *Id.*, ¶¶125, 127. Abraham invited approximately 50 guests to his party, including senior and junior residents, nurses, and physicians from TJUH, one of Abraham's Rothman partners, and a few personal friends of Abraham. *Id.*, ¶126. Abraham's wife and children were not at Abraham's house for the party as Abraham and his wife were in the process of divorcing. *Id.*, ¶128. Roe was among the guests at Abraham's party. *Id.,* ¶130.

According to Abraham, throughout the night, Roe was acting in a sexually suggestive manner, and particularly exhibiting a sexual interest in Abraham. *Id.*, ¶¶131–151, 249. Despite asking Roe to leave, Roe refused; and upon entering his house, Roe walked up to Abraham, "without his affirmative consent, and aggressively kissed Dr. Abraham on the mouth and placed her arms around him." *Id.*, ¶¶152–57. The entire encounter occurred while at least one of Abraham's overnight guests was inside his home. *Id.*, ¶156.

Abraham alleges that he was "inebriated" at this time. *Id.*, ¶158. Despite his "inebriation," Abraham purports to have a precise recollection of his sexual encounter with Roe. For example, Abraham contends that he "attempted to push Roe away [when she kissed him], but he was unable to do so. He told Roe that he did not want to have sexual relations with her, stating 'this isn't a good idea.'" *Id.*, ¶158. Abraham further contends that Roe became even more aggressive, shouting

4

indignantly, "don't you want to F--- me," to which Abraham purportedly responded, "No, that's not a good idea." *Id*., ¶159.   Roe then "forcefully pulled Dr. Abraham to the floor. She lay on her back on an area rug" (Abraham, therefore, was on top of her), and they had sexual intercourse.  *Id*., ¶160–162.  According to Abraham, "[d]uring the intercourse, Roe continued to yell, 'F--- me! F--- me!' Roe moaned loudly and grunted with pleasure. Roe was so loud that one of the overnight house guests, A.D., heard her." *Id*., ¶163. Abraham further contends that, "[t]hroughout the intercourse, Roe kissed and caressed Dr. Abraham's body. She thrust her hips and moved her body in a manner that was pleasurable to her. With her hand, Roe guided Dr. Abraham's penis into her vagina." *Id*., ¶164.

After the intercourse concluded, Abraham claims he felt exhausted and dizzy, and his mind foggy. *Id*., ¶165.  Abraham then went to bed and Roe followed him (or actually led the way). *Id*., ¶166–68.  The next morning, Abraham woke up, apparently hung over from the previous night, while Roe lay naked in his bed, telling him she wanted to have sex with him again. *Id*., ¶¶171–72. Abraham noticed that Roe was wearing a wedding band. *Id*., ¶¶174–75. After Roe confirmed she had a husband, Abraham asked Roe to leave and she complied. *Id*., ¶176.

### C.    Roe's Husband Finds Out About His Wife's "Sexual Encounter" With Abraham, Exhibits Outrage With Abraham, And Abraham Becomes Alarmed And Fears For His Safety.

Three days after the incident, on June 26, 2018, Roe texted Abraham in the morning and asked that he call her.  *Id*., ¶179. When Abraham and Roe spoke, Abraham contends Roe apologized to him "for what she did," and "further stated that the encounter was 'consensual,'" and informed Abraham that she told her husband, R.P.[4], about the sexual encounter, and R.P. was

---

[4] Abraham inappropriately chose to designate Roe's husband in the Complaint by the specific initials "R.P." rather than the pseudonym "Mr. Roe."  Abraham's intentional use of "R.P. is a clear attempt to "out" Roe by having her identity revealed, and to humiliate her among her fellow Jefferson colleagues.

5

"f------ angry." *Id*., ¶¶179–82.  Abraham was "[a]larmed" and "told Roe that he wanted something in writing that the encounter was "consensual." *Id*., ¶183.  Indeed, Abraham fails to allege why he asked Roe to provide a written acknowledgement that the encounter was "consensual" when he alleges that the encounter was <u>not</u> consensual.   Nonetheless, Roe refused to admit that the encounter was "consensual" and stated that her husband wanted to meet Abraham in person" that same day.  *Id*., ¶184. "Fearing for his safety due to R.P.'s anger, Dr. Abraham declined."  *Id*., ¶185. Abraham, subsequently, asked Roe why R.P. needed to meet with him, to which Roe responded, to propose something to "make this better."  *Id*., ¶185.

Based on Roe's response, Abraham believed Roe was suggesting that "Abraham pay off Roe and R.P." and that they were "attempting to manipulate and extort him."  *Id*., ¶186.  As a result, Abraham told Roe that he needed "to make a report to his" supervisor, Dr. Alex Vaccaro, the head of Orthopaedic Surgery at Rothman, and  to "Dr. Jim Purtill, the Residency Program Director at TJUH, and Roe's direct supervisor."  *Id*., ¶¶187, 199.   In response, Abraham claims Roe "raised her voice and said, 'No way! Why would you do that? I don't want my career to be ruined. Can you at least wait until you hear what my husband has to say? He wants to work out a resolution with you, so that you can make this right for us.'" *Id*., ¶188. The Complaint does not allege that Abraham ever told Roe he believed she sexually assaulted him or that he did not consent to their sexual encounter.  Nor does the Complaint allege that Roe ever demanded money from Abraham.

Around 2:30 p.m. that day, Roe's husband, R.P., showed up at Fox Chase Hospital, where Abraham was working, exhibiting "controlled rage," asking to see Abraham. *Id*., ¶¶189–93. Abraham refused to meet with R.P., to which R.P. left Abraham a "threatening voicemail … [that] stated: '…I think I'll give you five minutes … to come out and … talk to me in private. I'd

6

appreciate that and I think it's in your best interest. Think I'll give you the five minutes...." *Id.*, ¶194. "Abraham was shaken by the events of the day and R.P.'s chilling voicemail." *Id.*, ¶195.

Accordingly, later that night, between 5:30 p.m. and 6:00 p.m. on June 26, 2018, Abraham called his supervisor, Dr. Alex Vaccaro. *Id.*, ¶196. Abraham claims to have told Dr. Vaccaro that "Roe had taken advantage of him at his annual party and that she had coerced him into having sexual intercourse. He also reported that R.P. had shown up at Dr. Abraham's workplace and that he believed that R.P. and Roe were trying to extort him." *Id.*, ¶197. "Dr. Vaccaro told Dr. Abraham to discuss the matter with Dr. Jim Purtill." *Id.*, ¶¶198–99.

After speaking with Dr. Vaccaro, Abraham decided to call R.P. that evening on Abraham's way home from Fox Chase Hospital. *Id.*, ¶201. During the call, Abraham alleges that R.P. stated that Roe had told him what happened and she had said it was "consensual;" Abraham further alleges that R.P. mentioned that there were "bruises all over Roe," and that Roe had a tampon inside her at the time of the sexual encounter that had not been removed. *Id.*, ¶¶201–05. Believing Roe's husband was going to demand money from him, Abraham "told R.P. that he would not negotiate with him, that Dr. Abraham had already reported the incident to his chairman, Dr. Alex Vaccaro, and that Dr. Abraham intended to meet the following morning with Dr. Jim Purtill, the residency program director and Roe's direct supervisor." *Id.*, ¶¶207–08. The Complaint does not allege that at any time, Roe's husband demanded or asked for any money from Abraham.

When Abraham arrived home later that night, he tried to reach Dr. Purtill, who did not respond. *Id.*, ¶¶213–214. "Concerned," Abraham called Dr. Vaccaro again. *Id.*, ¶¶215-16. Dr. Vaccaro informed Abraham that Roe had gone directly to Dr. Purtill's home and reported to him that Dr. Abraham had "raped" her. *Id.*, ¶217.

