**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

----------------------------------------------------------------- x

JOHN A. ABRAHAM, M.D.,                                  :
                                                             :
               Plaintiff,          :          CIVIL ACTION NO.: 20-cv-02967 (MMB)
                                                             :
v.                                                            :
                                                             :
THOMAS JEFFERSON UNIVERSITY, et al.     :
                                                             :
              Defendants,       :
                                                             :

----------------------------------------------------------------- x

**MEMORANDUM OF LAW**
**IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**NESENOFF & MILTENBERG, LLP**
Andrew T. Miltenberg, Esq.
(*pro hac vice admission pending*)
Stuart Bernstein, Esq.
(*pro hac vice admission pending*)
Cindy Singh, Esq.
(*pro hac vice admission pending*)
363 Seventh Avenue, 5th Floor
New York, NY 10001
Phone: (212) 736-4500

**ROGERS CASTOR**
Bruce Castor, Jr., Esq
26 E. Athens Avenue
Ardmore, PA 19003

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 1

A. Jane Roe and Dr. Abraham's Sexual Encounter on June 23-24, 2018 ................................. 3

B. After a Failed Attempt to Extort Dr. Abraham and After Dr. Abraham Reports Roe's Sexual Misconduct, Roe Falsely Accuses Dr. Abraham of Rape ......................................... 6

C. June 27, 2018: Dr. Abraham Receives a Notice of Concern, and TJUH Wrongfully Pressures Him Into Taking An Administrative Leave ....................................................... 8

D. The Flawed and Gender Biased Disciplinary Proceeding against Dr. Abraham. ............... 9

ARGUMENT ...................................................................................................... 11

I. LEGAL STANDARD. ........................................................................................ 11

II. PLAINTIFF SUFFICIENTLY ALLEGES HIS CLAIMS OF TITLE IX SEX DISCRIMINATION ........................................................................................... 15

A. The Law Concerning Title IX Discrimination Claims. ........................................... 15

B. The Allegations of the Complaint Support a Plausible Inference that Defendants Discriminated Against Dr. Abraham on the Basis of Sex ........................................ 17

C. Plaintiff Sufficiently Alleges a Selective Enforcement Claim, although this Doctrinal Test is No Longer Controlling in the Third Circuit. ............................................. 21

D. Plaintiff Sufficiently Alleges a Deliberate Indifference Claim, although this Doctrinal Test is No Longer Controlling in the Third Circuit. ............................................. 27

i.    Legal Standard ......................................................................................... 27

ii.   Defendants Had Actual Notice of the Misconduct ....................................... 29

iii.  Defendants Are Still Liable Under Title IX for Off-Campus Misconduct. .......................................................................................... 31

iv.   Plaintiff has Sufficiently Alleged the Causation Element ............................ 33

v.    Plaintiff has Sufficiently Alleged that Defendants' Response was Clearly Unreasonable in Light of the Circumstances. ...................... 34

III     Plaintiff Sufficiently Alleges Retaliation. ...................................................... 35

IV.     Principles of Equity and Judicial Economy Require this Court Retain Jurisdiction over Plaintiff's State Law Claims. ........................................................................ 38

V.      Plaintiff Sufficiently Alleges His Breach of Contract Claim. ....................................... 39

VI.     Plaintiff Sufficiently Alleges His Claim for Intentional Infliction of Emotional Distress ................................................................................................... 41

VII.    Plaintiff Sufficiently Pleads His Claim for Negligent Infliction of Emotional Distress. .................................................................................................. 42

VIII.   Plaintiff Sufficiently States A Claim for Tortious Interference with Business Relations ................................................................................................ 45

IX.     If the Court Dismisses Any Claim, Such Dismissal Should Be without Prejudice. ....... 47

CONCLUSION ........................................................................................................... 47

## <u>TABLE OF AUTHORITIES</u>

Cases

*Arista Records, LLC v. Doe 3,*
  604 F.3d 110 (2d Cir. 2010) .................................................................... 13, 22
*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................... 13
*Bell Atl. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................... 12, 13
*Bolick v. NE Indus,*
  *Serv. Corp.* 666 F. App'x 101 (3d Cir. 2017) ........................................... 14
*Bostic v. Smyrna Sch. Dist.,*
  418 F.3d 355 (3d Cir. 2005) ....................................................................... 29
*Burlington N. & Santa Fe Ry. Co. v. White,*
  548 U.S. 53 (2006) ............................................................................... 35, 36
*Cheney v. Daily News L.P.,*
  654 F. App'x 578 (3d Cir. 2016) ............................................................... 41
*Cooper v. Menges,*
  541 Fed.Appx. 228 (3d Cir.2013) ............................................................. 36
*Crandell v. New York Coll. of Osteopathic Med.,*
  87 F. Supp. 2d 304 S.D.N.Y. 2000) ..................................................... 31, 32
*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,*
  526 U.S. 629 (1999) ............................................................................. 31, 32
*Dawn L. v. Greater Johnstown Sch. Dist.,*
  586 F. Supp. 2d 332 (W.D. Pa. 2008) ....................................................... 34
*DeLa Cruz v. Piccari Press,*
  521 F. Supp. 2d 424 (E.D. Pa. 2007) ......................................................... 14
*Doe ex rel. Doe v. Coventry Bd. of Educ.,*
  630 F. Supp. 2d 226 (D. Conn. 2009) ........................................................ 33
*Doe v. Amherst Coll.,*
  238 F.Supp.3d 195 (D. Mass. 2017) ..................................................... 24, 26
*Doe v. Baum,*
  903 F.3d 575 (6th Cir. 2018) ................................................................ 17, 18
*Doe v. Brown U.,*
  166 F. Supp. 3d 177 (D.R.I. 2016) ....................................................... 23, 24
*Doe v. Columbia Univ.,*
  831 F.3d 46 (2d Cir. 2016) ................................................................*passim*
*Doe v. Lynn Univ., Inc.,*
  235 F.Supp.3d 1336 (S.D. Fla. 2017) ........................................................ 26
*Doe v. Manor Coll.,*
  No. CV 18-5309, 2020 WL 4756599 (E.D. Pa. Aug. 17, 2020) ................ 28
*Doe v. Mercy Catholic Medical Center,*
  850 F.3d 545 (3d Cir. 2017) ................................................................ 15, 35
*Doe v. Miami Univ.,*
  882 F.3d 579 (6th Cir. 2018) ........................................................ 15, 18, 38

*Doe v. Purdue Univ.*,
  928 F. 3d 652 (7th Cir. 2019)................................................................ 16, 18, 21
*Doe v. Rollins Coll.*,
  352 F. Supp. 3d 1205 (M.D. Fla. 2019) ............................................................. 26
*Doe v. The Trustees of the Univ. of Pennsylvania*,
  270 F. Supp. 3d 799 (E.D. Pa. 2017) .........................................................*passim*
*Doe v. University of the Sciences*,
  961 F. 3d 203 (3d Cir. 2020)......................................................................*passim*
*Doe v. Washington & Lee Univ.*,
  No. 14-CV-00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015)..........................26
*Does v. Se. Delco Sch. Dist.*,
  272 F. Supp. 3d 656 (E.D. Pa. 2017) ........................................................... 29, 30
*Drysdale v. Woerth*,
  1998 WL 966020 (E.D. Pa. Nov. 18, 1998)....................................................... 14
*Fowler v. UPMC Shadyside*,
  578 F.3d 203  (3d Cir. 2009)............................................................................. 12
*Frazer v. Temple Univ.*,
  25 F. Supp. 3d 598 (E.D. Pa. 2014) ................................................................. 36
*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998) ................................................................................... 29, 30
*Gendia v. Drexel Univ.*,
  No. CV 20-1104, 2020 WL 5258315 (E.D. Pa. Sept. 2, 2020)............................. 17
*Greene v. BMW of N. Am.*,
  No. 11-CV-04220 (WJM), 2014 WL 47940 (D.N.J. Jan. 7, 2014)........................ 24
*Gruver v. Ezon Prod., Inc.*,
  763 F. Supp. 772 (M.D. Pa. 1991) .................................................................. 41
*Haidak v. Univ. of Massachusetts-Amherst*,
  933 F.3d 56 (1st Cir. 2019) ............................................................................ 26
*Hedges v. United States*,
  404 F.3d 744 (3d Cir. 2005)............................................................................ 12
*Henderson v. Merck & Co.*,
  998 F. Supp. 532 (E.D. Pa. 1998) ................................................................... 39
*Toney v. Chester County Hospital*,
  36 A.3d 83 (Pa. 2011) ................................................................................... 44
*Kach v. Hose*,
  589 F.3d 626 (3d Cir. 2009) ...................................................................... 38, 39
*Kernaghan v. BCI Commc'ns, Inc.*,
  802 F. Supp. 2d 590 (E.D. Pa. 2011) ............................................................... 45
*Kling v. Univ. of Pittsburgh Med. Ctr.*,
  No. 2:18-CV-01368-CRE, 2020 WL 2832008 (W.D. Pa. May 8, 2020)........................... 43, 44
*Lincoln Ben. Life Co. v. AEI Life, LLC*,
  800 F.3d 99 (3d Cir. 2015).............................................................................. 13
*Lloyd v. City of Bethlehem*,
  No. 02-0830, 2002 WL 31341093 (E.D. Pa. Oct. 16, 2002)................................. 41
*Manor Coll.*,
  No. CV 18-5309, 2020 WL 4756599 ............................................................ 33, 34

*Menaker v. Hofstra Univ.*,
  935 F.3d 20 (2d Cir. 2019)............................................................................... 25

*Moore v. Temple Univ.*,
  No. CV 13-5079, 2016 WL 4061352 (E.D. Pa. July 29, 2016) ................................ 36

*Morosetti v. Louisiana Land & Expl. Co.*,
  522 Pa. 492, 564 A.2d 151 (1989) ................................................................... 41

*Neal v. Colorado State Univ.-Pueblo*,
  No.16-CV-873 (RM) (CBS), 2017 WL 633045 (D. Colo. Feb. 16, 2017) ............................ 26

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*,
  101 F.3d 1492 (3d Cir. 1996)........................................................................... 38

*Noakes v. Syracuse Univ.*,
  369 F. Supp. 3d 397 (N.D.N.Y. 2019) ................................................................. 25

*Phillips v. Cty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008).......................................................................*passim*

*ProCentury Ins. Co. v. Harbor House Club Condo. Ass'n, Inc.*,
  652 F. Supp. 2d 552 (D.N.J. 2009) ................................................................... 12

*Prof'l Cleaning and Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*,
  245 Fed. Appx. 161 (3d Cir. 2007) ................................................................... 47

*Ritter v. Oklahoma City Univ.*,
  No. 16-CV-0438 (HE), 2016 WL 3982554 (W.D. Okla. July 22, 2016).................................. 23

*Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*,
  678 F. Supp. 2d 1008 (E.D. Cal. 2009) ............................................................... 32

*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*,
  511 F.3d 1114 (10th Cir. 2008)........................................................................ 32

*Rouse v. Duke Univ.*,
  914 F. Supp. 2d 717 (M.D.N.C. 2012), aff'd, 535 F. App'x 289 (4th Cir. 2013)..................... 32

*Schwake v. Arizona Bd. of Regents*,
  967 F.3d 940 (9th Cir. 2020)........................................................................... 16

*Tafuto v. New Jersey Inst. of Tech.*,
  No. 10-CV-4521 (PGS), 2011 WL 3163240 (D.N.J. July 26, 2011)..................................... 47

*Wells v. Xavier Univ.*,
  7 F.Supp.3d 746 (S.D. Ohio 2014)...................................................................... 26

*Yusuf v. Vassar Coll.*,
  35 F.3d 709 (2d Cir. 1994)......................................................................... 15, 22

Statutes

20 U.S.C. § 1681 ................................................................................... 15, 16

28 U.S.C. § 1367 ..................................................................................... 38

Rules

Fed. R. Civ. P. 15 .................................................................................... 47

Fed. R. Civ. P. 12 ............................................................................ 1, 12, 14, 40

Fed. R. Civ. P. 8 ................................................................................. 13, 43

## INTRODUCTION

Plaintiff, Dr. John A. Abraham ("Plaintiff" or "Dr. Abraham") brings this action to obtain relief against Defendants Thomas Jefferson University ("TJU") and Thomas Jefferson University Hospitals, Inc. ("TJUH") (collectively "Defendants") based on causes of action for violation of Title IX of the Education Amendments of 1972, breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress, and tortious interference by Defendants with Plaintiff's business relations with Rothman Orthopaedic Institute (hereinafter "Rothman Orthopaedics").

