UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------x

JOHN A. ABRAHAM, M.D.,           |      Civil Action No.

                                             |      **2:20-cv-02967-MMB**

             **Plaintiff,**          |

                                           |      **JURY TRIAL DEMANDED**

    -against-               |

                                           |      **FIRST AMENDED COMPLAINT**

THOMAS JEFFERSON UNIVERSITY   |
and THOMAS JEFFERSON UNIVERSITY   |
HOSPITALS, INC.                     |

                    **Defendants.**     |

-------------------------------------------------------------x

Plaintiff John A. Abraham, M.D. ("Plaintiff" or "Dr. Abraham"), by his attorneys Nesenoff

& Miltenberg, LLP, and Rogers Counsel, as and for his First Amended Complaint ("Complaint")[1]

against Defendants, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.     Plaintiff brings this action against Defendants Thomas Jefferson University

("TJU") and Thomas Jefferson University Hospitals, Inc. ("TJUH") (collectively "Defendants")

alleging violation of Title IX of the Education Amendments of 1972 ("Title IX"), breach of

contract, intentional infliction of emotional distress, negligent infliction of emotional distress, and

tortious interference by Defendants with Plaintiff's business relations with Rothman Orthopaedics.

## THE PARTIES

2.     Plaintiff is a natural person whose permanent residence is in the Commonwealth of

Pennsylvania. Plaintiff held a faculty appointment and clinical privileges at TJUH.

---

[1] In amending his Complaint, Plaintiff has used best efforts to shorten the document in an effort to comply with the Court's direction in its March 15, 2021 Memorandum and Order, No. CV 20-2967, ECF Doc. No. 12, 2021 WL 982722, at *1 (E.D. Pa. Mar. 15, 2021).

[1]

3.      Defendant TJUH is a Pennsylvania corporation with its principal place of business located at 111 S. 11th Street, Philadelphia, Pennsylvania 19107.

4.      Defendant TJU is a private university organized under the laws of the Commonwealth of Pennsylvania, with a principal place of business at 1020 Walnut Street, Philadelphia, Pennsylvania 19107.

5.       Defendants TJU and TJUH each receive federal funding. The total amount of annual federal funding received by TJU and TJUH is not publicly available.

6.      Defendants TJU and TJUH do business collectively under the marketing name "Jefferson Health."

7.      The operations of Defendants TJU and TJUH are substantively consolidated. As one example of Defendants' consolidated operations, Defendants maintain connected websites.

8.      At all times material to this Complaint, Defendants TJU and TJUH acted by and through their authorized agents, servants, and employees who were operating within the scope and course of their employment with Defendants and in furtherance of Defendants' business.

## JURISDICTION AND VENUE

9.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the claims herein arise under federal law; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

10.     This Court has personal jurisdiction over TJU and TJUH since Defendants are conducting business within the Commonwealth of Pennsylvania.

11.     Venue for this action is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

A.  **Background: The Effect of the "April 2011 Dear Colleague Letter" on University Sexual Misconduct Policies.**

12.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to universities receiving federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

13.     The DCL advised that sexual violence constitutes sexual harassment under Title IX and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

14.     The OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11)

15.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" (DCL at 15) and focus on victim advocacy.

16.     Although a mere guidance letter, the OCR treated the DCL as a binding regulation and pressured universities to aggressively pursue investigations of sexual assault on campus.

17.     After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

18.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office For Civil Rights, U.S. Department Of Education (June 26, 2014),   https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-

violence.pdf.

19.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited April 4, 2021).

20.     The threat of revoking federal funds was a powerful tool in motivating colleges to aggressively pursue and punish males accused of sexual misconduct.

21.     Colleges, universities, and teaching hospitals, including TJU and TJUH, were fearful of, and concerned about, being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). In response to pressure from the federal government, educational institutions, like TJU and TJUH, limited the procedural protections afforded to males, like Dr. Abraham, in sexual misconduct cases.

22.     On September 22, 2017, the OCR formally rescinded the DCL and put in place interim guidance (the "2017 Q&A"). *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A    on    Campus    Sexual    Misconduct* (Sept.    2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

23.     Among other things, the 2017 Q&A prohibited universities from relying on assumptions that favored complainants over respondents and required investigators to "synthesize *all available evidence*—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case."  2017 Q&A at 4 (emphasis added).

[4]

24.     The 2017 Q&A was in effect at the time of the disciplinary proceeding described herein.  Taking into account its guidance, Defendants' policies were unfair and contrary to the goal of gender equality in Title IX proceedings. [2]

**B.     TJU's Sexual Misconduct Policy and Contract with Dr. Abraham**

25.     Plaintiff, like any other employee or agent of TJU/TJUH, was bound by the University's policies and procedures, including its Sexual Misconduct Policy (the "Policy").

26.     The majority of TJU employees, including staff with significant responsibility to student and campus activities, are required to report information they receive concerning an incident to Campus Security and the Title IX Coordinator, in this matter, Zoe Gingold. (*See Policy*, VI "Initial Procedures" (A)(2) at 7-8).

27.     In the disciplinary proceeding described herein, Jane Roe[3] was treated as the "complainant," and Dr. Abraham was treated as the "respondent."

28.     If the Title IX Coordinator determines that an investigation will commence, a "Notice of Concern" is issued. (*See id.*).

29.     The "Notice of Concern," described further below, indicated that Dr. Abraham would be assigned a TJU representative as his "advisor."  TJU assigned Jennifer Fogerty to be Dr. Abraham's Title IX advisor in this matter.

30.     Under the Policy, within two business days of receiving the Notice of Concern, both the complainant and the respondent will be asked to identify any "significant conflicts" that

---

[2] On May 6, 2020, the United States Department of Education released new Title IX regulations, which carried the force and effect of law on August 14, 2020.  ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html) The new Title IX regulations provide respondents procedural rights that Dr. Abraham was deprived of during his own disciplinary proceeding, including without limitation: i) a presumption of innocence until a finding of responsibility is made; ii) the right to be provided with a copy of the investigative report produced in the matter and a minimum of ten days in which to respond to the investigative report. (See "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf)
[3] Jane Roe is referred to herein pseudonymously.

would affect the timing of the investigation and any potential hearing. (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

31.     The issuance of the Notice of Concern marks the commencement of the "Formal Investigation" phase of the disciplinary matter. (*See id.*).

32.     In this matter, TJU assigned a third-party investigator, Gaetan Alfano, Esq. ("Investigator Alfano").

33.     No information is publicly available as to the training received by Investigator Alfano on conducting sexual misconduct investigations.

34.     No information is available as to any training specifically offered by TJU to Investigator Alfano on the Policy or conducting sexual misconduct investigations generally.

35.     The Policy indicates that investigations "may" include interviews of the parties, and any material witnesses presented by either party as well as the review of any material evidence. (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

36.     The Policy specifically provides that both parties will have the opportunity to present written statements, witnesses and other evidence during the process. (*Id.* at 11).

37.     Following an investigation, the Policy indicates that there may be several potential outcomes, such as a No Charge Decision, Non-Hearing Resolution, or Charge Decision. (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

38.     Relevant to this matter are the following outcomes: i) Non-Hearing Resolution; and ii) Charge Decision.

39.     A Non-Hearing Resolution is appropriate where the Title IX Coordinator "concludes that a reasonable Sexual Misconduct Board could find, by a preponderance of the evidence, that the alleged Sexual Misconduct occurred, but there is not a significant dispute among

the parties and the Title IX Coordinator about the proper outcome of the matter (including administrative remedies and disciplinary sanctions)…"   (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

40.     At TJU, the "Sexual Misconduct Board" is a pool of faculty and staff "specially trained" in matters related to sexual misconduct. (*See Policy*, VII "Investigation and Disciplinary Process" at 13).

