## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN A. ABRAHAM, M.D., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: 20-cv-02967 (MMB) |
| | : | |
| v. | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY, et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

KLEHR HARRISON HARVEY
BRANZBURG LLP

Dated: May 10, 2021

*/s/ Stephanie D. Wolbransky*
William A. Harvey (No. 25344)
Lisa A. Lori (No. 83814)
Stephanie D. Wolbransky (No. 326356)
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Telephone: (215) 569-2700
Fax: (215) 568-6603
wharvey@klehr.com
llori@klehr.com
swolbransky@klehr.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF ALLEGED FACTS..............................................................2

      A.    General Background and Initial Complaint ............................................2

      B.    The Court's Order Granting Defendants' Motion to Dismiss the Initial Complaint
            for Failure to Comply with Fed. R. Civ. P. 8(a) ........................................3

      C.    The Amended Complaint ..........................................................................4

      D.    The June 23–24, 2018 Sexual Incident Between Abraham And Roe at Abraham's
            Pool Party..................................................................................................4

      E.    Roe's Husband Finds Out About His Wife's "Sexual Encounter" With Abraham,
            Exhibits Outrage With Abraham, And Abraham Becomes Alarmed And Fears For
            His Safety...................................................................................................6

      F.    TJU's Investigation Into The Events of June 23-24, 2018 And Abraham's Leave
            of Absence Pending The Investigation And Voluntary Resignation .....................7

III.  STANDARD OF REVIEW ................................................................................9

IV.   ARGUMENT .....................................................................................................10

      A.    Abraham's Amended Complaint Should Be Dismissed For Failure To Comply
            With Fed. R. Civ. P. 8 .............................................................................10

      B.    Plaintiff's Title IX Claims (Counts I and II) Should Be Dismissed for Failure to
            State Claims. ............................................................................................12

            1.    Plaintiff Fails to State A Claim For Sex Discrimination ...........................13

                  i.     Abraham's Claim Is Deficient Because He Cannot Allege Any
                         Discrimination On The Basis Of His Sex. .....................................13

                  ii.    Abraham's Claims Of Discrimination Are Fatally Flawed Because
                         Jefferson Did Not Have Any Requisite Notice of Or Control Over
                         Roe's Purported Conduct..............................................................17

                  iii.   Abraham's Claim Is Fatally Defective Because Jefferson's
                         Response to the Allegations Was Reasonable in Light of the
                         Circumstances ...............................................................................22

            2.    Plaintiff Fails to State a Claim for Retaliation...........................................22

           i.      Abraham Cannot Allege Any Adverse Action By Jefferson. ........23

           ii.     Abraham Has Not, And Cannot, Allege Any Causation. ..............24

C.    This Court Should Decline to Exercise Supplemental Jurisdiction Over Abraham's State Law Claims. ................................................................26

D.    If the Court Decides to Retain Jurisdiction Over the State Law Claims, Plaintiff's Claims Should be Dismissed for Failure to State a Claim ....................................28

1.    Abraham Fails To State A Claim For Breach of Contract ........................28

2.    Plaintiff Fails To State A Claim For Intentional Infliction of Emotional Distress ...............................................................................................29

3.    Abraham Fails to State A Claim For Negligent Infliction of Emotional Distress ...............................................................................................31

           i.      Plaintiff's Claim for Negligent Infliction of Emotional Distress is Barred by the "Gist of the Action" Doctrine ................................31

           ii.     Abraham's Claim for Negligent Infliction of Emotional Distress Further Fails to State A Claim ....................................................32

4.    Abraham Fails to State A Claim For Tortious Interference with Business Relations ............................................................................................33

V.    CONCLUSION ..................................................................................................34

PHIL1 9481924v.6

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angeloni v. Diocese of Scranton*,
   135 Fed.App'x. 510 (3d Cir. 2005) ................................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................9, 26

*B.W. v. Career Tech. Ctr. of Lackawanna Cty.*,
   422 F. Supp. 3d 859 .....................................................................................18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..........................................................................9, 15, 26

*Black v. Cmty. Educ. Centers, Inc.*,
   No. CIV.A. 13-6102, 2014 WL 859313 (E.D. Pa. Mar. 4, 2014) ...........................32

*Bohler-Uddeholm Am., Inc., v. Ellwood Grp., Inc.*,
   247 F.3d 79 (3d Cir. 2001) ............................................................................32

*Bolick v. NE Indus Servs. Corp.*,
   666 F.App'x 101 (3d Cir. 2016) .....................................................................11

*Bostic v. Smyrna Sch. Dist.*,
   418 F.3d 355 (3d Cir. 2005) ......................................................................17, 18

*Brejcak v. County of Bucks*,
   No. CIV.A. 03-4688, 2004 WL 377675 (E.D. Pa. Jan. 28, 2004) .........................12

*Bruno v. Erie Ins. Co.*,
   106 A.3d 48 (Pa. 2014) .................................................................................32

*Burks v. City of Phila.*,
   904 F. Supp 421 (E.D. Pa. 1995) ....................................................................12

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006) ......................................................................................23

*Checa v. Drexel University*,
   No. CV 16-108, 2016 WL 3548517 (E.D. Pa. June 28, 2016) ...............................24

*Clarkson v. SEPTA*,
   700 F. App'x 111 (3d Cir. 2017) ....................................................................23

*Coffman v. Wilson Police Dep't.*,
  739 F. Supp. 257 (E.D. Pa. 1990) ............................................................12

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) .......................................................19, 20, 21, 22

*Denton v. Silver Spring Nursing and Rehab. Ctr.*,
  739 A.2d 571 (Pa. Super. Ct. 1999) ........................................................32

*Doe v. Baum*,
  903 F.3d 575 (6th Cir. 2018) ...............................................................17

*Doe v. Brandeis Univ.*,
  177 F. Supp. 3d 561 (D. Mass. 2016) ......................................................30

*Doe v. Columbia Coll. Chicago*,
  933 F.3d 849 (7th Cir. 2019) ...............................................................25

*Doe v. Columbia Univ.*,
  831 F.3d 46 (2d Cir. 2016) .................................................................13

*Doe v. Mercy Catholic Med. Ctr.*,
  850 F.3d 545 (3d Cir. 2017) ........................................................14, 22, 23

*Doe v. Miami Univ.*,
  882 F.3d 579 (6th Cir. 2018) ...............................................................13

*Doe v. Pennsylvania State Univ.*,
  No. 4:17-CV-01315, 2018 WL 317934 (M.D. Pa. Jan. 8, 2018).............................15

*Doe v. Princeton Univ.*,
  790 F. App'x 379 (3d Cir. 2019) ...........................................................15

*Doe v. Purdue Univ.*,
  928 F.3d 652 (7th Cir. 2019) ...............................................................17

*Doe v. The Trustees of the Univ. of Pennsylvania*,
  270 F. Supp. 3d 799 (E.D. Pa. 2017) ...................................................13, 30

*Doe v. Univ. of Sciences*,
  961 F.3d 203 (3d Cir. 2020)..........................................................13, 16, 17

*Does v. Se. Delco Sch. Dist.*,
  272 F. Supp. 3d 656 (E.D. Pa. 2017) ...................................................18, 22

*Drysdale v. Woerth*,
  No. CIV.A. 98-3090, 1998 WL 966020 (E.D. Pa. Nov. 18, 1998) .........................11

iv

*Erie R. Co. v. Tompkins*,
　304 U.S. 64 (1938) ............................................................................27

*Fowler v. UPMC Shadyside*,
　578 F.3d 203 (3d. Cir. 2009) .........................................................2, 9

*Frazer v. Temple Univ.*,
　25 F. Supp. 3d 598 (E.D. Pa. 2014) ...............................................24

*Gebser v. Lago Vista Ind. Sch. Dist.*,
　524 U.S. 274 (1998) ...................................................................17, 18

*Gendia v. Drexel Univ.*,
　No. CV 20-1104, 2020 WL 5258315 (E.D. Pa. Sept. 2, 2020) .............15

*Gould Elecs., Inc. v. United States*,
　220 F.3d 169 (3d Cir. 2000) .............................................................9

*Greenwood Partners, L.P. v. Cimnet, Inc.*,
　No. 2010-CV-06624-LDD, 2003 WL 22238981 (E.D. Pa. Sept. 26, 2003) ..........................27

*Groeber v. Friedman & Schuman, P.C.*,
　555 F. App'x 133 (3d Cir. 2014) .....................................................25

*Growth Horizons, Inc. v. Delaware Cty., Pa.*,
　983 F.2d 1277 (3d Cir. 1993) .........................................................27

*Gruver v. Ezon Prod., Inc.*,
　763 F. Supp. 772 (M.D. Pa. 1991) .................................................28

*Gunn v. On The Border Acquisitions*,
　LLC, 298 F. Supp. 3d 811 (E.D. Pa. 2018) ...................................24

*Haggerty v. Burkey Mills, Inc.*,
　211 F.Supp. 835 (E.D.N.Y. 1962) .................................................32

*Haidak v. Univ. of Massachusetts-Amherst*,
　933 F.3d 56 (1st Cir. 2019) ............................................................16

*Harris v. Saint Joseph's Univ.*,
　No. CIV.A. 13-3937, 2014 WL 1910242 (E.D. Pa. May 13, 2014) .......................30

*Hart v. Arnold*,
　884 A.2d 316 (Pa. Super. Ct. 2005) ..............................................31

*Hoy v. Angelone*,
　720 A.2d 745 (Pa. 1998) ...........................................................29, 30

