**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | x | |
| JOHN A. ABRAHAM, M.D., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: 20-cv-02967 (MMB) |
| | : | |
| v. | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY, et al. | : | |
| | : | |
| Defendants, | : | |
| | : | |
| | x | |

**MEMORANDUM OF LAW**
**IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**
**FIRST AMENDED COMPLAINT**

**NESENOFF & MILTENBERG, LLP**
Andrew T. Miltenberg, Esq.
(*pro hac vice admission pending*)
Stuart Bernstein, Esq.
(*pro hac vice admission pending*)
Cindy Singh, Esq.
(*pro hac vice admission pending*)
363 Seventh Avenue, 5th Floor
New York, NY 10001
Phone: (212) 736-4500

**ROGERS COUNSEL**
Lance Rogers, Esq
26 E. Athens Avenue
Ardmore, Pennsylvania 19003
(610) 228-0222
lance@rogerscounsel.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................i

INTRODUCTION ..................................................................................................................1

PROCEDURAL HISTORY ....................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

   A.  Jane Roe and Dr. Abraham's Sexual Encounter on June 23-24, 2018 .....................4

   B.  After a Failed Attempt to Extort Dr. Abraham and After Dr. Abraham Reports Roe's
       Sexual Misconduct, Roe Falsely Accuses Dr. Abraham of Rape .............................6

   C.  June 27, 2018: Dr. Abraham Receives a Notice of Concern, and TJUH Wrongfully
       Pressures Him Into Taking An Administrative Leave .................................................8

   D.  The Flawed and Gender Biased Disciplinary Proceeding against Dr. Abraham. ...................9

ARGUMENT ........................................................................................................................11

   I.      LEGAL STANDARD ...................................................................................................11

   II.     THE AMENDED COMPLAINT IS IN FULL COMPLIANCE WITH RULE 8 OF
          THE FEDERAL RULES OF CIVIL PROCEDURE. ........................................13

   III.    PLAINTIFF SUFFICIENTLY ALLEGES HIS CAUSE OF ACTION FOR TITLE
          IX SEX DISCRIMINATION ...................................................................................15

      A.  The Law Concerning Title IX Discrimination Claims ...........................................16

      B.  The Allegations of the Complaint Support a Plausible Inference that Defendants
         Discriminated Against Dr. Abraham on the Basis of Sex. .....................................18

      C.  Defendants' Attempt to Superimpose Elements of the "Selective Enforcement"
         and "Deliberate Indifference" Doctrinal Tests on to Plaintiff's Sex Discrimination
         Claim is a Red Herring and Should be Disregarded by the Court. ..............................22

   IV.  PLAINTIFF SUFFICIENTLY ALLEGES RETALIATION. ..........................................24

   V.     PRINCIPLES OF EQUITY AND JUDICIAL ECONOMY REQUIRE THIS
         COURT RETAIN JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS. ...27

   VI.  PLAINTIFF SUFFICIENTLY ALLEGES HIS BREACH OF CONTRACT CLAIM ...28

   VII. PLAINTIFF SUFFICIENTLY STATES A CLAIM FOR TORTIOUS
         INTERFERENCE WITH BUSINESS RELATIONS ...............................................34

   VIII.   IF THE COURT DISMISSES ANY CLAIM, SUCH DISMISSAL SHOULD BE
         WITHOUT PREJUDICE. ...........................................................................................36

CONCLUSION .....................................................................................................................37

i

# TABLE OF AUTHORITIES

## Cases

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ....................................................13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................2, 13, 14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................2, 12

*Bell Atl. v. Twombly*, 550 U.S. 544, 556 (2007) .............................................................................12

*Bolick v. NE Indus, Serv. Corp.* 666 F. App'x 101 (3d Cir. 2017) ..................................................14

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ..............................................25

*Cheney v. Daily News L.P.*, 654 F. App'x 578, 583 (3d Cir. 2016) .................................................31

*Cooper v. Menges,* 541 Fed. Appx. 228, 232 (3d Cir.2013 ............................................................25

*DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) .........................................15

*Doe v. American University*, No. 19-CV-03097 (APM), 2020 WL 5593909, at *6
  (D.D.C. Sept. 18, 2020) ............................................................................................................18

*Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) .......................................................................18, 19

*Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).............................................12, 18, 20, 22

*Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017) ..............................16, 24

*Doe v. Penn. State Univ.*, 276 F.Supp.3d 300 (M.D. Pa. 2017)......................................................14

*Doe v. Purdue Univ.*, 928 F. 3d 652, 667-668 (7th Cir. 2019) ......................................16, 17, 19, 22

*Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 809
  (E.D. Pa. 2017)..................................................................................................................passim

*Doe v. Univ. of Miami*, 882 F.3d at 591................................................................................19, 27

*Doe v. University of Arkansas-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020) ............................17

*Doe v. University of the Sciences*, 961 F. 3d 203, 209 (3d Cir. 2020)......................................passim

*Drysdale v. Woerth*, 1998 WL 966020 (E.D. Pa. Nov. 18, 1998) ....................................................14

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).......................................................12

*Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 615 (E.D. Pa. 2014)..................................................25

*Gruver v. Ezon Prod., Inc.*, 763 F. Supp. 772, 775 (M.D. Pa. 1991)...............................................30

*Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) ............................................................12

*Henderson v. Merck & Co.,* 998 F. Supp. 532, 539 (E.D. Pa. 1998)................................................29

*Kernaghan v. BCI Commc'ns, Inc.*, 802 F. Supp. 2d 590, 596 (E.D. Pa. 2011) ..............................35

*Kling v. Univ. of Pittsburgh Med. Ctr.*, No. 2:18-CV-01368-CRE, 2020 WL 2832008, at *3

    (W.D. Pa. May 8, 2020)............................................................................................................32

*Kling*, No. 2:18-CV-01368-CRE, 2020 WL 2832008, at *4 ...........................................................33

*Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015)..............................13

*Lloyd v. City of Bethlehem*, No. 02-0830, 2002 WL 31341093, at *3 (E.D. Pa. Oct. 16, 2002).....30

*Moore v. Temple Univ.*, No. CV 13-5079, 2016 WL 4061352, at *6 (E.D. Pa. July 29, 2016)......25

*Morosetti v. Louisiana Land & Expl. Co.*, 522 Pa. 492, 495, 564 A.2d 151, 152–53 (1989) .........30

*Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)...................................12, 26, 27, 36

*ProCentury Ins. Co. v. Harbor House Club Condo. Ass'n, Inc.*, 652 F. Supp. 2d 552, 555

    (D.N.J. 2009................................................................................................................................12

*Prof'l Cleaning and Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 Fed. Appx. 161,

    165 (3d Cir. 2007).....................................................................................................................36

*Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020)..........................................16

*Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020)....................................23, 24

*Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021)...........................17

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002)....................................................23

*Tafuto v. New Jersey Inst. of Tech.*, No. 10-CV-4521 (PGS), 2011 WL 3163240, at \*5

    (D.N.J. July 26, 2011)..........................................................................36

*Toney v. Chester County Hospital*, 36 A.3d 83 (Pa. 2011).............................................33

*Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)..................................................16

## **Statutes**

28 U.S.C. § 1367 (a) ................................................................................27

28 U.S.C.§ 1367 (c) ................................................................................28

## **Rules**

Fed. R. Civ. P. 8 ...............................................................................13, 14, 32

Fed. R. Civ. P. 12 ...........................................................................2, 12, 15, 30

Fed. R. Civ. P. 15 ................................................................................36

iv

**INTRODUCTION**

Plaintiff, Dr. John A. Abraham ("Plaintiff" or "Dr. Abraham") brings this action to obtain relief against Defendants Thomas Jefferson University ("TJU") and Thomas Jefferson University Hospitals, Inc. ("TJUH") (collectively "Defendants") based on causes of action for violation of Title IX of the Education Amendments of 1972, breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress, and tortious interference by Defendants with Plaintiff's business relations with Rothman Orthopaedic Institute (hereinafter "Rothman Orthopaedics").

At this stage of the litigation, this Court must *presume all facts to be true and draw all inferences in favor of the non-moving party*. The Amended Complaint sufficiently sets forth factual allegations providing a plausible basis for the causes of action alleged. For the reasons set forth below, Defendants' motion should be denied.

**PROCEDURAL HISTORY**

Plaintiff initially filed his Complaint against Defendants in this action on June 19, 2020 ("Complaint") (ECF No 1). Plaintiff set forth causes of action for violation of Title IX of the Education Amendments of 1972, breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress, and tortious interference by Defendants with Plaintiff's business relations with Rothman Orthopaedics.

On or about August 21, 2020, Defendants filed their motion to dismiss the Complaint ("Motion"). (ECF No 6). In their Motion, Defendants argued for dismissal on the grounds that the Complaint violated Federal Rule of Civil Procedure 8(a) calling for a "short and plain statement of the claim showing that the pleader is entitled to relief" (FRCP Rule 8(a)(2)). Defendants also

argued for dismissal of Plaintiff's causes of action on substantive grounds. Plaintiff timely opposed this motion, and Defendants timely replied. (ECF Nos 8 and 9).

