IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| JOHN A. ABRAHAM, M.D. | CIVIL ACTION |
|---|---|
| v. | NO. 20-2967 |
| THOMAS JEFFERSON UNIVERSITY, et al. | |

**MEMORANDUM RE: DEFENDANT'S MOTION TO DISMISS**

**Baylson, J.**                                                                                                     **September 9, 2021**

## I. INTRODUCTION

Pending before the Court is a Motion to Dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). This Court previously granted the dismissal of Plaintiff's original Complaint on March 15, 2021, based on Fed. R. Civ. P. 8(a).

Plaintiff, a doctor, alleges that a female resident physician took advantage of him sexually after a party at his home. Plaintiff claims that Jefferson officials handled the investigation with bias against him because he is a male. Plaintiff raises various claims under Title IX and Pennsylvania state law.

## II. FACTUAL BACKGROUND

The facts as follows are taken from Plaintiff's Amended Complaint (ECF 14). Plaintiff John Abraham worked as the Director of the Musculoskeletal Oncology Center at Thomas Jefferson University Hospital ("TJUH") and the Service Chief of Orthopedic Oncology at Rothman Orthopaedics. (Am. Compl. 9, ¶¶ 53–56).

On June 23, 2018, Plaintiff hosted an annual party at his home to thank his colleagues. (Id. at 10, ¶ 59). "Jane Roe,"[1] a resident physician at TJUH, was there. (Id. ¶ 57, 60). Toward the end

---

[1] This memo retains the pseudonym used by the parties.

1

of the party, Roe forced Plaintiff to drink whiskey by holding it to his lips and pouring it. (Id. at 11, ¶ 64).

Plaintiff "noticed that he said some trouble walking due to the alcohol" when he was cleaning up outside after the party. (Id. ¶ 67). When he went inside, Roe approached him and aggressively kissed him. (Id. ¶ 68). Plaintiff attempted to push Roe away and rebuff her advances, but she became more aggressive, pulling him to the floor, where they had sexual intercourse. (Id. at 11–12, ¶¶ 69–75).

Afterward, Plaintiff went upstairs to his bedroom. (Id. at 12, ¶ 79). By the time he got there, Roe was on his bed. (Id.). He felt there was nothing he could do to make her leave, and he fell asleep immediately. (Id. at 13 ¶ 80). In the morning, she tried to initiate intercourse with him again, but he asked her to leave and walked her to her car. (Id. ¶¶ 82–85).

A few days later, Plaintiff and Roe spoke on the telephone. (Id. ¶ 86). Roe apologized for her behavior and said that the sexual encounter was "consensual." (Id. ¶ 87). Roe also said that she had told her husband about the encounter, and that he was angry and wanted to meet with Plaintiff so that they could "make this better." (Id. at 14 ¶¶ 88–89). Plaintiff was worried that the Roes were "attempting to manipulate and extort him." (Id. ¶ 90). Plaintiff told Roe that he planned to report the encounter to his TJUH supervisors, and she asked him not to until he heard what her husband had to say. (Id. ¶ 91).

Later that day, Mr. Roe went to Plaintiff's office, was escorted out by security for his behavior, and later left Plaintiff a "threatening voicemail," saying that the two men should speak in private. (Id. ¶¶ 92–94).

Plaintiff reported the sexual encounter and alleged extortion attempt to his TJUH supervisor, Dr. Alex Vaccaro, later that day. (Id. at 14–15, ¶¶ 95–96). Dr. Vaccaro told Plaintiff

2

he would speak with the General Counsel, and that Plaintiff should discuss the matter with Dr. Jim Purtill, the Residency Program Director. (Id. at 15 ¶¶ 97–99). Plaintiff then called Mr. Roe back. (Id. ¶ 100). Mr. Roe made comments that made Plaintiff think he was making a "monetary demand," and Plaintiff told Mr. Roe he would not negotiate, that he had reported the incident to Dr. Vaccaro, and intended to meet with Dr. Purtill. (Id. at 15–16, ¶ 104–05).

