**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN A. ABRAHAM, M.D. | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY | : | No. 2:20-cv-02967-MMB |
| HOSPITALS, INC. | : | |
| *Defendants.* | : | |
| | : | |
| | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Contents…………………………………………………………………………i

Table of Authorities………………………………………………………………… ii

I. INTRODUCTION…………………………………………………………………2

II.  FACTUAL BACKGROUND ...................................................................4

III. LEGAL ARGUMENT.............................................................................4

    A. THE CONTROLLING LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT.............4

    B. THE EVIDENCE CLEARLY SUPPORTS A TITLE IX CAUSE OF ACTION ...............................5

        1.  *Plaintiff Suffered Sexual Misconduct by J.P.* ........................................................5

        2.  *Defendant Exercised Substantial Control Over Both J.P. and the Context in Which the Sexual Misconduct Occurred* ...............................................................7

        3.  *Defendant Unquestionably Had Actual Knowledge of J.P.'s Sexual Misconduct...9*

        4.  *Defendant was Deliberately Indifferent to Dr. Abraham's Complaint and His rights as the Accused by J.P.'s Concocted Narrative* ...........................................17

        5.  *The Sexual Misconduct and Defendant's Subsequent Inaction was so Severe that Dr. Abraham was Deprived of the Benefits Provided by TJUH* ..........................21

    C. THE EVIDENCE CLEARLY SUPPORTS A TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP CAUSE OF ACTION ...................................................................22

    D. PLAINTIFF IS UNQUESTIONABLY ENTITLED TO DAMAGES ............................................25

        1.  *Plaintiff is Entitled to Economic Damages* ........................................................25
        2.  *Plaintiff is Entitled to Punitive Damages Stemming from Defendant's Tortious Interference* ......................................................................................................26

IV. CONCLUSION.....................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases:</u>**

*A.H. v. Minersville Area Sch. Dist.,* 408 F. Supp. 3d 536 (M.D. Pa. 2019)……………………7, 8

*Bostic v. Smyrna Sch. Dist.,* 418 F.3d 355 (3d Cir. 2005)………………………………………...9,10

*Chambers ex rel. Chambers v. Scch. Dist. Of Phila. Bd. Of Educ.,* 587 F.3d 176 (3d Cir. 2009)...5

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)……………………………………………………………………………...5,7,8,17,26

*Doe v. Univ. of Scis.,* 961 F.3d 203 (3d Cir. 2020)…………………………………………...5

*Doe v. Columbia Univ.,* 831 F.3d 46 (2d Cir. 2016)…………………………………………5

*Doe v. Mercy Catholic Medical Center*, 850 F. 3d 545 (3d. Cir. 2017)…………………………...5

*Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656 (E.D. Pa. 2017)……………………………...10

*Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923 (Pa. Super. 2013)…………………………………………………………………………22, 26, 27

*Feld v. Merriam*, 485 A.2d 742 (Pa. 1984)…………………………………………………27

*Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992)………………………………26

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998)………………………………9,26

*Hall v. Millersville Univ.*, 22 F. 4th 397 (3d. Cir. 2022)………………………………..5,7,9, 10, 17, 21

*Jeanette Paper Co. v. Longview Fibre Co.*, 548 A.2d 319 (Pa. Super. 1988)……………………27

*McNeil v. Yale Univ.*, 436 F. Supp. 3d 489 (D. Conn. 2020), aff'd in part, vacated in part sub nom. *McNeil v. Yale Chapter of Alpha Delta Phi Int'l, Inc.*, No. 21-639-CV, 2021 WL 5286647, (2d Cir. Nov. 15, 2021)…....………………………………………………………………8

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241 (3d. Cir. 2011)…………………4

*Roe v. St. Louis Univ.*, 746 F.3d 874 (8th Cir. 2014)……………………………………………8


**<u>Statutes:</u>**

20 U.S.C. § 1681…..…………………………………………………………………5


**<u>Other:</u>**

Restatement (Second) of Torts § 766 (Am. Law Inst. 1965)…………………..……………22,23

Restatement (Second) of Torts § 767 (Am. Law Inst. 1965)………………..………..22,23,24

## I.    INTRODUCTION

This case stems from Defendant's deliberate indifference to its duties under Title IX and systemic failure to address sexual harassment and prevent gender bias throughout the Title IX investigation. Plaintiff's experience serves as an example of the devasting consequences that occur when an institution blatantly disregards a plaintiff's complaint merely on the basis of gender and fails to apply their policies equally when prompted with valid and obvious complaints of sexual harassment and sexual misconduct.

On June 23, 2018, J.P. coerced Dr. Abraham into consuming alcohol and later sexually assaulted him. *See* Exhibit "D" at 143:12-143:22. Dr. Abraham immediately reported that he was assaulted to his supervisor, Dr. Alex Vaccaro, Chairman of the Department of Orthopaedics at Thomas Jefferson University Hospital, who blatantly disregarded his complaint and told him "**a man cannot be sexually assaulted by a woman**." *See* Exhibit "L" at 33:24-34:19; *see also* Dep. of Dr. Vaccaro in matter of *Abraham v. Phillips*, attached hereto as Exhibit "M" at 61:6-62:24. Dr. Abraham also tried to report the assault to Dr. James Purtill, Residency Program Director at Thomas Jefferson University Hospital, who refused to answer Dr. Abraham's multiple calls and messages, but instead focused on J.P.'s subsequent concocted narrative. *See* Exhibit "D" at 160:6-160:15. Dr. Edmund Pribitkin, Chief Medical Officer for Thomas Jefferson University Hospital, blatantly disregarded Dr. Abraham's report and stated, "John, surgeon to surgeon, I wish you the best." *Id.* at 228:16-229:1. Finally, Ms. Zoe Gingold, Title IX Coordinator, learned that Dr. Abraham made a report to Ms. Jennifer Fogerty, Dr. Abraham's Title IX Advisor, and subsequently learned of J.P.'s sexual misconduct through the Title IX investigation. *See* Exhibit "O"; *see also* The Pietragallo Firm Investigation (hereinafter "Report"), attached hereto as Exhibit

"F." However, Ms. Gingold ignored Dr. Abraham's complaint and never initiated an investigation into Dr. Abraham's claims against J.P. *See* Exhibit "B" at 70:17-70:20.

