UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN A. ABRAHAM, M.D. <br>                           *Plaintiff,* <br> v. <br><br> THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC., et al. <br>                           *Defendants.* | No. 2:20-cv-02967-MMB |

**PLAINTIFF'S TRIAL MEMORANDUM**

Plaintiff submits this Trial Memorandum pursuant to this Honorable Court's October 26, 2023 Order (ECF #73) and Judge Baylson's Pretrial and Trial Procedures.

**I.     PLAINTIFF'S TITLE IX GENDER DISCRIMINATION CLAIM**

Title IX of the Education Amendments of 1972 states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Overall, Title IX "'bar[s] the **imposition of university discipline** [when sex] is a motivating factor in the decision to discipline.'" *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)).

The Third Circuit adopted a clear and straightforward proof for Plaintiff to meet to succeed on a claim under Title IX: "[Did] the University discriminate[] against [the Plaintiff] on the basis of sex?" *See Doe v. Univ. of the Scis.*, 961 F.3d 203 (3d Cir. 2020). In *Univ. of the Sciences*, the Court expressly ***rejected*** all "doctrinal tests" that Courts had previously ascribed to Title IX actions. *Id.* at 209. ("We agree with the Seventh Circuit and 'see no need to superimpose doctrinal tests on the [Title IX] statute.'").

    **a.  *Establishing Any Bias***

1

In establishing that a University's investigation and application of its sexual misconduct policies were motivated by gender bias, Courts recognize that a Plaintiff **need not meet this burden by direct evidence of gender bias**. Indeed, in *Univ. of the Science*, the Court recognized that Plaintiff may establish gender was the motivating factor by facts that the University "[e]ngaged in **selective** investigation **and enforcement** of [its] policies by failing to consider [the plaintiff's] alcohol consumption and whether [Roe] 2 should have been charged with violations of [the policy] if [Doe] was intoxicated when they had sex" and that "[a]lthough both [he] and [Roe] 2 had been drinking [during the party], [the University] identified [the plaintiff] as the initiator of sexual activity, notwithstanding the comparable intoxication of both participants."

At trial, Dr. Abraham will offer extensive testimony regarding TJUH's Title IX policy, including the issues of consent, sexual assault, and sexual harassment. The evidence is overwhelming that TJUH had notice and proof that J.P. was the instigator of the sexual interaction between Plaintiff and J.P. despite Plaintiff's intoxication. Plaintiff will testify that he informed multiple TJUH individuals, such as the TJUH Department Chair (Vaccaro), of J.P.'s inappropriate sexual advances on June 27, 2018:

> Q. What I'm trying to understand is, did you say something to him other than describing the events that had him understanding you were making a complaint that the hospital counsel needed to be aware of? Like did you say I want to make a complaint?
> A. Yes.
> Q. I didn't hear that. So can you just walk me through what you said to him.
> A. Well, I described the whole event and then I said now they are, you know coming after me for money or something. And I told him that I had not intention of having sex with her. I told him that **I told her this is not a good idea and tried to push her away more than once**.

State Deposition of John Abraham at 253:17-254:1.

Dr. Vaccaro has already acknowledged that he was told by Dr. Abraham that "this particular woman was being **very aggressive sexually with him**[.]" State Deposition of Alex Vaccaro, M.D. at 12:20-22. Ms. Gingold, TJUH's Title IX Coordinator, will testify that John's version of events, **as reported to Dr. Vaccaro before an investigation was started**, **constitutes sexual misconduct by J.P.**:

> Q.  In this paragraph [of the sexual misconduct policy], it talks about verbally withdrawing consent. Right?
> A.  Yes.
> Q.  It says, "The best way to do that is by saying 'no,' or 'stop.'" Right?
> A.  Yes.
> Q.  If a person says, **"No, this is not a good idea,"** while someone is trying to engage in sexual intercourse with them, that is not giving consent." Correct?
> A.  Yes.

Zoe Gingold. State Trial Transcript May 9, 2023 Afternoon at 78:14-24.

