UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN A. ABRAHAM, M.D.<br>*Plaintiff,*<br>v.<br><br>THOMAS JEFFERSON UNIVERSITY<br>and THOMAS JEFFERSON UNIVERSITY<br>HOSPITALS, INC<br>*Defendants.* | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:    No. 2:20-cv-02967-MMB |

## DEFENDANTS' MOTION FOR MISTRIAL

Defendants Thomas Jefferson University and Thomas Jefferson University Hospitals, Inc. (collectively, "Jefferson") moves for a mistrial in this civil action brought by Dr. John A. Abraham ("Dr. Abraham").

### I. INTRODUCTION

1. Jefferson respectfully moves for a mistrial.

2. The confluence of circumstances discussed below has resulted in severe, substantial and incurable prejudice against Jefferson, depriving Jefferson of a fair trial in this case.

### II. PLAINTIFF'S COUNSEL'S BELLIGERENT TREATMENT OF THE COURT HAS CREATED THE PERCEPTION OF BIAS IN FRONT OF THE JURY

3. The Court is vested with power to impose silence, respect and decorum in its presence. That inherent power is part of the Court's discretionary authority to manage its cases. *Bank of Hope v. Miye Chon*, 938 F.3d 389, 395 (3d Cir. 2019).

4. A trial judge may never appear to abdicate his function or surrender to counsel the conduct of the trial; rather, at all times, the trial judge must exercise his function to guide and control the trial. *Faudreee v. Iron City Sand & Gravel Co.*, 201 F. Supp. 447, 450 (W.D. Pa. 1962).

5. It is a fundamental principle that a complex case must be managed by a judge with a firm hand. *U.S. v. American Telephone & Telegraph Co.*, 83 F.R.D. 323, 327 n.1 (D.D.C. 1979).

6. It is the duty of the trial judge not only to afford the parties a fair trial, but also to conduct the proceedings with such poise and dignity and evident impartiality that, so far as is reasonably possible, the parties may leave his courtroom with a feeling that they have been given a fair trial. *F.W. Woolworth & Co. v. Contemporary Arts, Inc.*, 193 F.2d 162, 169 (1st Cir. 1951).

7. Plaintiff's counsel has repeatedly argued with the trial judge in connection with the judge's rulings on motions. Jefferson believes that the transcript and, importantly, the audio recording will reveal that plaintiff's counsel has yelled at and scolded the judge after rulings were made, and that plaintiff's counsel continued to argue to the judge under the guise of "making a record" even after the judge had ruled.

8. Critically, all of this occurred within the hearing of the jury because the judge indicated at the beginning of the case that objections would be argued in open court in front of the jury and not at sidebar. It is Jefferson's position that, time and again, Plaintiff's counsel has abused this procedure, and the court has not admonished or otherwise corrected their conduct (which, to a third party observer, appears to be highly belligerent and disrespectful to the Court).

9. Given this, Jefferson respectfully submits that Plaintiff's counsel has been unreasonably permitted to create the perception that they are in charge of the trial proceedings, and that the resulting impression upon the jury has deprived Jefferson of its opportunity for a fair and impartial trial.

### III. THE ERRONEOUS JURY INSTRUCTIONS HAVE MADE IT TOO EASY FOR PLAINTIFF TO PROVE ITS FRIVOLOUS CLAIM, AND DEPRIVED DEFENDANTS OF ANY MEANINGFUL DEFENSE

10. Trial courts must carefully circumscribe their instructions to the jury, because while the jury is the factfinder, the range of facts capable of being found in a given case is a question of law. *Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 422 (3d Cir. 2006).

11. Jury instructions as a whole must fairly and adequately represent the evidence and applicable law in light of the issues presented in a particular case and it is error for the district court to provide the jury with instructions misstating the law. *Wolfe v. Fayetteville, Arkansas S.D.*, 648 F.3d 860, 864 (8th Cir. 2011).

12. It is the trial court's responsibility to charge the jury with the correct applicable law on the central issues in the case. The trial court is not relieved of this duty simply because the parties fail to adequately educate the court. Thus, the fact that counsel did not tender perfect instructions does not immunize from scrutiny on appeal a failure to instruct the jury adequately concerning the issues in the case. *Davis v. Lane*, 814 F.2d 397, 401 (7th Cir. 1987).

13. Courts have struggled with how to instruct juries in Title IX cases. But in cases such as the one here—where a senior person has sexual relations with a subordinate person but later claims that the institution's process of investigating him and related decisions were gender-biased—courts have put significant guardrails around such claims.

14. For example, courts have imported the burden-shifting used in Title VII gender discrimination claims, on the theory that there is little—if any—functional difference between gender discrimination in a private company versus gender discrimination in a publicly funded educational institution.

