**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN A. ABRAHAM, M.D.** | : | |
| *Plaintiff,* | : | |
| v. | : | |
| | : | |
| | : | **No. 2:20-cv-02967-MMB** |
| **THOMAS JEFFERSON UNIVERSITY** | : | |
| **and THOMAS JEFFERSON** | : | |
| **UNIVERSITY HOSPITALS, INC.** | : | |
| *Defendants.* | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

The Court should deny Defendants' Motion for Judgment as a Matter of Law in its entirety where all claimed grounds have either been waived, affirmatively disclaimed, or are the law of the case, and, in any event, where all facts and reasonable inferences in Plaintiff's favor are clearly sufficient for a jury to reasonably find liability.

## I.   THE EVIDENCE

### A.  PLAINTIFF'S PERTINENT EMPLOYMENT HISTORY

Plaintiff John Abraham, M.D. ("Abraham") was the Chief of Orthopedic Oncology at The Rothman Institute ("Rothman). 12/5/23 at 156:5-157:8. Abraham also held an academic appointment with Defendants and served as their Director of the Musculoskeletal Oncology Center. *Id* at 157:9-14. Abraham was widely renowned for his success as an orthopedic surgeon as a teacher. *Id* at 158:13-16. Abraham has never been accused of sexual misconduct previously. 12/6/23 at 7:23-25.

### B.  DEFENDANTS' KNOWLEDGE OF THE EVENTS[2]

Looking to thank the TJUH staff for their dedicated service, Abraham hosted an annual event at his home, which occurred on June 23, 2018. 12/5/23 at 163:16-:22. Abraham invited TJUH staff that he routinely worked with as well as their families. *Id* at 163:25-164:6; 165:9-11. In 2018, Abraham asked the Chief Resident to send out the invitations; she then invited all residents, instead of only senior residents as Abraham intended. *Id* at 165:25-166:8. As TJUH only assigned fourth and fifth-year residents to Abraham's service, **Abraham never had Phillips, a second-year resident, on his service or under his purview**. *Id* at 158:23-25; 159:2-7. Despite never working with Abraham, Phillips attended Abraham's event. *Id* at 158:23-25; 159:2-7. After the event,

---

[2] The record is clear that, contrary to Defendants facially false claims at bar, the trial testimony referring to Phillips sexual misconduct, identified herein, was *entirely* limited to what Defendants learned throughout the investigation, exactly as this Court ordered. *See* ECF No. 112.

Defendants learned of Phillips' aggressive, sexual misconduct that night from *multiple witnesses*. 12/4/23 at 123:23-125:1. Phillips was seen "grinding on various members" of the University community. *Id* at 124:23-125:1. A Nurse overheard a report that Phillips wanted to "F [Abraham]," to which Abraham replied "**oh, no, that's not even happening.**" *Id* at 128:2-128:4. Gingold, Defendants' Title IX Coordinator, testified that the 41 witnesses interviewed had no reason to lie and believed they were honest. 12/4/23 at 119:3-7; *see also* 12/6/23 at 281:23-282:1. Multiple witnesses also reported that Phillips was "rubbing" Vincent DeJoseph, an OR Tech and "nibbling on his ear." Tr. 12/4/23 at 131:13-134:13; 136:24-137:2. DeJoseph reported to Defendants that "her being close and the ***touching made [him] uncomfortable***." *Id* at 221:7-8; *see also, id* at 131:13-134:13; 136:24-137:2. An OR Tech is a subordinate position to a Resident. Tr. 12/5/23 at 102:10-15. Phillips pressured DeJoseph to sing, crudely stating "don't be a pussy," "if you do this, I'll do this," and whispering something in DeJoseph's ear. 12/4/23 at 139:20-23. Most notably, Abraham reported to multiple TJUH non-confidential reporters that, *inter alia*, Phillips refused to leave his home, was extremely aggressive, and eventually repeatedly sexually forced herself upon him. 12/5/23 at 177:9-15. ***However, at no point did Defendants ever investigate or discipline Phillips for the known sexual misconduct against Abraham or other individuals.***[3] *See* 12/4/23 at 138:17-139:15.

### C. ABRAHAM WAS THE FIRST PERSON TO REPORT, WHICH DEFENDANTS DISREGARDED

Abraham was the first person to report the events of June 23, not Phillips. 12/5/23 at 252:21-24. Incredibly distraught about what he endured, Abraham called his supervisor, Vaccaro. *Id* at 177:6-8. Abraham described, *inter alia*, Phillips' aggressive behavior with multiple people at

---

[3] Phillips' sexual misconduct was so egregious and so widely reported that the President of TJUH mistakenly believed that Defendants' investigation was a result of ***Phillips' conduct*** that night (Tr. 12/5/23 at 100:12-103:17) – as under Title IX it should have been.

3

the party, that Phillips hid in Abraham's house and refused to leave, and that Abraham and Phillips eventually had a sexual interaction over his objections. *Id* at 177:6-8. Abraham clearly communicated to Vaccaro that he told Phillips **three times** that he did not consent to sex. *Id* at 177:16-22. Abraham also told Vaccaro that he feared Phillips was trying to extort him. *Id* at 179:1-17. Vaccaro confirmed this. *Id* at 238:17-20; *see also Id* at 240:2-25.

Following their phone call, Vaccaro contacted TJUH Counsel regarding Abraham's report. *Id* at 180:7-13. Vaccaro confirmed that Defendants' Title IX Policy required him to communicate Abraham's report to the Title IX Coordinator, yet Vaccaro concedes that he never reported this and "[does not] know who Mrs. Gingold is." *Id* at 238:21-23. Per Vaccaro's advice, Abraham called and left messages for Defendants' Residency Director, Purtill, on June 26, which Purtill ignored. *Id* at 180:18-182:10; 12/6/23 at 13:12-13:16. Purtill called Vaccaro that night to tell him Phillips was raped, to which Vaccaro replied, "that's not the story I received. So let's not make any judgments." 12/5/23 at 270:6-13. Shortly thereafter, Vaccaro called Abraham to notify him that Phillips claimed she was raped and that, per TJUH directives, he was suspended from *Rothman*. *Id* at 187:8-11; 244:3-4.

