**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN ABRAHAM, M.D.<br><br>      Plaintiff<br><br>    v.<br><br>THOMAS JEFFERSON UNIVERSITY AND THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.<br><br>      Defendants. | No. 2:20-cv-02967-MMB |

**JEFFERSON'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW**

**I.     Introduction**

The response filed by Abraham to the Motion for Judgment consists of strident rhetoric and claims that Jefferson waived the arguments it raises now without addressing the substance of the actual arguments on the merits. In fact, a review of the history of how we got here demonstrates that Jefferson did not waive any of the arguments on which it bases its Motion for Judgment and that the Motion should be granted.

**II.    Jefferson Did Not Waive Its Right to Make a Renewed Motion for Judgment as a Matter of Law, Nor Any of the Arguments Made in It.**

Abraham first argues that Jefferson waived its right to make a Rule 50(b) motion at all. He asserts that Jefferson was required to move for judgment as a matter of law "at the close of all of the evidence" to make a renewed motion for judgment as a matter of law post-trial. ECF No. 156-2, at 11–12. He is wrong. In 2006, Rule 50(b) was revised by "deleting the requirement that a motion be made at the close of all the evidence." Fed. R. Civ. P. 50 advisory committee notes to 2006 amendment.[1]

Jefferson did move for judgment as a matter of law during trial – twice – once at the close of Abraham's liability evidence, ECF No. 145, 12/06/23 Tr., at 269:19–270:14; and again at the close of his damages evidence, ECF No. 140, 12/11/23 Tr., at 47:19–50:18. The Court took the liability motion under advisement, ECF No. 145, 12/06/23 Tr., at 273:3–4, and denied the damages motion, ECF No. 140, 12/11/23 Tr., at 8:22. Rule 50(b) plainly permits Jefferson to renew its motion post-trial.

---

[1] *See also* 9B Wright & Miller Fed. Prac. & Proc. Civ. § 2537 (3d ed.) (The 2006 "amendments revised Rule 50(b) to permit renewal after verdict of *any* Rule 50(a) motion for judgment as a matter of law. ***This abolished the earlier requirement that a motion for judgment as a matter of law had to be made at the close of all the evidence***." (emphasis added)).

Abraham also claims that Jefferson waived certain arguments made in its renewed Motion. He claims that Jefferson waived its argument concerning Abraham's burden of proof at trial when Jefferson moved for judgment as a matter of law. ECF No. 156-2, at 2. During its Rule 50 presentation, Jefferson's counsel argued that Abraham had "not introduced any evidence that any of the Defendants' actions were based on his sex." ECF No. 145, 12/06/23 Tr., at 272:15–16. That is precisely what Jefferson is again arguing: Abraham failed to establish that Jefferson took an action motivated by his gender that resulted in the harm of which he complains.[2]

### III. The Evidence Introduced at Trial Was Insufficient to Establish a Title IX Violation.

In a Title IX discrimination case, the ultimate question is always: "Could a reasonable jury—presented with the facts alleged—find that sex was a motivating factor in the University's disciplinary decision?" *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021); *see also Doe v. Univ. of the Scis.*, 961 F.3d 203, 209 (3d Cir. 2020). A plaintiff who attacks a Title IX proceeding must prove that the university took some action, motivated by improper gender bias ***and*** that he was damaged by that action. *See Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 773–74 (3d Cir. 2020) (proof of a gender-motivated outcome requires the plaintiff to "impeach[] the accuracy of the proceedings against him" ***and*** that the action was the result of gender bias). Beginning with the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994), courts have identified theories by which a Title IX plaintiff could prove the challenged action was motivated by gender and damaged someone, namely (1) selective enforcement, (2) deliberate indifference, and (3) erroneous outcome. The point of the theories established in *Yusuf* is to ensure

---

[2] Alternatively, even should the Court deny this motion, the grounds raised herein can form the predicate for a ruling granting Jefferson a new trial, which ruling is subject to a less standard and burden. *See Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995); *Windsor Shirt Co. v. N.J. Nat'l Bk.*, 793 F. Supp. 589, 601 (E.D. Pa. 1992). Consequently, even if the Court declines to enter judgment in favor of Jefferson and against Abraham as a matter of law, the Court may decide that the arguments raised in this motion warrant granting a new trial. Thus, the arguments raised in this motion, and additionally set forth herein, are incorporated by reference into Jefferson's accompanying post-trial motion seeking a new trial.

