# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN ABRAHAM, M.D. <br><br> Plaintiff <br><br> v. <br><br> THOMAS JEFFERSON UNIVERSITY AND THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC. <br><br> Defendants. | No. 2:20-cv-02967-MMB |

**JEFFERSON'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A NEW TRIAL**

I.      **Introduction**

The jury's verdict and how the case was tried are incompatible. It cannot be true that both judgment was properly entered premised on the idea that Jefferson did "not conduct[] a proper Title IX investigation" that exonerated Dr. Abraham, ECF No. 143, 11/30/23 Tr., at 32:3–5, **and** that Jefferson could not question the credibility of Dr. Abraham and the veracity of his account of what happened between him and Dr. Phillips. The Court should either enter judgment for Jefferson or grant a new trial.

II.     **Abraham Misstates this Court's Authority to Grant a New Trial on Weight-of-the Evidence Grounds.**

Abraham misstates the law when he claims that a new trial motion cannot be premised on a weight of the evidence argument unless the movant filed a motion for judgment as a matter of law arguing insufficient evidence at the close of all of the evidence. Sufficiency of the evidence and weight of the evidence challenges are not the same thing, as the case cited by Abraham explains. *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 365 (3d Cir. 1999) (a weight-of-the-evidence argument allows the court to "critically evaluate the evidence and exercise its discretion in favor of a new trial because the probative evidence in their favor as contrasted with that opposed is overwhelming. ***This is not a position that can be taken in support of a Rule 50 motion for judgment as a matter of law*.**" (emphasis added)). A court may consider a weight of the evidence argument under Rule 59(a) even if a party did not make a Rule 50(a) motion. *See Keller v. Cnty. of Bucks*, 209 F. App'x 201, 205 (3d Cir. 2006) ("***[T]he failure to move for judgment as a matter of law does not preclude review on a 'weight of the evidence' claim***." (citing *Greenleaf*, 174 F.3d at 365) (emphasis added)). Moreover, even if a Rule 50(a) motion was a predicate to moving for a new trial on weight-of-the-evidence grounds (which it is not), ***Jefferson made a Rule 50(a)***

*motion at trial*. ECF No. 165, at 2.[1] This Court can consider whether the jury's verdict was against the weight of the evidence in connection with Jefferson's alternative request in its Motion for Renewed Judgment as a Matter of Law. ECF No. 152-2, at 5. These arguments are incorporated by reference herein. Even if judgment in Jefferson's favor is not warranted, a new trial clearly is.

### III. The Excluded Evidence Is Highly Relevant and Should Have Been Allowed at Trial.

Plaintiff's argument that the Court properly prohibited any use of the two texts authored by Dr. Abraham and of statements made by Dr. Abraham through his agent, his lawyer, are entirely without merit. A district court has "wide[] latitude" to order a new trial where an erroneous evidentiary ruling prejudiced the moving party. *Reynolds v. Univ. of Pa.*, 684 F. Supp. 2d 621, 627 (E.D. Pa. 2010) ("Where, on the other hand, the asserted basis for a new trial involves a matter originally within the trial court's discretion—*e.g.*, evidentiary rulings—the court has much wider latitude." (citing *Klein v. Hollins*, 992 F.2d 1285, 1289–90 (3d Cir. 1993))).

Plaintiff first argues that the Court in this case was limited to admitting evidence of only the information upon which Jefferson relied in acting as it did before Dr. Abraham withdrew from the Title IX process in December 2018. Dr. Abraham relies upon *Rullo v. University of Pittsburgh*, 2021 U.S. Dist. LEXIS 29877 (W.D. Pa. Feb. 18, 2021), for support. That case is completely unlike this one. In that case, the materials involved were the contents of police reports and the information in them was entirely unspecified. There was no reason to think those materials consisted of statements made by Ms. Rullo. Here, in contrast, the material sought to be admitted are statements made **by Plaintiff**. Moreover, the claim by Ms. Rullo in that case was that the University had concluded the investigation. Here, there was no conclusion. Dr. Abraham's only

---

[1] A party can move under Rule 50(a) for judgment as a matter of law "at any time before the case is submitted to the jury," Fed. R. Civ. P. 50(a), and can renew the motion for judgment as a matter of law under Rule 50(b) after the verdict, Fed. R. Civ. P. 50(b). Contrary to Abraham's argument, a party need not make a Rule 50 motion "at the close of the evidence" to raise issues under Rule 50(b). *See* ECF No. 165, at 2.

