**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN ABRAHAM, M.D. | |
| Plaintiff | No. 2:20-cv-02967-MMB |
| v. | |
| THOMAS JEFFERSON UNIVERSITY AND THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC. | |
| Defendants. | |

**JEFFERSON'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF ITS MOTIONS FOR JUDGMENT AND A NEW TRIAL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

A.   *Doe v. Rollins* and *Doe v. St. John's* Are Entirely Consistent with and Support the View of Title IX Advanced by Jefferson in Memoranda already Filed. ............................. 1

B.   Jefferson's Right to a Fair Trial Was Impaired by the Exclusion of Dr. Abraham's Contemporaneous Statements Contradicting the Entire Thrust of His Testimony and His Account of the Events of June 23/24. ................................................................... 2

C.   Dr. Abraham Did Not Prove That Anything About the Handling of the Title IX Investigation Was Discriminatory. ..................................................................................... 5

D.   The Court Misapprehended the Effect of Dr. Abraham's Invocation of the Fifth Amendment. ........................................................................................................................... 8

E.   Dr. Abraham's Tortious Interference Theory Is Not Recognized in Pennsylvania. ........... 9

A.      ***Doe v. Rollins*** **and** ***Doe v. St. John's*** **Are Entirely Consistent with and Support the View of Title IX Advanced by Jefferson in Memoranda already Filed.**

Jefferson has earlier explained its view of the Third Circuit's opinions *Doe v. University of the Sciences*, 961 F.3d 203 (3d. Cir. 2020), and *Doe v. St. Joseph's University*, 832 F. App'x 770 (3d Cir. 2020).  *See* ECF No. 165, at 10–11; ECF No. 166, at 12–13.  *Doe v. Rollins*, 77 F.4th 1340, 1351 (11th Cir. 2023), and *Doe v. St. John's*, 91 F.4th 643, 665 (2d Cir. 2024) are consistent with Jefferson's understandings.  Both cases hold that Title IX does not require that a Title IX claimant plead or prove a particularized, pre-conceived model of discrimination, adopting the view expressed in *Doe v. Purdue*, 928 F.3d 652, 667 (7th Cir. 2019), where the court explained there is "no need to superimpose doctrinal tests on the statute" because "all of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student."  The 11th Circuit agreed in *Rollins*, 77 F.4th at 1351 (citing *Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022)).  *St. John's* did too.  *See* 91 F.4th at 674 n.9 ("[T]he erroneous outcome and selective enforcement theories described in *Yusuf* are not necessarily the only ways in which a plaintiff may show that a university's disciplinary proceedings exhibited sex-based bias.").  The Third Circuit is in accord.  *See Univ. of Sciences*, 961 F.3d at 209.

But nothing about those holdings relieves a plaintiff from articulating and proving that some specific act by the defendant, motivated by gender bias, caused the plaintiff harm.  As then-Judge Barrett noted in *Purdue*, a pleading case, the liberality in pleading does not mean that actual, disciplined proof of discrimination that caused harm to the plaintiff was not required at the fact-finding stage of the case.  *See* 928 F.3d at 670.  That is also the teaching of *Rollins* (on summary judgment); *St. John's*; *St. Joseph's* (summary judgment); and *Doe v. Univ. of Denver*, 1 F.4th 822,

830 (10th Cir. 2021) (summary judgment).[1]

**B.    Jefferson's Right to a Fair Trial Was Impaired by the Exclusion of Dr. Abraham's Contemporaneous Statements Contradicting the Entire Thrust of His Testimony and His Account of the Events of June 23/24.**

The Court commented on February 28, 2024, as follows:

> Well, look… Let me say this. There is no question that, from his own testimony and the documents, plaintiff made certain statements that are inconsistent with the other with each other but I think, as far as the jury's verdict is concerned, I have to assume that the jury did not think they were material and I don't think I can penalize the plaintiff on posttrial motions because he made inconsistent statements.  See, he did change his position a few times in the record reflects that. And that was argued very heavily by Mr. Harvey and Ms. Lori in the closing arguments.