7

**D.      TJU's Investigation Into The Events of June 27, 2018 And Abraham's Leave of Absence Pending The Investigation And Voluntary Resignation.**

On June 27, 2018, Abraham received a Notice of Concern from TJU's Title IX Coordinator, which indicated that the Title IX office had received a report of an incident of "alleged sexual assault" and that the behavior, if substantiated, would constitute a violation of TJU's Sexual Misconduct Policy, and that TJU would be commencing an investigation into the incident. *Id.*, ¶¶222–23, 226.  Abraham alleges that same day, June 27, 2018, TJUH allegedly "pressured" him to take a leave of absence "by stating that Dr. Abraham would be suspended and reported to the Medical Staff and the National Practitioner Databank ("NPDB") if he did not take an immediate leave of absence." *Id.*, ¶¶228--29.  While Abraham "pleaded" that Roe's complaint was false and maintained that "there was another side to the story," Abraham agreed to take a leave of absence from his teaching and clinical duties at TJU.  *Id.*, ¶¶231–232.[5]

On or about July 2, 2018, Roe filed a police report in Lower Merion Township, Montgomery County, accusing Abraham of rape. *Id.*, ¶239.[6]  Because of this police investigation, Abraham decided that he would not submit any written/oral statement or otherwise participate in TJU's Title IX investigation. *Id.*, ¶242.[7]

On October 19, 2018, TJU concluded its investigatory stage of the proceeding regarding "the events of June 23–24, 2018." *Id.*, ¶300.  However, before TJU scheduled any hearing in the

---

[5] While Rothman temporarily suspended Abraham, his employment was never terminated. *Id.* at ¶234.

[6] In November 2018, after a four-month-long investigation by the police, the Montgomery County District Attorney declined to pursue charges against Abraham. *Id.*, ¶241.

[7] Abraham alleged that TJU was "motivated by gender-bias against Dr. Abraham as a male accused of sexual assault," and that "TJU used the existence of the criminal investigation to deprive Dr. Abraham of a full and fair opportunity to participate in the investigation." *Id.*, ¶245.  Abraham based his contention on TJU's denial of a request for an extension of time to prepare a written statement in connection with TJU's investigation (which commenced in June 2018); on October 3, 2018, TJU denied his request, citing to TJU's "obligation to resolve the matter promptly." *Id.*, ¶245.  However, the end of a Title IX investigation does not end the matter, as a hearing would still have to be held to determine a remedy if Abraham or Roe were found responsible.

8

matter, TJU informed Abraham that TJU believed "it would be in the best interest of the parties to explore whether a Non-Hearing Resolution might be feasible." *Id.*, ¶301. Abraham explored this possibility, but no resolution could be reached. *Id.*, ¶302.

On December 21, 2018, prior to TJU scheduling a hearing on the June 23–24, 2018 incident, Abraham voluntarily resigned from his faculty appointment and clinical privileges at TJU/TJUH as well as any institution in which TJU/TJUH had a controlling interest. *Id.*, ¶¶305, 309. Abraham contends he voluntarily resigned because, "given the flawed, gender-biased conduct of TJU and its agents in this matter, Dr. Abraham feared that any Title IX hearing would have a pre-determined finding of responsibility." *Id.*, ¶304. However, the Complaint does not provide any facts to support Abraham's alleged "fear," and rather, appears to be based on speculation and an unwarranted conclusion, particularly given that Abraham chose not to participate in TJU's investigation and that TJU's investigation was of the incident as a whole.

Because of Abraham's voluntary resignation, on January 8, 2019, TJU terminated its processing of Roe's Title IX complaint. *Id.*, ¶¶310–11. No findings of responsibility were made against Abraham or Roe in connection with the matter. *Id.*, ¶313.

In January 2019, Abraham returned to work for Rothman. *Id.* at ¶315. At all times relevant hereto, Abraham remained, and remains, a partner in Rothman. *Id.* at ¶116.

### E.     Abraham's Instant Complaint Against Jefferson.

On June 19, 2020, Abraham filed this seven-count action against Jefferson for: (1) violations of Title IX[8], *see id.* at ¶370–479; (2) breach of contract, *id.* at ¶480–487; (3) intentional infliction of emotional distress, *id.* at ¶488–496; (4) negligent infliction of emotional distress, *id.*

---

[8] Abraham alleges that Jefferson violated Title IX on the following bases: (1) selective enforcement; (2) deliberate indifference; and (3) retaliation.

at ¶497–504; and (5) tortious interference with business relations, *id.* at ¶505–529. For the reasons set forth below, Abraham's claims are deficient and should be dismissed.

## III.   STANDARD OF REVIEW

Jefferson moves to dismiss Abraham's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state claims upon which relief may be granted.   In reviewing a 12(b)(6) motion, the court evaluates the merits of the claims by accepting all allegations in the complaint as true, viewing them in the light most favorable to the plaintiff, and determining whether they state a claim as a matter of law. *Gould Elecs., Inc. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000). A plaintiff's obligation to provide the grounds of his "entitle[ment] to relief requires more than just labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). The court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief' " *Id.* at 211 (quoting *Ashcroft*, 556 U.S. at 679). For a complaint to withstand a motion to dismiss under Rule 12(b)(6), the "[f]actual allegations must be enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true[.]" *Twombly,* 550 U.S. at 555. Thus, the complaint must state more than "naked assertions" devoid of "further factual enhancement." *Ashcroft*, 556 U.S. at 678.

## IV.   ARGUMENT

### A.   Abraham's Complaint Should Be Dismissed For Failure To Comply With Fed.R.Civ.P. 8(a).

Under Federal Rule of Civil Procedure 8(a), a pleading which sets forth a claim for relief shall include a "short and plain statement of the claim showing that the pleader is entitled to relief." In this case, Abraham has filed a 91-page, 529 paragraph Complaint, which includes numerous conclusions of law and purported citation to law. It is clear to Jefferson that Abraham's "novel," disguised as a complaint, is designed to embarrass Jefferson and Roe, to cause Roe public humiliation and to damage her reputation.

The Court has discretion to dismiss or strike a complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure. *Bolick v. NE Indus Servs. Corp.,* 666 F.App'x 101, 103 (3d Cir. 2017) (affirming dismissal of complaint for failure to comply with Rule 8(a)); *see also Drysdale v. Woerth,* 1998 WL 966020, at *2 (E.D. Pa. Nov. 18, 1998) (court dismissed 93 paragraph complaint);. In determining compliance with Rule 8, the complaint must be sufficiently clear that the court or the opposing party need not "forever sift through its pages in search of the nature of plaintiff's claim." *Bolick,* 666 F. App'x at 104. In *Bolick,* the district court dismissed the complaint pursuant to Rule 8 because the defendants were left to "guess what of the many things discussed constituted a specific cause of action against them." *Id.* at 103. The Third Circuit Court agreed, finding the claims were not simple, concise, nor direct, because the complaint was "too voluminous and unfocused to be intelligible." *Id.* at 104.

Abraham's Complaint in this matter is anything but a "short and plain statement showing that the pleader is entitled to relief," as required by Federal Rule of Civil Procedure 8(a)(2), and should be dismissed for this reason alone. Abraham has proffered a lengthy and complex complaint in violation of Rule 8(a), and his failure to conform to this Rule has left Jefferson with the task of dredging through 91 pages and 529 paragraphs, to infer what facts support Abraham's Complaint.