At this stage of the litigation, this Court must *presume all facts to be true and draw all inferences in favor of the non-moving party*. The Complaint sufficiently sets forth factual allegations providing a plausible basis for the causes of action alleged.  For the reasons set forth below, Defendants' motion should be denied.

## STATEMENT OF FACTS

At points, Defendants' rendition of the facts in the Complaint (Def. Mem. at 3-10) impermissibly ignores the standard of review for motions to dismiss made under Federal Rule of Civil Procedure 12(b)(6). On a motion to dismiss, a court "must take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 809 (E.D. Pa. 2017) (internal citations omitted). *Accord Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) ("When assessing the merits of a Rule 12(b)(6) motion, we accept as true all factual allegations in the complaint and view those facts in the light most favorable to the non-moving party"(internal citations omitted)).

In their Statement of Facts, Defendants misstate the factual allegations in the Complaint, claiming, for example, that "TJU's investigation was of the incident as a whole." (Def. Mem. at 9) Dr. Abraham's Complaint plainly alleges that TJU failed to investigate Dr. Abraham's allegations

that Jane Roe[1] engaged in non-consensual sexual intercourse with him on the night in question, and further failed to investigate whether Roe's complaint against him was retaliatory. (Compl. ¶¶ 293-299).  Where, as here, Defendants fail to accept the factual allegations of the Complaint and fail to draw reasonable inferences in Plaintiff's favor, the Court should disregard Defendants' assertions.

A full accounting of the facts underlying Plaintiff's claims can be found in the Complaint (ECF No. 1).  For the court's convenience, following is a summary of the pertinent allegations made in the Complaint.

At the time of the events giving rise to this Complaint, Plaintiff was the Director of the Musculoskeletal Oncology Center for TJUH and Service Chief of Orthopedic Oncology at Rothman Orthopaedics. (Compl. ¶115). Plaintiff held clinical privileges and a faculty appointment at TJUH. (Compl. ¶119). At all points relevant herein, TJU and TJUH operated as agents of each other.  As detailed below, the operations of TJU and TJUH are substantially consolidated. (Compl. ¶¶28-29).

Plaintiff was likewise, at all times relevant herein, a partner at Rothman Orthopaedics. (Compl. ¶116) Plaintiff's relationship with Rothman Orthopaedics was contractual in nature as it was governed by a partnership agreement. *Id.* Prior to the events at issue, Plaintiff was a highly accomplished orthopedic surgeon with no disciplinary history and an unblemished professional reputation. (Compl. ¶¶115-122)

At all times relevant herein, Jane Roe was an Orthopedic Surgery resident physician at TJUH. (Compl. ¶123) Dr. Abraham did not directly supervise Jane Roe.  *Id.*

---

[1] The Complainant is referred to pseudonymously as Jane Roe.

A. **Jane Roe and Dr. Abraham's Sexual Encounter on June 23-24, 2018**

On June 23, 2018, at approximately 6:00 p.m., Plaintiff hosted an annual party at his residence to thank various members of the hospital community, including his operating staff. About 50 guests attended the party, including senior and junior residents, nurses, physicians, one of Plaintiff's Rothman Orthopaedics partners, and a few personal friends. The party included catered food, a tended bar, and a live band. Prior to the commencement of the party, Dr. Abraham instructed the bartender to dilute all of his drinks to approximately "half" strength. Dr. Abraham issued this instruction to ensure that he would not become intoxicated and would be able to carry out his duties as host. (Compl. ¶¶125-129)

Though she was not specifically invited, Jane Roe was among the guests. (Compl. ¶130) Throughout the evening, Roe exhibited unwelcome, sexually aggressive behavior towards Dr. Abraham and other males at the party. (Compl. ¶139) A.D., one of Dr. Abraham's overnight party guests, told Dr. Abraham that "it was very clear that Roe wanted to fuck [Dr. Abraham]." Dr. Abraham told A.D. that he had no intentions of having a sexual encounter with Roe. (Compl. ¶140) As observed by partygoers and Dr. Abraham through a window, Roe had entered Dr. Abraham's bedroom uninvited. (Compl. ¶141;¶250) Party-goer M.T. described Roe's behavior as "weird" and thought that Roe was acting as if she was Dr. Abraham's wife. (Compl. ¶249)

Roe also engaged in sexually harassing and non-consensual sexual contact with another party guest, V.D. While V.D. was playing the piano inside Dr. Abraham's home on June 23, 2018, Roe sat next to V.D., uninvited. Without consent, Roe, rubbed V.D.'s leg and nibbled his ear, making V.D. visibly uncomfortable. On information and belief, a report was made about Roe's nonconsensual sexual contact with V.D. to TJU's Human Resources Department as well as to

3

Chief Medical Officer Ed Pribitkin. On information and belief, TJU failed to investigate the allegations of Roe's nonconsensual sexual contact with V.D. (Compl. ¶¶251-256)

Around midnight, the party was winding down and all but a few of the invited guests had already left. A.D. and a few other house-guests remained, as Dr. Abraham had previously invited these individuals, who had all travelled from a distance, to spend the weekend with him. Roe, however, lingered. Without permission, she went into Dr. Abraham's private liquor cabinet and poured Irish whiskey from a rare, expensive botte into one of Dr. Abraham's wine glasses. (Compl. ¶¶147-148)

Roe then came outside and handed Dr. Abraham the almost-full glass, encouraging him to drink it. At this time, Dr. Abraham was sitting on a bench near his pool.  Dr. Abraham refused the glass of alcohol, but Roe held it to his lips and started pouring it. Dr. Abraham consumed a mouthful. Roe wanted Dr. Abraham to drink more, and she became more forceful and insistent. Dr. Abraham pushed her hand away, causing the glass to fall and shatter. (Compl. ¶¶149-151) Dr. Abraham told Roe to leave.  A few guests witnessed this encounter and also asked Roe to leave. (Compl. ¶152)

Believing that all party guests, except for those staying overnight, had left, Dr. Abraham spent a few minutes putting out the torches in the backyard, and closing up the garbage bins. (Compl. ¶154).  He noticed that he had some trouble walking due to the alcohol. (¶155).

Upon entering his house, Roe walked up to Dr. Abraham. Without his affirmative consent, Roe aggressively kissed him on the mouth and placed her arms around him. Inebriated, Dr. Abraham attempted to push Roe away, but he was unable to do so.  He told Roe that he did not want to have sexual relations with her, stating "this isn't a good idea." Roe then became even more

aggressive, shouting indignantly, "don't you want to fuck me?" Dr. Abraham again said "No, that's not a good idea." (Compl. ¶¶156-159)

In a raised voice, Roe began repeating: "fuck me!" "Come on fuck me!" "I want you to fuck me!" Roe forcefully pulled Dr. Abraham to the floor.  She lay on her back on an area rug. Roe and Dr. Abraham proceeded to have sexual intercourse. During the intercourse, Roe continued to yell, "Fuck me! Fuck me!" Roe moaned loudly and grunted with pleasure.  Roe was so loud that one of the overnight house guests, A.D., heard her. Throughout the intercourse, Roe kissed and caressed Dr. Abraham's body. She thrust her hips and moved her body in a manner that was pleasurable to her.  With her hand, Roe guided Dr. Abraham's penis into her vagina. (Compl. ¶¶160-164) During this encounter, Plaintiff was intoxicated and allegedly incapacitated, as that term is defined under the TJU/TJUH Sexual Misconduct Policy ("Policy"). (Compl. ¶6)

After the intercourse concluded, Dr. Abraham felt exhausted and dizzy.  His mind was foggy, and he could not process what had just occurred.  At some point after the intercourse had concluded, Dr. Abraham told Roe that he needed to go up to bed. (Compl. ¶¶165-166) Dr. Abraham collected his clothes and then proceeded to his bedroom.  As he began climbing the stairs, he saw that Roe was already most of the way up the staircase. By the time Dr. Abraham entered his bedroom, Roe had already positioned herself in his bed. (Compl. ¶¶168-169) Short of calling the police, Dr. Abraham felt that there was nothing he could do to get Roe to leave. He was too exhausted to take any further action, and he fell asleep immediately. (Compl. ¶170)

When Dr. Abraham awoke the next morning, June 24, 2018, he could not think clearly and felt as though the room was spinning. (Compl. ¶171) Seeing that Dr. Abraham was awake, Roe, still naked, flipped on to her stomach then rose up on her hands and knees.  She said words to the effect of: "I want you to fuck me again, this way, this is my favorite position."  She indicated that

she wanted Dr. Abraham to enter her from behind. (Compl. ¶172) Dr. Abraham felt relieved when the telephone rang, giving him the excuse he needed to prevent any further activity with Roe. (Compl. ¶173)

At that point, as Roe lay back down in the bed, Dr. Abraham noticed that she was wearing wedding/engagement rings. (Compl. ¶174) After inquiring as to whether Roe "had someone waiting for her at home," Dr. Abraham asked Roe to leave. (Compl. ¶¶175-176) Dr. Abraham walked Roe to her car, but as he left the house, he noticed that he was unusually sensitive to the sunlight.  He felt as though he had been drugged.  As they reached Roe's vehicle, Roe put her arm around Dr. Abraham and kissed his cheek. She then got into her car and drove away. (Compl. ¶¶177-178)

### B. After a Failed Attempt to Extort Dr. Abraham and After Dr. Abraham Reports Roe's Sexual Misconduct, Roe Falsely Accuses Dr. Abraham of Rape

Following the sexual encounter, on June 26, 2018, Roe and her husband, R.P., attempted to extort money from Dr. Abraham. (Compl. ¶8; ¶179). Roe requested via text message that Dr. Abraham call her. (Compl. ¶179). When Roe and Dr. Abraham spoke on the phone, she said she was sorry for what she did and that the sexual encounter was "consensual." Roe next stated that she had told her husband, R.P.[2], about the sexual encounter and that R.P. was "fucking angry." (Compl. ¶¶180-182) Roe stated that her husband wanted to meet Dr. Abraham in person. Fearing for his safety due to R.P.'s anger, Dr. Abraham declined. (Compl. ¶184)

When Dr. Abraham asked Roe why R.P. needed to speak to him, Roe indicated that R.P. wanted to propose something that could "make this better" for Roe and R.P. It became clear to Dr.