41.     When a sexual misconduct case must be decided, a hearing panel is assembled from faculty and staff on the Sexual Misconduct Board. (*See Policy,* VII "Investigation and Disciplinary Process" at 13).

42.     The second potential outcome relevant to this matter is the "Charge Decision." When the Title IX Coordinator determines that a Non-Hearing Resolution is not feasible, and that a reasonable Sexual Misconduct Board could find, by a preponderance of the evidence, that the alleged sexual misconduct occurred, the Title IX Coordinator will issue a "Charge Letter." (*See id.* at 11-12.) The Charge Letter refers the matter to a Sexual Misconduct Board for adjudication. (*See id.*).

43.     Under the Policy, hearings are to be conducted in accordance with the TJU's "Community Standards" process and may include the presentation of evidence and witnesses at a live hearing. (*see* Policy VII "Investigation  and Disciplinary Process" at 13; *see generally,* "Community    Standards"    available    at    https://www.jefferson.edu/university/academic-affairs/schools/student-affairs/student-handbooks/university-policies/code-of-conduct.html   (last accessed April 6, 2021).

44.     On or about July 9, 2018, Dr. Abraham sent an email to his TJU-appointed Title IX advisor, Jennifer Fogerty. Citing to Section VII of the Policy, Dr. Abraham pointed out that

hearings in Title IX matters are to be conducted in accordance with the "Community Standards" process. Dr. Abraham requested a copy of the "Community Standards" procedures.

45.    Without citing to a specific provision of the Policy as the basis of her conclusion, Ms. Fogerty indicated that a hearing through the Sexual Misconduct Board only occurred where the respondent was a student or medical resident at TJU/TJUH.

46.    Ms. Fogerty then indicated that a "Jefferson employee or agent" found to have violated the Policy would be subject to "appropriate disciplinary and/or corrective action under applicable policies."  According to Ms. Fogerty, the applicable policies included the TJU Code of Conduct, Policy Prohibiting Unlawful Discrimination, Harassment and Retaliation, and potentially the Bylaws of the Sidney Kimmel Medical College and/or the TJUH Medical Staff.  However, at no point during the course of the investigation was Dr. Abraham ever provided with a hard copy or link to these policies.

47.    The Policy defines "sexual assault" as "any non-consensual sexual act, however slight, with any object, by a person upon another person that is without consent and/or by force." (*See* Policy V "Prohibited Behaviors" at 4).

48.     The Policy specifically notes that the following behaviors are deemed "sexual assault" when consent is not present: (i) "sexual intercourse (anal or vaginal); (ii) "sexual activity with another person who is not able to give consent due to intoxication, incapacitation, unconsciousness, helplessness, or other inability." (*See id.* at 4).

49.    The Policy notes that "consent to engage in sexual activity must be obtained from each partner and must exist from beginning to end of each instance of sexual activity." (*See* Policy IV "Consent" at 3).

[8]

50.     Consent may be demonstrated through "mutually understandable words and/or actions that clearly indicate a willingness to engage in sexual activity." (*Id.*)

51.     The Policy notes that consent is "not effective" "if the person is too incapacitated to provide informed, knowing and voluntary consent." (*Id.*)  The "use of alcohol or drugs shall not diminish one's responsibility to obtain consent, but may diminish one's ability to consent." (*Id.*)

52.     Retaliation is also prohibited under the Policy. Retaliation may occur when someone engages in actions "intended to punish, seek retribution against or otherwise adversely affect a person who, in good faith, makes an allegation or report of Sexual Misconduct or participates or cooperates in [TJU's] process for addressing allegations and/or incidents of Sexual Misconduct…." (*See* Policy V "Prohibited Behaviors" at 7)

C.     **Plaintiff's Background**

53.     Dr. Abraham was the Director of the Musculoskeletal Oncology Center at TJUH, and the Associate Professor of Orthopedic Surgery and Radiation Oncology at TJU.

54.     As part of his educational/teaching role as Associate Professor, Dr. Abraham had resident physicians rotate with him, participated as an attending physician in multiple weekly meetings to discuss various patient cases, and taught an "Oncology Review" for the Orthopedic In-Training Exam.

55.     Until the wrongful disciplinary proceeding described herein, Dr. Abraham was a well-liked and highly-respected member of the TJU/TJUH community. He had never been involved in any type of disciplinary proceeding before, at TJU/TJUH or elsewhere.

56.     Dr. Abraham was also Service Chief of Orthopedic Oncology at Rothman Orthopaedic Institute ("Rothman Orthopaedics"). Dr. Abraham was a partner at Rothman Orthopaedics. His relationship was governed by a partnership agreement and was contractual.

[9]

**D.**   **Jane Roe and Dr. Abraham's Initial Interactions**

57.      Jane Roe was an Orthopedic Surgery resident physician at TJUH.  Dr. Abraham did not directly supervise Jane Roe.

58.      Prior to June 23, 2018, Dr. Abraham had only two interactions with Jane Roe.  On one occasion, Roe spoke to Dr. Abraham concerning a patient that she was managing while she was "on call."  On another occasion, Roe attended a professional journal club meeting, along with other guests, held at Dr. Abraham's home.

**E.**   **Jane Roe's Behavior at Dr. Abraham's Annual Party on June 23, 2018**

59.      On June 23, 2018, beginning at approximately 6:00 p.m., Dr. Abraham hosted a party at his home. Dr. Abraham held this party annually to thank his operating room team and residents for their hard work. Dr. Abraham also invited a few friends to attend the party and stay for the weekend.

60.      Though she was not specifically invited, Jane Roe was among the guests. During the early portion of the party, Roe spoke briefly to Dr. Abraham and strangely alluded to Dr. Abraham's salary, stating that he had one of the best orthopedic oncology jobs in the country.

61.      Jane Roe went on to state that she had rotated onto Dr. Abraham's surgical service as a medical student.  Dr. Abraham told Roe that he did not recall that.

62.      Throughout the course of the evening, partygoers observed Jane Roe:

   a.   Taking an unauthorized "tour" of Dr. Abraham's home;

   b.   Standing, without permission in Dr. Abraham's bedroom;

   c.   Placing her hands, without consent on Dr. Abraham's shoulders and saying words to the effect of, "I normally don't wear anything other than a thong into the pool."

   d.   "Lurking" behind Dr. Abraham or otherwise standing "too close" to him.

[10]

e.   Displaying sexually aggressive behavior, including embracing another guest, J.H[4].

f.   Engaging in allegedly sexually harassing and non-consensual sexual contact with party guest, V.D. Specifically, Roe sat next to V.D., rubbed his leg, and nibbled his ear, making V.D. visibly uncomfortable.

63.   Around midnight, Roe lingered as the party wound down. Without permission, she poured Irish whiskey from Dr. Abraham's private liquor cabinet into a wine glass.

64.   Roe then came outside to where Dr. Abraham was sitting. She handed him the almost-full glass, encouraging him to drink it. He refused the alcohol, but Roe held it to his lips and started pouring it. Dr. Abraham consumed a mouthful. Roe wanted Dr. Abraham to drink more, becoming more forceful and insistent. Dr. Abraham pushed her hand away, causing the glass to fall and shatter.

65.   Dr. Abraham and a few guests, who witnessed this encounter, asked Roe to leave.

66.   Dr. Abraham then said goodbye to the final remaining guests in the backyard. Seeing that there was no one left in the backyard, he believed that all guests, apart from those individuals who had previously been invited to stay for the weekend, had left.

67.   Dr. Abraham noticed that he had some trouble walking due to the alcohol; nonetheless, he made it into the house safely.

68.   Upon entering his house, Roe suddenly walked up to Dr. Abraham. Without his affirmative consent, Roe aggressively kissed Dr. Abraham on the mouth and placed her arms around him.

69.   Inebriated, Dr. Abraham unsuccessfully attempted to push Roe away.  He told Roe that he did not want to have sexual relations with her, stating "this isn't a good idea."