*Huggins v. Coatesville Area Sch. Dist.*,
    452 F. App'x 122 (3d Cir. 2011) ......................................................................26

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005).........................................................................................24

*Jones v. Se. Pa. Transp. Auth.*,
    796 F.3d 323 (3d Cir. 2015)............................................................................23

*K.T. v. Culver-Stockton Coll.*,
    865 F.3d 1054 (8th Cir. 2017) .........................................................................18

*Kazatsky v. King David Mem'l Park, Inc.*,
    527 A.2d 988 (Pa. 1987) .................................................................................29

*Kollaritsch v. Michigan State Univ. Bd. of Trustees*,
    944 F.3d 613 (6th Cir. 2019) ....................................................................18, 20

*Larochelle v. Wilmac Corp.*,
    210 F. Supp. 3d 658 (E.D. Pa. 2016) ..............................................................23

*McNeil v. Yale Univ.*,
    436 F. Supp. 3d 489 (D. Conn. 2020)..............................................................21

*MDB v. Punxsutawney Christian Sch.*,
    386 F. Supp. 3d 565 (W.D. Pa. 2019).........................................................31, 32

*Morosetti v. Louisiana Land & Expl. Co.*,
    564 A.2d 151 (Pa. 1989) .................................................................................29

*Nagel v. Pocono Med. Ctr.*,
    168 F.R.D. 22 (M.D. Pa. 1996)........................................................................12

*Raines v. Haverford Coll.*,
    849 F. Supp. 1009 (E.D. Pa. 1994) .................................................................29

*Redevelopment Auth. of Cambria Cty. v. Int'l Ins. Co.*,
    685 A.2d 581 (Pa. Super. Ct. 1996)................................................................32

*Roe v. St. Louis Univ.*,
    746 F.3d 874 (8th Cir. 2014) ..........................................................................21

*S.K. v. N. Allegheny Sch. Dist.*,
    168 F. Supp. 3d 786 (W.D. Pa. 2016)..............................................................19

*Saravanan v. Drexel Univ.*,
    No. CV 17-3409, 2017 WL 5659821 (E.D. Pa. Nov. 24, 2017)..........................15

*Schofield v. Metro. Life Ins. Co.*,
  252 Fed.App'x. 500 (3d Cir. 2007)......................................................................24

*Singletary v. Missouri Dep't of Corr.*,
  423 F.3d 886 (8th Cir. 2005) ............................................................................23

*Swanger v. Warrior Run Sch. Dist.*,
  346 F. Supp. 3d 689 (M.D. Pa. 2018) ................................................................19

*Sweeney v. St. Joseph's Hosp.*,
  769 F.Supp 747 (M.D. Pa. 1991), *aff'd,* 980 F.2d 724 (3d Cir. 1992) ................29

*Thompson Coal Co. v. Pike Coal Co.*,
  412 A.2d 466 (Pa.1979) ....................................................................................33

*Tully v. Mott Supermarkets, Inc.*,
  540 F.2d 187 (3d Cir. 1976)..............................................................................27

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*,
  898 F.2d 914 (3d Cir.1990)...............................................................................33

*United Mine Workers v. Gibbs*,
  383 U.S. 715 (1966)....................................................................................27, 28

*Verdu v. Trustees of Princeton Univ.*,
  No. CV 19-12484 (FLW), 2020 WL 1502849 (D.N.J. Mar. 30, 2020)............14, 15

*Welsh v. Male*,
  No. 05-CV-6838, 2007 WL 906182 (E.D. Pa. Mar. 22, 2007)........................11, 12

*In re Westinghouse Securities Litigation*,
  90 F.3d 696 (3d Cir. 1996)................................................................................11

*Yusuf v. Vassar Coll.*,
  35 F.3d 709 (2d Cir. 1994).................................................................................13

## Statutes

15 U.S.C. § 37(b)(1)(B)(i) .................................................................................14

20 U.S.C. § 1681(a) ...............................................................................13, 19, 26

28 U.S.C. § 1367.................................................................................................27

## Other Authorities

5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §1217
  (2d ed. 1990) ....................................................................................................11

3C Fed. Jury. Prac. & Instr. § 177.36 (5th ed. 2001) ..................................................................18

Fed. R. Civ. P. 8(a) ............................................................................................3, 10, 11

Fed. R. Civ. P. Rule 8(d)(1) ...........................................................................................10, 11

Fed. R. Civ. P. 12(b)(6).................................................................................................9, 34

Fed. R. Civ. P. 12(f) ............................................................................................................11

PHIL1 9481924v.6

Defendants, Thomas Jefferson University ("TJU") and Thomas Jefferson University Hospital, Inc. ("TJUH" and together with TJU, "Jefferson" or "Defendants") hereby submit this Memorandum of Law in support of their Motion to Dismiss Plaintiff's First Amended Complaint (the "Amended Complaint").

## I.     INTRODUCTION[1]

This is an action based on alleged discrimination under Title IX of the Education Amendments of 1972 ("Title IX") brought by Plaintiff, John A. Abraham, M.D. ("Plaintiff" or "Abraham") against Jefferson.  As an initial matter, Abraham's Amended Complaint, for the second time, violates Rule 8 of the Federal Rules of Civil Procedure and the Court's directives set forth in its March 15, 2021 Order, dismissing Abraham's initial Complaint. *See* ECF No. 11.  The Amended Complaint contains 41-pages (and contains 256-numbered paragraphs) – double the page limit suggested by the Court in its Order, and continues to allege purported detailed items of evidence, as well as speculation, lengthy dissertations on Title IX, extensive conclusions of law, and unnecessary details of explicit sexual acts.

Moreover, Abraham's claims are premised upon an incident that occurred during a pool party he held at his home on the evening and early morning hours of June 23-24, 2018, wherein a student/resident in Abraham's orthopedic surgery department, Jane Roe ("Roe"), claimed that Abraham raped her at his party.  Abraham alleges that she sexually assaulted him at the party. Abraham further contends that Roe filed her Title IX complaint with TJU, alleging rape, only after, and in retaliation for, his purported claim to TJU that she sexually assaulted him, and (based on Abraham's paranoia and no facts whosoever) as part of an alleged scheme by Roe and her husband

---

[1] The facts set forth herein are based on Abraham's allegations in the First Amended Complaint, accepting as true all well pled allegations and all reasonable inferences that logically flow from those allegations, solely for purposes of the motion.

PHIL1 9473701v.2
PHIL1 9481924v.6

to extort money from him.  In the instant litigation, Abraham contends that TJU violated Title IX because it did not investigate his alleged claim against Roe, and that, in the course of investigating Roe's rape claim against him, TJU conducted a flawed and gender-biased investigation.

Ultimately, Abraham took a leave of absence from his teaching and clinical roles at Jefferson and eventually voluntarily resigned.  As a result of Abraham's voluntary resignation, TJU dismissed the Title IX matter concerning the June 23-24 incident, prior to scheduling a hearing, with no adverse findings against anyone.

Apparently unhappy that TJU did not take disciplinary action against Roe, Abraham filed the instant action against Jefferson.  In the Amended Complaint, Abraham asserts two claims against Jefferson under Title IX: (i) sex discrimination, and (ii) retaliation, both of which fail to state claims upon which relief may be granted.  Abraham also attempts to assert state law claims against Jefferson for: (i) breach of contract, (ii) intentional infliction of emotional distress, (iii) negligent infliction of emotional distress, and (iv) tortious interference.  Since Abraham's Title IX claims – the only claims supporting jurisdiction in this Court – are fatally defective, this Court should decline to exercise supplemental jurisdiction over Abraham's state law claims.  In the event this Court is inclined to retain jurisdiction over Abraham's state law claims, the claims should be dismissed because, they too, fail to state claims upon which relief may be granted.

## II.  STATEMENT OF ALLEGED FACTS[2]

### A.  General Background and Initial Complaint

On June 19, 2020, Abraham filed his initial Complaint, asserting seven counts against Jefferson for: (1) violations of Title IX[3], *see* ECF No. 1 at ¶370–479; (2) breach of contract, *id.* at

---

[2] Jefferson disputes Abraham's factual allegations in his pleadings, but recites them because, for purposes of this motion only, the Court must accept them as true. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–211 (3d. Cir. 2009).

[3] Abraham alleged that Jefferson violated Title IX on the following bases: (1) selective enforcement; (2) deliberate indifference; and (3) retaliation.

¶480–487; (3) intentional infliction of emotional distress, *id.* at ¶488–496; (4) negligent infliction

of emotional distress, *id.* at ¶497–504; and (5) tortious interference with business relations, *id.* at

¶505–529 (the "Initial Complaint").  Abraham's Initial Complaint consisted of more than 88 pages

and 529 numbered paragraphs.   On August 21, 2020, Defendants submitted their Motion to

Dismiss the Initial Complaint, on the grounds that it violated the "short and plain statement of the

claim" requirement of Fed. R. Civ. P. 8(a), and for failure to state claims upon which relief can be

granted.