By Memorandum and Order dated March 15, 2021 ("Order"), this Court dismissed Plaintiff's Complaint without prejudice and with leave to file an Amended Complaint. (ECF No. 11). In balancing compliance with FRCP Rule 8(a) with the legal standards set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court found that compliance with *Twombly* and *Iqbal* did not require the number of paragraphs and pages contained in the Complaint.

The Court, however, specifically declined to specify "any maximum limit of paragraphs or pages but note[d] that even the complaints in the most serious cases seldom exceed 20-25 pages as a guideline." (ECF No 11 at 3). The Court also reserved its ruling on dismissal of Plaintiff's substantive claims until Plaintiff filed his Amended Complaint. (*Id.*)

Plaintiff timely filed his Amended Complaint, in full compliance with FRCP Rule 8 and the Court's Order. Defendants filed their Motion to Dismiss the Amended Complaint on May 10, 2021, and this opposition follows.

## **STATEMENT OF FACTS**

At points, Defendants' rendition of the facts in the Amended Complaint (Def. Mem. at 2-9) impermissibly ignores the standard of review for motions to dismiss made under Federal Rule of Civil Procedure 12(b)(6). On a motion to dismiss, a court "must take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 809 (E.D. Pa. 2017) (internal citations omitted). *Accord Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) ("When assessing the

2

merits of a Rule 12(b)(6) motion, we accept as true all factual allegations in the complaint and view those facts in the light most favorable to the non-moving party"(internal citations omitted)).

In their Statement of Facts, Defendants misstate the factual allegations in the Amended Complaint, claiming, for example, that "TJU's investigation was of the incident as a whole." (Def. Mem. at 9) Dr. Abraham's Amended Complaint plainly alleges that TJU failed to investigate Dr. Abraham's allegations that Jane Roe[1] engaged in non-consensual sexual intercourse with him on the night in question, and further failed to investigate whether Roe's complaint against him was retaliatory. (Am. Compl. ¶¶ 151-156).   Where, as here, Defendants fail to accept the factual allegations of the Amended Complaint and fail to draw all reasonable inferences in Plaintiff's favor, the Court should disregard Defendants' assertions.

A full accounting of the facts underlying Plaintiff's claims can be found in the Amended Complaint (ECF No. 14).  For the court's convenience, following is a summary of the pertinent allegations made in the Amended Complaint.

At the time of the events at issue, Plaintiff was the Director of the Musculoskeletal Oncology Center for TJUH and Service Chief of Orthopedic Oncology at Rothman Orthopaedics. (Am. Compl. ¶53; ¶56). Plaintiff held clinical privileges and a faculty appointment at TJUH. (Am. Compl. ¶¶53-54). At all points relevant herein, the operations of TJU and TJUH were substantially consolidated. (Am. Compl. ¶7).

 Plaintiff was likewise, at all times relevant herein, a partner at Rothman Orthopaedics. (Am. Compl. ¶56) Plaintiff's relationship with Rothman Orthopaedics was contractual in nature as it was governed by a partnership agreement. *Id.* Prior to the events at issue, Plaintiff was a highly

---

[1] The Complainant is referred to pseudonymously as Jane Roe.

respected orthopedic surgeon with no disciplinary history and an unblemished professional reputation. (Am. Compl. ¶55)

At all times relevant herein, Jane Roe was an Orthopedic Surgery resident physician at TJUH. (Am. Compl. ¶57) Dr. Abraham did not directly supervise Jane Roe. *Id.*

**A. Jane Roe and Dr. Abraham's Sexual Encounter on June 23-24, 2018**

On June 23, 2018, at approximately 6:00 p.m., Plaintiff hosted an annual party at his residence to thank various members of the hospital community, including his operating staff. Plaintiff also invited a few friends to attend the party and stay for the weekend. (Am. Compl. ¶ 59)

Though she was not specifically invited, Jane Roe was among the guests. (Am. Compl. ¶60) Throughout the evening, Roe exhibited unwelcome, sexually aggressive behavior towards Dr. Abraham and other males at the party. (Am. Compl. ¶62) As reported by party-goers, such behavior included standing without permission in Dr. Abraham's bedroom, placing her hands without consent on Dr. Abraham's shoulders and saying words to the effect of, "I normally don't wear anything other than a thong in the pool." (*Id.*)

Roe also engaged in sexually harassing and non-consensual sexual contact with another party guest, V.D. (*Id.*) Without consent, Roe sat next to V.D., rubbed V.D.'s leg and nibbled his ear, making V.D. visibly uncomfortable. (*Id.*) On information and belief, a report was made about Roe's nonconsensual sexual contact with V.D. to TJU's Human Resources Department as well as to Chief Medical Officer Ed Pribitkin. On information and belief, TJU failed to investigate the allegations of Roe's nonconsensual sexual contact with V.D. (Am. Compl. ¶150)

Around midnight, as the party was winding down, Roe lingered. (Am. Compl. ¶63) Without permission, she went into Dr. Abraham's private liquor cabinet and poured Irish whiskey into one of Dr. Abraham's wine glasses. (*Id.*) Roe then came outside and handed Dr. Abraham

the almost-full glass, encouraging him to drink it. Dr. Abraham refused the glass of alcohol, but Roe held it to his lips and started pouring it. Dr. Abraham consumed a mouthful. Roe wanted Dr. Abraham to drink more, and she became more forceful and insistent. Dr. Abraham pushed her hand away, causing the glass to fall and shatter. (Am. Compl. ¶64) Dr. Abraham and a few guests who witnessed the encounter asked Roe to leave. (Am. Compl. ¶65)

Believing that all party guests, except for those staying overnight, had left, Dr. Abraham headed into his house for the night. (Am. Compl. ¶66) He noticed that he had some trouble walking due to the alcohol. (Am. Compl. ¶67)

Upon entering his house, Roe walked up to Dr. Abraham. Without his affirmative consent, Roe aggressively kissed him on the mouth and placed her arms around him. (Am. Compl. ¶67) Inebriated, Dr. Abraham attempted to push Roe away, but he was unable to do so.  He told Roe that he did not want to have sexual relations with her, stating "this isn't a good idea." Roe then became even more aggressive, shouting indignantly, "don't you want to fuck me?" Dr. Abraham again said "No, that's not a good idea." (Am. Compl. ¶¶69-70)

In a raised voice, Roe began repeating: "fuck me!" "Come on fuck me!" "I want you to fuck me!" Roe forcefully pulled Dr. Abraham to the floor.  She lay on her back on an area rug. Roe and Dr. Abraham proceeded to have sexual intercourse. During the intercourse, Roe continued to yell, "Fuck me! Fuck me!" Roe moaned loudly and grunted with pleasure.  Roe was so loud that one of the overnight house guests, A.D., heard her. Throughout the intercourse, Roe kissed and caressed Dr. Abraham's body. She thrust her hips and moved her body in a manner that was pleasurable to her.  With her hand, Roe guided Dr. Abraham's penis into her vagina. (Am. Compl. ¶¶71-75)

After the intercourse concluded, Dr. Abraham felt exhausted and dizzy. His mind was foggy, and he could not process what had just occurred.  At some point after the intercourse had concluded, Dr. Abraham told Roe that he needed to go up to bed. (Am. Compl. ¶¶76-77) Dr. Abraham collected his clothes and then proceeded to his bedroom.  As he began climbing the stairs, he saw that Roe was already most of the way up the staircase. By the time Dr. Abraham entered his bedroom, Roe had already positioned herself in his bed. (Am. Compl. ¶¶78-79) Short of calling the police, Dr. Abraham felt that there was nothing he could do to get Roe to leave. He was too exhausted to take any further action, and he fell asleep immediately. (Am. Compl. ¶80)

When Dr. Abraham awoke the next morning, June 24, 2018, he could not think clearly and felt as though the room was spinning. (Am. Compl. ¶81) Seeing that Dr. Abraham was awake, Roe, still naked, flipped on to her stomach then rose up on her hands and knees. She said words to the effect of: "I want you to fuck me again, this way, this is my favorite position."  She indicated that she wanted Dr. Abraham to enter her from behind. (Am. Compl. ¶82) Dr. Abraham felt relieved when the telephone rang, giving him the excuse he needed to prevent any further activity with Roe. (Am. Compl. ¶83)

Dr. Abraham asked Roe to leave. Dr. Abraham walked Roe to her car, but as he left the house, he noticed that he was unusually sensitive to the sunlight.  He felt as though he had been drugged.  As they reached Roe's vehicle, Roe put her arm around Dr. Abraham and kissed his cheek. She then got into her car and drove away. (Am. Compl. ¶¶83-85)

**B. After a Failed Attempt to Extort Dr. Abraham and After Dr. Abraham Reports Roe's Sexual Misconduct, Roe Falsely Accuses Dr. Abraham of Rape**

Following the sexual encounter, on June 26, 2018, Roe and her husband, R.P., attempted to extort money from Dr. Abraham. (Am. Compl. ¶¶86-109). At Roe's request, she and Dr. Abraham spoke on the phone (Am. Compl. ¶86). When Roe and Dr. Abraham spoke on the phone,

she said she was sorry for what she did and that the sexual encounter was "consensual." Roe next

stated that she had told her husband, R.P.[2], about the sexual encounter and that R.P. was "fucking

angry." (Am. Compl. ¶¶87-88) Roe stated that her husband wanted to meet Dr. Abraham in person

to propose something that could "make this better" for Roe and R.P. (Am. Compl. ¶89)  It became

clear to Dr. Abraham that Roe was suggesting that Dr. Abraham pay off Roe and R.P.   Dr.