Plaintiff had trouble reaching Dr. Purtill, who did not reply to Plaintiff's text message or voicemail. (Id. at 16, ¶¶ 110–11). When Plaintiff followed up with Dr. Vaccaro, he learned that Roe had gone to Dr. Purtill's home and reported that Plaintiff had raped her. (Id. ¶ 112–13).

On June 27, 2018, Plaintiff received a Notice of Concern from Jefferson's Title IX coordinator, alleging that he had "non-consensual sexual intercourse" with Roe, and informing him that an investigation would take place and that he would receive a University-assigned advisor. (Id. at 17, ¶¶ 118–19). TJUH's Chief Medical Officer warned Plaintiff that he would be suspended and reported to the Medical Staff and National Practitioner Database (NPDB) if he did not immediately take a leave of absence. (Id. ¶ 121). Dr. Abraham "believed he had no choice but to capitulate," and took the leave. (Id. ¶ 124). Plaintiff was also suspended from his position at Rothman Orthopaedics. (Id. at 18 ¶ 125).

Plaintiff alleges that Jefferson took no action to investigate his allegations against Roe, and denied him the chance to provide a statement or present witnesses or offer evidence in his defense such as Mr. Roe's voicemail. (Id. at 18–19, ¶¶ 130–34). Plaintiff was not able to review Jefferson's investigative report, any evidence collected, or any statements of witnesses interviewed, if any. (Id. at 19, ¶¶ 135–36). Plaintiff states that there is no written basis in Jefferson's Sexual Misconduct Policy[2] for depriving him of these opportunities. (Id. ¶ 137).

---

[2] Plaintiff did not attach a copy of the Policy to his initial nor Amended Complaint.

3

Plaintiff relinquished his clinical privileges and faculty appointment at TJU and TJUH, believing he could continue to practice at Rothman Orthopaedic offices that were not owned by Jefferson. (Id. at 22–23, ¶ 160, 162).

On January 8, 2019, TJU terminated its investigation. (Id. at 23 ¶ 163). Plaintiff alleges that no findings of responsibility were made against him. (Id.). Plaintiff states that he was nevertheless prohibited from seeing patients at any Rothman office that had Jefferson medical residents, leaving only three out of twenty offices available to him. (Id. at 27–28, ¶ 181–89).

Plaintiff's Amended Complaint also dedicates significant space to describing the pressure Defendant faced in the context of the "Dear Colleague" letter issued by the Department of Education, the #MeToo Movement, and the Times Up Healthcare Movement. (Id. at 3–5, ¶¶ 12–24; id. at 24–27, ¶¶ 170–180).

### III. PROCEDURAL HISTORY

Plaintiff filed a lengthy Complaint against Jefferson on June 19, 2020. (ECF 1). He alleged, as follows, three counts in violation of Title IX, and pled supplemental jurisdiction to bring four counts under Pennsylvania state law:

1. Selective Enforcement Violation of Title IX
2. Deliberate Indifference Violation of Title IX
3. Retaliation Violation of Title IX
4. Breach of Contract
5. Intentional Infliction of Emotional Distress
6. Negligent Infliction of Emotional Distress
7. Tortious Interference with Business Relations

The Court granted Defendants' Motion to Dismiss on procedural grounds, because the Complaint did not comply with Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." (Op. 2, ECF 11.) Thereafter, the parties stipulated that Plaintiff could file an Amended Complaint on or before April 12, 2021, and this

Court signed the applicable Order.  (ECF 13.)  Plaintiff filed his Amended Complaint on April 12, 2021 (ECF 14.)  The Amended Complaint includes six counts:

1. Sex Discrimination Violation of Title IX
2. Retaliation Violation of Title IX
3. Breach of Contract
4. Intentional Infliction of Emotional Distress
5. Negligent Infliction of Emotional Distress
6. Tortious Interference with Business Relations

## IV. PARTIES' ARGUMENTS

### A. Defendant's Motion to Dismiss

Defendant Jefferson[3] first argues that Plaintiff's Amended Complaint should again be dismissed for failure to comply with Fed. R. Civ. P. 8(a), because it is not much of an improvement over the original Complaint and does not follow the Court's guidance in the Dismissal Order.[4] Rather, the Amended Complaint amounts to forty-one pages and 256 paragraphs.  Defendant argues that it remains designed to embarrass Jefferson and Roe, and is a far cry from the "short and plain statement of the claim" required by the Rules.  (Mot. to Dismiss 10–11, ECF 17-1.)