While simultaneously ignoring Dr. Abraham's reports, Defendant immediately initiated an investigation into J.P.'s false claim that Dr. Abraham sexually assaulted her without J.P. ever making a complaint under Title IX. *See* Exhibit "J" at JEFFERSON263. This investigation unveiled significant and credible complaints from other individuals at Thomas Jefferson University Hospital, who were on the receiving end of J.P.'s inappropriate sexual advances. *See* Exhibit "F"; *see also* Afternoon Session Trial Transcript from Abraham/Phillips Litigation, dated May 9, 2023, attached hereto as Exhibit "B" at 10:2-11:14. Defendant TJUH **never reprimanded, punished or otherwise disciplined** J.P. despite these credible complaints of sexual misconduct. Indeed, Ms. Gingold plainly admits that J.P.'s actions violated Defendant's Title IX policy, and TJUH did nothing. *See* Exhibit "B" at 115:12-116:9. Moreover, Dr. Abraham had no reasonable opportunity to partake in this investigation because Defendant terminated the investigation prior to the conclusion of the criminal investigation. *See* Lower Merion Police Investigation, attached hereto as Exhibit "S" at P1.83-P1.90; *see also* Exhibit "T" at JEFFERSON441. Notably, the Lower Merion Police Department concluded that "**not a single individual was able to provide any information that would lend credence to the claims made by [J.P.]**." *See* Exhibit "S" at P1.13 (emphasis added).

Similarly, Dr. Purtill and Dr. Vaccaro were "made aware that the Title IX investigation could not find the evidentiary support for [J.P.'s] allegations." *See* Exhibit "aa" at P63.38. Despite this, Dr. Pribitkin later pressured Dr. Abraham to resign stating, "[he] would be reported to the National Database if [he] didn't [resign]." *See* Exhibit "D" at 248:13-248:22. In other words, Dr. Pribitkin instructed Dr. Abraham that if **he did not accept the highest level of punishment**

**possible**, which was resignation, Dr. Abraham would be reported to the National Practitioner Database. *Id*.; *see also* Exhibit "V" at JEFFERSON458-JEFFERSON462.

In sum, Defendant baselessly concluded with no evidentiary support that Dr. Abraham sexually assaulted J.P. and permanently damaged Dr. Abraham's reputation and career. However, despite having clear evidence of J.P.'s repeated sexual misconduct, J.P. never faced disciplinary action. *See* Exhibit "I" at 40:21-42:2. Defendant continues to misrepresent and ignore these highly relevant facts establishing Defendant's gender bias and violation of Title IX.

For the reasons set forth more fully in Plaintiff's Memorandum of Law attached hereto, Defendant's Motion for Summary Judgment must be denied.

## II.    FACTUAL BACKGROUND[1]

Plaintiff incorporates his Statement of Additional Facts and his Response to Defendant's Statement of "Undisputed" Facts, filed contemporaneously, as if set forth at length herein.

## III.    LEGAL ARGUMENT

### A.  THE CONTROLLING LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT.

Succinctly put, "the question regarding disposition of a case by summary judgment as a matter of law is whether 'there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 255 n. 18 (3d. Cir. 2011). "In determining whether such relief is warranted, '[t]he evidence of the nonmovant is to be believed, and all justifiable

---

[1] It must be noted, that at all times pertinent hereto, Dr. Abraham was *not* privy to the interviews or findings of Defendant's Title IX investigation (also referred to as the "Pietragallo Firm Report"), which TJUH withheld until only a few days before the Abraham/Phillips Litigation; Dr. Abraham defended his innocence, fought for his claims against J.P. for sexual misconduct, and gave all of his depositions without ever having seen the overwhelming evidence in his favor, which was unlawfully withheld by TJUH until the Supreme Court's intervention.

inferences are to be drawn in his favor.'" *Chambers ex rel. Chambers v. Scch. Dist. Of Phila. Bd. Of Educ.*, 587 F.3d 176, 181 (3d Cir. 2009). Further particulars of the governing standard will be discussed as appropriate, infra, but under any formulation this much is clear: summary judgment is not warranted here.

### B.  THE EVIDENCE CLEARLY SUPPORTS A TITLE IX CAUSE OF ACTION

Title IX of the Education Amendments of 1972 states that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Overall, Title IX "'bar[s] the imposition of university discipline [when sex] is a motivating factor in the decision to discipline.'" *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)).

A plaintiff will prevail under a Title IX cause of action when:

> 1) [Defendant] received federal funds;[2] 2) sexual harassment occurred; 3) [defendant] exercised substantial control over the harasser and the context in which the harassment occurred; 4) [Defendant had actual knowledge of the harassment; 5) [Defendant] was deliberately indifferent to the harassment; and 6) the harassment was so severe, pervasive, and objectively offensive that it deprived [plaintiff] of [plaintiff's] access to the educational opportunities or benefits provided by the school.

*Hall v. Millersville Univ.*, 22 F.4th 397, 408 (3d. Cir. 2022) (citing *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644 (1999)).

### 1.  *Plaintiff Suffered Sexual Misconduct by J.P.*

---

[2] The parties do not dispute that Defendant TJUH's residency program is an "educational program" under Title IX of the Education Amendments 1972. *See Doe v. Mercy Catholic Medical Center*, 850 F. 3d 545 (3d. Cir. 2017) (finding hospital residency program to be an "educational program" under Title IX of the Education Amendments of 1972); *see also* (ECF # 69-3 at 4).

The evidence clearly establishes J.P.'s sexual misconduct directed toward Dr. Abraham. Despite never working with Dr. Abraham, J.P. attended Dr. Abraham's event, which was designed to thank the staff and residents he worked with. *See* Dep. of Dr. Abraham in the matter of *Abraham v. Phillips*, attached hereto as Exhibit "E" at 55:3-55:9. Throughout the night, J.P. touched Dr. Abraham without his consent in ways that made him uncomfortable. See Exhibit "D" at 243:8-243:17. Specifically, J.P. would jump into pictures next to Dr. Abraham to touch him and told Dr. Abraham "she would only wear a thong into the pool if it was just the two of us." *Id.* Long after the guests departed, J.P. refused to leave Dr. Abraham's home. *See* Exhibit "F" at JEFFERSON708. Without permission, J.P. rifled through Dr. Abraham's kitchen and poured a large glass of whiskey into a wine glass. *See* Exhibit "D" at 240:21 – 242:16. J.P. then handed Dr. Abraham the glass of whiskey and demanded he drink it. *Id.* When Abraham went to smell the contents of the glass, J.P. "tipped the glass and dumped more than half of it into [his] mouth." *Id.*; *see also* Exhibit "F" at JEFFERSON719. By the end of the night, Dr. Abraham was intoxicated and could not consent to any sexual activity. *Id.* at 100:18-101:4. J.P. then began touching Dr. Abraham, which made him uncomfortable. *Id.* 243:8-243:9. Dr. Abraham also testified that he told J.P. that he did not consent to sexual intercourse twice. *See* Exhibit "D" at 143:12-143:22. Despite this, J.P. sexually assaulted Dr. Abraham while he was intoxicated and could not consent. *Id.* at 191:15-191:18, 200:17-200:20. Zoe Gingold, Defendant's Title IX Coordinator at the time plainly explained that Dr. Abraham's withdraw of consent, coupled with J.P.'s sexual advances would constitute sexual assault under Defendant's Title IX policies. *See* Exhibit "B" at 78:20-24.