Ms. Gingold will testify that per TJUH policy, Dr. Vaccaro is an individual that **must** report sexual misconduct to the Title IX Coordinator, and an investigation **must occur into the reported misconduct**:

> 2. **Non-Confidential Reporting** – The majority of Jefferson employees are non-confidential and are required to report information regarding an incident to Campus Security and the Title IX Coordinator. Reporting an incident to anyone not identiifed as confidential are obligates the university to investigate. This includes:

> c. College Deans or Associate Deans
>
> d. Full-time faculty
>
> e. Residence Life staff (including RA's)
>
> f. Staff with significant responsibility to student and campus activities
>
> g. Human Resources (if involving an employee)
>
> h. Coaches

JEFFERSON000296-97.

Yet, no notice of concern regarding J.P.'s sexual misconduct was ever initiated or sent to the parties, and the Title IX Investigators were **only investigating the allegation that Dr. Abraham sexually assaulted J.P.**:

> On Jul 5, 2018, at 5:48 PM, Leslie A. Mariotti <LAM@Pietragallo.com> wrote:
>
> Dear Dr. Abraham,
>
> My firm has been retained by Thomas Jefferson University to conduct a factual investigation into the allegation that you sexually assaulted Dr. Jessica Phillips on June 23, 2018.
>
> In connection with that investigation, we would like to schedule a time to meet with you in person, at a location convenient to you.
>
> I would appreciate it if you could provide some dates and times when you would be available to meet next week.
>
> If you have any questions, please do not hesitate to contact me at (215) 988-1451.
>
> Thank you for your cooperation.
>
> Best regards,
>
> Leslie Mariotti
>
> **Leslie A. Mariotti, Esquire**
> Pietragallo Gordon Alfano Bosick & Raspanti, LLP
> 1818 Market St., Suite 3402
> Philadelphia, PA 19103
> Office: (215) 988-1451 | Fax: (215) 754-5188
> LAM@Pietragallo.com | BIO

P0000101-102. This is ***identical evidence the Third Circuit expressly stated was sufficient*** to establish gender bias in *Univ. of the Sciences, supra.*

Moreover, there is overwhelming evidence that TJUH had notice of J.P.'s sexual misconduct against **other members of the TJUH community during the same evening in question**. Despite the plain and overwhelming notice, TJUH did not investigate J.P. for misconduct, nor was a Title IX proceeding ever initiated against her for her improper and inappropriate conduct. By way of merely one clear example, the Title IX investigators uncovered information that **J.P. nibbled on a TJUH OR Nurse's ear during the June 23, 2018, party**. TJUH's Title IX Coordinator will identify that such action **was sexual misconduct under the Title IX policy**, as the Title IX Coordinator **already has admitted**:

> Q.  Ma'am, you said at the beginning of your testimony that **nibbling on your co-worker's ear could be considered sexual harassment**. Correct?
> A.  **Correct**.
> Q.  At no time was Dr. Phillips ever investigated for sexual harassment. Right?
> A.  Correct.
> Q.  Nor was she removed from her classes. Right?
> A.  Correct.
> Q.  And at no time was she and [sic] told she can't go anywhere near Vincent DeJoseph. Right?
> A.  I would have to look at my, the reports that were previous.
> Q.  But in general, she was never reprimanded in any way - -
> A.  Correct.
> Q.   - - for nibbling on Mr. DeJoseph's ear?
> A.  Correct.

Zoe Gingold. State Trial Transcript May 9, 2023 Afternoon at 115:12-116:6.