15. This burden-shifting theory has been used by courts in the Third Circuit, but has been ignored by this Court. For example:

    A.  Title IX of the Education Amendments of 1972 states that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any education program or activity receiving federal financial assistance. Because Title IX prohibits subjecting a person to discrimination on account of sex, it is understood to bar the imposition of institutional discipline when sex is a motivating factor in the decision to discipline. *Doe v. Manor College*, 587 F. Supp.2d 249, 251 (E.D. Pa. 2022).

    B.  But Title IX has an exacting culpability requirement, which limits liability to those cases where a defendant institution intentionally violates the statute. *B.W. v. Career Tech. Ctr. of Lacka. Cty.*, 422 F. Supp.3d 859, 880 (M.D. Pa 2019).

    C.  To establish a *prima facie* case of discrimination under Title IX, a plaintiff must prove that: (i) he was subjected to discrimination in an educational program; (ii) the program receives federal assistance; and (iii) that the discrimination was on the basis of his male sex. *A.H. v. Minersville Area. S.D.*, 408 F. Supp.3d 536, 550 (M.D. Pa. 2019).

    D.  In response to a Title IX plaintiff's *prima facie* showing, the burden shifts to the Title IX defendant to offer a legitimate non-discriminatory justification for the alleged adverse action that plaintiff complains about. This burden is relatively light and is satisfied if the Title IX defendant provides evidence which, if true, would permit a conclusion that it took the adverse action for a non-discriminatory reason. At this stage, the Title IX defendant need not prove that the articulated reason actually motivated its conduct, just that it had a non-discriminatory reason to do what it did. *A.H. v. Minersville Area. S.D.*, 408 F. Supp.3d 536, 572-73 (M.D. Pa. 2019). **Here, had the proper burden of proof been instructed, the jury would have been <u>expressly</u> <u>directed</u> to consider that Jefferson's non-discriminatory justification was that plaintiff Dr. Abraham (a Director of Surgery, attending physician and faculty member) admitted**

*to having sex with Dr. Phillips (a junior resident and student).* Jefferson's response had nothing to do with gender and everything to do with this power and status differential. Had Dr. Abraham been female and Dr. Phillips been male, the same result would have been reached, because of this power and status differential. But because the burden shifting instruction was neither used nor explained, Jefferson's non-discriminatory reason for its actions "got lost in the shuffle."

        E.     The burden of production is then shifted back to the Title IX plaintiff to provide evidence from which a factfinder could reasonably conclude that the Title IX defendant's proffered justification is merely a pretext for gender discrimination. *A.H. v. Minersville Area. S.D.*, 408 F. Supp.3d 536, 573 (M.D. Pa. 2019). **But Dr. Abraham produced no evidence to rebut Jefferson's well-founded arguments that any investigation or consequences that Dr. Abraham suffered was as a result of his own poor decision to have sex with a resident and student—a decision Dr. Abraham himself recognized was unethical.** But because the correct instructions were not given, Jefferson was—for all practical purposes—entirely stripped of this valuable defense. Indeed, because of the erroneous instructions, plaintiff's counsel was able to vehemently and repeatedly argue that the fact that Dr. Abraham was the "superior" and that Dr. Phillips was the "subordinate" was irrelevant—but nothing could be farther from the true and accurate state of the law.

        F.     At this point, other than by declaring a mistrial, there is no way to cure this Court's failure to follow the guidance of its sister courts in the Third Circuit.

        G.     More to the point, absent granting a mistrial, this Court has just declared that in the Eastern District of Pennsylvania, there is an "open season" for Title IX claims, because the standards of proof used in this district are exceedingly and unreasonably lenient, and also allow a plaintiff to plead the vaguest of claims despite seeking millions of dollars in compensation. That

many Title IX defendants are non-profits, charities or publicly funded institutions makes this all the more egregious.

16. But this is not the Court's only lapse in failing to put guardrails around this cause of action. In Title IX cases involving alleged sex discrimination in institutional discipline, including termination proceedings—such as the one brought by Dr. Abraham here—there are two categories of claims: (i) claims of an erroneous outcome from a flawed proceeding; or (ii) claims of selective enforcement.

17. When a plaintiff claims an ***erroneous outcome from a flawed proceeding***, he must prove particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding. Where the evidence shows that the Title IX defendant attempted to objectively analyze and fairly resolve the complaint, as a matter of law, it cannot be concluded that the Title IX defendant simply terminated or disciplined the plaintiff because of his sex. *Winter v Penn State Univ.*, 172 F. Supp.3d 756, 775-76 (M.D. Pa. 2016).