On June 27, Defendants' Title IX Coordinator, Zoe Gingold,[4] sent Abraham and Phillips a Notice of Concern Letter, ***only addressing Phillips' complaint***. 12/5/23 at 201:8-202:3; JX17. A distinction of "*power*" does not exist in Defendants' Title IX Policy.[5] 12/4/23 at 109:23-110:7. In fact, there was no applicable policy that prohibited an attending from sleeping with a resident in 2018. 12/5/23 at 184:25-185:1. Abraham's verbal allegations and those from others included in the Report obligated TJU to investigate the claims *against* Phillips made by multiple men. 12/4/23

---

[4] Gingold was aware of all regulations in effect and had expert knowledge of Title IX. *See* 12/4/23 at 51:5-52:10.
[5] Gingold assisted in drafting Defendants' Title IX Policy and confirmed the Policy applied to ***all*** conduct occurring at the party. *See* 12/4/23 at 60:1-5; *see also id* at 60:14-63:9.

at 83:25-84:5; *see, also,* 12/7/23 at 42:18-43:1. Defendants would be required to amend its original Notice of Concern to investigate Abraham's complaint, which never occurred. 12/4/23 at 83:6:9.

Jennifer Fogerty was Abraham's Title IX advisor. *Id* at 98:21-99:19. Abraham reported to Fogerty all of Phillips improper conduct that night, including Phillips' sexual misconduct toward him as he did Vaccaro. 12/5/23 at 206:4-15; 207:6-209:19. Abraham also emailed Fogerty asking when he could submit evidence to "support ***my claims***." *Id* at 78:7-18.

Fogerty was also required to report Abraham's complaints to Gingold as a non-confidential reporter. *Id* at 73:2-11. Fogerty told Abraham that she would speak with Gingold about what he reported; Gingold emailed "**no need to talk**." *Id* at 76:2-77:7; *id* at 206:16-20. The investigation that ensued was *solely* of Phillips allegations. 12/4/23 at 97:1-7; see also, 12/6/23 at 374:20-375:1.

## D. DEFENDANTS ACCEPTED PHILLIPS' FALSE CLAIMS AND DISREGARDED CORROBORATION OF ABRAHAM'S COMPLAINTS

The OR staff held a meeting where nurses expressed concerns that they did not feel comfortable working with Phillips after witnessing her "act[] inappropriately." 12/5/23 at 307:22-309:11; 109:17-18; *and* 100:12-101:20. Despite these concerns, ***only Abraham, not Phillips***, was squeezed out of TJUH. *Id* at 108:9:15; 137:22-138:10.

Despite the concurrent criminal investigation, Defendants never attempted to obtain any materials from this investigation, which was terminated in Abraham's favor. *Id* at 35:7-9. Unlike other witnesses, Phillips, rather than being interviewed in Defendants investigation, was permitted to submit written answers – a courtesy never extended to Plaintiff. Yet, even those written answers when compared to objective evidence, contained startling falsehoods which Defendants disregarded. For example, Phillips claimed that she was so intoxicated that she blacked out and could not recall her sexual interaction with Plaintiff, but those interviewed belied that claim. *Id* at 141:13-142:8; *see also* 12/5/23 at 40:13-43:23; Defendants never considered the metabolism rate

5

of alcohol over time nor the rate at which bruises develop. 12/5/23 at 255:4-17; Purtill never reported seeing any bruises on Phillips on June 26. 12/6/23 at 23:24-24:1; Phillips reported no food at the party but Abraham's menu was attached to the Report, emphasizing the inconsistency. 12/6/23 at 299:24-301:7; Phillips also never reported having any sexual interaction with Abraham on June 24, but Dibadj reported that he heard "sexual sounds" that morning to which Phillips letter admitted. 12/4/23 at 145:10-146:4. The Report noted: "[i]t's not clear to us why this information was not provided in response to the initial questions" to Phillips. *Id* at 145:10-146:4.

Purtill oversaw all issues regarding the residents but **refused to read the report**. 12/5/23 at 38:13-39:19; 108:16-108:23. Contrastingly, Vaccaro read the Report and concluded that "John was innocent" and "should have the right to work, period." *Id* at 281:22-282:2. Nowhere does the Title IX Policy, the Report, or the Notice of Concern reference anything about an alleged "supervisor," "power balance," or any other courtroom defense created by Jefferson after the fact.

### E. DEFENDANTS FORCED ABRAHAM TO TAKE AN UNPAID LEAVE WHILE PHILLIPS EVADED ANY DISCIPLINARY ACTION

Abraham also reported Phillips' misconduct to Pribitkin, Chief Medical Officer. *Id* at 213:10-215:3. Pribitkin disregarded it: "John, surgeon to surgeon, I wish you luck." *Id*. Pribitkin then threatened Abraham that if he did not take a leave of absence, Pribitkin would report him to the National Practitioner Database. *Id* at 214:2-5. Left with no choice, Abraham emailed Pribitkin stating he was taking a leave of absence "for personal reasons," *exactly* as Pribitkin instructed him to do. *Id* at 215:7-22; *see also* JX38. Following Abraham's suspension without pay, Defendants took Abraham's research, and showcased it solely as the work of another TJUH physicians, on behalf of Defendants. *Id* at 346:17-348:5. Yet, Phillips received academic accommodations, full pay, and never faced any disciplinary action, or any reprimand, for her misconduct at all. 12/6/23 at 348:24-349:2; 383:11-21.