the jury has some structured way in which to find that the challenged action was motivated by the plaintiff's gender, not some non-discriminatory factor, and that the plaintiff was harmed by the action. *See Univ. of Denver*, 1 F.4th at 830 ("[E]vidence of an erroneous outcome or selective enforcement are means by which a plaintiff might show that sex was a motivating factor in a university's disciplinary decision."); *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) ("[a]ll of these [theories] simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student"). A plaintiff who is challenging university-imposed discipline might choose to prove a Title IX violation in a number of ways, but the plaintiff's burden remains the same: the challenged action taken by the university must have been motivated by the plaintiff's gender. *See Univ. of Denver*, 1 F.4th at 830; *Univ. of the Scis.*, 961 F.3d at 210. In fact, as argued in Jefferson's Rule 50 motion at trial, the evidence introduced cannot sustain a burden of demonstrating "the Defendants' actions were based on his sex." ECF No. 145, 12/6/23 Tr., at 272:15–16.

Contrary to the argument made by Abraham in his response, nothing in the *Doe v. University of the Sciences* case changes that. *University of the Sciences* was a case that addressed how courts must address motions to dismiss, not fundamental issues of factual proof of liability and damages at trial that make sense and provide a jury a basis to conclude that wrongful conduct took place and that the plaintiff was damaged. In the context of a motion to dismiss, the *University of the Sciences* Court said,

> [w]e agree with the Seventh Circuit and "see no need to superimpose doctrinal tests on the [Title IX] statute." Thus, we adopt the Seventh Circuit's ***straightforward pleading standard and hold that, to state a claim under Title IX***, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex. Although parties are free to characterize their claims however they wish, this standard hews most closely to the text of Title IX.

3

961 F.3d at 209 (emphasis added) (citations omitted).  The Third Circuit said nothing about a plaintiff's burden *at trial* to articulate and prove a Title IX violation and tie damages to it.  *Cf. Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 927 (S.D. Iowa 2018) (Title IX pleading standard is an "inapt" comparison to a plaintiff's summary judgment burden).

There is no dispute about that.  The Court charged the jury accordingly:

> You must award Plaintiff an amount that will fairly compensate him for any injury ***he actually sustained as a result of the Defendants' conduct***. . . . The damages that you award must be the fair compensation, no more and no less.  The award of compensatory damages is meant to put Plaintiff in the position he would have occupied, ***if the conduct had not occurred***.  Plaintiff has the burden of proving damages by the preponderance of the evidence.  Plaintiff must show ***that the injury would not have occurred without the Defendants' act***.
> . . . .
> Compensatory damages must not be based on speculation or sympathy.  They must be based on the evidence presented at trial and only on that evidence.

ECF No. 140, 12/11/23 Tr., at 82:1–25 (emphases added).

Jefferson urged the Court repeatedly to impose some structure on Abraham's Title IX claim in the form of selective enforcement or erroneous outcome.  ECF Nos. 17, 69, 110, 138, 12/5/23 Tr., at 96:10–13.  What Jefferson tried to avoid is exactly what happened at the trial.  Abraham—to this day—has failed to articulate what action taken by Jefferson he claims harmed him and instead resorted to generalized claims of "gender bias."  In the end, he proved nothing.

It is useful to review how we got here.

On November 30, 2023, only days before trial, the Court held oral argument on a variety of trial issues.  There was an extensive discussion of the evidence that would be permitted and the theory of liability.  Abraham contended that: "What occurred at the party from Dr. Abraham's mind or Dr. Phillips' mind is not the issue . . . here.  What is at issue is what was relayed to Jefferson."  ECF No. 143, 11/30/23 Tr., at 31:20–22.

4

The Court observed that it understood that Abraham was contending: "The issue was whether Jefferson was liable to you for not conducting a proper Title IX investigation. That's what you're alleging[?]"  *Id.* at 32:3–5.