2

claim that supports the award of damages is that he withdrew from the process before it ended, claiming that if he had participated in the process, he somehow knew it would not reach the correct result, and that a properly conducted process, had it been concluded, would have exonerated him.

That makes the case entirely different from *Rullo*. Here, information about Plaintiff's contemporaneous statements about what happened at the party are not only relevant, they are critical to an adjudication of this case.

***First,*** as demonstrated in Jefferson's Motion for Judgment as a Matter of Law, ECF Nos. 152-2, 165, Dr. Abraham's theory of liability and damages requires that he prove what happened at the party. His sustained effort to argue to the jury that his version of what happened at the party was truthful is an implicit admission of that and can only be explained as such (although, in fact, he supplied no basis for the jury to conclude that since none of the evidence offered by him and admitted was ***not***, as he claims, offered for the truth of what happened at the party).[2]

***Second***, contrary to his statements, he did offer evidence at trial that went beyond what he claims he told Jefferson and/or Rothman before he withdrew from the Title IX process. As explained in the briefing on the Motion for Judgment, while superficially couched in terms of what he told Jefferson or Rothman, in fact, Abraham's testimony consisted oftentimes of assertions that never were told to Jefferson or Rothman. One example is his volunteering – in an answer wholly nonresponsive to the cross-examination question he was asked that Dr. Phillips had poured alcohol down his throat against his wishes. This was part of his claim – asserted because he wanted the jury to believe it was true – that she had gotten him drunk at the party and therefore his participation in the sexual activity was nonconsensual. ECF No. 145, 12/6/23 Tr., at 125:9–24. There is no

---

[2] As demonstrated in the Motion for Judgment as a Matter of Law, the only way Plaintiff can justify the entry of damages in his favor is if he can show the truth of what he was complaining about namely, that if there had been a fair process, he would have prevailed. *See* ECF No. 165, at 5–14.

3

evidence that he ever told that story to anyone at Jefferson prior to the trial and that story was told only for one purpose, to try to convince the jury that it was true.

***Third***, Plaintiff took the stand in this case, and even assuming for the sake of discussion that the foregoing arguments about relevance are not enough, surely it must be so that Jefferson may confront Dr. Abraham with or otherwise offer evidence relevant to the issue of whether his testimony was truthful and complete. That is, Dr. Abraham took the stand and testified at length about what he claimed he told Jefferson. He testified at length about his conviction that he was the victim and that Dr. Phillips was the aggressor. We certainly hope that neither in December, when Dr. Abraham testified, nor now, in briefing post-trial motions, did he believe that whether he was telling the truth in his testimony is "irrelevant." We suspect that the Court and jury would be surprised to hear that, and if Dr. Abraham does rely on such a remarkable assertion to defend the "irrelevance" of the evidence proffered by Jefferson, we ask that he clearly so state.

Surely, the testimony of Dr. Abraham as to what he told Jefferson personnel was offered to attempt to demonstrate that he was providing to them what he believed to be a truthful account of what happened at the party. He was saying to the jury, in effect:

> Here is what I told Jefferson, and my account at the time I told it to them was truthful then and is truthful now.

We at least hope that is what his testimony intended to convey, for the alternative could only be this:

> Here is what I told Jefferson and it is irrelevant whether or not what I told them was true. If I made it up, that doesn't matter. Jefferson is still liable to me, even if I fabricated the story I told Jefferson. Challenging its truthfulness is beyond the scope of the trial.

It should not be necessary to say that would be shocking, if true.

Indeed, if the purpose of calling Dr. Abraham to testify about what he told the Jefferson was not to ask the jury to conclude that he was testifying truthfully and completely, telling the

4

"whole truth," as the oath says, then we don't understand why he was called to testify at all. Of course it was to offer to the jury proof that he was claiming that he had truthfully made the report that he did. And if that's true, how could it possibly be that his truthfulness could not be challenged by confronting him with inconsistent statements made by him, and with which he was fully familiar at the time he made the accusations and when he testified? How could it possibly be that Dr. Abraham can claim that his entire case rests on what he claims is the manner in which his truthful accusations against Dr. Phillips were handled; and then claim that he may not be cross-examined as to whether or not he was telling the truth when he made those accusations?