ECF No. 174, 2/28/24 Tr., at 62:8–18.

To the extent the Court may be suggesting that the excluded evidence is not material[2]; that the Court believes the jury would have disregarded it, thinking it immaterial; and/or that Jefferson's counsel had sufficient opportunity to draw attention to inconsistent statements of Dr. Abraham, and that the jury necessarily considered those arguments and rejected them, we respectfully believe the Court is incorrect.

***First,*** given the way the trial was conducted, with constant recitals as to what Dr. Abraham asserted "happened at the party," only sometimes couched in terms of what he "reported" to others; and the overwhelming import placed on the purported truth of that testimony in Dr. Abraham's counsel's closing arguments, it is not reasonable to believe that the jury was not swayed by those arguments.  They played an enormous role in this trial, notwithstanding the Court's ruling on the

---

[1] The Plaintiff in *Rollins* has petitioned for certiorari, claiming there is a split in the circuits as to this point. No. 23-509 (U.S.).  Jefferson agrees with the arguments advanced by Rollins that no such split exists.  The Court will consider the petition at its March 15, 2024 conference.

[2] The Court observed during the February 28 hearing that neither party objected to its ruling that the truth of what happened at the party was not relevant. ECF No. 174, 2/28/24 Tr., at 24:21–25:9.  That is incorrect.  Jefferson opposed Dr. Abraham's motion *in limine* to prohibit the introduction of evidence identified by Jefferson that went directly to the falsity of the anticipated testimony of Dr. Abraham as to what happened at the party.  ECF Nos. 83, 96, 112.

motion *in limine* and efforts to advise the jury that such evidence was not offered for its truth. Sometimes courts can place unwarranted faith in the effectiveness of an instruction to a jury that something is "not offered for its truth," and circumstances like those present here – repeated accounts of what happened at the party, followed by Plaintiff's exhortation to the jury to find that Dr. Phillips was a "liar," that Dr. Abraham was "the most credible guy" and "did nothing wrong" – will overcome even the most earnest effort by the Court to instruct the jury to ignore those allegations "for their truth."  ECF No. 146, 12/7/23 Tr., at 52:10–14, 64:16–17.  Parsing what is and is not offered for the truth is not a natural intellectual exercise among non-lawyers serving on a jury, and especially so where testimony about the subject whose "truth" is said not to be at issue so permeates the trial.

***Second***, whether the jury considered and disregarded such evidence of Abraham's inconsistent statements as was admitted, is irrelevant to whether the evidence that was excluded was material and ought to have been admitted.  The excluded evidence was vastly different in character and volume than that to which Jefferson was able to refer to in its arguments.  The Court excluded not just a single, cumulative piece of evidence, whose exclusion might be said to have been immaterial in the overall scheme.  It excluded voluminous evidence, including multiple statements of Dr. Abraham made before, during, and immediately after the events in question that are fundamentally irreconcilable with his later adopted versions of what took place on June 23/24. We will spare the Court another review of that evidence but respectfully suggest it is not possible to conclude anything other than that an inability to introduce those statements and confront Dr. Abraham with them on cross-examination profoundly harmed Jefferson's substantial rights.  *See Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 400 (3d Cir. 2016).

And, we contend, the Court's observation at trial of the statements' purported

3

"inflammatory" nature as an additional reason to exclude them (ECF No. 145, 12/6/23 Tr., at 190:9–10) actually proves that point.  Far from a reason to exclude them, their graphic nature is an essential part of their critical relevance.  Here was Plaintiff, whose entire case was premised on his having been wronged by false accusations of sexual misconduct at the hands of a young woman, writing in real-time, describing ***his*** sexual intent toward her, and ***his*** shame about ***his*** conduct, directly contrary to ***his*** testimony.  At trial, as a tactic, that same Plaintiff purposefully inflamed the jury with accounts of the alleged sexual misconduct on the part of the young woman, at one point actually recounting to the jury in the most crude and graphic terms possible an alleged request by her that he have sex with her.[3]  Having done so, he should not be heard to complain of a need to spare the jury from hearing his own crude sexual expressions describing his own sexual desires, conduct, and morning-after self-assessment, lest it somehow "inflame" the jury ***against him***.  The plain fact is that sexual conduct is part of this case.  Dr. Abraham put it there, and did so with relish when it tactically suited him,[4] and the inflammatory words of a male, middle-aged, world-famous oncologic surgeon are every bit as relevant and appropriate for the jury to hear as those of a young woman.  Any other result is not fair.