11

As an alternative to dismissing Abraham's Complaint, Jefferson respectfully requests that the Court strike the Complaint under Federal Rule of Civil Procedure 12(f) for going beyond Rule 8(a)(2)'s requirement of a "short and plaint statement." *See Welsh v. Male,* 2007 WL 906182, at *1 (E.D. Pa. Mar. 22, 2007) (court struck complaint containing 71 pages, 128 paragraphs). While motions to strike are generally disfavored, several courts have stricken complaints that were more concise than Abraham's. *Id.* (citing *Coffman v. Wilson Police Dept.,* 739 F.Supp. 257, 262 (E.D. Pa. 1990)); *see also Burks v. City of Philadelphia,* 904 F.Supp 421, 424 (E.D. Pa. 1995) (court struck 36 page, 128 paragraph complaint). Indeed, Abraham's 91-page Complaint contains an extended discussion of the history and background of Title IX and the #MeToo Movement, and a multi-page digression concerning unnecessary, explicit, and boorish detail into the sexual encounter between Abraham and Roe. These are examples of many instances where the Complaint "reads more like a novel than a legal pleading it purports to be." *Burks,* 904 F.Supp. at 424; *see also Brejack v. County of Bucks,* 2004 WL 377675, at *3 (E.D. Pa. Jan. 28, 2004) (45 pages, 216 paragraphs); *Nagel v. Pocono Med. Ctr.,* 168 F.R.D. 22, 23 (M.D. Pa. 1996) (26 pages, 184 paragraphs).

The Court should therefore grant Jefferson's request to dismiss or strike the Complaint. In the event the Court does not dismiss or strike Abraham's Complaint for violating Rule 8(a), Abraham's Complaint should be dismissed for failure to state claims upon which relief may be granted.

**B.     Plaintiff's Title IX Claims (Counts I, II and III) Should Be Dismissed for Failure to State Claims.**

Title IX of the Education Amendments of 1972 provides, in part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance …"  20 U.S.C. § 1681(a). "Because Title IX prohibits ... subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline [when sex] is a motivating factor in the decision to discipline." *Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020) (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)).  Courts recognize several different theories under Title IX, including selective enforcement, deliberate indifference, and retaliation claims.  *See Doe v. Trustees of the Univ. of Pennsylvania*, 270 F. Supp.3d 799, 822 (E.D. Pa. 2017) (citing *Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir. 1994)); *see also Doe v. Miami Univ.,* 882 F.3d 579, 589 (6th Cir. 2018).  Regardless of the theory alleged, to state a claim under Title IX, the alleged facts, if proven true, must support "a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." *Univ. of Sciences,* 961 F.3d at 209.  Plaintiff, however, fails to allege any facts in his 91-page complaint to plausibly infer that Jefferson discriminated against him on the basis of his sex.

### i.        Plaintiff Fails to State A Claim For Selective Enforcement

In Count I of Abraham's Complaint, Abraham attempts to state a claim for selective enforcement, under Title IX.  To state a claim for selective enforcement, a plaintiff must allege that "the [university's] actions against [a male plaintiff] were motivated by his gender <u>and</u> that a similarly situated woman would not have been subjected to the same disciplinary proceedings." *The Trustees of the Univ. of Pennsylvania,* 270 F.Supp. 3d 799, 824 (E.D. Pa. 2017) (citing *Tafuto v. N.J. Inst. of Tech.*, Civ. A. No. 10-4521, 2011 WL 3163240, at *2 (D.N.J. July 26, 2011) (emphasis added).  In support of his selective enforcement claim, Abraham alleges that TJU "treated Jane Roe differently than Dr. Abraham under the Sexual Misconduct Policy" and "TJU investigated Roe's complaint against Dr. Abraham, [but did not] investigate Dr. Abraham's

13

complaint against Roe for sexual misconduct … [or] whether Roe's complaint against Dr. Abraham was retaliatory." Compl., ¶¶384–85.  Abraham's claim fails because, among other deficiencies, Abraham has not alleged, and cannot allege, that he was similarly situated to Roe.[9]

To state a claim for selective enforcement, a male plaintiff must allege that "a female was in circumstances sufficiently similar to his own and was treated more favorably by the [educational institution]." *Tafuto*, 2011 WL 3163240, at *2 (D.N.J. July 26, 2011); *Verdu v. Trustees of Princeton*, 2020 WL 1502849, at *6 (D.N.J. March 30, 2020). Here, Abraham was an Associate Professor and attending physician in TJU's Orthopedic Residency Program.  Compl., ¶¶118-119. Roe, on the other hand, was a resident in Abraham's department, training to be an orthopedic surgeon. *Id.,* ¶123.  Resident physicians are deemed to be students. 15 U.S.C. § 37(b)(1)(B)(i) (A "graduate medical education program" is a "residency program" for "medical education and training."); *see also* Compl., ¶430 (alleging that TJUH's residency program is an educational program); *see also Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 550, 557 (3d Cir. 2017) (finding resident physician was a student as well as an employee). As a result, Roe and Abraham were not similarly situated.

"[W]hen a male professor claims that a university selectively enforced a policy against him, he must identify a female professor who received better treatment even though she 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it.'" *Verdu*, 2020 WL 1502849, at *6 (D. N.J. March 30, 2020) (quoting *Saravanan v. Drexel University*, 2017 WL 5659821, at *6

---

[9] As an initial matter, Abraham was not subject to any disciplinary proceedings.  Rather, Abraham alleged only that TJU commenced an investigation into Roe's allegations, and that on December 21, 2018, he voluntarily resigned from his TJU faculty appointment and clinical privileges, and from any other TJU-affiliated institution, without TJU issuing any adverse finding against him.  Compl., ¶¶305–313.

14

(E.D. Pa. Nov. 24, 2017).   Furthermore, a student is not a proper comparator in a selective enforcement claim brought by a professor against a university.  *Verdu*, 2020 WL 1502849, at *6. This is because the university's "obligations and relationship to [Abraham, a professor/attending physician, and Roe, a student/resident] were fundamentally different." *Id*.

Moreover, Roe - the student - accused Abraham - the professor - of rape (involving penetration) and having bruises on her body.  Compl., ¶¶204, 217.  By Abraham's own admissions in his Complaint, Abraham accused Roe of "tak[ing] advantage of him at his annual party, that she had coerced him into having sexual intercourse," that Roe's husband "had shown up at Dr. Abraham's workplace and that he believed that R.P. and Roe were trying to extort him." *Id*., ¶197. "To consider a student similarly situated, 'the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it.'" *Verdu*, 2020 WL 1502849, at *6 (citing *Saravanan*, 2017 WL 5659821, at *6).   Even if Roe and Abraham are somehow similarly situated, which they are not, and the conduct at issue is similar, which it is not, Abraham's status as profession/attending physician, and Roe's status as a student/resident subordinate to Abraham, constitutes mitigating circumstances that distinguishes their conduct.  As such, Roe and Abraham are not similarly situated.

Furthermore, Plaintiff has not identified any similarly situated female professor or attending physician at Jefferson who was treated differently than Plaintiff in response to claims by residents of sexual assault or rape by attending physicians.  More importantly, to state a claim under Title IX, Plaintiff must show that "gender bias was a motivating factor" in the disciplinary process. *The Trustees of the Univ. of Pennsylvania,* 270 F.Supp. 3d at 824 (citing *Harris v. St. Joseph's Univ.,* 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014); *see also Doe v. Trustees of*

15

*Bos. Coll.*, 892 F.3d 67, 90 (1st Cir. 2018) (quoting *Yusuf*, 35 F.3d at 715).  At most, Abraham has alleged that Jefferson investigated Roe's case instead of his, not because he is a male, but because a professor and attending physician in Jefferson's residency program was alleged to have raped a resident in that program.  *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019).