---

[2] Defendants' contention that the use of the initials "R.P." to designate Roe's husband is an attempt to "out" Roe is entirely without merit. (Def. Mem. at 5) That initials were used designate R.P. is consistent with the designation of other individuals referenced in the Complaint such as witnesses and other party-goers. (*See* Compl. at page 25, note 2)

Abraham that Roe was suggesting that Dr. Abraham pay off Roe and R.P.  Dr. Abraham realized that these individuals were attempting to manipulate and extort him." (Compl. ¶¶185-186)

Dr. Abraham told Roe that he needed to make a report to his (and Roe's) supervisors, Dr. Alex Vaccaro and Dr. Jim Purtill. Roe raised her voice and said, "No way! Why would you do that? I don't want my career to be ruined. Can you at least wait until you hear what my husband has to say? He wants to work out a resolution with you, so that you can make this right for us." (Compl. ¶¶187-188)

That same day, exhibiting a "controlled rage," R.P. showed up unannounced at Fox Chase Hospital to meet Dr. Abraham. (Compl. ¶¶190;193) Dr. Abraham declined to see R.P., who was escorted out of the hospital due to his behavior. Dr. Abraham requested that a formal report be written concerning this incident. (*Id.*)  R.P. also left Dr. Abraham a "threatening voicemail," stating that it would be in Dr. Abraham's "best interest" to speak to him in private. (Compl. ¶194)

Between 5:30 p.m. and 6:30 p.m., on June 26, 2018, Dr. Abraham reported Roe's alleged sexual misconduct and extortion attempt to his TJU/TJUH supervisor, Dr. Alex Vaccaro. He detailed that Roe had taken advantage of him at his annual party and that she had coerced him into having sexual intercourse. He also reported that R.P. had shown up at his workplace and that he believed that R.P. and Roe were trying to extort him. Dr. Vaccaro told Dr. Abraham that he was going to speak to TJU's General Counsel concerning Dr. Abraham's report, and he further told Dr. Abraham to discuss the matter with Dr. Jim Purtill, the TJUH Residency Program Director and Roe's direct supervisor. (Compl. ¶¶9;197-199).

After speaking to Dr. Vaccaro, Dr. Abraham returned R.P.'s phone call. (Compl. ¶201) During this conversation, R.P. made false claims about bruises on Roe, and also told Dr. Abraham that they were going to have to figure out a way to resolve the situation. (Compl. ¶¶204; 206) Dr.

Abraham understood R.P.'s statement to be a monetary demand. (Compl. ¶207) Dr. Abraham told R.P. that he would not negotiate with him, and that he had already reported the incident to his chairman, Dr. Vaccaro, and that he intended to meet the next morning with Dr. Jim Purtill. (Compl. ¶208)

On information and belief, R.P. and Roe were suddenly on the defensive after learning that Dr. Abraham had already reported Roe's conduct, and that Roe's career was now in jeopardy. On information and belief, Roe now needed to switch tactics from extortion to filing a false claim of sexual assault in order to save her career. (Compl. ¶¶211-212)

When he arrived home on the evening of June 23, 2018, Dr. Abraham texted Dr. Purtill. Receiving no reply, he left Dr. Purtill a voicemail. (Compl. ¶¶213-214) When Dr. Purtill did not return his call, Dr. Abraham called Dr. Vaccaro. (Compl. ¶¶215-216) Shockingly, Dr. Vaccaro told Dr. Abraham that Roe had gone directly to Dr. Purtill's home and falsely reported to him that Dr. Abraham had raped her. (Compl. ¶217) Dr. Abraham expressed his confusion and dismay to Dr. Vaccaro. He reminded Dr. Vaccaro that he had initially reported Roe's sexual misconduct. (Compl. ¶218)

**C. June 27, 2018: Dr. Abraham Receives a Notice of Concern, and TJUH Wrongfully Pressures Him Into Taking An Administrative Leave**

On June 27, 2018, Dr. Abraham received a Notice of Concern from Defendants' Title IX coordinator. The Notice alleged that he had engaged in "non-consensual sexual intercourse" with Roe. The Notice further informed him that an investigation would be commenced and that he would be assigned a University representative as an advisor. (Compl. ¶¶222-226).

That same day, TJUH Chief Medical Officer, Ed Pribitkin, threatened Dr. Abraham by stating that Dr. Abraham would be suspended and reported to the Medical Staff and the National Practitioner Database ("NPDB") if he did not take an immediate leave of absence. Dr. Abraham

pleaded with Dr. Pribitkin that the allegation was false and told Dr. Pribitkin that there was another side to the story. Dr. Pribitkin refused to listen. On information and belief, Dr. Pribitkin was at all relevant times herein a mandatory reporter under the Policy. Under the threat of suspension and reporting to the NPDB, Dr. Abraham believed he had no choice but to capitulate and take a leave of absence. (Compl. ¶¶228-232).

As a further result of Roe's false allegations, Dr. Abraham was suspended from his position at Rothman Orthopaedics. (Compl. ¶234)

**D. The Flawed and Gender Biased Disciplinary Proceeding against Dr. Abraham.**

Defendants conducted a superficial, flawed and gender-biased investigation into Roe's claims against Dr. Abraham. (Compl. ¶¶13;242-299) As discussed, Dr. Abraham reported to TJU/TJUH officials that i) he had a complaint against Roe for sexual misconduct against him, and ii) Roe's false complaint against him was retaliatory, given that it occurred, after Dr. Abraham made his report of Roe's misconduct, and on information and belief, following a failed extortion attempt carried out by Roe and her husband, R.P. Defendants took no action to investigate Dr. Abraham's allegations against Roe. (Compl. ¶¶14;293-299)

During the course of the investigation Defendants wrongfully deprived Dr. Abraham of the opportunity to review the investigative report produced by TJU, Roe's initial complaint to the Title IX Office as well as any evidence and witness statements collected.  There is no written basis in Defendants' Policy for depriving Dr. Abraham of the opportunity to review these materials. (Compl. ¶14) Defendants failed to pursue potentially exculpatory information on behalf of Dr. Abraham. (*Id.*) The investigation was concluded without allowing Dr. Abraham a full and fair

opportunity to provide a statement[3], to present over twenty-nine material witnesses along with witness statements, and to offer other evidence on his behalf, such as the threatening voicemail left by R.P., Roe's husband.

Fearing that the bias that pervaded the investigation would likewise taint any hearing in this matter, and having exhausted his savings during his leave of absence, in December, 2018, with full reservation of his rights, Dr. Abraham relinquished his clinical privileges and faculty appointment at TJU/TJUH as well as at any institution in which TJU/TJUH had a controlling interest. (Compl. ¶¶15; 303-305) Dr. Abraham relinquished his privileges with the specific understanding that he would be able continue his employment at his prior level at any Rothman Orthopaedics office, that was not majority-owned by TJU/TJUH, at least until Roe concluded her residency program.  At the time of Dr. Abraham's relinquishment of his clinical privileges and faculty appointment from TJU/TJUH, no other restrictions were discussed. (Compl. ¶309)

On January 8, 2019, Dr. Abraham received a letter from the Title IX Coordinator, Ms. Gingold, indicating that TJU was terminating its processing of Roe's Title IX Complaint. (Compl. ¶310) No findings of responsibility were made against Dr. Abraham in connection with Roe's complaint. (Compl. ¶313) Ms. Gingold's letter made no mention of Dr. Abraham's complaint against Roe, or Dr. Abraham's allegation that Roe's complaint against him was retaliatory. (Compl. ¶314)

When Dr. Abraham returned to practice through his contractual relationship with Rothman Orthopaedics in January, 2019, TJU and TJUH continued to wrongfully interfere with his ability to practice his medical specialty, to retain and re-build his patient base, and subjected him to further

---

[3] On or about July 2, 2018, Roe filed a police report accusing Dr. Abraham of sexual assault. After an approximately four-month-long investigation, in or about November, 2018, the Montgomery County District Attorney declined to pursue charges against Dr. Abraham. Given the pending criminal investigation, Dr. Abraham could not simultaneously submit a written/oral statement or otherwise participate in TJU's Title IX investigation. (Compl. ¶¶ 239,241,242).

reputational harm and emotional distress. (Compl. ¶¶17; 315-336) Dr. Abraham, for example, was suddenly restricted from seeing patients in any Rothman Orthopaedics office that contained TJU/TJUH orthopedic medical residents. Instead of having the choice of approximately twenty offices available to him, in January, 2019, Dr. Abraham was told that only approximately three offices were available. Dr. Abraham was forced to move out of the region where he had built his outstanding reputation for ten years. (Compl. ¶¶324-325)

The disciplinary proceedings herein occurred at a time when Defendants were facing pressure from the federal government, the #MeToo Movement, the Times Up Healthcare Movement, and the media to selectively enforce its sexual misconduct policy against males and find against males accused of sexual assault. During the period described in the Complaint, there were two open OCR investigations against TJU for alleged Title IX infractions. (Compl. ¶¶351-369)

Defendants' conduct subjected Dr. Abraham to significant economic harm, including without limitation, lost earnings, loss of future earnings, and loss of career prospects. He has suffered from depression, anxiety, and suicidal ideation, requiring treatment. Dr. Abraham has also suffered and will continue to suffer ongoing reputational harm due to Defendants' conduct. (Compl. ¶¶18-20;337-350; 336; 324-326)

For the foregoing reasons, Dr. Abraham has filed his Complaint seeking judicial intervention to address Defendants' wrongful conduct.

## ARGUMENT

### I.   LEGAL STANDARD.

Federal Rule of Civil Procedure 8(a) requires simply that a Complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts

that serve as a basis for the claim." *ProCentury Ins. Co. v. Harbor House Club Condo. Ass'n, Inc.*, 652 F. Supp. 2d 552, 555 (D.N.J. 2009).  Rather, a Complaint need only "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted).  Notice-pleading "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Id.* (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 556 (2007)).

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) In reviewing the motion, the district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under *any reasonable reading of the complaint*, the plaintiff *may* be entitled to relief." *Phillips*, 515 F.3d at 233 (emphasis added). The District Court must "draw all reasonable inferences in favor of the plaintiff." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 809 (internal citations omitted).  In that regard, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts alleged is improbable and that a recovery is very remote and unlikely." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Twombly*, 550 U.S. at 556).

Even where "the facts a plaintiff alleges in a complaint may turn out to be self-serving and untrue," a court at the motion-to-dismiss stage "is not engaged in an effort to determine the true facts." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) "If the complaint is found sufficient to state a legal claim, the opposing party will then have ample opportunity to contest the truth of

the plaintiff's allegations and to offer its own version" through discovery and substantive litigation. *Ibid.*

Moreover, the *Twombly* pleading standard "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal citations and quotations omitted). Thus, the mandatory presumption of truth and the beneficial inference in favor of the Plaintiff apply not only to facts based on direct personal knowledge, but also those alleged on "information and belief." *See also Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015) (denying motion to dismiss and noting that the Ninth, Seventh, and Second Circuit all presume truth of "information and belief" allegations).

Plaintiff's Complaint is in full compliance with Federal Rule of Civil Procedure 8(a). Defendants' arguments that the Complaint should be dismissed or stricken on that basis (Def. Mem. at 10-12) are without merit. In *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78, (2009), the Supreme Court noted that while the pleading standard announced in Rule 8 does not require "'detailed factual allegations,'" "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." The *Ashcroft* Court stated in relevant part:

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."

*Id.* (internal citations omitted). Here, Dr. Abraham's Complaint has been carefully drafted, with sufficient factual matter to allow a court to draw the reasonable inference that Defendants are liable for the misconduct alleged. *See id.* ("A claim has facial plausibility when the plaintiff pleads

13

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. (internal citations omitted)).

The cases cited by Defendants in support of dismissal, *Bolick v. NE Indus, Serv. Corp.* 666 F. App'x 101 (3d Cir. 2017) and *Drysdale v. Woerth*, 1998 WL 966020 (E.D. Pa. Nov. 18, 1998), are unreported and without precedential value, and as detailed below, factually distinguishable from the present matter. Plaintiff's Complaint is meticulously written, with headings to delineate different sections. Each of Plaintiff's seven causes of action are segregated and contain a summary of the pertinent factual allegations in support. Contrary to Defendants' contention, this is not a case where Defendants had to "dredg[e]" through the Complaint to "infer" the facts in support. (Def. Mem. at 11).