---

[4] For privacy purposes, individuals are referred to herein by initials.

70.     Roe then became even more aggressive, shouting indignantly, "don't you want to fuck me?"  Dr. Abraham again said "No, that's not a good idea."

71.     In a raised voice, Roe began repeating: "fuck me!" "Come on fuck me!" "I want you to fuck me!"

72.     Roe forcefully pulled Dr. Abraham to the floor.  She lay on her back on an area rug.

73.     Roe and Dr. Abraham proceeded to have sexual intercourse.

74.     During the intercourse, Roe continued to yell, "Fuck me! Fuck me!" Roe moaned loudly and grunted with pleasure.  Roe was so loud that one of the overnight house guests, A.D., heard her.

75.     Throughout the intercourse, Roe kissed and caressed Dr. Abraham's body. She thrust her hips and moved her body in a manner that was pleasurable to her. With her hand, Roe guided Dr. Abraham's penis into her vagina.

76.     After the intercourse concluded, Dr. Abraham felt exhausted and dizzy.  His mind was foggy, and he could not process what had just occurred.

77.     At some point after the intercourse had concluded, Dr. Abraham told Roe that he needed to go up to bed.

78.     At no point before, during, or after the sexual encounter did Roe express any discomfort or displeasure. To the contrary, based on Dr. Abraham's observations, she was still aroused.

79.     Dr. Abraham collected his clothes and then proceeded to his bedroom.  As he began climbing the stairs, he saw that Roe was already most of the way up the staircase. By the time Dr. Abraham entered his bedroom, Roe had already positioned herself in his bed.

80.     Short of calling the police, Dr. Abraham felt that there was nothing he could do to get Roe to leave. He was too exhausted to take any further action, and he fell asleep immediately.

**F.**     **The Morning of June 24, 2018.**

81.      The next morning, June 24, 2018, when Dr. Abraham awoke, he could not think clearly and felt as if the room was spinning.

82.     Seeing that Dr. Abraham was awake, Roe, still naked, flipped on to her stomach then rose up on her hands and knees.  She said words to the effect of: "I want you to fuck me again, this way, this is my favorite position."  She indicated that she wanted Dr. Abraham to enter her from behind.

83.     Dr. Abraham felt relieved when the telephone rang, giving him the excuse he needed to prevent any further activity with Roe. Dr. Abraham asked Roe to leave.

84.     After they each dressed, Dr. Abraham walked Roe to her car. As he left the house, he noticed that he was unusually sensitive to the sunlight.  He felt as though he had been drugged.

85.     As they reached Roe's vehicle, Roe put her arm around Dr. Abraham and kissed his cheek. She then got into her car and drove away.

**G.**     **June 26, 2018: After a Failed Attempt at Extortion, in an Effort to Save Her Career After Dr. Abraham Reports Roe's Sexual Misconduct, Roe Falsely Accuses Dr. Abraham of Rape**

        **a.**     **Suspicious Phone Call with Roe on the Morning of June 26, 2018; R.P. Shows Up to Fox Chase Hospital**

86.     At Roe's request, on the morning of June 26, 2018, she and Dr. Abraham spoke on the telephone.

87.     Roe stated that she was sorry for what she did and that the sexual encounter was "consensual."

88.     Roe next stated that she had told her husband, R.P.[5], about the sexual encounter and that R.P. was "fucking angry."

89.     Roe stated that her husband wanted to meet Dr. Abraham in person to propose something that could "make this better" for Roe and R.P.

90.     It became clear to Dr. Abraham that Roe was suggesting that he pay off Roe and R.P. Dr. Abraham realized that these individuals were attempting to manipulate and extort him.

91.     Dr. Abraham told Roe that he needed to make a report to his (and Roe's) supervisors, Drs. Alex Vaccaro and Jim Purtill. Roe exclaimed, "No way! Why would you do that? I don't want my career to be ruined. Can you at least wait until you hear what my husband has to say? He wants to work out a resolution with you, so that you can make this right for us."

92.     Later that day, R.P. showed up, uninvited, to Fox Chase hospital to see Dr. Abraham. Dr. Abraham declined to see R.P.

93.      While at Fox Chase hospital, R.P. left Dr. Abraham a threatening voicemail, in which R.P. stated: "…I think I'll give you five minutes for you to come out and have the opportunity to talk to me in private. I'd appreciate that and I think it's in your best interest. Think I'll give you the five minutes...."

94.     R.P. had to be removed from the hospital waiting area due to his behavior.

   **b.  Dr. Abraham Reports Roe's Conduct to his Supervisor**

95.     After texting his supervisor, Dr. Alex Vaccaro ("Dr. Vaccaro"), at approximately 4:00 p.m. on June 26, 2018, Dr. Abraham spoke to Dr. Vaccaro between 5:30 p.m. and 6:00 p.m.

---

[5] Prior to their sexual encounter, Plaintiff was unaware that Roe was married.

96.     Dr. Abraham reported that Roe had taken advantage of him at his party and had coerced him into having sexual intercourse, that R.P. had shown up at his workplace, and that he believed that R.P. and Roe were trying to extort him.

97.     Dr. Vaccaro told Dr. Abraham that he was going to speak to TJU's General Counsel concerning Dr. Abraham's report, and he further told Dr. Abraham to discuss the matter with Dr. Jim Purtill ("Dr. Purtill").

98.     Dr. Purtill was TJUH's Residency Program Director and Roe's direct supervisor.

99.     Given that Dr. Abraham and Dr. Purtill both typically had clinic on Wednesdays[6], Dr. Abraham intended on speaking to Dr. Purtill the following morning.

### c.   Dr. Abraham's Disturbing Phone Call with R.P. in the early evening of June 26, 2018

100.    On the way home from Fox Chase Hospital, Plaintiff returned R.P.'s phone call in an attempt to defuse R.P.'s anger.

101.    R.P. stated that Roe had told him what happened and she had said it was "consensual." Dr. Abraham again found the use of the word "consensual" unusual, and he interpreted it as R.P.'s attempt to convince Dr. Abraham not to report Roe for sexual misconduct.

102.    Suddenly, R.P. mentioned that there were "bruises" all over Roe. R.P. also stated the Roe had a tampon inside her vagina, which was not removed during her sexual encounter with Dr. Abraham. To Dr. Abraham's knowledge, R.P.'s statements were false.

103.    R.P. told Dr. Abraham that "we" were going to have to figure out a resolution.

104.    Dr. Abraham clearly understood that R.P. was demanding money from him.

---

[6] June 27, 2018 was a Wednesday.

105.     Dr. Abraham told R.P. that he would not negotiate with him, that Dr. Abraham had already reported the incident to his chairman, Dr. Vaccaro, and that Dr. Abraham intended to meet the following morning with Dr. Purtill.

106.     Agitated, R.P. loudly repeated: "We told you not to tell anyone about this!"

107.     On information and belief, R.P.'s anger escalated when he figured out that the plan to extort Dr. Abraham would not work since Dr. Abraham had already reported the incident.

108.     On information and belief, R.P. and Roe were suddenly on the defensive after learning that Dr. Abraham had already reported Roe's conduct, putting Roe's career in jeopardy.

109.     On information and belief, Roe now needed to switch tactics from extortion to filing a false claim of sexual assault in order to save her career.

### d.   Later in the Evening of June 26, 2018: A False Accusation of Rape

110.     Given the urgency of the situation, when Dr. Abraham arrived home, he texted Dr. Purtill.

111.     Receiving no reply to that text message, Dr. Abraham left Dr. Purtill a voicemail indicating that he needed to speak to Dr. Purtill urgently about a resident issue. Dr. Purtill did not return Dr. Abraham's call.