> **B.**   **The Court's Order Granting Defendants' Motion to Dismiss the Initial**
> **Complaint for Failure to Comply with Fed. R. Civ. P. 8(a)**

On March 15, 2021, the Court dismissed Abraham's 88-page Complaint, as it violated Rule

8 of the Federal Rules of Civil Procedure.  *See* the Court's March 15, 2021 Order, ECF No. 11.  In

its Memorandum and Order granting Defendants' Motion to Dismiss, the Court stated that Plaintiff

"put many detailed items of evidence into the Complaint which are not necessary, thus making the

case difficult for the Court to appropriately consider the substantive grounds of the Motion to

Dismiss on the merits, Plaintiff's response, and also, assuming the case proceeds, to fairly rule on

discovery issues as they may arise." *See* the Court's March 15, 2021 Order, ECF No. 11 at 2.  The

Court further noted that while some facts in support of legal claims are required, "compliance with

these requirements does not require 88 pages and over 500 paragraphs." *Id.* at 3.  The Court

provided guidance to Abraham with respect to filing an Amended Complaint.  Specifically, the

Court stated "even the complaints in the most serious cases seldom exceed 20-25 pages." *Id.*

On April 12, 2021, Abraham filed an Amended Complaint.   Abraham's Amended

Complaint is 41-pages (and contains 256-numbered paragraphs) – double the page limit suggested

by the Court in its Order.  The Amended Complaint continues to allege purported detailed items

of evidence, as well as speculation, lengthy dissertations on Title IX, extensive conclusions of law,

and unnecessary details of explicit sexual acts.  Abraham's Amended Complaint, accordingly, continues to violate Rule 8 as well as the Court's guidelines, and should be dismissed for this reason alone.

### C.      The Amended Complaint

Distilled to their essence, the factual allegations in Abraham's Amended Complaint, and inferences drawn therefrom, are as follows:

At all relevant times, Abraham was, and remains, a partner at Rothman Orthopaedic Institute (hereinafter "Rothman"), where he served, and currently serves, as Service Chief of Orthopedic Oncology.  *See* Am. Compl., ¶56.  In addition to being a partner with Rothman, Abraham had served as the Director of the Musculoskeletal Oncology Center at TJUH, and was an Associate Professor of Orthopedic Surgery and Radiation Oncology at TJU.  *Id*., ¶53.  Abraham also was an attending physician in Jefferson's orthopedic surgery residency program, where he oversaw resident physicians who were enrolled in Jefferson's residency program and had them "rotate" with him.  *Id*., ¶54.

Jane Roe ("Roe") was a resident in Jefferson's orthopedic surgery residency program.  *Id*., ¶57.  Although Abraham alleges that he did not supervise Roe as a resident, Roe contended that "she had rotated onto Dr. Abraham's surgical service as a medical student."  *Id*., ¶¶57, 61.

### D.      The June 23–24, 2018 Sexual Incident Between Abraham And Roe at Abraham's Pool Party

On June 23, 2018, beginning at 6:00 p.m., Abraham hosted a party at his home.  *Id*., ¶59.  Abraham invited his operating room team, residents, and a few of his personal friends.  *Id*.  Roe was among the guests at Abraham's party.  *Id.,* ¶60.

According to Abraham, throughout the night, Roe was acting in a sexually suggestive manner, and particularly exhibiting a sexual interest in Abraham.  *Id*., ¶¶62–64.  Despite asking

Roe to leave, Roe refused; and upon entering his house, Roe walked up to Abraham, "without his affirmative consent, and aggressively kissed Dr. Abraham on the mouth and placed her arms around him." *Id.*, ¶¶65, 68.  The entire encounter occurred while at least one of Abraham's overnight guests was inside his home. *Id.*, ¶65.

Abraham alleges that he was "inebriated" at this time. *Id.*, ¶69.  Despite his "inebriation," Abraham purports to have a precise recollection of his sexual encounter with Roe.  For example, Abraham contends that he "attempted to push Roe away [when she kissed him], but he was unable to do so.  He told Roe that he did not want to have sexual relations with her, stating 'this isn't a good idea.'" *Id.*  Abraham further contends that Roe became "even more aggressive, shouting indignantly, 'don't you want to F--- me,' to which Abraham purportedly responded, 'No, that's not a good idea.'" *Id.*, ¶70.  Roe then "forcefully pulled Dr. Abraham to the floor. *Id.*, ¶72.  She lay on her back on an area rug" (Abraham, therefore, was on top of her), and they had sexual intercourse. *Id.*, ¶¶72–73.  According to Abraham, "[d]uring the intercourse, Roe continued to yell, 'F--- me! F--- me!'  Roe moaned loudly and grunted with pleasure.  Roe was so loud that one of the overnight house guests, A.D., heard her." *Id.*, ¶74.  Abraham further contends that, "[t]hroughout the intercourse, Roe kissed and caressed Dr. Abraham's body.  She thrust her hips and moved her body in a manner that was pleasurable to her.  With her hand, Roe guided Dr. Abraham's penis into her vagina." *Id.*, ¶75.

After the intercourse concluded, Abraham claims he felt exhausted and dizzy, and his mind foggy. *Id.*, ¶76.  Abraham then went to bed and Roe followed him (or actually led the way). *Id.*, ¶¶77–79.  The next morning, Abraham woke up, apparently hung over from the previous night, while Roe lay naked in his bed, telling him she wanted to have sex with him again. *Id.*, ¶¶81–82. At that time, Abraham asked Roe to leave. *Id.*, ¶83.

PHIL1 9481924v.6

**E.     Roe's Husband Finds Out About His Wife's "Sexual Encounter" With Abraham, Exhibits Outrage With Abraham, And Abraham Becomes Alarmed And Fears For His Safety**

Three days after the incident, on June 26, 2018, Roe and Abraham spoke on the telephone, at Roe's request.  *Id*., ¶86.  When Abraham and Roe spoke, Abraham contends Roe apologized to him "for what she did," and "further stated that the encounter was 'consensual,'" and informed Abraham that she told her husband, R.P.[4], about the sexual encounter, and R.P. was "f------ angry." *Id*., ¶¶87–88.  Roe also stated that her husband wanted to meet Abraham "in person" that same day.  *Id*., ¶89.  Abraham, subsequently, asked Roe why R.P. needed to meet with him, to which Roe responded, to propose something to "make this better."  *Id*.

Based on Roe's response, Abraham believed Roe was suggesting that Abraham "pay off Roe and R.P." and that they were "attempting to manipulate and extort him."  *Id*., ¶90.  As a result, Abraham told Roe that he needed "to make a report to his" supervisor, Dr. Alex Vaccaro,  the head of Orthopaedic Surgery at Rothman, and  to Jim Purtill, the Residency Program Director at TJUH, and Roe's direct supervisor.  *Id*., ¶91.  In response, Abraham claims Roe "raised her voice and said, 'No way!  Why would you do that?  I don't want my career to be ruined.  Can you at least wait until you hear what my husband has to say?  He wants to work out a resolution with you, so that you can make this right for us.'"  *Id*.  The Amended Complaint does not allege that Abraham ever told Roe he believed she sexually assaulted him or that he did not consent to their sexual encounter.  Nor does the Amended Complaint allege that Roe ever demanded money from Abraham.

---

[4] Abraham inappropriately chose to designate Roe's husband in both the Initial Complaint and the Amended Complaint by the specific initials "R.P." rather than the pseudonym "Mr. Roe."  Abraham's intentional use of "R.P. is a clear attempt to "out" Roe by having her identity revealed, and to humiliate her among her fellow Jefferson colleagues.

Around 2:30 p.m. that day, Roe's husband, R.P., showed up at Fox Chase Hospital, but after Abraham refused to meet with R.P., R.P. left Abraham a "threatening voicemail … [that] stated: '…I think I'll give you five minutes … to come out and … talk to me in private. I'd appreciate that and I think it's in your best interest. Think I'll give you the five minutes....'"  *Id*., ¶93.

After speaking with Dr. Vaccaro, Abraham decided to call R.P. that evening on Abraham's way home from Fox Chase Hospital.  *Id*., ¶100.  During the call, Abraham alleges that R.P. stated that Roe had told him what happened, and she had said it was "consensual;" Abraham further alleges that R.P. mentioned that there were "bruises all over Roe," and that Roe had a tampon inside her at the time of the sexual encounter that had not been removed.  *Id*., ¶¶101–102. Purportedly believing Roe's husband was going to demand money from him, Abraham "told R.P. that he would not negotiate with him, that Dr. Abraham had already reported the incident to his chairman, Dr. Alex Vaccaro, and that Dr. Abraham intended to meet the following morning with Dr. Jim Purtill."  *Id*., ¶¶104–105.

When Abraham arrived home later that night, he tried to reach Dr. Purtill, who did not respond.  *Id*., ¶¶110–111.  "Concerned," Abraham called Dr. Vaccaro again.  *Id*., ¶112.  Dr. Vaccaro informed Abraham that Roe had gone directly to Dr. Purtill's home and reported to him that Dr. Abraham had "raped" her.  *Id.*, ¶113.