Abraham realized that these individuals were attempting to manipulate and extort him. (Am.

Compl. ¶¶89-90)

Dr. Abraham told Roe that he needed to make a report to his (and Roe's) supervisors, Dr.

Alex Vaccaro and Dr. Jim Purtill. Roe raised her voice and said, "No way! Why would you do

that? I don't want my career to be ruined. Can you at least wait until you hear what my husband

has to say? He wants to work out a resolution with you, so that you can make this right for us."

(Am. Compl. ¶91)

Later that day, R. P. showed up uninvited to Fox Chase Hospital to see Dr. Abraham, but

Dr. Abraham declined to see him. R.P. also left Dr. Abraham a "threatening voicemail," stating

that it would be in Dr. Abraham's "best interest" to speak to him in private. (Am. Compl. ¶93)

Between 5:30 p.m. and 6:30 p.m., on June 26, 2018, Dr. Abraham reported Roe's alleged

sexual misconduct and extortion attempt to his TJU/TJUH supervisor, Dr. Alex Vaccaro. (Am.

Compl. ¶95) He detailed that Roe had taken advantage of him at his annual party and that she had

coerced him into having sexual intercourse. (*Id.*) He also reported that R.P. had shown up at his

workplace and that he believed that R.P. and Roe were trying to extort him. (*Id.*) Dr. Vaccaro told

---

[2] **Error! Main Document Only.** Defendants' contention that the use of the initials "R.P." to designate Roe's husband is an attempt to "out" Roe is entirely without merit. (Def. Mem. at 6, note 4) That initials were used designate R.P. is consistent with the designation of other individuals referenced in the Amended Complaint such as witnesses and other party-goers. (*See* Am. Compl. at page 11, note 4)

Dr. Abraham that he was going to speak to TJU's General Counsel concerning Dr. Abraham's report, and he further told Dr. Abraham to discuss the matter with Dr. Jim Purtill, the TJUH Residency Program Director and Roe's direct supervisor. (Am. Compl. ¶¶97-98).

After speaking to Dr. Vaccaro, Dr. Abraham returned R.P.'s phone call. (Am. Compl. ¶100) During this conversation, R.P. made false claims about bruises on Roe, and also told Dr. Abraham that they were going to have to figure out a way to resolve the situation. (Am. Compl. ¶¶102-103) Dr. Abraham understood R.P.'s statement to be a monetary demand. (Am. Compl. ¶104) Dr. Abraham told R.P. that he would not negotiate with him, and that he had already reported the incident to his chairman, Dr. Vaccaro, and that he intended to meet the next morning with Dr. Jim Purtill. (Am. Compl. ¶105)

On information and belief, R.P. and Roe were suddenly on the defensive after learning that Dr. Abraham had already reported Roe's conduct, and that Roe's career was now in jeopardy. On information and belief, Roe now needed to switch tactics from extortion to filing a false claim of sexual assault in order to save her career.  (Am. Compl. ¶¶108-109)

When he arrived home on the evening of June 23, 2018, Dr. Abraham texted Dr. Purtill. Receiving no reply, he left Dr. Purtill a voicemail. (Am. Compl. ¶¶110-111) When Dr. Purtill did not return his call, Dr. Abraham called Dr. Vaccaro. (Am. Compl. ¶112) Shockingly, Dr. Vaccaro told Dr. Abraham that Roe had gone directly to Dr. Purtill's home and falsely reported to him that Dr. Abraham had raped her. (Am. Compl. ¶113) Dr. Abraham reminded Dr. Vaccaro that he had initially reported Roe's sexual misconduct. (Am. Compl. ¶114)

**C. June 27, 2018: Dr. Abraham Receives a Notice of Concern, and TJUH Wrongfully Pressures Him Into Taking An Administrative Leave**

On June 27, 2018, Dr. Abraham received a Notice of Concern from Defendants' Title IX Coordinator. The Notice alleged that he had engaged in "non-consensual sexual intercourse" with

Roe. The Notice further informed him that an investigation would be commenced and that he would be assigned a University representative as an advisor. (Am. Compl. ¶¶118-119).

That same day, TJUH Chief Medical Officer, Ed Pribitkin, threatened Dr. Abraham by stating that Dr. Abraham would be suspended and reported to the Medical Staff and the National Practitioner Database ("NPDB") if he did not take an immediate leave of absence. Dr. Abraham pleaded with Dr. Pribitkin that the allegation was false and told Dr. Pribitkin that there was another side to the story. Dr. Pribitkin refused to listen. On information and belief, Dr. Pribitkin was at all relevant times a mandatory reporter under the Sexual Misconduct Policy. Under the threat of suspension and reporting to the NPDB, Dr. Abraham believed he had no choice but to capitulate and take a leave of absence. (Am. Compl. ¶¶120-124).

As a further result of Roe's false allegations, Dr. Abraham was suspended from his position at Rothman Orthopaedics. (Am. Compl. ¶125)

**D.  The Flawed and Gender Biased Disciplinary Proceeding against Dr. Abraham.**

Defendants conducted a superficial, flawed and gender-biased investigation into Roe's claims against Dr. Abraham. (Am. Compl. ¶¶129-156) As discussed, Dr. Abraham reported to TJU/TJUH officials that i) he had a complaint against Roe for sexual misconduct against him, and ii) Roe's false complaint against him was retaliatory, given that it occurred, after Dr. Abraham made his report of Roe's misconduct, and on information and belief, following a failed extortion attempt carried out by Roe and her husband, R.P. Defendants took no action to investigate Dr. Abraham's allegations against Roe. (Am. Compl. ¶¶151-156)

During the course of the investigation Defendants wrongfully deprived Dr. Abraham of the opportunity to review the investigative report produced by TJU, Roe's initial complaint to the Title IX Office as well as any evidence and witness statements collected. (Am. Compl. ¶¶135-136)

There is no written basis in Defendants' Sexual Misconduct Policy for depriving Dr. Abraham of the opportunity to review these materials. (Am. Compl. ¶137) Defendants failed to pursue potentially exculpatory information on behalf of Dr. Abraham. (Am. Compl. ¶¶142-147) The investigation was concluded without allowing Dr. Abraham a full and fair opportunity to provide a statement[3], to present over twenty-nine material witnesses along with witness statements, and to offer other evidence on his behalf, such as the threatening voicemail left by R.P., Roe's husband. (Am. Compl. ¶¶129-134)

Fearing that the bias that pervaded the investigation would likewise taint any hearing in this matter, and having exhausted his savings during his leave of absence, in December, 2018, with full reservation of his rights, Dr. Abraham relinquished his clinical privileges and faculty appointment at TJU/TJUH as well as at any institution in which TJU/TJUH had a controlling interest. (Am. Compl. ¶¶158-160) Dr. Abraham relinquished his privileges with the specific understanding that he would be able continue his employment at his prior level at any Rothman Orthopaedics office, that was not majority-owned by TJU/TJUH, at least until Roe concluded her residency program.  (Am. Compl. ¶162) At the time of Dr. Abraham's relinquishment of his clinical privileges and faculty appointment from TJU/TJUH, no other restrictions were discussed. (*Id*.)

On or about January 8, 2019, TJU terminated its investigation with no findings of responsibility against Dr. Abraham. TJU did not address Dr. Abraham's complaint against Roe or his allegation that Roe's complaint was retaliatory. (Am. Compl. ¶163)

---

[3] On or about July 2, 2018, Roe filed a police report accusing Dr. Abraham of sexual assault. (Am. Compl. ¶126). After an investigation, in or about November, 2018, the Montgomery County District Attorney declined to pursue charges against Dr. Abraham. (Am. Compl. ¶128). The pending criminal investigation constrained Dr. Abraham's ability to simultaneously submit a written/oral statement or otherwise participate in TJU's Title IX investigation. (Am. Compl. ¶129).