Defendant next argues that Plaintiff's Title IX claims (Counts I and II) should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  (Id. at 12–13).  Specifically, Defendant argues that Plaintiff cannot allege and discrimination on the basis of his sex.  (Id. at 13.)  At most, Defendant argues, Plaintiff has alleged that Jefferson investigated Roe's case against his, *because he was a professor and attending physician* in Jefferson's residency program and was accused of raping a *student* in that program.  (Id. at 14.)  Plaintiff did not allege the existence of any female

---

[3] Plaintiff has sued both Thomas Jefferson University and Thomas Jefferson University Hospitals. (ECF 14).  This memo will refer to them collectively as "Jefferson."
[4] See Order at 3, ECF 12.

5

professor/attending physician who was treated differently than a male professor/attending physician with respect of sexual assault claims of students/residents. (<u>Id.</u> at 15.)

Finally, Jefferson argues that its response to Abraham's claims against Roe was reasonable considering the known circumstances. (<u>Id.</u> at 22.) Specifically, Abraham has alleged no facts suggesting Roe posed a risk to fellow students or the Jefferson community.

As to Plaintiff's retaliation claim, Jefferson argues that Plaintiff cannot show two of the three requisite elements: that he suffered an adverse action and that there was a causal connection between any protected conduct any adverse action. First Jefferson points out that Abraham alleges that he was "pressured" into a leave of absence and later resigned because he did not believe Jefferson's investigation would be fair. Jefferson contends that administrative leaves of absence and voluntary resignations are not adverse actions. Second, Jefferson argues that Plaintiff's only basis for inferring retaliation is temporal, based on the allegation that Abraham reported the Roe's sexual misconduct, and one day later was pressured into taking a leave of absence. This is insufficient to state a claim, because it still allows an inference that discipline occurred because of Plaintiff's wrongful behavior. (<u>Id.</u> at 26.)

Because Jefferson argues that Plaintiff has not stated any federal claim, it therefore contends that the Court should not exercise supplemental jurisdiction over the remaining state law claims. (<u>Id.</u> at 26–28.) Still, Defendant argues, even if this Court does exercise jurisdiction over those claims, they also fail to state a claim and should be dismissed under R. 12(b)(6). (<u>Id.</u> at 28–34).

### B. <u>Plaintiff's Response in Opposition</u>

Opposing the Motion to Dismiss, Plaintiff first argues that the Amended Complaint complies with Fed. R. Civ. P. 8.

Next, Plaintiff argues that the Title IX discrimination claim should survive because Defendant did not analyze his claim under the proper Third Circuit standard, which prescribes that plaintiffs need only "raise a plausible inference that the university discriminated against [him] on the basis of sex." (Pl.'s Resp. in Opp'n 16, ECF 19.) Plaintiff argues that the Amended Complaint's allegations support this inference because they include facts that Jefferson yielded to external pressures, limited procedural protections afforded to men, and failed to investigate his complaint even though he reported to multiple mandatory reporters under Jefferson's Sexual Misconduct Policy. (Id. at 20.) His supervisor even told him that "a man cannot be sexually assaulted by a woman." (Id. at 21 (citing Am. Compl. ¶ 179.))