### 2. *Defendant Exercised Substantial Control Over Both J.P. and the Context in Which the Sexual Misconduct Occurred.*

Defendant unquestionably exercised substantial control over J.P. and Dr. Abraham's event, and any claim to the contrary is merely further evidence of gender bias. A university must apply

its Title IX Policy when the university exercises control over the accused and the context in which

the sexual misconduct occurred. *Davis Next Friend LaShonda D., 526* U.S. at 630. Whether a

university had control over "is not a limited inquiry into [the university's] formal disciplinary

authority, but a broader examination of the degree of control [the university] had over [the accused]

and its ability to "take remedial action." *Hall*, 22 F.4th at 409 (quoting *Davis Next Friend*

*LaShonda D.*, 526 U.S. at 644).

Further, the Supreme Court **never limited** Title IX actions to only those taking place on

the university's property, but extended the university's jurisdiction to anywhere the university

exercises control over the "***context in which the harassment occurred***." *A.H. v. Minersville Area*

*Sch. Dist.*, 408 F. Supp. 3d 536, 563, 583 n.13. (M.D. Pa. 2019) (citing *Davis*, 526 U.S. at 644). In

*A.H.*, the school prohibited a student from using the student's restroom of choice while not on

school grounds. The school denied any liability, claiming it "had no control over the public

bathrooms." The court expressly rejected this contention and explained that "[t]he fact that the

school determined that it had the ability to tell A.H. what restroom she could use, or not use,

indicates that it was exercising control over the student and her actions." *Id.* at 563. In so holding,

the court explained the importance of The Supreme Court's use of "context:"

> Although in *Davis*, the misconduct at issue involved student-on-student harassment and occurred "during school hours and on school grounds", the Supreme Court explained that a school may be liable under Title IX where "the recipient retains substantial control over the context in which the harassment occurs" and that recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority.

*Id.* at 583 n. 13 (quoting *Davis Next Friend LaShonda D.*, 526 U.S. at 644). Therefore, where an

institution elects to mandate the actions of its staff and students in a certain context while off-

campus, the institution elects to exercise substantial control over situations not occurring on campus.

Notably, **Defendant only cites two, non-binding cases** to support Defendant's contention that Defendant did not exercise substantial control over the event because the event did not occur on school grounds. *See* (ECF #69-3 at 25). However, neither case concludes that an institution would never exercise substantial control beyond the institution's property. *Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014); *see also McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 512 (D. Conn. 2020), aff'd in part, vacated in part sub nom. *McNeil v. Yale Chapter of Alpha Delta Phi Int'l, Inc.*, No. 21-639-CV, 2021 WL 5286647, at *3, 4 (2d Cir. Nov. 15, 2021) (reversing District Court's dismissal with prejudice of plaintiff's FHA claim and affirming Court's denial of defendant's motion to dismiss plaintiff's Title IX claim). In fact, *McNeil* actually held that the school did exercise substantial control. *Id.* (emphasis added) ("Yale may have substantial control over the circumstances in which that student can remain enrolled at Yale, **whether the underlying conduct occurred on Yale's campus or off of it**").

In the present action, Defendant expressly chose to exercise control over off-campus activities. Defendant's Title IX Policy states: "***any off-campus* or online behaviors that have an adverse impact on the University or any member of the University community fall under this policy**." *See* Exhibit "A" at JEFFERSON266 (emphasis added). Ms. Gingold, Defendant's Title IX Coordinator, also testified that Defendant's Title IX Policy applied to the events of June 23, 2018 and all of the individuals present. *See* Exhibit "B" at 65:22-66:2, 74:25-75:6. Thus, like the school in *A.H.*, that "determined it had the ability" to oversee the actions of students while off campus, Defendant also determined it had the ability to oversee the actions as articulated in Defendant's Title IX Policy.

8

Defendant's exercise of control over Dr. Abraham's event is also established when Defendant promptly instituted a Title IX investigation on behalf of J.P. for her alleged claim occurring at the same exact location for the same exact event. Defendant even states in Defendant's Amended Statement of Undisputed Facts that "[t]he sexual encounter between Dr. Phillips and Dr. Abraham implicated TJU's Sexual Misconduct Policy." (ECF # 71 at ¶ 48). Indeed, Defendant explicitly stated they "received today a report of an incident of alleged sexual assault that implicates Jefferson's Title IX machinery." *See* June 27, 2018 Notice of Concern Letter at JEFFERSON000226, attached as Exhibit "J." For Defendant to now purport that a Title IX investigation was warranted on behalf of J.P., but not Dr. Abraham, is merely further evidence of Defendant's gender bias against Dr. Abraham.

### 3. Defendant Unquestionably Had Actual Knowledge of J.P.'s Sexual Misconduct.

An institution has actual knowledge where an "'appropriate person' had actual notice of harassment." *Hall*, 22 F.4th at 410 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998)). An appropriate person is an official of the institution who "has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Gebser*, 524 U.S. at 290. A Title IX coordinator is considered an "appropriate person." *See Gebser* at 278 (emphasizing need for Title IX Coordinator to be alerted of report for institution to have actual knowledge). "Other school officials may be 'appropriate persons,' depending on their power to take corrective action to address the discrimination and institute corrective measures." *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir. 2005).

The "educational institution has 'actual knowledge if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Id.* at 361. "[B]ecause the standard is couched in terms of 'danger,' it necessarily contemplates liability

where school officials suspect, but cannot be sure of, abusive conduct." *Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 689 (E.D. Pa. 2017) (citing *Bostic,* 418 F.3d 355 at 361).