This evidence was the subject of a significant portion of the Title IX Investigator's report:

5

> "swooning." DeJoseph: "felt like she was hitting on me." He was "a little uncomfortable ... mainly her being close and the touching made me uncomfortable." He would stop playing the piano and Phillips would say "don't stop." DeJoseph said "she started nibbling on my ear." Her teeth were on his ear. He stopped playing again. He looked over at his friends.
>
> Asked if the "nibbling" could have been an accident, if Phillips could have fallen onto him, DeJoseph said it would a "stretch" to say it was an accident. He took it as a romantic overture. They were on the piano bench for five to ten minutes. She started rubbing his arm about five minutes in. She had a cup and was drinking something dark. He noticed she had a ring on. Asked if she was drunk, DeJoseph said: "I want to say that's the reason, but I don't know." He again said he had not talked to Phillips prior to that incident. DeJoseph said he was uncomfortable so he said "I'm leaving." Phillips said: "why are you going?" DeJoseph told her he was going back to the city with his friends. DeJoseph said she seemed upset that he was leaving with his friends. She asked: "Why are you going out in the city?"
>
> Sanrocco reported that Phillips was flirty with DeJoseph at the piano. DeJoseph was playing piano and Phillips was "being affectionate." They were laughing; he saw her hand on his thigh. Sanrocco saw Phillips nibble on Vince's ear – a "quick little thing". Vince "shot him a look like what's up with that." Sanrocco kind of looked away. He felt like it was weird to watch. (Sanrocco)
>
> Cotton[25] said she, DeJoseph, (Mealey) and Sanrocco were in the house and ready to go. Cotton, Sanrocco and DeJoseph wanted to go out in city. They were planning their Uber. DeJoseph was playing the piano. Phillips sat on the piano bench and Cotton saw her rubbing DeJoseph's arm and leg. She saw Phillips nibble on DeJoseph's ear. Phillips was seated next to DeJoseph. Cotton said when Phillips nibbled on his ear, DeJoseph pulled his head/neck back (she demonstrated). DeJoseph's reaction was not rude but he was pulling back. She thinks he was on left, she was on the right. Cotton had "no clue" if Phillips was intoxicated.
>
> Dibadj also said he observed Phillips' arm over DeJoseph's shoulder. Phillips was whispering in his ear. She was trying to get him to sing. Phillips said "don't be a pussy" to DeJoseph, and "if you do this, I'll do this…" and started whispering something in his ear which Dibadj could not hear. Dibadj said he did not think he should be there. He walked away to put the liquor box back in the bar.[26]

JEFFERSON000706. Ms. Gingold admits that she reviewed the Title IX Report:

6



October 19, 2018

Mr. John Abraham, M.D.

RE: Title IX Proceedings

Dear Dr. Abraham:

Thomas Jefferson University's investigation into the Title IX allegations pertaining to the events of June 23-24, 2018 has been concluded. ==Upon review of the confidential investigatory report,== I have determined that a No Charge Decision is not possible in this case. Accordingly, before issuing a formal Charge Letter and scheduling the matter for hearing, the University believes it would be in the best interests of the parties to explore whether a Non-Hearing Resolution might be feasible.

I am aware that the investigation of this highly fact-intensive matter has taken some time to complete, and I am mindful that the University and the parties wish to obtain a final resolution in a timely manner. It is therefore important that consideration of a possible Non-Hearing Resolution proceed rapidly, and to that end I would request that you let me know as soon as practicable your thoughts on whether a Non-Hearing Resolution might be possible, and on what you would want the terms of such a resolution to include.

In the event it appears after discussion that a Non-Hearing Resolution is not feasible, we will proceed to issue a Charge Letter and schedule the matter for hearing.

Thank you very much for your attention. Please contact me with any questions.

Sincerely,

*Zoe Gingold*

Zoe Gingold
Title IX Coordinator
Jefferson (Philadelphia University + Thomas Jefferson University)
Phone: 215-951-6830
Fax:     215-951-2770
ZoeAnn.Gingold@Jefferson.edu

Per University Policy, Ms. Gingold was **required to initiate a Title IX proceeding into J.P.'s Conduct:**

7

> 2. **Non-Confidential Reporting** –The majority of Jefferson employees are non-confidential and are required to report information regarding an incident to Campus Security and the Title IX Coordinator. ==Reporting an incident to anyone not identiifed as confidential are obligates the university to investigate==. This includes:
>
>    a. Campus Security (811 or 215-955-8888 in Center City, 215-951-2999 in East Falls)