18. In *Winter*, the plaintiff was a male professor who had been the subject of a sexual harassment complaint brought by a female student. Unlike Dr. Abraham here, the *Winter* plaintiff followed through with and cooperated during Penn State's internal investigation and hearing process. Indeed, a hearing was held; the complaint was deemed founded; and the professor was terminated. He then sued under Title IX claiming he was the victim of an "erroneous outcome" that was reached because of bias against him as a male. Here, it is difficult to ascertain whether or even how Dr. Abraham can make an "erroneous outcome" claim, because he quit the process before the hearing, voluntarily relinquishing his privileges and resigning from his faculty position. Consequently, there never was an "outcome" for him to complain about.

19. But no such strictures of pleading the claim and proof were put on plaintiff Dr. Abraham here. In fact, Dr. Abraham was essentially allowed to throw spaghetti against the wall to see what would stick. Such *ad hoc* claims like those of Dr. Abraham, where there are no discernable elements within which to fit the evidence, inevitably lead to unfairness to the defendant and—in a larger sense—to a very disjointed and disparate set of rulings which provide no guidance whatsoever as to how educational institutions are expected to act. This is why the *Winter* court wisely required the Title IX plaintiff to at least plead his claim with some modicum of precision.

20. When a plaintiff claims **selective enforcement** of complaints based on gender, courts have made clear that the plaintiff has an even steeper hill to climb. Such claims require statistical evidence of disparate treatment. Plaintiff Dr. Abraham presented no statistical evidence that Jefferson treats women better than or differently than similarly situated men in connection with its policies, procedures and investigations of incidents such as the one underlying this case. Indeed, Dr. Abraham has not cited to a single instance where any women affiliated with Jefferson, who were in the same circumstances as Dr. Abraham—*i.e.*, female directors of surgery/professors who admittedly had sex in their private homes with male residents/students—were treated differently or better than Dr. Abraham was treated. It is Jefferson's position that Dr. Abraham cannot make a "selective enforcement" claim without such evidence *See Doe v. St. Joseph's Univ.*, 832 Fed. Appx. 770, 773 (3d Cir. 2020) (in a "selective enforcement" claim, the plaintiff asserts that regardless of his guilt or innocence, the severity of the penalty and/or the decision to initiate the proceedings was affected by him being a male; but to prevail under this theory, the male accused must identify similarly situated females who were treated less harshly than he was). **Obviously, Dr. Abraham cannot say that his accuser, Dr. Phillips, is that "similarly situated**

***female," because the two are not equal.***  He was a director of surgery and faculty member; she was a resident and student.

21.  Ironically, this Court issued a pre-trial ruling recognizing that it had to put some guardrails around the Title IX claim and evidence to be presented, but then went on to ignore the battle-tested and pre-packaged guardrails already put in place by courts in the Third Circuit, namely, the *A.H., Winter and Doe* courts, as discussed above.

22.  At this point, the error cannot be corrected and Jefferson respectfully asserts, has caused a complete misuse of Title IX <u>and</u> a complete miscarriage of justice in this case.

23.  Additionally, Title IX does not mandate that an institution take any particular action when it receives a complaint pertaining to sexual harassment, improper sexual contact or inappropriate sexual activity.  Rather, the institution is merely required to respond by taking reasonable actions under the circumstances.  If the evidence shows that the Title IX defendant acted reasonably under the circumstances, there is no claim for violation of Title IX. *Douglas v. Brookville Area S.D.*, 836 F. Supp.2d 329, 348 (W.D. Pa. 2011).  Jefferson gleaned from this Court's pre-trial ruling that the issues to be tried were, <u>first</u>, what Jefferson knew at the time and, <u>second</u>, did Jefferson act reasonably under the circumstances.  But that is not how the jury was instructed.  There was no mention that if the jury found that Jefferson acted reasonably based on what it knew at the time, it could not be said that Jefferson engaged in gender discrimination. There is no other way to put it: this Court just opened its doors to a flood of Title IX claims on account of its complete disregard of other cases in the Third Circuit that have precisely circumscribed the claim and defenses thereto.  In this district, Title IX defendants do not have even a "fighting chance" of prevailing, especially where—as here—the Plaintiff can conceal the exact theory he is proceeding under and modify his claims as the trial progresses.

24. Finally, plaintiffs such as Dr. Abraham have tried to bring another identified species of Title IX claim, *the **deliberate indifference** claim*. But courts—including this one—are highly skeptical of "deliberate indifference" claims based on a Title IX plaintiff's allegation that the investigation and hearing process of an institution was biased against him on account of his gender. This is because Title IX "deliberate indifference" claims are typically brought in a situation where the Title IX defendant has ignored a victim's complaint of sexual harassment or assault.[1] The application of a "deliberate indifference" claim is questionable in other contexts. As held by Judge Padova of this Court, "[w]e are likewise skeptical that a Title IX deliberate indifference claim can be pursued to challenge either the initiation or the outcome of a disciplinary proceeding…however, even assuming *arguendo* that the Title IX deliberate indifference standard can be applied in a case such as this one, we conclude that the Complaint fails to state a claim upon which relief can be granted because it does not adequately allege deliberate indifference on the part of Defendant…[t]o establish deliberate indifference, the official's response to the alleged gender bias…must be clearly unreasonable in light of the known circumstances." *Doe v. Trustees of the Univ. of Penna.*, 270 F. Supp.3d 799, 825 (E.D. Pa. 2017). But again, no such instruction was given, meaning that Jefferson was—yet again—stripped of a defense.