6

### F.  DEFENDANTS PURPOSEFULLY EXCLUDED ABRAHAM FROM THE INVESTIGATION AND THE FINDINGS FAVORABLE TO ABRAHAM

Abraham planned to participate in Defendants' investigation until Phillips filed a criminal complaint which limited his ability to do so. 12/5/23 at 203:5-204:10; and 218:23-219:11. In light of the inability to testify during the concurrent criminal investigation, on advice of counsel, he requested a short extension until the criminal matter concluded. 12/6/23 at 326:4-9. Defendants refused these requests, falsely claiming they had a deadline to complete the investigation. 12/4/23 at 155:5-13; *see also* 12/5/23 at 207:16-24. However, there was no deadline for completion of the investigation. 12/6/23 at 281:16-17; 346:-8. Toy also acknowledged that Defendants were aware at the time that OCR did not have a fixed timeframe for when a Title IX investigation must be completed. *Id* at 379:8-14. Nevertheless, Defendants denied Abraham's reasonable requests.

After receiving the Report, Defendants determined a course of action based solely on Phillips' complaint with no regard to Abraham's complaints and contrary to the reports' findings. 12/5/23 at 47:7-14; see also, 12/6/23 at 287:21-24; 289:1-3. Toy falsely stated that a "No Charge Decision was not possible" and suggested a "Non-hearing Resolution." 12/6/23 at 350:2-351:1; *see also,* 12/4/23 at161:16-163:8. There was no evidence of any scheduled hearing or discussion of hearing introduced.

### G. DEFENDANTS PURPOSEFULLY WITHHELD CRUCIAL INFORMATION FROM ABRAHAM TO PRESSURE HIM TO RESIGN

After informing Abraham that a No-Charge Decision was not possible, Defendants refused to provide Abraham with a copy of the Report. However, Toy, Fogerty, and Gingold all conceded that the OCR guidelines required that "[t]he Reporting and Responding Parties and appropriate Officials ***must have timely and equal access*** to ***any*** information that will be used during ***informal or*** formal disciplinary meetings and hearings." 12/6/23 at 380:9-380:19, *see also* 12/5/23 at 86:8-

11. Defendants disregarded this OCR policy and **refused** to provide Abraham with a copy of the Report, even during discovery in this matter. *See,* Tr. 12/4/23 at 150:15-22; and 193:1-25.

While Defendants withheld this crucial exonerating information from Abraham, Toy simultaneously threatened Abraham that "**there was no way [Abraham] won't be found at-fault at this hearing**." 12/5/23 at 232:20-21. See, also, 12/6/23 at 376:18-23 ("***I made clear, early in the process to Abraham's counsel***, that it was my personal belief that any resolution would ***require Abraham to sever his relationship from Jefferson***"). Abraham never would have caved to TJUH's threats if he had seen the Report, as required. 12/5/23 at 342:10-20.

Accordingly, on December 21, 2018, under the severe duress and at direction of TJUH, Abraham relinquished his clinical privileges at TJUH. 12/5/23 at 322:17-323:10. Abraham stated he was not "resigning" but rather departing from TJUH as "this is not a choice I am making but is a decision I am compelled to make due to present circumstances since, as I understand it, I have no ability to return to any type of gainful employment without doing this." *Id* at 215:7-22; see also JX38. Abraham's relinquishment of privileges constituted the highest form of punishment possible. 12/6/23 at 352:7-14. In his December 2018 email, Abraham repeated once again his complaints against Phillips, which Defendants, once again, entirely disregarded despite Phillips remaining a Resident and their obligation to investigate her. 12/5/23 at 326:11-327:13. Toy falsely claimed that Abraham's allegations were unfounded purportedly based on TJUH's review of the Report. *Id* at 358:20-359:6. Yet, as we now know, that report had ample evidence of Phillips' misconduct and virtually exonerated Abraham entirely.

In fact, in further and total self-destruction of his the defense, what Defense Counsel *confirmed* in his closing, powerfully and repeatedly, was that what the Report showed at **most** was a mutual "mistake" by two adults. See, 12/7/23 Closing at, e.g., 73:16 (assault is not "infidelity")

## H. DEFENDANTS CONSCIOUSLY DISREGARDED TITLE IX'S CONFIDENTIAL PROCESS AND SELECTIVELY SHARED PHILLIPS' ALLEGATIONS TO THE MEDICAL COMMUNITY

Purtill knew the Title IX investigation must remain a confidential process. 12/5/23 at 17:25-18:7; 54:10-17; 113:21-24. Yet, Purtill relayed what he heard from Phillips to *Rothman officials*, including Dr. Rothman, Mike West, Mike Selesky, and Brenna Woods. *Id* at 26:13-27:8. Purtill shared only what Phillips told him, as he refused to hear Abraham's side of the story. *Id* at 27:10-11. Purtill also spoke with residents, and despite having access to the vast exculpatory evidence in the Report, Purtill only relayed Phillips' allegations to the residents. *Id* at 36:1-39:1.

## I. ABRAHAM WAS TERMINATED FROM ROTHMAN DUE TO DEFENDANTS' TORTIOUS INTERFERENCE

Abraham averaged about 500 surgeries in 2017, which drastically decreased to about 150 surgeries in 2021 and 2022. 12/7/23 at 140:17-141:2. Abraham explained that the community hospitals, such as Capital Health, are not equipped to handle the complex surgeries he performs. *Id* at 142:2-7. Prior to June 2018, Abraham never failed to meet his required revenue to remain a Partner at Rothman. However, after Abraham was wrongfully prohibited from performing any surgeries at TJUH, Abraham failed to meet his required numbers for a few years, and Rothman terminated Abraham. *Id* at 281:18-294:4. Vaccaro told Abraham if he dropped **the lawsuit against Jefferson, then he could get back to Jefferson**. *Id* at 174:22-175:2.

Rothman suspended Abraham because TJUH commanded it even before Pribitkin forced Abraham's leave of absence from TJUH. 12/5/23 at 244:3-4. TJUH believed Phillips from the outset because she was a woman and discredited Abraham because he was a man. TJUH told Vaccaro "exactly what [Abraham] needed to say in order to resign from Jefferson." *Id* at 318:2-5. TJUH knew of the "PR Issues" (12/5/23 at 127:9-128:8) that would exist if they found against Jessica, as the investigative findings required. 12/6/23 at 112:18-21. Moreover, the Rothman Board

learned of Phillips false rape claims because of Purtill violating the TJUH confidentiality provision of its Title IX process, which would certainly influence their decision to terminate Abraham at the first opportunity which was October 2022. Abraham explained how his revenue numbers are almost entirely derived from his work at Jefferson. 12/5/23 at 351:5-352:12.