Asked what Abraham's counsel planned to ask of Dr. Abraham, Abraham's counsel assured the Court:

> Your Honor, I only intend to ask Dr. Abraham the relevant questions pertaining to what he informed [] Jefferson. That's where I am going. I am not asking him to be like why did you throw the party? I mean there is some stuff that might be background but it's all stuff they knew.

*Id.* at 33:22–34:1.

Mr. Harvey argued to the Court that Jefferson did not view it that way and that at trial, he predicted, Abraham would argue to the jury that Dr. Abraham's version of the events that took place at the party *was* relevant and *was* correct. Mr. Harvey argued:

> Counsel's going to eventually argue in his closing to the jury, okay, that based upon the evidence that they have heard here in this courtroom, okay . . . [t]hat the investigation and the law firm and then Jefferson's investigation, ultimately, ***should have drawn a different conclusion*** – that they should have charged not Dr. Abraham but Dr. Phillips with some kind of sexual assault against Dr. Abraham, okay? And that Jefferson was the one with sufficient knowledge that that was Dr. Abraham's position. ***That rather than being the predator at the party he was the victim***, okay . . . . that they were on sufficient knowledge that that was his position – a position that he never took and articulated to Jefferson until after he resigned his privileges at Jefferson in December 2020, okay? That's what they are going to eventually argue – that we did not, that the investigation was gender biased under Title IX. And because it was gender biased, he has suffered all these damages and therefore, Jefferson University should pay him all of his money. ***That's what their argument to the jury is going to be ultimately, okay?*** And they are going to base that, okay, on Dr. Abraham's now contrived testimony respectfully[.]

*Id.* at 34:21–35:19.  Mr. Harvey's prediction was eerily perceptive, as will be seen.

The Court then asked Abraham's counsel whether that was correct and the response was, "No, Your Honor."  *Id.* at 35:21; *see also id.* at 9:11–13.

5

The next day, the Court issued a Memorandum. The Court explained that it had done extensive research into Title IX cases, but found virtually no reported cases as to how the Court should conduct the trial in this kind of case. The Court then began its ruling by observing that "what happened at the party is really not relevant." ECF No. 112, at 2. The Court explained that it believed it was inappropriate to have the jury spending many hours listening to conflicting testimony about the party "which is not relevant" and which would be "inflammatory and unnecessary, if not prejudicial." *Id.* The Court held "the specific encounters between plaintiff and any other guests at his party are simply not relevant." *Id.* at 3.

Then the trial happened. And it was conducted as the Court ruled – there was no evidence presented as to the truth of what happened at the party. ***None.*** Time and time again, the court ruled the evidence offered was not offered for the truth. *See* ECF No. 137, 12/4/23 Tr., at 12:24–15:7, 24:7–21, 33:3–12, 124:4–20, 215:6–12; ECF No. 138, 12/5/23 Tr., at 113:1–19, 172:14–173:5, 223:11–24, 226:18–227:4 (instances where the Court stated that evidence of what happened at the party was "not being offered for the truth of the matter asserted")

But that did not mean Mr. Harvey's prediction as to what Abraham would argue that the jury should find was incorrect. Look at the closing. It is exactly the arguments Mr. Harvey predicted at the November 30 oral argument. The closing was replete with references to what happened at the party and each and every time a reference is made to what happened at the party the argument only makes sense as a request to the jury to conclude that Dr. Abraham's version of what happened at the party was true. Perhaps the most glaring example occurred when Abraham's counsel argued to the jury that Dr. Phillips's accusations about Dr. Abraham were "lies," ECF No. 146, 12/7/23 Tr., 50:8, an argument that could only be made if one were trying to ask the jury to conclude that Dr. Abraham's version of what happened at the party was true – something he

6

contended he was not trying to do and that the Court found to be "irrelevant." Other examples abound – too numerous to include here within the Court's page limitations. We attach as Exhibit A hereto a list of the many times that Abraham argued to the jury that which he assured the court prior to trial that he would not offer evidence to prove, and did not prove – namely, that Dr. Abraham's version of the evening's events was true.