Imagine, that a student at an institution subject to Title IX reports to the relevant authorities at the institution that she was sexually assaulted by a fellow student and supplies a statement describing the assault in detail, claiming the sexual advances were completely uninvited and nonconsensual, and then claims that the institution improperly ignored the report, never opened a file and concluded the fellow student did nothing wrong without investigation. Again, assume that she left out of her report that just before the assault she had exchanged texts with a third party stating that she had invited the fellow student to her apartment and was intending or at least considering having sexual relations with him. She then takes the stand at a trial, contending the institution was required to open an investigation into her fellow student's behavior because she made truthful and credible accusations, and, that when she made those accusations, she was telling the truth. She left out of her testimony any mention of the text she sent just before the alleged assault. Is it possible the university could not challenge the truthfulness of her testimony by using the text – whether it knew about it at the time of the investigation or not? We suggest the answer to that question is of course not.

With this in mind, now let's look at the particular statements of Dr. Abraham and examine the individualized arguments about them and their alleged "irrelevance":

### A. The "Young Hot Single Female" Text

Regarding the "Young Hot Single Female" Text, Plaintiff makes what amounts to arguments that he might have made to a jury as to why they should not place much weight on that text, namely, that it mentioned only that he was interested in single females, it was written a month before the party, and included a "crying-laughing emoji." *See* ECF No. 161-2, at 12. Surely the fact that a witness may have some way to attempt to explain away evidence that contradicts his testimony is not a reason to exclude it. The jury should hear it, and decide if his explanation is satisfactory. That is particularly true if, as is so here, there are other even more problematical texts that corroborate the point made by the "Young Hot Single Female" Text.

### B. The "Cock Block" Text

As to the "Cock Block" Text there is no real answer in the Response. *See id.* Plaintiff says only that it "clearly says '[Dr. Phillips[3] is] one of my residents so I really can't anyway," ECF No. 161-2, at 12, but far from explaining the lack of relevance, all that purported explanation does is highlight one – only one – reason that the text is so relevant: namely, that it represents a real-time expression of Dr. Abraham's complete awareness of the gross impropriety of his having sex with his student.

But more importantly, the argument completely ignores the even more relevant components of the text exchange: (1) the lack of denial of his friend's contemporaneous observation that it appeared to him that Dr. Abraham was intent on having sex with Dr. Phillips, as evidenced by the friend's unfortunately unheeded admonishment, "Don't do it?" and (2) the

---

[3] The text does not refer to Dr. Phillips by name, but it is obvious that is the person to whom Dr. Abraham was referring.

6

reference by Dr. Abraham to his being "cock-blocked" – using a term referring to the prevention of the consummation of a male's intent to have sex with another by the intervention of a third party[4] – as the first reason he was not – at least at that moment[5] – having sex with her.

Jefferson does not find it surprising that Plaintiff presents no articulable rationale for exclusion of the text in his Response.[6] There is none. The import of the text is crystal clear. It was a real-time expression of interest by Dr. Abraham in having sex with Dr. Phillips out of his own mouth[7] and an expression of disappointment by him that some third person was interfering with his ability to do so by "___-blocking" him. We also know it was uttered at a time when he acknowledges that he was not intoxicated. *See* ECF No. 163-5, at 4.

The remainder of the text chain is even more remarkable. The next morning, at approximately 9:45 AM, the same texter who had had elicited Dr. Abraham's admission he was being "c__-blocked" asked if Dr. Abraham was alone ("U alone?"). ECF No. 153-4, at 3. Dr. Abraham replied: "I am now . . . . Not proud . . . Poor choice[.]" *Id.* Those are not the words of a person who believed himself to have been assaulted. Those words can only mean one thing: **he**

---

[4] We doubt the Court has regularly encountered the phrase employed by Dr. Abraham. Its meaning is apparent on its face, we suggest, but if there is any doubt, we refer the Court to the following two webpages explaining the meaning of the term. *See, e.g.*, Wikipedia, https://en.wikipedia.org/wiki/Cockblock; Merriam-Webster, https://bit.ly/3SSxotc. The term is also widely used in popular culture. *See, e.g.*, *Superbad* (Columbia Pictures), https://www.youtube.com/watch?v=fls3z7Me2Dc. Dr. Abraham's use of the term demonstrates a familiarity with the sexual situation he encountered, a third-party interfering with his sexual intentions toward another, and the utility of a shorthand expression to describe such a situation.