In addition, even assuming that "what happened at the party" was not at issue, and that the jury applied that instruction faithfully (which we do not believe is so), the excluded evidence still

---

[3] Dr. Abraham made sure to be explicit and inflammatory with the jury, going out of his way to testify in that manner: "[Dr. Phillips] came out and was aggressively all over me. She was saying, come on. I want you to ***F me***. I want you to ***F me***. You know you want to ***F me***."  ECF No. 138, 12/15/23 Tr., at 177:9–12 (emphasis added).  Dr. Abraham even made sure the jury knew exactly how he claimed Dr. Phillips allegedly positioned her body the next morning, purposefully conjuring up images in the jurors' minds in the most salacious terms possible: "She said specifically I want you to ***F me*** in this position. This is my favorite position. She ***got up on her hands and knees***. And ***she was trying to encourage me*** to have sex with her again." *Id.* at 212:7–10 (emphasis added).  To call that testimony anything but an effort to inflame the jury is to deny the obvious.

[4] It is not an overstatement to describe Dr. Abraham's depiction of the conduct of the young woman with whom he had sex as "slut-shaming," the practice of describing a woman's dress, appearance, and behavior as inviting sex, used in defense of a claim by the woman that she had been assaulted. *See, e.g.*, https://www.dictionary.com/e/slang/slut-shaming/.

was highly material – indeed, critical – to evaluate Dr. Abraham's credibility, a subject put front and center when his counsel asked the jury to find him the "most credible" witness.  ECF No. ECF No. 146, 12/7/23 Tr., at 64:16–17.

    **C.**    **Dr. Abraham Did Not Prove That Anything About the Handling of the Title IX Investigation Was Discriminatory.**

At times, it sure sounded like Plaintiff was arguing that Jefferson's failure to open a separate investigation into Dr. Phillips' conduct was his theory. That is, essentially, the "selective enforcement" theory, even if Dr. Abraham does not articulate it as such.  But the problem is, he did not prove anything like it.

First, there was no policy requiring a separate investigation.  On February 28, the Court inquired as to whether there was any evidence that any Jefferson policy required Jefferson to open two separate investigations.  ECF No. 174, 2/28/24 Tr., at 76:20–21.  Plaintiff's counsel reflexively and incorrectly responded that the policy (JX-17) did require that.  Not so.  They then claimed that Ms. Gingold testified that a separate investigation was required.  ECF No. 174, 2/28/24 Tr., at 76:15–77:12.  Also not so.  At trial, Plaintiff's counsel asked Ms. Gingold "If you -- because whenever you receive new allegations, you would require a new Notice of Concern, right?"  ECF No. 137, 12/4/23 Tr., at 83:6–7 (emphasis added).  Ms. Gingold responded, "If we receive new allegations, we would either amend this [i.e., the notice of concern], look into it, depending on what those allegations are. Yes." *Id.* at 83:8–9.  Gingold's testimony was not that a new or separate *investigation* was required, only that the existing notice could be amended or that Jefferson would "look into" the new allegations "depending" on their content.

But second, even if there were such a policy, the incontestable evidence admitted at trial – proven by Dr. Abraham's or his own lawyer's words – is that Dr. Abraham ***never would have cooperated with such investigation***.  Here's what is undisputed:  the incident occurred on June

23/24.  A Notice of Concern was sent on June 27.  JX-17.  On July 6, Dr. Abraham told Jefferson that he and his lawyer would show up to provide a statement on July 13 or July 16.  JX-33.  On July 9, Abraham spoke to Ms. Fogerty.  Dr. Abraham testified that he told Ms. Fogerty he felt he was "on the receiving end of the sexual misconduct that occurred" and asked "what do I do about that?"  ECF No. 138, 12/5/23 Tr., at 206:16–20.  In a follow-up email that day, Ms. Fogerty told him what to do.  She actually invited Dr. Abraham to file a complaint if he wished and instructed him, in writing, on how he could do so, even providing the Title IX coordinator's phone number and email.  JX-36.