Abraham simply failed to provide any factual allegations of differential treatment based on gender for attending physicians or faculty members accused of raping residents.  Without any facts alleged, Abraham's claim fails to meet the *Twombly* standard.  Because Abraham has failed to allege any facts to show that the Jefferson treated similarly situated females differently than him, Abraham's claim should be dismissed.

### ii.    Abraham Fails to State A Claim For Deliberate Indifference

In Count II of his Complaint, Abraham attempts to assert a claim for deliberate indifference under Title IX.  To state a claim for deliberate indifference, a plaintiff must allege,  among other things: (1) actual notice of sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school;" ***and*** (2) that the defendant's "response to the harassment ... is clearly unreasonable in light of the known circumstances." *Doe v. Princeton Univ.,* 790 F. App'x 379, 384 (3d Cir. 2019) (citing *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649–650 (1999) ("funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.") The official's response to the alleged gender bias must be clearly unreasonable in light of the known circumstances. *The Trustees*

16

*of the Univ. of Pennsylvania,* 270 F. Supp. at 825 (citing *Doe v. Brown Univ.,* 16 F.Supp. 3d 177, 190–91 (D.R.I. 2016)).

"[D]eliberate indifference claims impose a significant burden on the plaintiff and consequently rarely proceed beyond a motion to dismiss." *Saravanan,* 2017 WL 5659821, at *7. Indeed, deliberate indifference is a high bar because "[s]chool administrators must continue to enjoy the flexibility they require in disciplinary decisions unless their response to harassment is clearly unreasonable." *Doe v. Galster*, 768 F.3d 611, 619 (7th Cir. 2014) (quoting *Davis*, 526 U.S. at 643) (internal quotation marks omitted); *see also G.C. ex rel. Counts v. North Clackamas School Dist.*, 654 F. Supp. 2d 1226, 1238, 1240 (D. Or. 2009) ("the deliberate indifference standard is a high one," and "more stringent" than negligence, "and the [school's] actions are not to be examined in hindsight".).  As the United States Supreme Court stated in *Davis*, "in an appropriate case, there is no reason why courts, on a motion to dismiss, … could not identify a response [of a school] as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Abraham's deliberate indifference claim is based on his allegations that Jefferson ignored, and failed to investigate, his complaint against Roe for sexual misconduct, and failed to investigate whether Roe's complaint against Abraham was retaliatory. Compl. ¶437.  Abraham's claim is fatally defective.[10]

---

[10] As an initial matter, Abraham's deliberate indifference claim appears to be novel. Such claims are not typically brought by senior level employees or professors of academic institutions relating to sexual misconduct committed by students or subordinates. Indeed, it is much more common for allegations of teacher-on-student or student-on-student harassment claims to be asserted under Title IX.  *See* e.g., *Davis*, 526 U.S. 629, 643, 646–47 (U.S. 1999) (student-on-student harassment); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998) (teacher-on-student harassment); *B.W. v. Career Technology Center of Lackawanna Cty.*, 422 F.Supp.3d 859 (M.D. Pa. 2019) (eight consolidated Title IX cases against defendant school districts concerning alleged sexual abuse and harassment of minor male students by one of their teachers); *Bostic v. Smyrna School Dist.*, 418 F.3d 355 (3d Cir. 2005) (former student and parents sued, school district, among others, alleging deliberate indifference to sexual relationship between student and former track coach); *Warren ex rel. Good v. Reading School Dist.*, 278 F.3d 163 (3d Cir. 2002) (mother of minor student, on behalf of student, filed suit against school district under Title IX seeking damages for school teacher's sexual abuse of student).

17

1.     **Abraham Has Not, and Cannot, Allege Jefferson Had Actual Knowledge of Roe's Sexual Misconduct.**

Abraham has not, and cannot, allege requisite elements to maintain a deliberate indifference claim.  It is well established that damages may be recovered for deliberate indifference *only* if "actual notice" of the underlying misconduct was provided to an "appropriate person" of the educational institution, who is "an official [that] has authority to address the alleged discrimination and [can] institute corrective measures" on the school's behalf. *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 277, 290 (1998). "An educational institution has actual knowledge if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Bostic v. Smyrna Sch. Dist.,* 418 F.3d 355, 361 (3d Cir. 2005) (internal quotations omitted) (upholding jury charge instructing that the plaintiff must show "sufficiently substantial danger to students.")

Moreover, actual knowledge "cannot be based upon a mere possibility." *Bostic*, 418 F.3d at 361.  Nor can actual knowledge be based upon "constructive notice or respondeat superior [or negligence principles] to permit recovery under Title IX." *Id.* (citing *Gebser*, 524 U.S. at 285–90). Rather, actual knowledge requires that "an employee who has been invested by the school board with supervisory power over the offending employee ***actually knew of the abuse, had the power to end the abuse, and failed to do so.***"  *Gebser,* 524 U.S. at 280 (emphasis added); *see also Bostic*, 418 F.3d at 361.  "An educational institution has "actual knowledge" if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Id.* (citing 3C Fed. Jury. Prac. & Instr. § 177.36 (5th ed. 2001); *B.W.*, 422 F. Supp.3d at 877 (citing *Bostic,* 418 F.3d at 361).

18

The "actual knowledge" element "requires schools to have more than after-the-fact notice of a single instance in which the plaintiff experienced sexual assault... Rather, a plaintiff must allege that the funding recipient had prior notice of a substantial risk of peer harassment [such as previous similar incidents of assault]"). *K.T. v. Culver-Stockton College*, 865 F.3d 1054, 1058 (8th Cir. 2017) (dismissing deliberate indifference claim on motion to dismiss for lack of adequate notice where claim involved after-the-fact notice of a single instance of sexual assault and finding no pervasive discrimination based on this one instance) (citing *Gebser*, 524 U.S. at 290); *Kollaritsch v. Michigan State University Board of Trustees*, 944 F.3d 613, 623-24 (6th Cir. 2019) (stating "plaintiff must plead, and ultimately prove, an incident of actionable sexual harassment, the school's actual knowledge of it, some ***further incident of actionable sexual harassment***, that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that the Title IX injury is attributable to the post-actual-knowledge further harassment."); *see also Does v. Southeast Delco School District*, 272 F. Supp.3d 656, 688 (E.D. Pa. 2017) (dismissing one case in consolidated action for deliberate indifference where school official did not have prior knowledge of sexual misconduct of teacher until complaint was made to school official, but allowing another case to proceed to trial where multiple prior complaints were made to school against child molester teacher, there was a pattern of abuse, and child abuse continued ***after*** notice provided to school and stating "[t]o prevail [on a claim for deliberate indifference], a plaintiff must prove an appropriate person knew of acts sufficiently indicating a danger of ***future*** abuse.") (emphasis added); *Swanger v. Warrior Run School District,* 346 F.Supp.3d 689, 705, 710 (M.D. Pa. 2018) (entering judgment in favor of school district where school district had no prior notice of sexual harassment before the offending conduct occurred and stating "[t]he Title IX funding recipient's deliberate indifference must

19

subject the students to further harassment, to wit, the indifference must "cause students to undergo harassment or make them liable or vulnerable to it.") (citing *Davis*, 526 U.S. at 644-645 (internal quotations omitted); S.*K. v. North Allegheny School District*, 168 F.Supp.3d 786, 796, 800 (W.D. Pa. 2016) (denying motion to dismiss Title IX claim where repeated reports of harassment were made to principal and superintendent, over the course of several months and despite such notice, harassment continued).