There is likewise no basis to strike any part of the Complaint under Federal Rule of Civil Procedure 12(f) (Def. Mem. at 12). Striking a pleading "is a drastic remedy to be resorted to only when required for the purposes of justice and should be used sparingly." *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (internal citation and quotation omitted). In order to prevail on such a motion, Defendants must demonstrate that "'the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or [that] the allegations confuse the issues.'" *Id.* (internal citations omitted). Defendants cannot meet this high burden. Defendants complain that the Complaint contains "unnecessary, explicit, and boorish detail into the sexual encounter between Abraham and Roe." (Def. Mem. at 12). However, the underlying proceedings consist of a Title IX complaint filed by Jane Roe against Dr. Abraham alleging "non-consensual sexual intercourse" as well as Dr. Abraham's contentions that Defendants never investigated his complaint that Roe had engaged in nonconsensual intercourse with him, and that Roe's complaint against him was retaliatory. (Compl. ¶¶223-224; ¶¶293-299).

## II.   PLAINTIFF SUFFICIENTLY ALLEGES HIS CLAIMS OF TITLE IX SEX DISCRIMINATION

Dr. Abraham's Complaint amply states claims for violations of Title IX. Defendants erroneously cling to the doctrinal tests for "selective enforcement" and "deliberate indifference." (Def. Mem. at 12-25). These doctrinal tests have been superseded by the more liberal pleading standard for claims of Title IX discrimination recently adopted by the Third Circuit in *Doe v. University of the Sciences*, 961 F. 3d 203, 209 (3d Cir. 2020).  Evaluated under the newly adopted standard set forth in *Doe v. University of the Sciences*, Dr. Abraham's Complaint survives this motion to dismiss. For the sake of argument only, Dr. Abraham's claim of Title IX sex discrimination is also evaluated under the superseded doctrinal tests for "selective enforcement" and "deliberate indifference."  Here, too, Dr. Abraham's claims survive a motion to dismiss.

### A.   The Law Concerning Title IX Discrimination Claims.

Title IX states: "No person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Employees at educational institutions receiving federal funding,[4] such as Dr. Abraham, have a private right of action under Title IX.  *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017). "Title IX bars the imposition of university discipline where gender is a motivating factor."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

Recently, the United States Courts of Appeals for the Third and Ninth Circuits followed the Seventh Circuit in rejecting the application of doctrinal tests, i.e. erroneous outcome, selective enforcement, deliberate indifference and archaic assumptions,[5] to Title IX claims, holding that the

---

[4] Plaintiff has alleged Defendants are educational institutions which receive federal funding; Defendants do not contest these allegations. (Compl. ¶¶25-29; ¶¶118-119)

[5] *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) recognized the erroneous outcome and selective enforcement theories of Title IX sex discrimination. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) recognized the theories of deliberate indifference and archaic assumptions.

only question that need be asked is "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex?'" *Doe v. Purdue Univ.*, 928 F. 3d 652, 667-668 (7th Cir. 2019). *See Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020) ("Although our court has acknowledged some of the doctrinal tests that other courts have employed in this context and assumed their application, we have not expressly adopted any of them…[W]e find persuasive the Seventh Circuit's approach to Title IX claims in this context" (internal citations omitted)); *Doe v. Univ. of the Sciences*, 961 F.3d at 209.[6]

In *Doe v. University of the Sciences*, the Third Circuit held:

> We agree with the Seventh Circuit and "see no need to superimpose doctrinal tests on the [Title IX] statute."  Thus, we adopt the Seventh Circuit's straightforward pleading standard and hold that, to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex. Although parties are free to characterize their claims however they wish, this standard hews most closely to the text of Title IX. *See* 20 U.S.C. § 1681(a).

*Id.* (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019).

In finding that Doe's Complaint contained "plausible allegations supporting the reasonable inference that [the University] discriminated against him on account of his sex," the Third Circuit found the following factors significant. *Id.* at 209. First, Doe alleged that the University succumbed to external pressure from the federal government following the issuance of the U.S. Department of Education's 2011 Dear Colleague Letter ("Dear Colleague Letter") in implementing and enforcing its disciplinary policy. *Id.* The Dear Colleague Letter allegedly limited procedural protections afforded to males like Doe accused of sexual misconduct. *Id.* at 209-210. Second, Doe alleged that "sex was a motivating factor" in the University's investigation. *Id.* Doe alleged, *inter alia*, that the University was improperly motivated by sex when it investigated him for policy

---

[6] On September 18, 2020, in *Doe v. American University*, No. 19-CV-03097 (APM), 2020 WL 5593909 (D.D.C. Sept. 18, 2020), the District Court for the District of Columbia also adopted the liberal pleading standard set forth in *Doe v. Purdue.*

violations but chose not to investigate three female students who allegedly also violated the policy at issue. *Id.* at 210.

These factors are non-exhaustive. *Doe v. American University*, No. 19-CV-03097 (APM), 2020 WL 5593909, at *6 (D.D.C. Sept. 18, 2020) collected cases where different factors combined to raise a plausible inference of sex discrimination. *E.g. Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("…specific allegation of adjudicator bias, combined with the external pressure facing the university, makes Doe's claim plausible"); *Doe v. Columbia*, 831 F.3d 46, 57 (2nd Cir. 2016) (plausible inference of sex discrimination arose where University faced "substantial criticism" "both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students.")

**B.** **The Allegations of the Complaint Support a Plausible Inference that Defendants Discriminated Against Dr. Abraham on the Basis of Sex.**

In analyzing the sufficiency of Dr. Abraham's complaint, this Court must not cling to the doctrinal tests as Defendants have in their motion to dismiss. (Def. Mem. at 12-25). Rather, this Court must draw all reasonable inferences in the light most favorable to Dr. Abraham, and must analyze the Complaint under the liberal standard set forth by the Third Circuit in *Doe v. University of the Sciences*. *See Gendia v. Drexel Univ.*, No. CV 20-1104, 2020 WL 5258315 (E.D. Pa. Sept. 2, 2020) (evaluating motion to dismiss under the standard set forth in *Doe v. University of the Sciences*).

Like the Plaintiff in *University of Sciences*, Dr. Abraham has alleged that Defendants impermissibly yielded to external pressure from the federal government in the wake of the 2011 Dear Colleague Letter when they enforced their Sexual Misconduct Policy in a gender-biased manner against him. (Compl. ¶¶ 34-76). Dr. Abraham has pled in detail the history of the Dear Colleague Letter and the various guidance documents such as the *Questions and Answers on Title*

17

*IX and Sexual Violence*, dated April 29, 2014. *Id.* He further alleged that in response to the actions of the federal government, TJU and TJUH tailored and enforced their policies to limit the procedural protections afforded to men, like Dr. Abraham, accused of sexual misconduct. (Compl. ¶¶ 70-72; ¶¶ 351-354). *Doe v. Univ. of the Sciences*, *supra*, 961 F.3d at 209-210; s*ee Doe v. Baum*, *supra*, 903 F.3d at 586; *see also Doe v. Univ. of Miami*, 882 F.3d at 591 (plausible inference of sex discrimination found where *inter alia* plaintiff alleged that pressure from government to "combat vigorously sexual assault on college campuses" and the "severe potential punishment" of loss of all federal funds for failure to comply led the University to "discriminate against men in its sexual-assault adjudication process.")

 In recent years, and during the pendency of Dr. Abraham's disciplinary proceeding, TJU faced scrutiny from the Office for Civil Rights ("OCR") as well as significant pressure to make findings of responsibility against males accused of sexual assault due to two open OCR complaints for alleged Title IX infractions. (Compl. ¶¶ 355). *See Doe v. Purdue*, 928 F.3d 652, 668 (finding plausible inference of sex discrimination where *inter alia* presence of open OCR investigations against the University created pressure on the University to demonstrate compliance).

Likewise, the #MeToo Movement, Times Up Healthcare movement, a scandal concerning TJU/TJUH physician Charles Pollack who self-reported sexual harassment of his female subordinate, and negative publicity concerning harassment of female medical students exerted pressure on Defendants to enforce the Sexual Misconduct Policy in a gender biased manner. (Compl. ¶¶ 351-369). Leaders of Times Up Healthcare, a group dedicated to eradicating sexual harassment, including sexual assault in healthcare, openly criticized TJU/TJUH's handling of sexual misconduct allegations concerning Dr. Charles Pollack. This pressure culminated in TJU/TJUH signing the Times Up Healthcare pledge letter, pledging its commitment to the

movement's core statements. (Compl. ¶¶ 361-363). These allegations are sufficient to support a plausible inference of sex discrimination under Title IX. *See Doe v. Columbia, supra,* 831 F.3d at 57.

Similar to the plaintiff in *University of Sciences*, Dr. Abraham sufficiently alleges that sex was a motivating factor in Defendants' investigation. *Doe v. Univ. of Sciences*, 961 F.3d at 209. (Compl. ¶¶370-452).  By way of example, not limitation, the following establishes a plausible inference that the University discriminated against Dr. Abraham on the basis of sex.

 TJU investigated Roe's complaint against Dr. Abraham for non-consensual intercourse, but at no point did Defendants investigate Dr. Abraham's complaint against Roe for sexual misconduct, i.e. non-consensual sexual intercourse. (Compl.¶385;¶¶293-299).  Defendants likewise failed to investigate whether Roe's complaint against Dr. Abraham was retaliatory. (Compl. ¶385; ¶¶386-387). *See Doe v. University of the Sciences, supra,* 961 F.3d at 210 (raising plausible inference of sex discrimination where University failed to investigate alleged policy violations of female complainants and female witness while investigating Doe).

Despite reporting that he had a complaint against Roe to i) Dr. Alex Vaccaro, Dr. Abraham's supervisor; ii) Dr. Ed Pribitkin, TJUH Chief Medical Officer; and iii) Jennifer Fogerty, Dr. Abraham's university-appointed Title IX advisor, no action was taken to investigate Dr. Abraham's complaint against Roe. (Compl. ¶¶388-394). Per Dr. Vaccaro's direction, Dr. Abraham also attempted to report Roe's misconduct to Dr. Jim Purtill, Jefferson Orthopedic Residency Program Director, but Dr. Purtill never replied to Dr. Abraham's message or returned Dr. Abraham's call. (Compl ¶388; ¶¶213-215). Dr. Abraham alleged, on information and belief, that Drs. Vaccaro, Pribitkin, and Purtill were all mandatory reporters under the Sexual Misconduct Policy. (Compl. ¶¶389,391).

19

Defendants also treated Roe and Dr. Abraham differently under the Sexual Misconduct Policy. While Dr. Abraham was wrongfully pressured into taking an administrative leave, no interim action was ever taken against Roe, despite Dr. Abraham's complaint against her. Roe was allowed to continue with her normal routine with no disruption in her pay. (Compl. ¶¶395-396). After the Title IX investigation concluded, with no finding against Dr. Abraham, Roe reported that seeing Dr. Abraham's name on the attendance board for "grand rounds" lecture, would cause her to suffer "PTSD." Defendants took no steps to verify Roe's claim, to determine whether her claim was retaliatory, or to arrive at a response that protected both Roe and Dr. Abraham's interests. Rather, Dr. Purtill, acting as agent for Defendants, reported this conduct to Dr. Vaccaro, Dr. Abraham's supervisor, and Dr. Abraham was excluded from this lecture. (Compl. ¶¶397-400; ¶¶329-334).

Dr. Abraham also alleged numerous material procedural defects during the Title IX investigation. (Compl. ¶¶242-292; 401). Such failures include the denial of Dr. Abraham's request for an extension of time to submit exculpatory evidence, including 29 witness statements. (Compl. ¶¶242-248). When denying the request for the extension, Defendants' Title IX Coordinator indicated that the University had an obligation to resolve the matter promptly. (Compl. ¶246). At the time that the Title IX Coordinator made this statement, the investigation had been pending for four months, and the Title IX process would continue for another three months before concluding. *Id*. Shortly after denying Dr. Abraham's request for an extension, Defendants concluded their investigation into Roe's Title IX allegations against Dr. Abraham, without Dr. Abraham having the opportunity to submit a written statement or evidence on his behalf. (Compl. ¶¶267-268). On information and belief, Defendants failed to thoroughly investigate Roe's credibility, including the claim that she was bruised after the sexual encounter; failed to investigate a prior false complaint

filed by Roe; and failed to investigate another complaint made by a male, V.D., accusing Roe of sexual misconduct. (Compl. ¶401).