112.     Concerned, Dr. Abraham called Dr. Vaccaro and told him that he had called Dr. Purtill, but received no reply.

113.     Shockingly, Dr. Vaccaro told Dr. Abraham that Roe had gone directly to Dr. Purtill's home and falsely reported to him that Dr. Abraham had raped her.

114.     Dr. Abraham reminded Dr. Vaccaro that he had initially reported Roe's sexual misconduct.

115.    On information and belief, Roe made this utterly false report after her husband, R.P., learned that Dr. Abraham had already reported her sexual misconduct to Dr. Vaccaro.

116.    On information and belief, Dr. Purtill, evidencing bias in favor of the female accuser, intentionally ignored Dr. Abraham's attempts to reach him.

117.    On information and belief, Dr. Purtill was a mandatory reporter under the Policy, who should have reported Dr. Abraham's allegations to the Title IX Coordinator.

**H.    Dr. Abraham Receives a Notice of Concern**

118.    On June 27, 2018, Dr. Abraham received a Notice of Concern from TJU Title IX Coordinator Zoe Gingold ("Ms. Gingold"), indicating that an investigation would be commenced.

119.    The Notice of Concern vaguely alleged that on or about the night of June 23, 2018, at a party at Dr. Abraham's residence, he engaged in "non-consensual sexual intercourse" with Roe. No further allegations as to why the intercourse was "non-consensual" were provided.

**I.    Dr. Abraham's Forced Leave of Absence from TJUH and Suspension from Rothman Orthopaedics**

120.    On June 27, 2018, TJUH coerced Dr. Abraham into taking a leave of absence.

121.    TJUH Chief Medical Officer, Ed Pribitkin, threatened that Dr. Abraham would be suspended and reported to the Medical Staff and the National Practitioner Database ("NPDB") if he did not take an immediate leave of absence.

122.    Dr. Abraham pleaded with Dr. Pribitkin that the allegation was false and told Dr. Pribitkin that there was another side to the story. Dr. Pribitkin refused to listen.

123.    On information and belief, Dr. Pribitkin was a mandatory reporter under the Policy.

124.    Under the threat of suspension and reporting to the NPDB, Dr. Abraham believed he had no choice but to capitulate and take a leave of absence.

[17]

125.    As a result of Roe's false allegations, Dr. Abraham was also suspended from Rothman Orthopaedics; his salary was cut to his base pay, which was unsustainable for the support of Dr. Abraham and his family[7].

**J.      Roe Files a Police Report**

126.    On or about July 2, 2018, Roe filed a police report accusing Dr. Abraham of sexual assault.

127.    On information and belief, Roe knowingly filed a false police report.

128.    After an investigation, in or about, November, 2018, the Montgomery County District Attorney declined to pursue charges against Dr. Abraham.[8]

**K.      The Flawed and Gender Biased Disciplinary Proceeding against Dr. Abraham.**

> **a.   TJU Deprives Dr. Abraham of a Full and Fair Opportunity to Participate in the Investigation of Roe's Claim Against Him**

129.    TJU was aware of the pending criminal investigation and its constraint on Dr. Abraham's ability to fully participate in the Title IX investigation.

130.    Nonetheless, motivated by gender-bias against Dr. Abraham as a male accused of sexual assault, TJU used the criminal investigation to deprive Dr. Abraham of a full and fair opportunity to participate in the investigation.

131.    Dr. Abraham, for example, asked for an extension to prepare his written statement.

132.    Ms. Gingold refused his request indicating that TJU had an obligation to resolve the matter promptly. At that time, however, the disciplinary process had been ongoing for four months and continued for yet another three months afterwards.

---

[7] At the time of the sexual encounter in question, Plaintiff and his wife were in the process of divorcing.
[8] Dr. Abraham is currently pursuing a civil action against Roe and R.P. in the Pennsylvania Court of Common Pleas for various torts including without limitation slander and libel.

133.   Approximately two weeks after his request for an extension was denied, Dr. Abraham received notice that TJU concluded its investigation into Roe's Title IX allegations against Dr. Abraham.

134.   The investigation was concluded without Dr. Abraham having a full and fair opportunity to give a statement or present any evidence on his behalf, including without limitation:

  i.   Twenty-nine material witness statements collected by a private investigator, which confirmed *inter alia* Roe's sexually aggressive behavior towards Dr. Abraham and other party guests on June 23-24, 2018.
  ii.   The testimony of A.D., who overheard the parties' sexual encounter and confirmed that he did not hear Roe say "no" or make any sounds of distress. To the contrary, A.D. heard Roe make sounds of enjoyment.
  iii.   The threatening voicemail from R.P. (discussed above), which calls into question Roe's motive in filing the Title IX complaint.

   **b.   TJU Deprived Dr. Abraham of the Ability to Review the Investigation Report and Other Key Investigation Documents**

135.   TJU never provided Dr. Abraham: i) the investigative report; ii) any evidence collected by Investigator Alfano; and iii) the statements of the witnesses interviewed (if any).

136.   TJU never provided Roe's initial complaint to the Title IX Office. As a result, Dr. Abraham still does not know the specific allegations that Roe made against him.

137.   TJU proffered no basis written in the Policy to support its withholding of any of the above information or documents.

138.   TJU's actions prejudiced Dr. Abraham's ability to defend himself during the Title IX investigation, and his ability to seek legal redress against TJU.

139.   Because the investigative report, any underlying evidence, and any witness statements are within the exclusive possession of TJU, Dr. Abraham must make allegations concerning the defects in the investigation process on information and belief.

### c.   The Flawed, Superficial, and Gender-Biased Investigation against Dr. Abraham

140.   As detailed below, TJU performed a superficial, flawed investigation into Roe's claims against Dr. Abraham.

141.   The investigation was biased against Dr. Abraham as a male accused of sexual assault.

142.   On information and belief, Roe filed a prior false complaint, which TJU either failed to consider entirely or did not appropriately consider as part of its investigation against Dr. Abraham. The existence of a prior false complaint is an important factor to be considered in evaluating Roe's credibility, reliability, and motive in the Title IX investigation against Dr. Abraham.

143.   On information and belief, TJU failed to appropriately investigate inconsistencies concerning alleged bruising to Roe's arms, neck and face sustained during the encounter.

144.   On information and belief, TJU either made no attempt to corroborate Roe's claim by interviewing operating room staff that came into contact with Roe in the days following the encounter or improperly disregarded the testimony of those interviewed.

145.   On information and belief, there are no medical records to support Roe's allegations of bruising.

146.   On information and belief, Roe never had an examination by a Sexual Assault Nurse Examiner to have evidence preserved in the form of a "rape kit."

147.   On information and belief, TJU did not review or request Roe's contemporaneous social media posts or messages to determine whether Roe discussed the events at issue either publicly or privately, or to test the credibility of Roe's narrative of the events in question.

148.    Because Dr. Abraham was never allowed to review TJU's investigative report, he has no knowledge whether crucial witnesses such as R.P. were interviewed.  R.P. left Dr. Abraham a threatening voicemail, showed up uninvited and unannounced to Dr. Abraham's clinic, then attempted to extort Dr. Abraham via a phone call on June 26, 2018.  R.P.'s testimony is crucial in evaluating the credibility of Roe's claims.

149.    Because Dr. Abraham was never allowed to review TJU's investigative report, he has no knowledge of i) how Roe's credibility was evaluated; ii) how witness credibility was evaluated; iii) whether witness statements (if any exist) were properly verified; or iv) whether witness statements were editorialized with a gender bias against him.

150.    TJU accorded Roe preferential treatment due solely to her gender. On information and belief, Roe's alleged non-consensual sexual contact with party guest V.D. was reported to TJU's Human Resources Department and Chief Medical Officer Ed Pribitkin, but TJU took no action to investigate these allegations.

### d.  TJU Fails to Investigate Dr. Abraham's Allegations that Roe engaged in Non-Consensual Sexual Intercourse with Him and Fails to Investigate whether Roe's Complaint was Retaliatory.