### F.    TJU's Investigation Into The Events of June 23-24, 2018 And Abraham's Leave of Absence Pending The Investigation And Voluntary Resignation

On June 27, 2018, Abraham received a Notice of Concern from TJU's Title IX Coordinator, which indicated that TJU would be commencing an investigation into the incident. *Id*., ¶118.  Abraham alleges that same day, June 27, 2018, TJUH allegedly "coerced" him to take a leave of absence "by stating that Dr. Abraham would be suspended and reported to the Medical

7

Staff and the National Practitioner Databank ("NPDB") if he did not take an immediate leave of absence." *Id.*, ¶¶120–121. While Abraham "pleaded" that Roe's complaint was false and maintained that "there was another side to the story," Abraham agreed to take a leave of absence from his teaching and clinical duties at TJU. *Id.*, ¶¶122, 124.[5]

On or about July 2, 2018, Roe filed a police report in Lower Merion Township, Montgomery County, accusing Abraham of sexual assault. *Id.*, ¶126.[6] Because of this police investigation, Abraham decided that he would not submit any written/oral statement or otherwise participate in TJU's Title IX investigation. *Id.*, ¶129.[7]

Before TJU had an opportunity to schedule any hearing in the matter, TJU suggested that Roe and Abraham attempt to reach a Non-Hearing Resolution. *Id.*, ¶157. No resolution was reached. *Id.*

On December 21, 2018, prior to TJU scheduling a hearing on the June 23–24, 2018 incident, Abraham voluntarily resigned from his faculty appointment and clinical privileges at TJU/TJUH as well as any institution in which TJU/TJUH had a controlling interest. *Id.*, ¶160. Abraham contends he voluntarily resigned because, "given the flawed, gender-biased conduct of TJU and its agents in this matter, Dr. Abraham feared that any Title IX hearing would have a pre-determined finding of responsibility." *Id.*, ¶159. However, the Amended Complaint does not provide any facts to support Abraham's alleged "fear," and rather, appears to be based on

---

[5] While Rothman temporarily suspended Abraham, his employment was never terminated. *Id.* at ¶125.

[6] In November 2018, after a four-month-long investigation by the police, the Montgomery County District Attorney declined to pursue charges against Abraham. *Id.*, ¶128.

[7] Abraham alleged that TJU was "motivated by gender-bias against Dr. Abraham as a male accused of sexual assault," and that "TJU used the existence of the criminal investigation to deprive Dr. Abraham of a full and fair opportunity to participate in the investigation." *Id.*, ¶130. Abraham based his contention on TJU's denial of a request for an extension of time to prepare a written statement in connection with TJU's investigation (which commenced in June 2018); on October 3, 2018, TJU denied his request, citing to TJU's "obligation to resolve the matter promptly." *Id.*, ¶132. However, the end of a Title IX investigation does not end the matter, as a hearing would still have to be held to determine a remedy if Abraham or Roe were found responsible.

speculation and an unwarranted conclusion, particularly given that Abraham chose not to participate in TJU's investigation and that TJU's investigation was of the incident as a whole.

Because of Abraham's voluntary resignation, on January 8, 2019, TJU terminated its processing of Roe's Title IX complaint. *Id.*, ¶163. No findings of responsibility were made against Abraham or Roe in connection with the matter. *Id.*

## III.   STANDARD OF REVIEW

Jefferson moves to dismiss Abraham's Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state claims upon which relief may be granted. In reviewing a 12(b)(6) motion, the court evaluates the merits of the claims by accepting all allegations in the complaint as true, viewing them in the light most favorable to the plaintiff, and determining whether they state a claim as a matter of law. *Gould Elecs., Inc. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000). A plaintiff's obligation to provide the grounds of his "entitle[ment] to relief requires more than just labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler*, 578 F.3d at 210–11 (3d Cir. 2009). The court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief' " *Id.* at 211 (quoting *Ashcroft*, 556 U.S. at 679). For a complaint to withstand a motion to dismiss under Rule 12(b)(6), the "[f]actual allegations must be enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true[.]" *Twombly,* 550 U.S. at 555. Thus, the complaint must state more than "naked assertions" devoid of "further factual enhancement." *Ashcroft*, 556 U.S. at 678.

9

## IV.     ARGUMENT

### A.     Abraham's Amended Complaint Should Be Dismissed For Failure To Comply With Fed. R. Civ. P. 8

Under Federal Rule of Civil Procedure 8(a), a pleading which sets forth a claim for relief shall include a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(d)(1) further provides that "[e]ach averment of a pleading shall be **simple, concise, and direct.**" *See* Fed. R. Civ. P. 8(d)(1) (emphasis added).  In this case, the Court previously dismissed Abraham's Initial Complaint for violating the standards in Rule 8, finding that Abraham "put many detailed items of evidence into the Complaint which are not necessary, thus making the case difficult for the Court to appropriately consider the substantive grounds of the Motion to Dismiss on the merits, Plaintiff's response, and also, assuming the case proceeds, to fairly rule on discovery issues as they may arise." *See* the Court's March 15, 2021 Order, ECF No. 11 at 2.  In dismissing the Initial Complaint, the Court provided guidance to Abraham for filing an Amended Complaint, noting that "even the complaints in the most serious cases seldom exceed 20-25 pages." *Id.* at 3. Abraham's Amended Complaint disregards the Court's Order and continues to violate Rule 8.

The Amended Complaint is 41 pages (and 256 paragraphs) – essentially double that set forth in the Court's guidelines – and continues to include numerous details of purported evidence. Abraham's lengthy and complex Amended Complaint continues to sound more like a "novel," disguised as a complaint, and remains designed to embarrass Jefferson and Roe, to cause Roe public humiliation and to damage her reputation.  The Amended Complaint fails to conform to Rule 8(a) for the second time, as it does not contain short nor plain statements, again leaving Jefferson (and the Court) with the task of dredging through 41 pages and 256 paragraphs to prepare a responsive pleading and determine discovery issues.  Moreover, while Abraham's Amended Complaint contains fewer paragraphs than the Initial Complaint, the averments are neither simple

10

nor concise, and leave Jefferson guessing as to which facts actually support Abraham's claims, in violation of Rule 8(d)(1).[8]

The Court has discretion to dismiss or strike a complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure. *Bolick v. NE Indus Servs. Corp.,* 666 F.App'x 101, 103 (3d Cir. 2016) (affirming dismissal of complaint for failure to comply with Rule 8(a)); *see also Drysdale v. Woerth,* No. CIV.A. 98-3090, 1998 WL 966020, at *2 (E.D. Pa. Nov. 18, 1998) (court dismissed 93 paragraph complaint). In determining compliance with Rule 8, the complaint must be sufficiently clear that the court or the opposing party need not "forever sift through its pages in search of the nature of plaintiff's claim." *Bolick,* 666 F. App'x at 104 (second amended complaint dismissed because, among other reasons, it failed to comply with the requirements of Rule 8 as the claims were not "simple, concise, and direct").

Taken together, Rules 8(a) and 8(d)(1) underscore the emphasis placed on clarity and brevity by the federal pleading rules. *In re Westinghouse Securities Litigation,* 90 F.3d 696, 702 (3d Cir. 1996) (*citing* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §1217 at 169 (2d ed. 1990)). Despite the Court's March 15, 2021 Order, Abraham's Amended Complaint contains the same deficiencies noted therein. Because this is Abraham's "second bite at the apple," his Amended Complaint should be dismissed for this reason alone.

As an alternative to dismissing Abraham's Amended Complaint, Jefferson respectfully requests that the Court strike the Amended Complaint under Federal Rule of Civil Procedure 12(f) for going beyond Rule 8(a)(2)'s requirement of a "short and plain statement." *See Welsh v. Male,*

---

[8] While Abraham's Amended Complaint contains less numbered paragraphs than his Initial Complaint, it appears that instead of removing irrelevant facts altogether, Abraham instead either combined numerous allegations into lengthier paragraphs so that the Amended Complaint appeared shorter, or he moved certain allegations from numbered paragraphs to footnotes. *See e.g.* Initial Complaint, ECF No. 1 at ¶¶75–76, which is now Footnote 2 in the Amended Complaint.

No. 05-CV-6838, 2007 WL 906182, at *1 (E.D. Pa. Mar. 22, 2007) (court struck complaint containing 71 pages, 235 paragraphs).  While motions to strike are generally disfavored, several courts have stricken complaints that were more concise than Abraham's.  *Id.* (citing *Coffman v. Wilson Police Dep't.,* 739 F. Supp. 257, 262 (E.D. Pa. 1990));  *see also Burks v. City of Phila.,* 904 F. Supp 421, 424 (E.D. Pa. 1995) (court struck 36-page, 128 paragraph complaint).  Indeed, Abraham's 41-page Amended Complaint still contains an extensive background section on the "Dear Colleague Letter," and a multi-page digression concerning unnecessary, explicit, and boorish detail into the sexual encounter between Abraham and Roe.  These are examples of many instances where the Amended Complaint "reads more like a novel than a legal pleading it purports to be."  *Burks,* 904 F. Supp. at 424; *see also Brejcak v. County of Bucks,* No. CIV.A. 03-4688, 2004 WL 377675, at *3 (E.D. Pa. Jan. 28, 2004) (court struck amended complaint containing 45 pages, 216 paragraphs, observing that "[w]hile there is no precise algorithm that answers at what length a complaint becomes objectionable, it is reasonable to conclude that 216 separate paragraphs are excessive under notice pleading, which the Federal Rules require")); *Nagel v. Pocono Med. Ctr.,* 168 F.R.D. 22, 23 (M.D. Pa. 1996) (court struck complaint containing 26 pages and 184 paragraphs).

The Court should therefore grant Jefferson's request to dismiss or strike the Amended Complaint.  In the event the Court does not dismiss or strike Abraham's Amended Complaint for violating Rule 8, Abraham's Amended Complaint should be dismissed for failure to state claims upon which relief may be granted, as set forth below.