When Dr. Abraham returned to practice through his contractual relationship with Rothman Orthopaedics in January, 2019, TJU and TJUH continued to wrongfully interfere with his ability to practice his medical specialty, to retain and re-build his patient base, and subjected him to further reputational harm and emotional distress. (Am. Compl. ¶¶181-190) Dr. Abraham, for example, was suddenly restricted from seeing patients in any Rothman Orthopaedics office that contained TJU/TJUH orthopedic medical residents. Instead of having the choice of approximately twenty offices available to him, in January, 2019, Dr. Abraham was told that only approximately three offices were available. Dr. Abraham was forced to move out of the region where he had built his outstanding reputation for ten years. (Am. Compl. ¶¶186-189)

The disciplinary proceedings herein occurred at a time when Defendants were facing pressure from the federal government, the #MeToo Movement, the Times Up Healthcare Movement, and the media to selectively enforce its sexual misconduct policy against males and find against males accused of sexual assault. During the period described in the Amended Complaint, there were two open OCR investigations against TJU for alleged Title IX infractions. (Am. Compl. ¶¶165-180)

Defendants' conduct subjected Dr. Abraham to significant economic harm, including without limitation, lost earnings, loss of future earnings, and loss of career prospects. He has suffered from depression, anxiety, and suicidal ideation. Dr. Abraham has also suffered and will continue to suffer ongoing reputational harm due to Defendants' conduct. (Am. Compl. ¶¶191-194; 203; 225; 232; 239; 246-247; 254-256)

## **ARGUMENT**

### I.  **LEGAL STANDARD.**

Federal Rule of Civil Procedure 8(a) requires simply that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "Under the liberal federal

pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts

that serve as a basis for the claim." *ProCentury Ins. Co. v. Harbor House Club Condo. Ass'n, Inc.*,

652 F. Supp. 2d 552, 555 (D.N.J. 2009).  Rather, a complaint need only "give the defendant fair

notice of what the claim is and the grounds upon which it rests."  *Phillips v. Cty. of Allegheny*, 515

F.3d 224, 231 (3d Cir. 2008) (citation omitted).  Notice-pleading "'does not impose a probability

requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable

expectation that discovery will reveal evidence of' the necessary element."  *Id.* (quoting *Bell Atl.*

*v. Twombly*, 550 U.S. 544, 556 (2007)).

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the moving

party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d

744, 750 (3d Cir. 2005) In reviewing the motion, the district court must "accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine

whether, under *any reasonable reading of the complaint*, the plaintiff *may* be entitled to relief."

*Phillips*, 515 F.3d at 233 (emphasis added). The District Court must "draw all reasonable

inferences in favor of the plaintiff." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp.

3d at 809 (internal citations omitted).  In that regard, "a well-pleaded complaint may proceed even

if it strikes a savvy judge that actual proof of those facts alleged is improbable and that a recovery

is very remote and unlikely." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009)

(quoting *Twombly*, 550 U.S. at 556).

Even where "the facts a plaintiff alleges in a complaint may turn out to be self-serving and

untrue," a court at the motion-to-dismiss stage "is not engaged in an effort to determine the true

facts."  *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) "If the complaint is found sufficient

to state a legal claim, the opposing party will then have ample opportunity to contest the truth of

the plaintiff's allegations and to offer its own version" through discovery and substantive litigation. *Ibid.*

Moreover, the *Twombly* pleading standard "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal citations and quotations omitted). Thus, the mandatory presumption of truth and the beneficial inference in favor of the Plaintiff apply not only to facts based on direct personal knowledge, but also those alleged on "information and belief." *See also Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015) (denying motion to dismiss and noting that the Ninth, Seventh, and Second Circuit all presume truth of "information and belief" allegations).

## II. THE AMENDED COMPLAINT IS IN FULL COMPLIANCE WITH RULE 8 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

Plaintiff's Amended Complaint is in full compliance with Federal Rules of Civil Procedure 8(a) and 8(d). Defendants' arguments that the Amended Complaint should be dismissed or stricken on that basis (Def. Mem. at 10-12) are without merit. In *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78, (2009), the Supreme Court noted that while the pleading standard announced in Rule 8 does not require "'detailed factual allegations,'" "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." The *Ashcroft* Court stated in relevant part:

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."

*Id.* (internal citations omitted). Here, Dr. Abraham's Amended Complaint has been carefully drafted, with sufficient factual matter to allow a court to draw the reasonable inference that Defendants are liable for the misconduct alleged. *See id.* ("A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. (internal citations omitted)).

In drafting his Amended Complaint, Plaintiff has significantly shortened his pleading to comply with the Court's March 15, 2021 Memorandum and Order (ECF No. 11) ("Order"). Whereas the Complaint contained 91 pages and 529 numbered paragraphs, the Amended Complaint contains 43 pages and 256 numbered paragraphs. Crucially, the Court declined to specify "any maximum limit of paragraphs or pages" for Plaintiff's Amended Complaint in its Order. Plaintiff's case is factually complex, and requires a detailed factual recitation in order to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. at 677–78. Each of the Paragraphs in Plaintiff's Amended Complaint has been thoughtfully drafted to comply with Rule 8(d)'s requirement that allegations be "simple, concise and direct." FRCP 8(d).

Moreover, this Court must construe Plaintiff's Amended Complaint so as to do justice. FRCP 8(e) ("Pleadings must be construed so as to do justice.") Plaintiff's Amended Complaint is of comparable length to other Title IX complaints filed in this district as well as sister districts. (*See e.g. Doe v. Trustees of Univ. of Pennsylvania*, 270 F.Supp.3d 799 (E.D. Pa. 2017) Case No. 2:16-cv-05088, ECF Doc. 1 (Complaint consisting of 51 pages and 210 numbered paragraphs, exclusive of exhibits); *see also Doe v. Penn. State Univ.*, 276 F.Supp.3d 300 (M.D. Pa. 2017), 4:17-cv-01315, ECF Doc. 1 (Complaint consisting of 70 pages and 223 numbered paragraphs).

The cases cited by Defendants in support of dismissal, *Bolick v. NE Indus, Serv. Corp.* 666 F. App'x 101 (3d Cir. 2017) and *Drysdale v. Woerth*, 1998 WL 966020 (E.D. Pa. Nov. 18, 1998), are unreported, without precedential value, and factually distinguishable from the present matter. Plaintiff's Amended Complaint is meticulously written, with headings to delineate different sections. Each of Plaintiff's six causes of action are segregated and contain a summary of or

references to the pertinent factual allegations in support. Contrary to Defendants' contention, this is not a case where Defendants had to "dredg[e]" through the Amended Complaint to "guess[]" the facts in support. (Def. Mem. at 10-11).

There is likewise no basis to strike any part of the Amended Complaint under Federal Rule of Civil Procedure 12(f) (Def. Mem. at 11-12). Striking a pleading "is a drastic remedy to be resorted to only when required for the purposes of justice and should be used sparingly." *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (internal citation and quotation omitted).  In order to prevail on such a motion, Defendants must demonstrate that "'the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or [that] the allegations confuse the issues.'" *Id.* (internal citations omitted).  Defendants cannot meet this high burden.  Defendants complain that the Amended Complaint contains "unnecessary, explicit, and boorish detail into the sexual encounter between Abraham and Roe."  (Def. Mem. at 12). However, the underlying proceedings consist of a Title IX complaint filed by Jane Roe against Dr. Abraham alleging "non-consensual sexual intercourse" as well as Dr. Abraham's contentions that Defendants never investigated his complaint that Roe had engaged in nonconsensual intercourse with him, and that Roe's complaint against him was retaliatory. (Am. Compl. ¶96; ¶119; ¶¶151-156).

### III. PLAINTIFF SUFFICIENTLY ALLEGES HIS CAUSE OF ACTION FOR TITLE IX SEX DISCRIMINATION

Dr. Abraham's Amended Complaint amply states a cause of action for sex discrimination in violation of Title IX (Am. Compl. Count I, ¶¶ 195-203). Plaintiff does *not* allege causes of action for "selective enforcement" or "deliberate indifference," and as detailed below, it is error for the Defendants to attempt to analyze Dr. Abraham's claim through those doctrinal tests (Def. Mem. at 12-22). Doctrinal tests, such as the tests for "selective enforcement" or "deliberate indifference"

have been superseded by the more liberal pleading standard for claims of Title IX sex discrimination recently adopted by the Third Circuit in *Doe v. University of the Sciences*, 961 F. 3d 203, 209 (3d Cir. 2020). Evaluated under the newly adopted standard set forth in *Doe v. University of the Sciences*, Dr. Abraham's Amended Complaint survives this motion to dismiss.

### A.  The Law Concerning Title IX Discrimination Claims.

Title IX states: "No person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Employees at educational institutions receiving federal funding,[4] such as Dr. Abraham, have a private right of action under Title IX.  *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017). "Title IX bars the imposition of university discipline where gender is a motivating factor."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

Recently, the United States Courts of Appeals for the Third, Fourth, Eighth, and Ninth Circuits followed the Seventh Circuit in rejecting the application of doctrinal tests, i.e. erroneous outcome, selective enforcement, deliberate indifference and archaic assumptions,[5] to Title IX claims, holding that the only question that need be asked is "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex?'" *Doe v. Purdue Univ.*, 928 F. 3d 652, 667-668 (7th Cir. 2019). *See Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020) ("Although our court has acknowledged some of the doctrinal tests that other courts have employed in this context and assumed their application, we have not expressly adopted any of them…[W]e find persuasive the Seventh Circuit's approach to

---

[4] Plaintiff has alleged Defendants are educational institutions which receive federal funding; Defendants do not contest these allegations. (*E.g.* Am. Compl. ¶¶198-199)

[5] *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) recognized the erroneous outcome and selective enforcement theories of Title IX sex discrimination. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) recognized the theories of deliberate indifference and archaic assumptions.