As for Title IX retaliation, Plaintiff likewise argues that he has stated a viable claim. (Id. at 24.) First, Plaintiff notes that there is no disagreement that Plaintiff engaged in a protected activity by reporting Roe's misconduct. Next, Plaintiff argues that he has alleged both an adverse action and a causal connection. As for the adverse action, Plaintiff argues that Jefferson gave him "two bad options:" to either take a leave of absence, or face suspension and reporting to the NPDB. (Id. at 24–25.) Plaintiff also argues that he has pled a causal connection because he was pressured into taking leave just one day after initially reporting Roe's alleged misconduct. (Id. at 25.) Plaintiff adds that in addition to the temporal connection, Jefferson's actions or lack thereof after he reported Roe's misconduct show a pattern of antagonistic behavior. For example, Plaintiff notes that Dr. Purtill failed to return Plaintiff's call or text message, and the Title IX coordinator denied his request to prepare a written statement. (Id. at 26.)

Plaintiff further contends that the Court should retain jurisdiction over the state law claims for the sake of equity, judicial economy, and the undue prejudice he would suffer, and that they

are sufficiently alleged. (Id. at 27–36.) Should the Court dismiss any claim, Plaintiff argues that dismissal should be without prejudice. (Id. at 36–37.)

### C. Defendant's Reply in Support

Defendant replied in support of its Motion to Dismiss, reiterating the length of Plaintiff's Complaint and noting that Plaintiff's Response does not attempt to overcome the purported violation of Rule 8(a). (Def.'s Reply in Supp. 1, ECF 9). Defendant further notes that Plaintiff's own Complaint pled his Title IX claims under the pre-USciences doctrinal tests, and that under either framework, his claims are defective. (Id. at 1–12). Defendant further argues that paid leaves of absence are not adverse employment actions such that Plaintiff's retaliation claim should survive. Finally, Defendant notes that undue prejudice is not a factor to be considered when a court decides whether to exercise supplemental jurisdiction over state law claims. (Id. at 12.)

## V. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must set forth enough factual allegations to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A facially plausible claim is one that permits a reasonable inference that the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When assessing the merits of a Rule 12(b)(6) motion, courts must accept as true all factual allegations in the complaint and view those facts in the light most favorable to the non-moving party. Umland v. PLANCO Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008).

VI.   ANALYSIS

A. Plaintiff's Federal Claims

i. Title IX Discrimination (Count 1)

As Plaintiff points out, the Third Circuit recently adopted a "straightforward pleading standard," explaining it no longer saw the "need to superimpose doctrinal tests on the Title IX statute." Doe v. Univ. of the Scis., 961 F.3d 203, 209 (3d Cir. 2020) ("USciences"). Accordingly, the Court held that "to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." Id. District Courts have affirmed that USciences "did more than clarify existing law, it altered it." Doe v. Princeton Univ., No. 3:19-CV-07853, 2020 WL 7397804, *3 (D.N.J. Dec. 17, 2020). In a non-binding case after the USciences decision, the Third Circuit still used the former doctrinal tests to delineate arguments but was clear that the USciences standard controlled. See Doe v. St. Joseph's Univ., 832 F. App'x 770, 775 n.3 (3d Cir. 2020).

In USciences, the Court determined that the plaintiff plausibly alleged the school enforced its sexual misconduct policy against him based on his sex. 961 F.3d at 211. First, the Court noted the school's failure to investigate one of the two complaining female witnesses even though she and the plaintiff were comparably intoxicated, and the school had notice that both individuals had possibly violated the policy. Id. The Court also pointed out that this failure occurred within the context of pressure applied by the 2011 Dear Colleague Letter. Accordingly, the Third Circuit reversed the trial court's dismissal of the plaintiff's Title IX claim. Id.

In St. Joseph's, the Court determined that there was no evidence that gender bias motivated the school's investigation of a male student and affirmed the trial court's grant of summary judgment in favor of the university. Id. at 774–75. First, the Court explained that the incident

9

concerned a private romantic encounter where nonconsensual physical contact allegedly occurred and was reported by the purported victim. Id. at 773. Next, the Court rejected the plaintiff's argument that the investigator's allegedly insufficient questioning of witnesses and the victim indicated gender bias. Id. at 774. Third, the Court determined that there was no indication the school's Title IX coordinator acted on gender bias by documenting the female student's allegations into a written complaint and elevating it to the appropriate officials. Id. Finally, the Court rejected the plaintiff's argument that the school's emphasis on fighting sexual assault reflected gender bias. Id.