An institution is deemed to have actual knowledge even where appropriate persons only learn of a single incident of sexual misconduct. *Hall*, 22 F. 4th 397 at 410. In *Hall*, The RA wrote a report that stated the RA heard a resident "scream and yell 'ow,'" and the accused later stated things "got a little physical." *Id.* The RA sent this statement to the University's Deputy Title IX Coordinator, who had the responsibility to investigate reports of sexual misconduct, and who was required to report this to the university's Title IX Coordinator. *Id.* Moreover, a resident's parent heard about this interaction and contacted the university's police department, the university's counseling department, and the university's area coordinator stating that she heard that the victim was assaulted. *Id.* However, the university did not reach out to the alleged victim after that single incident and told the parent the university could do nothing "without a complaining witness." *Id.* at 401. The court concluded that the university had actual knowledge "the record shows that the abuse and danger [the victim] faced from [the harasser] were reported to several persons at [the university] who had some authority to take corrective action." *Id.* at 410.

In the present action, Defendant unquestionably had actual notice of Dr. Abraham's complaint as Dr. Vaccaro, Dr. Pribitkin, Jennifer Fogerty and Ms. Gingold all constitute "appropriate persons" who had actual knowledge of Dr. Abraham's report that J.P. sexually assaulted him and J.P.'s sexual misconduct towards other men that, together, indicated a sufficiently substantial danger to the University community.

First, Dr. Vaccaro, served as the as the President of Rothman and as Charman as TJUH. *See* Exhibit "E" at 7:10-7:13, 10:12-10:15. On June 26, 2018, Dr. Abraham reported to Dr. Vaccaro that J.P. sexually assaulted him. *See* Exhibit "D" at 222:13-222:20. However, like the Deputy Title

IX Coordinator in *Hall*, who both failed to investigate or relay the report to the Title IX Coordinator, Dr. Vaccaro ignored Dr. Abraham's report. *See* Exhibit "L" at 33:24:-34:19; *see also* Dep. of Dr. Vaccaro in matter of *Abraham v. Phillips*, attached hereto as Exhibit "M" at 61:6-62:24. Dr. Vaccaro even acknowledged that he would be required to report an occurrence of sexual assault. *See* Exhibit "A" at JEFFERSON271; *see also* Exhibit "L" at 9:3-9:15. In fact, in a subsequent conversation with Dr. Abraham, Dr. Vaccaro told Dr. Abraham: "**a man cannot be sexually assaulted by a woman**." *See* Exhibit "L" at 33:24:-34:19; *see also* Exhibit "M" at 61:6-62:24. In explaining this statement, Dr. Vaccaro testified that he believed that a woman could only rape a man where "a woman drugs a man, if a woman is stronger than a man, [or] if a woman attacks a man." *Id.* In so stating, Dr. Vaccaro blatantly disregarded Defendant's Title IX Policy defining sexual harassment and consent. *See* Exhibit "A" at JEFFERSON267, JEFFERSON268.

Second, Dr. Pribitkin, Chief Medical Officer at TJUH, had actual knowledge of Dr. Abraham's assault. Dr. Abraham reported to Dr. Pribitkin that J.P. had sexually assaulted him. *See* Exhibit "D" at 228:16-229:1. Dr. Pribitkin blatantly disregarded Dr. Abraham's assault and refused to take appropriate action that was within his power to take. *Id.* Dr. Pribitkin responded, "John, surgeon to surgeon, I wish you the best." *Id*. As chief medical officer, Dr. Pribitkin was directly involved in the disciplinary process and had the authority to initiate the investigation with the Medical Staff. *See* Dep. of Edmund Pribitkin, attached hereto as Exhibit "X" at 6:23-8:3. Also, Dr. Pribitkin was a recipient of Dr. Abrham's December 21, 2018, email wherein Dr. Abraham explicitly stated: "I was the first person (not the complainant) to report complainant's sexual misconduct toward me, in a complaint to Alex Vaccaro who asked me to contact Jim Purtill to formalize my complaint." *See* Exhibit "H" at JEFFERSON190. Dr. Abraham also stated that after he reported to Dr. Vaccaro that J.P. sexually assaulted him, which Dr. Vaccaro failed to report, the

harassment continued when Dr. Abraham "was threatened by complainant's husband after she made her complaint to the point where he needed to be removed from the hospital by security." *Id*. Likewise, Dr. Pribitkin was directly informed of J.P.'s other sexual indiscretions against other members of the University community. *see also* Afternoon Session Trial Transcript from Abraham/Phillips Litigation, dated May 9, 2023, attached hereto as Exhibit "B" at 10:2-11:14. Jeanette Domanico, R.N. testified extensively to this meeting with Dr. Pribitkin and others at TJUH explaining that the nursing safe, some of whom were on the receiving end of J.P.'s sexual advances, refused to work with J.P.:

> Q.      Now, ma'am, after the party and the conversation you just described, were you also involved in a meeting with other OR nurses regarding working with my client?
> A.      Yes.
> **Q.      And is it fair to say that during that meeting there was a group expression that you didn't wish to work with my client**?
> A.      **Correct**.
> Q.      And "my client" being Jessie Phillips?
> A.      Correct.
> **Q.      And that was the result of the allegations that were lodged after the party on June 23, 2018. Right**?
> A.      **Correct**.
> Q.      You would agree with me, at least from your perspective, on part on what Dr. Abraham described to you about what happened?
> A.      I'm Sorry? Can you repeat that?
> Q.      At least with you specifically –
> A.      Yes.
> Q.      -- part of your reasoning not wanting to work with her was based on what Dr. Abraham told you happened at the party after you left. Is that correct?
> A.      I did not have a problem working with her. It was more of the staff. I was just there for their representation.
> Q.      Let me rephrase.
>          From your understanding, other staff members, based on what they understood the allegations from Dr. Abraham to be, didn't want to work with my client. You can answer.
> A.      I don't know if it was because of Dr. Abraham. **I think it was because of their interactions, their own interactions.**

*See* Exhibit "B" at 10:2-11:12.

Notably, nowhere in Defendant's Code or Title IX Policy does Defendant state when Defendant no longer has a duty to investigate a report because that duty is ongoing. Moreover, forcing Dr. Abraham to resign and then conveniently purporting that Defendant had no obligation to investigate his report of sexual assault that occurred while he was employed at TJUH is, again, only evidence of Defendant's gender bias directed toward Abraham. *See* Exhibit "U."

Third, Defendant's Title IX Coordinator, Zoe Gingold, had actual knowledge of J.P.'s sexual misconduct towards Dr. Abraham as well as the multiple accounts of J.P.'s sexual harassment towards other men the night of June 23, 2018. *See* Exhibit "B" at 89:13-90:2; *see also* Exhibit "F." Ms. Gingold blatantly disregarded Dr. Abraham's concerns and merely claimed that everything was being investigated. Yet, despite credible, confirmed, and repeated allegations of sexual misconduct on the part of J.P., **TJUH did nothing**.