> b. Title IX Coordinators:
>
>    1. Title IX Coordinator: Zoe Ann Gingold, Director, Office of Student Accessibility Services, Jefferson University, gingoldz@philau.edu; 215-951-6830
>    2. Deputy Title IX Coordinator, Center City: Nannette Vliet, Associate Dean, Jefferson College of Health Professions, Nannette.vliet@jefferson.edu; 215-503-7941
>    3. Deputy Title IX Coordinator, Center City: Katherine Trayes, Associate Dean, Sidney Kimmel Medical College, Katherine.trayes@jefferson.edu; 215-503-6988
>    4. Deputy Title IX Coordinator, East Falls: Elizabeth Shepard-Rabadam, Associate Provost, Academic Affairs, Jefferson University, Sheparde@philau.edu; 215-951-0353
>    5. Deputy Title IX Coordinator, East Falls: Alison Stefanik, Associate Director of Student Engagement, Jefferson University, Stefanika@philau.edu; 215-951-2856

JEFFERSON000296-97. Despite receiving this plain and *admitted* evidence of sexual misconduct, per TJUH's sexual misconduct policy, the university did nothing to initiate a Title IX proceeding, investigate J.P.'s sexual misconduct, **or impose any measures against J.P. for plainly violating the policies.** This is blatant and offensive evidence of gender bias by not applying the policies equally that permeated the investigation and ultimate outcome.

This is only a fraction of the bias evidence that Plaintiff will present at trial.

II. **PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM**

   a. **Governing Law on Tortious Interference with Contractual Relations**

"[A] party is liable for pecuniary loss due to tortious interference with a contractual relationship when the party 'intentionally and improperly interferes with the performance of a

8

contract . . . between another and a third person by inducing or otherwise causing[1] the third person not to perform the contract.'" *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932 (Pa. Super. 2013) (citations omitted). A plaintiff **will prevail** on a tortious interference claim by establishing:

> (1) the existence of a contractual or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Id.* at 933 (quoting Restatement (Second) of Torts § 766 (Am. Law Inst. 1965).

### i. A Contractual Relation Existed between Plaintiff and Rothman Orthopedic Institute

A defendant may be liable for interfering either with an *existing* contractual agreement *or a prospective* contractual agreement. *Id.*, cmt. (a). Plaintiff will prevail if he can establish that Defendants interfered with an existing contract (e.g. Rothman institute) which subsequently caused the third-party not to perform the contract or not to enter into or continue a prospective relation."[2] *See,* Restatement (Second) of Torts § 766 (Am. Law Inst. 1965), cmt. (b) ("When the interference is with a contract, an interference is more likely to be treated as improper than in the case of interference with prospective dealings").

---

[1] "Otherwise causing "refers to the situations in which A leaves B no choice." Restatement (Second) of Torts § 767, cmt. (h) (Am. Law Inst. 1965). The Restatement's examples include destroying a product, so a party cannot sell it, and falsely imprisoning a party to prevent the party from performing the contract. Here, Plaintiff can only argue Defendants induced Rothman not to perform the contract.

[2] Restatement (Second) of Torts § 766B also allows a tortious interference claim for parties who induce or otherwise cause a third person ***not to enter into or continue to prospective relation***.

9

### ii. Defendants' Action was Purposeful, with the Intent to Cause Harm

Plaintiff establishes intent with evidence that "the interference with his contractual relations was ***either desired by the actor or known by him to be a substantially certain result of his conduct***." Restatement (Second) of Torts § 767, cmt. (b) (Am. Law Inst. 1965) (emphasis added). However, "[t]he desire to interfere with the other's contractual relations need not, however, be the sole motive. If it is the primary motive it may carry substantial weight in the balancing process ***and even if it is only a casual motive*** it may still be significant in some circumstances." *Id.* Plaintiff must also establish defendant had "knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract." Restatement (Second) of Torts § 766, cmt. (j).