25. In short, this Court has blazed a trail in Title IX jurisprudence. Unfortunately, in the wrong direction. Plaintiff should have been required to identify, before trial, exactly what

---

[1] For example, Dr. Phillips may have had such a "deliberate indifference" claim if Jefferson had done what Dr. Abraham now argues it should have, namely, not investigate him at all. To the extent that plaintiff Dr. Abraham argued (repeatedly) that Jefferson did not investigate Dr. Abraham's claims about what Dr. Phillips did or did not do at Dr. Abraham's party, the reality is that to the extent Jefferson knew about Dr. Abraham's allegations—like the "ear nibbling"—these things were in the investigation report. ***Dr. Abraham's bald allegations regarding some sort of alleged failure to investigate failed to mention or acknowledge the obvious—all these things were in the investigation report and because they were in the investigation report, they were investigated.***

theory he was proceeding under, to allow Jefferson and the Court to determine whether to use the "burden shifting regime" of *A.H*, the "erroneous outcome regime" of *Winter* or the "selective enforcement regime" of *Doe*. Also, Jefferson should not have been deprived of the "reasonableness defense" of *Douglas* and *Doe*.

26. This Court should not multiply its error by allowing this lawsuit to proceed to an award of undeserved damages, because the liability phase was so fundamentally flawed and in derogation of the decisions of other courts in the Third Circuit that it cannot be allowed to stand.

27. A mistrial should be granted.

## IV. THE JURY'S SOLE WRITTEN QUESTION

28. Shortly after retiring to deliberate, counsel and the judge were called back into the courtroom because the jury had a question.

29. The question pertained to a "fact" that neither plaintiff nor defendants had put into evidence, and that was not contained in any document admitted into evidence.

30. The jury foreperson, when questioned about this, acknowledged that this "fact" had not been discussed at trial, but stated that the jury desired to know this "fact."

31. This was in complete derogation of the Court's instruction to the jury no more than 30 minutes before, that if a "fact" or any other matter was not discussed and entered into evidence at trial, it could not form the basis for the jury's decision.

32. This incident reveals that the jury failed to understand and is incapable of following the Court's instructions.

## V. TRIAL COUNSEL'S ILLNESS

33. Mr. Harvey is Jefferson's long-time attorney. He was ill throughout the trial; ultimately had to leave the trial before it was complete; and sought emergency medical treatment.

Due to his illness during the trial and his abrupt departure, Jefferson was without its most trusted lawyer, who had been picked to lead the trial team in this case. It is not unheard of for a mistrial to be granted where the illness of defense counsel prevents him from participating in the trial. *See U.S. v. Doran*, 882 F.2d 1511, 1515 (10th Cir. 1990); *U.S. v. Saccoccia*, 58 F.3d 754, 763 (1st Cir. 1995).

34. While some courts have refused to grant a mistrial under this circumstance, the reasons for the refusal are typically because defendant has provided no objective evidence that its attorney was physically unable to try the case. *See Square Liner 360, Inc. v. Chisum*, 691 F.2d 362, 375 (8th Cir. 1982). Here, Mr. Harvey is a well-known and respected lawyer in Philadelphia; there is no basis to speculate that he was sandbagging; and he was obviously sick and in respiratory distress during the trial. Considering all of the other issues outlined above, this was not the trial where Jefferson could afford to be without its choice of lead counsel.

35. For this reason as well, a mistrial should be granted.

|  |  |
|---|---|
|  | KLEHR HARRISON<br>HARVEY BRANZBURG LLP |
| Dated: December 11, 2023 | By: /s/ Stephanie D. Wolbransky<br>William A. Harvey<br>Lisa A. Lori<br>Stephanie D. Wolbransky<br>1835 Market Street, Suite 1400<br>Philadelphia, PA 19103<br>Ph  (215) 569-2700<br>Fax (215) 568-6603<br>wharvey@klehr.co<br>llori@klehr.com<br>swolbranksy@klehr.com<br><br>*Attorneys for Defendants* |

## **CERTIFICATE OF SERVICE**

  I, Stephanie D. Wolbransky, hereby certify that I caused a true and correct copy of the foregoing Motion to be served on all counsel of record via the Court's ECF system.


Dated: December 11, 2023             */s/ Stephanie D. Wolbransky*
                               Stephanie D. Wolbransky