Abraham "stopped receiving calls from Doctors that had sent patients to [him] for 10 years, even though [he's] the closest Doctor to their patient in the area." 12/7/23 at 142:8-18; and 150:19-22. Abraham has sought employment with other hospitals in the area but has been unable to secure employment due to his tarnished reputation from the forced departure. *Id* at 147:10-148:2. Abraham also stopped receiving referrals from Rothman. *Id* at 141:7-9.  Vaccaro remained in touch with Abraham throughout the investigation, as he was concerned about mental health, believing at one point that he "would commit suicide." 12/5/23 at 280:3-8.

## II.    ARGUMENT

### A.  LEGAL STANDARD FOR RULE 50 MOTIONS

A motion for judgment as a matter of law "must specify the judgment sought and the law and facts that entitled the movant to judgment" and "be made [ ] before the case is submitted to the jury." *Fed. R. Civ. P.* 50(a)(2). A party's failure to raise an issue in a Rule 50(a)(2) motion "with sufficient specificity to put the opposing party on notice waives his right to raise the issue post-trial." *Chinniah v. East Pennsboro Twp*., 2014 U.S. Dist. LEXIS 88088, *3-4 (E.D. Pa. 2014) citing, *Williams v. Runyon*, 130 F.3d 568, 571-572 (3d. Cir. 1997).

Defendants made their *only* Rule 50 motion at trial on 12/6/23, arguing what the law required of Plaintiff – totally different than what they claim now to be the applicable standard:

> "Plaintiff accuses the Defendants of discriminating against him on the basis of his gender. And they have not introduced any evidence that any of the Defendants' actions were based on his sex.

They [Plaintiff] have to establish that the discrimination was intentional. They also have to establish that the evidence shows that both -- that the **male was treated differently or less favorably than the <u>woman</u>**, which they have not done here, and that their actions were clearly unreasonable, in light of the circumstances.

And clearly unreasonable conduct must rise to a level that is more than just negligence, which the Plaintiffs have not proved here."

12/6/23 at 272:13 – 273:2.

It is clear that the Defendants did not argue insufficient evidence for the now claimed issues of (1) selective enforcement, (2) deliberate indifference, or (3) erroneous decision in their motion for a directed verdict at trial. *See, Williams*, 130 F.3d at 571-572 (A "blanket statement that 'there is no legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff or any of the issues that counsel have set forth in this case' is "obviously insufficient."). Moreover, if "a party fails to move for judgment as a matter of law at the close of all the evidence, the party wholly waives the right to mount ***any*** post-trial attack on the ***sufficiency*** of the evidence." *Yohannon v. Keene Corp.,* 924 F.2d 1255, 1261 (3d Cir. 1991).

Even assuming the matters upon which the Rule 50(b) motion is based have been preserved, Judgment as a matter of law under Rule 50(b) may be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). In considering the evidence, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Id* at 1166. Judgment as a matter of law should only be granted if the record is "critically deficient of that *minimum* quantum of evidence from which a jury *might* reasonably afford relief." *Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir. 1980) (citations omitted).

A party seeking judgment in its favor based on the insufficiency of the evidence ***must file*** for judgment as a matter of law before the case is submitted to a jury and after the jury returns a verdict. *Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 364 (3d Cir. 1999) ("It is well settled that a party who does not file a Rule 50 motion for judgment as a matter of law ***at the end of the evidence*** is not thereafter entitled to have judgment entered in its favor notwithstanding an adverse verdict on the ground that there is insufficient evidence to support the verdict.").

## B. THE EVIDENCE CLEARLY ESTABLISHED GENDER DISCRIMINATION UNDER TITLE IX

As a preliminary matter, Defendants *waived* and even *affirmatively disclaimed* the purported error in Title IX law they now peddle before the Court. See, Def. Proposed Jury Instr. (ECF #106)(No mention of burden shifting or doctrinal tests) and Tr., 12/5/23 at 92:15-21 ("This is **not** a burden shifting to anybody" and "[b]urden's **not shifted** at all.") Yet, even if those issues were preserved (and they most certainly were not), the jury clearly rejected the manufactured "supervisor" narrative peddled at trial.

### 1. PROOF OF SUFFICIENT GENDER BIAS

Title IX of the Education Amendments of 1972 states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Overall, Title IX "'bar[s] the **imposition of university discipline** [when sex] is a motivating factor in the decision to discipline.'" *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)). The Third Circuit adopted a clear and straightforward standard to succeed on a claim under Title IX: "[Did] the University discriminate[] against [the Plaintiff] on the basis of sex?" *See Doe v. Univ. of the Scis.*, 961 F.3d 203 (3d Cir. 2020). In so doing, they expressly ***rejected*** all "doctrinal tests"

that Courts had previously ascribed to Title IX actions. *Id.* at 209. ("We agree with the Seventh Circuit and 'see no need to superimpose doctrinal tests on the [Title IX] statute'").