In sum, there is no way to view the arguments made by Abraham – *as opposed to the proof – which did NOT include ANY evidence as to what happened at the party, by Abraham's design* – as anything other than but an effort to prove that Dr. Abraham's factual account of the party and his and Dr. Phillips's sexual encounter was accurate and that Dr. Phillips's was not. Hence, the argument in the final moments of the closing, asking the jury to include that Dr. Abraham's claim that "I know I didn't do anything wrong" was true and that Dr. Phillips should be found by the jury to be a liar and a "malignancy." ECF No. 146, 12/7/23 Tr., at 64:19, 21, 67:10–11.

One must then ask why, if at his own request, Abraham offered no evidence as to what actually happened at the party – and the court admitted none – did Abraham ask the jury to conclude Dr. Abraham's version was true?[3]

The reason, we suggest, is that the only way a jury could possibly find in his favor and award him the damages he was awarded is if it was convinced that his version of the party's events was true.

The precise action that Abraham alleged to be the product of intentional discrimination was vague and constantly shifted. Sometimes, at trial, the allegedly discriminatory "action" taken by

---

[3] Separately, in Jefferson's Motion for a New Trial, Jefferson will address the issue of whether – if there was evidence offered as to what happened at the party – it was improperly denied the right to offer its evidence of what Dr. Abraham did at the party. When Jefferson tried to proffer evidence of the real-time contemporaneous text messages sent by Dr. Abraham, at a time when he was sober, that notwithstanding his sexual advances on Phillips, he was being "cocked blocked" in his wishes to have sex with Dr. Phillips, Jefferson was not allowed to offer that proof. Had it been admitted, that evidence surely would have been critical to any jury asked, as this one was by Abraham, to conclude that Dr. Phillips told "lies" and was a "malignancy."

Jefferson had nothing to do with Dr. Abraham himself, but with an alleged discriminatory failure to open a separate investigation into the possible violation of the Title IX policy by Dr. Phillips in her conduct towards others. The argument seems to have been that the failure to do so was the result of discrimination because Dr. Phillips was a female. With respect to that theory of liability, it might not have been necessary to prove the truth of what happened at the party because the claim of discrimination was not that some incorrect conclusion about what happened at the party had been reached as a consequence of discrimination, but only that no separate investigation had been opened when the allegations of improper conduct were made. To conclude such discrimination occurred one need not prove the truth of the allegations, only that they were made – and, of course, that the reason a separate investigation was not opened was due to intentional discrimination. But another necessary consequence of that theory of liability, of course, would have been that there would be no damages suffered by Dr. Abraham if that were the action that was the product of discrimination by Jefferson, for the mere fact that no investigation was opened into Dr. Phillips's conduct separate from the investigation that took place with regard to Dr. Abraham's conduct would not have produced a single dollar of damages to Dr. Abraham, simply as a matter of basic causation. Failure to open an investigation into her conduct towards others might have benefited her, one might suppose, but been irrelevant to him.

Sometimes the argument seems to have been that the discriminatory "action" on the part of Jefferson that created the liability under Title IX was the failure to discipline Dr. Phillips by some sort of suspension or other penalty. But again, the problem with that theory of liability is the failure to discipline Dr. Phillips in some manner did not produce a single dollar of damage to Dr. Abraham. There was no articulation in the slightest as to how he would have benefited if she had been suspended or otherwise disciplined for her conduct.

Sometimes the argument seems to have been that the "action" taken by Jefferson was, as stated by the Court on November 30, that Jefferson was "not conducting a proper Title IX investigation." ECF No. 143, 11/30/23 Tr., at 32:3–5. That was the theory of liability articulated at the November 30 conference. But what does that mean? Even that is ill-defined. How was it improper? Was it concluded too quickly? Did it take too long? Did it reach the wrong conclusion? And, with respect to that theory, there is no proof whatsoever that the Title IX investigation process was ever concluded. The report that was generated by Mr. Alfano reached no conclusion. *See* ECF No. 145, 12/6/23 Tr., 287:21–24. There was a notice sent to Dr. Abraham stating that it was not possible to reach a conclusion without convening a hearing, *see* JX-53 (attached hereto as Exhibit B) at which point Dr. Abraham, then represented by numerous lawyers, concluded that he was going to resign from Jefferson, not wanting to undergo the hearing at which the truth of what happened at the party would in fact be explored, with all participants having every opportunity to offer whatever proof it wanted.