[5] It remains a mystery who was blocking Dr. Abraham, how he or she was doing so, and when that person apparently ceased the ultimately unsuccessful blocking effort. Those would have been entirely legitimate topics of examination of Dr. Abraham had the Court not excluded this evidence and inquiry into the circumstances surrounding it.

[6] Plaintiff also suggests that the Cock Block Text was not properly used as cross-examination material, but ought to have been offered by Jefferson in its defense case. *See* ECF No. 161-2, at 12–13. The Court, however, definitively ruled that the challenged texts could not be admitted at all, *see* ECF No. 145, 12/6/23 Tr., at 189:16–190:12; *see also* ECF No. 112, and Plaintiff agrees that the Court's rulings precluded any use of it, *see* ECF No. 161-2, at 11.

[7] Incidentally, the fact that this text was written during the party, and concerns interest in having sex with Dr. Phillips, a married person, contradicts the argument proffered as to the irrelevancy of the "Young Hot Single Female" Text, which was based upon the premise that it only concerned "single" young hot females. Apparently between the writing of that text and the evening of the party, Dr. Abraham's inhibitions about having sex with a married woman evaporated.

7

made a "choice" and *he* was not "proud" of *his* choice. Even if Dr. Abraham does not concede the obviousness of that meaning, certainly cross-examination of Dr. Abraham premised on the idea that *he* made a choice of which *he* was "Not proud" was entirely warranted. The lack of pride was in *his behavior*, no one else's, and acknowledging one is "Not proud" of one's behavior is the equivalent of being ashamed of it. Certainly, a jury should have been told of his self-expression of shame about his conduct.

And yet because Jefferson could not confront Dr. Abraham with his words, Jefferson's counsel could not challenge his testimony. By disallowing the use of the texts, Jefferson's counsel was unable to effectively cross-examine him on this critical point.

Plaintiff also suggests that another justification for the exclusion of Dr. Abraham's real-time expression of sexual interest in Dr. Phillips was some sort of "refusal" on the part of Jefferson to produce other texts somehow presumed to be helpful to Dr. Abraham's case. ECF No. 161-2, at 12. One can only marvel at that justification. Plaintiff elicited, in front of the jury, a statement suggesting that Jefferson had access to and reviewed text messages of party attendees, the suggestion being that, after having done that, Jefferson employees persisted in acting improperly and conducting the investigation notwithstanding obtaining the party attendees' text messages, the implication being that text messages consistent with Dr. Abraham's accusations were improperly ignored. ECF No. 145, 12/6/23 Tr., at 318:25–319:3. Yet now, we know, that the same party who elicited that testimony knew at the time it was elicited that there were indeed real-time contemporaneous text messages of party attendees describing, explicitly, Dr. Abraham's apparent sexual interest in Dr. Phillips; the frustration, for at least a while, of his accomplishment of those interests by the "\_\_\_\_-blocker"; and a complete awareness on his part as to the impropriety of doing what he did. And yet that text is somehow "irrelevant?" It is not. It is central to an

8

evaluation of his credibility. *See United States v. Repak*, 852 F.3d 230, 249–50 (3d Cir. 2017) ("[E]vidence concerning a witness's credibility is always relevant, because credibility is always at issue." (quoting *United States v. Green*, 617 F.3d 233, 251 (3d Cir. 2010))).

### C. The "Abraham's Admissions" Letter from Abraham's Authorized Agent.

As for the third document offered by Jefferson, but excluded by the Court, the Aaron letter, Plaintiff entirely misses the point. He claims that Jefferson was allowed to refer to the letter to elicit from Dr. Abraham that it had been sent by his lawyer to the Rothman Institute for the purpose of demonstrating that, at a time when Dr. Abraham claimed he could not cooperate with Jefferson, he was cooperating with Rothman (or at least asserting that he was). That rebuts the notion that Dr. Abraham was constrained from cooperating with Jefferson in its effort to investigate his conduct because of concern about the Lower Merion police investigation. Authorizing one's lawyer to supply information that can only have come directly from Dr. Abraham, and no one else, where it suited him to do so, but simultaneously refusing to cooperate with Jefferson are inconsistent steps. Indeed, the document was permitted to be used for that purpose, but its contents were not allowed to be used and it was for that point as well for which the letter was being offered. Jefferson wanted to demonstrate to the jury that, contrary to the testimony of Dr. Abraham during trial blaming his conduct on intoxication, and that he had not consented due to intoxication, in fact, he had authorized his lawyer to tell Rothman – not Jefferson – that "Dr. Abraham was ***not*** intoxicated" and that the sexual encounter with Dr. Phillips was "***both voluntary and consensual***." *See* ECF No. 163-5, at 4 (emphasis added). Those statements were not allowed to be shown to the jury, nor was Jefferson allowed to confront Dr. Abraham with them, despite their glaring inconsistency with his testimony. *See* ECF No. 145, 12/6/23 Tr., at 201:2–203:22. Plaintiff has no answer to that demonstration of relevance because there is none.