Then what happened?  On July 11, he was advised that he was under criminal investigation. Immediately, on July 13, the first of the two alternate dates upon which he said he would appear, his lawyer wrote to Jefferson to say that Dr. Abraham would ***not*** appear nor cooperate, stating that he "will not submit a written statement tomorrow or be interviewed on Monday [July 16]."  JX-42.  The lawyer continued, however, that he "can continue to be in touch about when Dr. Abraham will give an interview assuming it is advisable."  *Id.*[5]  The same lawyer advised later, in October, "I will let you know when the criminal matter is resolved and ask that Dr. Abraham then be permitted to speak to the Title IX investigators, ***even if that is after their Report is issued***."  JX-52 (emphasis added).  Then, in "[e]arly in November" 2018, ECF No. 138, 12/5/23 Tr., at 334:12–13; *see also id.* at 332:24–333:3, Dr. Abraham and his counsel were advised that the criminal investigation was concluded and that no charges would be filed.

What then?  Six weeks then elapse without a single word from Dr. Abraham to Jefferson

---

[5] While Dr. Abraham was refusing to cooperate in any way with Jefferson, he supplied a written statement to Rothman. JX-46.  His refusal to cooperate was selective.  But even then, Dr. Abraham refused to provide any information regarding Dr. Phillips' alleged conduct – not only to Jefferson but to Rothman as well.  See JX-46, specifically questions 16 and 17 and the responses thereto, where Mr. Aaron stated, on Dr. Abraham's behalf, that further information about Dr. Phillips' sexual conduct "cannot be provided."

that the criminal investigation had concluded or any indication that Dr. Abraham would now be willing to be interviewed about the events of June 23/24, and not a word is uttered about making a complaint about Dr. Phillips. Then, Dr. Abraham announced his departure – never having made a Title IX complaint about Dr. Phillips, as he was advised, in writing on July 9 (JX-36), nor participating in the Title IX process – entirely of his own volition. JX 56, 61.

This chronology establishes beyond any possible question the following things: (1) that Dr. Abraham knew full well, in writing, how to file a complaint about Dr. Phillips' behavior[6]; (2) he chose not to do so, when, through not the slightest fault or involvement on the part of Jefferson, Dr. Phillips' making of a criminal complaint against him led him to decide on the advice of counsel to refuse to participate in Jefferson's investigation; and (3) even when the circumstances changed and the investigation was concluded without charges, he *still* chose not to participate in Jefferson's investigation. So the theory of liability does not work. It is flatly inconsistent with the incontestable facts demonstrated at trial.[7]

Was there another theory? Jefferson thinks there was – albeit only furtively and even

---

[6] Plaintiff suggested during oral argument on February 28 that the Jefferson Title IX policy provided that any report of sexual misconduct to any Jefferson employee required the opening of an investigation. ECF No. 174, 2/28/24 Tr., at 32–34. In this case, that's a red herring. Such a policy is necessary and relevant where a potential complainant is afraid, intimidated, or otherwise pressured not to make a Title IX complaint. In such a case, others' awareness of the situation and obligation to open an investigation notwithstanding the victim's hesitancy to come forward might be relevant. But here, we have a Harvard/Yale educated, world-famous surgeon, represented by a bevy of lawyers, who was instructed by Jefferson, in writing, as to how to file a complaint. The notion he was somehow puzzled or intimidated to not make a complaint if he wished to do so is nothing less than absurd. He made an affirmative decision not to do so. It is that simple.