The "actual knowledge" element also includes a causation component, which "require[s] that harassment, or the likelihood or vulnerability of a student to be subjected to it, must occur *subsequent to an official's decision not to remedy a known violation*." *Swanger*, 346 F. Supp.3d at 705 (emphasis added).  As the United States Supreme Court held in *Davis*:

> If a funding recipient does not engage in harassment directly,[11] it may not be liable for damages *unless its deliberate indifference "subject[s]" [i.e., "exposes"] its students to harassment*. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it. … Moreover, because the harassment must occur "under" "the operations of" a funding recipient, see 20 U.S.C. § 1681(a); …, the harassment must take place in a context subject to the school district's control, … These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs.

*Davis,* 526 U.S. at 644–45 (emphasis added) (citations omitted).

Here, Abraham's deliberate indifference claim is based on a single alleged instance of purported sexual misconduct by Roe at Abraham's personal party on June 23-24, 2018 (i.e., her taking "advantage" of him).  However, Abraham alleges no further incidents of sexual misconduct

---

[11] Jefferson is not alleged to have committed the alleged sexual harassment or assault upon Plaintiff directly.

by Roe against him or that Roe ever posed a substantial danger to students.[12]  Indeed, the single incident occurred after hours, off Jefferson's campus, at a party that was planned, paid for, and controlled and hosted exclusively by Abraham at his personal residence.  Abraham chose which guests to invite, and which food and alcohol to serve.  Abraham does not allege—nor could he— that Jefferson in any way organized or had any control over any event during the evening at Abraham's party.  Abraham's after-the-fact notice to Jefferson of Roe's one instance of purported sexual misconduct against him at his personal house party—"notice" that was given only after Abraham became frightened by Roe's husband's conduct, and after Abraham became paranoid and believed he was being manipulated by Roe and her husband— cannot, as a matter of law, satisfy the stringent "actual knowledge" requirement to state a claim for deliberate indifference.

Notwithstanding that Abraham cannot allege any requisite knowledge of Jefferson, Abraham cannot allege any causation.  Abraham has not and cannot allege that he suffered any "further actionable harassment" by Roe after Abraham provided notice, or that the "further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that [Abraham's] Title IX injury is attributable to the post-actual-knowledge further harassment." *Kollaritsch,* 944 F.3d at 623-24.  There simply was "no post-actual-knowledge further harassment" of Abraham (or anyone) by Roe.

To the extent Abraham alleges Jefferson's deliberate indifference is based upon its ignorance to his complaint against Roe, this claim also fails. By Abraham's own admission, Jefferson investigated Roe's allegations "stemming from the ***events of June 23-24, 2018***." Compl.,

---

[12] Abraham alleges that Roe engaged in purported sexually harassing and non-consensual sexual contact with another party guest at the party, "V.D.," by rubbing his legs and nibbling his ear while he was playing the piano. Compl., ¶¶251, 255.  Even if these allegations are true, this type of conduct is not covered by Title IX, as it does not equate to rape or sexual assault, or similar conduct to which Abraham alleged Roe engaged in against him. Indeed, Abraham still fails to allege that Jefferson had the requisite knowledge or notice of this claim ***prior to*** the party.

21

¶300 (emphasis added). Indeed, the investigation into Roe's allegations about Abraham subsumed his allegations against her, since both individuals allege incidents of sexual misconduct against each other that occurred on the same date. In other words, Abraham's sexual assault allegations were his defense against Roe's allegations, and likewise, by bringing a rape claim against Abraham, Roe alleged that she did not consent to the sexual intercourse. For Jefferson to engage in a second investigation of the same incident would be redundant and an exercise in futility. Notably, Jefferson's investigation concluded and Title IX process terminated prior to a hearing, without a finding of guilt against Abraham (as Abraham's voluntary resignation rendered a hearing moot since Abraham was now gone and would no longer threaten to disrupt the educational program in which Roe was participating). *Id.,* ¶313. Further, Jefferson's decision to conclude the Title IX matter involving the June 23-24 incident was based upon Abraham's resignation from the university, not any alleged gender bias. Accordingly, Abraham's claim for deliberate indifference should be dismissed.

### 2. Abraham Has Not and Cannot Allege That Jefferson Had Control Over The Incident.

Abraham's claim is further defective because he cannot allege that Jefferson had any control over the incident, which happened at Abraham's personal residence, after hours, at his pool party that was organized and controlled exclusively by Abraham. The Supreme Court has made it clear that to be liable for deliberate indifference under Title IX, a school must have had control over the situation in which the harassment or rape occurs. *Davis*, 526 U.S. at 645. In Davis, the Supreme Court recognized that where "the misconduct occurs during school hours and on school grounds ... the misconduct is taking place 'under' an 'operation' of the funding recipient." *Id.* at 646. It is "[i]n these circumstances, the recipient retains substantial control over the context in

which harassment occurs." Id. And "in this setting the [educational institution] exercises substantial control over the harasser." Id.

However, where the sexual abuse occurs off-campus, outside of property owned by the school, or during a program not controlled nor sponsored by the school, a plaintiff cannot claim that the school has "control" over the circumstances, and cannot establish a claim for deliberate indifference.  *E.g., Roe v. St. Louis University*, 746 F.3d 874, 884 (8th Cir. 2014)  (finding that university had no control over student conduct that occurred at an off campus party, and therefore, the court dismissed the deliberate indifference claim); *McNeil v. Yale University*, 436 F.Supp.3d 489, 511–12 (D. Conn. 2020) (dismissing Title IX claim that was based on conduct at fraternity parties that occurred off-campus, outside of school hours, and in space and time not under Yale's control).

Here, Abraham claims he was sexually mistreated by Roe at his personal residence, at an after-hours party he hosted for his friends and colleagues, not all of whom were Jefferson employees.  Again, Abraham made all the decisions as to the party and had exclusive control over it.  Jefferson had no control whatsoever over the occurrence of this event at Abraham's home.  More importantly, Abraham has not alleged that he was assaulted within the confines of any property or program controlled by Jefferson.  Accordingly, his claim for deliberate indifference should be dismissed.

### 3.   Abraham Has Alleged No Facts to Show That Jefferson's Response To His Claim Of Sexual Misconduct by Roe Was Clearly Unreasonable In Light Of The Known Circumstances.

Abraham's claim further fails because he has alleged no facts to suggest that Jefferson's response to his claims against Roe were "clearly unreasonable in light of known circumstances." Whether the response was clearly unreasonable may be determined as a matter of law.  *Davis*, 526

23

U.S. at 649. In determining whether a response was clearly unreasonable, courts examine the "apparent gravity of the risk." *Does v. Southeast Delco School District*, 272 F. Supp.3d at 689. Indeed, the Supreme Court made clear that it wanted to preserve flexibility for schools, noting that "courts should refrain from second guessing the disciplinary decisions made by school administrators." *Davis,* 526 U.S. at 648 ("clearly unreasonable" is not a "mere" reasonableness standard").

Here, there are no facts alleged to suggest that Roe posed any risks to students or the Jefferson community.  The facts as alleged by Abraham suggest, at most, that: a resident, who was at Abraham's pool party, likely intoxicated herself, undisputedly had sexual relations with Abraham – a professor/attending physician in her program, and that both Abraham and Roe contend the sexual relations were nonconsensual.  No other instances of sexual misconduct are alleged to have been committed by Roe after her encounter with Abraham.   Under these circumstances, Abraham has not shown that Jefferson's alleged response to his complaint against Roe was clearly unreasonable.