Dr. Abraham's superiors made gender-biased statements towards him. By way of example, on August 20, 2018, Dr. Abraham's supervisor, Dr. Alex Vaccaro, told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged him from making any such claim. (Compl. ¶401; ¶365).

Drawing all reasonable inferences in the light most favorable to Dr. Abraham, as the court must in evaluating a motion to dismiss, it is plausible that sex was a motivating factor in the Defendants' investigation of Dr. Abraham and in their decision to enforce the Sexual Misconduct Policy against him only (and not against Roe). *See Doe v. Purdue*, 928 F.3d at 669 (finding plausible inference of sex discrimination where plaintiff alleged *inter alia* defects in adjudicatory process, including improper analysis of complainant's credibility); *see also Doe v. Columbia*, 831 F.3d at 59 (noting that "[t]he role of the court at this stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed.")

C. <u>**Plaintiff Sufficiently Alleges a Selective Enforcement Claim, although this Doctrinal Test is No Longer Controlling in the Third Circuit.**</u>

As discussed above, following *Doe v. University of the Sciences*, while the "parties are free to characterize their claims however they wish," doctrinal tests such as selective enforcement, are no longer controlling for the purpose of determining whether a Plaintiff has plausibly alleged Title IX sex discrimination. *Doe v. Univ. of Sciences*, 961 F.3d. at 209.  For the sake of argument only, to address the contentions made by Defendants (Def. Mem. at 13-16), Plaintiff will analyze his claim under the selective enforcement theory. Plaintiff has amply satisfied this doctrinal test. (*See* Compl. ¶¶370-426)

Under a selective enforcement theory, a plaintiff must allege that "regardless of the [plaintiff]'s guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the [plaintiff]'s gender." *Yusuf*, 35 F.3d at 715. A claim has two elements: i) "that a female was in circumstances sufficiently similar to [that of the male plaintiff] and was treated more favorably by the [educational institution]," and ii) particular circumstances suggesting that gender-bias was a motivating factor behind the inconsistency. *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 824 (E.D. Pa. 2017)

Plaintiff has sufficiently alleged that Roe was a female in similar circumstances, i.e. the behavior that both Plaintiff and Roe complained of stemmed from their sexual encounter on the night of June 23, 2018. (Compl. ¶¶196-200; ¶¶222-224) While Defendants argue that Roe is not an appropriate comparator to Plaintiff because she is a student, they do not cite any caselaw to support that proposition that is controlling in this district. (Def. Mem. at 13-15).

Defendants' argument also overlooks the allegations in the Complaint which are permissibly pled on information and belief. Dr. Abraham alleges that i) compared to the number of accused females, the number of males accused of sexual misconduct whose cases are formally investigated and adjudicated is greater; ii) to the extent that females were subjected to disciplinary hearings, and were found responsible, their sanctions were less severe than comparable male respondents. (Compl. ¶¶422-423) Dr. Abraham makes these allegations on information and belief because he was unable to location any data related to gender of those accused of sexual misconduct who were formally investigated, found responsible and sanctioned. (Compl. ¶423).

Where, as here, certain information is in the exclusive possession of the defendant, a plaintiff may allege such facts "on information and belief," and such allegations are sufficient to preclude dismissal. *Arista Records, LLC v. Doe 3*, 604 F.3d at 119-120. The precise breakdown

of TJU/TJUH's Title IX complaints, investigations, and outcomes along gender lines is in the exclusive possession and control of Defendants and thus the allegation on information and belief is permissible. *See Ritter v. Oklahoma City Univ.*, No. 16-CV-0438 (HE), 2016 WL 3982554, at *2 (W.D. Okla. July 22, 2016) ("This is the type of case for which 'upon information and belief' pleading was designed. It is highly unlikely defendant would or possibly could willingly disclose the factual information it criticizes plaintiff for not alleging in his complaint."). *See Trustees of the U. of Penn.*, 270 F. Supp. at 824 (selective enforcement claim could proceed to discovery even though complaint alleged that comparator information was in exclusive possession of university); *Doe v. Brown U.*, 166 F. Supp. 3d 177, 189 (D.R.I. 2016) ("Requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts")

Moreover, the Complaint specifically alleges that Plaintiff was treated differently than Roe. While Defendants investigated Roe's complaint against Dr. Abraham alleging non-consensual intercourse, they failed to investigate Dr. Abraham's allegations that Roe engaged in non-consensual sexual intercourse with him and that her complaint against him was retaliatory. (Compl. ¶¶ 222-226; ¶¶293-299; ¶¶384-394). Both Roe and Dr. Abraham's allegations of non-consensual sexual intercourse stem from the same sexual encounter. (Compl. ¶¶ 125-170). While Dr. Abraham was wrongfully pressured into taking administrative leave as a result of Roe's allegations, no interim action was taken against Roe. Roe was allowed to continue her usual routine, with no disruption in pay, despite Dr. Abraham's allegations against her. (Compl. ¶¶395-396). After the Title IX investigation concluded, with no finding against Dr. Abraham, Roe reported that seeing Dr. Abraham's name on the attendance board for "grand rounds" lecture,

would cause her to suffer "PTSD." Defendants took no steps to verify Roe's claim, determine whether her claim was retaliatory, or to arrive at a response that protected both Roe and Dr. Abraham's interests. Rather, Dr. Purtill, acting as agent for Defendants, reported this conduct to Dr. Vaccaro, Dr. Abraham's supervisor, and Dr. Abraham was excluded from this lecture. (Compl. ¶¶397-400; ¶¶329-334).

Plaintiff thus alleges several grounds for a selective enforcement claim under Title IX. *See Greene v. BMW of N. Am.*, No. 11-CV-04220 (WJM), 2014 WL 47940, at *3 (D.N.J. Jan. 7, 2014) Courts across the country have upheld similar claims on a motion to dismiss. *See, e.g., Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 412–13 (D.R.I. 2018) ("Brown investigated Jane's complaint; it ignored John's complaint. While the two are not exactly identical, the allegations as pleaded present John and Jane as similarly situated."); *Doe v. Amherst Coll.*, 238 F.Supp.3d 195, 223 (D. Mass. 2017) (finding selective enforcement claim sufficiently pled where College encouraged female complainant to file a formal complaint against plaintiff, but College did not encourage plaintiff to file a complaint against same female complainant, or investigate, when it learned that she may have initiated sexual activity with plaintiff when he was "blacked out and incapable of consenting.")

Plaintiff has also satisfied the second prong of this doctrinal test, alleging particular circumstances suggesting that gender-bias was a motivating factor behind the inconsistent treatment between Roe and him. *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. at 824. (Compl. ¶¶ 401-425) Dr. Abraham has alleged that his superiors made gender-biased statements towards him. By way of example, on August 20, 2018, Dr. Abraham's supervisor, Dr. Alex Vaccaro, told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged him from making any such claim. (Compl. ¶401; ¶365). As discussed above, Dr.

24

Abraham's disciplinary investigation occurred while Defendants endured increased scrutiny from the government due to two open OCR investigations for Title IX infractions. (Compl. ¶355) Likewise, the #MeToo Movement, Times Up Healthcare movement, a scandal concerning TJU/TJUH physician Charles Pollack who self-reported sexual harassment of his female subordinate, and negative publicity concerning harassment of female medical students exerted pressure on Defendants to enforce the Sexual Misconduct Policy in a gender biased manner. (Compl. ¶¶ 351-369).

Courts have routinely upheld such allegations as sufficient to show gender bias and preclude dismissal on the pleadings. *See, e.g. Doe v. Columbia*, 831 F.3d at 57 ("[I]t is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault."); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("[W]here a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a *prima facie* case of sex discrimination"); *Doe v. Trs. Univ. Pennsylvania*, 270 F. Supp. 3d at 823–24 (E.D. Pa. 2017) (allegations regarding "training materials and possible pro-complainant bias on the part of University officials," in addition to "criticism [defendant] has received in the past for not taking the complaints of female students sufficiently seriously"); *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 416 (N.D.N.Y. 2019) ("[A] reasonable inference could be drawn that the Investigator, the University Conduct Board, the Appeals Board, and other University officials were motivated to appease OCR by siding with [the female complainant]

. . ..."); *Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1210–11 (M.D. Fla. 2019) (investigation "amidst a clamor of public and campus scrutiny over its treatment of sexual assault complaints by female students" created "circumstantial evidence of bias"); *Doe v. Amherst Coll.*, 238 F.Supp.3d 195, 223 (D. Mass. 2017) (allegations that university was trying to "appease" a biased, student-led movement); *Doe v. Lynn Univ., Inc.*, 235 F.Supp.3d 1336, 1340–42 (S.D. Fla. 2017) (allegations that university was reacting to "pressure from the public and the parents of female students" to punish males); *Neal v. Colorado State Univ.-Pueblo*, No.16-CV-873 (RM) (CBS), 2017 WL 633045, at *14 (D. Colo. Feb. 16, 2017) (allegations of "gender-skewed implementation of the 2011 DCL, pressure to avoid DOE investigation and loss of federal funding, procedural shortcomings," and Title IX employee bias); *Doe v. Washington & Lee Univ.*, No. 14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (allegations that university's disciplinary procedures amount to "a practice of railroading [the] accused," combined with pressure from the OCR and involvement of potentially biased employee in disciplinary process); *Wells v. Xavier Univ.*, 7 F.Supp.3d 746, 751 (S.D. Ohio 2014) (allegations suggested that university was "reacting against him[ ] as a male" in response to a Department of Education investigation).

Defendants' reliance (Def. Mem. at 16) on *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019) is misplaced, as that case dealt with an appeal from a case disposed following a motion for summary judgment. At the motion to dismiss stage, accepting Dr. Abraham's allegations as true and drawing all reasonable inferences in his favor, he has plausibly alleged that gender bias was a motivating factor in the differential treatment of him and Roe. Dr. Abraham's claim for selective enforcement should therefore survive a motion to dismiss.

**D. Plaintiff Sufficiently Alleges a Deliberate Indifference Claim, although this Doctrinal Test is No Longer Controlling in the Third Circuit.**

As discussed above, while the "parties are free to characterize their claims however they wish," doctrinal tests such as deliberate indifference, are no longer controlling for the purpose of determining whether a Plaintiff has plausibly alleged Title IX sex discrimination. *Doe v. Univ. of Sciences*, 961 F.3d. at 209. For the sake of argument only, to address the contentions made by Defendants (Def. Mem. at 16-25), Plaintiff will analyze his claim under the deliberate indifference theory. Plaintiff has amply satisfied this doctrinal test. (See Compl. ¶¶370-426; ¶¶351-369).

**i. Legal Standard**

To state a claim for deliberate indifference, a plaintiff must allege that an "an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 825 (internal citations and quotation marks omitted). The plaintiff must also allege that the official's response to the alleged gender bias was clearly unreasonable in light of the known circumstances. *Id.* (internal citations omitted).

Broken down further, a Plaintiff must show that "(1) the defendant received federal funds; (2) sexual harassment occurred; (3) the harassment took place under circumstances in which the school exercised substantial control over both the harasser and the context in which the harassment occurred; (4) the defendant had actual knowledge of the harassment; (5) the harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived the victim of access to the educational opportunities or benefits provided by the school; (6) the defendant was deliberately indifferent to the harassment; and (7) the defendant's deliberate indifference subjected the plaintiff to harassment, i.e. caused the plaintiff to undergo harassment or made the plaintiff

liable or vulnerable to it." *Doe v. Manor Coll.,* No. CV 18-5309, 2020 WL 4756599, at *7 (E.D. Pa. Aug. 17, 2020) (evaluating deliberate indifference claim on motion for summary judgment).