151.    Despite Dr. Abraham's repeated attempts to report Roe's misconduct and retaliation against him, TJU took no action.

152.    As discussed, prior to Roe lodging her false complaint against him, Dr.  Abraham first reported his complaint about Roe to Dr. Vaccaro on June 26, 2018.

153.    On information and belief, Roe only lodged her complaint after the extortion attempt failed and after learning from R.P. that Dr. Abraham had already initiated a complaint against her for sexual misconduct.

154.     As discussed above, on June 26, 2018, Dr. Vaccaro told Dr. Abraham to directly report his complaint to Dr. Jim Purtill. Despite calling Dr. Purtill directly, and sending Dr. Purtill a text message on June 26th, requesting his immediate attention to a resident problem, Dr. Abraham never heard back from Dr. Purtill.

155.     On or about July 6, 2018, Dr. Abraham called Ms. Fogerty, his assigned TJU Title IX Advisor, and detailed his complaint against Roe. Dr. Abraham also expressed to Ms. Fogerty that Roe's complaint against him was retaliatory.

156.     Ms. Fogerty took no further action concerning Dr. Abraham's complaint for sexual misconduct against Roe or his complaint against Roe for retaliation.

**L.     Dr. Abraham Relinquishes His Clinical Privileges and Faculty Appointment at TJUH.**

157.     At the suggestion of TJU, Roe and Dr. Abraham, through counsel, unsuccessfully attempted to reach a "Non-Hearing Resolution" to this matter.

158.     By December, 2018, Dr. Abraham had exhausted his savings, and he was in a financially unsustainable position.

159.     Given the flawed, gender-biased conduct of TJU and its agents in this matter, Dr. Abraham feared that any Title IX hearing would have a pre-determined finding of responsibility.

160.     By email dated December 21, 2018, Dr. Abraham, maintaining his innocence and reserving all rights, relinquished his faculty appointment and clinical privileges at TJU/TJUH as well as any institution in which TJU/TJUH had a controlling interest.

161.     In his December 21, 2018 email, addressed to TJU counsel, TJUH President, Rich Webster, Dr. Alex Vaccaro, and CEO of the Rothman Institute, Mike West, Dr. Abraham again indicated that i) he had a complaint against Roe and ii) Roe's complaint against him was retaliatory. Dr. Abraham again stated that neither complaint had been addressed.

[22]

162.   Dr. Abraham relinquished his clinical privileges and his faculty appointment TJU/TJUH as well as at any institution in which TJU/TJUH had a controlling interest with the understanding that he would be able continue his employment at his prior level at any Rothman Orthopaedics office that was not majority-owned by TJU/TJUH, at least until Roe concluded her residency program. At the time of Dr. Abraham's relinquishment of his clinical privileges and faculty appointment from TJU/TJUH, no other restrictions were discussed.

**M.**   **January 8, 2019 Termination of the Title IX Investigation Against Dr. Abraham.**

163.   On or about January 8, 2019, TJU terminated its investigation with ***no findings of responsibility*** against Dr. Abraham. TJU did not address Dr. Abraham's complaint against Roe or his allegation that Roe's complaint was retaliatory.

164.   According to TJU, since Dr. Abraham's separation from TJU represented the highest form of relief that would have been available under applicable policy, there was no need for a hearing or further disciplinary inquiry or action.

**N.**   **Climate Concerning Sexual Assault at TJU and TJUH.**

165.   As discussed above, universities such as TJU and medical residency programs such as the one at TJUH have enacted victim-centered policies for resolution of sexual assault complaints.

166.   In doing so, these schools were guided by the now-rescinded DCL, the threats of OCR investigations, Title IX lawsuits and the ultimate penalty--rescission of federal funds.

167.   Even following the rescission of the DCL, TJU/ TJUH continued to enforce its victim-centered policies in a gender biased manner that impermissibly denied males accused of sexual assault due process.

[23]

168.     As is evidenced in Dr. Abraham's case, TJU's policies and procedures are applied with gender bias against males accused of sexual assault.

169.     In recent years, and during the pendency of Dr. Abraham's disciplinary proceeding, TJU has faced scrutiny from OCR as well as significant pressure to make findings of responsibility against males accused of sexual assault due to two open OCR complaints dealing with alleged Title IX infractions. Both OCR complaints were commenced on May 15, 2017. *See* https://projects.propublica.org/graphics/civil-rights-violations#13737 (noting that the issues being investigated in these two complaints are, respectively, "Title IX- Admissions" and "Title IX Retaliation") (last accessed April 10, 2021).

170.     TJU and TJUH faced pressure to selectively enforce the Sexual Misconduct Policy against males and to find against males accused of sexual misconduct due to pressure from the #MeToo Movement, Times Up HealthCare Movement, and negative publicity concerning sexual harassment of female medical students. *See generally* August 3, 2019, "#MeToo Meets Medicine: Philly Doctors fight sex harassment, pay gaps by joining Time's Up Healthcare, available at https://www.inquirer.com/business/times-up-healthcare-sexual-harassment-gender-medicine-doctors-nurses-20190803.html (noting that "Thomas Jefferson University this year ousted Charles Pollack, head of Jefferson's Lambert Center for marijuana research, after he self-reported sexually harassing a subordinate.")

171.     In June, 2018, i.e. at the time that Dr. Abraham's disciplinary proceeding was commenced, a report published by the National Academies of Science, Engineering and Medicine (NASEM) on sexual harassment gained media attention.

172.     The NASEM report found that sexual harassment in academia was more common among engineering and medical students than students in non-STEM fields. (*See* M. Thielking,

"Sexual Harassment is Rampant in Science – and current Policies Aren't Cutting It, Landmark Report Finds" June 12, 2018, available at https://www.statnews.com/2018/06/12/sexual-harassment-science-nasem-report/)

173.    The media has highlighted statistics concerning sexual harassment of female medical students, putting pressure on institutions such as TJU/TJUH to appear "tough" on males accused of sexual assault. *See id.* ("In one survey, nearly half of female medical students said they had been harassed by faculty or staff"); *see also* August 3, 2019 "#MeToo Meets Medicine: Philly Doctors fight sex harassment, pay gaps by joining Time's Up Healthcare, available at https://www.inquirer.com/business/times-up-healthcare-sexual-harassment-gender-medicine-doctors-nurses-20190803.html (quoting the same statistic: "In one survey for the [NASEM] report, almost half of female medical students reported being harassed by faculty or staff.")

174.    The media is likewise critical of how universities including TJU/ TJUH have handled sexual harassment. *See id.* (noting "it's critical for colleges to do more than just comply with the laws such as Title IX and Title VII, which have led to policies and procedures that might protects [sic] universities but don't do much to stop harassment.")

175.    The Times Up Healthcare movement is committed to eradicating sexual harassment, including sexual assault in healthcare. The Time Up Healthcare website states the following:

> Sexual harassment and gender discrimination have no place in health care. Women make up nearly 80 percent of the health care workforce, but only 20 percent of the decision makers — including hospital leadership, executives, and association presidents — are women. And sexual harassment and gender discrimination run rampant: Researchers estimate that 50 percent of female medical students will experience harassment before they even graduate. That's unacceptable.

https://timesupfoundation.org/work/times-up-healthcare/ (last accessed April 10, 2021).