### B.     Plaintiff's Title IX Claims (Counts I and II) Should Be Dismissed for Failure to State Claims.

Title IX of the Education Amendments of 1972 provides, in part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance …"  20 U.S.C. § 1681(a).  "Because Title IX prohibits ... discrimination on account of sex, it is understood to bar the imposition of university discipline [when sex] is a motivating factor in the decision to discipline." *Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020) (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)).  Courts recognize several different theories under Title IX, including selective enforcement, deliberate indifference, and retaliation claims.  *See Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 822 (E.D. Pa. 2017) (citing *Yusuf v. Vassar Coll.,* 35 F.3d 709 (2d Cir. 1994));  *see also Doe v. Miami Univ.,* 882 F.3d 579, 589 (6th Cir. 2018).  Although the "selective enforcement" and "deliberate indifference" titles have been removed from the Counts in Abraham's Amended Complaint, he continues to rely on these individual theories in what can be gleaned from the substance of his convoluted allegations.  Notwithstanding how Abraham characterizes his individual Title IX claims, Abraham fails to allege any facts in his 41-page Amended Complaint to plausibly infer that Jefferson discriminated and/or retaliated against him on the basis of his sex.

### 1.    Plaintiff Fails to State A Claim For Sex Discrimination

Count I of Abraham's Amended Complaint fails to state a claim for sex discrimination under Title IX.

#### i.    Abraham's Claim Is Deficient Because He Cannot Allege Any Discrimination On The Basis Of His Sex.

Abraham has not, and cannot, allege any discrimination by Jefferson on the basis of his sex or that gender bias was a motivating factor in any disciplinary process, as fundamentally required to state a claim under Title IX.  The gravamen of Abraham's claim is that Jefferson investigated Roe's claims of sexual assault by Abraham under its policy, but did not investigate Abraham's purported claims of sexual assault and retaliation by Roe under the same policy, and that

13

Jefferson's purported selective enforcement of its policy against him and not Roe was based solely on his sex.[9]

It is critically important to note that Abraham was an Associate Professor and attending physician in TJU's Orthopedic Residency Program.  Am. Compl., ¶¶53–54.  Roe, on the other hand, was a resident in Abraham's department, training to be an orthopedic surgeon.  *Id.*, ¶57. Resident physicians are deemed to be students.  15 U.S.C. § 37(b)(1)(B)(i) (A "graduate medical education program" is a "residency program" for "medical education and training.");  *see also Am.* Compl., ¶197 (alleging that TJUH's residency program is an educational program);  *see also Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 550, 557 (3d Cir. 2017) (finding resident physician was a student as well as an employee).

Abraham simply failed to provide any factual allegations of differential treatment based on his gender.  At most, Abraham has alleged that Jefferson investigated Roe's case instead of his, <u>not</u> because he was a male, but because he was a professor and attending physician in Jefferson's residency program, and was accused of raping a student and resident in that program.  Nonetheless, "when a male professor claims that a university selectively enforced a policy against him, he must identify a *female* professor who received better treatment even though she 'engaged in the *same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it.'"[10]  *Verdu v. Trustees of Princeton Univ.*, No.

---

[9] Abraham contends that TJU was motivated by gender-bias and deprived Abraham of a full and fair opportunity to participate in TJU's investigation because of Abraham's then-pending criminal investigation into his conduct on the evening in question. Am. Compl., ¶130. Abraham's allegation is false.  Jefferson invited Abraham to participate in the investigation, but Abraham himself chose not to do so. *Id., ¶¶*129 –132; *see also* Initial Complaint, ¶242.

[10] Although Abraham removed "selective enforcement" from the title of his claim in his Amended Complaint, his allegations, in substance, continue to allege selective enforcement of Jefferson's Title IX policy. *See e.g.*, Am. Compl., ¶170 (alleging "TJU and TJUH faced pressure to selectively enforce the Sexual Misconduct Policy against males and to find against males accused of sexual misconduct due to pressure from the #MeToo Movement, Times Up HealthCare Movement, and negative publicity concerning sexual harassment of female medical students.")
Relatedly, Abraham baldly asserts that Jefferson's policies for resolving sexual assault complaints are "victim-centered" and "applied with gender bias against males accused of sexual assault." *Am. Compl.*, ¶¶165–168. However,

CV 19-12484 (FLW), 2020 WL 1502849, at *6 (D.N.J. Mar. 30, 2020) (emphasis added) (quoting *Saravanan v. Drexel Univ.*, No. CV 17-3409, 2017 WL 5659821, at *6 (E.D. Pa. Nov. 24, 2017)). Notably, a student is not a proper comparator in a selective enforcement claim brought by a professor against a university. *Id*. This is because the university's "obligations and relationship to [a professor/attending physician such as Abraham and a student/resident such as Roe] were fundamentally different." *Id*.

Here, Abraham and Roe are not similarly situated as Abraham was a professor/attending physician and Roe was a student/resident. Abraham has not identified any female professor or female attending physician at Jefferson who was treated differently than Abraham in response to claims by students or residents of sexual assault by the professors or attending physicians. Rather, Abraham improperly references one other ***male professor***, Dr. Charles Pollack, who allegedly "self-reported sexual harassment of his subordinate." Am. Compl., ¶ 176. This is insufficient to assert discriminatory treatment by Jefferson as Abraham would have to allege the existence of a female professor/attending physician who was treated differently than a male professor/attending with respect to claims of sexual assault of students/residents. Without alleging these facts, Abraham's claim fails to meet the *Twombly* standard and his claim should be dismissed.

Furthermore, based on Abraham's allegations, Roe provided notice to TJU of Abraham's alleged sexual misconduct <u>before</u> Abraham allegedly provided notice to TJU of Roe's alleged

---

general allegations that a school's Title IX policies favor one gender over another are insufficient to support a plausible inference of discrimination. *Gendia v. Drexel Univ.*, No. CV 20-1104, 2020 WL 5258315, at *3 (E.D. Pa. Sept. 2, 2020) (citing *Doe v. Princeton Univ.*, 790 F. App'x 379, 383 (3d Cir. 2019) (finding statement that defendant university " 'does not believe male students can be victims,' ... too 'generalized' and 'conclusory' to raise an inference of disparate treatment" (internal quotations and citations omitted)); *Doe v. Pennsylvania State Univ.*, No. 4:17-CV-01315, 2018 WL 317934, at *5 (M.D. Pa. Jan. 8, 2018) (finding plaintiff's allegations that university's "existing practices and procedures discriminate, on the basis of sex, against the male accused" and that the university "conducted its investigation of the allegations against [him] in a manner that was slanted in favor of the female accuser[ ]" conclusory).

sexual misconduct.[11]  *See Am. Compl.*, ¶¶95–117 (Abraham alleging that, on the evening of June 26, 2018, after Roe's husband contacted Abraham, he first spoke with Dr. Vaccaro between the hours of 5:30 p.m. and 6:00 p.m., informing him that "Roe had taken advantage of him at his annual party and that she had coerced him into having sexual intercourse" and that Abraham "believed [Roe and her husband] were trying to extort him," to which Dr. Vaccaro responded that Abraham needed to contact Dr. Purtill); *Id.*, ¶¶110-113 (Abraham learning from Dr. Vaccaro, later on June 26, 2018, that Roe previously visited Dr. Purtill at his home that day and informed Dr. Purtill that Abraham raped her);  s*ee also* Initial Compl., ¶¶189-197, 216-217.  Abraham's allegation that Roe's complaint against him was retaliatory for his purported complaint against her is patently false based on his own allegations as Roe notified TJU of her claim against Abraham first.  It is, therefore, more plausible that Jefferson investigated Roe's claim of sexual assault instead of Abraham's purported claim because Roe "made the allegation first—<u>not</u> because [Abraham's] sex influenced the university." *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019) (emphasis in original) (upholding dismissal of Title IX claim brought by male student against university where male student alleged that university discriminated against him because it investigated female student's claim of sexual assault against him and did not investigate his claim of sexual assault by her).

As further support of his claim of discrimination, Abraham alleges that Jefferson faced "external pressure" in light of the 2011 Dear Colleague Letter, as well as the Department of Education ("DoEd"), which purportedly motivated Jefferson "to aggressively pursue and punish males [i.e., Abraham] accused of sexual misconduct."  Am. Compl., ¶¶12-20, 178.  However, as the Third Circuit held in *University of the Sciences*, "allegations about pressure from DoED and

---

[11] Jefferson disputes Abraham's claim that he made any complaints to Jefferson regarding Roe's alleged sexual assault of him.

the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination." *Id*. (citing *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) ("That said, the letter, standing alone, is obviously not enough to get [the plaintiff] over the plausibility line." (citation omitted)); and *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (noting that pressure from DoEd "alone is not enough to state a claim that the university acted with bias in this particular case")).

Accordingly, Abraham has failed to allege any facts that plausibly show that Jefferson's discriminated against him or that Jefferson in any way treated him differently based on his sex. Thus, his claim should be dismissed.

> ### ii. Abraham's Claims Of Discrimination Are Fatally Flawed Because Jefferson Did Not Have Any Requisite Notice of Or Control Over Roe's Purported Conduct.

Damages may be recovered under Title IX only if "actual notice" of the underlying misconduct was provided to an "appropriate person" of the educational institution, who is "an official [that] has authority to address the alleged discrimination and [can] institute corrective measures" on the school's behalf. *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 277, 290 (1998). "An educational institution has actual knowledge if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361 (3d Cir. 2005) (internal quotations omitted) (upholding jury charge instructing that the plaintiff must show "sufficiently substantial danger to students.")

Moreover, actual knowledge "cannot be based upon a mere possibility." *Bostic*, 418 F.3d at 361. Nor can actual knowledge be based upon "constructive notice or respondeat superior [or negligence principles] to permit recovery under Title IX." *Id*. (citing *Gebser*, 524 U.S. at 285–90). Rather, actual knowledge requires that "an employee who has been invested by the school

17

board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so." *Gebser*, 524 U.S. at 280; *see also Bostic*, 418 F.3d at 361. "An educational institution has "actual knowledge" if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Id.* (citing 3C Fed. Jury. Prac. & Instr. § 177.36 (5th ed. 2001); *B.W. v. Career Tech. Ctr. of Lackawanna Cty.*, 422 F. Supp. 3d 859, 877 (citing *Bostic*, 418 F.3d at 361).