Title IX claims in this context" (internal citations omitted)); *Doe v. Univ. of the Sciences*, 961 F.3d at 209; *Doe v. University of Arkansas-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020); *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021))[6]

In *Doe v. University of the Sciences*, the Third Circuit held:

> We agree with the Seventh Circuit and "see no need to superimpose doctrinal tests on the [Title IX] statute."  Thus, we adopt the Seventh Circuit's straightforward pleading standard and hold that, to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex. Although parties are free to characterize their claims however they wish, this standard hews most closely to the text of Title IX. *See* 20 U.S.C. § 1681(a).

*Doe v. Univ. of the Sciences*, 961 F.3d at 209 (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019).

In finding that Doe's Complaint in *Doe v. University of the Sciences* contained "plausible allegations supporting the reasonable inference that [the University] discriminated against him on account of his sex," the Third Circuit found the following factors significant. *Id.* at 209. First, Doe alleged that the University succumbed to external pressure from the federal government following the issuance of the U.S. Department of Education's 2011 Dear Colleague Letter ("Dear Colleague Letter") in implementing and enforcing its disciplinary policy. *Id.* The Dear Colleague Letter allegedly limited procedural protections afforded to males like Doe accused of sexual misconduct. *Id.* at 209-210. Second, Doe alleged that "sex was a motivating factor" in the University's investigation. *Id.* Doe alleged, *inter alia*, that the University was improperly motivated by sex when it investigated him for policy violations but chose not to investigate three female students who allegedly also violated the policy at issue. *Id.* at 210.

---

[6] On September 18, 2020, in *Doe v. American University*, No. 19-CV-03097 (APM), 2020 WL 5593909 (D.D.C. Sept. 18, 2020), the District Court for the District of Columbia also adopted the liberal pleading standard set forth in *Doe v. Purdue*.

These factors are non-exhaustive. *Doe v. American University*, No. 19-CV-03097 (APM), 2020 WL 5593909, at *6 (D.D.C. Sept. 18, 2020) collected cases where different factors combined to raise a plausible inference of sex discrimination. *E.g. Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("…specific allegation of adjudicator bias, combined with the external pressure facing the university, makes Doe's claim plausible"); *Doe v. Columbia*, 831 F.3d 46, 57 (2nd Cir. 2016) (plausible inference of sex discrimination arose where University faced "substantial criticism" "both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students.")

### B.  The Allegations of the Complaint Support a Plausible Inference that Defendants Discriminated Against Dr. Abraham on the Basis of Sex.

In analyzing the sufficiency of Dr. Abraham's complaint, this Court must eschew the doctrinal tests Defendants cling to in their motion to dismiss. (Def. Mem. at 13-22).  Rather, this Court must draw all reasonable inferences in the light most favorable to Dr. Abraham, and must analyze the Complaint under the liberal standard set forth by the Third Circuit in *Doe v. University of the Sciences*. *See Gendia v. Drexel Univ.*, No. CV 20-1104, 2020 WL 5258315 (E.D. Pa. Sept. 2, 2020) (evaluating motion to dismiss under the standard set forth in *Doe v. University of the Sciences*).

Like the Plaintiff in *University of Sciences*, Dr. Abraham has alleged that Defendants impermissibly yielded to external pressure from the federal government in the wake of the 2011 Dear Colleague Letter when they enforced their Sexual Misconduct Policy in a gender-biased manner against him. (Am. Compl. ¶¶ 12-24). Dr. Abraham has pled the history of the Dear Colleague Letter and the related guidance documents. He further alleged that in response to the actions of the federal government, TJU and TJUH limited the procedural protections afforded to men, like Dr. Abraham, accused of sexual misconduct. (Am. Compl. ¶21). *Doe v. Univ. of the*

*Sciences*, *supra,* 961 F.3d at 209-210; s*ee Doe v. Baum*, *supra,* 903 F.3d at 586; *see also Doe v. Univ. of Miami*, 882 F.3d at 591 (plausible inference of sex discrimination found where *inter alia* plaintiff alleged that pressure from government to "combat vigorously sexual assault on college campuses" and the "severe potential punishment" of loss of all federal funds for failure to comply led the University to "discriminate against men in its sexual-assault adjudication process.")

In recent years, and during the pendency of Dr. Abraham's disciplinary proceeding, TJU faced scrutiny from the Office for Civil Rights ("OCR") as well as significant pressure to make findings of responsibility against males accused of sexual assault due to two open OCR complaints for alleged Title IX infractions. (Am. Compl. ¶ 169). *See Doe v. Purdue,* 928 F.3d 652, 668 (finding plausible inference of sex discrimination where *inter alia* presence of open OCR investigations against the University created pressure on the University to demonstrate compliance).

Likewise, the #MeToo Movement, Times Up Healthcare movement, a scandal concerning TJU/TJUH physician Charles Pollack who self-reported sexual harassment of his female subordinate, and negative publicity concerning harassment of female medical students exerted pressure on Defendants to enforce the Sexual Misconduct Policy in a gender biased manner. (Am. Compl. ¶¶ 169-180).  Leaders of Times Up Healthcare, a group dedicated to eradicating sexual harassment, including sexual assault in healthcare, openly criticized TJU/TJUH's handling of sexual misconduct allegations concerning Dr. Charles Pollack.[7] This pressure culminated in TJU/TJUH signing the Times Up Healthcare pledge letter, pledging its commitment to the

---

[7] Defendants misconstrue the allegations in the Amended Complaint when they point to Dr. Charles Pollack as a comparator. Dr. Pollack is not referenced as a comparator. Rather, Plaintiff alleges that the negative publicity concerning Dr. Pollack and TJU's prior handling of that sexual harassment matter constitute external pressure on the TJU/TJUH to operate with gender bias in its handling of Dr. Abraham's disciplinary matter.

movement's core statements. (Am. Compl. ¶¶ 170-176). These allegations are sufficient to support a plausible inference of sex discrimination under Title IX. *See Doe v. Columbia, supra,* 831 F.3d at 57.

Similar to the plaintiff in *University of Sciences*, Dr. Abraham sufficiently alleges that sex was a motivating factor in Defendants' investigation. *Doe v. Univ. of Sciences*, 961 F.3d at 209. (Compl. ¶¶370-452). By way of example, not limitation, the following establishes a plausible inference that the University discriminated against Dr. Abraham on the basis of sex.

TJU investigated Roe's complaint against Dr. Abraham for non-consensual intercourse, but at no point did Defendants investigate Dr. Abraham's complaint against Roe for sexual misconduct, i.e. non-consensual sexual intercourse. Defendants likewise failed to investigate whether Roe's complaint against Dr. Abraham was retaliatory. (Am. Compl. ¶¶95-96; ¶¶118-119; ¶¶151-156). *See Doe v. University of the Sciences, supra,* 961 F.3d at 210 (raising plausible inference of sex discrimination where University failed to investigate alleged policy violations of female complainants and female witness while investigating Doe).

Despite reporting that he had a complaint against Roe to i) Dr. Alex Vaccaro, Dr. Abraham's supervisor; ii) Dr. Ed Pribitkin, TJUH Chief Medical Officer; and iii) Jennifer Fogerty, Dr. Abraham's university-appointed Title IX advisor, no action was taken to investigate Dr. Abraham's complaint against Roe. (Am. Compl. ¶¶ 95-99; ¶¶120-125; ¶¶151-156). Per Dr. Vaccaro's direction, Dr. Abraham also attempted to report Roe's misconduct to Dr. Jim Purtill, Jefferson Orthopedic Residency Program Director, but Dr. Purtill never replied to Dr. Abraham's message or returned Dr. Abraham's call. (Am. Compl. ¶¶97-99; ¶¶110-117). Dr. Abraham alleged, on information and belief, that Drs. Vaccaro, Pribitkin, and Purtill were all mandatory reporters under the Sexual Misconduct Policy. (Am. Compl. ¶¶214;217).

Defendants also treated Roe and Dr. Abraham differently under the Sexual Misconduct Policy. While Dr. Abraham was wrongfully pressured into taking an administrative leave, no interim action was ever taken against Roe, despite Dr. Abraham's complaint against her. (Am. Compl. ¶202(f)).

Dr. Abraham also alleged numerous material procedural defects during the Title IX investigation. (Am. Compl. ¶¶129-156).  Such failures include the denial of Dr. Abraham's request for an extension of time to submit exculpatory evidence, including 29 witness statements. (Am. Compl. ¶¶129-134). When denying the request for the extension, Defendants' Title IX Coordinator indicated that the University had an obligation to resolve the matter promptly. (Am. Compl. ¶132). At the time that the Title IX Coordinator made this statement, the investigation had been pending for four months, and the Title IX process would continue for another three months before concluding. *Id*. Shortly after denying Dr. Abraham's request for an extension, Defendants concluded their investigation into Roe's Title IX allegations against Dr. Abraham, without Dr. Abraham having the opportunity to submit a written statement or evidence on his behalf. (Am. Compl. ¶¶133-134). On information and belief, Defendants failed to thoroughly investigate Roe's credibility, including the claim that she was bruised after the sexual encounter; failed to investigate a prior false complaint filed by Roe; and failed to investigate another complaint made by a male, V.D., accusing Roe of sexual misconduct. (Am. Compl. ¶¶142-147; ¶150).