Several lower courts have applied the new standard from USciences, providing guidance on when plaintiffs have raised plausible inferences of gender discrimination. See, e.g., Gendia v. Drexel Univ., No. 20-1104, 2020 WL 5258315, *3 (E.D. Pa. Sept. 2, 2020) (Beetlestone, J.) (general allegations that a school's investigation favored one gender over the other insufficient to support a plausible inference of discrimination); Doe v. Princeton Univ., No. 20-cv-4352, 2021 WL 194806, *6 (D.N.J. Jan. 20, 2021) (no plausible inference of discrimination when investigatory panel examined all allegations of misconduct by both plaintiff and alleged victim); Saravanan v. Drexel Univ., No. 17-3409, 2017 WL 5659821, *5 (E.D. Pa. Nov. 24, 2017) (Kearney, J.) (allegations that university officials questioned whether it was possible for woman to rape man sufficient to raise a Title IX claim).

Under the USciences standard, Plaintiff's Title IX discrimination claim survives the Motion to Dismiss. Several allegations in the Amended Complaint raise a "plausible inference of discrimination." Most notably, Plaintiff alleges that Dr. Vaccaro told him that "a man cannot be sexually assaulted by a woman," and discouraged Plaintiff from making such a claim. (Am Compl. 26, ¶ 179). These kinds of statements by university employees have been accepted by courts as

evidence of possible gender bias against males. See Saravanan, 2017 WL 5659821, at *4 & n.47 (Kearney, J.) (Title IX discrimination claims survived dismissal where plaintiff alleged "statements by members of the disciplinary tribunal [or] statements by pertinent university officials" suggested that men cannot be sexually assaulted) (collecting cases).

Although allegations of imperfect proceedings are generally insufficient to raise an inference of gender-based discrimination, see Verdu v. Trs. of Princeton Univ., No 19-12484, 2020 WL 1502849, *4 (D.N.J. Mar. 30, 2020), Plaintiff's Amended Complaint goes further than that, alleging a complete failure to investigate his report against Roe. (See Am. Compl. 21, ¶¶ 151–56.) Although he detailed his complaint against Roe to his Title IX advisor, he alleges that the advisor took no action on it. (Id. at 22, ¶ 156.) Plaintiff also alleges that he reported his complaint to Dr. Alex Vaccaro and Dr. Jim Purtill, who also took no action. (Id. at 32, ¶ 213–14, 33, ¶ 222(a)). He alleges that in January 2019, Jefferson indicated that it had concluded its investigation into *Roe's* allegations against *him*, making no mention of *his* complaint against *Roe*. (Id. at 23 ¶ 163.) These allegations resemble those in USciences, where the university failed to investigate the male Plaintiff's complaint against his female accuser "despite having notice that both allegedly violated the [school's sexual misconduct] Policy." 961 F.3d at 211.

Finally, Plaintiff spelled out his allegations about gender-biased investigation against the backdrop of the 2011 Dear Colleague Letter. (Am Compl. at 3–5, ¶¶ 12–24.) The USciences Court made clear that such allegations, in combination with the "pressure applied" by the Dear Colleague Letter, support a plausible claim of sex discrimination. See USciences, 961 F.3d at 211.

### ii. Title IX Retaliation (Count 2)

To state a claim for Title IX retaliation, a Plaintiff must plead facts showing that "(1) she engaged in activity protected by Title IX; (2) she suffered an adverse action; and (3) there was a causal connection between the two." Cunning v. West Chester Univ., No. 20-836, 2021 WL 765729, *5 (E.D. Pa. Feb. 25, 2021) (Jones, II, J.) (citing Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545, 564 (3d Cir. 2017)). Title VII retaliation jurisprudence also applies when making this inquiry. Mercy Catholic Med. Ctr., 850 F.3d at 564.