On July 2, 2018, Ms. Gingold assigned Jennifer Fogerty as Dr. Abraham's Title IX advisor. *See* Exhibit "O' at JEFFERSON351. On July 9, 2019, Dr. Abrham and Ms. Fogerty spoke on the phone regarding Dr. Abraham's questions and concerns about the investigation. *Id.* at JEFFERSON398-399; *see also* Exhibit "D" at 191:2-191:9. During this conversation, Dr. Abraham notified Ms. Fogerty that he had a complaint and wanted to share his story. *See* Exhibit "D" at 191:2-191:9. Ms. Fogerty asked him: "so you believe that you were sexually assaulted by Dr. Phillips?" *Id.* Abraham confirmed J.P. sexually assaulted him. *Id.* That same day, Ms. Fogerty emailed Abraham stating, "[o]n the phone today you also asked the process for filing a complaint on your own – You can also use the university Title IX coordinator to file a complaint. The Title IX coordinator is Zoe Gingold." *See* Exhibit "O" at JEFFERSON397. Immediately after emailing Dr. Abraham, Ms. Fogerty forwarded this email to Ms. Gingold and stated: "FYI. He may file a

complaint on his own so if you want to connect on Tuesday I'll be in and out (I have orientation)." *Id.* Gingold replied: "I've been on vacation and will address his concerns tomorrow." *Id.*

On July 9, 2018, Gingold emailed Fogerty, stating: "Are you available to talk at 1:00? I have a presentation, orientation and a few meetings. If 1:00 does not work, let me know what time works before 3:30?" *Id.* at JEFFERSON396. On July 9, 2018, Fogerty replied: "You don't have to reach out to him. I just want to fill you in and let you know he might make a report." Gingold then replied: "Ok. Thanks. **No need to talk**. The notice letter indicated that Jefferson was investigating the incident and did not mention that a complaint was filed. **In this case, Jefferson is investigating the incident, without a filed complaint**." *Id.* When asked why she never followed up on Dr. Abraham's report of sexual assault, Ms. Gingold insisted that "he might make a report but the report was never made." *See* Exhibit "F" at 53:8-55:11. This testimony rings hollow when read in conjunction with her email above to Ms. Fogerty. However, Ms. Gingold had previously testified that "just because somebody went to their supervisor instead of going directly to [the Title IX Coordinator], that doesn't mean they didn't make any kind of report," acknowledging that Dr. Abraham's report to Ms. Fogerty constituted a report. *See* Exhibit "B" at 70:17-70:20. Thus, like the Title IX Coordinator in *Hall* who did not conduct an investigation after receiving a report from the RA and purported that "nothing could be done without a complaining witness," Ms. Gingold also improperly and unlawfully disregarded Dr. Abraham's report.

Ms. Gingold also had actual knowledge of sexual misconduct directed towards Dr. Abraham through the Report. *See* Exhibit "F." First, Ali Dibadj reported J.P.'s aggressive and alarming behavior towards Dr. Abraham. *Id.* at JEFFERSON697, JEFFERSON698. After only just meeting Dibadj for the first time that night, J.P. demanded that Dibadj share "embarrassing stores about John." *Id.* Uncomfortable with the interaction, Dibadj replied: "I just met you, I do

not want to tell you embarrassing stories. I don't know you." *Id.*  J.P. also demanded the Dibadj give J.P. a tour of Dr. Abraham's home, and specifically "asked where Dr. Abraham's bedroom was." *Id.* at JEFFERSON698, JEFFERSON711. Jeanette Domanico alerted Dr. Abraham that J.P. had walked upstairs with Dibadj in a group conversation and Dibadj then explained J.P.'s obsession with Dr. Abraham's bedroom and his personal life, and subsequently stated to both Ms. Domanico and Dr. Abraham that: ''[J.P.] doesn't want to f*** me, she wants to f*** him,' gesturing to Dr. Abraham." *Id.* at JEFFERSON700. Later, after most guests had departed, J.P. demanded a second tour of Dr. Abraham's home. *Id.* at JEFFERSON711. Mr. Wisnieski also "heard Phillips say: 'I'm staying over'" in response to the last group of leaving. *Id.* at JEFFERSON708.

Dibadj also reported that Dr. Abraham told him the next morning that J.P. had gotten him drunk. *Id.* at JEFFERSON719. Thus, Ms. Gingold had knowledge of facts indicating that Dr. Abraham was drunk, and thus could not consent to the sexual encounter Defendant was investigating.

Ms. Gingold also learned of R.P.'s (J.P.'s husband) threatening behavior towards Abraham. *Id.* at JEFFERSON723. Defendants discovered the security guard at Fox Chase "was concerned that Dr. Reid's reason for being there was personal, not health care, and that was against policy." *Id.* "The security guard allowed him to wait 5/10 minutes. Dr. Abraham did not come out. The security guard suggested that time was up and Dr. Reid left." *Id.*

Finally, Ms. Gingold also had actual knowledge of J.P.'s sexual harassment towards other men through the report. First, Dr. Tyler Kreitz's girlfriend, Anna, and Dr. Beck's wife stated that J.P. is "handsy with men" and were uncomfortable with their significant others around J.P. *Id.* at JEFFERSON677, JEFFERSON682. Second, Mike Casciato reported that J.P. made him

15

uncomfortable the evening of June 23. *Id.* at JEFFERSON696. Specifically, Ms. Casciato reported: "'I'm a 58-year-old-man. She was being flirtatious, hanging on my arm, being touchy-feely.' He said 'the interaction was unexpected' and he 'felt a bit awkward.'" *Id.* Notably, Matt Wisniewski corroborated Mr. Casciato's report, stating "Phillips, 'had a ring on' and 'was all over Mike.' He recalls asking someone 'is that Jess's husband?' because she was standing close to him *Id.* Multiple eyewitness accounts also reported that J.P. "was rubbing against a male's sales representative and staff" and "grinding into" Mike Casciato and Jarele Hill, at an event where staff's spouses and children were present. *Id.*

Next, multiple eye witnesses confirmed J.P.'s sexual harassment of Vince DeJoseph. *Id.* at JEFFERSON705, JEFFERSON706. Around midnight, J.P. saw Mr. DeJoseph sitting at the piano and sat right next to him on the bench and immediately started "rubbing" him. *Id.* Mr. DeJoseph stated he believed "she was hitting on [him]," and her being close and the touching made [him] uncomfortable." *Id.* When Mr. DeJoseph stopped playing the piano, she "nibbl[ed] on [his] ear," and J.P. stated "don't stop." *Id.* Mr. DeJoseph immediately stood up and stated, "I'm leaving." *Id.* at JEFFERSON706. Ms. Gingold testified that "[n]ibbling on somebody's ear could be considered an action of a sexual nature." *See* Exhibit "B" at 80:20-80:22.