Here, as only one example, Defendants not only had knowledge that interfering with Dr. Abraham's contract with Rothman would result in Dr. Abraham's complete suspension, but Defendants also desired Dr. Abraham's complete suspension, evidenced by Dr. Vaccaro and Dr. Purtill improperly volunteering information of Defendants Title IX investigation to Rothman. Dr. Vaccaro was acting in his role as Chairman of TJUH when he spoke with Dr. Abraham about the events of June 23, 2018, including that J.P. sexually assaulted Dr. Abraham. *See* Dep. of Alex Vaccaro at 15:9-15:19. Similarly, Dr. Purtill was acting within his role as TJUH's residency director when J.P. made a report to Dr. Purtill. *See* Exhibit "Z" at 36:19-37:3. Both Dr. Vaccaro and Dr. Purtill took the information they learned in the role at TJUH and informed all the shareholders of Rothman of J.P.'s allegations, which resulted in Dr. Abraham's complete suspension at Rothman.

Defendants reasonably knew that volunteering such confidential information to Rothman would result in Dr. Abraham's complete suspension from Rothman, which is sufficient to establish

Defendants purposely acted to cause harm to Plaintiff. Nevertheless, Defendants desired to cause such harm, evidenced by Defendants' refusal to allow Dr. Abraham to fulfill his employment duties as a Rothman surgeon at any TJUH facility **even after the Defendants' completed their investigation**.

Additionally, because Defendants prohibited Dr. Abraham from performing surgeries as a Rothman surgeon at any TJUH facility, ***even where J.P. was known to not be in that hospital***, Defendants directly impacted Dr. Abraham's ability to generate revenue for Rothman as part of his contractual obligations.

### III. DAMAGES AVAILABLE UNDER TITLE IX AND TORTIOUS INTERFERENCE

Plaintiff is entitled to compensatory damages for violations of Title IX. *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 70-71 and 76 (1992). "[A] party is liable for pecuniary loss due to tortious interference with a contractual relationship." *Empire Trucking Co.*, 71 A.3d at 932. For tortious interference claims, Plaintiff is also entitled to emotional distress and harm to Plaintiff's reputation as a result of the Defendants conduct. *See*, Pa. Model Jury Instructions No. 17.290. Additionally, with respect to tortious interference claims, "punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" *Empire Trucking Co.*, 71 A.3d at 937 (quoting *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984)). Where a defendant acts "dishonestly" in informing a third-party of information regarding the plaintiff, punitive damages are warranted. *Id.* at 937, 938 (holding that where defendant provided *false* information about plaintiff to a third-party that contracted with plaintiff constituted "dishonesty and lack of business ethics" which warranted an award of punitive damages); *see also Jeanette Paper Co. v. Longview Fibre Co.*, 548 A.2d 319, 327-23 (Pa. Super. 1988) (finding punitive damages proper where defendant broke contract with

11

broker after receiving information from broker regarding potential customer, and then sold to that customer directly).

In 2015, Dr. Abraham became a partner at Rothman and an Associate Professor at TJUH. Dr. Abraham was granted operating privileges at TJU, with two operating rooms available to him. Prior to the Defendants conduct at issue here, Dr. Abraham performed approximately 400 to 500 surgeries per year; a statistic that has been eviscerated. Dr. Abraham incurred substantial economic losses, which will be presented through expert testimony, including approximately $5,172,585 as of only 2022. For tortious interference only, Plaintiff is also entitled to mental and emotional distress and reputational harm resulting from Defendants tortious interference with his contract with Rothman.

Defendants' reckless indifference also warrants punitive damages. As set forth in *Empire Trucking Co.*, Defendants acted dishonestly when Defendants improperly breach the Title IX confidentiality, induced Rothman to breach its contract with Abraham, and induced other known third-parties from entering into contracts reasonably necessary for Abraham to develop and continue his once successful practice.

Respectfully submitted,

**THE BEASLEY FIRM, LLC**

BY:  /s/ *Andrew M. Marth*
LANE R. JUBB, JR., ESQUIRE
ANDREW M. MARTH, ESQUIRE
Identification No. 319272/330361
THE BEASLEY BUILDING
1125 Walnut Street
Philadelphia, PA 19107
215.592.1000
215.592.8360 (telefax)

Dated: 1 December 2023