Moreover, Third-Circuit District Courts have made clear that where a Plaintiff does **not plead** doctrinal tests**, doctrinal tests will not apply**. *Doe v. Franklin & Marshall Coll.*, No. 5:23-cv-0943, 2023 U.S. Dist. LEXIS 185889, at *3-4 (E.D. Pa. Oct. 17, 2023) ("because Doe separated the Title IX claim into an 'erroneous outcome,' 'selective enforcement,' and 'deliberate indifference' count, they were discussed in turn. This Court's decision to analyze the Title IX claims according to the specific theory identified by *Doe* is supported by the Third Circuit Court of Appeals decision in *St. Joseph's University*, which was issued five months after *University of the Sciences*."). Here, Plaintiff's operative complaint **only alleged discrimination under the *Doe v. Univ. Of the Scis.*** framework. See September 10, 2021, Opinion ECF #21 at 5. This Honorable Court has already recognized that *Doe v. Univ. Of the Scis.* "did more than clarify existing law, **it altered it,**" and **only** reviewed Plaintiff's legal proofs under the *Doe v. Univ. Of the Scis.* framework. *Id.* at 9. Thus, it is well settled at this juncture that the Court's jury instruction properly stated the change in the law by *Doe v. Univ. Of the Scis.* and complied with the well-recognized law-of-the-case doctrine. *Bedrosian v. IRS*, 42 F.4th 174, 181 (3d Cir. 2022) (the law of the case doctrine "prevents reconsideration of legal issues already decided in earlier stages of a case"). [6]

## 2. EVIDENCE OF DEFENDANTS' GENDER BIAS IS OVERWHELMING

As already detailed, the evidence at trial conclusively established that Defendants were obligated to investigate Abraham's claims regarding Phillips' improper sexual aggression and behavior – but did not; rather they only investigated her allegations – and even when that very

---

[6] As set forth, *infra*, all of Defendants' arguments pertaining to 'erroneous outcome,' 'selective enforcement,' or 'deliberate indifference' have been waived repeatedly and do not apply, as Plaintiff did not bring his claims under these antiquated doctrinal tests and the Third Circuit rejected doctrinal tests. Thus, no further briefing is warranted.

investigation did not support those allegations, they suppressed that evidence all to harm the accused man, based on the sheer allegations of the woman.  The evidence also conclusively established the Defendants made up their minds regarding Phillips allegations **before a hearing was even scheduled**. The University should never make a decision regarding the outcome of a Title IX hearing before that hearing occurs. Yet, Toy told Plaintiff that "any resolution would require Abraham to sever his relationship from Jefferson." 12/6/23 at 377:20-25. Toy believed – without any evidentiary support – that "[t]here is no reasonable basis to conclude, based on the evidence from the investigation, that Abraham was a victim of sexual misconduct." *Id* at 373:3-8. Plaintiff testified to oral statements by Toy that "there's no way you won't be found at-fault at [a] hearing." 12/5/23 at 113:1-5; 232:18-21; and 12/6/23 at 57:15-17. Vaccaro told Plaintiff that a man could not be sexually assaulted by a woman; unquestionably evidence of gender bias. *Saravanan v. Drexel Univ.*, 2017 WL 5659821, *5 (E.D. Pa. Nov. 24, 2017). This pattern of discrimination extended into the lack of investigation into the *multiple* claims against Phillips made to *multiple* University officials – who were required to investigate – that Phillips engaged in misconduct. Yet, all claims against Phillips were **wholly ignored**. Defendants *admitted* in their closing that this was not a sexual assault by Abraham but instead that Phillips engaged in "infidelity" (Tr. 12/7/23 at 73:16) – *wholly inapposite* to TJUH's determination that a no charge was not possible.

Simply put, the evidence established – overwhelmingly and repeatedly – that Plaintiff was a male sacrifice to the "PR issues" TJUH feared had it acted properly, and that TJUH sided with Phillips and discredited Plaintiff from the outset because she was a woman, and he was a man.

### 3. THERE IS NO REQUIREMENT FOR "CLEARLY UNREASONABLE" BUT THE JURY CHARGE ENCOMPASSED THIS IN ANY EVENT

Defendants waived this argument by failing to object to the charge.  In any event, the Court charged the jury that Plaintiff 'must prove that Defendants *intentionally* discriminated against

him." 12/7/23 at 99:1. Thus, the jury found the Defendants discriminated against Plaintiff *intentionally* – certainly a higher bar than "clearly unreasonable." This is <u>*precisely*</u> the charge the Defendants requested (ECF #106 at pp. 16-17) because they knew intentional conduct is more difficult to prove than "clearly unreasonable."

### C. DEFENDANTS' TORTIOUS INTERFERENCE WITH PLAINTIFF'S CONTRACTUAL *RELATIONS*

"[A] party is liable for pecuniary loss due to tortious interference with a contractual relationship when the party 'intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract.'" *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932 (Pa. Super. 2013) (citations omitted). A plaintiff will prevail on a tortious interference with contractual relations claim through establishing:

> (1) the existence of a contractual, or prospective contractual *relation* between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing *relation*, or to prevent a prospective *relation* from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Id.* at 933 (quoting Restatement (Second) of Torts § 766 (Am. Law Inst. 1965) (emphasis added).

To establish intent, the plaintiff may establish either "the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct." Restatement (Second) of Torts § 767, cmt. (b) (Am. Law Inst. 1965). However, "[t]he desire to interfere with the other's contractual relations need not [ ] be the sole motive. If it is the primary motive it may carry substantial weight in the balancing process and even if it is only a casual motive it may still be significant in some circumstances." *Id.* Thus, "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract." Restatement (2d) § 766 at cmt. (k).

The Pennsylvania Supreme Court has adopted Restatement (Second) of Torts § 766B to adjudicate claims for interference with *prospective* contractual relations. *See Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895, 897 (Pa. 1971). Section 766B provides:

> One who intentionally and improperly interferes with another's prospective contractual relation […] is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective ***relation*  or** (b) preventing the other from acquiring or continuing the prospective ***relation***.

Restatement (Second) of Torts § 766B (1979); see *Behrend v. Bell Tel. Co.*, 242 Pa. Super. 47, 363 A.2d 1152, 1158-59 (Pa. Super. 1976), *vacated on other grounds*, 473 Pa. 320, 374 A.2d 536 (Pa. 1977). The commentary to § 766B indicates that such a claim may find its basis in "any prospective contractual relation," including "any other relations leading to potentially profitable contracts." Restatement (Second) of Torts § 766B, cmt. c.  *Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1274-1275 (Pa. Super. 2012).