Was Jefferson's conclusion that an evidentiary hearing was necessary to resolve the matter – at which all parties would be afforded an opportunity to offer evidence – the action that constituted the discriminatory conduct? That is, is the claim that Jefferson should have looked at the evidence it had at the time and concluded that Dr. Abraham should be exonerated without a Title IX hearing?

Sometimes the argument seems to have been that the discriminatory conduct on the part of Jefferson was the prediction by Mr. Toy that he did not have confidence that the outcome of the hearing that was offered would be favorable to Dr. Abraham. *See* ECF No. 145, 12/6/23 Tr., at 373:3–8. Was that the conduct of Jefferson at issue?

9

Unfortunately, the trial was conducted without any direction or instruction to the jury from the Court as to these matters, despite Jefferson having argued prior to the trial that some articulation of the theory of liability beyond mere "discrimination" was required to establish liability. The Court, in reliance upon the *University of the Sciences* case, we respectfully believe improperly, declined to do that, and the result was what Jefferson believes to have been an amorphous, ill-defined claim.

But here is the problem: if either of the latter two theories were Abraham's theory of liability – the alleged "discriminatory" conduct towards Dr. Abraham that constituted a violation of Title IX – then what about his damages? In either model, the wrong theoretically done to him was depriving him of the opportunity to have a hearing at which he could – in a setting where that was legitimately the actual issue to be addressed, namely "what happened at the party" – offer whatever proof he wanted.

But in that case, just like a legal malpractice case, one must prove not only that a wrong was done, but also be able to articulate in a rational manner how the wronged party was harmed so that the finder of fact could assess the appropriate amount of damages, if any, to be awarded. The wronged party must prove the case within the case.

*St. Joseph's University* is a perfect example. In that post-*University of the Sciences* case, at the summary judgment stage of the proceedings, the court considered an appeal for a grant of summary judgment to a defendant university in a Title IX case. Judge Matey, one of the panel members in *University of the Sciences*, applied the applicable selective enforcement and erroneous outcome tests to the Court's analysis of the proofs on summary judgment. *St. Joseph's Univ.*, 832 F. App'x at 773–75. Addressing an erroneous outcome claim, the Court said, "to prevail on an erroneous-outcome claim, a plaintiff must "cast some articulable doubt on the accuracy of the

10

outcome of the disciplinary proceeding" and then show "***particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding***." *Id.* at 773 (emphasis added). That is the point, one must show that the result was actually erroneous, for otherwise one cannot show either liability or that one was damaged by the challenged conduct. Here, even if Abraham could prove the former—which is impossible, as he himself prevented any outcome from occurring by resigning before the board could be convened, hear evidence, and render a decision—he certainly did not prove the latter, that any supposed erroneous decision was a result of gender discrimination.

That is, if the wrong done to Dr. Abraham as a result of sexual discrimination was the failure to give him an opportunity to prove that he should not be disciplined, then to prove that he was ***damaged*** by the loss of that opportunity, he would have had to prove that by offering evidence of what would have happened at the hearing. He would have had to offer proof that he would have been exonerated or, if not totally exonerated, at least not disciplined in such a way as to lose his job. Otherwise, an assessment of damages is sheer speculation.

And that explains what Abraham actually was trying to do at the trial. Abraham knew that if he succeeded in establishing liability that Jefferson had rushed to judgment improperly and come to the wrong conclusion without a hearing, he would have to prove damages. For the reasons just demonstrated, the only way to prove damages – if the allegedly improper conduct consisted of the failure to allow him to have a hearing by somehow forcing him to resign before the hearing took place – then he would have to prove what would have happened at the hearing. Hence, Abraham needed to prove the truth of what happened at the party, something he purposefully did not do.