9

Thus, Jefferson was not permitted to confront the plaintiff with his own words uttered *before*, the "Young Hot Single Female" text; *during*, the "Cock Block" text; and *after* the party, the "Not proud . . . Poor choice" texts and "Abraham's Admissions" – his own words or words he supplied directly to his lawyer[8] for the purpose of describing what happened at the party to Rothman investigators. In short, to disallow evidence demonstrating (1) an interest in having sex with party attendees sent a month before the party, (2) that during the party he wanted to have sex with Dr. Phillips at a time when he was not drunk but was being prevented from doing so by an unidentified "cock blocker," (3) that the next morning he expressed shame for *his* "Poor choice" and shame over *his* conduct, and (4) that after the party, through his authorized agent, that he was not drunk at the party and that the sex was consensual are all utterly and fundamentally inconsistent with his testimony.

We respectfully suggest to the Court as it considers this issue that it pose these questions: If the jury were asked today whether it would have affected their deliberations to know that at 10:59 PM on the night of the party, at a time he was not intoxicated, a friend of Dr. Abraham and party attendee observed his conduct towards Dr. Phillips and concluded that Dr. Abraham was intent on having sex with Dr. Phillips, enough so to advise him "Don't do it"; to which Dr. Abraham responded not by denying that intent, but by saying he was being "cock-blocked" –

---

[8] The notion that the words in the Aaron letter were not words of and "admissions" of Dr. Abraham is incorrect. Mr. Aaron was not a witness. He was a lawyer, Dr. Abraham's lawyer. He was not at the party. He learned what happened there from his client – no one else. And he made the factual averments in the letter on behalf of his client, obviously authorized by his client. The assertions in the letter are expressed in terms of what Dr. Abraham claims, and the letter only makes sense if it is regarded as statements made *by Dr. Abraham* through his authorized agent, his lawyer. Can it possibly be so that somehow Dr. Abraham can claim now that the statements he authorized his lawyer/agent to make to third parties consisting of representations of fact about what happened at the party by Dr. Abraham are not his statements? And that he may not be confronted with them? We suggest the answer is no. *See, e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1198 (3d Cir. 1993) (statements made by counsel "in a representational capacity" admissible against client); *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) (prior complaint made through counsel admitted against party when party later changed story); *see also* Fed. R. Evid. 801(d)(2)(D) (statement of party's agent made "within the scope of that relationship and while it existed" admissible as a statement of a party opponent).

10

prevented by another from accomplishing his wishes, and noting that it was "one of his residents so I really can't anyway," would it have affected the trial's outcome? Would it also have affected the trial's outcome if the jury knew that, the next morning, Dr. Abraham said to the same friend he told he was being "cock-blocked" that his interaction with Dr. Phillips was a "Poor choice" of which he was "Not proud"?

We suggest that the answer to those questions is beyond argument; that evidence and the other excluded evidence would be regarded by the jury as critical to its evaluation of the case.

## IV. The Erroneous Jury Instructions Warrant a New Trial.

### A. The Court's Title IX Instructions Relieved Abraham of His Title IX Burden.

Abraham advances a misguided and dangerous interpretation of Title IX's discrimination prohibition. He asks the Court to uphold the jury verdict because "the evidence at trial of Defendants' gender bias was not only sufficient, it was overwhelming." ECF No. 161-2, at 24. Abraham contends a jury could find Title IX liability with evidence of gender "bias" alone absent proof the challenged action was motivated by gender and resulted in the plaintiff's harm. That is not the law, nor should it be.