[7] During the February 28 oral argument, the Court indicated that Dr. Abraham testified Mr. Toy, a lawyer at Jefferson, had predicted to Mr. Aaron that the outcome of a hearing would be unfavorable to Dr. Abraham, and therefore that might have been justification for Dr. Abraham's refusal to participate in the process. ECF No. 174, 2/28/24 Tr., at 55:11–15. The only evidence of that was Dr. Abraham's claim that Aaron told Dr. Abraham what Toy said, which is hearsay erroneously admitted over objection. There is no theory that would justify admitting that hearsay testimony just because Dr. Abraham was a client of Mr. Aaron. In addition, there was no evidence that Mr. Toy had any control or influence over the hearing process, making any reliance upon his alleged statement a red herring. Moreover, Dr. Abraham's refusal to participate in the Title IX process began long before Mr. Toy's alleged statement. Nothing about that hearsay statement rebuts the fundamental point that Dr. Abraham made a fully informed decision to refuse to participate in the process, even when the purported cause of that refusal, the criminal investigation, was eliminated.

deceptively pursued.  It was a claim that Dr. Abraham's version of the events of June 23/24 was truthful and Dr. Phillips' was not.  Although Plaintiff claimed before trial that he had no interest in such a theory (notwithstanding Mr. Harvey's prediction Plaintiff would so argue), as demonstrated in prior filings, his conduct in court both during the trial and in closing argument demonstrates the opposite.  But there are two fundamental problems.  He actually claims, and still does (despite his request to the jury that it find Dr. Abraham's version was truthful and Dr. Phillips' a "lie"), that he offered *no* evidence on the topic at trial.  Second, if that's incorrect, and his theory did, in fact, involve proof of the truth of his version of the events of June 23/24, then the Court erred by prohibiting Jefferson from introducing what Jefferson respectfully believes is overwhelming evidence demonstrating that Dr. Abraham's version of those events is false.[8]

So, was there some other theory?  If there was, we confess we don't know what it was.

**D.     The Court Misapprehended the Effect of Dr. Abraham's Invocation of the Fifth Amendment.**

At the February 28 argument, the Court inquired as to whether it ought to have given an "adverse inference" charge to the jury.  Jefferson does not contend an adverse inference charge ought to have been given about Dr. Abraham's testimony *at trial*.  At trial, after all, he did not invoke the Fifth Amendment.  But the invocation of the Fifth Amendment to decline to participate in Jefferson's Title IX process has consequences for this case.  A fact-finder in a non-criminal context is permitted to draw an adverse inference from a party's invocation of the Fifth Amendment.  *Baxter v. Palmigiano*, 425 U.S. 308, 317 (1976).  Surely, Dr. Abraham had a right to decline to participate.  But just as surely, like any court or jury in America in a civil setting,

---

[8] Plaintiff's counsel claimed during the February 28 oral argument that the Court "never precluded" Jefferson from introducing the substance of the Aaron letter, JX-46, in the defense case.  ECF No. 174, 2/28/24 Tr., 40:11–14.  Not so.  The Court definitively ruled that it would not allow Jefferson to "go into the details of what he said, even though I recognize that it is, to some extent, contrary to his direct testimony."  ECF No. 145, 12/6/23 Tr., at 176:3–188:15; 193:23–204:6.

Jefferson had every right to consider his doing so in addressing the serious allegation that had come to its attention. Both Jefferson (during its investigation) and the jury (during the civil trial) *could* draw an adverse inference against Dr. Abraham.

### E. Dr. Abraham's Tortious Interference Theory Is Not Recognized in Pennsylvania.

Dr. Abraham's claim that Jefferson interfered with *his* performance of his Rothman contract is not viable under Pennsylvania law. The Restatement of Torts recognizes two types of tortious interference. One type, manifested in § 766, occurs where the tortfeasor interferes with the performance of a contract by the person or entity with whom the plaintiff has a contract. The other type of interference, manifested in § 766A, occurs when the tortfeasor's tortious conduct makes the claimant's performance of his obligations difficult or impossible, thereby causing the contract to end. Pennsylvania law does not recognize the latter type of tortious interference claim. *See Phillips v. Selig*, 959 A.2d 420, 436 (Pa. Super. 2008); *see also Am. Osteopathic Ass'n v. Am. Bd. of Internal Med.*, 555 F. Supp. 3d 142, 149 n.3 (E.D. Pa. 2021).