Further, Abraham cannot allege specific facts to support his claim of deliberate indifference based upon gender discrimination, and instead makes only conclusory allegations of gender bias. *See e.g.* Compl., ¶438. In addition to demonstrating that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to the misconduct, a plaintiff must also establish that the defendants' response to the alleged gender bias was "clearly unreasonable in light of the known circumstances." *The Trustees of the Univ. of Pennsylvania,* 270 F. Supp. 3d at 825. Abraham's discussion focuses solely on Jefferson's failure to investigate his sexual misconduct complaints against Roe. Abraham fails to plead any facts to

24

support his contention that Jefferson's response was motivated by any gender bias or "clearly unreasonable" in light of the circumstances. Accordingly, Abraham's claim should be dismissed.

### iii.    Plaintiff Fails to State a Claim for Retaliation.

In Count III of the Complaint, Abraham attempts to allege a cause of action for retaliation under Title IX.  To state a claim for retaliation under Title IX, plaintiff must allege that: (1) he "engaged in activity protected by Title IX," (2) he "suffered an adverse action," and (3) there was a causal connection between the two. *Mercy Catholic Med. Ctr.*, 850 at 564 (3d Cir. 2017).  In analyzing Title IX retaliation claims, Title VII's retaliation framework generally governs.  *Id.*

Abraham's retaliation claim is premised on his allegation that Jefferson retaliated against him by pressuring him to take a leave of absence after he reported Jane Roe's alleged sexual misconduct against him, i.e. nonconsensual sexual intercourse, and after Abraham alleged that Roe's complaint against him was retaliatory.  Compl., ¶¶462, 472–73.  Abraham's claim is legally deficient because, among other things, he cannot allege any adverse action or any causal connection between protected conduct and any (non-existent) adverse action.

### 1.    Abraham Cannot Allege Any Adverse Action By Jefferson.

To state a claim for retaliation, Abraham "must point to an employment action that is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Clarkson v. SEPTA*, 700 F. App'x 111, 115 (3d Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  Here, Abraham contends that Jefferson's purported "pressured" leave of absence constitutes an adverse employment action. Abraham further alleges that he later voluntarily resigned because he did not believe TJU's investigation would be fair.  Neither of these actions can constitute adverse employment actions because administrative leaves of absences and voluntary resignations are not adverse actions.  *See,*

25

*e.g., Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) ("A paid suspension pending

an investigation of an employee's alleged wrongdoing does not fall under any of the forms of

adverse action" under Title VII);  *Singletary v. Missouri Department of Corrections,* 423 F.3d 886,

891-92 (8th Cir. 2005) (finding that placement on administrative leave did not constitute an adverse

action under Title VII); *Larochelle v. Wilmac Corp*., 210 F. Supp.3d 658, 705 (E.D. Pa. 2016)

(dismissing retaliation claim for lack of adverse action because plaintiff voluntarily resigned);

*Gunn v. On The Boarder Acquisitions*, LLC, 298 F. Supp.3d 811 (E.D. Pa. 2018) (finding that

voluntary resignation does not constitute an adverse employment action under Title VII, absent a

claim for constructive discharge[13]); *see also Checa v. Drexel University*, 2016 WL 3548517, at *5

(E.D. Pa. June 28, 2016) ("Our Court of Appeals has not recognized voluntary resignations to be

adverse employment actions") (citing *Schofield v. Metro. Life Ins. Co*., 252 Fed.Appx. 500, 503

(3d Cir.2007)).

Accordingly, because Abraham took an administrative leave of absence and then

voluntarily resigned, he failed to allege any cognizable adverse action.  Accordingly, his claim for

retaliation should be dismissed.

## 2.     Abraham Has Not, And Cannot, Allege Any Causation.

Even if Abraham can allege an adverse employment action, Abraham fails to allege the

requisite causal link between the alleged protected activity and any adverse employment action.

To assert a claim for retaliation under Title IX, "Plaintiff must plead facts sufficient to plausibly

show that [the school] 'retaliated against [him] because [he] complained of sex discrimination.'"

---

[13] Abraham has not asserted a claim for constructive discharge. To assert a claim for constructive discharge, Abraham would have to allege that Jefferson "knowingly permitted a condition of discrimination in employment so intolerable that a reasonable person subject to them would resign."  *Gunn*, 298 F. Supp.3d at 823 (citing *Angeloni v. Diocese of Scranton*, 135 Fed.Appx. 510, 513 (3d Cir. 2005)).

26

*Frazer v. Temple University*, 25 F. Supp.3d 598, 615 (E.D. Pa. 2014) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005).  While the  requisite causal connection sometimes can be demonstrated by showing either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link,'" *Id.* (citation omitted), "the 'mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'" *Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 136 (3d Cir. 2014).

In support of his retaliation claim, Abraham alleges that, "[o]ne day after Dr. Abraham reported Jane Roe's alleged sexual misconduct against him, i.e. nonconsensual sexual intercourse, and alleged that Roe's false complaint against him was retaliatory, he was pressured by TJUH into taking a leave of absence." Compl., ¶462. Thus, Abraham's exclusive basis for inferring retaliation by Jefferson is a temporal one, allegedly based on the fact that Abraham reported sexual misconduct of Roe.  However, Abraham's contention is unavailing.

As an initial matter, based on Abraham's Complaint, Roe provided notice to TJU of Abraham's alleged sexual misconduct <u>before</u> Abraham provided notice to TJU of Roe's alleged sexual misconduct. *See Id.*, ¶¶189–197 (Abraham alleging that, on the evening of June 26, 2018, after Roe's husband contacted Abraham and Abraham became "fearful", Abraham first spoke with Dr. Vaccaro between the hours of 5:30 p.m. and 6:00 p.m., informing him that "Roe had taken advantage of him at his annual party and that she had coerced him into having sexual intercourse" and that Abraham "believed [Roe and her husband] were trying to extort him," to which Dr. Vaccaro responded that Abraham needed to contact Dr. Purtill); *Id.*, ¶¶216–217 (Abraham learning from Dr. Vaccaro, later on June 26, 2018, that Roe previously visited Dr. Purtill at his home that

day and informed Dr. Purtill that Abraham raped her). Abraham's allegation that Roe's complaint against him was retaliatory for his complaint against her is patently false as Roe notified TJU of her claim against Abraham first. Thus, since Roe's complaint came first, it could not have been in retaliation for Abraham's complaint against her.

Moreover, based on these allegations, Abraham cannot plausibly demonstrate that he was "pressured … into taking a leave of absence" because of any sex discrimination or because he engaged in any protected activity (which he alleges was reporting Roe's sexual misconduct and her retaliatory complaint as to his rape of her).  Rather, it is more plausible that, if Abraham was pressured to take a leave of absence at all (which he was not), it was because Jefferson received notice from a student/resident that Abraham – one of its professors and attending physicians in its residency program— was accused of raping a resident—not because Abraham made any complaints to Jefferson. *See Doe v. Columbia College Chicago*, 933 F.3d 849, 857 (7th Cir. 2019) (dismissing retaliation claim on motion to dismiss where there were no facts in complaint to allow an inference that university wanted to retaliate against plaintiff for complaining about harassment, and where plausible inferences showed that discipline occurred because of plaintiff's wrongful behavior); *Huggins v. Coatesville Area Sch. Dist.*, 452 F. App'x 122, 128 (3d Cir. 2011) (rejecting causal connection between protected activity and sexual harassment investigation where investigation was initiated in response to complaints); *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " (quoting *Twombly*, 550 U.S. at 557)). As a university, Jefferson has an obligation to investigate any and all claims of sexual misconduct, regardless of the order in which related claims were made. Regardless of when Abraham's complaint was made in comparison to Roe's complaint, various restrictions would have

28

been put in place, as it is part of the Title IX procedures and protocols. For Abraham to claim that these purported restrictions were only placed upon him because of his gender is unsupported as a matter of law.