As detailed below, plaintiff has sufficiently set forth his claim for deliberate indifference.[7] Plaintiff has alleged that Defendants received federal funding (Compl. ¶¶25,27) and that the sexual harassment in the form of non-consensual intercourse occurred (Compl. ¶¶125-170) under circumstances in which Defendants exercised substantial control (discussed below). He further alleged that the harassment, i.e. non-consensual sexual intercourse, was so severe that it deprived Plaintiff of the benefits provided by Defendants. Specifically, Plaintiff was pressured into administrative leave. He suffered emotional harm, reputational harm, anxiety and depression. (Compl. ¶¶222-233; ¶¶337-350). Plaintiff has alleged that Defendants had actual notice of the misconduct, that they were deliberately indifferent to the same[8], and that their indifference made Plaintiff vulnerable to, and caused him to suffer, additional harassment. (Compl. ¶¶315-336; ¶¶436-449). Contrary to Defendants' contention (Def. Mem. at 24-25), Plaintiff has amply pled circumstances suggesting that TJU/TJUH's response was motivated by gender-bias. Details concerning the gender-biased statement by Dr. Abraham's supervisor, Dr. Vaccaro; Defendants' sexual harassment scandal involving Dr. Charles Pollack; two open OCR complaints; and the backdrop of criticism from the Times Up Healthcare Movement are alleged in the Complaint. (Compl. ¶¶ 351-369).

---

[7] While Defendants claim that Dr. Abraham's deliberate indifference claim is novel, they cite no case-law suggesting that his claim is in any way precluded under Title IX. (Def. Mem. at 17, n10).

[8] Defendants misstate the allegations of the Complaint when they write, "[b]y Abraham's own admission, Jefferson investigated Roe's allegations 'stemming from the *events of June 23-24, 2018.*'" Def. Mem. at 21, citing to Compl.¶ 300. Paragraph 300 of the Complaint actually states: "As discussed, by letter dated October 19, 2018, Ms. Gingold, as Title IX Coordinator, informed Dr. Abraham that the investigation into Roe's Title IX allegations stemming from the events of June 23-24, 2018 had been concluded." At the motion to dismiss stage, Defendants cannot argue with the facts, and this Court must accept Dr. Abraham's factual allegations as true. *Phillips,* 515 F.3d at 233 Dr. Abraham has consistently alleged that Defendants failed to investigate i) his claim against Roe for non-consensual sexual intercourse and ii) whether Roe's complaint against him was retaliatory.

ii.   **Defendants Had Actual Notice of the Misconduct**

The Third Circuit has stated that actual notice "must amount to 'actual knowledge of discrimination in the recipient's programs.'" *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir. 2005) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Actual notice, or "actual knowledge," is present "if an appropriate person at the institution has knowledge of facts sufficiently indicating substantial danger to [the complainant] so that the institution can reasonably be said to be aware of the danger." *See Bostic*, 418 F.3d at 361 (finding no error in jury instruction containing this standard). An "appropriate person" is an "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures…" *Bostic*, 418 F.3d at 360, quoting *Gebser* 524 U.S. at 290.

While the Defendants cite out-of-circuit cases (Def. Mem. at 19) to support their argument that Plaintiff's single report of Roe's misconduct was not sufficient, the Third Circuit has created no such rule. In fact, this Court has acknowledged that "[p]recedent is imprecise about exactly how much an appropriate person must know in order to satisfy the actual knowledge prong of the test." *Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 688 (E.D. Pa. 2017). This Court has interpreted *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 to mean that "actual notice requires more than a simple report" of inappropriate conduct. *Id.* at 688-689 (internal citations omitted). A plaintiff must "prove an appropriate person knew of acts sufficiently indicating danger of future abuse." *Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d at 689 (emphasis added) (internal citations omitted). While the known acts must demonstrate more than the mere possibility of abuse, institutions will still be liable where "school officials suspect, but cannot be sure of, abusive conduct." *Id.*

Defendants' only citation to binding precedent supporting their contention that deliberate indifference can only exist for a future violation is taken out of context. In *Does v. Se. Delco Sch. Dist.* ("*Does*"), this Court held that a single instance of a teacher placing his hand on a student's lap did not amount to actual knowledge – not due to a lack of future conduct – but because that single instance would not be enough to provide school officials with actual knowledge of a substantial danger to students. *Id.* at 689. Further, the Court noted that the school official never knew of any complaint regarding the teacher at any time. *Does* does not stand for the assertion that future conduct must be present before the school's inaction can constitute deliberate indifference, but rather, that the known conduct must be sufficient to provide knowledge of a potential substantial danger.

Here, Defendants had actual notice. Sufficient information was provided to appropriate individuals who were in a position to take corrective action and end the discrimination. Plaintiff provided more than a simple, ambiguous report of misconduct. Dr. Abraham alleged that Roe had engaged in non-consensual sexual intercourse with him. (Compl. ¶¶ 196-200). A report of sexual assault is not analogous to a teacher placing a hand on a student's lap, as was the case in *Does*. The severity of the allegation put Defendants on notice that Roe presented a substantial danger to other students. Dr. Abraham likewise alleged, on information and belief, that V.D., another party guest made a report to TJU's Human Resources Department, which Defendants failed to investigate. (Compl. ¶¶ 255-256).

Dr. Abraham likewise reported his allegations to "appropriate person[s]" who had the ability to take corrective action and end the discrimination. *See Gebser*, 524 U.S. at 290. Dr. Abraham initially reported his allegations of Roe's sexual misconduct to his supervisor, Dr. Alex Vaccaro. Per Dr. Vaccaro's direction, he left a message for Dr. Jim Purtill, the Orthopedic

Residency Program Director, who never reached out to Dr. Abraham. He next attempted to report the conduct to Dr. Ed. Pribitkin, TJUH Chief Medical Officer. Dr. Pribitkin failed to listen to Dr. Abraham and failed to take any action. On December 21, 2018, approximately six months after his initial report of Roe's misconduct, Dr. Abraham again indicated in an email to addressed to TJU counsel, TJUH President, Rich Webster, Dr. Alex Vaccaro, and CEO of the Rothman Institute, Mike West, that i) he had a complaint against Roe and ii) that Roe's complaint against him was retaliatory. Dr. Abraham indicated that neither of these issues had been investigated or in any way addressed by TJU/TJUH. (Compl. ¶¶437-449).

### iii.    **Defendants Are Still Liable Under Title IX for Off-Campus Misconduct.**

Defendants inappropriately rely on the Supreme Court decision in *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) and two out-of-circuit decisions to support their argument that schools do not have sufficient "control" over the circumstances to support a finding of deliberate indifference when the harassment occurs off-campus.

To the contrary, since *Davis* was decided, multiple courts have recognized that institutions may still be liable under Title IX for off-campus conduct. Indeed, *Davis* "limit[s] a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. However, as one court has explained, "[t]hat the misconduct took place during school hours and on school grounds was found by the Court to be a sufficient, not a necessary, condition for liability." *Crandell v. New York Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 316 n.130 (S.D.N.Y. 2000) (denying defendants' motion for summary judgment because plaintiff alleged "a nexus between the off-campus misconduct and a hostile environment at the institution" such as missing class and fear of negative effects on future career). Further, one court has stated that the

control requirement in *Davis* "can be met by proof that the misconduct occurred 'during school hours and on school grounds' *or when the 'harasser is under the school's disciplinary authority*.'" *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1025 (E.D. Cal. 2009) (quoting *Davis,* 526 U.S. at 647) (emphasis added)) (finding the substantial control requirement was met when the harassing acts took place at an off-campus football camp).

   *Davis* did not limit the circumstances in which institutional liability will lie to harassment occurring during school hours and on school grounds, but found merely that such conditions give rise to an inference of control by and therefore liability of the institution." *See Crandell*, 87 F. Supp. 2d at 316 n.130; *see generally, Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 n.1 (10th Cir. 2008) ("We do not suggest that harassment occurring off school grounds cannot as a matter of law create liability under Title IX. *Davis* suggests that there must be some nexus between the out-of-school conduct and the school); *Rouse v. Duke Univ.*, 914 F. Supp. 2d 717, 724 (M.D.N.C. 2012), aff'd, 535 F. App'x 289 (4th Cir. 2013) ("the Court assumes without deciding that an educational institution's response to an off-campus rape by an unaffiliated third party may trigger Title IX institutional liability, either by direct acts or by 'deliberate indifference' as defined by the Supreme Court.")

   Plaintiff has demonstrated a sufficient nexus between the off-campus sexual assault and a hostile environment at TJU/TJUH. First, Roe was under the disciplinary control of Defendants, as she is an Orthopedic Surgery resident physician at TJUH. (Compl. ¶123). At the motion to dismiss stage, this court must draw all reasonable inferences in favor of the Plaintiff. *Phillips*, 515 F.3d at 233. As such, it is worth noting that Defendants believed that they had sufficient control over Dr. Abraham's off-campus party to institute disciplinary proceedings against him and to investigate

him for alleged nonconsensual sexual intercourse with Roe. It is therefore disingenuous for Defendants to now claim that that they lacked "control over the incident." (Def. Mem. at 22)

Even following the closure of the Title IX investigation, Defendants took no action to stop Roe's harassment and retaliatory behavior towards Dr. Abraham. At no point did Defendants institute a no-contact order between the parties. In February, 2019, after the closure of the Title IX investigation, Roe complained that seeing Dr. Abraham's name on the attendance board for "grand rounds" lecture, would cause her to suffer "PTSD." Without verifying Roe's claim, or determining whether it was retaliatory, Dr. Purtill, acting as agent for Defendants, reported this conduct to Dr. Vaccaro, Dr. Abraham's supervisor, and Dr. Abraham was excluded from this lecture. (Compl. ¶¶397-400; ¶¶329-334).

This conduct sufficiently establishes the requisite nexus between the off-campus conduct and the harassment faced by Dr. Abraham. *See Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009) (finding that a reasonable jury could conclude that the perpetrator's "mere presence at the high school was harassing because it exposed [the complainant] to the possibility of an encounter with him." (internal citations omitted).

### iv.    Plaintiff has Sufficiently Alleged the Causation Element.

Contrary to Defendants' contention (Def. Mem. at 20-21), Dr. Abraham has sufficiently alleged that the Defendants' deliberate indifference subjected him to harassment, i.e. caused the plaintiff to undergo harassment or made the plaintiff liable or vulnerable to it." *Manor Coll.,* No. CV 18-5309, 2020 WL 4756599, at *7.

Dr. Abraham has alleged in detail the harassment and hostility he endured as a result of Defendants' deliberate indifference to his allegations against Roe. Defendants' failure to take reasonable action exposed Dr. Abraham to further harassment. In February, 2019, Roe complained

that seeing Dr. Abraham's name on the attendance board for "grand rounds" lecture, would cause her to suffer "PTSD." Without verifying Roe's claim, or determining whether it was retaliatory, Dr. Purtill, acting as agent for Defendants, reported this conduct to Dr. Vaccaro, Dr. Abraham's supervisor, and Dr. Abraham was excluded from this lecture. (Compl. ¶¶397-400; ¶¶329-334). Dr. Abraham was likewise banned from 2019 TJUH Residency Graduation and 2019 Resident Research Day. (Compl. ¶¶323-336). *See Manor Coll.,* No. CV 18-5309, 2020 WL 4756599, at *7 (denying summary judgment to College and finding that hostility from complainant's peers may amount sexual harassment sufficient to satisfy the causation element of a deliberate indifference claim.)

Plaintiff was subjected to a hostile environment at his workplace. Defendants' deliberate indifference deprived Dr. Abraham of the customary benefits of his employment, e.g. attendance at residency research events and a grand-rounds lecture. These events were necessary for the maintenance of Dr. Abraham's customary level of field expertise. (Compl. ¶¶315-336).

### v.   Plaintiff has Sufficiently Alleged that Defendants' Response was Clearly Unreasonable In Light of the Circumstances.