[25]

176.    Leaders of the Times Up Healthcare movement have openly criticized TJU for its handling of alleged sexual misconduct, namely the sexual misconduct allegations of Dr. Charles Pollack. Dr. Pollack self-reported sexual harassment of his subordinate. As reported by the Philadelphia Inquirer, Esther Choo, MD, a founding member of Time's Up Healthcare stated the following of Pollack: "These people fail upward. It's not just that he kept a career going, but he had positions of prestige," said Choo. "It's called 'passing the trash.' Why can't we just take out the trash?" (*See* August 3, 2019 "#MeToo Meets Medicine: Philly Doctors fight sex harassment, pay gaps by joining Time's Up Healthcare, available at https://www.inquirer.com/business/times-up-healthcare-sexual-harassment-gender-medicine-doctors-nurses-20190803.html)

177.    In June, 2019, TJU/TJUH pledged its commitment to the core statements of Times Up Healthcare, including that "sexual harassment and gender inequity has no place in the healthcare workplace." (*See* TJU Pledge Letter, available at https://timesupfoundation.org/wp-content/uploads/2019/11/tuh-sig-jefferson.png)

178.    It is amidst this pressure and in this charged environment that the flawed and gender-biased proceeding against Dr. Abraham took place, with TJU/TJUH operating, on information and belief, in fear of negative publicity that could arise if TJU/TJUH did not demonstrate that it was "tough" on males accused of sexual assault.

179.    During the period in question, Dr. Abraham's superiors made gender-biased statements towards him. By way of example, not limitation, on August 20, 2018, Dr. Alex Vaccaro told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged Dr. Abraham from making any such claim.

180.    On information and belief, Defendants were responding to pressure faced from the TJU/TJUH's leadership, from media, and from movements such as #MeToo and Times Up

Healthcare when they conducted a superficial, gender-biased investigation against Dr. Abraham and ignored Dr. Abraham's complaint of Roe's sexual misconduct toward him as well as his complaint that Roe's complaint against him was retaliatory.

**O.     TJU/TJUH Interfered With and Continues to Harm Dr. Abraham's Medical Practice and Business Relationship with Rothman Orthopaedics.**

181.    During Dr. Abraham's coerced leave of absence from June, 2018 through December, 2018, TJU/TJUH's agents and employees misrepresented Dr. Abraham's status to physicians seeking to refer patients to Dr. Abraham and to existing patients seeking Dr. Abraham's services. Patients were told that Dr. Abraham had left TJUH and could not see them; patients were then referred to other doctors. Referring physicians were told that Dr. Abraham was no longer seeing patients at TJUH.

182.    TJU/TJUH's misrepresentations concerning Dr. Abraham's leave of absence directly caused a steep decline in Dr. Abraham's referral base and patient volume.

183.    In January, 2019, Dr. Abraham returned to employment through his business relationship with Rothman Orthopaedics.

184.    TJU and TJUH through its agents and employees, were aware of Dr. Abraham's business relationship with Rothman Orthopaedics.

185.    TJU/TJUH, through the actions of their agents/employees, have intentionally harmed Dr. Abraham's medical practice and his business relationship with Rothman Orthopaedics.

186.    In January, 2019, Dr. Abraham was restricted, without any end date, from any Rothman Orthopaedics office that contained TJU/TJUH residents.  On information and belief, this restriction originated with TJU/TJUH, and was implemented to placate TJU/TJUH.

187.    As noted above, the only restriction discussed at the time that Dr. Abraham relinquished his clinical privileges and faculty appointment at TJU/TJUH was that Dr. Abraham

would not see any patients at any Rothman Orthopaedics offices that were majority owned by TJU/TJUH at least until Roe's residency graduation.

188.    At all times relevant herein, Rothman Orthopaedics had approximately twenty-two offices, two of which were majority owned by TJU/TJUH. As Dr. Abraham understood it, he would have access to approximately twenty offices upon his return to practice in January, 2019.

189.    Due to the above restriction, Dr. Abraham had approximately three offices available to him. Dr. Abraham was forced to move out of the area that he had built his previously-unblemished reputation for the past ten years, causing a decline in his patient base and patient referrals.

190.    Dr. Abraham was likewise banned from 2019 Resident Research Day, in which Dr. Abraham's studies are typically presented. Attendance at this event was mandated by Rothman Orthopaedics.

## P.    Additional Harm to Dr. Abraham

191.    Dr. Abraham has suffered severe and irreparable harm, including without limitation economic harm, reputational harm, harm to his career, and emotional distress, due to the conduct of the Defendants.

192.    Dr. Abraham has been mislabeled as a "rapist" which has, and will continue to, harm his reputation. He has been socially ostracized and has suffered widespread humiliation due to the events described herein.

193.    Dr. Abraham has lost earnings, suffered a diminution in his patient base and future earning potential.

194.    Dr. Abraham has suffered and continues to suffer from mental pain and anguish, including without limitation, symptoms of anxiety, depression, "PTSD," and suicidal ideation.

[28]

**COUNT I**
**(Violation of Title IX of the Education Amendments of 1972)**
**(Sex Discrimination)**

195.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

196.    Title IX provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

197.    Defendant TJUH's residency program is an "educational program" under Title IX. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3d. Cir. 2017) (finding hospital residency program to be an "educational program" under Title IX).

198.    Defendants TJU and TJUH receive federal funding. The total amount of federal funding received by Defendants is not publicly available.

199.    At all points relevant herein, Defendants TJU and TJUH operated as agents of one another. As described, the operations of Defendants TJU and TJUH are substantively consolidated.

200.    Title IX prohibits sex discrimination against employees of universities and educational programs that receive federal funding- its protections are not limited to students.

201.    As recently held by the Third Circuit in *Doe v. University of* Sciences, 961 F.3d 203, 209 (2020), "…to state a claim under Title IX, the alleged facts … must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex."

202.    Particular facts demonstrating a plausible inference of Defendants' discrimination against Dr. Abraham due to his sex have been detailed above, and include the following.

a. While TJU investigated Roe's complaint against Dr. Abraham, TJU/TJUH failed to investigate Dr. Abraham's complaint against Roe for sexual

misconduct and failed to investigate whether Roe's complaint against Dr. Abraham was retaliatory. (*See e.g.* ¶¶ 151-156)

b.   Dr. Abraham attempted to report Roe's misconduct to officials of TJU/TJUH who had the authority to institute corrective measures. Each time he was ignored, and the response of the TJU/TJUH was clearly unreasonable in light of the known circumstances. (*See e.g.* ¶¶ 151-156; 161; 122-123). Dr. Vaccaro expressed stereotypical views about gender when he told Dr. Abraham that a man cannot be sexually assaulted by a woman.

c.   Defendants conducted a flawed, superficial and gender-biased proceeding against Dr. Abraham. (*See e.g.* ¶¶ 129-150)

d.   Particular circumstances suggest that gender-bias was a motivating factor in the inconsistent treatment of Jane Roe and Dr. Abraham.  (¶¶ 165-180; 12-24)

e.   Upon information and belief, as compared to the number of females accused of sexual misconduct, the number of males whose cases are formally investigated and adjudicated is greater.

f.    Upon information and belief, Defendants treat accused females and accused males differently during the pendency of an investigations. Dr. Abraham was wrongfully pressured by TJUH into taking an administrative leave due to Roe's complaint. However, despite Dr. Abraham's complaint, no interim action was ever taken against Roe.

g.   To the extent that any female accused were subjected to disciplinary hearings, and found responsible, the sanctions issued were far less severe than those issued to comparable male respondents. These allegations are alleged upon information and belief because Plaintiff was unable to locate any data relating to the gender of those accused of sexual misconduct who were formally investigated, found responsible and received sanctions.[9]  Defendants engaged in a Title IX compliance strategy which targeted males and sought more severe discipline against them.

---

[9] Accordingly, the information that may support these allegations is *exclusively* within TJU and TJUH's possession, custody and control and is not publicly reported. *See Trustees of the U. of Penn.*, 270 F. Supp. at 824 (selective enforcement claim could proceed to discovery even though complaint alleged that comparator information in exclusive possession of university); *Doe v. Brown U.*, 166 F. Supp. 3d 177 (D.R.I. 2016) ("Requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts"); *Ritter v. Oklahoma City U.*, 2016 WL 3982554 at **2-3 (W.D. Okla. July 22, 2016) (allegations of gender bias pled on information and belief met *Twombly* standard).