The "actual knowledge" element "requires schools to have more than after-the-fact notice of a single instance in which the plaintiff experienced sexual assault … Rather, a plaintiff must allege that the funding recipient had prior notice of a substantial risk of peer harassment [such as previous similar incidents of assault]"). *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017) (dismissing claim on motion to dismiss for lack of adequate notice where claim involved after-the-fact notice of a single instance of sexual assault and finding no pervasive discrimination based on this one instance) (citing *Gebser*, 524 U.S. at 290; *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 623-24 (6th Cir. 2019) (stating "plaintiff must plead, and ultimately prove, an incident of actionable sexual harassment, the school's actual knowledge of it, some further incident of actionable sexual harassment, that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that the Title IX injury is attributable to the post-actual-knowledge further harassment."); *see also Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 688 (E.D. Pa. 2017) (dismissing one case in consolidated action for deliberate indifference where school official did not have prior knowledge of sexual misconduct of teacher until complaint was made to school official, but allowing another case to proceed to trial where multiple prior complaints were made to school against child molester teacher, there was a pattern of abuse, and child abuse continued

after notice provided to school and stating "[t]o prevail [on a claim for deliberate indifference], a plaintiff must prove an appropriate person knew of acts sufficiently indicating a danger of future abuse.") (emphasis added); *Swanger v. Warrior Run Sch. Dist.*, 346 F. Supp. 3d 689, 705, 710 (M.D. Pa. 2018) (entering judgment in favor of school district where school district had no prior notice of sexual harassment before the offending conduct occurred and stating "[t]he Title IX funding recipient's deliberate indifference must subject the students to further harassment, to wit, the indifference must "cause students to undergo harassment or make them liable or vulnerable to it.") (citing *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644-645 (1999) (internal citations omitted)); *S.K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 796, 800 (W.D. Pa. 2016) (denying motion to dismiss Title IX claim where repeated reports of harassment were made to principal and superintendent, over the course of several months and despite such notice, harassment continued).

The "actual knowledge" element also includes a causation component, which "require[s] that harassment, or the likelihood or vulnerability of a student to be subjected to it, must occur subsequent to an official's decision not to remedy a known violation." *Swanger*, 346 F. Supp. 3d at 705 (emphasis added). As the United States Supreme Court held in *Davis*:

> If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" [*i.e.*, "exposes"] its students to harassment. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it. … Moreover, because the harassment must occur "under" "the operations of" a funding recipient, *see* 20 U.S.C. § 1681(a); …, the harassment must take place in a context subject to the school district's control, … These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs.

PHIL1 9481924v.6

*Davis*, 526 U.S. at 644–45 (emphasis added) (citations omitted).

Here, Abraham's claim is based on a single alleged instance of purported sexual misconduct by Roe at Abraham's personal party on June 23-24, 2018 (*i.e.*, her taking "advantage" of him).  However, Abraham alleges no further incidents of sexual misconduct by Roe against him or that Roe ever posed a substantial danger to students.  Indeed, the single incident occurred after hours, off Jefferson's campus, at a party that was planned, paid for, and controlled and hosted exclusively by Abraham at his personal residence.  Abraham chose which guests to invite, and which food and alcohol to serve.  Abraham does not allege—nor could he—that Jefferson in any way organized or had any control over any event during the evening at Abraham's party. Abraham's after-the-fact notice to Jefferson of Roe's one instance of purported sexual misconduct against him at his personal house party—"notice" that was given only after Abraham became frightened by Roe's husband's conduct, and after Abraham became paranoid and believed he was being manipulated by Roe and her husband— cannot, as a matter of law, satisfy the stringent "actual knowledge" requirement to state a claim for discrimination under Title IX.

Notwithstanding that Abraham cannot allege any requisite knowledge of Jefferson, Abraham cannot allege any causation.  Abraham has not and cannot allege that he suffered any "further actionable harassment" by Roe after Abraham provided notice, or that the "further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that [Abraham's] Title IX injury is attributable to the post-actual-knowledge further harassment." *Kollaritsch*, 944 F.3d at 623-24.  There simply was "no post-actual-knowledge further harassment" of Abraham (or anyone) by Roe.

Abraham's claim is further defective because he cannot allege that Jefferson had any control over the incident, which happened at Abraham's personal residence, after hours, at his pool

20

party that was organized and controlled exclusively by Abraham.  The Supreme Court has made it clear that to be liable under Title IX, a school must have had control over the situation in which the harassment or rape occurs.  *Davis*, 526 U.S. at 645.  In *Davis*, the Supreme Court recognized that where "the misconduct occurs during school hours and on school grounds ... the misconduct is taking place 'under' an 'operation' of the funding recipient."  *Id*. at 646.  It is "[i]n these circumstances, the recipient retains substantial control over the context in which harassment occurs."  *Id*. And "in this setting the [educational institution] exercises substantial control over the harasser."  *Id*.

However, where the sexual abuse occurs off-campus, outside of property owned by the school, or during a program not controlled nor sponsored by the school, a plaintiff cannot claim that the school has "control" over the circumstances, and cannot establish a claim for deliberate indifference.  *See e.g., Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (finding that university had no control over student conduct that occurred at an off campus party, and therefore, the court dismissed the Title IX claim);  *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 511–12 (D. Conn. 2020) (dismissing Title IX claim that was based on conduct at fraternity parties that occurred off-campus, outside of school hours, and in space and time not under Yale's control).

Here, Abraham claims he was sexually mistreated by Roe at his personal residence, at an after-hours party he hosted for his friends and colleagues, not all of whom were Jefferson employees.  Again, Abraham made all the decisions as to the party and had exclusive control over it.  Jefferson had no control whatsoever over the occurrence of this event at Abraham's home.  More importantly, Abraham has not alleged that he was assaulted within the confines of any property or program controlled by Jefferson.

21

> iii.  **Abraham's Claim Is Fatally Defective Because Jefferson's Response to the Allegations Was Reasonable in Light of the Circumstances**

Finally, Abraham's claim further fails because he has alleged no facts to suggest that Jefferson's response to his claims against Roe were "clearly unreasonable in light of known circumstances." Whether the response was clearly unreasonable may be determined as a matter of law. *Davis*, 526 U.S. at 649. In determining whether a response was clearly unreasonable, courts examine the "apparent gravity of the risk." *Se. Delco Sch. Dist.*, 272 F. Supp. 3d at 689. Indeed, the Supreme Court made clear that it wanted to preserve flexibility for schools, noting that "courts should refrain from second guessing the disciplinary decisions made by school administrators." *Davis,* 526 U.S. at 648 ("clearly unreasonable" is not a "mere" reasonableness standard").

Here, there are no facts alleged to suggest that Roe posed any risks to students or the Jefferson community. The facts as alleged by Abraham suggest, at most, that: a resident, who was at Abraham's pool party, likely intoxicated herself, undisputedly had sexual relations with Abraham – a professor/attending physician in her program, and that both Abraham and Roe contend the sexual relations were nonconsensual. No other instances of sexual misconduct are alleged to have been committed by Roe after her encounter with Abraham. Under these circumstances, Abraham has not shown that Jefferson's alleged response to his complaint against Roe was clearly unreasonable. Accordingly, Abraham's claim for sex discrimination under Title IX should be dismissed.

### 2.  Plaintiff Fails to State a Claim for Retaliation

In Count II of the Amended Complaint, Abraham attempts to allege a cause of action for retaliation under Title IX. In analyzing Title IX retaliation claims, Title VII's retaliation framework generally governs. *Mercy Catholic Med. Ctr.*, 850 F.3d at 564. To state a claim for

retaliation under Title IX, plaintiff must allege that: (1) he "engaged in activity protected by Title IX," (2) he "suffered an adverse action," and (3) there was a causal connection between the two. *Id.* Abraham's retaliation claim is premised on his allegation that Jefferson retaliated against him by pressuring him to take a leave of absence after he reported Roe's alleged sexual misconduct against him, i.e., nonconsensual sexual intercourse, and after Abraham alleged that Roe's complaint against him was retaliatory.[12] Am. Compl., ¶¶210, 220 –221. Abraham's claim is legally deficient because, among other things, he cannot allege any adverse action or any causal connection between protected conduct and any (non-existent) adverse action.

### i.    Abraham Cannot Allege Any Adverse Action By Jefferson.

To state a claim for retaliation, Abraham "must point to an employment action that is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Clarkson v. SEPTA*, 700 F. App'x 111, 115 (3d Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Here, Abraham contends that Jefferson's purported "pressured" leave of absence constitutes an adverse employment action. Abraham further alleges that he later voluntarily resigned because he did not believe TJU's investigation would be fair. Neither of these actions can constitute adverse employment actions because administrative leaves of absences and voluntary resignations are not adverse actions. *See, e.g., Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) ("A paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action" under Title VII); *Singletary v. Missouri Dep't of Corr.,* 423 F.3d 886, 891-92 (8th Cir. 2005) (finding that placement on administrative leave did not constitute an adverse action under Title VII); *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 705 (E.D. Pa. 2016)

---

[12] As stated above, Jefferson denies that Abraham ever made any such complaints to Jefferson.