Dr. Abraham's superiors made gender-biased statements towards him. By way of example, on August 20, 2018, Dr. Abraham's supervisor, Dr. Alex Vaccaro, told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged him from making any such claim. (Am. Compl. ¶179).

Drawing all reasonable inferences in the light most favorable to Dr. Abraham, as the court must in evaluating a motion to dismiss, it is plausible that sex was a motivating factor in the Defendants' investigation of Dr. Abraham and in their decision to enforce the Sexual Misconduct Policy against him only (and not against Roe). *See Doe v. Purdue*, 928 F.3d at 669 (finding plausible inference of sex discrimination where plaintiff alleged *inter alia* defects in adjudicatory process, including improper analysis of complainant's credibility); *see also Doe v. Columbia*, 831 F.3d at 59 (noting that "[t]he role of the court at this stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed.")

C. **Defendants' Attempt to Superimpose Elements of the "Selective Enforcement" and "Deliberate Indifference" Doctrinal Tests on to Plaintiff's Sex Discrimination Claim is a Red Herring and Should be Disregarded by the Court.**

In their Memorandum of Law, Defendants write: "Although the 'selective enforcement' and 'deliberate indifference' titles have been removed from the Counts in Abraham's Amended Complaint, he continues to rely on these individual theories in what can be gleaned from the substance of his convoluted allegations." (Def. Mem. at 13). Plainly, Defendants miss the mark here. Plaintiff does *not* allege causes of action for "selective enforcement" or "deliberate indifference," and it is error for the Defendants to attempt to analyze Dr. Abraham's claim through those doctrinal tests (Def. Mem. at 12-22). Defendants' argument in this regard is a red herring and should be disregarded by the Court.

The importance of *Doe v. University of the Sciences*, 961 F.3d 203, cannot be overstated. With the ruling in *University of the Sciences*, the Third Circuit has now expressly *rejected* the demanding doctrinal tests as necessary to state a claim for relief, instead adopting a broader standard that hews more closely to the text of Title IX and prevents courts from imposing

22

unnecessarily heightened pleading standards in Title IX cases. *See, e.g., Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020) (adopting the same pleading standard as the Seventh Circuit in *Purdue* and the Third Circuit in *University of the Sciences*, noting "There is no heightened pleading standard for Title IX claims….. That point is particularly apt here. It may be difficult for a plaintiff to know the full extent of alleged discrimination in decision [-] making before discovery allows a plaintiff to unearth information controlled by the defendant." (citing *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002))).

As discussed above, under the new Third Circuit standard, "to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." *Doe v. Univ. of Scis.*, 961 F.3d at 209. Nothing further is needed to survive a motion to dismiss. As detailed above, Dr. Abraham has sufficiently pled allegations to support a plausible inference that Defendants discriminated against him on the basis of his sex.

Since Plaintiff has not set forth a cause of action for "selective enforcement," he need not plead the elements of the same. Dr. Abraham has alleged, as did the Plaintiff in *University of the Sciences*, that Defendants were improperly motivated by sex when they investigated him but not Roe. (*See Doe v. Univ. of Scis.*, 961 F.3d at 210 ("Doe also claims that USciences was improperly motivated by sex when it investigated him but chose not to investigate three female students who allegedly violated the Policy…")). These allegations serve to support a plausible inference that Defendants discriminated against Dr. Abraham on the basis of sex.

Likewise, Dr. Abraham has not set forth a cause of action for "deliberate indifference," and he need not plead the elements of the same. Among the facts pled in the Amended Complaint, Dr. Abraham alleged that: i) he attempted on numerous occasions to report Roe's misconduct to

officials of TJU/TJUH who had the authority to institute corrective measures; ii) each time he tried to make a report he was ignored; and iii) that Defendants' response to his report was clearly unreasonable in light of known circumstances. (*See* Am. Compl. ¶¶ 95-99; 110-117; 120-125; 151-156; 161; 202(b)). These factual allegations support a plausible inference that Defendants discriminated against Dr. Abraham on the basis of sex. Nothing further is needed to survive a motion to dismiss. *See Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 948 (9th Cir. 2020) ("Sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed.")

## IV. PLAINTIFF SUFFICIENTLY ALLEGES RETALIATION.

Plaintiff has sufficiently alleged retaliation in violation of Title IX. (Am. Compl. ¶¶204-225). To state a claim for retaliation, a plaintiff must allege that i) he or she engaged in activity protected by Title IX; ii) he or she suffered an adverse action; and iii) there was a causal connection between protected activity and adverse action. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 564 (3d Cir. 2017). There is no disagreement that Plaintiff engaged in a protected activity by reporting Roe's sexual misconduct. (*See* Am. Compl. ¶210). Despite Defendants' assertions (Def. Mem. at 22-26), Plaintiff has alleged both i) that he suffered an adverse action and ii) that a causal connection existed between the protected activity and the adverse action.

Plaintiff sufficiently alleges that he was subjected to an adverse action, in that the day after he initially reported his allegations of sexual assault and retaliation by Roe, he was wrongfully pressured into taking a leave of absence under the threat of suspension and reporting to the National Practitioner Database (NPDB)[8]. (Compl. ¶473).  In *Burlington N. & Santa Fe Ry. Co. v. White*,

---

[8] Dr. Abraham has not alleged that his voluntary resignation constituted an "adverse action."  Dr. Abraham reserves his right to move pursuant to Federal Rule of Civil Procedure 15(a)(2) to amend his complaint to assert a claim for constructive discharge.

548 U.S. 53, 68 (2006), the Supreme Court formulated the "adverse action" test for retaliation claims. An adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal citations and quotation marks omitted). Plaintiff's alleged choice of two bad options, given to him by TJUH's Chief Medical Officer, i.e., i) take a leave of absence or ii) face suspension and reporting to the NPDB, fits within the *Burlington* Court's definition. The alleged untenable choice may well have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Defendants argue that being pressured into a leave of absence is not an adverse employment action for purposes of a retaliation claim.  Def. Mem. at 23-24.  Defendants, however, do not cite any binding precedent on point. The cases cited by Defendants are inapposite, as they address voluntary resignation and paid suspension.

Plaintiff has also sufficiently pled the requisite causal connection between the protected activity and the adverse action.  To establish the requisite causal connection, Plaintiff must allege facts to demonstrate either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 615 (E.D. Pa. 2014), quoting *Cooper v. Menges,* 541 Fed. Appx. 228, 232 (3d Cir.2013). In the absence of this proof, a "plaintiff must show that from the evidence gleaned from the record as a whole the trier of fact should infer causation" (internal citations and quotation marks omitted). *Moore v. Temple Univ.*, No. CV 13-5079, 2016 WL 4061352, at *6 (E.D. Pa. July 29, 2016)

Here, Dr. Abraham has adequately alleged temporal causation; he was pressured into administrative leave just one day after he initially reported his allegations against Roe to his

supervisor, Alex Vaccaro. (Am Compl. ¶¶210-211). The temporal proximity between the protected activity and adverse action is unusually suggestive.

Plaintiff also satisfies the causation prong when one looks at the record as a whole. Dr. Abraham's coerced leave of absence was part of a pattern of antagonistic behavior by TJU/TJUH that began when he initially reported Roe's misconduct. (Am. Compl. ¶¶213-218). This pattern of conduct included, for example, Dr. Purtill's failure to return Dr. Abraham's call or respond to his text message on June 26, 2018 when Dr. Abraham tried to report Roe's conduct to him. (Am. Compl. ¶¶ 213- 214).  Additionally, TJU was aware that Dr. Abraham was also the subject of a criminal investigation due to Roe's allegations against him. (Am. Compl. ¶129). Due to the criminal investigation, Dr. Abraham's ability to participate in the Title IX investigation was constrained. (Am. Compl. ¶129). When Dr. Abraham requested an extension to prepare his written statement in the Title IX investigation, Title IX Coordinator, Zoe Gingold, denied his request indicating that TJU had an obligation to resolve the matter promptly. At that time, however, the matter had already been ongoing for four months and continued for yet another three months afterwards. (Am. Compl. ¶¶131-132).

Defendants' arguments represent a substantive disagreement with the facts as alleged by Dr. Abraham. Defendants argue that "Roe provided notice to TJU of Abraham's alleged sexual misconduct before Abraham provided notice to TJU of Roe's alleged sexual misconduct." (Def. Mem. at 25). However, Defendants may not argue with the facts as alleged by Dr. Abraham at this stage of the litigation. The Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under *any reasonable reading of the complaint*, the plaintiff *may* be entitled to relief." *Phillips*, 515 F.3d at 233 (emphasis added). Dr. Abraham has alleged that he provided notice to his supervisor, Dr. Vaccaro, of his allegations

against Roe, before Roe provided notice to TJU of her allegations against him. (Am. Compl. ¶¶95-99; 105-115).