This first element, protected activity, is not in dispute. As to the second, Plaintiff alleges that he was subjected to an adverse action because "he was wrongfully pressured into taking a leave of absence under the threat of suspension and reporting to the National Practitioner Database (NPDB)." (Pl.'s Resp. in Opp'n 24.) As Defendant points out, our Circuit—and several others— have held that "[a] paid suspension pending an investigation of an employee's alleged wrongdoing" is not an adverse employment action. See Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 326 (3d Cir. 2015) (collecting cases). Although Plaintiff does not specify whether his leave of absence was paid, this is not material, because Plaintiff has not met the third element of retaliation.

Plaintiff has not pled a causal connection between any possible adverse action and Plaintiff's reporting of Roe's misconduct. Even if there had been an adverse action against him (i.e., suspension without pay), the facts indicate that Jefferson acted *after* receiving notice of Plaintiff's possible misconduct. (Am. Compl. 17, ¶ 120.) See Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003) ("the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred"); Huggins v. Coatesville Area Sch. Dist., 452 F. App'x 122, 128 (3d Cir. 2011) ("since the sexual harassment investigation

that led to [plaintiff's] suspension and termination was initiated in response to complaints from students, *however ill-founded*, that investigation cannot be causally related to [plaintiff's] complaint") (emphasis added). Plaintiff's argument concerning the temporal proximity of Jefferson pressuring him into taking a leave does not pass muster.

Because Plaintiff has raised a plausible inference he was discriminated against on the basis of sex, this Court will exercise supplemental jurisdiction over his state law claims, discussed below.

### B. Plaintiff's State Law Claims

#### i. Breach of Contract (Count 3)

Under Pennsylvania law, breach-of-contract claims contain three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003). A plaintiff need not "attach the subject contract to the complaint or plead its terms verbatim," but must "plead [the contract] according to its legal effect." Mirabella v. William Penn Charter Sch., No. 15-1162, 2016 WL 7042208, *2 (E.D. Pa. Feb. 24, 2016) (Goldberg, J.).

The first element is at issue here, whether a contract even exists, is paramount here. Plaintiff alleges that the Sexual Misconduct Policy constituted a contract between Abraham and Jefferson. (Am. Compl. 35 ¶ 228.) Defendant argues that Plaintiff "failed to show how [Jefferson's] policies formed a binding contract with him, as policies, without more, are not contracts." (Mot. to Dismiss 28.)

Defendant's argument is persuasive. "In order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d

575, 585–87 (3d Cir. 2009) (quoting Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956)) (brackets omitted). In other words, "[t]o merely allege the existence of a policy, or the failure of an employer to adhere to a policy, is not sufficient to overcome" a motion to dismiss. Rossi v. Sun Refining & Mktg. Corp., No. 94-3037, 1995 WL 12056, *4 (E.D. Pa. Jan. 11, 1995) (Giles, J.) (internal citations omitted).

Although Plaintiff contends that his Complaint included specific Policy provisions, his paraphrasing of certain provisions does not raise a plausible inference that the Policy was a binding contract between him and Jefferson, and that Jefferson breached its alleged duties to him under that contract. Plaintiff's citation to Lloyd is likewise inapposite, as the language Plaintiff quotes was the Lloyd trial judge's summary of that plaintiff's argument—and that plaintiff lost his breach of contract claim on summary judgment. Lloyd v. City of Bethlehem, No. 02-CV-00830, 2004 WL 540452, *2 (E.D. Pa. Mar. 3, 2002) (Gardner, J.) ("we determine that the City's policy of progressive discipline . . . is nothing more than advisory").

### ii. Intentional Infliction of Emotional Distress ("IIED") (Count 4)

The Pennsylvania Supreme Court has not formally adopted the Restatement's (Second) test for an IIED claim, but it does apply the test when faced with such claims. See Taylor v. Albert Einstein Med. Ctr., 754 A.2d 6500 (Pa. 2000) ("Although we have never expressly recognized a cause of action for intentional inflection of emotional distress, and thus have never formally adopted this section of the Restatement, we have cited the section as setting forth the minimum elements necessary to sustain such a cause of action.").