Mr. Sanrocco, Ms. Cotton, Mr. Wisniewski, and Ms. Song all corroborated J.P.'s inappropriate behavior towards Mr. DeJoseph, and Mr. Sanrocco testified that he had to look away because it was too uncomfortable to watch. *Id.* at JEFFERSON706, JEFFERSON707, JEFFERSON708, JEFFERSON710. Dr. Dibadj witnessed J.P. pressuring Mr. DeJoseph to sing and telling him, "don't be a pussy." *Id.* Dr. Dibadj also reported that J.P. told DeJoseph, "if you do this, I'll do this" and whispered something in Mr. DeJoseph's ear. *Id.* Dr. Dibadj also left the

room because he was uncomfortable. *Id.* Therefore, Defendant had actual notice of the underlying facts that indicated a danger to the University community.

### 4. Defendant was Deliberately Indifferent to Dr. Abraham's Complaint and His Rights as the Accused by J.P.'s Concocted Narrative

Deliberate Indifference occurs when a "recipient's response to the harassment **_or lack thereof_** is clearly unreasonable in light of the known circumstances." *Davis Next Friend LaShonda D.*, 526 U.S. at 630 (emphasis added); *see also Hall*, 22 F. 4th at 410.

A Title IX Coordinator failing to reach out to the complainant after a report or failing to take disciplinary action both constitute deliberate indifference. *Hall*, 22 F.4th at 410, 411. In *Hall*, the Title IX Coordinator refused to investigate a report, claiming "nothing could be done without a complaining witness." *Id.* However, the university also never reached out to the victim. *Id.* The university argued that failing to reach out to the victim and initiating an investigation was mere "negligence or bureaucratic inaction, which cannot amount to deliberate indifference." *Id.* However, the court disagreed and rejected the university's argument and held that "a reasonable jury could still conclude **_[the university] acted with deliberate indifference due to its inaction._**" *Id.* (emphasis added).

Here, Defendant's actions unquestionably amount to deliberate indifference. Despite having actual knowledge of Dr. Abraham's complaint, as detailed above, Defendant deliberately chose not to investigate Dr. Abraham's report. First, after Dr. Abraham told Dr. Pribitkin that J.P. sexually assaulted him, Dr. Pribitkin simply stated: "**John, surgeon to surgeon, I wish you the best**," and never relayed Dr. Abraham's complaint to the Title IX Coordinator or instituted any corrective measures himself as the Chief Medical Officer. *See* Exhibit "D" at 228:16-229:1. In fact, Dr. Pribitkin later pressured Dr. Abraham, stating, "[he] would be reported to the National Database if [he] didn't [resign]". *Id.* at 248:13-248:22. In other words, Dr. Pribitkin instructed Dr.

Abraham that if **he did not accept the highest level of punishment possible**, which was resignation, Dr. Abraham would be reported to the National Practitioner Database. *Id*.; *see also* Exhibit "V" at JEFFERSON458-JEFFERSON462. Moreover, the interviews and evidence reported to TJUH by the Pietragallo firm was so overwhelming favorable to Abraham, that TJUH needed to consciously disregard it in order to support its biased agenda against Dr. Abraham and push him out rather than have to issue findings against the female.

Exactly like the Title IX Coordinator in *Hall*, Ms. Gingold Ms. Gingold failed to reach out to Dr. Abraham after learning that Dr. Abraham reported an incident that triggered Defendant's Title IX Policy, and Ms. Gingold deliberately chose to not initiate an investigation. *See* Exhibit "F" at 53:8-55:11. Instead, Ms. Gingold claimed the University was investigating the matter **without a filed complaint**. Yet, now, when it comes to Dr. Abraham's concerns about J.P.'s inappropriate actions toward him, the University seemingly requires an official Title IX complaint be filed in order for the Title IX machinery to initiate. Notably, Ms. Gingold's deliberate indifference continued after learning of facts of J.P.'s sexual misconduct towards Dr. Abraham and other men through the Title IX report, demonstrating J.P.'s threat to the University community. *See* Exhibit "F."

Defendant also deliberately prevented Dr. Abraham from participating in the investigation, despite his desperate efforts to share his story to receive justice for the assault he endured. Defendant did not assign Dr. Abraham a Title IX advisor until July 2, 2018. *See* Exhibit "O" at JEFFERSON351. Immediately after receiving an advisor, Dr. Abraham reached out to Ms. Fogerty, requesting to participate in the investigation. *See* Exhibit "O" at JEFFERSON347, JEFFERSON348. The Pietragallo Firm (hereinafter "Firm") did not contact Dr. Abraham to request a meeting until July 6, 2018. *See* Correspondence with the Pietragallo Firm, attached hereto

as Exhibit "R" at P101-102. Dr. Abraham responded that he was eager to participate in the investigation. *Id.* at P134.

However, **that same day**, J.P. filed a criminal complaint against Dr. Abraham. *See* Lower Merion Police Investigation, attached hereto as Exhibit "S" at P1.83-P1.90. Accordingly, on July 13, 2018, Dr. Abraham requested an extension to provide a written statement and give an interview as J.P's police report prompted a criminal investigation into the same allegations that formed the basis of Defendant's Title IX investigation. *See* Dr. Abraham's Extension Requests, attached hereto as Exhibit "T" at JEFFERSON426. Pursuant to Defendant's Title IX Policy, Defendant has the ability to grant extensions "for good cause." *See* Exhibit "A" at JEFFERSON276. Ms. Gingold replied to Dr. Abraham: "Jefferson University will continue to follow its Title IX Policy pursuant to our procedures. We will remain in contact with you and Dr. Abraham." *See* Exhibit "T" at JEFFERSON428.