With regard to intentionality, "[i]f the actor knows that the consequences are […] substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1274-1275, citing Rstmt. (2d) of Torts § 8A, cmt. B, cross-references § 8A.

The evidence, already summarized, *supra*, was more than sufficient to satisfy these standards.

## 1.   THE THEN-EXISTING AND PROSPECTIVE CONTRACTUAL RELATIONS

Defendants never objected to Plaintiffs' testimony as to what his contractual requirements were nor objected that the written contract be used instead of Plaintiffs' testimony as would be required to preserve this post trial issue. See, 12/6/23 at 105:12 – 106:20. Moreover, Defendants still argued such in their closing (12/7/23 at 84:16-25), which the jury found unpersuasive. They *never* argued the best evidence rule and thus, any claim premised on "best evidence" is waived.

Rothman witnesses and Plaintiff testified at length as to what Abraham's revenue requirement was and that Rothman terminated him at the earliest opportunity and claimed failed to meet his revenue requirements. Furthermore, Plaintiff detailed many aspects of that contractual relationship, including, *inter alia*, his benefits (compensation etc.) and obligations (such as the requirement to meet annual 'numbers') thereunder; much if not all was also confirmed in Vaccaro's testimony, all without objection.

Just as it is well-established that contracts may, for example, be reached orally, the law therefore necessarily recognizes claims for tortious interference with such **oral** contracts. *See, e.g., Cella v. Puccio*, 1999 U.S. Dist. LEXIS 9096, at *4-*5 (E.D. Pa. 1999). See, also. *Int'l Diamond Imps., Ltd., L.P.*, 40 A.3d 1261 (Pa. Super. 2012)("the parties ***hand-shake on the deal***" sufficient evidence to find contract for basis of intentional interference).

The argument that because a written contract itself was not introduced into evidence would somehow render the entire claim infirm as a matter of law, is untenable particularly where, as here, there was more than ample evidence of the contractual rights/obligations at issue. And it is ***that*** proof of a contractual right that has been singled out as necessary. *See, United States Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 925 (3d Cir. 1990) ("Thus, as a threshold matter, **a contract *right*** must be established."). That is, as the Pennsylvania Supreme Court case cited in *United States Healthcare* for the foregoing proposition makes clear: "any contract ***right*** on [plaintiff's] part that was injured through the actions of [defendant]." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979). And there is certainly not even an argument cited in law or logic to conclude that this, like all other aspects of the claim, cannot be established in the usual way—that is, by ***any*** competent evidence— nor is there any argument that there is some

exception to the usual rules of proof mandating that this claim be proven in one and only one way: by introduction of a written contract.

Defendants cite *Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199 (3d. Cir. 2009) as the only legal basis to support its claim that Plaintiff failed to present sufficient evidence to establish tortious interference. ECF #152-2 at pp. 10-11. Defendants never so much as referenced or argued *Acumed* at any point in the litigation. In any event, nothing about *Acumed* would serve as a basis to alter the verdict here.

First, *Acumed* differs significantly from the facts here, where the *Acumed* jury found a defendant liable on a specific count, *but explicitly found*, as part of its ruling on a different count, that the defendant did *not* engage in the predicate activities that would make the first count actionable, which the Court emphasized as grounds to overturn the jury's finding of liability. *See generally, Acumed*, 561 F.3d at 216-18. That is _not_ what we have here, where the jury found Defendants not only acted intentionally but to such a degree that they awarded punitive damages. Moreover, the appellees in *Acumed* only presented evidence of an *existing* contract between *Acumed* and <u>Surgical</u> (the defendant), _not_ a third-party. *Id* at 212. That is *not* the case here, which include both ample evidence of then existing contracts with Rothman but *prospective* contracts as well.[7]

Secondly, in *Acumed* — there was a potential 'exception' to the usual rules of proof by any competent evidence due to the Best Evidence Rule, which "requires that '[t]o prove the *content* of a *writing*,[8] recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these Rules or by Act of Congress.'" <u>*Acumed, supra,*</u> 561 F.3d at

---

[7] Defendants never sought a specific verdict sheet to separate damages between the then-existing from prospective contracts.

[8] And as set forth, *infra*, this testimony was <u>*not*</u> to prove the context of a writing, as there was no applicable writing.

222 (*quoting*, Fed. R. Evid. 1002). And, in fact, the Court in *Acumed* affirmed *the preclusion by the trial court*, based on this Rule, of appellant-Morris's testimony "regarding buy-out clauses contained in appellant's contracts with other manufacturers and suppliers" where those contracts were "not submitted into evidence or even produced for review at the trial." *Id.*

Yet this only further compels denial of Defendants' motion given the current stage of the litigation here – and what did, and did not, occur at trial. That is, **even** assuming it could have been applicable earlier in this case, it should have no proper place in the case now. Of course, the purpose of such Rules is to govern, *at trial*, the **introduction** of evidence. *If* Rule 1002 could have applied to Plaintiff and Vacarro's testimony about the contract here as it did in *Acumed*, Defendants *should have raised this*—should have moved to preclude such testimony absent introduction of the written contract, or objected to it absent the same, or even, when the contract was not otherwise introduced in Plaintiff's case, moved at the close of Plaintiff's case to strike the testimony. Defendants **did none of those things**, and, thus, waived any challenge thereto.

In any event, waiver aside, the testimony was admitted, unchallenged, to establish the facts at issue, as it did, and there is no law to suggest the evidence could be retrospectively deemed incompetent to establish what it factually did establish solely on the basis that, looking back, it was not the purported 'best evidence.'