But the problem, of course, is the trial was not conducted on that basis  The trial was conducted on the premise that what happened at the party was "irrelevant," and **NO** proof of that

11

was offered or admitted. And that was not because of Jefferson's choice of theories and proofs, but of ***Abraham's***. That is, Abraham claimed and asserted to the Court that it would conduct the entire trial and never offer proof or ask the jury to conclude what actually happened at the party and afterward.[4]

Abraham was now in a trap, one created by himself. He wanted to try the case on liability by claiming that the truth of what happened at the party did not matter, but his theory of damages is premised on the theory that the proof of what happened at the party was critical. For the only way he can have suffered the damages he claims to have suffered and as to which he offered proof would be if in fact there were a properly conducted Title IX examination, he would have been exonerated.

Two things cannot simultaneously be true. It cannot be true that the truth of what happened at the party is irrelevant – and yet that Dr. Abraham was damaged by the failure to conduct a "proper investigation," with his definition of a "proper" investigation of necessity being one that would have run to conclusion, with full unfettered participation by him and Jefferson to discern the truth of what happened, and where he would have been exonerated.

Thus, at its very foundation the claim of Abraham and the theory upon which the court conducted the trial was fundamentally faulty, and cannot possibly sustain the verdict here. It is not possible in that scenario to award him $15,000,000 in damages unless there is some proof that

---

[4] He did that for an obvious reason: he wanted to avoid an examination of his conduct – ***for the truth of it*** – before the jury, including, most notably, but hardly exclusively, by having the jury see that he wrote a text to a friend at the party at a time he was by his own account *not* intoxicated, 10:59 p.m., telling that friend he had been "cock-blocked," a term used to describe what occurs when a third person interferes with (i.e., blocks) the intentions of a man to have sex with another (at least at that point) by an unnamed person. Doing so would have given the "lie" – to use a term used by Dr. Abraham's counsel to describe his view of Dr. Phillips' version of the events. We daresay that if the text were shown to the jury, it would not have concluded that Dr. Phillips was "lying" and a "malignancy." He succeeded, the premise of the trial was that such information was irrelevant, but for the reason explained in the text – that has consequences.

12

he has been exonerated.  In other words, the theory and proof of liability and damages cannot be harmonized.

For this reason, the Court should – Jefferson respectfully believes, must – enter judgment for it because the proofs offered by Abraham as to whether "the Defendants' actions were based on sex," ECF No. 145, 12/6/23 Tr., 272:15–16, – which he admits omitted any effort to prove what actually happened – cannot possibly sustain the verdict that included a damage award.  It is not possible under the law.

### IV.     There Was No Evidence of Tortious Interference.

Abraham now argues that he proved tortious interference with prospective contractual relations.  But this was never a claim in the lawsuit.  Abraham's claim was that Jefferson interfered with a written contract between him and Rothman, which Abraham never bothered to introduce into evidence.  Indeed, the Court instructed the jury that the tortious interference claim was with respect to Abraham's contract with Rothman.  *See* ECF No. 146, 12/7/23 Tr., at 99:12–16.  Any references to any other contract, written or oral, prospective or actual, hoped for or speculative, are irrelevant and should be disregarded.  Abraham cannot now rely on alleged evidence of supposed "prospective contracts" to retroactively support his claim for tortious interference.

Also, a defendant cannot interfere with a business relationship that already has been terminated, or for which the decision to terminate the relationship either has been made already or is inevitable.  *ATF Trucking, L.L.C. v. Quick Freight, Inc.*, 2008 WL 2940795 (E.D. Pa. July 29, 2008); *Devon Robotics v. DeViedma*, 2012 WL 3627419 (E.D. Pa. Aug. 23, 2012) (finding lack of intent where there was an "already depreciating relationship"); *Stout v. Peugeot Motors of Am.*, 662 F. Supp. 1016 (E.D. Pa. 1986) (granting motion for judgment notwithstanding the verdict because the actions allegedly taken by the interfering party had no influence on the contractual counterparty's decision to terminate the agreement, which decision had already been made at the

13

time the interfering party was alleged to have acted); *In re Prithvi Catalytic, Inc.*, 571 B.R. 105, 124 (Bankr. W.D. Pa. 2017) (dismissing claim for tortious interference with contractual relations because defendants could not have intended to tortiously interfere with a business expectancy that was already extinguished by the counterparty).