Abraham felt no need at trial to have (a) tied the alleged gender bias to a challenged action and (b) produced evidence demonstrating that alleged the gender-motivated action resulted in his damages. Jefferson repeatedly asked the Court to impose some structure on Abraham's Title IX claim in the form of selective enforcement or erroneous outcome. ECF Nos. 17, 69, 110; *see also* ECF No. 138, 12/5/23 Tr., at 96:10–13. Jefferson anticipated that Abraham would attempt to carry his Title IX burden without tying the alleged gender bias to an action taken by Jefferson and without advancing evidence establishing that the action resulted in his damages. Abraham's strategy worked – he presented no evidence tying the alleged gender bias to an action taken by Jefferson that resulted in his damages. *See* ECF No. 165, at 3–14.

11

The Court's jury instructions allowed the jury to agree with Abraham that gender bias alone is sufficient to establish Title IX liability. The Court's instructions did not advise the jury that Abraham must prove the challenged action taken by Jefferson must both (1) have been motivated by Abraham's gender and (2) resulted in his damages. Nor did the Court instruct the jury that anti-respondent bias is a defense to Title IX liability. The Court should order a new trial to correct these fundamental jury instruction errors.

### 1. The Title IX Liability Instruction Allowed the Jury to Erroneously Conclude That Any Evidence of Gender Bias Triggered Liability.

Contrary to Abraham's claim, a plaintiff cannot establish Title IX liability with proof of gender bias alone. In a Title IX discrimination case, the ultimate question is always: "Could a reasonable jury—presented with the facts alleged—find that sex was a motivating factor in the University's disciplinary decision?" *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021); *see also Doe v. Univ. of the Scis.*, 961 F.3d 203, 209 (3d Cir. 2020). A plaintiff who attacks a Title IX proceeding must prove that the university took some action, motivated by improper gender bias ***and*** that he was damaged by that action. *See Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 773–74 (3d Cir. 2020) (proof of a gender-motivated outcome requires the plaintiff to "impeach[] the accuracy of the proceedings against him" ***and*** that the action was the result of gender bias). A plaintiff who is challenging university-imposed discipline might choose to prove a Title IX violation in a number of ways, but the plaintiff's burden remains the same: the challenged action taken by the university must have been motivated by the plaintiff's gender. *See Univ. of Denver*, 1 F.4th at 830; *Univ. of the Scis.*, 961 F.3d at 210.

Contrary to Abraham's argument, nothing in *University of the Sciences* changes that. *University of the Sciences* was a case that addressed how courts must analyze motions to dismiss, not fundamental issues of factual proof of liability and damages at trial to provide a jury a basis to

12

conclude that wrongful conduct took place and that the plaintiff was damaged.  *See* 961 F.3d at 209.  The *University of the Sciences* court said nothing about a plaintiff's burden **at trial** to articulate and prove a Title IX violation and tie damages to it.  *Cf. Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 927 (S.D. Iowa 2018) (Title IX pleading standard is an "inapt" comparison to a plaintiff's summary judgment burden).

The Court's jury instructions failed to inform the jury that they needed to identify a connective thread between the challenged action, Jefferson's alleged gender bias, and the alleged harm that Abraham suffered as a result of the challenged action.  The Court's Title IX liability instruction permitted the jury to erroneously conclude that **any** action motivated by Abraham's sex in any way could establish Title IX liability.  ECF No. 146, 12/7/23 Tr., at 98:22–99:11.  Abraham was thus relieved from his burden to tie the challenged action to Jefferson's alleged gender bias **and** prove that action resulted in his harm.  The Court should order a new trial to correct this fundamental error.

Abraham advances a reading of Title IX untethered to its text and endorsed by no court when he argues that gender bias alone is sufficient to establish liability.  ECF No. 161-2, at 24.  Even *University of the Sciences* required a connection between the alleged gender bias and the challenged action that produced the plaintiff's harm.  961 F.3d at 210 ("it is plausible that, as [Doe] alleges, sex was a motivating factor in USciences's investigation **and decision to expel him**" (emphasis added)).  Abraham's interpretation of Title IX would result in liability for **any** differential treatment between any man and any woman, regardless if the challenged action produced the harm of which the plaintiff complains.  The Court should not condone such an expansion of Title IX liability.