Clearly, Dr. Abraham's claim falls under § 766A. He claims that Jefferson interfered with *his* performance of the Rothman contract, not Rothman's performance. Abraham testified that, after he lost access to Jefferson's facilities in 2018, his productivity plummeted and caused Rothman not to renew his contract in 2022. ECF No. 138, 12/5/23 Tr., at 156:22–157:3 ("So, the easiest analogy I can think of is if you're a Racecar Driver, you need a car and a track. And you can't perform your function without either one of those things. So you have a company that provides your car, which is like Rothman. And you have a company that provides the track, which is like Jefferson. And I need both of those things in order to be able to do my job."); ECF No. 145, 12/6/23 Tr., at 102:1–103:3; ECF No. 146, 12/7/23 Tr., at 161:19–162:3. The same theory was advanced in counsel's arguments: "pay attention to the Judge's charge as to how to prove tortious

interference. ***If he has an inability or it makes his Contract performance harder*** . . . .”  ECF No. 146, 12/7/23 Tr., at 63:21–25 (emphasis added).

Plaintiff's answer to this seems to be only that the Court gave the standard Pennsylvania jury instruction on tortious interference with no objection from Jefferson.  ECF No. 174, at 12:16– 13:4.  That is irrelevant.  The question is whether the theory and proof supporting the tortious interference claim is that embodied in § 766A.  It was, and for that reason, cannot sustain a judgment under Pennsylvania law.

At oral argument on February 28, the Court observed that Plaintiff did not elicit with any clarity the capacity in which the alleged tortious interferor (or even who it was) was acting as opposed to the tortious interferee (or who it was).  It was only: “Jefferson,” the interferor; and “Rothman,” the interferee.  But here's the problem, as the Court noted.  The interferee, Rothman, had a board, officers, and directors.  Dr. Vaccaro is the president and chairman of the board of the Rothman Institute.  JX-26; ECF No. 138, 12/5/23 Tr., at 286:14–16.  Dr. Purtill was employed by and was on the board of Rothman  ECF No. 145, 12/6/23 Tr., at 22:25–23:4; 85:8.  Dr. Vaccaro and Dr. Purtill did what they did at Rothman as officers and directors of Rothman.  One cannot tortiously interfere with oneself.

Moreover, Dr. Abraham was terminated from Rothman in 2022, four years after he left Jefferson.  That is when the interference took place, if at all.  Dr. Vaccaro testified that Rothman's decision not to renew Abraham's contract had nothing to do with Jefferson.  ECF No. 138, 12/5/23 Tr., at 289:7–9.  Even according to Dr. Abraham, the only reason he was terminated from Rothman was the loss of his “race track” at Jefferson.  This is not sufficient to sustain a claim against Jefferson.

Dated: March 8, 2024

Respectfully submitted,

KLEHR HARRISON HARVEY
BRANZBURG LLP

By:  /s/Stephanie  D. Wolbransky
     William A. Harvey
     Lisa A. Lori
     Stephanie D. Wolbransky
     1835 Market Street | Suite 1400
     Philadelphia, Pennsylvania 19103
     Telephone:  215-569-2700
     wharvey@klehr.com
     llori@klehr.com
     swolbransky@klehr.com

COZEN O'CONNOR

By:  /s/ Brian P. Flaherty
     Brian P. Flaherty
     Jason A. Kurtyka
     One Liberty Place
     1650 Market Street | Suite 2800
     Philadelphia, PA 19103
     Telephone: 215-665-4647
     bflaherty@cozen.com
     jkurtyka@cozen.com

*Attorneys for Defendants, Thomas Jefferson University and Thomas Jefferson University Hospitals, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Brian P. Flaherty, hereby certify that on March 8, 2024, I caused a true and correct

copy of the foregoing Motion to be served on all counsel of record via the Court's ECF system.


*/s/ Brian P. Flaherty*
Brian P. Flaherty