Accordingly, because Abraham cannot plausibly allege any causation between his alleged reporting of Roe's sexual assault and her retaliatory complaint against him, and his voluntary leave of absence, Abraham cannot state a claim for retaliation.

### C.    This Court Should Decline to Exercise Supplemental Jurisdiction Over Abraham's State Law Claims.

In Counts IV–VII, Abraham has asserted claims under state law, relating to Jefferson's alleged conduct in connection with the Title IX investigation. *See* Compl., ¶¶480–529.  Outside of Abraham's Title IX claims in Counts I–III, Abraham has asserted no independent basis for federal jurisdiction over any remaining state law claims, as the sole means by which Abraham claims federal jurisdiction in this matter is through his Title IX claims, pursuant to 20 U.S.C. § 1681(a).[14] Should the Court grant Defendants' Motion to Dismiss related to the Title IX claims in Counts I–III, Jefferson respectfully requests that the Court decline to exercise supplemental jurisdiction over Abraham's remaining state law claims, and dismiss such claims.

It is within the Court's discretion to decline to exercise supplemental jurisdiction over Abraham's remaining state law claims. Under 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction. Stated otherwise, a prerequisite to the federal court's exercise of pendent jurisdiction over a plaintiff's state law claims is that at least one claim based on the court's original jurisdiction is before the court. *See* 28 U.S.C. § 1367. When "the district

---

[14] No diversity exists between the parties as they are all "residents" of the Commonwealth of Pennsylvania. Compl., ¶¶22, 24, 26.

29

court has dismissed all claims over which it has original jurisdiction," the district court has the express authority to decline to exercise supplemental jurisdiction over any related state law claims. *Id.*; *see also Growth Horizons, Inc. v. Del. County, Pa.,* 983 F.2d 1277, 1285 (3d Cir. 1993); *Greenwood Partners, L.P. v. Cimnet, Inc.,* No. 2010-CV-06624-LDD, 2003 WL 22238981, at *4 (E.D. Pa. Sept. 26, 2003) ("a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction").  In making this determination, the district court should consider generally accepted principles of "judicial economy, convenience, and fairness to the litigants." *See Growth Horizons, Inc.* 983 F.2d at 1284 (citing *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)). Where these factors are not present, "a federal court should hesitate to exercise jurisdiction over state claims." *Gibbs,* 383 U.S. at 726 (citing *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938)). The Supreme Court further stated that "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* The Third Circuit similarly does not encourage litigation in federal court in the absence of a federal cause of action. *See Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 196 (3d Cir. 1976) (court found that when "a federal claim could be, or has been dismissed . . . the court should ordinarily refrain from exercising supplemental jurisdiction in the absence of extraordinary circumstances").

In this case, the Court should not exercise supplemental jurisdiction over Abraham's state law claims. *Gibbs,* 383 U.S. at 726.  Abraham has not shown extraordinary circumstances to warrant the Court's jurisdiction over the state law claims. Because the lawsuit is only two months old and the parties have yet to engage in discovery, judicial economy weighs in favor of dismissal. Further, all parties reside in or around Philadelphia, and would suffer no inconvenience from the

Court dismissing the state law claims, as Abraham could choose to litigate them in state court in the future. Thus, the Court should be inclined to dismiss Counts IV–VII.

### D. If the Court Decides to Retain Jurisdiction Over the State Law Claims, Plaintiff's Claims Should be Dismissed for Failure to State a Claim

In the event the Court retains supplemental jurisdiction over Abraham's state law claims, Abraham's claims should be dismissed for failure to state claims upon which relief can be granted.

#### i. Abraham Fails To State A Claim For Breach of Contract.

In Count IV, Abraham attempts to assert a claim for breach of contract. Abraham contends that TJU's Sexual Harassment Policy constitutes the contract between him and TJU/TJUH. Compl., ¶482. However, Abraham has failed to include in his Complaint the actual contract between him and TJU that governed. Abraham has further failed to show how TJU's policies formed a binding contract with him, as policies, without more, are not contracts.

In the employment context, for a policy to become part of an employment contract, it must be part of the offer of employment – "an *inducement* to join the company." *Gruver v. Ezon Products, Inc.*, 763 F.Supp. 772, 774 (M.D. Pa. 1991) (court granted defendant's motion to dismiss, in part, because plaintiff failed to plead that a contract for employment, including an anti-sexual harassment term in the handbook, was in existence). It is not sufficient to show only that the company "had a policy. It must be shown that they intended to offer it as a binding contract." *Morosetti v. Louisiana Land & Exlp. Co.,* 564 A.2d 151, 152–53 (Pa. 1989). Accordingly, Abraham's breach of contract claim should be dismissed.[15]

---

[15] Notably, Abraham's claims for breach of contract related to ¶485(c)–(g) do not refer to any subsection of the Policy. If the Court determines that Abraham's breach of contract claim can survive a motion to dismiss, his claims with respect to these subsections are insufficient to state a claim because he fails to reference specific provisions of the Policy in which Jefferson breached. *See Raines v. Haverford Coll.,* 849 F.Supp. 1009 (E.D. Pa. 1994) (citing *Sweeney v. St. Joseph's Hosp.,* 763 F.Supp 747, 751 (M.D. Pa. 1991), *aff'd* 980 F.2d 724 (3d Cir. 1992) (plaintiff's breach of contract claim failed because he did not specify which provisions, policies, practices and procedures defendant violated)). Thus, at the very least, Abraham's breach of contract claim related to ¶485(c)–(g) should be dismissed.

31

ii.    **Plaintiff Fails To State A Claim For Intentional Infliction of Emotional Distress.**

In Count V, Abraham attempts to assert a claim for intentional infliction of emotional distress.  To support such a claim, at a minimum, Abraham must allege conduct of Jefferson that "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *See Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 991-92 (Pa. 1987) ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"). Further, it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress. *Hoy v. Angelone,* 720 A.2d 745, 754 (Pa. 1998) (allegations that support a claim of intentional infliction of emotional distress must rise to a level of conduct that could be described as "the most clearly desperate and ultra-extreme conduct").

Here, Abraham alleges that the following conduct to support his claim:

- Ignoring Abraham's repeated attempts to report i) his allegations of Roe's sexual misconduct and ii) that Roe's filing of a complaint against him was retaliatory;

- Pressuring Abraham into taking a leave of absence;

- Making gender-biased statements towards him [by stating to him that "a man cannot be sexually assaulted by a woman" and discouraged Abraham from making any such claim;

- Not allowing Abraham to review: i) the investigation report, ii) Roe's initial complaint to the Title IX Office; iii) any evidence collected by the Title IX investigator; and iv) any witness statements collected by the Title IX investigator;

- Performing a superficial, flawed investigation of Roe's complaint and failing to pursue potentially exculpatory information on behalf of Abraham;

32

- Failing to appropriately investigate falsities in Roe's account, such as the claim that Roe had "bruises" following the sexual encounter on June 23, 2018;

- On information and belief, prohibiting Abraham from viewing "grand rounds" lectures, because Roe claimed that she would suffer "PTSD" upon seeing Abraham's name on the virtual attendance board;

- On information and belief, taking no steps to verify Roe's claim, determine whether Roe's claim was retaliatory, or to develop a response that protected both Roe and Abraham;

- Failing to comply with the Sexual Misconduct Policy throughout the disciplinary process.