Dr. Abraham has sufficiently alleged that Defendants' response to his allegations of non-consensual intercourse against Roe was "clearly unreasonable" in light of the known circumstances. *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 825 (internal citations and quotation marks omitted). As alleged by Dr. Abraham, despite his numerous reports to appropriate individuals, Defendants failed to investigate his claim of sexual assault and his claim that Roe's complaint against him was retaliatory. (Compl. ¶¶437-449)

Under the "reasonable response doctrine," Defendants had a duty to investigate. That they failed to do so was "clearly unreasonable" subjecting them to liability under the deliberate indifference theory. *See Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 369 (W.D.

Pa. 2008) ("The reasonable response doctrine implies a duty on the part of the funding recipient, upon notice of possible sexual harassment, to promptly investigate and if necessary to take remedial action." (internal citations omitted)).

## III.   PLAINTIFF SUFFICIENTLY ALLEGES RETALIATION.

Plaintiff has sufficiently alleged retaliation in violation of Title IX. (Compl. ¶¶427-452). To state a claim for retaliation, a plaintiff must allege that i) he or she engaged in activity protected by Title IX; ii) he or she suffered an adverse action; and iii) there was a causal connection between protected activity and adverse action. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 564 (3d Cir. 2017).  There is no disagreement that Plaintiff engaged in a protected activity by reporting Roe's sexual misconduct. (Compl.¶472). Despite Defendants' assertions (Def. Mem. at 25-29), Plaintiff has alleged both i) that he suffered an adverse action and ii) that a causal connection existed between the protected activity and the adverse action.

Plaintiff also sufficiently alleges that he was subjected to an adverse action, in that the day after he initially reported his allegations of sexual assault and retaliation by Roe, he was wrongfully pressured into taking a leave of absence under the threat of suspension and reporting to the National Practitioner Database (NPDB)[9]. (Compl. ¶473).  In *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), the Supreme Court formulated the "adverse action" test for retaliation claims. An adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal citations and quotation marks omitted). Plaintiff's alleged choice of two bad options, given to him by TJUH's Chief Medical Officer, i.e., i) take a leave of absence or ii) face suspension and reporting to the NPDB, fits within the

---

[9] Dr. Abraham has not alleged that his voluntary resignation constituted an "adverse action."  Dr. Abraham reserves his right to move pursuant to Federal Rule of Civil Procedure 15(a)(2) to amend his complaint to assert a claim for constructive discharge.

*Burlington* Court's definition. The alleged untenable choice may well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Defendants argue that being pressured into a leave of absence is not an adverse employment action for purposes of a retaliation claim.  Def. Mem. at 25-26.  Defendants, however, do not cite any binding precedent on point. The cases cited by Defendants are inapposite, as they address voluntary resignation and paid suspension.

Plaintiff has also sufficiently pled the requisite causal connection between the protected activity and the adverse action.  To establish the requisite causal connection, Plaintiff must allege facts to demonstrate either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 615 (E.D. Pa. 2014), quoting *Cooper v. Menges,* 541 Fed. Appx. 228, 232 (3d Cir.2013). In the absence of this proof, a "plaintiff must show that from the evidence gleaned from the record as a whole the trier of fact should infer causation" (internal citations and quotation marks omitted). *Moore v. Temple Univ.*, No. CV 13-5079, 2016 WL 4061352, at *6 (E.D. Pa. July 29, 2016)

Here, Dr. Abraham has adequately alleged temporal causation; he was pressured into administrative leave just one day after he initially reported his allegations against Roe to his supervisor, Alex Vaccaro. (Compl.¶¶473-474). The temporal proximity between the protected activity and adverse action is unusually suggestive.

Plaintiff also satisfies the causation prong when one looks at the record as a whole. Dr. Abraham's coerced leave of absence was part of a pattern of antagonistic behavior by TJU/TJUH that began when he initially reported Roe's misconduct. (Compl.¶¶475-477). This pattern of conduct included, for example, Dr. Purtill's failure to return Dr. Abraham's call or respond to his

36

text message on June 26, 2018 when Dr. Abraham tried to report Roe's conduct to him. (Compl. ¶475; ¶214).   Additionally, TJU was aware that Dr. Abraham was also the subject of a criminal investigation due to Roe's allegations against him. (Compl. ¶243). Due to the criminal investigation, Dr. Abraham's ability to participate in the Title IX investigation was constrained. (Compl. ¶243). When Dr. Abraham requested an extension to prepare his written statement in the Title IX investigation, Title IX Coordinator, Zoe Gingold, denied his request in an email dated October 3, 2018, stating "Jefferson has the obligation to resolve the matter promptly." At that time, however, the matter had already been ongoing for four months and continued for yet another three months after Ms. Gingold made this statement. (Compl. ¶475).

Defendants' arguments represent a substantive disagreement with the facts as alleged by Dr. Abraham. Defendants argue that "Roe provided notice to TJU of Abraham's alleged sexual misconduct before Abraham provided notice to TJU of Roe's alleged sexual misconduct." (Def. Mem. at 27). However, Defendants may not argue with the facts as alleged by Dr. Abraham at this stage of the litigation. The Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under *any reasonable reading of the complaint*, the plaintiff *may* be entitled to relief." *Phillips*, 515 F.3d at 233 (emphasis added). Dr. Abraham has alleged that he provided notice to his supervisor, Dr. Vaccaro, of his allegations against Roe, before Roe provided notice to TJU of her allegations against him. (Compl. ¶¶196-221).

Defendants next attempt to argue that "Dr. Abraham cannot plausibly demonstrate" causation, by arguing that there are more plausible explanations for Defendants' alleged conduct of pressuring Dr. Abraham into taking a leave of absence, i.e. that he had been accused of sexual misconduct of a resident. (Def. Mem. at 28).   Defendants miss the mark here again, as they must

accept all factual allegations as true and draw all reasonable inferences in the light most favorable to Doe. *Doe v. Univ. of Sciences*, 961 F.3d.at 210; *Phillips*, 515 F.3d at 233. *See also Doe v. Univ. of Miami*, 882 F.3d at 594 (noting that "although alternative non-discriminatory explanations for the defendants' behavior may exist, that possibility does not bar [plaintiff's] access to discovery.")

## IV.   PRINCIPLES OF EQUITY AND JUDICIAL ECONOMY REQUIRE THIS COURT RETAIN JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS.

In the event that this Court dismisses Counts I, II, and III of Dr. Abraham's Complaint, i.e. the claims alleging violations of Title IX, this Court should still retain jurisdiction over Dr. Abraham's state law claims.

Under 28 U.S.C. § 1367 (a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Undoubtedly, Plaintiff's state law claims are based upon the same set of operative facts as his Title IX claims, thus providing the court with supplemental jurisdiction over his state law claims.

The Third Circuit has held that "elimination of the federal claim does not deprive the court of the constitutional power to adjudicate the pendent claim." *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1505 (3d Cir. 1996). Instead, when a District Court originally only has federal question jurisdiction and subsequently dismisses the federal claims, the District Court has the discretion to either retain or dismiss the state law claims without prejudice. 28 U.S.C.§ 1367 (c). "That discretion, however, is not unbridled. Rather, the decision 'should be based on considerations of 'judicial economy, convenience and fairness to the litigants.'" *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009) (quoting *New Rock Asset Partners*, 101 F.3d at 1505).

Dismissal of the state law claims here would result in undue prejudice to Dr. Abraham, who would have to file a new complaint in state court and expend additional attorneys' fees to do so. Moreover, judicial economy is better served by keeping this case in the District Court. By virtue of the Plaintiff's Complaint and this motion practice, this Court is fully familiar with many of the alleged facts and arguments in this matter. To dismiss the remainder of Plaintiff's claims at this juncture would essentially force a separate court to re-assess issues which have been presented to this Court. This would be a needless duplication of efforts and an inefficient use of judicial resources.

In any event, should this court decline to retain supplemental jurisdiction over the state law claims, then dismissal of these claims should be without prejudice, as there has been no adjudication on the merits. *Kach v. Hose*, 589 F.3d at 650.

## V.  PLAINTIFF SUFFICIENTLY ALLEGES HIS BREACH OF CONTRACT CLAIM.

Contrary to Defendants' contentions (Def. Mem. at 31), Plaintiff has sufficiently pled all elements of his claim for breach of contract and the implied covenant of good faith and fair dealing contained therein. (Compl. ¶¶480-487)

Under Pennsylvania law, three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages. *Doe v. Univ. of Sci*s., 961 F.3d 203, 211 (3d Cir. 2020) (internal citations and quotations omitted). Contained within a contract is an implied covenant of good faith and fair dealing. *Henderson v. Merck & Co.,* 998 F. Supp. 532, 539 (E.D. Pa. 1998) ("The general duty of good faith and fair dealing in the performance of a contract has been recognized by Pennsylvania courts" (internal citations omitted)).

Plaintiff has sufficiently alleged the existence of a contract, i.e. Defendants' Sexual Misconduct Policy ("Policy") and the breach of that contract.[10] (Compl. ¶¶77;482) Plaintiff identifies specific provisions of the Policy which Defendants allegedly violated. (Compl. ¶485) Plaintiff also lists the precise ways in which Defendants failed to comply with the Policy and the implied covenant of good faith and fair dealing contained in this contract. (*Id.*) Plaintiff has alleged, *inter alia*, that Defendants breached their contractual duties to him by denying him a fair and equal opportunity to present written statements, witnesses, and other evidence during the investigation of Roe's complaint against him and by depriving him of the opportunity to identify significant conflicts which would affect the timing of the investigation. (*Id.*) Plaintiff has also alleged causation and damages. (Compl. ¶¶486-487)

Defendants note that Plaintiff fails to attach a copy of the governing contract to his Complaint. (Def. Mem. at 31). However, there is no requirement that Plaintiff do so. All that is necessary at this stage of the litigation is for Plaintiff to set forth enough factual allegations to state a claim that is plausible on its face. *See Doe v. Univ. of Scis.*, 961 F.3d at 208 (articulating standard of review for FRCP 12(b)(6) motion to dismiss. Plaintiff's claims are sufficient to survive this motion to dismiss.

Contrary to Defendants' arguments, Dr. Abraham has sufficiently alleged that the Policy formed a contract, which bound him and any other employee/agent of TJU/TJUH. (Compl. ¶¶77;482). *See Lloyd v. City of Bethlehem*, No. 02-0830, 2002 WL 31341093, at *3 (E.D. Pa. Oct.

---

[10] Defendants' argument (Def. Mem. at 31, n15) that Plaintiff's claim for breach of contract set forth in ¶485(c)-(g) should be dismissed for failure to reference "specific provisions of the policy [that] Jefferson breached," is without merit. Plaintiff has alleged that Defendants breached the implied covenant of good faith and fair dealing, in addition to specific Policy provisions. The allegations in ¶485(a)-(g) specify how the implied covenant of good faith and fair dealing was breached.  In addition, items (c), (d), and (g), which claim that Defendants breached their contractual obligations by failing to investigate Dr. Abraham's allegations against Roe and by performing a superficial, flawed and gender-biased investigation of Roe's allegations against him, refer to specific Policy provisions detailed earlier in the Complaint. (*See e.g.* Compl. ¶¶ 79,80,82, 87-94).

16, 2002) ("Provisions in an employee manual may constitute a unilateral offer which an employee accepts by performing his duties"). The cases cited by Defendants are factually distinguishable from the present matter. *Morosetti v. Louisiana Land & Expl. Co*., 522 Pa. 492, 495, 564 A.2d 151, 152–53 (1989) dealt with a policy on severance which was never made known to the employees.  That is plainly not the case here. In *Gruver v. Ezon Prod., Inc.*, 763 F. Supp. 772, 775 (M.D. Pa. 1991), the Court granted Defendant's motion to dismiss the breach of contract claim because the plaintiff "failed to plead that a contract for employment including an anti-sexual harassment term was in existence." Here, Dr. Abraham has sufficiently pled the existence of the Policy containing the disciplinary procedures at issue.