203.     As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of income, lost career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding investigation, requiring Defendants to remove any record of the investigation of Roe's complaint and Roe's complaint from Plaintiff's employment file, and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

## COUNT II
## (Violation of Title IX of the Education Amendments of 1972)
## (Retaliation)

204.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

205.     Defendants TJU and TJUH operated as agents of one another; the operations of Defendants TJU and TJUH are substantively consolidated.

206.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

207.     Defendant TJUH's residency program is an "educational program" under Title IX.

208.     Defendants TJU and TJUH receive federal funding.

209.    Retaliation by a university or other educational program receiving federal funds against a person engaging in protected activity under Title IX is actionable. To state a claim for retaliation, a plaintiff must allege that i) he or she engaged in activity protected by Title IX; ii) he or she suffered an adverse action; and iii) there was a causal connection between protected activity and adverse action. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d at 564.

210.    One day after Dr. Abraham reported Jane Roe's alleged sexual misconduct against him, i.e. nonconsensual sexual intercourse, and alleged that Roe's false complaint against him was retaliatory, he was pressured by TJUH into taking a leave of absence.

211.    As discussed above, prior to Roe lodging her false complaint against him, Dr. Abraham first reported his complaint that Roe had engaged in a nonconsensual sexual encounter with him, then attempted to extort him, to his supervisor, Dr. Alex Vaccaro, on June 26, 2018.

212.    On information and belief, Roe only lodged her complaint against Dr. Abraham in retaliation, after the extortion attempt failed and after learning from R.P. that Dr. Abraham had already initiated a complaint against her for sexual misconduct.

213.    On June 26, 2018, Dr. Vaccaro told Dr. Abraham to directly report his complaint to Dr. Jim Purtill.  Dr. Purtill did not respond to Dr. Abraham's June 26, 2018 voicemail and text message.

214.    On information and belief, Dr. Purtill and Dr. Vaccaro are mandatory reporters under the Policy. Yet, they did not report Dr. Abraham's complaint against Roe to the Title IX Coordinator.

215.    On June 27, 2018, TJUH Chief Medical Officer, Ed Pribitkin, threatened to suspend Dr. Abraham, and report him to the NPDB, if he did not take an immediate leave of absence.

[32]

216.     Dr. Abraham pled with Dr. Pribitkin that Roe's allegation was false and told Dr. Pribitkin that there was another side to the story. Dr. Pribitkin would not listen.

217.     On information and belief, Dr. Pribitkin was a mandatory reporter under the Policy. He took no action to report Dr. Abraham's complaint to the Title IX Coordinator.

218.     Under the threat of suspension and reporting to the NPDB, Dr. Abraham had no choice but to capitulate and take a leave of absence.

219.     Dr. Abraham engaged in activity protected under Title IX when he reported Roe's sexual misconduct towards him, i.e. non-consensual sexual intercourse, and when he alleged that Roe's false complaint against him was retaliatory.

220.     Dr. Abraham suffered adverse action the day after he initially reported these allegations of sexual assault and retaliation when he was forced to take a leave of absence under the threat that he would suffer career-ruining consequences if he did not oblige.

221.     The unusual temporal proximity between the date of Dr. Abraham's report of the alleged assault and retaliation by Roe and the date that TJUH forced him to take a leave of absence demonstrates a causal connection between the protected activity and the adverse action.

222.     Moreover, Dr. Abraham's forced leave of absence was part of a pattern of antagonistic behavior by TJU and TJUH that began when Dr. Abraham initially reported Roe for misconduct. As detailed above, this pattern included without limitation:

   a.   Drs. Vaccaro and Purtill took no action with respect to Dr. Abraham's first-reported sexual assault complaint against Roe.

   b.   Dr. Abraham's superiors made gender-biased statements towards him. By way of example, not limitation, on August 20, 2018, Dr. Alex Vaccaro told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged Dr. Abraham from making any such claim.

   c.   TJU used the criminal complaint against Dr. Abraham to prevent him from defending himself against Roe's false allegation. (*See e.g.* ¶¶ 129-134).

[33]

d. At no time was Dr. Abraham provided with the specific policies that were applied to his case, particularly after his advisor told him he was not entitled to a hearing before the Sexual Misconduct Board.

e. To date, TJU has withheld from Dr. Abraham all evidence concerning its investigation into Roe's allegations.

223. As detailed in this Complaint, the external pressure faced by TJU and TJUH to credit female claims of sexual assault and to prove that TJU and TJUH were tough on male perpetrators of sexual violence is another circumstance suggesting a causal link between Dr. Abraham's protected activity, i.e. reporting Roe's misconduct and retaliation, and the adverse action taken against him. (¶¶165-180; 12-24)

224. As a result of Defendants' retaliation, Dr. Abraham suffered reputational harm; economic damages including without limitation lost earnings and loss of future earning potential; and mental pain and anguish, including without limitation, symptoms of anxiety, depression, "PTSD," and suicidal ideation.

225. As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of income, and lost career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding investigation, requiring Defendants to remove any record of the investigation of Roe's complaint and Roe's complaint

from Plaintiff's employment file, and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

## COUNT III
## Breach of Contract

226.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

227.    Under Pennsylvania law, to allege breach of contract, a Plaintiff must allege (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 810 (E.D. Pa. 2017) (internal citations omitted).

228.    The Policy constituted a contract between Dr. Abraham and TJU / TJUH.

229.    Under Pennsylvania law, contracts contain an implied covenant of good faith and fair dealing.

230.    Defendants TJU and TJUH operated as agents of one another; their operations are substantively consolidated.

231.    Defendants breached the implied covenant of good faith and fair dealing as well as at least the following duties to Dr. Abraham, set forth in the Policy, in their investigation of the sexual encounter between Dr. Abraham and Roe occurring on the night of June 23, 2018:

   a.   Denying Dr. Abraham a fair and equal opportunity to present written statements, witnesses and other evidence during the investigatory process. (*See* Policy VII "Investigation and Disciplinary Process" at 11).

   b.   Denying Dr. Abraham a fair and equal opportunity (or any opportunity at all) to identify any "significant conflicts" that would affect the timing of the investigation and any potential hearing. (*See Policy*, VII "Investigation and Disciplinary Process" at 11).

   c.   Failing to investigate Dr. Abraham's complaint that Roe had engaged in non-consensual sexual intercourse with him.

    d.   Failing to investigate whether Roe's complaint against Dr. Abraham was retaliatory.

    e.   Failing to provide Dr. Abraham with a hard copy of, or link to, the specific policies and procedures which were applicable to any hearing in his matter.  The failure to provide this information prejudiced Dr. Abraham's ability to weigh his options for the resolution of this matter, i.e. whether to proceed to a hearing or pursue a non-hearing resolution.

    f.   Depriving Dr. Abraham the opportunity to review the investigative report, Roe's initial complaint to the Title IX Office, any evidence and witness statements.  There is no written basis in the Policy for withholding these materials.

    g.   Performing a superficial, flawed, gender biased investigation of Roe's complaint. (*See e.g.* ¶¶129-150)

232.    Plaintiff has suffered and will continue to suffer substantial economic losses as a result of the direct, proximate, and foreseeable consequence of the foregoing breaches. Plaintiff has suffered actual and consequential damages, as a result of these breaches.

233.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## <u>COUNT IV</u>
## <u>Intentional Infliction of Emotional Distress</u>

234.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

235.    Defendants TJU and TJUH operated as agents of one another; the operations of Defendants are substantively consolidated.

236.    Defendants' conduct was extreme, outrageous, and of such character as not to be tolerated by a civilized community, i.e. where the accused is provided no meaningful opportunity to defend himself against false accusations and where complaints of sexual misconduct and retaliation are ignored. Such conduct included but was not limited to the conduct set forth at Paragraphs 151-156; ¶161; ¶¶121-123; ¶¶129-150; ¶179).