(dismissing retaliation claim for lack of adverse action because plaintiff voluntarily resigned); *Gunn v. On The Border Acquisitions*, LLC, 298 F. Supp. 3d 811 (E.D. Pa. 2018) (finding that voluntary resignation does not constitute an adverse employment action under Title VII, absent a claim for constructive discharge[13]);  *see also Checa v. Drexel University*, No. CV 16-108, 2016 WL 3548517, at *5 (E.D. Pa. June 28, 2016) ("Our Court of Appeals has not recognized voluntary resignations to be adverse employment actions") (citing *Schofield v. Metro. Life Ins. Co.*, 252 Fed.App'x. 500, 503 (3d Cir. 2007)).

Accordingly, because Abraham took an administrative leave of absence and then voluntarily resigned, he failed to allege any cognizable adverse action.  Accordingly, his claim for retaliation should be dismissed.

### ii.    Abraham Has Not, And Cannot, Allege Any Causation.

Even if Abraham can allege an adverse employment action, Abraham fails to allege the requisite causal link between the alleged protected activity and any adverse employment action. To assert a claim for retaliation under Title IX, "plaintiff must plead facts sufficient to plausibly show that [the school] 'retaliated against [him] because [he] complained of sex discrimination.'" *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 615 (E.D. Pa. 2014) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005)).  While the  requisite causal connection sometimes can be demonstrated by showing either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link,'"  *Id.* (citation omitted), "the 'mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of

---

[13] Abraham has not asserted a claim for constructive discharge. To assert a claim for constructive discharge, Abraham would have to allege that Jefferson "knowingly permitted a condition of discrimination in employment so intolerable that a reasonable person subject to them would resign."  *Gunn*, 298 F. Supp. 3d at 823 (citing *Angeloni v. Diocese of Scranton*, 135 Fed.App'x. 510, 513 (3d Cir. 2005)).

demonstrating a causal link between the two events.'" *Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 136 (3d Cir. 2014).

In support of his retaliation claim, Abraham alleges that, "[o]ne day after Dr. Abraham reported Jane Roe's alleged sexual misconduct against him, i.e. nonconsensual sexual intercourse, and alleged that Roe's false complaint against him was retaliatory, he was pressured by TJUH into taking a leave of absence." Am. Compl., ¶210. Thus, Abraham's exclusive basis for inferring retaliation by Jefferson is a temporal one, allegedly based on the fact that Abraham reported sexual misconduct of Roe. However, Abraham's contention is unavailing.

As set forth above, Roe provided notice to TJU of Abraham's alleged sexual misconduct <u>before</u> Abraham allegedly provided notice to TJU of Roe's alleged sexual misconduct. *See Am. Compl.*, ¶¶95–117. As stated above, Abraham's allegation that Roe's complaint against him was retaliatory for his complaint against her is false as Roe notified TJU of her claim against Abraham first. Thus, since Roe's complaint came first, it could not have been in retaliation for Abraham's complaint against her.

Moreover, based on these allegations, Abraham cannot plausibly demonstrate that he was "pressured … into taking a leave of absence" because of any sex discrimination or because he engaged in any protected activity (which he alleges was reporting Roe's alleged sexual misconduct and her retaliatory complaint as to his rape of her). Rather, it is more plausible that, if Abraham was pressured to take a leave of absence at all (which he was not), it was because Jefferson received notice from a student/resident that Abraham – one of its professors and attending physicians in its residency program— was accused of raping a resident—not because Abraham made any complaints to Jefferson. *See Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 857 (7th Cir. 2019) (dismissing retaliation claim on motion to dismiss where there were no facts in complaint to allow

an inference that university wanted to retaliate against plaintiff for complaining about harassment, and where plausible inferences showed that discipline occurred because of plaintiff's wrongful behavior); *Huggins v. Coatesville Area Sch. Dist.*, 452 F. App'x 122, 128 (3d Cir. 2011) (rejecting causal connection between protected activity and sexual harassment investigation where investigation was initiated in response to complaints); *see also Ashcroft,* 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " (quoting *Twombly*, 550 U.S. at 557)).  Regardless of when Abraham's alleged complaint was made in comparison to Roe's complaint, various restrictions would have been put in place, as it is part of the Title IX procedures and protocols.  For Abraham to claim that these purported restrictions were only placed upon him because of his gender is unsupported as a matter of law.

Accordingly, because Abraham cannot plausibly allege any causation between his alleged reporting of Roe's sexual assault and her retaliatory complaint against him, and his voluntary leave of absence, Abraham cannot state a claim for retaliation.

### C.     This Court Should Decline to Exercise Supplemental Jurisdiction Over Abraham's State Law Claims.

In Counts III–VI, Abraham has asserted claims under state law, relating to Jefferson's alleged conduct in connection with the Title IX investigation.  *See* Am. Compl., ¶¶226–256. Outside of Abraham's Title IX claims in Counts I–II, Abraham has asserted no independent basis for federal jurisdiction over any remaining state law claims, as the sole means by which Abraham claims federal jurisdiction in this matter is through his Title IX claims, pursuant to 20 U.S.C. § 1681(a).[14]  Should the Court grant Defendants' Motion to Dismiss related to the Title IX claims in

---

[14] No diversity exists between the parties as they are all "residents" of the Commonwealth of Pennsylvania. Am. Compl., ¶¶2–4.

Counts I–II, Jefferson respectfully requests that the Court decline to exercise supplemental jurisdiction over Abraham's remaining state law claims, and dismiss such claims.

It is within the Court's discretion to decline to exercise supplemental jurisdiction over Abraham's remaining state law claims.  Under 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction.  Stated otherwise, a prerequisite to the federal court's exercise of pendent jurisdiction over a plaintiff's state law claims is that at least one claim based on the court's original jurisdiction is before the court.  *See* 28 U.S.C. § 1367.  When "the district court has dismissed all claims over which it has original jurisdiction," the district court has the express authority to decline to exercise supplemental jurisdiction over any related state law claims. *Id.*; *see also Growth Horizons, Inc. v. Delaware Cty., Pa.,* 983 F.2d 1277, 1285 (3d Cir. 1993); *Greenwood Partners, L.P. v. Cimnet, Inc.,* No. 2010-CV-06624-LDD, 2003 WL 22238981, at *4 (E.D. Pa. Sept. 26, 2003) ("a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction").  In making this determination, the district court should consider generally accepted principles of "judicial economy, convenience, and fairness to the litigants."  *See Growth Horizons, Inc.* 983 F.2d at 1284 (citing *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)).  Where these factors are not present, "a federal court should hesitate to exercise jurisdiction over state claims." *Gibbs,* 383 U.S. at 726 (citing *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938)).  The Supreme Court further stated that "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.*  The Third Circuit similarly does not encourage litigation in federal court in the absence of a federal cause of action.  *See Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 196 (3d Cir. 1976) (court found that when "a federal claim could

be, or has been dismissed . . . the court should ordinarily refrain from exercising supplemental jurisdiction in the absence of extraordinary circumstances").

In this case, the Court should not exercise supplemental jurisdiction over Abraham's state law claims. *Gibbs,* 383 U.S. at 726. Abraham has not shown extraordinary circumstances to warrant the Court's jurisdiction over the state law claims. Indeed, judicial economy weighs in favor of dismissal because the parties have yet to engage in discovery and all parties reside in or around Philadelphia. Accordingly, Abraham would suffer no inconvenience from the Court dismissing the state law claims, as Abraham could choose to litigate them in state court in the future. Thus, the Court should be inclined to dismiss Counts III–VI.

### D. If the Court Decides to Retain Jurisdiction Over the State Law Claims, Plaintiff's Claims Should be Dismissed for Failure to State a Claim

In the event the Court retains supplemental jurisdiction over Abraham's state law claims, Abraham's claims should be dismissed for failure to state claims upon which relief can be granted.

### 1. Abraham Fails To State A Claim For Breach of Contract

In Count III, Abraham attempts to assert a claim for breach of contract. *See* Am. Compl., ¶¶226–233. Abraham contends that TJU's Sexual Harassment Policy constitutes the contract between him and TJU/TJUH. *Id.,* ¶228. However, Abraham has failed to attach to his Amended Complaint the actual contract between him and TJU that governed. Abraham has further failed to show how TJU's policies formed a binding contract with him, as policies, without more, are not contracts.

In the employment context, for a policy to become part of an employment contract, it must be part of the offer of employment – "an *inducement* to join the company." *Gruver v. Ezon Prod., Inc.*, 763 F. Supp. 772, 774 (M.D. Pa. 1991) (court granted defendant's motion to dismiss, in part, because plaintiff failed to plead that a contract for employment, including an anti-sexual

harassment term in the handbook, was in existence).  It is not sufficient to show only that the company "had a policy.  It must be shown that they intended to offer it as a binding contract." *Morosetti v. Louisiana Land & Expl. Co.,* 564 A.2d 151, 152–53 (Pa. 1989).  Accordingly, Abraham's breach of contract claim should be dismissed.[15]

### 2. Plaintiff Fails To State A Claim For Intentional Infliction of Emotional Distress

In Count IV, Abraham attempts to assert a claim for intentional infliction of emotional distress.  *See* Am. Compl., ¶¶234–239.  To support such a claim, at a minimum, Abraham must allege conduct of Jefferson that "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *See Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 991-92 (Pa. 1987) ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!").  Further, it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.  *Hoy v. Angelone,* 720 A.2d 745, 754 (Pa. 1998) (allegations that support a claim of intentional infliction of emotional distress must rise to a level of conduct that could be described as "the most clearly desperate and ultra-extreme conduct").