Defendants next attempt to argue that "Dr. Abraham cannot plausibly demonstrate" causation, by arguing that there are more plausible explanations for Defendants' alleged conduct of pressuring Dr. Abraham into taking a leave of absence, i.e. that he had been accused of sexual misconduct of a resident. (Def. Mem. at 28). Defendants miss the mark here again, as they must accept all factual allegations as true and draw all reasonable inferences in the light most favorable to Doe. *Doe v. Univ. of Sciences*, 961 F.3d.at 210; *Phillips*, 515 F.3d at 233. *See also Doe v. Univ. of Miami*, 882 F.3d at 594 (noting that "although alternative non-discriminatory explanations for the defendants' behavior may exist, that possibility does not bar [plaintiff's] access to discovery.")

## V.  PRINCIPLES OF EQUITY AND JUDICIAL ECONOMY REQUIRE THIS COURT RETAIN JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS.

In the event that this Court dismisses Counts I and II of Dr. Abraham's Amended Complaint, i.e. the claims alleging violations of Title IX, this Court should still retain jurisdiction over Dr. Abraham's state law claims.

Under 28 U.S.C. § 1367 (a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  Undoubtedly, Plaintiff's state law claims are based upon the same set of operative facts as his Title IX claims, thus providing the court with supplemental jurisdiction over his state law claims.

The Third Circuit has held that "elimination of the federal claim does not deprive the court of the constitutional power to adjudicate the pendent claim."  *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1505 (3d Cir. 1996).  Instead, when a District

Court originally only has federal question jurisdiction and subsequently dismisses the federal claims, the District Court has the discretion to either retain or dismiss the state law claims without prejudice. 28 U.S.C.§ 1367 (c).  "That discretion, however, is not unbridled. Rather, the decision 'should be based on considerations of 'judicial economy, convenience and fairness to the litigants.'"  *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009) (quoting *New Rock Asset Partners*, 101 F.3d at 1505).

Dismissal of the state law claims here would result in undue prejudice to Dr. Abraham, who would have to file a new complaint in state court and expend additional attorneys' fees to do so.  Moreover, judicial economy is better served by keeping this case in the District Court. Given the Complaint, Amended Complaint, and the related motion practice, this Court is fully familiar with many of the alleged facts and arguments in this matter. To dismiss the remainder of Plaintiff's claims at this juncture would essentially force a separate court to re-assess issues which have been presented to this Court. This would be a needless duplication of efforts and an inefficient use of judicial resources.

In any event, should this court decline to retain supplemental jurisdiction over the state law claims, then dismissal of these claims should be without prejudice, as there has been no adjudication on the merits. *Kach v. Hose*, 589 F.3d at 650.

## VI. PLAINTIFF SUFFICIENTLY ALLEGES HIS BREACH OF CONTRACT CLAIM.

Contrary to Defendants' contentions (Def. Mem. at 28-29), Plaintiff has sufficiently pled all elements of his claim for breach of contract and the implied covenant of good faith and fair dealing contained therein. (Am. Compl. ¶¶226-233)

Under Pennsylvania law, three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms; (2) a breach of the contract;

and (3) resultant damages. *Doe v. Univ. of Sci*s., 961 F.3d 203, 211 (3d Cir. 2020) (internal citations and quotations omitted).  Contained within a contract is an implied covenant of good faith and fair dealing. *Henderson v. Merck & Co.,* 998 F. Supp. 532, 539 (E.D. Pa. 1998) ("The general duty of good faith and fair dealing in the performance of a contract has been recognized by Pennsylvania courts" (internal citations omitted)).

Plaintiff has sufficiently alleged the existence of a contract, i.e. Defendants' Sexual Misconduct Policy ("Policy") and the breach of that contract.[9] (Am. Compl. ¶¶25; 228; 231) Plaintiff identifies specific provisions of the Policy which Defendants allegedly violated. (Am. Compl. ¶231) Plaintiff also lists the precise ways in which Defendants failed to comply with the Policy and the implied covenant of good faith and fair dealing contained in this contract. (*Id.*) Plaintiff has alleged, *inter alia*, that Defendants breached their contractual duties to him by denying him a fair and equal opportunity to present written statements, witnesses, and other evidence during the investigation of Roe's complaint against him and by depriving him of the opportunity to identify significant conflicts which would affect the timing of the investigation. (*Id.*) Plaintiff has also alleged causation and damages. (Am. Compl. ¶¶232-233)

Defendants note that Plaintiff fails to attach a copy of the governing contract to his Amended Complaint. (Def. Mem. at 28). However, there is no requirement that Plaintiff do so. All that is necessary at this stage of the litigation is for Plaintiff to set forth enough factual allegations to state a claim that is plausible on its face. *See Doe v. Univ. of Scis.*, 961 F.3d at 208 (articulating

---

9 Defendants' argument (Def. Mem. at 29, n15) that Plaintiff's claim for breach of contract set forth in ¶231(c)-(g) should be dismissed for failure to reference "specific provisions of the policy [that] Jefferson breached," is without merit. Plaintiff has alleged that Defendants breached the implied covenant of good faith and fair dealing, in addition to specific Policy provisions. The allegations in ¶231(a)-(g) specify how the implied covenant of good faith and fair dealing was breached.

standard of review for FRCP 12(b)(6) motion to dismiss).  Plaintiff's claims are sufficient to survive this motion to dismiss.

Contrary to Defendants' arguments, Dr. Abraham has sufficiently alleged that the Policy formed a contract, which bound him and any other employee/agent of TJU/TJUH. (Am. Compl. ¶¶25;228). *See Lloyd v. City of Bethlehem*, No. 02-0830, 2002 WL 31341093, at *3 (E.D. Pa. Oct. 16, 2002) ("Provisions in an employee manual may constitute a unilateral offer which an employee accepts by performing his duties"). The cases cited by Defendants are factually distinguishable from the present matter. *Morosetti v. Louisiana Land & Expl. Co*., 522 Pa. 492, 495, 564 A.2d 151, 152–53 (1989) dealt with a policy on severance which was never made known to the employees.  That is plainly not the case here. In *Gruver v. Ezon Prod., Inc.*, 763 F. Supp. 772, 775 (M.D. Pa. 1991), the Court granted Defendant's motion to dismiss the breach of contract claim because the plaintiff "failed to plead that a contract for employment including an anti-sexual harassment term was in existence." Here, Dr. Abraham has sufficiently pled the existence of the Policy containing the disciplinary procedures at issue.

## VII.  PLAINTIFF SUFFICIENTLY ALLEGES HIS CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Contrary to Defendants' contentions (Def. Mem. at 29-31), Dr. Abraham has sufficiently alleged his claim for intentional infliction of emotional distress.  (Am. Compl. ¶¶234-239).

To state a claim for intentional infliction of emotional distress, a plaintiff must allege: (1) the defendant's conduct was extreme or outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the plaintiff's distress is severe. *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 826–27 (internal citations omitted). The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (internal citations omitted).

Dr. Abraham has alleged facts sufficient to meet this legal standard, and it is a question of law for the court whether, accepting all facts as true, he has met the threshold. *See Cheney v. Daily News L.P.*, 654 F. App'x 578, 583 (3d Cir. 2016) ("It is for the court to determine in the first instance whether the conduct is extreme and outrageous, such that recovery may be permitted" (internal citation omitted)).

As set forth in the Amended Complaint, Defendants' conduct was "extreme, outrageous and of such character as to not be tolerated by a civilized community" because it created an environment in which someone wrongfully accused of sexual misconduct had no meaningful opportunity to defend himself and where complaints of sexual misconduct and retaliation are ignored. (Am. Compl. ¶236).

In the Amended Complaint, Dr. Abraham listed specific ways in which Defendants' conduct created this intolerable environment. For example, Defendants pressured him into taking a leave of absence under threat of suspension and reporting to the NPDB (but took no interim action against Roe despite his allegations against her). (Am. Compl. ¶¶ 120-124; 202(f)) Defendants also conducted a superficial, flawed and gender-biased investigation against Dr. Abraham, never allowing him to review i) the investigation report, ii) Roe's initial complaint to the Title IX Office; iii) any evidence collected by the Title IX investigator; and iv) any witness statements collected by the Title IX investigator. (Am. Compl. ¶¶ 135-136) Dr. Abraham's superiors made gender-biased statements towards him. By way of example, Dr. Alex Vaccaro told Dr. Abraham that "a man cannot be sexually assaulted by a woman" and discouraged Dr. Abraham from making any such claim. (Am. Compl. ¶179)

Dr. Abraham further alleged that the Defendants' conduct caused him to suffer emotional and psychological distress, humiliation and embarrassment, sleeplessness, anxiety, depression, suicidal ideation. (Am. Compl. ¶239) Having sufficiently alleged all requisite elements, Dr. Abraham's claim for intentional infliction of emotional distress should survive this motion to dismiss.

### VII. PLAINTIFF SUFFICIENTLY PLEADS HIS CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.

Despite Defendants' arguments to the contrary (Def. Mem. at 31-33), Dr. Abraham has sufficiently alleged a claim for negligent infliction of emotional distress. (Am. Compl. ¶¶240-247).