An action for IIED requires a plaintiff to show that (1) the conduct is extreme; (2) the conduct is intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress is severe. Chuy v. Phila. Eagles, 595 F.2d 1265, 1273 (3d Cir. 1977). "The burden of demonstrating

outrageous conduct is substantial." Smith v. RB Distrib., Inc., No. 20-900, 2020 WL 6321579, *13 (E.D. Pa. Oct. 28, 2020) (McHugh, J.). A plaintiff must show conduct so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting Restatement (Second) of Torts § 46 cmt. D (Am. Law Inst. 1965)). Plaintiff falls far short of stating such a claim; even taking Plaintiff's allegations as true and assuming Jefferson conducted a flawed, biased investigation, its actions were not so uncivilized as to support a claim for IIED.

### iii. Negligent Infliction of Emotional Distress ("NIED") (Count 5)

Pennsylvania recognizes four theories for NIED. Karp v. Jenkins, No. 4:18-CV-02282, 2020 WL 6504639, *3 (M.D. Pa. Nov. 4, 2020). Plaintiff has pled the theory of a "special relationship liability premised on the breach of a preexisting contractual or fiduciary relationship." (Compl. 83–85, ¶¶ 497–504). The Supreme Court of Pennsylvania has made clear that "special relationships must encompass an implied duty to care for the plaintiff's emotional well-being," such as "relationships involving life and death." Toney v. Chester Cty. Hosp., 36 A.3d 83, 95 (Pa. 2011). Federal and state courts have consistently excluded the employer-employee relationship from this category. See Kling v. Univ. of Pittsburgh Med. Ctr., No. 2:18-CV-01368, 2020 WL 4218004, *2 (W.D. Pa. July 23, 2020) (collecting cases). There is no reason to depart from this well-settled precedent. Although Plaintiff contends that the applicable relationship here stems from a contractual duty rather than an employer-employee relationship, the Court is not convinced. Plaintiff tried to situate his breach of contract claim in the employment context and did not sufficiently allege the existence of a contract at all. Plaintiff therefore has no viable claim for NIED.

### iv. Tortious Interference with Business Relations (Count 6)

There are four elements to this claim: "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." Meyer v. Del. Valley Lift Truck, Inc., 392 F. Supp. 3d 483, 496 (E.D. Pa. 2019) (Beetlestone, J.); see also Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc., 20 A.3d 468, 475–76 (Pa. 2011) (describing the tort's history in Pennsylvania courts).

Plaintiff contends that Jefferson tortiously interfered with his contractual relationship for employment with Rothman Orthopaedics when Jefferson forbade him from working at any Rothman office containing Jefferson residents. (Am. Compl. 39, ¶ 252.) Defendant argues that it took reasonable action in doing so. See Tulp v. Educ. Comm'n for Foreign Med. Graduates, 376 F. Supp. 3d 531, 545–46 (E.D. Pa. 2019) (Beetlestone, J.) ("in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff") (quoting Glenn v. Point Park Coll., 272 A.2d 895, 899 (Pa. 1971)). In determining whether defendants have a justification for such actions, Pennsylvania courts examine the factors from Section 767 of the Restatement (Second) of Torts:

> (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

Restatement (Second) of Torts § 767.

Considering these detailed factors, the Court cannot conclude whether Jefferson's actions were unjustified or justified. Although the Plaintiff's claim is questionable, he has made sufficient factual allegations that the Court will not dismiss the claim at the R. 12 stage, and will allow it to proceed.

## VII. CONCLUSION

For the foregoing reasons, the Court will **DENY** the Motion to Dismiss as to Plaintiff's Title IX discrimination claim (count 1) and tortious interference with business relations claim (count 6), and **GRANT** the Motion to Dismiss as to Plaintiff's Title IX retaliation and remaining state law claims (counts 2–5). An appropriate Order follows.

o:\civil 20\20-2967 abraham v thom jeff univ\memo re mtd am compl.docx