On September 25, 2018, Dr. Abraham's counsel again requested an extension of the investigation, so Dr. Abraham participate after the conclusion of the concurrent criminal investigation. *Id.* at JEFFERSON440. On October 3, 2018, Ms. Gingold replied: "Jefferson must close the investigation and bring this matter to resolution. In the event the criminal inquiry is resolved while the investigation remains open, or in the event he opts to participate regardless, certainly Dr. Abraham would be given an opportunity to do so." *Id.* at JEFFERSON441. On October 5, Dr. Abraham's counsel replied: "the Montgomery County District Attorney's Office advised us that the criminal matter will be resolved in two to three weeks, which is just one to two weeks from now. We believe no harm could come from holding open the Title IX investigation for that brief period to allow a fair opportunity for Dr. Abraham to speak to you investigators, **which he would very much like to do**. If you will not hold open the investigation, I will let you

know when the criminal matter is resolved and ask that Dr. Abraham then be permitted to speak to the Title IX investigators, even if that is after their Report is issued." *Id.* at JEFFERSON443 (emphasis added).

Ms. Gingold ignored Dr. Abraham's October 5th request and began reviewing the Firm's report on October 17, 2023. *See,* Robert Toy's Correspondence, dated October 17, 2018, attached hereto as Exhibit "U" at JEFFERSON 145. Again, Ms. Gingold reviewed the Firm's report that included the events of J.P.'s sexual harassment and assault of both Dr. Abraham and other men on June 23, 2018, but still did not reach out to Dr. Abraham or initiate a subsequent investigation. Instead, on October 19, Ms. Gingold emailed Dr. Abraham to notify him that the Title IX investigation had concluded. *See* Exhibit "V" at JEFFERSON446-447. The criminal investigation concluded shortly after, on November 13, 2018. *See* Exhibit "S" at P1.4. The Lower Merion Police Department concluded that: "**not a single individual was able to provide any information that would lend credence to the claims made by Jessi Phillips**. No one saw any illegal behavior on the part of the suspect. As a result, this case can now be considered closed." *Id.* at P1.13 (emphasis added). However, because the criminal investigation concluded after Defendant concluded its investigation and refused to grant Dr. Abraham an extension, Dr. Abraham was not able to participate.

Finally, Defendant states that the first time Defendant did not have actual notice of Dr. Abraham's complaint until his email, dated December 21, 2018. (ECF # 71 at ¶¶ 128-130); *see also* Exhibit "H" at JEFFERSON190. In so stating, Defendant acknowledges that the recipients of this email constitute TJUH members that would then have actual notice of Dr. Abraham's complaint and admit that no investigation was conducted in response to Dr. Abraham's reports.

Also, Defendant contends, without factual or legal support, that Defendant had no obligation to investigate this claim because Dr. Abraham was no longer an employee of TJUH. However, no where in Defendant's Code or Defendant's Title IX Policy does Defendant prescribe a time limit for when a complainant must make a report. *See* Exhibit "A;" "C." Instead, the Title IX Policy states that: "this policy applies to all members of the University community." Even if Dr. Abraham's assault occurred while he was an employee of TJUH, so he was a part of the "University Community" at the time the assault occurred. Additionally, the J.P. was still a resident at the time Dr. Abraham sent this email, meaning Defendant chose not to investigate a claim involving a member of the university posing a threat to the community.

### 5. *The Sexual Misconduct and Defendant's Subsequent Inaction was so Severe that Dr. Abraham was Deprived of the Benefits Provided by TJUH.*

As detailed above, Dr. Abraham not only endured sexual assault but also endured his supervisors disregarding his assault and punishing him for "misconduct" that had no evidentiary basis. *See Hall*, 22 F.4th at 408 (holding that victim "rarely left her room and missed class" was sufficient to conclude "the victim's harassment was sufficiently severe and pervasive so as to deprive the victim of the benefits of provided by the school").

In this case, Dr. Abraham endured both the trauma of a sexual assault and was also forced to relinquish his clinical privileges. *See* Exhibit "H." Accordingly, Dr. Abraham's was deprived of all benefits provided at TJUH.

### C. THE EVIDENCE CLEARLY SUPPORTS A TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP CAUSE OF ACTION

"[A] party is liable for pecuniary loss due to tortious interference with a contractual relationship when the party 'intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person

not to perform the contract.'" *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932 (Pa. Super. 2013) (citations omitted). A plaintiff will prevail on a tortious interference with a contractual relationship claim through establishing:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Id.* at 933 (quoting Restatement (Second) of Torts § 766 (Am. Law Inst. 1965).

To establish intent, the plaintiff may establish either "the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct." Restatement (Second) of Torts § 767, cmt. (b) (Am. Law Inst. 1965). However, "[t]he desire to interfere with the other's contractual relations need not, however, be the sole motive. If it is the primary motive it may carry substantial weight in the balancing process and even if it is only a casual motive it may still be significant in some circumstances." *Id.* The question of a whether a defendant's interference was intentional is unquestionably a matter for the jury and not one to be disposed at Summary Judgment. *Id.* at cmt. (l).

Section 767 of the Restatement affirms that whether an action is improper must be determined "under the circumstances," and the determination depends on "a judgment and choice of values in each situation." *Id.* at cmt. (b). "Thus[,] the manner of presenting an inducement to the third party may be significant," and "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract." Restatement § 766 at cmt. (k). "[I]t is clear that the central inquiry is whether the defendant's conduct is 'sanctioned by the 'rules of the game' which society has adopted." *Empire Trucking*

*Co.*, 71 A.3d at 935. In determining whether a defendant's actions were justified under the circumstances, Pennsylvania courts examine the factors set forth in Section 767 of the Restatement (Second) of Torts:

> (a) the **nature** of the actor's conduct; (b) the actor's **motive**; (c) the **interests** of the others with which the actor's conduct interferes; (d) the **interests** sought to be advanced by the actor; (e) **the social interests in protecting the freedom of action of the actor and the contractual interests of the other**; (f) the **proximity or remoteness of the actor's conduct to the interference**; and (g) the relations between the parties.

Restatement (Second) of Torts § 767 (Am. Law Inst. 1965).

However, "[o]ne who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. **The interference is an immediate consequence of the conduct, and the other factors need not play as important a role in the determination that the actor's interference was improper**." *Id.* at cmt. (h) (emphasis added).

For relationship of the parties, the Restatement explains that where a party offers advice as a volunteer and not because the party is an advisor, this constitutes improper conduct. For example, the restatement provides:

> In a case where A is the actor, B is the injured party and C is the third party influenced by A's conduct, the significant relationship may be between any two of the three parties. . . . Or, if A is C's business advisor, it is proper for him to advise C, in good faith and within the scope of C's request for advice, that it would be to his financial advantage to break his contract with B, while it would be **improper if he were a volunteer**.

*Id.* at cmt. (g).

The nature of the actor's conduct is significant where the actor violated "recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods." *Id.* at cmt. (c).