Finally, the fundamental truth remains, that the best evidence rule is not applicable under the facts here, in any event. The Best Evidence Rule **assumes** that **the contractual rights/obligations at issue**, as to which Plaintiff and Vaccaro testified—for example, not only as to his basic compensation but his other benefits; the revenue 'numbers' requirement ("1.3 million"), what he would receive by meeting it, and what would happen if he did not, etc.— were *actually* in a written contract. **If they were *not*—**if they were **oral** agreements, or were otherwise

not formally reduced to a written contract—**then not only would the Best Evidence Rule have had *no* possible application at any stage** of the case, **but this entire issue of introduction of a written contract would be *no* issue**, and have **no** place in the case at all. That is, **no** part of the written contract here details anything about the "numbers" to which Plaintiff and Rothman testified, nor does it touch the parameters of how Plaintiff was terminated (or not renewed) as both Plaintiff and Vaccaro described (e.g. a mulligan for COVID). See, also, JX 2 and JX 105 attached as Exhibit "A." This is precisely why Defendants did not object to its lack of introduction but instead permitted all witnesses to discuss the contractual relations that were actually at issue, which are not contained in any writing. Moreover, as the Third Circuit explained in *Acumed*:

> In determining whether there is a ***prospective*** contractual relationship in a tortious interference case, Pennsylvania courts have considered whether the evidence supports a finding that there was an objectively "***reasonable likelihood or probability***" that the contemplated contract ***would have materialized*** absent the defendant's interference. *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 184 (3d Cir. 1997). A "reasonable likelihood" of occurrence is something ***less than a contractual right*** but more than a mere hope that there will be a future contract. *Phillips v. Selig*, 2008 PA Super 244, 959 A.2d 420, 428 (Pa. Super. Ct. 2008) (some citations omitted)

*Id*, 561 F.3d at 213. This is an *objective* standard "which of course must be supplied by adequate proof.'" *Polay v. West Co.*, No. 88-9877, 1990 U.S. Dist. LEXIS 5373, 1990 WL 59351, at *10 (E.D. Pa. May 7, 1990; *see also InfoSAGE, Inc. v. Mellon Ventures, L.P.*, 2006 PA Super 68, 896 A.2d 616, 627-28 (Pa. Super. Ct. 2006).

Rothman admitted there was a contract with Plaintiff. 12/5/23 at 287:20 – 288:17. After Defendants improperly obstructed questioning of Vacarro, the Court asked questions of him, which *confirmed* that Plaintiff's contract was not renewed because he did not "hit a certain [revenue] threshold" to continue "to qualify as a partner" at Rothman, with everyone getting a mulligan. *Id* at 292:24 – 293:19.   Abraham described – without objection – how it takes three years to lose your partnership at Rothman. 12/6/23 at 106:18 and 12/7/23 at 169:1-25. Vaccaro

testified to the same thing, including by *questioning from the court* – again, without objection. 12/5/23 at 292:7 – 294:5.

Abraham always hit his threshold revenue numbers to maintain his partnership when he had access to all of TJUH's operating rooms. 12/5/23 at 291:18-21 and 293:23 – 294:1. The number of plaintiff's surgeries were "***reduced significantly from when before Jefferson told [Rothman President Vaccaro] to suspend him***" from Rothman. *Id* at 294:2-5. [9] Plaintiff only collected 38.87% of the amount billed for surgery at Capital Health whereas at TJUH he was able to collect over 72%, which is how his goal was based. 12/8/23 at 111:2-14. Even Defendants' own "litigation support" expert testified that "if Jefferson did something" that "yes, [it] likely" would impact his revenue production. 12/8/23 at 114:12-23.

As it pertains to interference with *prospective* business relations, Plaintiff was one of the foremost qualified orthopedic oncologists in the country and his former supervisor testified there was no reason he could not be director at other hospitals in the area. 12/5/23 at 247:13-16. Yet, after Plaintiff was forced out of Jefferson and eventually Rothman, Plaintiff could not get privileges at any other reputable hospitals. *Id* at 181:5-7. Plaintiff was the only remaining candidate as the Director of Orthopedics for Lehigh Valley Health Network, with preplanned interview questions for the final board interview. 12/6/23 at 107:3 – 109:3.[10] Jefferson admitted that it would be appropriate for its residents (who were told of Phillips' false narrative by Purtill) to refer any cancer patients to Abraham. *Id* at 40:2-5. Furthermore, Plaintiff would have been entitled to

---

[9] As further evidence that the employment contract with Rothman was not the Best Evidence, Vaccaro himself said, "it's kind of a difficult" to answer what portion of revenue is  based off of surgeries at Jefferson. 12/5/23 351:5-20.
[10] Of course, less than a week after Plaintiff's trial (where Defendants' CFO falsely testified TJU would be forced to terminate employees if any punitive damages award was issued), we now ***know precisely*** who contacted Lehigh Valley. See, e.g., 12/19/23, *Jefferson, Lehigh Valley Health Network Sign Non-Binding Letter of Intent to Combine[.]*, https://www.jefferson.edu/about/news-and-events/2023/12/jefferson-lehigh-valley-health-network-sign-non-binding-letter-of-intent-to-combine.html.

*prospective benefits* of his Rothman partnership, for example, the value for his ownership and buyout, which he never received. 12/8/23 at 117:5-10.

In sum, there was ample evidence that Defendants tortiously interfered with Plaintiff's contractual relations with Rothman and other third parties – all of which came into evidence without objection.

### 2. JEFFERSON'S CONDUCT TOWARD PLAINTIFF WAS NOT PRIVILEGED

First, even assuming a privilege, it would not be absolute, but conditional, capable of being overcome by evidence that it was abused, that Defendants' conduct was not proper or justified. *See, e.g., Constantakis v. Bryan Advisory Servs., LLC*, 275 A.3d 998, 1027 n. 27 (Pa. 2022); *United States Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 924-25 (3d Cir. 1990). Accordingly, any determination that Defendants conduct **was** privileged as a matter of law would, necessarily, have to encompass a determination that there was insufficient evidence from which the jury could have found otherwise; that is, from which the jury could have found, **as it did** – based on the evidence, which was more than sufficient – that Defendants' conduct was **not** privileged or justified.[11]