While Abraham argues causality on the ground Vaccaro supposedly told Abraham that he could get his Jefferson position back if he "dropped the TJUH lawsuit," *see* ECF No. 156-2, at 23, this lawsuit was not filed against Jefferson until nearly two years after Abraham voluntarily resigned from his position at Jefferson. Thus, there can be no causal connection between the two. Moreover, Abraham claims that Rothman's decision to terminate him at the "first opportunity" in October 2022 was because "Purtill knowingly violated the TJUH strict confidentiality requirement of the Title IX process." *Id.* Purtill was permitted to speak to his fellow Rothman Board members and—indeed—has a duty to because he himself was a Rothman Board member, and what was being discussed was whether another Board member (Abraham himself) should remain employed at Rothman. There was no evidence presented that any act or inaction of Jefferson caused Rothman to not renew Abraham's contract in 2022, several years after the matter concerning Abraham's position at Jefferson was closed. Rothman made an independent decision to not renew Abraham's contract, and Abraham did not—and cannot—establish causation or even the most attenuated of connections. Rothman made an independent decision with respect to what to do with Abraham's contract; this had nothing to do with Jefferson; and Abraham—if he is aggrieved by this—should take it up with Rothman in his pending arbitration against them. *See* ECF No. 145, 12/6/23 Tr., at 106:1–20.

**V.    Other Damages Claims Not Supported by the Evidence.**

In addition to the damages issues discussed above, Abraham presented insufficient evidence to prove his damages. Indeed, while he claims that Jefferson "induced Rothman to limit

14

Abraham's ability to work at various Rothman locations," he offers no citation to the record to support this point. The evidence at trial showed quite the opposite. Abraham continued to be employed by Rothman and worked at various locations, including Capital Health, until his termination in October 2022. *See* ECF No. 45, 12/6/23 Tr., at 102:1–10. Also, because Abraham never introduced the Rothman contract into evidence, he did not establish that he had any contractual right to work at Jefferson as opposed to any other location where Rothman provided services. Without evidence of such a contractual right, there can be intentional interference with that right – yet, Abraham's entire damage theory was predicated on an allegation that he had a right to work at Jefferson as opposed to at other Rothman locations. Further, the damages Abraham was awarded at trial do not reflect the evidence presented. Abraham's expert witness testified that Abraham claimed compensatory damages in the amount of $5.1 million. However, Abraham offered no evidence to support the $6 million in compensatory damages. That is yet another reason the jury's verdict cannot stand.

**VI.   Conclusion**

Jefferson respectfully requests the Court grant its motion for judgment as a matter of law.

Dated: February 16, 2024        Respectfully submitted,

                                                KLEHR HARRISON HARVEY
                                                BRANZBURG LLP

                                                By:  */s/Stephanie  D. Wolbransky*
                                                       William A. Harvey
                                                       Lisa A. Lori
                                                       Stephanie D. Wolbransky
                                                       1835 Market Street | Suite 1400
                                                       Philadelphia, Pennsylvania 19103
                                                       Telephone:  215-569-2700
                                                       wharvey@klehr.com
                                                       llori@klehr.com
                                                       swolbransky@klehr.com

                                              COZEN O'CONNOR

                                              By:  */s/ Brian P. Flaherty*
                                                       Brian P. Flaherty
                                                       One Liberty Place
                                                       1650 Market Street | Suite 2800
                                                       Philadelphia, PA 19103
                                                       Telephone: 215-665-4647
                                                       bflaherty@cozen.com

                                            Attorneys for Defendants, Thomas Jefferson
                                            University and Thomas Jefferson University
                                            Hospitals, Inc.

## **CERTIFICATE OF SERVICE**

I, Stephanie D. Wolbransky, hereby certify that on February 16, 2024, I caused a true and correct copy of the foregoing Motion to be served on all counsel of record via the Court's ECF system.

*/s/ Stephanie D. Wolbransky*
Stephanie D. Wolbransky