13

> **2.  Without Instruction on the Anti-Respondent Bias Defense, the Jury Was Allowed to Infer Anti-Male Bias from Non-Discriminatory Actions.**

Abraham does not contest that the Court should have given an anti-respondent bias defense instruction. ECF No. 161-2, at 15–24. Nor does Abraham contest that it was error for the jury not to know that an anti-respondent bias does not create an inference of anti-male bias. *Id.* The jury was thus allowed to infer anti-male bias from Jefferson's decision to investigate Abraham because of his status as a teacher and Phillips's as a learner. The Court should order a new trial to correct this fundamental error.

> **B.  The Court's Fifth Amendment Instruction Failed to Inform the Jury that it Could Draw a Negative Inference from Abraham's Decision Not to Participate in the Jefferson Investigation.**

Abraham misses that Jefferson's assignment of error to the Court's Fifth Amendment instruction concerns the lack of a negative inference instruction, not that the Court gave a Fifth Amendment instruction generally. ECF No. 161-2, at 24–25. Jefferson's counsel **objected**, ECF No. 146, 12/7/23 Tr., at 23:15–19, to the Court's proposal to give a Fifth Amendment instruction to lend credibility to Abraham's argument that "he made a strategic decision not to participate in Jefferson's investigation," *id.* at 24:1–2. At a minimum, the Court should have instructed the jury it could draw a negative inference from Abraham's invocation of the Fifth Amendment to avoid participating in Jefferson's investigation. Without it, the jury was allowed to infer that Jefferson attempted to violate Abraham's Fifth Amendment rights by requesting his participation in its investigation. A new trial is warranted to remedy this fundamental error.

> **V.  Plaintiff's Counsel's Inflammatory and Disparaging Remarks Tainted the Jury's Verdict.**

Abraham does not dispute that Plaintiff's counsel's repeated arguments with the Court in front of the jury and inflammatory and disparaging remarks crossed a line. He says Plaintiff's

counsel's conduct could have been worse and, in any event, it did not influence the jury. Not so. Focus on one example: where Plaintiff's counsel in his closing argument called Dr. Phillips "a malignancy" that "metastasized into this cancer" that Abraham "was forced to cut off the legs and the arms to save the body." ECF No. 146, 12/7/23 Tr., at 64:19–65:1. Implying that Dr. Phillips is a sub-human growth whose biological function was to destroy a respected and successful man not only played up the "slut-shaming" tropes that Plaintiff's counsel trotted out during trial but unfairly and prejudicially tried to convince the jury their job was to choose who to believe: Dr. Phillips, the "liar," or Dr. Abraham, "the most credible guy in this courtroom." *Id.* at 64:16–17. Abraham's claim depended on the jury believing that he was innocent. (Though Plaintiff's counsel assured the Court that, "No, Your Honor," they did not intend to argue to the jury that Abraham's version of the events was true. ECF No. 143, 11/30/23 Tr., at 34:21–35:21.) The only purpose of Plaintiff's counsel's disparaging description of Dr. Phillips was to persuade the jury it should believe "the most credible guy in this courtroom," not the "malignancy" that ruined his life. The likelihood that the jury was influenced by Plaintiff's counsel's inappropriate remarks warrants a new trial.

## VI.   Conclusion

Jefferson respectfully requests the Court grant its motion for a new trial.

Dated: February 20, 2024                    Respectfully submitted,

                                                                        KLEHR HARRISON HARVEY BRANZBURG LLP

By: */s/Stephanie D. Wolbransky*
    William A. Harvey
    Lisa A. Lori
    Stephanie D. Wolbransky
    1835 Market Street | Suite 1400
    Philadelphia, Pennsylvania 19103
    Telephone:  215-569-2700
    wharvey@klehr.com
    llori@klehr.com
    swolbransky@klehr.com

COZEN O'CONNOR

By: */s/ Brian P. Flaherty*
    Brian P. Flaherty
    One Liberty Place
    1650 Market Street | Suite 2800
    Philadelphia, PA 19103
    Telephone: 215-665-4647
    bflaherty@cozen.com

Attorneys for Defendants, Thomas Jefferson University and Thomas Jefferson University Hospitals, Inc.

## **CERTIFICATE OF SERVICE**

I, Stephanie D. Wolbransky, hereby certify that on February 20, 2024, I caused a true and correct copy of the foregoing Motion to be served on all counsel of record via the Court's ECF system.

*/s/ Stephanie D. Wolbransky*
Stephanie D. Wolbransky