Compl., ¶492.[16]

None of this purported conduct, however, rises to the level of "outrageousness" so as to support a claim for intentional infliction of emotional distress. *The Trustees of the University of Pennsylvania,* 270 F.Supp.3d at 827 (citing *Hoy,* 720 A.2d at 754). In *The Trustees of the University of Pennsylvania,* plaintiff alleged that the university distorted the facts of plaintiff and the complainant's encounter, improperly attacked plaintiff's credibility, unjustifiably branded plaintiff a rapist, threatened plaintiff with expulsion, and ultimately imposed an unfair sanction. *Id.* The court concluded that such conduct, even if objectionable, was not of the type to give rise to a claim for intentional infliction of emotional distress. *Id.; see also Harris,* Civ. A. No. 13-3937, 2014 WL 1910242, at *4 (concluding that complaint failed to allege outrageous conduct sufficient to support a claim for intentional infliction of emotional distress when it alleged that university took disciplinary actions based on false information and falsely portrayed plaintiff as a sex offender); *Doe v. Brandeis Univ.,* 177 F.Supp.3d 561 (D. Mass. 2016) (concluding that complaint failed to allege outrageous conduct sufficient to support a claim for intentional infliction of

---

[16] As set forth in Section (III)E. below, to the extent Abraham's claim is based on provisions of TJU's Policy, his claim is barred by the gist of the action doctrine.

emotional distress when it alleged that university employed unfair and unreasonable procedures in a disciplinary hearing and improperly branded plaintiff a sexual predator). Because Abraham's averments do not exceed the insurmountably high bar required for outrageous conduct, Abraham's claim for intentional infliction of emotional distress should be dismissed.

### iii.    Abraham Fails to State A Claim For Negligent Infliction of Emotional Distress.

In Count VI, Abraham alleges that Jefferson breached its contractual duty to him, as set forth under the Policy. Abraham's claim is fatally flawed and should be dismissed.

### 1.    Plaintiff's Claim for Negligent Infliction of Emotional Distress is Barred by the "Gist of the Action" Doctrine

Abraham's claim for negligent infliction of emotional distress purports to be based on Jefferson's alleged failure to not follow its Policy and investigate his claim against Roe. However, Abraham's breach of contract claim is based on this same purported contract—the Policy. As a result, the gist of the action doctrine bars Abraham's claim.

The "gist of the action" doctrine prevents plaintiffs from recasting ordinary breach of contract claims as tort claims. *MDB v. Punxsutawney Christian Sch.,* 386 F. Supp. 3d 565, 591 (W.D. Pa. 2019) (citing *Hart v. Arnold,* 884 A.2d 316, 339 (Pa. Super. 2005)). "[T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Id.* (quoting *Redevelopment Auth. v. Int'l Ins. Co.*, 685 A.2d 581, 590 (Pa. Super. 1996)). The gist of the action is contractual if "the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts." *Id.* (citing *Bohler-Uddeholm Am., Inc., v. Ellwood Grp., Inc.,*247 F.3d 79, 104 (3d Cir. 2001). The nature of the allegedly breached duty is the decisive factor – "***if the duty would not exist without the contract,***

34

***then the claim sounds in contract alone****.*" *Id.* (citing *Bruno v. Erie Ins. Co.,* 106 A.3d 48, 68 (Pa. 2014) (emphasis added)).

Because Abraham's negligent infliction of emotional distress claim is based on facts underlying the Sexual Misconduct Policy, this scenario falls squarely within the gist of the action doctrine. *See generally* Compl., ¶¶497–504.  Therefore, as a matter of law, Abraham's claim for negligent infliction of emotional distress should be dismissed.

### 2.    Abraham's Claim for Negligent Infliction of Emotional Distress Further Fails to State A Claim

In Pennsylvania:

> The crux of a claim for negligent infliction of emotional distress is that defendant breached some duty they owed to plaintiff and that the breach injured him. Although [plaintiff] alleges that [defendants] "had a duty of care to protect [defendants] from emotional distress," . . . we are unaware of any authority establishing the existence of this duty between an employer and employee. With no articulable duty established, we are reluctant to extend a cause of action for negligent infliction of emotional distress to the instant action.

*Denton v. Silver Spring Nursing and Rehabilitation Center,* 739 A.2d 571, 578 (Pa. Super. 1999). Furthermore, Pennsylvania courts have never acknowledged any duties owed from an employer to an employee. *See Denton,* 739 A.2d at 578; *see also Black v. Community Education Centers, Inc.,* 2014 WL 859313, at *2 (E.D. Pa. Mar. 4, 2014) (no special relationship between employer and employee to support negligent infliction of emotional distress claim).  Instead, it is the employee who owes the employer duties, not the other way around. *Haggerty v. Burkey Mills, Inc.,* 211 F.Supp 835 (E.D.N.Y. 1962) ("It is well settled that an employee owes a duty to his employer to be loyal to his interests and faithfully to devote his time to the promotion of his employer's interests.").  Because Abraham fails to establish the existence of any duty owed from Jefferson to

35

him based on his employment, he fails to state a claim for negligent infliction of emotional distress upon which relief can be granted.  Accordingly, his claim should be dismissed.

### iv. Abraham Fails to State A Claim For Tortious Interference with Business Relations.

In Count VII of Abraham's Complaint, Abraham attempts to state a claim for tortious interference with business relations. To establish a claim for tortious interference, a plaintiff must plead: (1) the existence of an existing or prospective contractual relationship between plaintiffs and a third party; (2) intent on the part of defendants to harm the plaintiffs by interfering with this relationship; (3) absence of privilege or justification for such interference; and (4) actual harm or damage to plaintiffs as a result of defendants' conduct. *United States Healthcare v. Blue Cross of Greater Phila.,* 898 F.2d 914, 925 (3d Cir.1990) (citing *Thompson Coal Co. v. Pike Coal Co.,* 412 A.2d 466 (Pa.1979)).

Abraham's claim is based on his contract with Rothman and assertion that Jefferson somehow tortiously interfered with that relationship.  Compl., ¶509.  However, Abraham is still employed by Rothman, and remains a partner there.

Moreover, despite these allegations, Abraham fails to demonstrate how Jefferson "specifically intended to harm Dr. Abraham's existing contractual relationship with Rothman Orthopaedics." *Id.*, ¶509.  More importantly, Abraham fails to make any causal link between Jefferson's alleged conduct and his harm.   Again, Rothman never terminated Abraham, and Abraham's contract and relationship with Rothman remains. *Id.*, ¶116.

To the extent Abraham's claim is based on reduced income because he cannot work at any Jefferson-affiliated hospitals, Abraham has failed to show any absence of privilege or justification by Jefferson. Abraham voluntarily resigned from Jefferson. His resignation ended his relationship

36

with Jefferson and any Jefferson-affiliated entities. Thus, Abraham fails to state a claim upon which relief can be granted.

## V.    CONCLUSION

For the reasons set forth above, Jefferson respectfully requests that the Court dismiss Abraham's Complaint in its entirety, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and grant such other relief as is just and proper.


Date: August 21, 2020                               Respectfully submitted,

                                                    KLEHR HARRISON HARVEY
                                                    BRANZBURG LLP


                                                    */s/ Stephanie D. Wolbransky*
                                                    William A. Harvey (No. 25344)
                                                    Lisa A. Lori (No. 83814)
                                                    Stephanie D. Wolbransky (No. 326356)
                                                    1835 Market Street, Suite 1400
                                                    Philadelphia, PA 19103
                                                    Telephone: (215) 569-2700
                                                    Fax: (215) 568-6603
                                                    wharvey@klehr.com
                                                    llori@klehr.com
                                                    swolbransky@klehr.com

                                                    *Attorneys for Defendants*