## VI.   PLAINTIFF SUFFICIENTLY ALLEGES HIS CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Contrary to Defendants' contentions (Def. Mem. at 32-34), Dr. Abraham has sufficiently alleged his claim for intentional infliction of emotional distress.  (Compl. ¶¶488-496).

To state a claim for intentional infliction of emotional distress, a plaintiff must allege: (1) the defendant's conduct was extreme or outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the plaintiff's distress is severe. *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 826–27 (internal citations omitted). The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (internal citations omitted).

Dr. Abraham has alleged facts sufficient to meet this legal standard, and it is a question of law for the court whether, accepting all facts as true, he has met the threshold. *See Cheney v. Daily News L.P.*, 654 F. App'x 578, 583 (3d Cir. 2016) ("It is for the court to determine in the first

instance whether the conduct is extreme and outrageous, such that recovery may be permitted" (internal citation omitted)).

As set forth in the Complaint, Defendants' conduct was "extreme, outrageous and of such character as to not be tolerated by a civilized community" because it created an environment in which someone wrongfully accused of sexual misconduct had no meaningful opportunity to defend himself. (Compl. ¶492). Dr. Abraham listed specific ways in which Defendants' conduct created this intolerable environment. (*Id.*) For example, Defendants pressured him into taking a leave of absence under threat of suspension and reporting to the NPDB (but took no interim action against Roe despite his allegations against her). (*Id.*)  Defendants also conducted a superficial, flawed and gender-biased investigation against Dr. Abraham, never allowing him to review i) the investigation report, ii) Roe's initial complaint to the Title IX Office; iii) any evidence collected by the Title IX investigator; and iv) any witness statements collected by the Title IX investigator. (*Id.*) Dr. Abraham's superiors made gender-biased statements towards him. By way of example, Dr. Alex Vaccaro told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged Dr. Abraham from making any such claim. (*Id.*)

Dr. Abraham further alleged that the Defendants' conduct caused him to suffer emotional and psychological distress, humiliation and embarrassment, sleeplessness, anxiety, depression, suicidal ideation. (Compl. ¶496.) Having sufficiently alleged all requisite elements, Dr. Abraham's claim for intentional infliction of emotional distress should survive this motion to dismiss.

## VII.    PLAINTIFF SUFFICIENTLY PLEADS HIS CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.

Despite Defendants' arguments to the contrary (Def. Mem. at 34-35), Dr. Abraham has sufficiently alleged a claim for negligent infliction of emotional distress. (Compl. ¶¶497-504).

As an initial matter, Defendants' contention that Dr. Abraham's tort claims of negligent infliction of emotional distress and intentional infliction of emotional distress are barred by the "gist of the action" doctrine are unavailing. (Def. Mem. at 33, n. 16; 34). Pursuant to Federal Rule of Civil Procedure 8(d), a plaintiff may set forth in the complaint "alternative statements of a claim," as well as "inconsistent claims," and the pleading "is sufficient if any one of them is sufficient." Plaintiff has alleged both contractual and tort claims arising out of Defendants' improper, discriminatory, bad-faith conduct throughout the investigation of Roe's allegations against Dr. Abraham. Plaintiff is not obligated at the pleading stage to select a single theory of the case.

To state a claim for negligent infliction of emotional distress, a plaintiff must allege the elements of a negligence claim, "i.e., that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *Kling v. Univ. of Pittsburgh Med. Ctr.*, No. 2:18-CV-01368-CRE, 2020 WL 2832008, at *3 (W.D. Pa. May 8, 2020), *report and recommendation adopted*, No. 2:18-CV-01368-MJH, 2020 WL 4218004 (W.D. Pa. July 23, 2020).

In Pennsylvania, a claim for negligent infliction of emotional distress is limited to four factual scenarios, including, as applicable to this case, "situations where the defendant had a contractual or fiduciary duty toward the plaintiff." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 827–28 (internal citations omitted). A plaintiff asserting this claim must also allege that he suffered "immediate and substantial physical harm." *Id.* at 828

Contrary to Defendants' arguments, Dr. Abraham's claim that a duty existed is not broadly based on an employer-employee relationship. Rather, Defendants owed a contractual duty[11] to Dr. Abraham by virtue of the Sexual Misconduct Policy. (Compl. ¶¶499-501). Dr. Abraham has alleged that Defendants breached their contractual duty by, *inter alia*, i) failing to investigate Dr. Abraham's claims that Roe had engaged in non-consensual sexual intercourse with him and that her complaint against him was retaliatory; ii) denying Dr. Abraham a fair and equal opportunity (or any opportunity at all) to identify "significant conflicts" that would affect the timing of the investigation, as required under the Policy; and iii) conducting a flawed, superficial and gender-biased investigation into Roe's allegations during which Dr. Abraham was denied a fair and equal opportunity to present written statements, witnesses and other evidence on his behalf. (Compl. ¶502).

Dr. Abraham also alleged that Defendants' breaches caused him immediate and substantial physical harm, in the form of humiliation, embarrassment, depression, suicidal ideation, sleeplessness, and anxiety. (Compl. ¶¶502-503). Dr. Abraham has further alleged that as a result he has sought medical treatment and suffered significant damages. (Compl. ¶503). *See Doe v. The Trustees of the Univ. of Pennsylvania,* 270 F. Supp. 3d at 828 ("… a plaintiff may establish physical harm or injury as physical manifestations of a psychic injury by establishing symptoms

---

[11] Defendants' contractual duty to investigate allegations of sexual misconduct is necessarily one that "hold[s] the potential of deep emotional harm in the event of a breach" and "encompass[es] an implied duty to care for the plaintiff's emotional wellbeing." *Kling*, No. 2:18-CV-01368-CRE, 2020 WL 2832008, at *4 (interpreting the Pennsylvania Supreme Court's persuasive, but not precedential, opinion in *Toney v. Chester County Hospital*, 36 A.3d 83 (Pa. 2011), as limiting negligent infliction of emotional distress claims based on contractual or fiduciary duties to claims where preexisting relationships involve "duties that obviously hold the potential of deep emotional harm in the event of breach ... [and] encompass an implied duty to care for the plaintiff's emotional well-being." (internal citations omitted)). As alleged in the present matter, when mishandled, investigations of sexual misconduct allegations cause significant emotional and psychological harm. (*See* Compl. ¶¶503-504;341;349).

of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and...ongoing mental, physical and emotional harm" (internal quotations and citations omitted)).

Since Dr. Abraham has sufficiently alleged his claim for negligent infliction of emotional distress, Defendants' motion to dismiss this count of the Complaint should be denied.

## VIII.   PLAINTIFF SUFFICIENTLY STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

Contrary to Defendants' contentions (Def. Mem. at 36-37), Dr. Abraham has sufficiently pled his claim for tortious interference with business relations. (Compl. ¶¶ 505-528) As detailed below, Defendants' arguments for dismissal of this claim center around a disagreement with the facts as pled by Dr. Abraham. As noted, such disagreement is inappropriate at the motion to dismiss stage. The Court must "take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 809 (internal citations omitted).

To state a claim for tortious interference with business relations, a plaintiff must allege:"(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct (internal citation omitted)" *Kernaghan v. BCI Commc'ns, Inc.*, 802 F. Supp. 2d 590, 596 (E.D. Pa. 2011). Plaintiff has alleged all required elements.

At all points relevant to the Complaint, Dr. Abraham was a partner at Rothman Orthopaedics; his relationship with Rothman Orthopaedics was contractual in nature. (Compl. ¶¶ 116;508) As a red herring, Defendants note that Dr. Abraham was never terminated from Rothman.

(Def. Mem. at 36). Termination is not a pre-requisite for a claim of tortious interference with business relations.

Despite Defendants' contention, Dr. Abraham has specifically alleged that Defendants engaged in purposeful action, specifically intended to harm his existing contractual relationship with Rothman Orthopaedics. (Compl. ¶509). He has further alleged that such actions were taken without privilege or justification. (Compl. ¶525). Dr. Abraham has also alleged that Defendants' conduct has resulted in significant actual damages. (Compl. ¶¶526-529).

Defendants' purposeful actions, specifically intended to harm Dr. Abraham's contractual relationship include the following, without limitation. In January, 2019, Dr. Abraham was restricted, without any end date, from any Rothman Orthopaedics office that contained TJU/TJUH residents. On information and belief, this restriction originated with TJU/TJUH, and was implemented to placate TJU/TJUH. However, the only restriction discussed at the time that Dr. Abraham relinquished his clinical privileges and faculty appointment at TJU/TJUH was that Dr. Abraham would not see any patients at any Rothman Orthopaedics offices that were majority owned by TJU/TJUH at least until Roe's residency graduation. At all times relevant to the Complaint, Rothman Orthopaedics had approximately twenty-two offices, two of which were majority owned by TJU/TJUH. As Dr. Abraham understood it, he would have access to approximately twenty offices upon his return to practice in January, 2019. Due to the above restriction, Dr. Abraham had approximately three offices available to him. Dr. Abraham was forced to move out of the area where he had built his previously-unblemished reputation for the past ten years, causing a decline in his patient base and patient referrals. (Compl. ¶¶511-514).

Defendants state that "Abraham voluntarily resigned from Jefferson. His resignation ended his relationship with Jefferson and any Jefferson-affiliated entities." (Def. Mem. at 36-37). The

Court must disregard Defendants' statements, as those are not the facts as alleged by Dr. Abraham. *See Phillips*, 515 F.3d at 233 ("In reviewing the motion, the district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under *any reasonable reading of the complaint*, the plaintiff *may* be entitled to relief" (emphasis added)).

Defendants have failed to meet their burden to prove the absence of a claim for tortious interference with business relations. As such, their motion to dismiss this count should be denied.

## IX.   IF THE COURT DISMISSES ANY CLAIM, SUCH DISMISSAL SHOULD BE WITHOUT PREJUDICE.

"When a defendant's motion to dismiss is granted, the court should 'freely' provide the plaintiff with leave to amend its dismissed causes of action 'when justice so requires.'" *Tafuto v. New Jersey Inst. of Tech.*, No. 10-CV-4521 (PGS), 2011 WL 3163240, at *5 (D.N.J. July 26, 2011) (quoting Fed. R. Civ. P. 15(a)(2)).  As the Third Circuit has directed, "[l]iberality is the keystone." *Prof'l Cleaning and Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 Fed. Appx. 161, 165 (3d Cir. 2007).  "[A]n amendment should be allowed whenever there has not been undue delay, bad faith on the part of the plaintiff, or prejudice to the defendant as a result of the delay." *Ibid.*  Defendants' motion should be denied in its entirety, but to the extent this court does dismiss any of Plaintiff's claims, such dismissal should be without prejudice and with leave to amend.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this court deny Defendants' motion in its entirety.

**Dated:** **New York, New York**
        **September 25, 2020**

**NESENOFF & MILTENBERG, LLP**

By:    */s/ Andrew T. Miltenberg*
        Andrew T. Miltenberg, Esq.
        (*pro hac vice admission pending*)
        Stuart Bernstein, Esq.
        (*pro hac vice admission pending*)
        Cindy Singh, Esq.
        (*pro hac vice admission pending*)
        363 Seventh Avenue, Fifth Floor
        New York, New York 10001
        (212) 736-4500
        amiltenberg@nmllplaw.com
        sbernstein@nmllplaw.com
        csingh@nmllplaw.com

**ROGERS CASTOR**

By:    */s/ Bruce Castor*
        Bruce Castor, Jr.
        26 E. Athens Avenue
        Ardmore, Pennsylvania 19003
        (610) 649-1880
        bruce@rogerscastor.com

        ***Attorneys for Plaintiff***

CC:  All counsel (via ECF)