237.    Defendants' conduct was intentional or reckless. Defendants' conduct was for an ulterior motive or purpose, *i.e.,* in an effort to appease Roe, avoid another investigation by OCR concerning TJU's handling of Title IX matters, and to avoid bad publicity concerning the TJU and TJUH's handling of sexual assaults.

238.    Defendants' intentional conduct resulted in severe emotional distress.

239.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered emotional and psychological distress, humiliation and embarrassment, sleeplessness, anxiety, depression, suicidal ideation, and other damages that may arise during the course of discovery and the course of trial in this matter. Plaintiff has sought treatment for such symptoms.

## COUNT V
## Negligent Infliction of Emotional Distress

240.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

241.     Defendants TJU and TJUH operated as agents of one another; their operations are substantively consolidated.

242.    The Policy constituted a contract between Dr. Abraham and TJU / TJUH.

243.    Under Pennsylvania law, contracts contain an implied covenant of good faith and fair dealing.

244.    Defendants TJU and TJUH owed a contractual duty to Plaintiff to comply with their own policies and procedures, including without limitation the Policy.

245.    Without limitation, Defendants breached their duty to Plaintiff, through following actions and inactions:

   a) Denying Dr. Abraham a fair and equal opportunity to present written statements, witnesses and other evidence during the investigatory process. (See Policy VII "Investigation and Disciplinary Process" at 11).

[37]

b) Denying Dr. Abraham a fair and equal opportunity (or any opportunity at all) to identify any "significant conflicts" that would affect the timing of the investigation and any potential hearing. (See Policy, VII "Investigation and Disciplinary Process" at 11).

c) Failing to investigate Dr. Abraham's allegation that Roe had engaged in non-consensual sexual intercourse with him.

d) Failing to investigate whether Roe's allegation against Dr. Abraham was retaliatory.

e) Failing to provide Dr. Abraham with a hard copy of, or link to, the specific policies and procedures which were applicable to any hearing in his matter. The failure to provide this information prejudiced Dr. Abraham's ability to weigh his options for the resolution of this matter, i.e. whether to proceed to a hearing or pursue a non-hearing resolution.

f) Depriving Dr. Abraham the opportunity to review the investigative report, Roe's initial complaint to the Title IX Office, evidence and witness statements. There is no written basis in the Policy for withholding these materials.

g) Performing a superficial, flawed, gender biased investigation of Roe's complaint. (*See e.g.* ¶¶ 129-150)

246.    Defendants' conduct, i.e. their breaches of duty toward the Plaintiff, was the direct and proximate cause of Plaintiff's immediate and substantial physical harm. Such harm included, without limitation emotional and psychological distress, humiliation and embarrassment, sleeplessness, anxiety, depression, suicidal ideation, for which Plaintiff has sought medical treatment.

247.    As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff has sustained significant damages, including without limitation damages to physical well-being, emotional and psychological damages and treatment for same, damages to reputation, lost career opportunities, and economic losses.

<u>**COUNT VI**</u>
**<u>Tortious Interference with Business Relations</u>**

248.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

249.    Defendants TJU and TJUH operated as agents of one another; the operations of Defendants TJU and TJUH are substantively consolidated.

250.    To set forth a claim for tortious interference with business relations, a plaintiff must allege: 1) a contractual relationship; 2) the purpose or intent to harm the existing relationship, 3) the absence of privilege or justification on the part of the defendant; and 4) actual damage to plaintiff as a result of defendant's conduct.

251.    Dr. Abraham had a contractual relationship with third party, Rothman Orthopaedics.

252.    Defendants TJU and TJUH were aware of Dr. Abraham's contractual relationship with Rothman Orthopaedics. Through their agents and employees, Defendants engaged in purposeful action, specifically intended to harm Dr. Abraham's existing contractual relationship with Rothman Orthopaedics. (*See e.g.* ¶¶ 181-190)

253.    Collective Defendants' actions were taken without privilege or justification.

254.    Plaintiff has suffered and will continue to suffer substantial economic losses as a direct, proximate and foreseeable consequence of Defendants' actions.  Plaintiff's economic losses include without limitation, lost earnings, loss of earning potential, loss of patient base and loss of patient referrals. Plaintiff has suffered actual and consequential damages, as a result of Defendants' conduct.

255.    As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff has sustained significant damages, including without limitation severe emotional

[39]

distress, humiliation and embarrassment, sleeplessness, anxiety, depression, suicidal ideation, and other damages that may arise during the course of discovery and the course of trial in this matter. Plaintiff has sought medical treatment for such symptoms.

256. As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff has sustained actual harm to his reputation and is entitled to damages in an amount to be determined at trial for the same.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    on the first count of violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Dr. Abraham:

(a) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of income , loss of future earning potential, and loss of career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(b) injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding Title IX investigation, requiring Defendants to remove any record of the Title IX investigation of Roe's complaint and Roe's complaint from Dr. Abraham's employment file; and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

(ii)    on the second count of violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Dr. Abraham:

(a) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of income , loss of future earning potential, and loss of career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

[40]

      (b) injunction against TJU and TJUH enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding Title IX investigation, requiring Defendants to remove any record of the Title IX investigation of Roe's complaint and Roe's complaint from Dr. Abraham's employment file; and reinstating Plaintiff's clinical privileges and faculty appointment at TJU and TJUH.

(iii)    on the third count against Defendants TJU and TJUH for breach of contract, damages in an amount to be determined at trial plus pre-judgment interest;

(iv)    on the fourth count of Intentional Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth count of Negligent Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth count of Tortious Interference with Business Relations, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, actual damages, consequential damages, past and future economic losses, loss of future career prospects, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, loss of educational opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

[41]

**Dated: April 12, 2021**

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**

By:   */s/ Andrew T. Miltenberg*
Andrew T. Miltenberg, Esq.
(*pro hac vice admission pending*)
Stuart Bernstein, Esq.
(*pro hac vice admission pending*)
Cindy Singh, Esq.
(*pro hac vice admission pending*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
csingh@nmllplaw.com

**ROGERS COUNSEL**

By:   */s/ Lance Rogers*
Lance Rogers
26 E. Athens Avenue
Ardmore, Pennsylvania 19003
(610) 228-0222
lance@rogerscounsel.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on April 12, 2021, I electronically filed the foregoing First Amended Complaint, which

was made available for viewing and downloading via the electronic case filing (ECF) system by:

**KLEHR HARRISON HARVEY BRANZBURG LLP**
William A. Harvey
Lisa A. Lori
Stephanie Wolbransky
1835 Market Street, Suite 1400
Philadelphia, PA19103
Telephone: (215)-569-2700
Fax: (215)-568-6603
wharvey@klehr.com
llori@klehr.com
swolbranksy@klehr.com
*Attorneys for Defendants*

**Dated: April 12, 2021**

**NESENOFF & MILTENBERG, LLP**

By:    /s/ Andrew T. Miltenberg
       Andrew T. Miltenberg, Esq.
       (*pro hac vice admission pending*)
       Stuart Bernstein, Esq.
       (*pro hac vice admission pending*)
       Cindy Singh, Esq.
       (*pro hac vice admission pending*)
       363 Seventh Avenue, Fifth Floor
       New York, New York 10001
       (212) 736-4500
       amiltenberg@nmllplaw.com
       sbernstein@nmllplaw.com
       csingh@nmllplaw.com

**ROGERS COUNSEL**

By:    /s/ Lance Rogers
       Lance Rogers
       26 E. Athens Avenue
       Ardmore, Pennsylvania 19003
       (610) 228-0222
       lance@rogerscounsel.com

       ***Attorneys for Plaintiff***

[43]