Here, to support his claim, Abraham alleges, among other things, that TJU engaged in the following conduct:

---

[15] Notably, Abraham's claims for breach of contract related to ¶231(c)–(g) do not refer to any subsection of the Policy. If the Court determines that Abraham's breach of contract claim can survive a motion to dismiss, his claims with respect to these subsections are insufficient to state a claim because he fails to reference specific provisions of the Policy in which Jefferson breached. *See Raines v. Haverford Coll.,* 849 F. Supp. 1009 (E.D. Pa. 1994) (citing *Sweeney v. St. Joseph's Hosp.,* 769 F.Supp 747, 751 (M.D. Pa. 1991), *aff'd,* 980 F.2d 724 (3d Cir. 1992) (plaintiff's breach of contract claim failed because he did not specify which provisions, policies, practices and procedures defendant violated)). Thus, at the very least, Abraham's breach of contract claim related to ¶231(c)–(g) should be dismissed.

- Failing to take action despite Abraham's repeated attempts to report Roe's misconduct and retaliation against him;

- Threatening Abraham that he would be suspended and reported to the Medical Staff and National Practitioner Database ("NPDB") if he did not take an immediate leave of absence;

- Using the criminal investigation against Abraham to deprive him of a full and fair opportunity to participate in the investigation;

- Not providing Abraham with i) the investigative report, ii) any evidence collected by the Title IX investigator; and iii) any statements of the witnesses interviewed;

- Performing a superficial, flawed investigation into Roe's claims against Abraham;

Am. Compl., ¶¶121, 130, 135, 140, 151.[16]

None of this purported conduct, however, rises to the level of "outrageousness" so as to support a claim for intentional infliction of emotional distress. *The Trustees of the Univ. of Pennsylvania,* 270 F. Supp. 3d at 827 (citing *Hoy,* 720 A.2d at 754). In *The Trustees of the Univ. of Pennsylvania,* plaintiff alleged that the university distorted the facts of plaintiff and the complainant's encounter, improperly attacked plaintiff's credibility, unjustifiably branded plaintiff a rapist, threatened plaintiff with expulsion, and ultimately imposed an unfair sanction. *Id.* The court concluded that such conduct, even if objectionable, was not of the type to give rise to a claim for intentional infliction of emotional distress. *Id.; see also Harris v. Saint Joseph's Univ.,* No. CIV.A. 13-3937, 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014) (concluding that complaint failed to allege outrageous conduct sufficient to support a claim for intentional infliction of emotional distress when it alleged that university took disciplinary actions based on false information and falsely portrayed plaintiff as a sex offender); *Doe v. Brandeis Univ.,* 177 F. Supp.

---

[16] As set forth in Section D(3)i. below, to the extent Abraham's claim is based on provisions of TJU's Policy, his claim is barred by the gist of the action doctrine.

3d 561 (D. Mass. 2016) (concluding that complaint failed to allege outrageous conduct sufficient to support a claim for intentional infliction of emotional distress when it alleged that university employed unfair and unreasonable procedures in a disciplinary hearing and improperly branded plaintiff a sexual predator).[17]  Because Abraham's averments do not exceed the insurmountably high bar required for outrageous conduct, Abraham's claim for intentional infliction of emotional distress should be dismissed.

### 3.  Abraham Fails to State A Claim For Negligent Infliction of Emotional Distress

In Count V, Abraham alleges that Jefferson breached its contractual duty of good faith and fair dealing, by failing to comply with the Policy, which caused him immediate and substantial physical harm.  *See* Am. Compl., ¶¶240–247.  Abraham's claim is fatally flawed and should be dismissed.

### i.  Plaintiff's Claim for Negligent Infliction of Emotional Distress is Barred by the "Gist of the Action" Doctrine

Abraham's claim for negligent infliction of emotional distress purports to be based on Jefferson's alleged failure to not follow its Policy and investigate his claim against Roe.  However, Abraham's breach of contract claim is based on this same purported contract—the Policy.  As a result, the gist of the action doctrine bars Abraham's claim.

The "gist of the action" doctrine prevents plaintiffs from recasting ordinary breach of contract claims as tort claims. *MDB v. Punxsutawney Christian Sch.,* 386 F. Supp. 3d 565, 591 (W.D. Pa. 2019) (citing *Hart v. Arnold,* 884 A.2d 316, 339 (Pa. Super. Ct. 2005)).  "[T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual

---

[17] Accordingly, even Abraham's allegation that he "has been mislabeled as a 'rapist'" does not overcome the threshold to support his claim for intentional infliction of emotional distress. *See* Am. Compl., ¶192.

consensus." *Id.* (quoting *Redevelopment Auth. of Cambria Cty. v. Int'l Ins. Co.*, 685 A.2d 581, 590

(Pa. Super. Ct. 1996)).  The gist of the action is contractual if "the parties' obligations are defined

by the terms of the contracts, and not by the larger social policies embodied in the law of torts."

*Id.* (citing *Bohler-Uddeholm Am., Inc., v. Ellwood Grp., Inc.,* 247 F.3d 79, 104 (3d Cir. 2001)).

The nature of the allegedly breached duty is the decisive factor – "***if the duty would not exist***

***without the contract, then the claim sounds in contract alone***."  *Id.* (citing *Bruno v. Erie Ins. Co.,*

106 A.3d 48, 68 (Pa. 2014) (emphasis added)).

Because Abraham's negligent infliction of emotional distress claim is based on facts

underlying the Sexual Misconduct Policy, this scenario falls squarely within the gist of the action

doctrine.  *See generally* Am. Compl., ¶¶240–247.  Therefore, as a matter of law, Abraham's claim

for negligent infliction of emotional distress should be dismissed.

> **ii.**     **Abraham's Claim for Negligent Infliction of Emotional Distress Further Fails to State A Claim**

In Pennsylvania:

> The crux of a claim for negligent infliction of emotional distress is that defendant breached some duty they owed to plaintiff and that the breach injured him. Although [plaintiff] alleges that [defendants] "had a duty of care to protect [defendants] from emotional distress," . . . we are unaware of any authority establishing the existence of this duty between an employer and employee.  With no articulable duty established, we are reluctant to extend a cause of action for negligent infliction of emotional distress to the instant action.

*Denton v. Silver Spring Nursing and Rehab. Ctr.,* 739 A.2d 571, 578 (Pa. Super. Ct. 1999).

Furthermore, Pennsylvania courts have never acknowledged any duties owed from an employer to

an employee.  *Id.*; *see also Black v. Cmty. Educ. Centers, Inc.,* No. CIV.A. 13-6102, 2014 WL

859313, at *2 (E.D. Pa. Mar. 4, 2014) (no special relationship between employer and employee to

support negligent infliction of emotional distress claim).  Instead, it is the employee who owes the

employer duties, not the other way around.  *Haggerty v. Burkey Mills, Inc.,* 211 F.Supp. 835

(E.D.N.Y. 1962) ("It is well settled that an employee owes a duty to his employer to be loyal to his interests and faithfully to devote his time to the promotion of his employer's interests."). Because Abraham fails to establish the existence of any duty owed from Jefferson to him based on his employment, he fails to state a claim for negligent infliction of emotional distress upon which relief can be granted.  Accordingly, his claim should be dismissed.

### 4. Abraham Fails to State A Claim For Tortious Interference with Business Relations

In Count VI of Abraham's Amended Complaint, Abraham attempts to state a claim for tortious interference with business relations.  *See* Am. Compl., ¶¶248–256.  To establish a claim for tortious interference, a plaintiff must plead: (1) the existence of an existing or prospective contractual relationship between plaintiffs and a third party; (2) intent on the part of defendants to harm the plaintiffs by interfering with this relationship; (3) absence of privilege or justification for such interference; and (4) actual harm or damage to plaintiffs as a result of defendants' conduct. *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 925 (3d Cir.1990) (citing *Thompson Coal Co. v. Pike Coal Co.,* 412 A.2d 466 (Pa.1979)).

Abraham's claim is based on his contract with Rothman and assertion that Jefferson somehow tortiously interfered with that relationship.  Am. Compl., ¶251.  However, Abraham is still employed by Rothman, and remains a partner there.  Moreover, Abraham fails to make any causal link between Jefferson's alleged conduct and his harm.  Indeed, Rothman never terminated Abraham, and Abraham's contract and relationship with Rothman remains.

To the extent Abraham's claim is based on reduced income because he cannot work at any Jefferson-affiliated hospitals, Abraham has failed to show any absence of privilege or justification by Jefferson.  Abraham voluntarily resigned from Jefferson.  His resignation ended his relationship

33

with Jefferson and any Jefferson-affiliated entities.  Thus, Abraham fails to state a claim upon which relief can be granted.

## V.      CONCLUSION

For the reasons set forth above, Jefferson respectfully requests that the Court dismiss Abraham's Amended Complaint in its entirety, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and grant such other relief as is just and proper.


Date: May 10, 2021                                        Respectfully submitted,

                                                          KLEHR HARRISON HARVEY
                                                          BRANZBURG LLP


                                                          */s/ Stephanie D. Wolbransky*
                                                          William A. Harvey (No. 25344)
                                                          Lisa A. Lori (No. 83814)
                                                          Stephanie D. Wolbransky (No. 326356)
                                                          1835 Market Street, Suite 1400
                                                          Philadelphia, PA 19103
                                                          Telephone: (215) 569-2700
                                                          Fax: (215) 568-6603
                                                          wharvey@klehr.com
                                                          llori@klehr.com
                                                          swolbransky@klehr.com

                                                          *Attorneys for Defendants*