As an initial matter, Defendants' contention that Dr. Abraham's tort claims of negligent infliction of emotional distress and intentional infliction of emotional distress are barred by the "gist of the action" doctrine are unavailing. (Def. Mem. at 30, n. 16; 31-32). Pursuant to Federal Rule of Civil Procedure 8(d), a plaintiff may set forth in the complaint "alternative statements of a claim," as well as "inconsistent claims," and the pleading "is sufficient if any one of them is sufficient." Plaintiff has alleged both contractual and tort claims arising out of Defendants' improper, discriminatory, bad-faith conduct throughout the investigation of Roe's allegations against Dr. Abraham. Plaintiff is not obligated at the pleading stage to select a single theory of the case.

To state a claim for negligent infliction of emotional distress, a plaintiff must allege the elements of a negligence claim, "i.e., that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *Kling v. Univ. of Pittsburgh Med. Ctr.*, No. 2:18-CV-01368-CRE, 2020 WL 2832008, at *3 (W.D. Pa. May 8, 2020), *report and recommendation adopted*, No. 2:18-CV-01368-MJH, 2020 WL 4218004 (W.D. Pa. July 23, 2020).

In Pennsylvania, a claim for negligent infliction of emotional distress is limited to four factual scenarios, including, as applicable to this case, "situations where the defendant had a contractual or fiduciary duty toward the plaintiff." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 827–28 (internal citations omitted). A plaintiff asserting this claim must also allege that he suffered "immediate and substantial physical harm." *Id.* at 828

Contrary to Defendants' arguments, Dr. Abraham's claim that a duty existed is not broadly based on an employer-employee relationship. Rather, Defendants owed a contractual duty[10] to Dr. Abraham by virtue of the Sexual Misconduct Policy. (Am. Compl. ¶¶242-244). Dr. Abraham has alleged that Defendants breached their contractual duty by, *inter alia*, i) failing to investigate Dr. Abraham's claims that Roe had engaged in non-consensual sexual intercourse with him and that her complaint against him was retaliatory; ii) denying Dr. Abraham a fair and equal opportunity (or any opportunity at all) to identify "significant conflicts" that would affect the timing of the investigation, as required under the Policy; and iii) conducting a flawed, superficial and gender-biased investigation into Roe's allegations during which Dr. Abraham was denied a fair and equal opportunity to present written statements, witnesses and other evidence on his behalf. (Am. Compl. ¶245).

---

[10] Defendants' contractual duty to investigate allegations of sexual misconduct is necessarily one that "hold[s] the potential of deep emotional harm in the event of a breach" and "encompass[es] an implied duty to care for the plaintiff's emotional wellbeing." *Kling*, No. 2:18-CV-01368-CRE, 2020 WL 2832008, at *4 (interpreting the Pennsylvania Supreme Court's persuasive, but not precedential, opinion in *Toney v. Chester County Hospital*, 36 A.3d 83 (Pa. 2011), as limiting negligent infliction of emotional distress claims based on contractual or fiduciary duties to claims where preexisting relationships involve "duties that obviously hold the potential of deep emotional harm in the event of breach ... [and] encompass an implied duty to care for the plaintiff's emotional well-being." (internal citations omitted)). As alleged in the present matter, when mishandled, investigations of sexual misconduct allegations cause significant emotional and psychological harm. (*See* Am. Compl. ¶¶246-247).

Dr. Abraham also alleged that Defendants' breaches caused him immediate and substantial physical harm, in the form of humiliation, embarrassment, depression, suicidal ideation, sleeplessness, and anxiety. (Am. Compl. ¶¶246-247). Dr. Abraham has further alleged that as a result he has sought medical treatment and suffered significant damages. (Am. Compl. ¶246). *See Doe v. The Trustees of the Univ. of Pennsylvania,* 270 F. Supp. 3d at 828 ("… a plaintiff may establish physical harm or injury as physical manifestations of a psychic injury by establishing symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and . . . ongoing mental, physical and emotional harm" (internal quotations and citations omitted)).

Since Dr. Abraham has sufficiently alleged his claim for negligent infliction of emotional distress, Defendants' motion to dismiss this count of the Amended Complaint should be denied.

## VII.  PLAINTIFF SUFFICIENTLY STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

Contrary to Defendants' contentions (Def. Mem. at 33-34), Dr. Abraham has sufficiently pled his claim for tortious interference with business relations. (Am. Compl. ¶¶ 248-256) As detailed below, Defendants' arguments for dismissal of this claim center around a disagreement with the facts as pled by Dr. Abraham. As noted, such disagreement is inappropriate at the motion to dismiss stage. The Court must "take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d at 809 (internal citations omitted).

To state a claim for tortious interference with business relations, a plaintiff must allege:"(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a

result of the defendant's conduct (internal citation omitted)" *Kernaghan v. BCI Commc'ns, Inc.*, 802 F. Supp. 2d 590, 596 (E.D. Pa. 2011). Plaintiff has alleged all required elements.

At all points relevant to the Amended Complaint, Dr. Abraham was a partner at Rothman Orthopaedics; his relationship with Rothman Orthopaedics was contractual in nature. (Am. Compl. ¶ 56) As a red herring, Defendants note that Dr. Abraham was never terminated from Rothman. (Def. Mem. at 33). Termination is not a pre-requisite for a claim of tortious interference with business relations.

Despite Defendants' contention, Dr. Abraham has specifically alleged that Defendants engaged in purposeful action, specifically intended to harm his existing contractual relationship with Rothman Orthopaedics. (Am. Compl. ¶¶252; 181-190). He has further alleged that such actions were taken without privilege or justification. (Am. Compl. ¶253). Dr. Abraham has also alleged that Defendants' conduct has resulted in significant actual damages. (Am. Compl. ¶¶255-256).

Defendants' purposeful actions, specifically intended to harm Dr. Abraham's contractual relationship include the following, without limitation. In January, 2019, Dr. Abraham was restricted, without any end date, from any Rothman Orthopaedics office that contained TJU/TJUH residents. On information and belief, this restriction originated with TJU/TJUH, and was implemented to placate TJU/TJUH. However, the only restriction discussed at the time that Dr. Abraham relinquished his clinical privileges and faculty appointment at TJU/TJUH was that Dr. Abraham would not see any patients at any Rothman Orthopaedics offices that were majority owned by TJU/TJUH at least until Roe's residency graduation. At all times relevant to the Amended Complaint, Rothman Orthopaedics had approximately twenty-two offices, two of which were majority owned by TJU/TJUH. As Dr. Abraham understood it, he would have access to

approximately twenty offices upon his return to practice in January, 2019. Due to the above restriction, Dr. Abraham had approximately three offices available to him. Dr. Abraham was forced to move out of the area where he had built his previously-unblemished reputation for the past ten years, causing a decline in his patient base and patient referrals. (Am. Compl. ¶¶186-189).

Defendants state that "Abraham voluntarily resigned from Jefferson. His resignation ended his relationship with Jefferson and any Jefferson-affiliated entities." (Def. Mem. at 33-34). The Court must disregard Defendants' statements, as those are not the facts as alleged by Dr. Abraham. *See Phillips*, 515 F.3d at 233 ("In reviewing the motion, the district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under *any reasonable reading of the complaint*, the plaintiff *may* be entitled to relief" (emphasis added)).

Defendants have failed to meet their burden to prove the absence of a claim for tortious interference with business relations. As such, their motion to dismiss this count should be denied.

## VIII.   IF THE COURT DISMISSES ANY CLAIM, SUCH DISMISSAL SHOULD BE WITHOUT PREJUDICE.

"When a defendant's motion to dismiss is granted, the court should 'freely' provide the plaintiff with leave to amend its dismissed causes of action 'when justice so requires.'" *Tafuto v. New Jersey Inst. of Tech.*, No. 10-CV-4521 (PGS), 2011 WL 3163240, at *5 (D.N.J. July 26, 2011) (quoting Fed. R. Civ. P. 15(a)(2)).  As the Third Circuit has directed, "[l]iberality is the keystone." *Prof'l Cleaning and Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 Fed. Appx. 161, 165 (3d Cir. 2007).  "[A]n amendment should be allowed whenever there has not been undue delay, bad faith on the part of the plaintiff, or prejudice to the defendant as a result of the delay."

*Ibid.*  Defendants' motion should be denied in its entirety, but to the extent this court does dismiss any of Plaintiff's claims, such dismissal should be without prejudice and with leave to amend.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff respectfully requests that this court deny Defendants' motion in its entirety.

**Dated:**   June 14, 2021

            **NESENOFF & MILTENBERG, LLP**

By:    */s/ Andrew T. Miltenberg*
         Andrew T. Miltenberg, Esq.
         (*pro hac vice admission pending*)
         Stuart Bernstein, Esq.
         (*pro hac vice admission pending*)
         Cindy Singh, Esq.
         (*pro hac vice admission pending*)
         363 Seventh Avenue, Fifth Floor
         New York, New York 10001
         (212) 736-4500
         amiltenberg@nmllplaw.com
         sbernstein@nmllplaw.com
         csingh@nmllplaw.com

         **ROGERS COUNSEL**

By:    */s/ Lance Rogers*
         Lance Rogers
         26 E. Athens Avenue
         Ardmore, Pennsylvania 19003
         (610) 228-0222
         lance@rogerscounsel.com

         ***Attorneys for Plaintiff***

CC:  All counsel (via ECF)