23

In the present action, Defendant TJUH tortiously interfered with Dr. Abraham's contractual relationship with the Rothman Institute. Pursuant to the Co-Management Agreement between TJUH and Rothman, Dr. Abraham provided orthopedic services at TJUH. *See* Co-Management Agreement, attached hereto as Exhibit "cc." Thus, Dr. Abraham had a separate business relationship with TJUH and Rothman. Similarly, Dr. Vaccaro and Dr. Purtill maintained positions at both Rothman and TJUH. Dr. Vaccaro served as the President at the Rothman Institute and as Chairman of Orthopedics at Sidney Kimmel Medical College at TJUH *See* Exhibit "M" at 7:10-7:13; 15:14-16). When Dr. Abraham called Dr. Vaccaro to report that J.P. had sexually assaulted him, Dr. Vaccaro testified that Dr. Vaccaro responded to the call in his role as Chairman of TJUH. *Id.* at 15:9-15:19. Specifically, Dr. Vaccaro testified that "for me as a chairman of the department I was like that's a problem." *Id.* at 10:12-10:16. Similarly, Dr. Purtill was the residency director at TJUH and Vice Chairman at Rothman. *See* Exhibit "Z" at 36:19-37:3. J.P. called Dr. Purtill as he was the residency director of her program at TJUH. However, both Dr. Vaccaro and Dr. Purtill took information they received in their official roles the Chairman and Vice Chairman and TJUH and volunteered this information to Rothman, which resulted in Dr. Abraham's complete suspension at Rothman, not simply a suspension limited to Dr. Abraham's role at Rothman on TJUH property.

Thus, as explained in the Restatement, Dr. Purtill and Dr. Vaccaro are not analogous to the financial advisor, who had a duty to provide advice. Rather, Dr. Purtill and Dr. Vaccaro are most analogous to the "volunteer" who offered information learned outside of their official capacity at Rothman in order to induce Rothman to suspend Dr. Abraham.

Additionally, Dr. Abraham was pressured to resign as he could not adequately provide for his family without working, and Dr. Vaccaro informed Dr. Abraham that the only way to regain

his employment at Rothman was to relinquish his privileges at TJUH. *See* Exhibit "H" at JEFFERSON190 (emphasis added) ("this is not a choice I am making but is a decision I am compelled to make due to present circumstances since, as I understand it, I have no ability to return to any type of gainful employment without doing this").

Additionally, after the conclusion of Defendant's investigation and the criminal investigation, which found that "**not a single individual was able to provide any information that would lend credence to the claims made by Jessi Phillips,**" Defendant still refused to allow Dr. Abraham to work at any TJUH hospital as an employee of Rothman. Abraham testified: "I was moved out of my hospital, I was moved to a community hospital. The directorship position was taken away. I was no longer allowed to work with residents. I was taken out of the research program. I was no longer allowed to be at grand rounds." In sum, Defendant tortiously interfered with Dr. Abraham's contract with Rothman, without any evidence (and, indeed, over the wholly favorable evidence for Dr. Abraham), and prohibited Dr. Abraham from fulfilling his employment duties at Rothman, in a flagrant effort to further its goal of avoiding the certain outcome of a man being the victim of the unlawful conduct instead of the woman.

### D.  PLAINTIFF IS UNQUESTIONABLY ENTITLED TO DAMAGES

#### *1.  Plaintiff is Entitled to Economic Damages*

"An implied private right of action for money damages exists under Title IX." *Davis Next Friend LaShonda D.*, 526 U.S. at 629 (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 60 (1992)). Specifically, such damages are allowed where the plaintiff has established the institution had actual knowledge of the discrimination and failed to adequately respond." *Gebser*, 524 U.S. at 276. Moreover, "a party is liable for **pecuniary loss** due to tortious interference with a contractual relationship." *Empire Trucking Co.*, 71 A.3d at 932.

25

As Plaintiff has established that Dr. Pribitkin, Dr. Vaccaro, and Ms. Gingold had actual knowledge of and were deliberately indifferent to Dr. Abraham's report, and Defendant tortiously interfered with Dr. Abraham's contract with Rothman, Plaintiff is entitled to damages.[3]

In 2015, Dr. Abraham became a partner at Rothman and an Associate Professor at TJUH. Dr. Abraham was granted operating privileges at TJU, with two operating rooms available to him. Prior to 2018, Dr. Abraham performed approximately 400 to 500 surgeries per year. *See* Plaintiff's Expert Report, attached hereto as Exhibit "Y" at 3. Dr. Abraham incurred substantial economic loss, amounting to (only as of that time) $5,172,585. *Id.* at 7.

### 2.   *Plaintiff is Entitled to Punitive Damages Stemming from Defendant's Tortious Interference*

"'Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" *Empire Trucking Co.*, 71 A.3d at 937 (quoting *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984)). Where a defendant acts "dishonestly" in informing a third-party of information regarding the plaintiff, punitive damages are warranted. *Id.* at 937, 938 (holding that where defendant provided false information about plaintiff to third-party that contracted with plaintiff constituted "dishonestly and lack of business ethics, [which] warrant[ing] an award of punitive damages"); *see also Jeanette Paper Co. v. Longview Fibre Co.*, 548 A.2d 319, 327-23 (Pa. Super. 1988) (finding punitive damages proper where defendant broke contract with broker after receiving information from broker regarding potential customer, and then sold to that customer directly").

In the present action, Defendant's reckless indifference warrants punitive damages. As set forth in *Empire Trucking Co.*, Defendant acted dishonestly when Defendant offered information

---

[3] Despite Defendant's contention, Dr. Abraham never voluntarily resigned from TJUH.  As articulated above, Dr. Pribitkin told Abraham that "[he] would be reported to the National Database if [he] didn't [resign]," regardless of the evidentiary outcome. (Abraham Dep. at 248:13-248:22).

to Rothman to induce Rothman to suspend Dr. Abraham, and Defendant induced Rothman to limit Dr. Abraham's ability to work at various Rothman locations without any sufficient grounds to establish Dr. Abraham sexually assaulted J.P.

## IV.     CONCLUSION

Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted:

**THE BEASLEY FIRM, LLC**

BY:     /s/ *Lane R. Jubb, Jr.*
        LANE R. JUBB, JR., ESQUIRE
        ANDREW M. MARTH, ESQUIRE
        Identification No. 319272/330361
        THE BEASLEY BUILDING
        1125 Walnut Street
        Philadelphia, PA 19107
        215.592.1000
        215.592.8360 (telefax)
Dated: 30 October 2023          lane.jubb@beasleyfirm.com