### 3. ROTHMAN'S DEALINGS WITH ABRAHAM WERE DUE TO JEFFERSON'S CONDUCT

Rothman suspended Abraham because TJUH told them to. 12/5/23 at 244:3-4. TJUH should not have told Rothman to do that but instead let the investigation process play out. TJUH sided with Phillips from the outset because she was a woman and discredited Abraham because he was a man. TJUH told Vaccaro "exactly what [Abraham] needed to say in order to resign from Jefferson." 12/5/23 at 318:2-5. TJUH knew of the "PR Issues" (Tr. 12/5/23 at 127:9-128:8) that

---

[11] In its charge on tortious interference, the Court specifically instructed the jury that, "[e]ven if you find that Defendants intentionally induced, or caused, Rothman … to not perform its Contract with Plaintiff, before finding Defendants liable, Abraham **must prove** that their actions were not privileged. In other words, that Defendants' actions were not justified"—and then listed the factors to be considered in that regard.  12/7/2023 at 100.

would exist if they found against Phillips. 12/6/23 at 112:18-21. Moreover, the Rothman Board learned of Phillips' false rape claims because of Purtill knowingly violated the TJUH strict confidentiality requirement of the Title IX process, which certainly influenced the Board's decision to terminate Abraham at the first opportunity, which was October 2022. Vaccaro told Abraham he could get TJUH to reinstate Abraham if he dropped the TJUH lawsuit. 12/7/23 at 174:21-175:2.

### D.  EVIDENCE OF DAMAGES CAUSED BY JEFFERSON

The Court charged the jury on standard causation – *without objection* by Defendants – for any damages. 12/11/23 at 82:4-25.  Defendants did not make a Rule 50 Motion prior to the jury's deliberation on damages and thus Defendants arguments pertaining to a purported lack of economic loss from either gender discrimination or tortious interference are waived. See, *Unitherm Food Systems, Inc.,* 546 U.S. at 404.  A damages verdict will be affirmed if "there is any view of the case which reconciles the [jury's] various answers." *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 763 (3d Cir. 1990).

Defendants own proposed verdict slip had no question for causation and only included a single line item for damages. ECF# 105. **Both parties** told the jury in closing that the only damages they could award were those "proximately caused by Jefferson's conduct" (12/11/23 at 60:8-12) and "can't be based on speculation, as counsel said, there has to be a proximate causation" (12/11/23 at 70:15-19).

#### 1.  ECONOMIC LOSS FROM GENDER DISCRIMINATION

Yet, even putting aside the clear waiver, Defendants *admitted* there **was** evidence of economic loss. See, e.g. 12/11/23 at 52:10-12 ("But our position in this case is that the only compensatory damages that are at-issue **is what his Expert presented, this $5.1 million**."). Abraham explained how his revenue numbers are strongly dependent on his surgeries at Jefferson.

23

Tr. 12/5/23 at 351:5-352:12. Plaintiff's expert testified to the very question of "[w]hat was the change to the economic impact or the economic position of Abraham as a result of losing his position at TJUH" between 2018 and 20**22**. Tr. Staller at 14:15-22. The answer to that very question was that $5.1 million "represents the economic loss to Dr. Abraham from December 2018 through December 31, 2022 as a result of **losing his position at TJU**." Tr. Staller at 26:13-18.

### 2. ECONOMIC LOSS FROM JEFFERSON'S TORTIOUS INTERFERENCE

Again, waiver aside, there was clear evidence of economic losses and other significant non-economic damages as a result of Plaintiff's separation from Rothman as summarized, *supra*.

### E. PUNITIVE DAMAGES WERE PROPERLY CONSIDERED AND WARRANTED UNDER THE LAW

"'Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" *Empire Trucking Co.*, 71 A.3d at 937 (quoting *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984)). Where a defendant acts, for example, "dishonestly" in informing a third-party of information regarding the plaintiff, punitive damages are warranted. *Id.* at 937, 938 (holding that where defendant provided false information about plaintiff to third-party constituted "dishonesty and lack of business ethics" warranting an award of punitive damages"). Defendant told Rothman to suspend Plaintiff, despite knowing his claims of innocence and his claims against Phillips. Abraham remained suspended with no ability to provide for his family, while TJUH had full knowledge of the exculpatory evidence in the Report and that it was, indeed, Phillips who had committed misconduct not Abraham. By unlawfully and dishonestly forcing Abraham to withdraw from TJUH, he was unable to meet his requisite revenue expectations at Rothman. All the while, TJUH knew the claims against Abraham were belied by the Report they withheld knowing OCR required them to give a copy to Abraham. Purtill –who refused to even read the Title IX report that discredited Phillips

and exonerated Abraham – offered false information to Rothman board members to induce Rothman to suspend Abraham and tarnish his otherwise outstanding reputation; clear defamation with actual malice. Defendant induced Rothman to limit Abraham's ability to work at various Rothman locations without any grounds to establish Abraham sexually assaulted Phillips, just so they could avoid the PR nightmare. Abraham never recovered, lost his buyout, lost his equity, lost his job, his home, his research opportunities, and his reputation was shattered amongst his peers in what should have been a confidential vindication process. Yet, this is but only a few examples of the evidence that established defendants conduct was outrageous and certainly recklessly indifferent and that was more than sufficient for the jury to so find as they did.

## III.   CONCLUSION

In sum, the Court should deny Defendants' Motion for Judgment as a Matter of Law in its entirety. All claimed grounds have either been waived, affirmatively disclaimed, or are the law of the case, and, in any event, all facts and reasonable inferences in Plaintiff's favor are clearly sufficient for a jury to reasonably find liability.

Respectfully submitted,

**THE BEASLEY FIRM, LLC**

BY:   /s/ *Lane R. Jubb, Jr.*
LANE R. JUBB, JR., ESQUIRE
ANDREW M. MARTH, ESQUIRE
Identification No. 319272/330361
THE BEASLEY BUILDING
1125 Walnut Street
Philadelphia, PA 19107
215.592.1000
215.592.8360 (telefax)
lane.jubb@beasleyfirm.com

Dated: ___31 January 2024