**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN A. ABRAHAM** | **CIVIL ACTION** |
| **v.** | **NO.  20-2967** |
| **THOMAS JEFFERSON UNIVERSITY & THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.** | |

<u>**MEMORANDUM RE: POST-TRIAL MOTIONS**</u>

**Baylson, J.**                                                                            **March 14, 2024**

"The law is the guardian of the ideal of unmediated truth, truth stripped bare of the ornament of narration…. The story that can best withstand the attrition of the rules of evidence is the story that wins."[1]

The events in this suit, in a nutshell, are as follows:

A female resident at Thomas Jefferson University attended a party at the home of Plaintiff, a male attending physician who worked at Jefferson but was employed by the Rothman Institute, a privately owned orthopedic practice.  The resident and Plaintiff each claimed that they were the victim of sexual assault by the other during a sexual encounter in Plaintiff's home after the party.  The resident additionally notified the police that Plaintiff had raped her.  When Jefferson learned of the situation, it started a Title IX investigation and informed Rothman, which then suspended Plaintiff.  Jefferson informed Plaintiff that it would have to initiate a hearing on the matter, which Plaintiff could avoid by resigning his faculty position at Jefferson, which he did.  Several years later, Plaintiff was terminated by Rothman.

---

[1] Janet Malcolm (1934-2021), author and journalist, <u>The Crime of Sheila McGough</u>.

## <u>TABLE OF CONTENTS</u>

I.  Procedural History ............................................................................................ 5

II.  Title IX Allegations ......................................................................................... 7

III.  List of Witnesses ............................................................................................ 9

IV.  Overview of the Evidence ............................................................................. 10

   A.  Testimony of Witnesses in Plaintiff's Case at Trial ........................................ 10

   B.  Motion for Directed Verdict ........................................................................ 13

   C.  Testimony of Witnesses in Defendants' Case at Trial ..................................... 15

   D.  Chronology of Key Events in the Period Between June and December, 2018 ............... 16

   E.  Liability Verdict ........................................................................................ 22

   F.  Summary of Evidence – Damages ................................................................. 22

   G.  Damages Verdict ...................................................................................... 23

V.  analysis of testimony ................................................................................... 23

   A.  Testimony about Jefferson and Rothman Relationship ................................... 23

     i.  Plaintiff's Role at Jefferson and Rothman ................................................. 23

   B.  Plaintiff's Counsel's Questions at Trial Did Not Allow the Jury to Differentiate between Jefferson and Rothman ............................................................................. 25

   C.  Inconsistencies in Plaintiff's Testimony ........................................................ 28

   D.  Contradictions in Testimony as Between Plaintiff and Other Witnesses ............ 28

   E.  Testimony and Arguments about the Party ..................................................... 30

   F.  Plaintiff's Testimony about the Sunday Morning Sexual Encounter ................. 31

   G.  Ethics ...................................................................................................... 32

   H.  Plaintiff's Departure from Jefferson ............................................................. 32

   I.  Plaintiff's Refusal to Participate in the Title IX Investigation Pending his Criminal Investigation .................................................................................................. 35

   J.  #MeToo Movement and Jefferson's Response to Dr. Phillips' Complaint ............ 35

   K.  "Between a Rock and a Hard Place" ............................................................. 39

   L.  Contributory Negligence .............................................................................. 41

VI.  Discussion of Inconsistent and Contradictory Testimony .............................. 45

VII.  Plaintiff's Assertion that His Complaint Was Not Investigated ...................... 47

VIII.  Renewed Post-Trial Motion for Judgment as a Matter of Law ...................... 48

   A.  Parties' Contentions with Respect to Defendants' Renewed Motion for Judgment as a Matter of Law ............................................................................................. 48

   B.  Legal Standard for Renewed Motion for Judgment as a Matter of Law .............. 49

C.    Judgment as a Matter of Law Cannot be Granted on the Title IX Claim ........................ 50

IX.    JUDGMENT AS A MATTER OF LAW WILL BE GRANTED ON TORTIOUS
INTERFERENCE LIABILITY ................................................................................................. 56

A.    Pretrial Proceedings ................................................................................................. 56

B.    Trial Theories ........................................................................................................... 57

C.    Defendants' Motion for Judgement Notwithstanding Verdict and Post-Trial ................. 58

X.    TRIAL TESTIMONY ................................................................................................... 60

A.    Insufficient Evidence of Tortious Interference ................................................................ 60

i.    Plaintiff's Suspension from Rothman ..................................................................... 60

a.    Rothman Investigation and Decision Whether to Keep Plaintiff at Rothman............ 62

ii.    Dr. Purtill's Information Communicated to Rothman ................................................. 63

iii.    Plaintiff's "Constructive Termination" from Jefferson on December 14, 2018......... 64

a.    Plaintiff's Post-Jefferson Employment with Rothman ................................................. 65

iv.    Termination of Plaintiff's Contract at Rothman......................................................... 66

B.    Rothman and Jefferson Were Intertwined ........................................................................ 69

XI.    LEGAL ANALYSIS ................................................................................................... 73

A.    Plaintiff Proved the Existence of a Contract with Rothman ............................................. 74

B.    Plaintiff Failed to Prove the Absence of Privilege or Justification on the Part of
Defendant ....................................................................................................................... 75

i.    Truthfulness Privilege ................................................................................................ 77

a.    Relevant Case Law ................................................................................................. 79

b.    Application to Plaintiff's Case ................................................................................. 82

C.    Plaintiff Failed to Prove Jefferson Intended to Harm His Contractual Relationship with
Rothman When Jefferson "Constructively Terminated" Him ................................................... 89

D.    Causation.......................................................................................................................... 95

i.    Plaintiff Failed to Prove Any Facts to Allow the Jury to Conclude That His Initial
Suspension from Rothman Caused His Eventual Termination from Rothman ..................... 95

ii.    Plaintiff's Loss of Privileges at Jefferson Fails as a Legal Cause to the Termination of
The Rothman Contract ...................................................................................................... 99

a.    Defendants Preserved Their § 766 and § 766A Arguments ..................................... 100

b.    Plaintiff's Main Causation Theory is Not Cognizable Under § 766 of the Restatement
103

XII.    Defendants' Motion for New Trial ................................................................................... 107

A.    Parties' Contentions with Respect to the Motion for New Trial .................................... 107

B.    New Trial Legal Standard................................................................................................ 108

C.    Text Messages and Arguments about the Party........................................................... 110

D.  Rothman Investigation and Fifth Amendment Issues ........................................................ 114

E.  Improper Comments/Arguments by Plaintiff's Counsel ................................................ 117

XIII.  Conclusion .................................................................................................................. 120

Although this case was filed on June 19, 2020, the relevant allegations are set forth in the first Amended Complaint (ECF 14, filed on April 12, 2021). This pleading, consisting of some 256 numbered paragraphs, contained detailed factual allegations which were the basis of extensive pretrial proceedings and the trial. The Amended Complaint contains the following counts as follows:

> Count I, "Violation of Title IX of the Education Amendments of 1972 (Sex Discrimination)," paragraphs 195-203
>
> Count II, "Violation of Title IX of the Education Amendments of 1972 (Retaliation)," paragraphs 204-225
>
> Count III, "Breach of Contract," paragraphs 226-233
>
> Count IV, "Intentional Infliction of Emotional Distress," paragraphs 234-239
>
> Count V, "Negligent Infliction of Emotional Distress," paragraphs 240-247
>
> Count VI, "Tortious Interference with Business Relations," paragraphs 248-256

## I.   PROCEDURAL HISTORY

The pretrial proceedings developed with Defendants Thomas Jefferson University and Thomas Jefferson University Hospitals, Inc. (hereinafter considered jointly as "Jefferson" or Defendants) filing a motion to dismiss (ECF 17). This Court denied the motion in part and granted the motion in part in its memorandum dated September 9, 2021 (ECF 21), finding that Plaintiff had appropriately pled their Title IX discrimination claims under Count I and tortious interference with business relations under Count VI, but dismissing Plaintiff's Title IX Retaliation claim and the remaining state law claims (Counts II – V).

Detailed discovery ensued following which Defendants filed a motion for summary judgment (ECF 69) with voluminous attachments and briefs, which the Court denied in a brief order noting the many disputed issues of fact (ECF 77). There were extensive motions in limine

filed (ECFs 82-89), following which the Court filed a pretrial order with a memorandum, dated December 1, 2023 (ECFs 112 and 113).  In this order, the Court stated that although the background of this case was a party held in Plaintiff's home, on the evening of Saturday, June 23, 2018, at which he invited numerous fellow doctors and other employees of the Defendants, the events at the party were not really relevant, and set forth certain guidelines as to the conduct of the trial, including an Order that counsel were not to introduce evidence as to what happened at the party held at Plaintiff's home.[2]  Therefore, the main issue was what Defendants were told, and what did they do or not do, as being the relevant issues, under the Title IX allegations.[3]

The jury returned a verdict in favor of the Plaintiff on liability on both the Title IX and Tortious Interference counts.  Following further testimony and argument on damages, the jury rendered its verdict and the Court entered judgment in favor of Plaintiff and against Defendants for $15 million.

Post-trial motions were filed by Defendants.

This Court will start with a summary of the pleadings and testimony, followed by a chronology of events.  Then, this Court will begin with an analysis of Defendants' Post-Trial Motion for Judgment as a Matter of Law with respect to Plaintiff's Title IX claim, followed by an analysis of Defendants' motion with respect to Plaintiff's Tortious Interference with Contractual

---

[2] A party with sexual content at a private home does not, ipso facto, warrant federal jurisdiction in this case.  However, as the events developed, Jefferson was notified about the sexual allegations, and instituted a Title IX investigation, and neither party disputes that this is a Title IX case.  However, one may wonder whether Congress intended events of this nature to be subject to Title IX jurisprudence.

[3] As discussed further below in the context of Defendants' Motion for New Trial, Plaintiff did not adhere to this ruling, and introduced a great deal of testimony, including his own narrative, of what had happened at the party—forcing the Court in many instances to instruct the jury that the testimony was admitted not necessarily for the truth of the matter asserted, but rather that it was stated to Jefferson as part of its investigation.

Relations claim.  Finally, this Court will analyze Defendants' Motion for New Trial with respect

to Plaintiff's Title IX claim.[4]

## II. TITLE IX ALLEGATIONS

    A. Amended Complaint (ECF 14)

196.       Title IX provides, in relevant part, that:
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.
197.       Defendant TJUH's residency program is an "educational program" under Title IX.  See Doe v. Mercy Catholic Medical Center, 850 F.3d 545 (3d Cir. 2017) (finding hospital residency program to be an "educational program" under Title IX).
198.       Defendants TJU and TJUH receive federal funding.  The total amount of federal funding received by Defendants is not publicly available.
…
200.       Title IX prohibits sex discrimination against employees of universities and educational programs that receive federal funding – its protections are not limited to students.
201.       As recently held by the Third Circuit in Doe v. University of Sciences, 961 F.3d 203, 209 (2020), "…to state a claim under Title IX, the alleged fact…must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex."
202.       Particular facts demonstrating a plausible inference of Defendants' discrimination against Dr. Abraham due to his sex have been detailed above, and include the following.
    a. While TJU investigated Roe's complaint against Dr. Abraham, TJU/TJUH failed to investigate Dr. Abraham's complaint against Roe for sexual misconduct and failed to investigate whether Roe's complaint against Dr. Abraham was retaliatory. (See e.g. ¶¶ 151-156)
    b. Dr. Abraham attempted to report Roe's misconduct to officials of TJU/TJUH who had the authority to institute corrective measures. Each time he was ignored, and the response of the TJU/TJUH was clearly unreasonable in light of the known circumstances. (See e.g.

---

[4] This Court notes that "[u]nder the 1991 amendments to Rule 50, both a motion for directed verdict and a motion for judgment notwithstanding the verdict are now designated as motions for judgment as a matter of law."  Baker v. Advanced Mixer, Inc., 1994 WL 178106, at *4 (E.D.Pa. 1994); Fed. R. Civ. P. 50.  However, "[t]his change in terminology did not alter the applicable standard of law…."  Id.

¶¶ 151-156; 161; 122-123). Dr. Vaccaro expressed stereotypical views about gender when he told Dr. Abraham that a man cannot be sexually assaulted by a woman.

c. Defendants conducted a flawed, superficial and gender-biased proceeding against Dr. Abraham. (See e.g. ¶¶ 129-150)

d. Particular circumstances suggest that gender-bias was a motivating factor in the inconsistent treatment of Jane Roe and Dr. Abraham. (¶¶ 165-180; 12-24)

e. Upon information and belief, as compared to the number of females accused of sexual misconduct, the number of males whose cases are formally investigated and adjudicated is greater.

f. Upon information and belief, Defendants treat accused females and accused males differently during the pendency of an investigations. Dr. Abraham was wrongfully pressured by TJUH into taking an administrative leave due to Roe's complaint. However, despite Dr. Abraham's complaint, no interim action was ever taken against Roe.

g. To the extent that any female accused were subjected to disciplinary hearings, and found responsible, the sanctions issued were far less severe than those issued to comparable male respondents. These allegations are alleged upon information and belief because Plaintiff was unable to locate any data relating to the gender of those accused of sexual misconduct who were formally investigated, found responsible and received sanctions. Defendants engaged in a Title IX compliance strategy which targeted males and sought more severe discipline against them.

B.  Defendants' Answer (ECF 23)

196.    Denied as stated. The allegations in paragraph 196 are conclusions of law to which no response is required. To the extent a response a required, the allegations are denied.

197.    Denied as stated. The allegations in paragraph 197 are conclusions of law to which no response is required. To the extent a response a required, the allegations are denied.

198.    Admitted in part; denied in part. It is admitted only that Jefferson receives federal funding. The remaining allegations are denied as Jefferson lacks sufficient information to form a belief as to the accuracy of the remaining allegations contained in paragraph 198 and deny the allegations on that basis.

200.    Denied as stated. The allegations in paragraph 200 are conclusions of law to which no response is required. To the extent a response a required, the allegations are denied.

201.    Denied as stated. The allegations in paragraph 201 are conclusions of law to which no response is required. To the extent a response a required, the allegations are denied.

202.     Denied as stated. The allegations in paragraph 202 are conclusions of law to which no response is required. To the extent a response a required, the allegations are denied.

## III.   LIST OF WITNESSES

### Liability Trial, Plaintiff's Case:[5]

- Zoe Gingold, Jefferson's Title IX Coordinator (cross examination by Plaintiff)
- Jennifer Fogerty, Dr. Abraham's Title IX Advisor (cross examination by Plaintiff)
- Richard Webster, President of Thomas Jefferson University Hospitals (cross examination by Plaintiff)
- Edmund Pribitkin, Chief Medical Officer for Thomas Jefferson University Hospitals (during the relevant time period) (cross examination by Plaintiff)
- John Abraham (direct examination)
- Alexander Vaccaro, Chairman of Orthopedics at Jefferson and President of Rothman (cross examination by Plaintiff)
- Jeanette Domanico, Jefferson Nurse (examination by Plaintiff)
- John Abraham (recalled)

---

[5] In light of Plaintiff's verdict, the Court must view the evidence in the light most favorable to Plaintiff. Although Plaintiff argues that I must disregard any negative facts about Plaintiff in the record, the Court disagrees. See Plaintiff's Post-Trial Supplemental Brief, ECF 177 at 5 ("For purposes of judgment as a matter of law, the Court can only consider the favorable testimony regardless [of] the speaker or from whom questions were posed"). Clearly, testimony contradictory to Plaintiff's testimony must be ignored. The Court can consider the Plaintiff's own testimony, which in this case, on some points, was not favorable to Plaintiff. Plaintiff called a number of Defendants' officers and employees as of cross-examination and the Court will consider their testimony except for any facts that are specifically contradicted by Plaintiff. Plaintiffs' argument is incorrect as a matter of law. In Reeves v. Sanderson Plumbing Products, Inc., the Supreme Court specifically held that in reviewing a trial record on post-trial motions, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See Wright & Miller 299. That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" 530 U.S. 133, 151 (2000).

The Third Circuit followed Reeves in Galena v. Leone:

> Like the District Court, we view Leone's behavior towards Galena in light of other evidence presented at the trial that was uncontroverted and unimpeached. See Reeves, 530 U.S. at 151 [ ] (applying Fed. R. Civ. P. 50, "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses") (internal quotation marks and citation omitted). But even giving Galena the benefit of all reasonable inferences, the evidence is insufficient to justify a finding that it was animus toward Galena or his message that motivated Leone when he had Galena removed from the meeting.

638 F.3d 186, 208 (2011).

Although a witness employed solely by Jefferson may not be "disinterested," Plaintiff attacks the conduct of Drs. Vaccaro and Purtill, who were Jefferson and Rothman surgeons/managers. By calling them as of cross at trial, Plaintiff obviously believed at least some of their testimony was relevant, therefore this Court cannot exclude their testimony that does not contradict Plaintiff.

- James Purtill, Orthopedic Surgery Residency Director (cross examination by Plaintiff)
- John Abraham (recalled)

**Liability Trial, Defendants' Case:**
- Gaetan Alfano, Title IX Investigator (direct by Defendants)
- Jennifer Fogerty (recalled, direct by Defendants)
- Robert Toy, Jefferson Legal Counsel (direct by Defendants)
- Alexander Vaccaro (recalled, direct by Defendants)

**Damages Trial, Plaintiff's Case:**
- John Abraham (recalled)
- Chad Staller, Plaintiff's Economic Expert (via video)

**Damages Trial, Defendants' Case:**
- Edward Waddington, Defendants' Expert
- John Mordach, Executive Vice President and Chief Financial Officer for Thomas Jefferson University (direct by Defendants)

## IV. OVERVIEW OF THE EVIDENCE

### A. Testimony of Witnesses in Plaintiff's Case at Trial

This Court offers a brief summary of the relevant testimony of witnesses at trial. Plaintiff started his case with Zoe Anne Gingold, Jefferson's Title IX Coordinator called as of cross examination. Ms. Gingold testified at length that, under the terms of Jefferson's Title IX policy, the University cannot discriminate on the basis of sex in "educational programs," and that this policy applies to employees and professors as well as students. (ECF 137, 60:6-20). Ms. Gingold testified that the policy applied to off-campus events. (ECF 137, 63:3-14). Events at Plaintiff's party were reported to Jefferson promptly, and fell within the ambit of Defendants' Title IX Policy, because as Ms. Gingold testified, it may have had an adverse impact on the University or its members. (ECF 137, 62:22-63:14).

Plaintiff's counsel then called Jennifer Fogerty, Assistant Provost at Jefferson, who was designated by Defendants as Plaintiff's Title IX Advisor, as of cross examination. Although Ms. Fogerty testified that she had a call with Plaintiff at the start of the Title IX investigation, where

she "do[es] not recall [Plaintiff] saying anything about being sexually assaulted on the call," Plaintiff distinctly contradicted her and asserted in his testimony that he specifically told Jennifer Fogerty that he "felt like [he] w[as] sexually assaulted" on the phone call.  (ECF 138 at 71:1-10; ECF 138, 206:9-15).  In view of the jury's verdict, and as discussed further below, this Court must disregard Ms. Fogerty's recollection because she was contradicted on a material point by Plaintiff. Ms. Fogerty further testified that she would expect Jefferson to investigate a complaint of sexual misconduct if Plaintiff had made a complaint, but here, "there was already an investigation underway. Both sides were going to be heard.  Both sides had an opportunity to speak.  So that was this transaction."  (ECF 138, 79:16-80:15).

Plaintiff's counsel next called as of cross-examination Richard Webster, President of Thomas Jefferson University Hospitals, and Dr. Edmund Pribitkin.  Richard Webster testified on cross examination that nurses brought to his attention their concern about having to work alongside Dr. Philips in the operating room.  (ECF 138, 101:3-20).  Dr. Pribitkin testified as of cross examination that he (1) learned that Plaintiff had a sexual encounter with a resident from Dr. Vaccaro and Dr. Purtill, and then (2) spoke with Plaintiff about this issue.  (ECF 138, 117:9-17). Dr. Pribitkin testified that, on the call with Plaintiff, he informed Plaintiff that he would have to report the sexual encounter to the Medical Staff if Plaintiff remained an active member of the Medical Staff.  Dr. Pribitkin testified that because Plaintiff subsequently elected to take a leave of absence from Jefferson and was then no longer an active member of the Medical Staff, there was no hearing and no report made by Jefferson.  (ECF 138, 123:13-125:23).

Plaintiff then testified at length as to the facts leading up to the party, and a number of events that took place at the party.  He then also testified about the post-party statements he made to Dr. Vaccaro and Ms. Fogerty.

Plaintiff testified that he reported to Dr. Vaccaro that (1) the resident, Dr. Phillips was "aggressively all over me" after the party, and (2) he told Dr. Phillips that "this is not a good idea." (ECF 138, 177:6-22). Plaintiff also initially testified that Dr. Vaccaro then said he would talk to Hospital Counsel about their discussion. (ECF 138, 180:4-13). Plaintiff testified that he reached out to Dr. Purtill, Residency Director, to discuss the events, but Dr. Purtill never responded to Plaintiff. (ECF 138, 182:2-10).

Plaintiff's direct testimony was interrupted so that Dr. Vaccaro could testify as of cross. Dr. Vaccaro confirmed Plaintiff's testimony that he told Dr. Vaccaro that Dr. Phillips "was very aggressive" and "he did say he made a mistake," but Dr. Vaccaro did not "remember him [Plaintiff] saying he tried to stop it." (ECF 138, 240:2-14).

Plaintiff's counsel then called Jeanette Domanico, a Jefferson nurse, who testified that she "may have" told Jefferson lawyers (1) her belief that Jessica Phillips was making up her allegations and planned it for the money and (2) her belief that Jessica Phillips had made a prior misconduct statement against Dr. Rothman. (ECF 138, 309:9-25). Plaintiff's counsel then called Dr. Purtill as of cross, who testified that he did not respond to Plaintiff's request to speak to Dr. Purtill because "I had a woman [Dr. Phillips] in my house who was distraught, in a crisis." (ECF 145, 13:12-22). Plaintiff then completed his direct and was extensively cross-examined. Plaintiff testified that he knew that having sex with Dr. Phillips was wrong when she walked into the party, and stated that to her, directly, three times, but that she subsequently poured alcohol into his drinks and directly into his mouth. (ECF 145, 125:11-22). Plaintiff also testified that he told Jennifer Fogerty that he would like to file a Complaint when he spoke to her on July 9, 2018. (ECF 145, 141:20-143:10). He testified that he was not obligated to put anything in writing to Jennifer Fogerty, but just her hearing his Complaint verbally was enough to initiate the Title IX process. (ECF 145 at 151:7-

21).  Plaintiff further testified that he sent a response to Jefferson Legal Counsel Kristin Barrett on

December 21, 2018, with 11 points regarding his departure from Jefferson.  (ECF 145, 137:16-

22).

### B.  **Motion for Directed Verdict**

At the conclusion of Plaintiff's case, Defendants moved for a directed verdict under Rule

50, stating the grounds as follows:

**Tortious Interference**
THE COURT:  You can relate facts that you think need to be proved that
the Plaintiff hasn't proven.

MS. WOLBRANSKY:  Sure; well –

THE COURT:  I don't want a review of what has been introduced.

MS. WOLBRANSKY:  Of course; well, at the onset, Your Honor, in order
to prove a Tortious Interference Claim, the Plaintiff must prove the first
element, which is the existence of a contractual agreement.

There has been no Contract admitted into evidence in this case.  They have
not established that there was a contractual relationship between Dr.
Abraham and Dr. Roth – and the Rothman Institute, which is the Contract
that Plaintiff is alleging that the Defendants interfered with.

THE COURT:  All right.  Next?

MS. WOLBRANSKY:  Second is on the second and third elements of the
Claim, which are intent and privileged.  Those two elements are intertwined
as I'm sure Your Honor knows.

And the Plaintiff must show that the Defendants acted intentionally to harm
the Plaintiff, and that the actions were improper, meaning that those actions
were not privileged.  And the Court may determine, as a matter of law, that
the Defendant's conduct was or was not privileged.

And in this case, the Plaintiff has not done that.  It is the Plaintiff's burden
to show that the Defendants acted with a requisite intent to harm him, but
also that any of the actions that were taken by the Defendants were not
privileged.

13

There's been no evidence presented in this case that any of the actions on the part of Defendants were anything other than the job functions that they were required to perform, as part of their jobs.   There was no harm demonstrated by any of the evidence to Dr. Abraham.

. . .

THE COURT:  -- else is missing, if any, from the Plaintiff's case?

MS. WOLBRANSKY:  Well, there's no intent.  There's no privilege.  And there has been –

THE COURT:  Well, you said that already.

MS. WOLSBRANSKY:  I know.  And there's no proximity between the Defendants' acts and the nonrenewal of the Contract.  Dr. Vaccaro testified –

THE COURT:  You mean no causation?

MS. WOLBRANSKY:   Yes, Dr. Vaccaro testified that the Contract remained in effect.

THE COURT:  Okay.  I don't –

MS. WOLBRANSKY:  - until 2022.

. . .

**Title IX**
MS. WOLBRANSKY:  Yeah, we also have a Motion under Rule 50 for Plaintiff's Title IX Claim, as well.

THE COURT:  All right.  State the reasons without argument.

MS. WOLBRANSKY:   Sure; Plaintiff accuses the Defendants of discriminating against him on the basis of his gender.  And they have not introduced any evidence that any of the Defendants' actions were based on his sex.

They have to establish that the discrimination was intentional.  They also have to establish that the evidence shows that both – that the male was treated differently or less favorably than the woman, which they have not done here, and that their actions were clearly unreasonable, in light of the circumstances.

And clearly unreasonable conduct must rise to a level that is more than just negligence, which the Plaintiffs have not provide here.  And for those reasons, Your Honor, we would request that the Court grant the Defendant's Rule 50 Motion on Plaintiff's Claims.

(ECF 145, 270:1-273:2).

## C.  Testimony of Witnesses in Defendants' Case at Trial

Defendants' first witness after Plaintiff rested his case was Gaetan Alfano, Esquire, a partner at Pietragallo Grodon Alfano & Raspanti, the firm hired by Jefferson to conduct the Title IX investigation.  Mr. Alfano testified to his belief that the investigation was "free of any gender bias" and that the investigative report was accurate. (ECF 145, 285:9-287:14).  Mr. Alfano further testified that Plaintiff was given the opportunity to participate in the investigation, but he declined to do so through his counsel.  (ECF 145, 289:18-25).

Defendants then recalled Jennifer Fogerty, who testified that the information contained in Plaintiff's December 21, 2018 email to Jefferson "relinquishing" his privileges from Jefferson (JX61) was never conveyed to her during her earlier phone call with Plaintiff. (ECF 145, 333:6-22).  Defendants' next witness was Robert Toy, a Jefferson lawyer, who testified that Jefferson's objective with the investigation was to make sure that it "was done thoroughly, objectively, and completely." (ECF 145, 343:12-20).  Defendants then recalled Dr. Vaccaro, who testified that (1) the Title IX investigation "looked at the whole totality of the facts.  And it looked at both sides," and (2) Plaintiff changed his story from initially calling it a "consensual relationship between two people" to later believing the encounter to be sexual assault by Dr. Phillips.  (ECF 145, 391:15-392:4).  Because Plaintiff had testified differently on these topics, the Court cannot rely on the second testimony by Dr. Vaccaro.

D.  **Chronology of Key Events in the Period Between June and December, 2018**

The initial exchanges of correspondence and discussions between Plaintiff and Defendants during the June to August, 2018 timeframe are very relevant and are examined in greater detail with reference to trial exhibits below.

1.      On June 26, 2018, Plaintiff received either a phone call or a text message from the resident Dr. Phillips indicating that they needed to talk.  During their subsequent phone conversation, Dr. Phillips told Plaintiff that she had told her husband about what happened at the party, and that her husband was angry and wanted to meet with Plaintiff.  (ECF 138, 169:13-170:22).

2.      On June 26, 2018 (4:07 pm), Plaintiff texted Dr. Vaccaro to discuss the incident at the party: "I have an issue.  Will be home later?  Have to talk to you in person," followed by, "Might be around 8 pm…too late?  Made a big mistake….regretting it already."  JX9.  Later that day, Plaintiff texted Dr. Vaccaro, "Don't think it's illegal just unethical ..[.] ugh."  JX9.

3.      Plaintiff testified that he told Dr. Vaccaro over the phone that evening that Dr. Phillips was behaving aggressively towards him at the party: "I told him [Dr. Vaccaro], I can't even believe what happened.  She was all over everybody at the party.  She was – she had her hands all over everybody.  She was extremely aggressive.  She waited until people left.  She hid in a corner of my house, until everybody was gone.  She refused people asking to take her home.  And then, she came out and was aggressively all over me.  She was saying, come on.  I want you to F me.  I want you to F me.  You know you want to F me.  So, I described all those things.  And I'm saying F.  But she said the real word.  So it was extremely aggressive.  And he [Dr. Vaccaro] said, wow, that's not good."  (ECF 138, 177:3-15).

4.      That same day, June 26, 2018, Dr. Vaccaro wrote a Note to File indicating that Plaintiff had consensual sex with Dr. Phillips: "Dr. Abraham called me today on 6/26/2018 and

16

stated that he had consensual intercourse with a junior resident in orthopaedics [sic], Jessica Phillips, at a party of his on Saturday, June 23, 2018." Dr. Vaccaro's note further indicates, "Dr. Abraham said that he, the husband and Jessica said that they understand that what occurred was consensual but it was inappropriate." JX12.

5.      Dr. Vaccaro's June 26, 2018 note indicated that, following a call with Jefferson legal counsel Kristin Barrett, to whom he described the events, Dr. Vaccaro told Plaintiff on a phone call "not to report back to work and to take a leave of absence until a full investigation occurred." JX12. Dr. Vaccaro testified that after he had the call with Kristin Barrett, Plaintiff "had to be suspended." (ECF 138, 295:6-11).

6.      On the same day, June 26, 2018, Dr. Purtill, Residency Director, received a phone call from Dr. Phillips where he learned about the incident and then took her to his home. (JX28). Following Dr. Vaccaro's suggestion that Plaintiff call Dr. Purtill to inform him about the incident, Plaintiff texted and called Dr. Purtill on June 26, 2018, but Dr. Purtill did not respond to the text message or return the call. (ECF 138, 181:1-182:10).

7.      The next event was a "Notice of Concern" by Zoe Gingold, Jefferson's Title IX Coordinator, sent to Plaintiff on June 27, 2018. JX17. This document was required by Defendants' Title IX policy statement, JX17, and set forth notice that allegations had been made against him of "non-consensual sexual intercourse," and attached a copy of the Jefferson Title IX policy.[6]

8.      Zoe Gingold testified that, after she sent the Notice of Concern to Plaintiff, Jefferson engaged the Pietragallo law firm to perform an investigation. (ECF 137, 114:11-15). Gaetan Alfano, a lawyer from the Pietragallo law firm, confirmed that Pietragallo was contacted

---

[6] Jefferson's Title IX Policy provides that "Once a report is made, the Title IX Coordinator will determine if an investigation will occur and the parties will receive a written Notice of Concern from the Title IX Coordinator." JX17 at 10.

by Robert Toy, a lawyer at Jefferson, "early on Wednesday morning" [on June 27, 2018] after the party at Plaintiff's house to start the investigation. (ECF 145, 279:23-280:4).

9.      The next event was a response by Plaintiff (Exh. JX22) to Zoe Gingold on June 29, 2018, requesting an extension until July 7 to "make my written submission."

10.      On the same day, June 29, 2018, Dr. Vaccaro issued a letter on Rothman stationary to Plaintiff confirming that, further to their discussion from June 26, 2018 where Plaintiff reported an incident involving him and a medical resident, Plaintiff was "immediately clinically suspended from seeing patients or coming to any Rothman Institute office" until the conclusion of the investigation into this incident and "you will continue to receive compensation from The Rothman Institute . . . your cooperation throughout this process is appreciated." (JX26). This letter also follows Dr. Vaccaro's discussion with Kristin Barrett on June 26, 2018, discussed above, which resulted in the determination that Plaintiff had to be suspended from Jefferson.

11.      On June 30, 2018, Zoe Gingold sent an e-mail to Plaintiff, thanking him for contacting her, and regarding the decision to provide a written statement: "thank you for contacting me and due to the holiday weekend and the decision to provide a written statement, the written submission may be provided by Friday, July 13, 2018. I will notify you of your advisor by early next week." (JX27).

12.      On July 1, 2018, Dr. Purtill sent a memo to himself with subject, "[J]essica [P]hillips." (JX28). In this memo, Dr. Purtill describes how Dr. Phillips contacted him on June 26, 2018 and told him her version of the events during and after the party. Dr. Purtill's memo also indicated that he called Dr. Vaccaro, "who was aware already," and who had told University Counsel about the incident. Dr. Purtill's memo next indicates that Dr. Purtill repeated the information he learned from Dr. Phillips to University Counsel Kristin Barrett, who told him that

the university would obtain outside counsel to investigate.  The memo also states that Dr. Purtill "was repeating the above information" to Dr. Rothman, Mike West, Mike Sileski and Brenna Woods (HR).  (JX28)

13.     This was followed by a July 6, 2018 letter from Plaintiff to Leslie Mariotti (JX33) at the Pietragallo law firm indicating that he wanted to meet for his interview and that he wanted to have his attorney, Judd Aaron, accompany him.

14.     Next was an email from Jennifer Fogerty, Defendants' Assistant Provost, who was assigned to work with Plaintiff on the Title IX issue as his advisor.  Plaintiff had sent Ms. Fogerty a list of questions "regarding the process in this Title IX matter" on July 6, 2018, and she answered each one of the questions in her email dated July 9, 2018 (JX37).

15.     The July 9, 2018 email from Ms. Fogerty referenced a phone call between Plaintiff and Ms. Fogerty that same day.  See JX36.  Ms. Fogerty writes, "I'm glad we were able to connect today.  I have written responses to the questions in your original email below.  On the phone today you also asked the process for filing a complaint on your own – You can also use the university Title IX coordinator to file a complaint.  The Title IX coordinator is Zoe Gingold…"  (JX36). Plaintiff testified that it was during that July 9, 2018 phone call with Ms. Fogerty that he conveyed to her "that I felt like I was the one that was kind of on the receiving end of the sexual misconduct that occurred.  And she said, so you feel like you were sexually assaulted?  And I said, yes, I do." (ECF 138, 206:4-15).   The Court must disregard Ms. Fogerty's assertion that Plaintiff never conveyed to her that he was sexually assaulted. (ECF 145, 338:16-23).

16.     The next event is an e-mail chain (JX38) starting with an e-mail from Plaintiff to Dr. Pribitkin dated July 10, 2018, stating "I would like to request an immediate leave of absence from Jefferson for personal reasons" which was accepted by Dr. Pribitkin's response dated the

same day: "thank you for this notification" and "We will process your request for indefinite voluntary leave of absence effective immediately."

17.     The next important event is documented in a July 13, 2018 letter from Plaintiff's lawyer Judd Aaron, Esquire to Zoe Gingold noting that he had been retained by Plaintiff and noting that Plaintiff "will not submit a written statement tomorrow or be interviewed on Monday," because of an ongoing criminal investigation as a result of the resident's having made a "police report which prompted a criminal investigation into the same allegations that form the basis of Jefferson's Title IX investigation."  (JX42).

18.     In August 2018, Plaintiff's attorney Judd Aaron provided certain information to Rothman, but not to Jefferson, about what occurred at the party.  (ECF 145, 227:3-23).

19.     On August 20, 2018, the day of the Rothman Institute's Board of Directors vote on whether to remove Plaintiff from Rothman, Plaintiff texted Dr. Vaccaro, who was both President of Rothman and a Chairman of Orthopedics at Jefferson, "Alex can you make sure the group knows that todays discussion was only about whether it was consensual on HER part?  I am not able to make a statement about me in this regard but I certainly will after the criminal investigation is done."  JX9.

20.     On October 5, 2018, Zoe Gingold emailed Plaintiff's counsel Judd Aaron, advising him that:

> Jefferson's investigators have offered Dr. Abraham numerous opportunities to participate in the investigation, which, as you have indicated in your letter, he has declined on the advice of counsel.  As I'm sure you know, Jefferson has an obligation under Title IX of the Education Amendments Act of 1972 to resolve this matter promptly. Given the time that has already passed to date, and in the absence of a clear commitment from the police or prosecuting authority handling the criminal inquiry that the criminal matter will be resolved in its entirety by a date certain in the very near future, your request to keep the matter open must, respectfully, be denied.

> Jefferson must close the investigation and bring this matter to
> resolution.  In the event the criminal inquiry is resolved while the
> investigation remains open, or in the event he opts to participate
> regardless, certainly Dr. Abrahams [sic] would be given an
> opportunity to do so." (JX52).

21.     On October 19, 2018, Zoe Gingold writes to inform Plaintiff that the Title IX investigation has concluded, and "[u]pon review of the confidential investigatory report, I have determined that a No Charge Decision is not possible in this case. Accordingly, before issuing a formal Charge Letter and scheduling the matter for hearing, the University believes it would be in the best interests of the parties to explore whether a Non-Hearing Resolution might be feasible." (JX53).

22.     On October 19, 2018, in response to Zoe Gingold's letter indicating that the Title IX investigation has concluded, Plaintiff writes," I believe a non-hearing resolution is possible and can proceed rapidly.  I will contact you next week with further information."  (JX54).

23.     In early November 2018, the Montgomery County District Attorney declines to press charges against Plaintiff in response to Dr. Phillips' allegations.  (ECF 138, 332:21-333:3; 334:6-13).

24.     On December 14, 2018, Plaintiff emailed Dr. Vaccaro that "[i]n order to comply with the request of the RI Board, limit my losses, and regain my ability to earn an income, I am writing this email to you as Chairman to give up my clinical privileges and academic appointment at Thomas Jefferson.  Please met know what further, if anything, I need to do to resume work at Rothman Institute."  (JX61).

25.     On December 18, 2018, Plaintiff emailed Jefferson Legal's Kristin Barrett, cc'ing Alex Vaccaro, Mike West, Kristen Vogl, Richard Webster, and others, giving context to his

decision to "relinquish my privileges at Jefferson."[7]   (JX61).  The details of this email are summarized below in the discussion on Plaintiff's departure from Jefferson.

### E.  Liability Verdict

The jury reached a verdict on liability on the fourth day of trial.  The jury found that (1) Plaintiff proved, by a preponderance of the evidence, that Defendants violated Title IX by discriminating against Plaintiff on the basis of his sex, and (2) Plaintiff proved, by a preponderance of the evidence, that Defendants tortiously interfered with Plaintiff's contract with Rothman Orthopedics Institute.  (ECF 146, 123:19-124:10).

### F.  Summary of Evidence – Damages

Plaintiff testified at the start of his damages case.  Plaintiff testified that he was no longer able to apply for research grants after he left Jefferson, and that research is important for patient referrals, his national reputation, and his ability to gain employment at other academic institutions.  (ECF 146, 139:15-140:16).  He also testified to reputational damage and testified that the number of surgeries he performs annually fell after his departure from Jefferson.  (ECF 146, 140:17-25; 150:12-17).  Plaintiff's counsel next played the videotaped testimony of his Economic Expert, Chad Staller, who testified that Plaintiff's damages for loss of income amounted to $5.1 million.

Defendants then presented their expert, Edward Waddington, who testified as to his opinion that the methodology employed by Plaintiff's Economic Expert Chad Staller was flawed and that "the relevant data that he used did not provide a reasonable basis for [his] opinion."  (ECF 147, 73:14-19, 83:17-21).  Mr. Waddington further testified, without opining on the "correct" amount of damages due to Plaintiff, that Mr. Staller "can't just do a simple mathematical

---

[7] There was also litigation brought by Plaintiff against Dr. Phillips, the resident, in Common Pleas Court in Philadelphia.  The record of this case contains some testimony from that proceeding, *see* below, but that case was settled without the payment of any damages to either party.  Plaintiff still has an arbitration pending against Rothman.

calculation that says we would have the same amount of income from '17 into '21, and compare that to what [Plaintiff] actually made, and say that everything in between there, in that variance, which Mr. Staller totals to be $5.1 million, is the total of his damages [sic], is related to the actions that you have found Thomas Jefferson guilty of, or whatever actions Thomas Jefferson has breached." (ECF 147, 83:2-9).  Last, John Mordach, Jefferson's Executive Vice President and Chief Financial Officer testified regarding Jefferson's financial condition.

### G.  **Damages Verdict**

The jury reached a verdict on damages on the sixth day of trial.  The jury awarded Plaintiff eleven million dollars in compensatory awards as a result of Defendants' Title IX violation and tortious interference with contractual relations.  Of this eleven million dollars, the jury awarded 45% for the Title IX violation and 55% for tortious interference with contractual relations.  The jury also found that Plaintiff was entitled to punitive damages as a result of Defendants' tortious interference with contractual relations and awarded Plaintiff four million dollars in punitive damages. (ECF 140, 105:7-106:2).

## V.  **ANALYSIS OF TESTIMONY**

This Court includes below an analysis of certain trial testimony, taken in the light most favorable to Plaintiff, relating to important issues in this case and relevant to Defendants' Renewed Motion for Judgment as a Matter of Law.

### A.  **Testimony about Jefferson and Rothman Relationship**

#### i.  **Plaintiff's Role at Jefferson and Rothman**

Plaintiff testified about the relationship between Jefferson and Rothman:

"Sure; I mean, it's a complicated relationship.  Rothman is a private practice. Private practice employs Physicians who practice orthopedic surgery.  There are only Orthopedic Surgeons and other Musculoskeletal Providers that are at – that

are employed by Rothman.  Jefferson is the hospital where we worked.  And that is where your academic appointment comes from. So your academic appointment is basically the title of Assistant Professor, Associate Professor, and then Professor. Jefferson is also where we actually physically work.  So, there are no Operating Rooms at Rothman Institute.  The Operating Rooms are at Jefferson.  So, the easiest analogy I can think of is if you're a Racecar Driver, you need a car and a track. And you can't perform your function without either one of those things.  So you have a company that provides your car, which is like Rothman.  And you have a company that provides the track, which is like Jefferson.  And I need both of those things in order to be able to do my job."
(ECF 138, 156:10-157:3).

Plaintiff also testified as to his respective roles:

- o "At Rothman, I was the Chief of Orthopedic Oncology, which, again, is my subspecialty.  And I was an Attending Surgeon, which means I'm a fully practicing Surgeon."  (ECF 138, 157:6-8)

- o "At Thomas Jefferson, I was the Director of the Musculoskeletal Oncology Center, which I created.  That was the point of bringing me down was to create that Division that Jefferson didn't previously have.  And I was an Associate Professor of orthopedic surgery and radiation oncology."  (ECF 138, 157:10-14)

- o Plaintiff also testified that he was a shareholder of Rothman.  (ECF 138, 186:14-16)

- o "I wasn't directly employed by Jefferson.  I was employed, meaning I get my paycheck, from Rothman.  But I was privileged and a Faculty Member at Jefferson."  (ECF 138, 330:2-4)

Plaintiff confirmed that any payment for purposes of his faculty position at Jefferson would go directly to Rothman, earmarked for Plaintiff, and that he would receive the payment from Rothman.  (ECF 147, 17:20-24).

Dr. Vaccaro did testify at one point distinguishing between his roles at Jefferson and Rothman.  He said that he was trying to help Plaintiff get back into the operating room and said that Jefferson "ha[s] no power over me, because I'm Rothman.  So I just needed him to go to Capital Health, because I made a deal with Capital Health…What Jefferson does and how they decide their privilege, is totally separate from me…. I never would preclude him from working at a Rothman facility, and at Capital Health."  (ECF 138, 261:12-20; 261:25-262:1-2)

24

Ms. Gingold testified, in response to a question about who "Dr. Abraham was" with respect to Jefferson, that Plaintiff was "Chief Attending on Faculty. And we considered him in a teaching role."[8]  (ECF 137, 217:1-5). Plaintiff testified that his pay for being the Director of the Oncology Program at Jefferson was directed from Jefferson to Rothman, and then would get directed to Plaintiff.  (ECF 138, 346:1-16).  Dr. Vaccaro similarly testified that Plaintiff's pay came from Rothman, not Jefferson:

> Q: Wasn't all his [Plaintiff's] pay from Rothman?
>
> A: Except the stipends the – well, yeah, in a sense, they give us the money.  We give the stipend.  So, in a sense, he's paid by Jefferson through a stipend.  But they give us the money.  We give it to John –
>
> Q: So –
>
> A: - through a stipend for Head of the Oncological Service
>
> Q: - did Dr. Abraham ever receive a direct paycheck from Jefferson?
>
> A: I don't believe so.  (ECF 138, 279:2-11)

## B.  **Plaintiff's Counsel's Questions at Trial Did Not Allow the Jury to Differentiate between Jefferson and Rothman**

A major issue this Court has in reviewing the trial testimony is being able to understand what specific statements or conduct were made by certain witnesses on behalf of Jefferson or Rothman or both.

Plaintiff Counsel's questioning as of cross of Dr. Vaccaro, quoted in part below, who had executive level roles at both Jefferson and Rothman, does not clearly indicate whether Jefferson or Rothman is the subject of the question at issue.  Defendant's Counsel objected to the line of questioning on this basis, and this Court overruled the objection:

---

[8] Plaintiff testified that that he was an "Attending Surgeon, which means I'm a fully practicing Surgeon."  (ECF 138, 157:6-8).  In the room where surgical operations are performed, the "attending" is the person in charge of medical procedures.

Q. I don't want any names. I don't want any year details. But can we agree that this was not the first instance that you've been aware of, of a Attending Physician having sex with a Resident?

A. Correct.

Q. And at -- prior to this event, there was not a Policy in place, that you were aware of, precluding such conduct, correct?

A. Correct, I was not aware of any consensual -- against any consensual relation between a Resident and Attending.

MS. LORI: Your Honor –

BY MR. JUBB:  Q. And –

**MS. LORI: - I'm going to object to this line of questioning because is it at Rothman? They're separated as Rothman and Jefferson. I -- he's –**

…

THE COURT: You can ask him on cross. Overruled.

(Asides)

(ECF 138, 258:13-259:11) (emphasis added). Cross examination of Dr. Vaccaro by Plaintiff's

counsel shows that Jefferson and Rothman are discussed interchangeably with questions that do

not clearly delineate which entity is under discussion:

Q: After John [Abraham] had told you his version of the events that evening, am I correct that you told him, yeah, I got to report this up, and you gave a phone call over to Jefferson Legal?

A: Yes.

Q: Jefferson Legal told you to suspend John?

A: Yes.

Q: And John did not receive any pay?

A: No, no, he was suspended with pay.  So he continued to get pay.

Q: Oh, from Rothman?

A: From Rothman, I don't know about Jefferson.

Q: Okay.  And am I correct that, at Jefferson, when you got a Faculty position, there's a certain salary associated with that?

A: You get a stipend from being a Service Line Leader.

Q: Okay.  Do you also get any sort of points, or stipends, for research that you do?

A: The Rothman Institute does that.

Q: Okay.  In other words, the Rothman Institute gives a Physician certain points, or stipends, depending on the research that you do associated with Jefferson?

A: Yes.  (ECF 138, 243:23-244:9-20)

Testimony from Plaintiff similarly establishes confusion with respect to whether Dr. Vaccaro was acting in his capacity as the President of Rothman Institute or the Chairman of Jefferson Orthopedics, or both:

Q: (Lisa Lori): And I just want to be clear about something with Rothman – your arbitration against Rothman.  Jefferson wasn't involved in how they calculated – did any target calculations?

A: (Plaintiff): Well, I don't know.  That's kind of a question for the jury.  I mean, because Alex Vaccaro is Chairman of Jefferson Orthopedics and the President of Rothman Institute.  So, can he distinguish those two?  I don't know.  As far as I know, if you're my Chairman, you're always my Chairman.  And that's how people – so I don't know what the answer to that is."

…

Q: "I'm just trying to understand.  Your arbitration against Rothman, right?"

A: Right.

Q: It concerns the way they calculated –

A: Correct

Q: – your income or your numbers –

A: Correct.

Q: - 2022?

A: Correct.

Q: Jefferson had no role in that, in 2022?

A: Well, that's what I'm saying.  I'm in the middle of a Jefferson lawsuit.  And the Chairman of Jefferson tells me you have to drop the lawsuit, or we're not going to let you get back to Jefferson.  So, then, when that same person tells me, oh, hey, you didn't make your numbers, when I thought you did, I don't know.

Q: Okay.

A: Why is that happening?

Q: So –

A: Is it because he is the Rothman Chairman and thinks that I didn't make my number?  Or is it because he's the Jefferson Chairman and just told me to drop the lawsuit and everything will be okay, and now is squeezing me in my numbers?  I don't know."  (ECF 146, 173:7 – 175:10)

27

### C.  Inconsistencies in Plaintiff's Testimony

There are inconsistencies in Plaintiff's own testimony and his statements as reported by Dr. Vaccaro because he stated multiple times that his sexual relationship with a resident was a "mistake," thus suggesting that he was not an unwilling participant in the sexual encounter:

- In response to a question from Defendants' Counsel as to what Plaintiff meant by "big mistake" when Plaintiff texted Dr. Vaccaro that he "made a big mistake, regretting it already," Plaintiff testified that "[t]here were a number of mistakes.  Among those was having any kind of sexual relationship with a Resident."  (ECF 145, 217:18-25)

- Plaintiff testified, "I was the person that reported it.  And the first thing out of my mouth was I made a mistake.  So, I mean, I don't know what taking responsibility means, but – or at least what Mr. Harvey thinks it means.  But, I mean, I think that's taking responsibility for it."  (ECF 138, 176:1-5).

### D.  Contradictions in Testimony as Between Plaintiff and Other Witnesses

There are also contradictions between Plaintiff's testimony and the testimony of other witnesses:

(1) Jennifer Fogerty

(2) Bob Toy

(3) Dr. Vaccaro

Jennifer Fogerty's testimony during cross examination by Plaintiff's Counsel during Defendants' case directly contradicts Plaintiff's account that he gave Jennifer Fogerty his Complaint over the phone:

- "I would have remembered this.  This was very – this is important, specific information. I would have remembered this…What I recall from the call is that he was upset about a divorce, about needing money for camp, and he was mostly worried about his job status.  I also remember going through some of those questions. So – no, I don't recall him saying all of this during that.  But this is information that would have definitely caused me to contact Zoe Gingold or Bob Toy to discuss in detail.  This was not shared with me."  (ECF 145, 338: 16-23).

28

Bob Toy additionally disclaimed that Jefferson was aware of any allegation of sexual misconduct from Plaintiff during cross examination by Plaintiff's counsel during Defendants' case:

- "The investigation was launched into Dr. Phillips' allegation.  But the allegation – I mean – excuse me – the investigation was comprehensive and investigated the entire thing.  But – yes, the only allegation of which we were aware was that made by Dr. Phillips."  (ECF 145, 374:22-25, 375:1)

Dr. Vaccaro's testimony at times conflicted with Plaintiff's testimony about what Plaintiff told Dr. Vaccaro:

- Dr. Vaccaro testified during examination by Plaintiff's Counsel during Plaintiff's case: "He said he made a mistake.  I don't remember him saying he tried to stop it."  (ECF 138, 240:13-14)

- Dr. Vaccaro's impressions of what happened that night during examination by Plaintiff's Counsel during Plaintiff's case: "My sum totality, as I said before, is two people drank alcohol.  Two people were attracted to each other.  And two people had sex that night, consensually. That was after looking at all the data."  (ECF 138, 256:12-15)

- Dr. Vaccaro's June 26, 2018 Memorandum memorializing his call that day with Plaintiff suggests that the sexual encounter <u>was</u> consensual on the part of Plaintiff <u>and</u> Jessica Phillips from Plaintiff's recount:

    > ***Dr. Abraham called me today on 6/26/2018 and stated that he had consensual intercourse*** with a junior resident in orthopedics, Jessica Phillips, at a party of his on Saturday, June 23, 2018…***Dr. Abraham said that he, the husband and Jessica said that they understand that what occurred was consensual but it was inappropriate***.  Dr. Abraham said that he discussed with Jessica that he would disclose this to both Dr. Purtill and myself and that's why he called me…I asked Dr. Abraham in a subsequent phone call not to report back to work and to take a leave of absence until a full investigation occurred.  (JX12)

- Dr. Vaccaro's testimony on <u>when</u> he learned about Plaintiff's Complaint that Plaintiff was sexually assaulted is arguably conflicting, but Dr. Vaccaro's ultimate agreement on cross examination that Plaintiff told Dr. Vaccaro that the sexual encounter was not

consensual on his part **in August 2018** supports Plaintiff's position that Jefferson (via Dr. Vaccaro) was on notice of Plaintiff's Complaint but did not act on it:

- o Initially, Dr. Vaccaro testified on cross-examination by Plaintiff's counsel and during Plaintiff's case that Plaintiff first told Dr. Vaccaro that he was sexually assaulted in December 2018: "I had actually dictated a letter that day [December 2018], which you and I never reviewed. So it's not entered into any evidence at this trial. But – I did say, at that time, I find it hard to believe that version of the story, because that came out later on down the line. He had not said that to me, up until December. So, that's when I said to him, I find it hard to believe your characterization of her assaulting you, because you never said that to me before, until now. That's why that came out." (ECF 138, 253-254). Dr. Vaccaro did, however, agree that Plaintiff told Dr. Vaccaro that Dr. Phillips was very aggressive with him.

- o Dr. Vaccaro confirmed the late timing of Plaintiff's Complaint later during Defendants' examination of Dr. Vaccaro during Plaintiff's case, testifying that he only learned that Plaintiff was claiming he was the victim <u>after</u> the Title IX investigation had concluded: "From the very beginning that he said they were both drinking, so it was clear they were both drinking. But the he [sic] was the victim came after the Title IX investigation and the criminal investigation had gone on, or had been concluded." (ECF 138, 280:24-25; 281:1-2).

- o However, at a later point during his testimony, and on cross examination by Plaintiff's counsel after being called by Defendants, Vaccaro testified that the pertinent discussion between Plaintiff and Dr. Vaccaro occurred in <u>August 2018</u>, and that Dr. Vaccaro was wrong about the December 2018 timing: "When he called me that night [in June 2018], he did not complain that he was attacked or raped by the woman that night. That came out down the line." (ECF 145, 390: 16-18) and "Title IX looked at the whole totality of the facts. And it looked at both sides. So, John Abraham's Complaint in December was different than what his Complaint to me was in June. In June, he mentioned that it was a consensual relationship between two people. As the investigation began, he, then, told me later on, like I mentioned yesterday, that he believed that he was assaulted by her." (ECF 145, 391:20-25; 392:1-2). Dr. Vaccaro then clarified that Plaintiff telling him "later on" that it was not consensual related to the discussion between Plaintiff and Dr. Vaccaro in August 2018. (ECF 145, 393:10-22)

### E. Testimony and Arguments about the Party

Below are several instances in which Plaintiff, against this Court's directive, testified about

the party:

- Plaintiff testified, "[t]here was no rape. There was no – I mean, literally the words were, 'I want you to F me.' And that is what I heard." (ECF 138, 188:8-11). Then Jefferson

objected, and this Court sustained the objection, saying "What happened there is – not the issue." (ECF 138, 188:17-19).

- In response to Defendant counsel's question, "Did you know it was wrong to have sex with Dr. Phillips," Plaintiff responded, "Right; and I really need to know a clarification on the time, because when she walked into the party, I absolutely knew that it was wrong. I stated it to three people, all of whom recounted that in the statement. I stated that to her, directly, three times. This is wrong. We can't do this. This is not right. **She went ahead and poured alcohol into my drinks, and even poured alcohol directly into … my mouth at one… point**." Defendant's Counsel objected to this response as nonresponsive, and this Court overruled the objection. (ECF 145, 125:11-25) (emphasis added).

- In response to Plaintiff counsel's question, "Did you believe that [Dr. Phillips' husband] actually did have a right to be angry?" Plaintiff responded, "…I mean, from my standpoint, here's a woman that she [sic] was not going to take no for an answer that night. **And she did everything in her power to ensure that there was a sexual – that there was sexual activity to take place, so – with a man who's not her husband**. So if I'm her husband, I would be angry about that kind of activity." (ECF 145, 261:16-25) (emphasis added).

### F.  Plaintiff's Testimony about the Sunday Morning Sexual Encounter

Plaintiff's testimony about his sexual encounter with Jessica Phillips the "morning after" does not suggest that he was the victim of sexual misconduct that morning. This testimony, however, does not conflict with Plaintiff's assertions that Dr. Phillips was sexually aggressive towards him <u>the evening prior</u>, which the jury may have considered more credible.

- Plaintiff's May 8, 2023 state court trial testimony read into the record by Jefferson counsel during Jefferson's case: "When I woke up… the next morning, I turned. I turned and saw her there. And I was kind of – I don't know if upset is the right word. But I was kind of in disbelief that that happened. Like I mentioned, I had no intention of having sex with anybody that night, let alone one of my Residents, and one of my Residents in the program, anyway. And that was clear. I made it clear more than three times during the night to different people that I didn't think it was a good idea. So I was kind of a little bit in disbelief. I saw her there. She woke up. We had a bit of conversation. And it was basically just small talk, light chitchat. And then, kind of all of a sudden, she got up on the bed on her hands and knees and said – she was like, smiling and kind of giggling. And she said, I want you to F me in this position. This is my favorite position… So I got up. I didn't get up but I kind of – I didn't get up but I kind of [sic] into an elevated position in the bed. I kind of rolled over. She was, again, on her hands and knees. I got behind her. I couldn't get an erection. I wasn't

fully aroused.  I put my hand on her back and I was trying to get an erection.  It just wasn't really happening.  And I really don't recall if there was any actual penetration.  Clearly, we were trying to have sex.  But it was sexual activity."  (ECF 145, 231:24-233:3).

### G. Ethics

The below testimony from Dr. Vaccaro and Plaintiff discusses Plaintiff's conduct as an ethical violation:

- Dr. Vaccaro testified during Plaintiff's case, "I'm the Chairman of Orthopedics [at Jefferson].  So my job is to make sure we educated Residents, Fellows.  And you can't have sex with someone you're educating."  (ECF 138, 272:20-22)  Dr. Vaccaro also testified, "It's a problem if she's a Medical Student.  It's a problem if she's a Resident.  It's a problem if she's a Fellow.  As long as she's in our Department, it's a problem."  (ECF 138, 273:3-5).

- June 26, 2018 (5:31 pm) Text message from Plaintiff to Dr. Vaccaro: "Don't think it's illegal, just unethical, ugh."  (ECF 138, 271:8-11)

- Plaintiff testified during Plaintiff's case and on cross-examination by Defendants' Counsel, "I think, in general, yes, it would be improper for a consensual relationship to happen between an Attending and a Resident.  So, to make that decision that we are going to do this is – would be improper, in particular if there's a Resident that's directly supervising a Resident – oh, sorry, an Attending that's directly supervising a Resident."  (ECF 145, 124:4-9)

- Plaintiff testified on cross examination during Plaintiff's case that there is a power differential between an Attending Physician and a Resident/Student.  (ECF 145, 156:23-24; 157:1-14)

### H. Plaintiff's Departure from Jefferson

Exhibit JX-61 is an e-mail chain of communications that took place in December of 2018.

The first e-mail in this chain is from Plaintiff to Dr. Vaccaro dated December 14, 2018 at 8:54 a.m. and states as follows:

> In order to comply with the request of the RI Board, limit my losses, and regain my ability to earn an income, I am writing this email to you as Chairman to give up my clinical privileges and academic appointment at Thomas Jefferson Hospital.

Please let me know what further, if anything, I need to do to resume
work at Rothman Institute.

Thank you.

The next email in the chain is from Dr. Vaccaro to Plaintiff, also including Kristin Barrett

(Associate General Counsel, Office of Legal Affairs at Jefferson), Kristen Vogel (Jefferson), and

Mike West (Rothman), Subject:  RE: Privileges:

Thank you John, Kristen please advise on the steps Alex

The next email in this chain is from Kristin Barrett to Plaintiff:

Hello Dr Abraham,

Dr. Vaccaro forwarded me your email regarding your resignation.
Can you please clarify whether you are resigning from the medical
staffs of all hospitals owned or partially owned by Jefferson?  For
example, does your resignation include Kennedy and ROSH in
addition to Thomas Jefferson University Hospital?

Thank you,
Kristin

The next e-mail in this chain is a page and half long, single-spaced, from Plaintiff to Kristin

Barrett with a show copy to Dr. Vaccaro, Mike West, Kristen Vogel, Richard Webster, Robert

Toy, Andrew Miltenberg, and Patricia Hamill re: Privileges.  Plaintiff writes that he "wanted to

respond to you [Ms. Barrett and Mr. Toy] to give much needed context to my decision to relinquish

my privileges at Jefferson."  (JX61).  Plaintiff further writes that this "is a decision I am compelled

to make due to present circumstances since, as I understand it, I have no ability to return to any

type of gainful employment without doing this."  Plaintiff writes that Mr. Toy "has had several

extensive discussions with my legal counsel regarding the relinquishment of my privileges in

connection with Thomas Jefferson's closure of the pending Title IX complaint against me without

any further action and without any finding of responsibility against me." (JX61). Plaintiff then lists eleven points, including:

- "I was the first person (not the complainant) to report complainant's sexual misconduct *towards me*, in a complaint to Alex Vaccaro who asked me to contact Jim Purtill to formalize my Complaint."

- "My complaint regarding the Jefferson resident was ignored completely by program director Jim Purtill, who I attempted to reach several times by phone and text after making my initial report to Dr. Vaccaro. Dr. Purtill never called me back or responded in any way to my report that I had a problem with a resident that needed his attention immediately. This is clearly documented in a text message, all prior to the resident's false complaint."

- "To this day, no recognition or investigation by Jefferson of my complaint against the resident, made first and directly to Dr. Vaccaro, and subsequently to Jim Purtill, and to Jennifer Fogerty in the Title IX office, has been made." (JX61)

Plaintiff's testimony during trial further suggests that Plaintiff felt he was constructively forced to resign following a conversation with Jefferson's Legal Counsel Bob Toy, in which Bob Toy stated that a hearing outcome in Plaintiff's favor was "highly unlikely":

- Plaintiff testified that his lawyer was in communication with Bob Toy (Jefferson's Counsel), and Bob Toy said words "to the effect of, it is highly unlikely that there will – that you will not have a [f]inding against you in this hearing. So, I mean, that tells me that this is not going to be a fair hearing. It's Jefferson running the hearing, running the – the Hearing Panel is Jefferson. The people doing the investigation is Jefferson. The people – it's all run by Jefferson. And Jefferson is telling me, you're not going to have a fair hearing." (ECF 138, 233:4-18)

  o Bob Toy expressed his personal opinion in a letter to Dr. Phillips' counsel as follows: "I made clear, early in the process to Dr. Abraham's Counsel, that it was my personal belief that any resolution would require Dr. Abraham to sever his relationship from Jefferson." (JX69; ECF 145, 376:18-377:25)

- Plaintiff then testified: "So, I did the next option which that [sic] was available to me, which was to resign, which was essentially [sic] I was being forced to do. I was told, you cannot get to work until you resign from Jefferson." (ECF 138, 234:6-9)

- Plaintiff also testified that "the Jefferson Lawyer [Toy] tells me, after reading a Report, which, in the end, is almost entirely favorable towards me, tells me there is no way, essentially – paraphrasing, but there's no way you're going to survive a hearing. So,

in my mind, there really was no choice.  There was no choice.  Nobody was listening to me.  I tried to file Complaints.  I tried to file a Complaint with Jennifer Fogerty.  I tried to file a Complaint with Alex Vaccaro.  I tried to file a Complaint with Jim Purtill.  Jim Purtill wouldn't even pick up the phone.  And he knew what was going on." (ECF 145, 113:1-13)

- Plaintiff confirmed that he knew, by resigning, that he wouldn't be facing a hearing board.  (ECF 145, 154:1-3)

I. **Plaintiff's Refusal to Participate in the Title IX Investigation Pending his Criminal Investigation**

Gaetan Alfano, the outside investigator hired by Jefferson to conduct the Title IX investigation, testified during Defendants' case and without contradiction that he never heard from anyone on Plaintiff's behalf that they wanted to provide information, even after the criminal investigation was completed.  (ECF 145, 296:20-24).

J. **#MeToo Movement and Jefferson's Response to Dr. Phillips' Complaint**

Defendants had to react to the incident.  The event giving rise to Plaintiff's Title IX claim occurred in June 2018, which was the height of the #MeToo movement in the United States.  In 2018 alone, Christine Blasey Ford testified against now-Justice Brett Kavanaugh before the Senate Judiciary Committee, alleging that he sexually assaulted her while they were high school students, Bill Cosby was sentenced to prison for sexual assault, and Mario Batali was asked to step down from the ABC show he had been co-hosting in the wake of sexual assault allegations.[9]

The impact of the #MeToo movement was felt acutely on university campuses.[10]  It also permeated through the court systems, where courts have since addressed the impact of external pressures on universities responding to Title IX claims.  See, e.g., Simons v. Yale Univ., 2024 WL 182208, at *9 (D. Conn. Jan. 17, 2024) (finding no direct evidence of discrimination actionable

---

[9] Major #MeToo Moments of 2018 (businessinsider.com)
[10] See Lena Felton, The Atlantic, How Colleges Foretold the #MeToo Movement - The Atlantic

under Title VII where Defendant testified that the University "responded to community concern that YSM [Yale School of Medicine] had 'taken a faculty member who was guilty of sexual harassment and was leaving him in a leadership position," which was "distinguished from acting upon pressures from the 'Me Too' movement" and Defendant "recognized (over the previous decade) a justified increase in the awareness of sexual harassment, and in public attention to the official responses thereto.")

The Third Circuit has recognized that public pressure, while insufficient alone to state a claim that the university acted with bias in the Title IX context, is relevant to alleging a claim of sex discrimination.  In <u>Doe v. University of Sciences</u>, 961 F.3d 293 (3d Cir. 2020), the male plaintiff alleged that USciences, in its implementation and enforcement if its sexual misconduct policy, succumbed to external pressure from the federal government.  <u>Id.</u> at 209.  In particular, the male plaintiff asserted that, after the Department of Education issued the 2011 Dear Colleague Letter, USciences "limited procedural protections afforded to male students like [Doe] in sexual misconduct cases" and that the school, "encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women." <u>Id.</u> at 209-210.

With respect to external pressure from the Department of Education, the Third Circuit in USciences noted that the 2011 Dear Colleague Letter "ushered in a more rigorous approach to campus sexual misconduct allegations," <u>Id.</u> at 210 (citing <u>Doe v. Purdue Univ.</u>, 928 F.3d 652, 668 (7th Cir. 2019)).  This precedential decision further noted that an official from the Department of Education's Office of Civil Rights warned that "[s]ome schools still are failing their students by responding inadequately to sexual assaults on campus.  For those schools, my office [in Department of Education] and [the] Administration have made it clear that the time for delay is

over." Id. (citing Purdue Univ., 928 F.3d at 668 (citing Examining Sexual Assault on Campus, Focusing on Working to Ensure Student Safety, Hearing Before the S. Comm. On Health, Educ., Labor, and Pensions, 113th Cong. 7 (2014) (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.))).  The Third Circuit in USciences ultimately held that the plaintiff states a plausible claim of sex discrimination based on his allegations about selective investigation/enforcement in combination with his allegations related to external pressure from the Department of Education's 2011 Dear Colleague Letter.

USciences is not an anomaly.  Title IX plaintiffs have also argued in other cases that a university's interest in combatting sexual assault, stemming from internal and external pressures, is an indicator of gender bias.  In Doe v. St. Joseph's Univ., 832 Fed. Appx. 770 (3d Cir. 2020) (NPO), the plaintiff argued that his university's emphasis on combatting sexual assault reflects the school's gender bias.  He noted, for example, that (1) a school presentation encouraged students to believe and support those who claimed to be victims of sexual assault, (2) the university had a financial incentive—a federal grant—to encourage students to report sexual misconduct, and (3) the university retained its existing sexual misconduct policy in the face of new guidance from the United States Department of Education.  Id. at 774.

In the (nonprecedential) opinion, the Third Circuit found that all these facts are gender neutral but noted that "some courts have properly pointed to internal or external pressure when evaluating gender bias" in cases containing "indicia of specific intent to punish male students." Id., citing Doe v. Univ. of the Scis., 961 F.3d 203, 210 (3d Cir. 2020) (gender bias plausibly alleged where the school, "encouraged by federal officials, ha[d] instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women"); Menaker v. Hofstra Univ., 935 F.3d 20, 27 (2d Cir. 2019) (gender bias plausibly alleged where,

among other things, the school "faced internal criticism for its assertedly inadequate response to
male sexual misconduct on campus" (emphasis added)); Doe v. Purdue Univ., 928 F.3d 652, 669
(7th Cir. 2019) (gender bias plausibly alleged where, among other facts, school-affiliated group
shared an article titled "Alcohol isn't the cause of campus sexual assault.  Men are."); Doe v.
Baum, 903 F.3d 575, 586 (6th Cir. 2018) (gender bias plausibly alleged where, for example," news
media consistently highlighted university's poor response to female complainants" (emphasis
added)); Doe v. Miami Univ., 882 F.3d 579, 594 (6th Cir. 2018) (gender bias plausibly alleged
where school was being sued by a female student for failing to expel her alleged attacker).

Similarly, in Doe v. Columbia Univ., 831 F.3d 46 (2d Cir. 2016), the Second Circuit, in
vacating the district court's judgment dismissing a Title IX male plaintiff's complaint, noted that
the Complaint gives "ample plausible support to a bias with respect to sex" where it includes
allegations that "there was substantial criticism of the University, both in the student body and in
the public media, accusing the University of not taking seriously complaints of female students
alleging sexual assault by male students."  Id. at 57.  The Second Circuit held that "[a]gainst this
factual background, it is entirely plausible that the University's decision-makers and its
investigator were motivated to favor the accusing female over the accused male, so as to protect
themselves and the University from accusations that they had failed to protect female students
from sexual assault."  Id.  Cf. Doe v. Samford University, 29 F.4th 675, 691 (11th Cir. 2022)
(finding that "the allegations in the complaint about the university's public statements "at most
support a reasonable inference of pro-complainant bias, not pro-female bias.  And the assertion
that public pressure led the university to discriminate on the basis of sex is not supported by facts").

Defendants were required to take Dr. Phillips' rape allegations seriously, but also, these
cases suggest that appeals to the #MeToo movement and public pressures on universities to

38

investigate female allegations of sexual assault by male university members may in fact <u>support</u> a male plaintiff's assertions of improper gender bias.  In these cases, as in the present case, the #MeToo movement provides important background context.

### K.  <u>"Between a Rock and a Hard Place"</u>

Following up on the nutshell introduction to this opinion, the parties in this case were, as the well-known saying goes, "between a rock and a hard place" throughout the course of their Title IX investigation. Defendants received conflicting accounts from Plaintiff, the resident Dr. Phillips, and other employees as to what occurred at the party and were tasked with reconciling these discordant representations and shepherding the parties towards a fair resolution.  As explained throughout this Memorandum, this Court cannot grant Defendants' Renewed Motion for Judgment as a Matter of Law on the Title IX claim here given Plaintiff's testimony that (1) he brought a complaint to Jefferson that Jefferson did not investigate and (2) he was intoxicated the evening of the party and thus incapable of consenting to the sexual encounter.  It is nevertheless useful to consider, as this Court has, other cases where a Defendant University is "between a rock and a hard place" in its effort to perform a reasonable and/or fair investigation in response to a Title IX claim.

**<u>Doe v. Rollins</u>.**  In <u>Doe v. Rollins College</u>, 77 F.4th 1340 (11th Cir. 2023) (petition for certiorari docketed), a former student, Doe, brought an action alleging that Defendant Rollins College violated Title IX when it disciplined him after a female student at Rollins College accused Doe of sexual assault and Rollins College's investigation determined that Doe violated the sexual misconduct policy. <u>Id.</u> at 1343.  Doe sued Rollins in federal court, asserting two claims under Title IX: selective enforcement and erroneous outcome.  <u>Id.</u>  The district court concluded that there was "no evidence by which a reasonable juror could conclude [that] Rollins['] conduct toward Doe

was motivated by his gender." Id. Doe and Roe attended a party, and afterwards, went to Doe's room, where sexual intercourse occurred. Id. at 1344. "But Doe's and Roe's recollections of how they ended up at Doe's room, and what happened once there, differ," with Doe asserting that the event was consensual and Roe asserting that it was not. Id. Unlike this case, however, "[i]t is undisputed that Doe (unlike Roe) did not allege any misconduct" on the part of Roe in so far that he "did not make a complaint that Roe had sexually assaulted him." Id. at 1352. Additionally, unlike this case, "[c]ritically, Doe never claimed that he was incapacitated." Id. at 1353. The Eleventh Circuit held that the district court properly granted summary judgment in favor of Defendant Rollins College on Doe's Title IX claims for selective enforcement and erroneous outcome. Id. at 1365. The Eleventh Circuit noted that the record:

> contains some evidence of Doe drinking alcohol on the night in question. But this was not enough to create a genuine issue of material fact as to whether Rollins discriminated against Doe on the basis of sex by failing to investigate Roe. Given that Doe did not file a complaint against Roe, and that Doe disclaimed any incapacity, no reasonable jury could find that Rollins' failure to investigate Roe was based on sex. Id. at 3154.

**Burks v. Board of Trustees.** In Burks v. Board of Trustees of Florida Agricultural and Mechanical Univ., 505 F. Supp. 3d 1273 (N.D.Fl. 2020), Plaintiff brought a Title IX discrimination claim that "boils down to whether Defendant was deliberately indifferent once it received actual notice of the alleged misconduct." Id. at 1281. "Deliberate indifference occurs when the official's 'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" Id. (citing Kocsis v. Florida State Univ. Bd. Of Trustees, 788 F. App'x 680, 684 (11th Cir. 2019)). In response to an investigation that recommended that the "same-sex allegations [were] unsubstantiated," Plaintiff in that case argued that the investigation was "mediocre" and "reached conclusions that do not comport with the facts [the investigator] gathered." Id. The

Court noted that "[t]he question is not whether [the university] could have done better; it is whether [the university] acted with deliberate indifference to its Title IX obligations when it received actual notice of misconduct." Id. at 1282. The Court held that Defendant is entitled to summary judgment on Plaintiff's claims of Title IX discrimination where Plaintiff "has cited no evidence from which a reasonable jury could find Defendants' response to the alleged discrimination was clearly unreasonable in light of the known circumstances." Id. (internal quotations omitted).

**Robinson v. Howard.** In Robinson v. Howard Univ., Inc., 335 F. Supp. 3d 13 (D.D.C. 2018), a tenured law professor brought a Title IX action against a private university after receiving a confidential letter of reprimand (among other disciplinary actions) for acts of sexual harassment, principally, asking female students to answer an "inappropriate and sexually suggestive question during one of his lectures." Id. at 32. The Court noted that, "[i]n an audacious move, Mr. Robinson [Defendant] argues that he, rather than his students, is the victim of a Title IX violation" due to "anti-male bias" in the outcome of the university's Title IX investigation. Id. at 27. The Court found, contrary to the law professor's claims, that "the available evidence shows that the University applied its facially gender-neutral Title IX policy in a reasonable manner." Id. at 28.

> Ms. Smiley's Report, for instance noted that Mr. Robinson's quiz question "creates an uncomfortable situation for any male or female student," as it may require students "to disclose intimate details" about their personal grooming habits. [ ] Neither the Report nor the University's later correspondence with Mr. Robinson show that the University's Title IX staff harbored anti-male biases. Mr. Robinson's claim therefore fails.

Id.

### L. **Contributory Negligence**

This Court considers whether Plaintiff's own conduct initiated the events resulting in this case. Many Title IX decisions implicitly indicate that a sliding scale exists for a university's investigatory duties, depending on the circumstances surrounding the alleged transgression.

In <u>L. v. Houston Indep. Sch. Dist.</u>, for instance, the Fifth Circuit analyzed a high school student's Title IX deliberate indifference claim against a school district for its allegedly inadequate response to a classmate's sexual assault.  776 F. App'x 839 (5th Cir. 2019).  Initially, the Fifth Circuit made clear that it was "the school's response to allegations of sexual assault, consensual or not, that determines whether the school acted with deliberate indifference," rather than "whether the assault was *actually* consensual."  <u>Id.</u> at 843-44.  Based on that framing, the Court concluded that "<u>in a situation where there is some indication that the incident may have been consensual</u>, and where there is the potential for criminal charges if it was an assault, it is not 'clearly unreasonable' to rely on the investigative expertise of a law enforcement agency."  <u>Id.</u> at 844; <u>see also</u> <u>Waters v. Metro. State Univ.</u>, 91 F. Supp. 2d 1287, 1292 n.6 (D. Minn. 2000), <u>aff'd,</u> 52 F. App'x 1 (8th Cir. 2002) ("In the context of sexual harassment in the college or university environment, "consensual" is not merely a magic word. Rather it is a characterization of behavior which, if a true characterization, removes the behavior from the threat of statutory sanction. The University was legally justified in relying upon Ms. Waters' own assertions that the affair was consensual."); <u>Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.</u>, 526 U.S. 629, 649 (1999) (establishing the "clearly unreasonable" test).

Simply put, this line of cases stands for the proposition that a university's duty to investigate lessens when there is independent evidence that an incident was consensual.

Here, recall that Plaintiff's Title IX theory of harm is two-fold.  First, it is that Jefferson discriminated against Plaintiff on the basis of sex <u>during</u> its investigation of Dr. Phillips's claim of misconduct.  Second, it is that Jefferson discriminated against Plaintiff by <u>failing to initiate</u> a separate investigation into Plaintiff's distinct claims of sexual misconduct by the resident.

As Jefferson construes the record, each investigatory decision matched the seriousness of the respective allegations.  On the one hand, Dr. Phillips immediately reported the sexual encounter as rape, a very serious felony, after which Jefferson rightly and extensively investigated her claims. By contrast, Jefferson argues, Plaintiff merely informed Jefferson personnel that (1) he had made an "unethical but not illegal" mistake and (2) that Dr. Phillips had been aggressive with Plaintiff. Plaintiff did not, Jefferson contends, promptly or specifically assert that he was a victim of sexual misconduct (at least initially).

To the extent the record unequivocally supports this framing, it would further support a conclusion that Jefferson permissibly chose **not** to open a [separate] investigation that (1) focused on Plaintiff's perspective and (2) treated Dr. Phillips as the accused.  Indeed, from a contributory negligence standpoint, we might even go one step further.  Because Dr. Phillips reasonably and immediately alleged that Plaintiff was the aggressor (as evidenced by Dr. Phillips's bruises and her informing Dr. Purtill), that upfront allegation entirely undermined the credibility of Plaintiff's vague "counterclaim," and also undermined Jefferson's need to independently investigate Plaintiff's perspective.  Accordingly, **if** the record demonstrates that Jefferson's actions were indeed guided solely by the nature of the respective allegations—rather than party gender—the jury could not have reasonably found in his favor on the Title IX claim.

The same sentiment applies in equal force to power dynamics.  As the Tenth Circuit has held, "on its own, evidence of an employer's discriminatory treatment of a group to which both genders can belong does not give rise to an inference of gender discrimination."  Doe v. Univ. of Denver, 952 F.3d 1182, 1997 (10th Cir. 2020).

As one such example, consider Ludlow v. Northwestern University.  There, the Northern District of Illinois dismissed a professor's Title IX claim against his university for its handling of

43

two students' sexual harassment complaints.  79 F. Supp. 3d 824 (N.D. Ill. 2015).  In so doing, the district court explained that while the professor had "set out a list of problems with the [] investigation," his complaint "contain[ed] no explicit or implied link to sex or gender."  Id. at 835-36.  Specifically, the Ludlow Court found that simply because the university's investigators "went on to conclude [the professor] had unequal power in the relationship, failed to cite any university policy against such relationships, and failed to consider evidence of [the victim's] prior romantic history," these errors did not "create a plausible inference that [the investigation and its conclusions were intentionally biased against [the professor] because he is male."  Id. at 836 (emphasis added).

Rephrased and distilled, a university's discriminatory treatment based solely on student-teacher power dynamics does not create an inference of gender discrimination.  As such, a university's decision to favor a student's claims over a teacher's claim, without more, does not give rise to a plausible Title IX violation.  Applied here, to the extent the record narrowly and singularly reflects that Jefferson discriminatorily investigated Dr. Phillip's claims more thoroughly than Plaintiff's solely due to the parties' respective roles resident/attending, a jury would not be permitted to find Jefferson liable under Title IX on that ground.

At the post-trial Rule 50 stage, the question we must ask is whether a reasonable jury could have concluded that Jefferson's conduct was motivated (1) solely by the nature and severity of the parties' cross-allegations, (2) solely by resident-attending dynamics, or (3) some combination of both.

Based on the record, we cannot overturn the jury's verdict on these grounds.  As noted above, while Jefferson attempted to recast Plaintiff's messages to Jefferson personnel as vague and incomplete/informal complaints, significant evidence points to the contrary.  Most notably, Plaintiff expressly testified at trial that he contemporaneously informed Jennifer Fogerty he was a

victim of "sexual misconduct."  He similarly informed Dr. Vaccaro that Dr. Phillips had been aggressive, and likewise later expressly conveyed to Dr. Vaccaro that he was subject to Dr. Phillips's alleged sexual misconduct.

In view of the verdict, any doubts about the Plaintiff's credibility must be ignored.  If a reasonable jury could find otherwise, we cannot grant Judgment as a Matter of Law on these grounds.  See, e.g., Doe v. Delaware State Univ., No. CV 20-1559-MN-JLH, 2022 WL 613361 (D. Del. Mar. 2, 2022), report and recommendation adopted, No. CV 20-1559(MN) (JLH), 2022 WL 823580 (D. Del. Mar. 18, 2022).

Likewise, the record contains at least one specific instance of a Jefferson employee explicitly referencing Plaintiff's gender in connection with its investigation.  Unless we view these references (along with other circumstantial evidence that might implicate gender's role) to be insufficient as a matter of law to support a jury's finding of gender discrimination, we simply cannot overturn the verdict on these grounds.

## VI.   DISCUSSION OF INCONSISTENT AND CONTRADICTORY TESTIMONY

Defendants' briefs point out many inconsistencies and contradictions arising out of Plaintiff's changing statements, particularly as compared to trial testimony.  The jury's verdict obviously requires the Court to ignore testimony contradictory to statements by Plaintiff as having legal significance in this case.  "Conflicting evidence which could reasonably lead to inconsistent conclusions will not justify a judgment notwithstanding the verdict….It is the function of the trier of fact alone … to evaluate contradictory evidence and to draw inferences therefrom."  Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1178 (3d Cir. 1976), cert. denied, 429 U.S. 1053 (1977).  "[S]ince there is evidence in the record to support the jury's verdict, especially when the majority of the evidence came from witness testimony, the credibility of which had to be weighed,

45

this court will not disturb the verdict."  Steinberg v. Boyer, 1991 WL 197316, at * 2 (E.D.Pa. 1991) (Naythons, M.J.).

1.      At the early stages, Plaintiff admitted that he had made "mistakes" and had also sent a text message to this effect.  See JX9, June 26, 2018 text message from Plaintiff to Dr. Vaccaro ("Made a big mistake….regretting it already," and, "Don't think it's illegal just unethical ..[.] ugh.").  However, as of at least July 9, Plaintiff adopted a different position.

2.      The Plaintiff's basic position, as articulated at the post-trial oral argument, more specifically than in the trial record, is that Defendants were on notice of improper behavior by the resident, as of the July 9, 2018 discussion with Jennifer Fogerty, if not through earlier discussions with Dr. Vaccaro in June 2018, and were duty bound, by the policy statement, to issue a "Notice of Concern" to the resident but did not do so.  Plaintiff also asserts that the sexual contact was consensual only by the resident but not by him, and that Defendants failed to investigate this specific contention.

3.      Although Plaintiff has made arguments in this litigation that Defendants should have commenced a [separate] investigation of the female resident, once the July 13, 2018 letter by Plaintiff's attorney Judd Aaron had been communicated to Defendants, Plaintiff had made clear that he was not going to speak to, or submit anything in writing to, Defendants.  Plaintiff does not give a good or satisfactory answer as to why he would have expected Jefferson to commence an investigation into his claims when he was refusing to cooperate.

4.      However, in view of the jury verdict, and in the absence of a specific Rule 50 statement by defense counsel at the close of Plaintiff's case on this point, the Court cannot give any weight to contradictory positions by the Plaintiff.  The jury may have very well thought that Plaintiff had made his position clear, and did not have to repeat it, and that under the Policy,

Jefferson should have but did not specifically undertake an investigation of the conduct of the resident.

## VII. PLAINTIFF'S ASSERTION THAT HIS COMPLAINT WAS NOT INVESTIGATED

Plaintiff's testimony that Defendants did not investigate his complaint that he was the victim of sexual misconduct presents the largest hurdle to granting Defendants' Renewed Motion for Judgment as a Matter of Law on the Title IX claim. Plaintiff testified that he told Jennifer Fogerty that <u>he</u> was the victim of sexual assault, thus triggering Jennifer Fogerty's obligation to report Plaintiff's complaint to the Title IX coordinator, Zoe Gringold, which she did not do. Plaintiff testified that he told Jennifer Fogerty during a phone call on or around July 9, 2018, that "I felt like I was the one that was kind of on the receiving end of the sexual misconduct that occurred. And she [Jennifer Fogerty] said, so you feel like you were sexually assaulted? And I said, yes, I do." (ECF 138, 206:9-15). Plaintiff testified that "[m]y recollection is recounting the entire story to her." (ECF 138, 207:25-208:1). Plaintiff also testified:

- "I never, during this entire period, to this day, have ever claimed that what happened that night was consensual on my part. And I wanted to make sure that he [Dr. Vaccaro] knew that, when they were talking about consensual, that it was on her [Jessica Phillips'] part. She has made the statement that it was consensual on her part." (ECF 138, 226:8-13)

- In reference to one of Plaintiff's discussions with Dr. Vaccaro: "And he [Dr. Vaccaro] said, do you expect anybody to believe that a man is sexually assaulted by a woman? And I said, well, that's what happened. He said – and he said, a man cannot be sexually – he said, John, a man cannot be sexually assaulted by a woman." (ECF 138, 228:17-21) [11]

---

[11] However, here, Vaccaro was not the relevant decision maker with any power to direct or decide the conclusion of the Title IX investigation at Jefferson. "To be probative, allegedly discriminatory statements must be made by the relevant decision maker." <u>Nichols. v. Loral Vought Sys. Corp.</u>, 81 F.3d 38, 41-42 (5th Cir. 1996); <u>see</u> <u>Sandstad v. CB Richard Ellis, Inc.</u>, 309 F.3d 893, 899 (5th Cir. 2002) ("Oral statements constitute evidence of discrimination if they indicate [discriminatory] animus and the speaker is principally responsible for the plaintiff's firing."). "Here, [Dr. Vaccaro] did not take part in the [Jefferson Title IX] investigation of [Plaintiff], the termination decision, nor the determination that he should be offered the option to resign, and as such he does not constitute a relevant decisionmaker." <u>Rosario v. Texas Veterans Commission</u>, 607 F. Supp. 3d 711, 717-718 (W.D. Tex. 2022).

- "[M]y clear understanding was that I had given my Complaint to Jennifer Fogerty. She accepted it. She said, I will talk with Zoe Gingold. And since she – and she replied, acknowledging that, and then said, you can also talk to Zoe Gingold, if you want. But she had told me she was talking to Zoe Gingold." (ECF 145, 253:3-8)

This testimony of Plaintiff requires this Court to deny Defendants' Post-Trial Motion for Judgment as a Matter of Law.

## VIII.  RENEWED POST-TRIAL MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Parties' Contentions with Respect to Defendants' Renewed Motion for Judgment as a Matter of Law

Defendants moved for renewed judgment as a matter of law pursuant to Rule 50(b). ECF 152. With respect to the Title IX claim, Defendants argue that there was no evidence at trial sufficient to support the jury's conclusion that Jefferson discriminated against Plaintiff on the basis of his sex. Jefferson argues that:

(1) Plaintiff did not prove that Jefferson "selectively enforced" its disciplinary policy against him;

(2) Plaintiff did not prove that Jefferson was "deliberately indifferent" to any alleged gender discrimination against him;

(3) Plaintiff did not prove that he was a victim of an "erroneous decision" from a flawed disciplinary process; and

(4) Jefferson cannot be liable under Title IX because their conduct under the circumstances was not "clearly unreasonable."

(ECF 152 at 4-10). In his Response in Opposition to Defendants' Motion for Judgment as a Matter of Law (ECF 156), Plaintiff argued that Defendants waived their arguments about selective enforcement, deliberate indifference and erroneous outcome by not raising them in their motion for judgment as a matter of law at the close of Plaintiff's case. (ECF 156-2 at 12). Plaintiff also asserts, in any event, that the evidence at trial "conclusively established that Defendants were

48

obligated to investigate Plaintiff's claims regarding Dr. Phillips' improper sexual aggression and behavior – but did not; rather they only investigated her allegations – and even when that very investigation did not support those allegations, they suppressed that evidence all to harm the accused man, based on the sheer allegations of the woman." (ECF 156-2 at 13-14). With respect to Jefferson's assertions that their conduct under the circumstances was not "clearly unreasonable," Plaintiff argues that there is no requirement for "clearly unreasonable," but the jury charge nevertheless encompassed this standard. (ECF 156-2 at 14-15).

In their Reply, Defendants argue (1) Jefferson did not waive its right to make a renewed motion for judgment as a matter of law, nor any of the arguments made in it, and (2) the evidence at trial was insufficient to establish a Title IX violation. ECF 165.

### B.  Legal Standard for Renewed Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) allows a district court to enter judgment as a matter of law at the conclusion of a jury trial, notwithstanding a jury verdict for the opposing party, on the renewed motion of a party, but "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001).[12]  This is a "sparingly invoked remedy." Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).

A district court may grant judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Le Page's, Inc. v. 3M, 324 F.3d 141, 145-46 (3d Cir. 2003) (citation and internal quotation marks

---

[12] "A motion for judgment notwithstanding the verdict cannot be made unless a motion for directed verdict was made by the party at the close of all evidence." Yohannon v. Keene Corp., 924 F.2d 1255, 1261 (3d Cir. 1991). This discussion applies to both the Title IX and Tortious Interference claims.

omitted).  "The court may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury."  <u>Parkway Garage, Inc. v. City of Philadelphia</u>, 5 F.3d 685, 691-92 (3d Cir. 1993), <u>abrogated on other grounds by</u> <u>United Artists Theatre Cir., Inc. v. Twp. Of Warrington</u>, 316 F.3d 392 (3d Cir. 2003); <u>see also</u> <u>LePage's</u>, 324 F.3d at 145-46 ("[R]eview of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict.").

"Conflicting evidence which could reasonably lead to inconsistent conclusions will not justify a judgment notwithstanding the verdict….It is the function of the trier of fact alone … to evaluate contradictory evidence and to draw inferences therefrom."  <u>Fireman's Fund Ins. Co. v. Videfreeze Corp.</u>, 540 F.2d 1171, 1178 (3d Cir. 1976), <u>cert. denied</u>, 429 U.S. 1053 (1977).  In other words, "[n]ormally, when the evidence is contradictory, a JNOV is inappropriate."  <u>Bonjorno v. Kaiser Aluminum & Chemical Corp.</u>, 752 F.2d 802, 811 (3d Cir. 1984).

## C.  <u>Judgment as a Matter of Law Cannot be Granted on the Title IX Claim</u>

Here, this Court cannot grant judgment as a matter of law on the Title IX claim without improperly weighing the evidence or determining the credibility of witnesses.  Plaintiff testified that he told Jennifer Forgerty that <u>he</u> was the victim of sexual assault, thus triggering Jennifer Fogerty's obligation to report Plaintiff's complaint to the Title IX coordinator, which she did not do.  While there are inconsistencies in Plaintiff's own testimony (as to whether the sexual encounter was a "mistake" or an assault), and inconsistences between his testimony that he was assaulted and the testimony of others (Jennifer Fogerty disclaims that Plaintiff made an assault allegation), Third Circuit precedent makes clear that conflicting evidence "will not justify a judgment notwithstanding the verdict" and "[i]t is the function of the trier of fact alone … to evaluate contradictory evidence and to draw inferences therefrom."  <u>Fireman's Fund</u>, 540 F.2d at

1178.  "In our system, judgments involving [Plaintiff]'s credibility and the persuasiveness of his evidence are rightly reserved for the jury."  <u>Reynolds v. Univ. of Penn.</u>, 684 F. Supp. 2d 621, 628 n.6 (E.D.Pa. 2010).

Furthermore, Defendants failed to preserve some of the grounds upon which they seek judgment as a matter of law in their renewed motion by not raising them in their motion for directed verdict.

Under Federal Rule of Civil Procedure 50(a)(2), a party may move for judgment as a matter of law "at any time before the case is submitted to the jury."  If the court denies this motion, the moving party may renew the motion within twenty-eight days after entry of judgment.  Fed. R. Civ. P. 50(b).  "'Since the post-submission motion is nothing more than a renewal of the earlier motion, however, the party may not raise any new issue that she did not raise in her pre-verdict motion."  <u>In re Prosser</u>, 534 Fed. Appx. 126, 131 (3d Cir. 2013) (citing 9B Charles Wright & Arthur Miller, Federal Practice & Procedure Section 2537 (3d ed. 2013)) In order to preserve an issue for judgment, "[t]he specific grounds for a JNOV must be asserted in the motion for a directed verdict."  <u>Bonjorno v. Kaiser Aluminum & Chemical Corp.</u>, 752 F.2d 802, 814 (3d Cir. 1984), <u>cert. denied</u>, 477 U.S. 908 (1986) (internal quotations omitted).  "If the issue was not raised in the motion for the directed verdict at the close of all the evidence, it is improper to grant the JNOV on that issue."  <u>Id.</u>  "Absent a motion in accordance with Federal Rule of Civil Procedure 50(a), judicial reexamination of the evidence abridges [a party's] Seventh Amendment right to a trial by jury."  <u>Fineman v. Armstrong World Indus., Inc.</u>, 980 F.2d 171, 183 (3d Cir. 1992).

In this case, Defendants argued in their motion for directed verdict at the close of Plaintiff's case that:

> (1) Plaintiffs "have not introduced any evidence that any of the Defendants' actions were based on his sex";

(2) Plaintiffs "have to establish that the discrimination was intentional"

(3) Plaintiffs "have to establish that the evidence shows that both – that the male was treated differently or less favorably than the woman, which they have not done here, and that their actions were clearly unreasonable, in light of the circumstances"; and

(4) "Clearly unreasonable conduct must rise to a level that is more than just negligence."

ECF 145 at 272:13-273:2. In their Renewed Motion for Judgment as a Matter of Law, Defendants argued that Plaintiff did not prove (1) selective enforcement, (2) deliberate indifference, (3) erroneous outcome, or (4) that Jefferson's conduct was "clearly unreasonable." ECF 152 at 5-10.

Defendants preserved their fourth argument that Defendants' conduct was not "clearly unreasonable." However, Defendants' remaining three post-trial arguments do not fare so well. While Defendants' motion for directed verdict touched aspects of their arguments raised post trial—e.g., intentional discrimination is required for Title IX claims, and "clearly unreasonable" conduct is an element of "deliberate indifference"—Defendants did not assert these three "specific grounds" in their motion for a directed verdict, and thus failed to preserve these arguments. See Bonjorno, 752 F.2d at 814 (emphasis added). This Court is similarly unpersuaded that Defendants' broad assertion during their motion for directed verdict that Plaintiff had "not introduced any evidence that any of the Defendants' actions were based on his sex" preserves these three arguments where Defendants failed to specifically argue that these three doctrinal frameworks apply.

Even assuming that Defendants did not waive their arguments, Defendants' asserted bases for granting judgment as a matter of law are unpersuasive.

Title IX of the Education Amendments of 1972 states that "[n]o person…shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance[.]" 20 U.S.C. Section 1681(a).  "Because Title IX prohibits….subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline [when sex] is a motivating factor in the decision to discipline." Doe v. Univ. Sciences, 961 F.3d 203, 209 (3d Cir. 2020) (citing Doe v. Columbia Univ., 831 F.3d 46, 53 (2d Cir. 2016).  Some Circuit Courts have examined Title IX claims using particular doctrinal frameworks.  The Second Circuit, for example, recognized erroneous outcome and selective enforcement as two theories under which a plaintiff may allege a Title IX violation. Yusef v. Vassar College, 35 F.3d 709 (2d Cir. 1994).  The Sixth Circuit additionally recognizes the deliberate indifference theory.  Doe v. Miami Univ., 882 F.3d 579, 589 (6th Cir. 2018).

The Seventh Circuit, however, observed that "[a]ll of these [theories] simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student," and "ask[e]d the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against [the student] 'on the basis of sex'?" Doe v. Purdue Univ., 928 F.3d 652, 667-68 (7th Cir. 2019).

The Third Circuit adopted the Seventh Circuit's "straightforward pleading standard" and held that, "to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." Univ. Sciences., 961 F.3d at 209.  The Third Circuit acknowledges that parties are "free to characterize their claims however they wish," but notes that this standard "hews must closely to the text of Title IX." Id. (citing 20 U.S.C. Sec. 1681(a)).

53

While Defendants argue that the Univ. Sciences decision has no bearing here since it was decided in the motion to dismiss context, other circuit courts, including the Eleventh Circuit, have extended the Univ. Sciences standard to the summary judgment stage: "Here we simply modify the inquiry to fit review of a grant of summary judgment: could a jury presented with the record evidence, viewed in [Plaintiff]'s favor, reasonably find that [Defendant] discriminated against [Plaintiff] on the basis of sex?" Doe v. Rollins, 77 F.4th 1340, 1351 (11th Cir. 2023); see also Doe v. Univ. of Denver, 1 F.4th 822, 830 (10th Cir. 2021) (reframing the Seventh Circuit's test for summary judgment review). This Court agrees with the Eleventh Circuit's approach and sees no reason, considering the Third Circuit's decision in Univ. Sciences, to require Plaintiff to prove his case by means of one of the doctrinal frameworks.

Defendants also argue that Jefferson cannot be liable under Title IX because their conduct under the circumstances was not "clearly unreasonable." Defendants raised this issue in their Rule 50 oral motion during trial, and thus did not waive this argument:

> They also have to establish that the evidence shows that both – that the male was treated differently or less favorably than the woman, which they have not done here, and that their actions were clearly unreasonable, in light of the circumstances.
>
> And clearly unreasonable conduct must rise to a level that is more than just negligence, which the Plaintiffs have not provide here. And for those reasons, Your Honor, we would request that the Court grant the Defendant's Rule 50 Motion on Plaintiff's Claims.
>
> ECF 145 at 272:17-273:2.

"Clearly unreasonable" conduct by a university is a required element for finding "deliberate indifference" in the Title IX context. "To be liable under Title IX, the university would have to have 'substantial control over both the harasser and the context in which the known harassment occurs." Hall v. Millersville Univ., 22 F.4th 397, 407 (3d Cir. 2022) (citing Davis ex

rel. v. Monroe Cnty. Bd. Of Educ., 526 U.S. 629, 645 (1999)).  "Moreover, the university would

have to know of the harassment and ultimately respond in a manner that is 'clearly unreasonable.'"

Id. (citing Davis, 526 U.S. at 648-49).  This Court notes that a university's investigation need not

be "flawless" to withstand a finding of sex discrimination.  See Roe v. St. John's University, 91

F.4th 643 (2d Cir. 2024) ("[T]he allegation that a university conducted its disciplinary proceedings

in a less-than-flawless manner does not automatically permit a factfinder to reasonably infer that

a university has committed sex discrimination.")   However, as explained throughout this

Memorandum, Defendants never issued a "Notice of Concern" based on Plaintiff's complaint of

sexual misconduct raised to Jennifer Fogerty and therefore the Court cannot grant Defendants'

Post-Trial Motion for Judgment as a Matter of Law.

IX.    **JUDGMENT AS A MATTER OF LAW WILL BE GRANTED ON TORTIOUS INTERFERENCE LIABILITY**

In contrast to the Title IX claim, both parties at trial devoted far less attention to Plaintiff's tortious interference claim. Despite the lack of clarity, this Court has deduced three theories of liability from the (1) pleadings in pretrial proceedings, (2) trial argument and evidence, and (3) post-trial motions. This Court will elucidate them in turn.

Those theories are that (1) Plaintiff's initial suspension from Rothman; (2) Dr. Purtill's decision to share information about the alleged assault with the Rothman directors and shareholders; and (3) Plaintiff's "constructive discharge" from Jefferson all caused Plaintiff's eventual termination from Rothman. Much of the evidence is reviewed in the Title IX discussion above, unless it is specifically relevant to tortious interference.

A. **Pretrial Proceedings**

The below excerpts represent the totality of the parties' pretrial pleadings on this claim.

1. Amended Complaint.

250.    To set forth a claim for tortious interference with business relations, a plaintiff must allege:  1) a contractual relationship; 2) the purpose or intent to harm the existing relationship, 3) the absence of privilege or justification on the part of the defendant; and 4) actual damage to plaintiff as a result of defendant' conduct.
251.    Dr. Abraham had a contractual relationship with third party, Rothman Orthopaedics.
252.    Defendants TJU and TJUH were aware of Dr. Abraham's contractual relationship with Rothman Orthopaedics.  Through their agents and employees, Defendants engaged in purposeful action, specifically intended to harm Dr. Abraham's existing contractual relationship with Rothman Orthopaedics.  (Amend. Compl. ¶¶ 250–52) (emphasis added).

2. Defendants' Answer.

250.    Denied as stated. The allegations in paragraph 250 are conclusions of law to which no response is required. To the extent a response a required, the allegations are denied.

251.     Denied as stated. The allegations in paragraph 251 are conclusions of law to which no response is required. To the extent a response a required, the allegations are denied.

252.     Admitted in part; denied in part. It is admitted only that Jefferson was aware that Plaintiff was employed by Rothman. The remaining allegations are denied. Jefferson specifically denies having knowledge regarding the nature of Plaintiff's contractual relationship with Rothman Orthopaedics. The remaining allegations in paragraph 252 are conclusions of law to which no response is required. To the extent a response is required, the allegations are denied. (Defs. Answer ¶¶ 250–52)

In opposition to Defendants Motion for Summary Judgment, ECF 69-3, Plaintiff sketched three separate theories of tortious interference liability.

First, Plaintiff argued that Dr. Vaccaro and Dr. Purtill, learned information as agents of Jefferson, which they relayed to Rothman and led to Plaintiff's initial suspension from Rothman in June 2018. ECF 74-1, 24

Second, Plaintiff argued as a result of Jefferson's actions, that Rothman pressured him to relinquish his privileges at Jefferson. Id. at 24–25.

And third, Defendants, according to Plaintiff, "prohibited Dr. Abraham from fulfilling his employment duties at Rothman" by refusing to allow Plaintiff working at Jefferson hospitals. Id.

This conduct was allegedly part of Defendants' "flagrant effort to further its goal of avoiding the certain outcome of a man being the victim of the unlawful conduct instead of the woman." Id. at 25.

### B.  Trial Theories

During Plaintiff's case in chief at trial, counsel again rested its tortious interference claim on Rothman's initial suspension of Plaintiff at Jefferson's direction. In opening, counsel stated:

"You will hear evidence, as well, for Plaintiff's Claim of tortious interference. It's a legal jargon for, did you mess with Contracts that I had or potential future Contracts? Jefferson told Rothman to suspend him. And by this unfair treatment, he wasn't allowed to perform his surgery within Jefferson."

ECF 137, 34:2–8. Additionally, Plaintiff's counsel argued that because of Jefferson's actions, Plaintiff "wasn't able to do certain things that could otherwise generate revenue for other entities that he needed to bill. [Defendants] diminished his capacity to do that." Id. at 34:18–20. Plaintiff also claimed that Dr. Purtill sharing Dr. Phillips's account of events with Rothman in the summer of 2018 constituted tortious interference. ECF 145, 23:23–26:4.

In closing, Plaintiff's counsel repeated these three lines of argument. Counsel emphasized how Dr. Purtill sharing Dr. Phillips's allegations with Rothman, Rothman's initial suspension of Plaintiff, and Plaintiff's departure from Jefferson affected his revenue obligations with Rothman. ECF 146, 59:22–61:21. Regarding the last point, counsel pointed out that Plaintiff's "ability to meet his contractual obligations [was] hampered." Id. at 61:19–20. Finally, in summarizing tortious interference for the jury, counsel reiterated that tortious interference lies if Plaintiff "has an inability or [the interference] makes his Contract performance harder." Id. at 63:22–23. Counsel contended that liability rose and fell with whether "Jefferson interfered with [Plaintiff's] ability to perform a Contract . . . or [whether Jefferson] defamed [Plaintiff] to certain people." Id. at 65:18–23.

### C. Defendants' Motion for Judgement Notwithstanding Verdict and Post-Trial

As documented above, at the close of Plaintiff's case, Defendants moved for a tortious interference judgment as a matter of law. ECF 145, 269:4–272:8. At this Court's instruction, defense counsel argued insufficiency of evidence on four grounds: Plaintiff failed to prove:

> (1) the existence of a contract between Plaintiff and Rothman,
>
> (2) that Defendants intentionally sought to harm Plaintiff's contractual relationship with Jefferson,
>
> (3) that Defendants acted without privilege or justification with respect to any interferences in the Rothman / Plaintiff contract, and

(4) that Defendants caused Rothman to terminate Plaintiff's contract.

Id. In response to Defendants' revived Rule 50 motion, Plaintiff primarily reasserts that evidence supported the jury's verdict on three theories of liability. Defendants' tortious interference manifested in:

(1) telling Rothman to suspend Plaintiff,

(2) in Dr. Purtill, learning information as an "agent" of Jefferson, telling Rothman directors and the Rothman Board Dr. Phillips's side of the story, and

(3) Plaintiff failing to meet revenue obligations after he relinquished privileges at Jefferson.

ECF 156-2, at 21–23. Plaintiff raised one additional argument, based on testimony brought out in trial, that in November 2021, Dr. Vaccaro told Plaintiff that he could not return to Jefferson unless he dropped his lawsuit against the Defendants. ECF 138, 348:16–49:01; ECF 146, 174:22–75:10.

In their written Motion for Judgment as a Matter of Law after trial and during post-trial oral argument, Defendants re-invoked the above four grounds. ECF 152-2, 10–14. At oral argument, Defendants elaborated that, under Pennsylvania law, the interference must go beyond causing the Plaintiff's performance of a contract to be more difficult to perform, but rather must induce a third party to not perform a contract with the Plaintiff. ECF 173, 10:14–11:15. Defendants argued that no tortious liability can causally flow from Plaintiff's departure from Jefferson because the loss of operating privileges at Jefferson only made it harder for Plaintiff to meet his revenue obligations with Rothman, which cannot constitute a causal link of tortious interference under Pennsylvania law. Id. Plaintiff countered that Defendants waived this argument because they did not raise it at any point during trial. Id. at 12:16–22.

59

## X.   TRIAL TESTIMONY

The Court begins with a review of two portions of the record relevant to Plaintiff's tortious interference claim. First, this Court will review evidence related to the critical events in Plaintiff's tortious interference claim, with minimal duplication of evidence reviewed above. Next, this Memorandum summarizes and elaborates on the interconnectedness of Rothman and Jefferson, which is critical context for Plaintiff's tortious interference claim.

### A.   Insufficient Evidence of Tortious Interference

#### i.   Plaintiff's Suspension from Rothman

Dr. Vaccaro testified that he suspended Plaintiff from Rothman on June 26, 2018, after (1) a call with Plaintiff where he told Dr. Vaccaro his version of the events from the party and (2) Dr. Vaccaro called Kristin Barrett, Jefferson legal counsel, who told Dr. Vaccaro to suspend Plaintiff.[13] JX12. The June 29, 2018 Letter of Suspension from Rothman, signed by Dr. Vaccaro on Rothman stationary, to Plaintiff suggests that Rothman (via Dr. Vaccaro) suspended Plaintiff immediately after a phone call between Dr. Vaccaro and Plaintiff (with no mention of the phone call between Dr. Vaccaro and Kristin Barrett):

> This letter is to follow up our [sic] discussion from Tuesday, June 26, 2018 whereby you reported an incident involving you and a medical resident.  This letter is confirming that you were immediately clinically suspended from seeing patients or coming to any Rothman Institute office until the conclusion of the investigation into this incident.  During the investigation period you will continue to receive compensation from The Rothman Institute.

JX26. Dr. Vaccaro was arguably acting upon information provided by Plaintiff himself in his decision to suspend Plaintiff from Rothman, rather than information provided by Jefferson. The Letter of Suspension never mentions Jefferson; the letter attributes the suspension only to "our discussion [between Plaintiff and Vaccaro] from Tuesday, June 26, 2018, whereby you [Plaintiff]

---

[13] Plaintiff was suspended with pay from Rothman. ECF 138, 278:23–279:1.

reported an incident involving you and a medical resident." <u>Id.</u> Similarly, Dr. Vaccaro's testimony established that Plaintiff's call to Vaccaro explaining the events from the party from Plaintiff's perspective was at least the catalyst for the suspension:

> Q: After John [Abraham] had told you his version of the events that evening, am I correct that you told him, yeah, I got to report this up, and you gave a phone call over to Jefferson Legal?
> A: Yes.

ECF 138, 243:23–2. However, other evidence shows that Dr. Vaccaro's motivating animus was the rape allegation, learned through discussions with Dr. Purtill and Kristin Barrett. Dr. Vaccaro confirmed during re-cross that Jefferson told him, via Barrett, to suspend Plaintiff, presumably from Rothman, because there was a rape allegation. <u>Id.</u> at 295:6–11. Dr. Vaccaro later testified that he told Plaintiff he had to be suspended because of the rape allegation against him:

> The Court: Dr. Vaccaro, when you say that you told Dr. Abraham that he had to be suspended, you said that to him, right?  Is that right?
> The Witness: Yes, I –
> The Court: Okay.
> The Witness: - called Kristen Barrack.
> The Court: Well –
> The Witness: Yeah.
> The Court: - why did he have to be suspended?
> The Witness: There was a rape allegation.

<u>Id.</u> at 296:13–22. Dr. Vaccaro's testimony that Plaintiff had to be suspended because the rape allegation against him is further substantiated by Dr. Purtill, who (1) received a call from Dr. Phillips on June 26, 2018 explaining her side of the story and (2) then memorialized his involvement in the events of June 26, 2018 in a memorandum that he sent to himself on July 1, 2018. JX28. The Purtill memo sheds light on the timing of Plaintiff's suspension: after speaking

to Dr. Phillips, Dr. Purtill "called [A]lex Vaccaro who was aware already." Id. Dr. Purtill told Dr. Vaccaro the information he received from Dr. Phillips and recorded in his memo that Dr. Vaccaro "had already told university counsel." Id. Dr. Purtill wrote that "University counsel Krist[i]n Bar[r]ett called me. I repeated the information above to her. She noted that the university would obtain outside counsel to investigate," then "Alex [Vaccaro] called me again saying that [J]ohn Abraham had been suspended pending investigation." Id.

### a.  Rothman Investigation and Decision Whether to Keep Plaintiff at Rothman

Rothman conducted a separate investigation into the incident. ECF 145, 223:4–19. Plaintiff testified that he himself did not answer questions during that Rothman investigation, but his lawyer did, supra:

> Q: During this process, Mr. -- excuse me. Mr. Harvey, in his opening, was, like, waving around a couple of questions that he said you answered for Rothman. Tell us about those.
>
> A: So, there were all these investigations going on at the same time. There was the Title IX investigation. There was this criminal investigation. And Rothman, who, again, separate from Jefferson, was doing their own investigation, they had elected to send a list of questions for me to answer in written format. But I wasn't able to, because of the criminal investigation, as I told you.
>
> Q. So, did you ever answer any sort of questions?
>
> A. I, myself, did not.
>
> Q. During this process, was there ever a discussion amongst the Rothman Board Members, which you were a part of, as to whether or not to keep you around?
>
> A. I believe there was.
>
> Q. And were you present for that interaction?
>
> A. No.
>
> Q. Do you know whether -- well, by present, I mean were you in the room for the vote?
>
> A. Correct; right. I understood that. And I was not.

ECF 138, 222:2 –22.

ii.  **Dr. Purtill's Information Communicated to Rothman**

On cross examination by Plaintiff's counsel, Dr. Purtill testified that he communicated to several Rothman personnel—Dr. Rothman, Mike West (Chief Executive Officer of Rothman Orthopaedics during the relevant time period), and Mike Selesky (Rothman Corporate Attorney)— Dr. Phillips's allegations as he later memorialized, and that "the Resident [Jessica Phillips] had been taken to the Crisis Counseling Center and was being cared for." ECF 145, 29:15–30:1. Dr. Purtill also testified on cross examination that he read his Memorandum summarizing his conversation with Jessica Phillips on or around June 26, 2018, to the Rothman Board Members. Id. at 21:25–22:4.

Plaintiff's testimony regarding the Rothman Board Meeting suggests that Dr. Purtill made statements against Plaintiff when the Rothman Board was considering whether to keep Abraham:

> Q. Tell us a little bit about that event, why it was occurring. What do you recall about it?
>
> A. Sorry, which event?
>
> Q. The Shareholder Board Member Meeting at Rothman about whether or not to keep you.
>
> A. Okay. So, there was -- they had to come up with what to do, what kind of a plan or what they were going to do. And the plan that was devised by the Rothman Board was that they would have a vote, given whatever evidence they could come up with, and have that vote, and determine if they were going to keep me as an Employee at Rothman or not, and a Shareholder, also. So, Shareholder means Owners. I was Part-Owner of Rothman Institute, as well as a Physician there.
>
> Q. And during that process, did anyone from Jefferson ever take any sort of statements about you?
>
> MS. LORI: Objection.
>
> A. I mean, I –
>
> MS. LORI: Calls for hearsay.
>
> THE COURT: Overruled.
>
> A. At that time, I didn't necessarily know who was making any statements or anything, because, again, I was kind of out of contact with everybody. But I've come to understand that there were statements made by Dr. Purtill.

ECF 138, 222:2–223:20.

### iii.   Plaintiff's "Constructive Termination" from Jefferson on December 14, 2018

As discussed, <u>supra</u>, Plaintiff relinquished his Jefferson clinical privileges and academic appointment on December 14, 2018.

Dr. Vaccaro testified at trial that Plaintiff was still employed by Rothman and still a partner at Rothman at the time he relinquished his privileges at Jefferson and gave up his faculty appointment on December 14, 2018.   ECF 138, 287:1–19.   However, of note, Plaintiff testified that Rothman's decision (to tell Plaintiff to resign from Jefferson) was influenced by Jefferson:

> Q: Okay.   Now, with that in mind [Abraham's relinquishment of privileges email to Jefferson], what did you mean when you say per the decision of the Board of the Rothman Institute?   What did you mean by that?
>
> A: Well, Rothman Institute was my Direct Employer, meaning if I wanted to get a job, I was clearly not going to be working at Jefferson.   I needed a job within the context of Rothman Institute at one of their other hospitals.   **And their decision, as they were told by Jefferson, by Kristen Barrack, was that I had to resign in order to get back to work.**

<u>Id.</u> at 323:11–20 (emphasis added). Plaintiff testified that it was "my understanding [ ] that that's what Jefferson had told him":

> A: "He [Vaccaro] said, you have to resign from Jefferson.   And we will move you to another hospital. And he had suggested a hospital called Capital Health, partly because Rothman, they had a – were working out kind of a deal with them to bring some of the Surgeons up there, but also partly because that's where my children live.   They live close to that hospital. So he said, John, you got to resign from Jefferson. And then, we will move you up to Capital Health."
>
> Q: And did Dr. Vaccaro give you any sort of insight into where he received those instructions from?
>
> A: Which instructions are these?
>
> Q: You got to withdraw from Jefferson.
>
> A: I – well, that's what Jefferson – that was my understanding is that that's what Jefferson had told him.
>
> Ms. Lori: Objection, Your Honor, speculation.

The Court: Overruled; are you objecting?

Ms. Lori: I object. Yes, I did, of speculation.

The Court: Yeah, overruled.

Id. at 229:25–230:17.

### a. Plaintiff's Post-Jefferson Employment with Rothman

Plaintiff testified that Dr. Vaccaro helped Plaintiff find a new job at Capital Health because Rothman had a relationship with Capital Health and because Plaintiff's children lived near Capital Health. In this vein, Dr. Vaccaro testified to his independent decision-making power with respect to Abraham's role at Rothman:

> Q: And ultimately, Jefferson told you, if he withdraws his privileges, then he can come back. Is that fair, back to Rothman?
>
> A: **Well, they have no power over me, because I'm Rothman. So I just needed him to go to Capital Health, because I made a deal with Capital Health.** I'd explained to him that this gentleman, from my understanding of the information, did not rape, did not assault a woman. It was consensual. And I said, would it be okay if he go to Capital? What Jefferson does and how they decide their privilege, is totally separate from me.
>
> Q: So you didn't take advice from Kristen Barrack [Jefferson] in an email that said, here's what John needs to say in his email to withdraw his privileges?
>
> A: **What she tells me to do is – that's her prerogative. What I do in Rothman is totally different. I never would preclude him from working at a Rothman Facility, and at Capital Health.**
>
> Q: In other words, Rothman is a Third Party. And Jefferson's separate?
>
> A: Right; so I'm letting John operate. But I don't have control over Thomas Jefferson. So that's why I pushed him to go to Capital Health.

ECF 138, 261:9–262:7 (emphasis added). Plaintiff confirmed that Dr. Vaccaro came up with the plan to have him work at Capital Health:

> "I think I – well, so I was able to – after that letter I sent – the email in the end of 2018, because I had resigned, as they instructed me to do, I was then able to start working again at Rothman. I already had, at that time, privileges at Fox Chase. So that was the first hospital I could go back to. And then, I had applied according to the plan that Dr. Vaccaro had come up with, to privileges at Capital Health…So I had started up working at Fox Chase probably about March was the first time I

65

walked back in the door of a hospital. And then, I think, at the end of April or beginning of May [of 2019] is when I started working at Capital Health."

ECF 146, 165:8–24. Dr. Vaccaro testified that Plaintiff "went to Capital Health, which is where he ended up working. He could be exposed to Residents at Capital Health, but not the Residents at Thomas Jefferson Universities. That's the conditions we did, because it was a Resident and an Attending relationship." ECF 138, 251:8–13.

### iv. <u>Termination of Plaintiff's Contract at Rothman</u>

Dr. Vaccaro testified at first that Rothman's decision not to renew Plaintiff's contract did not have anything to do with Jefferson:

> Q. Did Rothman's nonrenewal of Dr. Abraham's Contract have anything to do with Jefferson?
> A: No.

ECF 138, 289:7–9. However, on cross examination by Plaintiff's counsel, Dr. Vaccaro agreed that Plaintiff was always able to "make his numbers" (i.e. perform enough work to continue qualifying as a partner) prior to June 2018, when the party occurred, but unable to do so after June 2018:

> Q. Okay. And I want to make sure everyone has a very clear picture as to the Rothman-Jefferson situation. And I tried to avoid it, for a number of reasons. But, with respect to both you and what you have going on, John analyzed his situation as having a car on a track with making operations for Rothman. If someone takes away the track, you can't put your car and get to where you need to go. All right? So if John doesn't have the Operating Rooms from Jefferson, the 400, 500 surgeries a year, he's not going to be able to do that at Capital Health, correct?
>
> A. Well, he's not going to be able to do it well. Capital Health, what he does there is -- he could do that. I don't know what the situation is. But you could, unless John thinks he can't. John knows better than I do about what the opportunities are. But he can do that at Jefferson.
>
> Q. Fair enough; and since -- I appreciate that. But we will let John talk about that. But can we agree that, at least from your knowledge of both Rothman and Jefferson, the amount of surgeries that John is capable of performing directly relates to the revenue received from Rothman?

A. Yes.

Q. And to the extent that he's unable to perform those surgeries for Rothman, revenue decreases, correct?

A. Yes, when he did not -- he didn't get any -- well, he didn't -- he just got his monthly pay, correct.

Q. Yes; and when it comes to how he was compensated and the lifestyle at the time, and his twin daughters, and his ex-wife, and his house, that was based off his compensation of Rothman as of June 1st, prior to the rape allegations, correct?

A. Right.

Q. And can we agree that, at no point prior to June 2018, when he was a Shareholder, did he ever not make his numbers, correct?

A. Correct.

Q. Okay. And the reason -- just to be clear -- he was afforded, in 2018, after this happened and he wasn't able to work, it was Rothman's position that he didn't make those numbers, correct?

A. The reason why we didn't renew his Contract?

Q. Well, I'm just focused on 2018. I don't want to get into –

A. Sure.

Q. - any of the stuff that you have to deal with Counsel.

A. Yeah.

Q. As of 2018, John, according to you, did not make his numbers, correct?

A. (No audible reply).

Q. He –

A. He probably did not. I don't -- I haven't done the math before I walked in here. But probably he did not make his numbers.

Q. Okay.

A. I agree.

Q. And then, in 2019, your position, as well, he did not make his numbers then, either, correct?

A. He did not.

Q. And in 2020, everybody got a bye because of COVID, correct?

A. Yes.

Q. And in 2021, according to you, he also did not make his numbers, correct?

…

A. You'd have to get a – you'd have to hit a certain threshold.

…

Q. And because of his inability, can we agree that, when he had access to all of the Jefferson Operating Rooms and the OR, and the Nurses, he made his numbers?

A. Yes.

Q. And the numbers of surgeries that her [sic] performed wherever was reduced significantly from when before Jefferson told you to suspend him, correct?

A. Yes.

Id. at 290:12–294:5. Plaintiff testified that he was unable to meet his production requirements from the time of the allegation to the time he sent an email to Dr. Vaccaro in December 2018 relinquishing his privileges at Jefferson: "So we have to make a certain amount of production. Or we have to earn a certain amount of income from cases. And I had only – and it's difficult to make, even if you're working 12 months of the year, let alone 6 months, with essentially is the – I only worked for six months that year." Id. at 317:1–6.

Plaintiff's testimony explained why his termination from Rothman took so many years (pursuant to the Rothman partnership contract) established that his surgeries at Jefferson helped him meet his revenue thresholds under the Rothman partnership contract:

> A. Well, there's a Partnership Contract that defines exactly how you lose your partnership, or get terminated from the group. And that is basically a three-step process. So the minimum number of years that someone can be in the practice before they end up getting terminated is going to be three years. So the first year is considered a bye, a Mulligan, we call it. So you have your Mulligan year. Everybody has some possibility of having a bad year. So you get a Mulligan. The second year, you get a penalty that's applied. And it's a -- it's based on a percentage. And that percentage is not horribly onerous. But it hurts to get a penalty. Then, the third year, you get a very high penalty, which is almost equal to your entire income from your cases. And then, if you don't meet it after that, then you're terminated.
>
> Q: Ultimately, were you terminated from Rothman?
>
> A. I was.

ECF 145, 106:4–20. Crucially, testimony also showed that Rothman had relationships with many healthcare systems besides Jefferson Dr. Vaccaro testified that Rothman had "relationships

with multiple Healthcare Systems, like Appen Health down in Orlando, Florida; NYU, up in New York. We used to have a relationship with Hackensack Hospital. So, we have a[n] academic and a business relationship. We do surgeries at these hospitals, and so forth. We're the closest with Jefferson, because that's where we started." ECF 138, 265:25–266:6. Plaintiff, in fact, worked at one of those affiliates, Capital Health, after he departed from Jefferson. Id. at 344:23–345:3.

## B. **Rothman and Jefferson Were Intertwined**

As discussed, supra, the record is opaque as to the precise nature of the relationship between Rothman and Jefferson. Simply put, while numerous witnesses testified that Rothman was "separate" from Jefferson—at least as to management and compensation factors—those same witnesses repeatedly stressed that these two entities worked very closely together.[14] Most importantly, Dr. Vaccaro and Dr. Purtill both held high level managerial responsibilities at both Rothman and Jefferson. Dr. Vaccaro was the Chairman of the Orthopedics Department at Jefferson, and the President of Rothman. Dr. Purtill was a shareholder at Rothman and Director of Residency at Jefferson. Both of these individuals maintained dual allegiances and played critical roles in the facts and theories relevant to Plaintiff's tortious interference allegations.

Yet, as noted above, the record contains shockingly few facts regarding whether these dual-agents were acting or speaking on behalf of Jefferson or Rothman, or both, during events pivotal

---

[14] At trial, both parties advanced this theory. Plaintiff did so on direct, when he confirmed with Dr. Vaccaro that Rothman and Jefferson are "separate," and Rothman sits as a third party. ECF 138, 262:3–7. Dr. Vaccaro confirmed that "Jefferson has no power over Rothman" on personnel decisions and that "Rothman and Jefferson are totally separate entities" when questioned by defense. Id. at 263:20–264:3. To both questions, Dr. Vaccaro confirmed that Rothman has a "relationship" with Jefferson as it does with "five other Healthcare Systems. But they don't have the power to tell me what to do with John Abraham." Id. In his most specific testimony, Dr. Vaccaro explained the entities' association as an "academic and business relationship. We do surgeries [at Jefferson] and so forth. We're the closest with Jefferson, because that's where we started. Rothman started in Philadelphia. That's our closest partner." Id. at 266:3–6. So, while there are some aspects of the relationship that resemble a "joint venture" or "joint employer" in this case, this Court sees no need to disturb an undisputed contention that they were separate for the purposes of tortious interference. Still, Plaintiff does not cite and this Court has not found a single precedent upholding a tortious interference trial verdict against a hospital for actions directed to a closely related medical group on facts similar to this case.

to this suit. That glaring absence, in turn, left jurors to guess what Jefferson had done vis-à-vis Plaintiff's contractual relationship with Rothman, as opposed to what actions Rothman took unilaterally and internally.

Most significant of these was Dr. Vaccaro, who was Chairman of Orthopedics at Jefferson and President of Rothman. As will be explained, it is hard to see how a reasonable jury could have found Jefferson liable for tortious interference with the Rothman contract, when Dr. Vaccaro—perhaps the most important bridge between the two entities—held executive / leadership roles at both.

Notably, Plaintiff's counsel rarely, if ever, asked any questions of Dr. Vaccaro to specify whether his comments or conduct were on behalf of Jefferson or Rothman or on behalf of both. Indeed, a close examination of the trial transcript shows that at critical junctures, the jury was left to guess on whose behalf Dr. Vaccaro and Dr. Purtill acted.

First, there is Dr. Purtill's testimony. The record does establish that on evening of June 26, 2018, he learned of Dr. Phillips's allegations as Residency Director of Jefferson and reported them up the command chain in that role. ECF 145, 8:1–14:5. But that communication was not the heart of Plaintiff's complaint against Dr. Purtill. As discussed, supra, Plaintiff argues that Defendants tortiously interfered when Dr. Purtill shared those allegations with Rothman personnel. However, the Record is completely silent as to whether Dr. Purtill was acting for Rothman or Jefferson at that time. Id. at 22:22–30:16. That delineation matters in evaluating the facts in an analytical framework for tortious interference, that Defendants interfered with Plaintiff's contract with Rothman.

Dr. Vaccaro's lengthy testimony was even more blurred on these topics because the questions were not specific. At multiple times, the record shows he acted on behalf of both

Jefferson and Rothman simultaneously. ECF 138, 260:20–23 (Vaccaro discussing how Residents would not approach him because he was President and Chairman); ECF 145, 157:23–158:2 (Plaintiff referring to Dr. Vaccaro as "Twice my Boss: he was the Head of Jefferson and Rothman Orthopedics."). Like Dr. Purtill, Dr. Vaccaro specified that on June 26, 2018, he memorialized his conversations and reported the incidents to Kristin Barrett in his role as Chairman at Jefferson. ECF 138, 268:02–270:21. Then, at other points, Dr. Vaccaro explained actions he took and duties he had that must have necessarily accompanied his role at Rothman exclusively. See, e.g., Id. at 247:23–249:01 (discussing the Rothman shareholder meeting); 251:23–252:11 (explaining other facilities Rothman partnered with besides Jefferson); 261:5–262:4 (testifying that Jefferson had no control over Rothman's personnel decisions); 281:15–285:84:1 (summarizing Rothman's investigation into Plaintiff's conduct); 290:12–294:5 (describing revenue thresholds in Rothman contract).

But in two of the most central events in Plaintiff's case, Dr. Vaccaro's role was entirely unclear. Plaintiff testified that Dr. Vaccaro told him (1) in 2018, to resign from Jefferson so he could return to work at Rothman and (2) in 2021, to drop this lawsuit against Jefferson so Dr. Vaccaro could get Plaintiff back to work at Jefferson. According to Plaintiff, Jefferson had directed Dr. Vaccaro to relay this information. But in both, the jury was left to speculate whether Dr. Vaccaro was acting on behalf of Jefferson or Rothman, or both, when he received instructions from Defendants, and in what capacity he conveyed that information to Plaintiff.

Plaintiff himself testified that he was confused and uncertain about each dual-agents' roles at each entity, and how those spheres of authority were delineated during the key events of this case. ECF 146, 174:22–175:10.

Plaintiff's counsel could have remedied this very vague testimony on the relationship between Jefferson and Rothman by asking the following types of questions to Dr. Vaccaro and Dr. Purtill, or other witnesses.

1. What were your duties at Jefferson as opposed to your duties for Rothman?

2. Did you have any authority over faculty members at Jefferson, such as the Plaintiff who was a faculty member and employee of Rothman?

3. What were Dr. Vaccaro's duties as President of Rothman, and also as a member of the Board of Rothman?

4. What was your relationship, if any, with other physicians who testified in this case, such as Dr. Pribitkin?

5. What was Dr. Vaccaro's relationship, if any, with Jefferson staff members such as Zoe Gingold, Jennifer Fogerty, Robert Toy, or other Jefferson legal counsel?

6. To whom, if anyone, did you report in the administration of Jefferson Hospital or Jefferson University?

7. Do any documents exist on these issues?

8. When Dr. Vaccaro spoke with Plaintiff in June 2018, had dinner with Plaintiff in November 2021, and communicated with Plaintiff at any time during the relevant period, was Dr. Vaccaro acting in his capacity as a Jefferson or Rothman manager, or both?

9. What responsibilities obligations did Jefferson's lawyers have to give advice to Rothman?

But Plaintiff's counsel did not do so, thus limiting the range of permissible inferences or facts that a reasonable jury could have drawn here. To be sure, this Court's ultimate conclusions rest on Defendants' Rule 50 arguments, but the unique factual posture of this case aids the following analysis. While defense counsel did not specifically argue the record was not clear on these issues, this Court has concluded that the lack of specificity in questions by counsel and testimony of witnesses pervades many of the Rule 50 contentions, as discussed below. And in reviewing the sufficiency of the evidence on the Rule 50 contentions, the Court must be able to consider the framing of the questions as well as the answers given by the witness.

## XI.   **LEGAL ANALYSIS**

Under Pennsylvania law, to prevail on a claim for tortious interference with existing or prospective contractual relationships, a party must prove:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party;[15]
>
> (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring;
>
> (3) the absence of privilege or justification on the part of the defendant;
>
> (4) legal damage to the plaintiff as a result of the defendant's conduct; and
>
> (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009) (emphasis added).   Importantly, "[w]hile some jurisdictions consider a justification for a defendant's

---

[15] While considering the parties' post-trial arguments, the Pennsylvania Supreme Court clarified an important issue for this case. Under Pennsylvania law, "[a]bsent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason." Geary v. United States Steel Corp., 319 A.2d 174, 176 (Pa. 1974). Overcoming that at-will presumption is "very great." DiBonaventura v. Consolidated Rail Corp., 539 A.2d 865, 867 (Pa. Super. 1988). Only "clear evidence that the parties intended to contract for a definite period" will set it aside. Greene v. Oliver Realty, Inc., 526 A.2d 1192, 1200 (Pa. Super. 1987) allocator denied, 536 A.2d 1331 (Pa. 1987). "[G]reat clarity is necessary" to do so. Scott v. Extracorporeal, Inc., 545 A.2d 334, 338 (Pa. Super. 1988).

For many years, the Pennsylvania Superior Court refused to recognize tortious interference claims when the Plaintiff was only an "at-will" employee. Hennessy v. Santiago, 708 A.2d 1269, 1279 (Pa. Super. 1998); Harun v. Cmty. Health Sys., 14 A.3d 120, 125 n.1 (Pa. Super. 2011). Thus, antecedent to any other element, a plaintiff needed to first overcome the presumption of "at-will" employment. Based on persuasive Superior Court case law, if Plaintiff did not overcome the heavy presumption of at-will employment, his tortious interference claim could not lie.

That issue was rendered moot by the Pennsylvania Supreme Court's recent decision, Salsberg v. Mann, --- A.3d ---, 2024 WL 696425 (Pa. Feb. 21, 2024). In Salsberg, the Supreme Court held that at-will employees may bring tortious interference claims when a third party interferes with their contractual relationship, reversing the lower court's precedent. Id. at *17. So, regardless of whether Plaintiff overcame the presumption of at-will employment, his tortious interference claim is cognizable under Pennsylvania law.

[15] As such, none of Plaintiff's now alleged interferences with prospective relations are germane because Plaintiff, by its own choice, did not plead this claim and the jury did not consider it.

interference to be an affirmative defense, Pennsylvania courts require the plaintiff, as part of his prima facie case, to show that the defendant's conduct was not justified." Id. at 215 (citing to Triffin v. Janssen, 626 A.2d 571, 574 n. 3 (Pa. Super. 1993)); see also Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 n.7 (1979); Silver v. Mendel, 894 F.2d 598, 602 n. 6 (3d Cir.1990).

While tortious interference causes of actions may incorporate interferences with either "prospective" or "existing" contractual relations, this trial focused exclusively on Defendants' alleged interferences with Plaintiff's existing contract with Rothman. Plaintiff pled as such in his Complaint, and the tortious interference jury instructions exclusively pertain to the Rothman contract. ECF 146, 99:12–22.[16]

A. **Plaintiff Proved the Existence of a Contract with Rothman**

Defendants first ground challenging the jury's verdict is that Plaintiff never introduced into evidence the existence of a contractual right between Plaintiff and Rothman. As a "threshold matter, a contract right must be established" in tortious interference claims. United States Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 925 (3d Cir. 1990); Thompson Coal Co. v. Pike Coal. Co., 412 A.2d 466, 270 (Pa. 1979). Moreover, tortious interference claims proliferate in the employment context. Salsberg v. Mann, 2024 WL 696425 at *1.

Defendants' argument fails for two reasons. First, the "presumption under Pennsylvania law is that all employment is at-will," without any formal contract introduction. Luteran v. Loral Fairchild Corp., 688 A.2d 211, 214 (Pa. Super. 1997) (citation omitted). That oral contracts for employment do not incorporate any written terms does not change the "axiomatic" principle "that a contract may be manifest orally, in writing, or as an inference from the acts and conduct of the

---

[16] As such, none of Plaintiff's now alleged interferences with prospective relations are germane because Plaintiff, by its own choice, did not plead this claim and the jury did not consider it.

parties." Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 716 (Pa. Super. 2005). So long as the essential terms of providing services for compensation exists, whatever the medium transmitted, an employment relationship exists. Id. at 716–17. And, as the Pennsylvania Supreme Court recently held, an employee, regardless of status (i.e. at-will or otherwise), may bring a tortious interference claim based on loss of his employment. Salsberg, 2024 WL 696425, at *10.

The record is undisputed that Plaintiff had, at an minimum, an employment contract with Rothman. Defendants admitted that Rothman was Plaintiff's "Employer." ECF 137, 40:08–10; ECF 138, 287:12–19; 288:11–13. Plaintiff detailed his position and employment with Rothman as well. ECF 138, 156:10–157:08; 223:03–08 (describing his position as employee and shareholder at Rothman); 323:14–20 ("Rothman was my Direct Employer"); 330:02–04 ("I was employed, meaning I get my paycheck, from Rothman."). And Dr. Vaccaro confirmed that Plaintiff worked for Rothman throughout his testimony. See, e.g., ECF 138, 248:06–15 (describing that Rothman Board voted on the three options to "fire[ Plaintiff] with cause, fire[ him] without cause, or just keep [Plaintiff] away from Residents," in August 2018).

But even putting the at-will employment issue aside, Plaintiff introduced specific terms of his "contractual right" under his partnership contract. Plaintiff and Dr. Vaccaro explained that Plaintiff had to meet certain revenue obligations under his contract, and that because he was not able to hit those targets for several years after his departure from Jefferson, Rothman terminated Plaintiff's contract. ECF 138, 290:12–294:5 (Dr. Vaccaro testimony); ECF 145, 106:4–20 (Plaintiff testimony).

### B. Plaintiff Failed to Prove the Absence of Privilege or Justification on the Part of Defendant

The privilege inquiry is holistic, as Pennsylvania courts have long held that "[w]hat is or is not privileged conduct in a given situation is not susceptible of [a] precise definition." Newtek

<u>Small Bus. Fin., LLC v. Texas First Cap., Inc.</u>, 644 F. Supp. 3d 113, 122 (E.D. Pa. 2022) (Smith, J.) (citing to <u>Glenn v. Point Park College</u>, 272 A.2d 895, 899 (Pa. 1971)).  As such, Pennsylvania courts tend to rely on the following several factors—set forth in § 767 of the Restatement (Second) of Torts—to determine whether a defendant's interference with another's contractual relationship was "improper":

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

<u>Walnut Street Assocs., Inc. v. Brokerage Concepts, Inc.</u>, 20 A.3d 468, 476 (Pa. 2011) (citing to <u>Adler, Barish, Daniels, Levin and Creskoff v. Epstein</u>, 393 A.2d 1175, 1184 (Pa. 1978)). Ultimately though, a factfinder's balancing of these considerations turns on the "rules of the game' [that] society has adopted." <u>Adler, Barish</u>, 393 A.2d at 1184 (internal citations and quotations omitted).

In the points for charge submitted before trial, Defendants requested an instruction on the privilege element, while Plaintiff did not. <u>See</u> Defs. Points for Charge at 19–20, ECF 106; Pl. Points for Charge at 26, ECF 101. This Court following Pennsylvania law, instructed the jury on privilege.

Court: Even if you find that Defendants intentionally induced, or caused, Rothman Orthopedic Institute to not perform its Contract with Plaintiff, before finding Defendants liable, Dr. Abraham must prove that their actions were not privileged. In other words, that Defendants' actions were not justifiable under the circumstances. Whether Defendants' actions were or were not justifiable under the circumstances is determined by applying the following factors: first, whether the Defendants' conduct was otherwise wrongful or tortious, for example whether the Defendants' conduct constituted defamation, misrepresentation, injurious falsehood, or whether the Defendants threatened violence or unjustified litigation; second, the expectations of the Parties involved; third, the relations between the Parties involved; fourth, the interest that Defendants sought to advance; fifth, whether Defendants' act was done for the purpose of causing the interference, or whether it was merely incidental to another purpose.

You will also consider society's interest in protecting business competition, as well as its interests in protecting the individual against interference with their pursuit of gain. ECF 146, 100:02–22.

### i. **Truthfulness Privilege**

While § 767 sets forth this default, generalized test, the commentary to § 767 clarifies that subsequent Restatement provisions address specific types of privilege claims, and therefore preempt this default standard. See In re Joy Global, Inc., 739 F. Supp. 2d 711, 733 (D. Del. 2010) (finding "when there is a more specific Restatement section relating to the tortious interference, [courts] follow the mores specific section.") (citations and quotations omitted). In relevant part, the commentary explains:

Section 768, following this Section, deals specifically with the question of whether competition is a proper or improper interference with contractual relations, either existing or prospective. Sections 769–773 deal with other special situations in which application of the factors enumerated in this Section have produced more clearly identifiable decisional patterns. The specific applications in these Sections therefore supplant the generalization expressed in this Section Restatement (Second) of Torts § 767 (1979).

Restatement (Second) of Torts § 767, cmt. a (emphasis added).  Particularly relevant here is § 772.

Section 772, the so-called "truthfulness" privilege, expressly exempts those defendants who "intentionally cause[] a third person not to perform a contract or not to enter into a prospective contractual relation with another," if the defendant merely provides a "third person" with  "(a)

truthful information, or (b) honest advice within the scope of a request for the advice."
Restatement (Second) of Torts § 772 (emphasis added).  Here too, the commentary is highly
relevant, further clarifying that

> There is of course no liability for interference with a contract or with a prospective
> contractual relation on the part of one who merely gives truthful information to
> another. The interference in this instance is clearly not improper. This is true even
> though the facts are marshaled in such a way that they speak for themselves and the
> person to whom the information is given immediately recognizes them as a reason
> for breaking his contract or refusing to deal with another. It is also true whether or
> not the information is requested.

Id. at cmt. b.  The Pennsylvania Supreme Court has expressly adopted this section of the
restatement.  Walnut St. Assocs., Inc., 20 A.3d at 478 ("Now that Restatement (Second) of Torts
§ 772(a) is squarely before us, we hold that the Superior Court properly determined that Section
772(a) should apply, and that it controls under the facts of this case.").[17]  Indeed, in Walnut Street,
the Court explained the Restatement's "formulation [was] consistent with the very nature of the
tort, and with Pennsylvania law."  Id. at 479.  It likewise endorsed the basic purpose of the
provision, reasoning that "[i]t would be strange, indeed, to deem disclosures of mere truth to be
actionable," as those "who would shield their contracting partners from non-privileged information
that might affect those partners' business decisions properly run a risk that speech in the form of a
truth, when disclosed, might imperil the relationship."  Id.

Thus, Pennsylvania has definitively rejected the notion "that truth is not a defense to a
tortious interference claim under Pennsylvania law."[18]  Id. at 472.  Accordingly, "[w]hen a

---

[17] See also Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94 (2009), aff'd, 610 Pa. 371, 20 A.3d 468
(2011).  The Superior Court's decision goes into greater detail on these key issues.

[18] Indeed, the Walnut Street Court actively distinguished the Third Circuit's decision Kachmar v. SunGard Data Sys.,
Inc., 109 F.3d 173 (3d Cir. 1997) and the Pennsylvania Superior Court's decision in Collincini v. Honeywell, Inc., 411
Pa.Super. 166, 601 A.2d 292 (1991), appeal denied, 530 Pa. 651, 608 A.2d 27 (1992), both of had previously suggested
that "truth" was but a factor in a larger, holistic "propriety" analysis.

defendant raises a so-called 'truth defense' to a claim for intentional interference with contractual relations, the court need not analyze the factors set out in [§ 767] regarding the type of conduct that qualifies as proper."  Feldman & Pinto, P.C. v. Seithel, 2011 WL 6758460, at *7 (E.D. Pa. Dec. 22, 2011) (Tucker, J.) (citing Walnut St. Assocs., Inc., 20 A.3d. at 477–78).

In view of this specific privilege carveout, this Court reviews whether the "truthfulness" privilege mandates a judgment notwithstanding the verdict.

As discussed, in Pennsylvania "there is ... no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another." Walnut St. Assocs., Inc., 20 A.3d at 478 (quoting Restatement (Second) of Torts § 772); see also Seithel, 2011 WL 6758460, at *7; Sandoz Inc. v. Lannett Co., Inc., 2020 WL 7695960, at *3 (E.D. Pa. Dec. 28, 2020) (McHugh, J.); Sortino v. Washington Hosp., 245 A.3d 1078, 14 (Pa. Super. Ct. 2020); Rantnetwork, Inc. v. Underwood, 2012 WL 1021326, at *16 (M.D. Pa. Mar. 26, 2012); United States ex rel. Spletzer v. Allied Wire & Cable, Inc., 2014 WL 12929018, at *1 n.1 (E.D. Pa. Dec. 16, 2014) (Tucker, J.). Walnut Street and its progeny are therefore highly instructive here, and so this Court's analysis of privilege begins with a brief review of these cases.

### a.  Relevant Case Law

In Walnut Street itself, an insurance broker for a self-funded employer brought a tortious interference claim against a third-party plan administrator. Walnut St. Assocs., Inc., 20 Ad. at 470. The administrator had disclosed the broker's commission fee to the employer, after which the employer terminated the broker. Id. Like here, the jury concluded the administrator "had intentionally and improperly interfered with the [broker/employer] contract, caused [employer] to terminate that contract," and thus "awarded [] damages." Id. at 471. On appeal, the Pennsylvania Supreme Court disagreed, instead officially adopting § 772's truth privilege.  Id. at 477–78.

Despite there being "no dispute that [administrator] intentionally imparted information" about the broker's commission to the employer, at a time when the employer "was seeking lower employee health insurance costs," the <u>Walnut Street</u> Court nonetheless held "as a matter of law that [administrator's] truthful statement to [employer] was not an improper interference, and [could not], on its own, support a claim for tortious interference with contractual relations." <u>Id.</u> at 478– 79.

Likewise, in <u>Sandoz</u>, Judge McHugh partially dismissed plaintiff-drug distributor's tortious interference claims against a rival distributor, where plaintiff alleged that defendant-rival had (1) "induced" plaintiff's upstream manufacturer, with whom plaintiff had an exclusive relationship, "to pretextually terminate [plaintiff's exclusive arrangement] in exchange for 'significant amounts of money,'" and (2) "sought to interfere with [p]laintiff's customer relationships and did so based on [plaintiff's] confidential information that [d]efendant improperly obtained from [the manufacturer]." 2020 WL 7695960, at *1. Initially, Judge McHugh concluded that "[d]efendant's alleged action—soliciting [manufacturer] to terminate its agreement on pretextual terms—could lack privilege and justification," and thus denied that portion of the defendant-rival's motion. <u>Id.</u> at *2. By contrast, Judge McHugh granted the motion with respect to plaintiff's further allegations that defendant had "contacted [plaintiff's] customers to inform them that it is now the exclusive distributor of [the relevant drug]," which resulted in "discord and confusion." <u>Id.</u> at *3 (internal quotations omitted). Judge McHugh reasoned that defendant-rival's "alleged inference with [p]laintiff's customers was not improper because [d]efendant's statements during its outreach were truthful." <u>Id</u>. In so concluding, Judge McHugh expressly invoked § 772 and the Pennsylvania Supreme Court's decision in <u>Walnut Street</u>, explaining that (1) "information need not be solicited" for the privilege to apply, and (2) a "statement is protected even if

the 'person to whom the information is given immediately recognizes them as a reason for breaking his contract or refusing to deal with another.'" Id. (citations omitted).

Judge Marston reached a similar conclusion in Learnquest, Inc. v. Alchemy Software Sols., Inc., where plaintiff-contractor brought an interference claim against a subcontractor.  2021 WL 4192044, at *1–2 (E.D. Pa. Sept. 14, 2021) (Marston, J.).  Specifically, plaintiff-contractor targeted subcontractor's complaints to plaintiff's clients that plaintiff had failed to pay past due invoices. Id.  In dismissing the claim, Judge Marston explained that plaintiff-contractor had "admit[ted] that it did not pay [defendant's] invoices," and that "any discussions between [defendant] and [plaintiff's] clients about the fact or amount of those unpaid invoices was truthful", and therefore could not "give rise to a claim for tortious interference with contractual relations."  Id. at *4.

Likewise, in Bentlejewski v. Werner Enterprises Inc, the Third Circuit affirmed summary judgment in favor of the employer of a truck driver-plaintiff, where the employer-defendant had provided an "employment verification" report—which listed the driver's past "preventable" accidents—to other prospective employers.  654 F. App'x 77, 78 (3d Cir. 2016) (non-precedential). In so affirming, the Court of Appeals explained the record was "want of evidence to support the notion that [defendant-employer] knowingly provided any false information or otherwise acted improperly in providing the employment verifications to" prospective employers.  Id. at 80 (emphasis added).[19]

---

[19] By contrast, in Seithel, Judge Tucker analyzed plaintiff-law firm's tortious interference claim against an ex-employee attorney who had attempted to poach clients.  Seithel, 2011 WL 6758460, at *1–6.  As part of this poaching attempt, defendant-ex employee sent letters to hundreds of the firm's clients and asserted, among other things, that defendant had "primary responsibility for the client's claims" and had "been involved in the client's litigation in a leadership position since the beginning of the lawsuits."  Id. at *3.  Relying on Walnut Street, Judge Tucker treated "truthfulness" as the threshold inquiry, explaining that "the truthfulness defense, if applicable, renders the remaining analysis of what conduct qualifies as proper unnecessary."  Id. at *9.  Unlike Walnut Street, Sandoz, and Bentlejewski, however, Judge Tucker rejected defendant's argument because defendant's "letter was misleading in several respects, at least with regard to some clients."  Id.  She concluded, for example, that defendant "did not have primary responsibility for the cases of some of the clients to whom she wrote," and that defendant's "assertion that she 'left' [the law firm] was also untruthful," given that defendant had in fact been fired.  Id. at *10–11.

Thus, this Court discerns a guiding legal principle from these cases, as follows—unequivocally true communications are exempt from liability, although the truthfulness privilege is inapplicable if a defendant's "exaggerations and omissions [are] as misleading as any outright falsehood."  Seithel, 2011 WL 6758460 at *12; see also Spletzer, 2014 WL 12929018, at *1 n.1; see also Manning v. Flannery, 528 F. App'x 141, 144 (3d Cir. 2013).

### b.  Application to Plaintiff's Case

Which brings us to Plaintiff's case.  The record, including the extensive discussion in the Title IX review, supra, unequivocally indicates that—to the extent Jefferson conveyed information about Plaintiff to Rothman—all such information was truthful. There are essentially two key inflection points when analyzing those communications—Plaintiff's initial suspension, and his eventual termination.[20]

Dr. Vaccaro initially suspended Plaintiff on June 26, 2018, upon learning about the incident from Plaintiff's own account and speaking with Jefferson legal. Dr. Vaccaro reaffirmed this June 26 suspension via a "Letter of Suspension," from Rothman on Rothman stationary, on June 29, 2018.  In relevant part, that letter states that it is

> [t]o follow up our discussion from Tuesday, June 26, 2018, whereby you reported an incident involving you and a Medical Resident.  This letter is confirming that you were immediately clinically suspended from seeing patients or coming to any Rothman Institute office until the conclusion of the investigation into this incident. During the investigation period, you will continue to receive compensation from the Rothman Institute.

---

[20] Because this Court finds that § 772's truthful privilege defeats Plaintiff's claims as a matter of law, it is immaterial that the jury did not consider a specific instruction on this defense. The Third Circuit directs us as such. In Acumed, the Court reversed a tortious interference verdict in favor of Plaintiff because it held that another specific privilege section of the Restatement, § 768, barred Plaintiff's claim as a matter of law. Acumed LLC, 561 F.3d at 219 n.15. As here, the jury did not receive instructions on the specific Restatement provision necessitating reversal. Id. However, because Restatement privilege mandated a judgment for defendants, remanding for a new trial simply based on a missed jury instruction "would [have been] pointless." Id. The same is true in this case. The record requires the truthful privilege apply. Consequently, jury instruction or not, a new trial on this issue is "pointless."

JX26.  Moreover, on cross examination, Dr. Vaccaro provided additional context for this key

event:

> Q: **After John [Abraham] had told you his version of the events that evening,
> am I correct that you told him, yeah, I got to report this up, and you gave a
> phone call over to Jefferson Legal?**
>
> **A: Yes.**
>
> **Q: Jefferson Legal told you to suspend John?**
>
> **A: Yes.**
>
> Q: And John did not receive any pay?
>
> A: No, no, he was suspended with pay.  She he continued to get pay.
>
> Q: Oh, from Rothman?
>
> A: From Rothman, I don't know about Jefferson.
>
> Q: Okay.  And am I correct that, at Jefferson, when you got a Faculty position,
> there's a certain salary associated with that?
>
> A: You get a stipend from being a Service Line Leader.
>
> Q: Okay.  Do you also get any sort of points, or stipends, for research that you do?
>
> A: The Rothman Institute does that.
>
> Q: Okay.  In other words, the Rothman Institute gives a Physician certain points, or
> stipends, depending on the research that you do associated with Jefferson?
>
> A: Yes.

ECF 138, 243:23–244:20 (emphasis added). In Dr. Vaccaro's memorialization of events,

he established that prior to talking to Kristin Barrett, he spoke with Dr. Purtill, who conveyed Dr.

Phillips's version of events. ECF 138, 274:11–276:09. Dr. Vaccaro then called Ms. Barrett, and

"described these incidents," which included Dr. Phillips's allegations, via Dr. Purtill's recollection.

Id. Additionally, Dr. Vaccaro explained that he suspended Plaintiff because "[t]here was a rape

allegation." ECF 138, 296:20–22. All in all, the record shows that Jefferson, via legal counsel, was

aware of the rape allegations prior to advising Dr. Vaccaro to suspend Plaintiff at Rothman.[21]

---

[21] Once again, the presence of critical dual-Jefferson and Rothman managers requires explanation. This Court, in
following its directive to take the verdict in the light most favorable to Plaintiff, assumes that Dr. Purtill and Dr.
Vaccaro were Jefferson actors to the extent they learned of and conveyed "damaging" information to Rothman, but

Thus, to withstand judgment as a matter of law on "truthfulness" grounds here, Plaintiff would need to point this Court to other portions of the record indicating that Dr. Vaccaro, Dr. Putill, Kristin Barrett,[22] or some other Jefferson actor conveyed a different, untrue version of events to Rothman that influenced Plaintiff's initial suspension. He cannot.

To be sure, Phillips's versions of the events found its way to Rothman prior to Rothman's parallel investigation into Phillips's claims. Dr. Purtill created a memo on July 1, 2018, describing his interactions with Phillips on June 26, 2018. JX 28. Dr. Purtill also verbally told Jefferson's counsel of his interaction with Phillips on June 26, id., and likewise conveyed these interactions to Dr. Vaccaro, Rothman lawyers, other Rothman directors, and the Rothman Board. ECF 145, 24:11–27:16; 21:25–22:04.

---

also Rothman actors to the extent they took adverse action against Abraham. This framing is favorable to Plaintiff, but nonetheless fails him.

In reality, however, this overlap favors Jefferson, as the agency principles require dual-employees owe a "duty of candor" to each employer, and situations such as this create a "Hobson's choice" that should lead dual-employees to choose "the path of truth" and share such information with both employers, "even as their interests began to diverge." Clinmicro Immunology Ctr., LLC v. Primemed, P.C., 2016 WL 4107710, at *12 (M.D. Pa. July 7, 2016), report and recommendation adopted, 2016 WL 4119947 (M.D. Pa. July 29, 2016). This essentially immunizes Dr. Vaccaro and Dr. Purtill's conduct for the purposes of tortious interference, as their middlemen status simultaneously rendered them both a Jefferson and Rothman actors, thus undermining their ability to be a Jefferson actor that had tortiously interfered with a Rothman contract. Moreover, unlike in Clinmicro, Rothman and Jefferson's interests were aligned, not divergent, at the outset—it was in the best interest of both institutions to uncover what happened at the party. Dr. Purtill and Dr. Vaccaro had no reason to silo serious felony allegations about Plaintiff, himself a dual-agent, from either institution.

Age-old duties bequeathed to employees, let alone partners, is of the highest order. Dr. Purtill and Dr. Vaccaro, as Rothman partners, owed their fellow shareholders "[n]ot honesty alone, but the punctilio of an honor the most sensitive." Clement v. Clement, 260 A..2d 728, 729 (Pa. 1970) (quoting Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.)). Relaying that a fellow shareholder is accused of sexually assaulting a Resident is highly material, and certainly falls within the parameters, let alone obligations, of a partner's disclosure to fellow members. See also Cornerstone Sys., Inc. v. Knichel Logistics, L.P., 255 F. App'x 660, 661 (3d Cir. 2007) (recognizing that employees owe fiduciary duties of loyalty).

[22] Somewhat separately, the commentary to § 772 expressly exempts legal advice, further bolstering the notion that Barrett's recommendation, even if influenced by lies, is privileged. See Restatement (Second) of Torts § 772, cmt. c (noting that "[i]n some instances the rule protects the public and private interests in certain professions or businesses. Thus the lawyer, the doctor, the clergyman, the banker, the investment, marriage or other counselor, and the efficiency expert need this protection for the performance of their tasks.") (emphasis added).

Nonetheless, two reasons negate the relevance and applicably of Dr. Purtill's memo and these other early verbal communications. First and foremost, as discussed above, Dr. Purtill owed the highest duty of loyalty to Rothman as a partner, including conveying material information that a Rothman physician and fellow partner was accused of committing rape. Clement v. Clement, 260 A.2d 728, 729 (Pa. 1970)

Second, crediting that Dr. Purtill's early communications to Jefferson and/or Rothman (depending on Dr. Vaccaro's role when he spoke with Dr. Purtill) did factor into Barrett's recommendation and thus into the initial "truthfulness" calculus, they do not alter the ultimate result. Simply put, Dr. Purtill's secondhand accounting is unequivocally phrased as just that. The contents of Dr. Purtill's memo clearly indicate he relayed what Dr. Phillips told him on June 26th, or otherwise recounted his perceptions of Dr. Phillips's demeanor that day. Accordingly, nothing in the record suggests Dr. Purtill did anything other than accurately communicate Dr. Phillips's allegations to Jefferson's counsel, Rothman personnel, and the Rothman Board. So, even if Plaintiff attempts to cast Dr. Phillips as a liar (which he of course does), he cannot contend, and did not contend at trial, that Jefferson actors lied to Rothman or presented knowingly false information. See Bentlejewski, 654 F. App'x at 80.

This point is critical, and bears repeating. To the extent Jefferson personnel relayed allegations to Rothman and disclosed those communications as such, Jefferson does not lose the protection of the truthfulness privilege. Even if Dr. Phillips's story was later debunked, again, nothing in the record suggests that Dr. Purtill or others lied or mischaracterized Dr. Phillips's claims when conveying them to Rothman. Plaintiff simply cannot show that these communications amounted to "exaggerations and omissions" that a jury could construe to be "as misleading as any outright falsehood." Seithel, 2011 WL 6758460, at *12. And to the extent that Dr. Purtill ever

offered his own opinion, based on what he learned from Dr. Phillips and disclosed to Rothman, it was a good-faith belief in what transpired, which merits protection under the truthfulness privilege.[23]

At post-trial oral argument, Plaintiff's counsel argued that Dr. Purtill's relaying of the information from his memo to Kristin Barrett and then later to Rothman directors and the Board constituted a material omission because he did not include Plaintiff's side of the story. ECF 173, 83:21–84:07. Dr. Purtill acknowledged, in fact, that he was only telling Rothman "the side of things that [he] heard from the Resident." ECF 145, 27:06–16. And in its written briefing, Plaintiff

---

[23] The distinction between an "opinion that a fact is true" and a "statement that is true" is not altogether clear—for instance, is there a legal distinction between a speaker claiming, "X is a drunk" versus "I believe X is a drunk"? On this question, the Court takes guidance from well-developed defamation jurisprudence. Under § 566 of the Second Restatement, which Pennsylvania adopts, the test whether an "opinion" transforms into a legally actionable defamatory statement is whether the speaker discloses the facts upon which he bases his belief. Restatement (Second) of Torts § 566 (1977); see Kuwait & Gulf Link Transp. Co. v. Doe, 216 A.3d 1074, 1085–86 (2019). Pennsylvania wholly endorses this legal test, as stated: "A statement in the form of an opinion is actionable only if it may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion. A simple expression of opinion based on disclosed facts is not itself sufficient for an action of defamation." Veno v. Meredith, 515 A.2d 571, 575 (Pa. Super. 1986) (internal citations and quotations omitted) (emphasis added).

Moreover, because truthful statements are similarly unactionable under tortious interference claims, courts must frequently decide the twin actions of defamation and tortious interference premised on a defendant making an allegedly false statement that harmed a contractual relationship. See, e.g., Nanavati v. Burdette Tomlin Mem'l Hosp., 857 F.2d 96, 109–10 (3d Cir. 1988) (rejecting plaintiff doctor's defamation claim against hospital defendants because defendants' opinion statements disclosed underlying factual basis for them, and therefore, tortious interference claim also failed because it was "expressly predicated on precisely the same facts as are alleged in the defamation count."); Kuwait, 216 A.3d at 1093 (summarily dismissing tortious interference claim after holding underlying defamation claim failed as a matter of law).

So too is Plaintiff's tortious interference theory stemming from Dr. Purtill's statements, which Plaintiff argued "defamed [Plaintiff] to certain people." ECF 146, 65:18–23. The privilege of Dr. Purtill's statements turn on their truth or falsity similarly to defamation claims. As such, this Court finds § 566 and Pennsylvania's interpretation persuasive. The record is undisputed that Dr. Purtill disclosed the factual basis for any opinion he may have formed on the Plaintiff and Dr. Phillips incident. He answered extensive questions from both parties about how he memorialized the series of events that occurred on June 26, 2018, in which Dr. Phillips came to his home and told him her side of the story. Dr. Purtill always couched the events in terms of what Dr. Phillips told him. ECF, 145, 7:8–10:14. He never opined on the events without disclosing the underlying account that Dr. Phillips told him. ECF 145, 21:25–22:4; 30:9–16 (Dr. Purtill confirming he told Rothman the information in his memo and did not expand beyond that information). As such, any "pure opinions" were not defamatory, and by extension, they also qualify under the tortious interference truthful privilege.

has again harped on Dr. Purtill's retelling of Dr. Phillips's story to Jefferson and the Rothman Board as the critical misrepresentation or omission to Rothman.[24] ECF 177, 2–4.

Even assuming Dr. Purtill, as a Rothman partner, was not privileged to convey any of Dr. Phillips's allegations about a fellow shareholder / physician to Rothman, which this Court rejects, it would be an incredibly slippery slope for liability to attach where, as here, a physician / educator conveys criminal allegations he reasonably believes are credible to an employer or other interested actor.

On this latter point, Plaintiff cites two defamation opinions. To the extent their reasoning is relevant, they cut against Plaintiff. In one, the Court held that a defendant who circulated erroneous accusations about the plaintiff, adopting them as true, could be liable for failing to "exercise reasonable care in investigating the truth of the statements prior to its publication." Gallagher v. Archdiocese of Philadelphia, 2017 WL 5256416, at *6 (Pa. Super. Ct. Nov. 13, 2017). But in Gallagher, unlike the issue at bar, the defendant blithely published her conclusory opinion, that where was a "serious cheating scandal" involving plaintiff, without disclosing her basis for that opinion. Dr. Purtill, on the other hand, couched his memorandum as Dr. Phillips's side of the story and always shared the entirety of his interaction with Rothman. Plaintiff's other case is no more persuasive. Ertel v. Patriot-News Co. restates the well-worn proposition that for publication of a false statement to sustain liability, the proponent must have acted with a culpable mens rea. 674 A.2d 1038, 1043 (Pa. 1996).  Once again, even the most tortured reading of the record cannot assign anything other than good-faith to Dr. Purtill when he conveyed Dr. Phillips's allegations to Rothman. [25]

---

[24] Plaintiff recites several purported misrepresentations that Jefferson made to Plaintiff, but those are irrelevant. This inquiry centers on Jefferson's misrepresentations or omissions to Rothman. ECF 177, 4.

[25] Two other later events involving Dr. Purtill are irrelevant to Dr. Purtill's initial communications to Jefferson or Rothman. At some point, Dr. Purtill received a copy of the Title IX Investigation Report. Plaintiff contends that

The case law also reinforces that conduct like Dr. Purtill's was privileged. For instance, in MFS, Inc. v. DiLazaro, Judge Slomsky rejected a manufacturer's contractual interference claim against the Pennsylvania Department of Environmental where department officials "told the truth" to manufacturer's potential client "about the PaDEP's [pollution] concerns" and other potential "compliance problem[s]" at the manufacturer's facility.  771 F. Supp. 2d 382, 461 (E.D. Pa. 2011) (emphasis added), aff'd, 476 F. App'x 282 (3d Cir. 2012). Judge Slomsky explained that "[a]lthough [a PaDEP official] conversed with a potential purchaser, he was merely providing truthful information which cannot be the basis of an intentional interference with prospective contractual relations claim." Id.; see also Bentlejewski, 654 F. App'x at 80 (exempting an employer for providing future employers with a report detailing a truck driver's past "preventable" accidents). Nobody disputes that Dr. Phillips did in fact accuse Plaintiff of rape and shared her account with Dr. Putill. Thus, nothing in the record suggests Dr. Purtill relayed knowingly false information to Rothman. Bentlejewski, 654 F. App'x at 80.

All in all, the truthfulness privilege requires judgment for Defendants.  Although Dr. Purtill relayed information to Rothman that was potentially damaging to Plaintiff, he merely provided truthful recitations of allegations as was conveyed to them, and appropriately framed those communications.  Id.

This same conclusion extends up to and through the second key inflection point in this case—Rothman's eventual termination of Plaintiff. The record reveals only more of the same.

---

because the Report was exculpatory for Plaintiff, Dr. Purtill's Memorandum was misleading. ECF 173, 84:23–25. As this Court noted at oral argument, however, Dr. Purtill wrote his Memorandum and spoke with Rothman months before Defendants even completed the Report, let alone gave it to Dr. Purtill. Thus, it would be metaphysically absurd to impute knowledge of the Report's contents to Dr. Purtill months before it was written.

Second, Dr. Purtill may have conveyed a partial account of the Title IX investigation in May 2023 to Jefferson residents. ECF 145, 36:1–12. This event is irrelevant for the same reasons as the Report findings. What Dr. Purtill did, or learned, in 2023 cannot affect this Court's analysis of Dr. Purtill's actions in the summer of 2018.

Plaintiff simply cannot direct this Court to an instance where Jefferson personnel conveyed anything to Rothman other than secondhand allegations, couched as such. That applies not only to dual Jefferson-Rothman actors like Vaccaro and Dr. Purtill, but also to instances where the respective Jefferson and Rothman investigations may have blended together. Simply put, there are **no** examples of Jefferson personnel relaying purely factual assertions to Rothman that Plaintiff committed sexual misconduct. That Jefferson personnel relayed Dr. Phillips's allegations, or perhaps even relayed other witness retellings of the party (that Plaintiff deems to be inaccurate) are of no relevance in this case. The question is whether <u>Jefferson</u> lied to or misled Rothman while allegedly interfering with Plaintiff's contract. The record unequivocally indicates Jefferson did not. Defendants are entitled to post-trial relief under § 772.

### C. <u>Plaintiff Failed to Prove Jefferson Intended to Harm His Contractual Relationship with Rothman When Jefferson "Constructively Terminated" Him</u>

Intertwined with privilege, the second element of tortious interference is an "intent to harm" an existing contractual relationship. According to § 766 of the Restatement, a defendant must have "intended" or be "substantially certain" that his actions will interfere with the plaintiff's contractual right. Restatement (Second) of Torts § 766 cmt. j; <u>Salsberg</u>, 2024 WL 696425 at *1. However, when a defendant breaches "his contracts with plaintiff and that as an incidental consequence thereof plaintiff's business relationships with third parties have been affected," tortious interference cannot lie. <u>Glazer v. Chandler</u>, 200 A.2d 416, 418 (1964). In this way, the Pennsylvania Supreme Court has cabined the scope of the "intent to harm" element directed toward the Plaintiff, because the "gist" of tortious interference is intentionally inducement of a <u>third party</u> (i.e. Rothman) to break a contract with the plaintiff, not collateral consequences plaintiff suffers as a result of a defendant's breach with plaintiff. <u>Windsor Sec., Inc. v. Hartford Life Ins. Co.</u>, 986 F.2d 655, 661 (3d Cir. 1993).

Glazer is the seminal case discussing the intent to harm element. There, the plaintiff and defendant, a real estate developer, entered a contract where plaintiff would acquire title to 56 residential plots from defendant, upon satisfaction of a two-year mortgage. 200 A.2d at 417. Plaintiff separately negotiated with the local municipality to connect sewer lines and receive building permits for the plots, contingent on plaintiff receiving title to the land. Id. Defendant breached the contract and did not transfer title. Id. As a result, plaintiff lost his business with municipality because he could not fulfill the terms of the sewer and permit contracts without title. Id. Plaintiff sued for tortious interference with the municipal contracts. Id. The Pennsylvania Supreme Court found for the defendant because the "allegations and evidence" only showed that plaintiff lost business with the municipality as "an incidental consequence" of defendant's breach. Id. at 418.

Glazer stands for the proposition that a plaintiff must show more than defendant's breach, but one taken "with the intention of injuring the plaintiff's" contract with a third party. Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc., 28 F. Supp. 2d 947, 951 (E.D. Pa. 1998) (Waldman, J.) (citing George A. Davis, Inc. v. Camp Trails Co., 447 F. Supp. 1304, 1310 (E.D. Pa. 1978) (Luongo, J.). Synthesizing the case law, a defendant's breach of contract, without more, cannot support an inference of "intent to harm." Glenn v. Point Park College, 272 A.2d 895, 898–99 (Pa. 1971) (no intent to harm plaintiff real estate broker's business relationship when defendant buyer circumvented broker and negotiated directly with third party property seller, resulting in broker losing commission). However, when accompanied by additional actions that harm a plaintiff's reputation and ability to conduct independent business, the intent may be found. See George A. Davis, Inc., 447 F. Supp. at 1310–11 (defendant not only terminated sales contract

with plaintiff, but also circulated letter with allegedly defamatory statements regarding plaintiff to plaintiff's prospective customers).

The additional injurious action, not knowledge that a breach will have downstream effects, is the critical factor. Valley Forge, 28 F. Supp. 2d at 952; see also NCC Sunday Inserts, Inc. v. World Color Press, Inc., 759 F. Supp. 1004, 1015–16 (S.D.N.Y. 1991) (finding no intent to harm even when defendant "knew" the consequences of buying third party company would lead to third party breaching contract with plaintiff); Peoples Mortg. Co. v. Fed. Nat. Mortg. Ass'n, 856 F. Supp. 910, 932 (E.D. Pa. 1994) (Giles, J.) (finding that plaintiff losing business as a result of defendant Fannie Mae rescinding contract was an "incidental consequence"). The additional action evincing a malevolent intent is fundamental because, as Judge Waldman acutely perceived, "[i]t will thus almost always be foreseeable to the supplying party that its failure to perform may well disrupt the business relations and opportunities of the receiving party." Valley Forge, 28 F. Supp. 2d at 952; see Amico v. Radius Commc'ns, 2001 WL 1807391, at *5 (Pa. Com. Pl. Oct. 29, 2001) (no intent to harm when defendant's breach of contract with plaintiff to air television ads for plaintiff's television show caused plaintiff to lose sponsorship opportunities with third parties). This is not enough for liability.

The record, viewed in light of the verdict, shows Jefferson arguably took one action with intent to harm Plaintiff's relationship with Rothman, when Jefferson Legal advised Dr. Vaccaro to suspend Plaintiff from Rothman when Dr. Phillips first complained of sexual assault. But the temporary suspension, as discussed above, is only one of Plaintiff's theories of tortious interference, and not the meatiest. Plaintiff's primary allegation is that his departure from Jefferson eventually made it more difficult for him to meet revenue obligations.

So, putting aside the temporary suspension issue, discussed <u>supra</u>, the question is whether Plaintiff's departure in December 2018, can support a jury verdict that Jefferson intended to harm Plaintiff when Rothman terminated his contract four years later. As a preliminary matter, Plaintiff struggled to show that merely because Dr. Vaccaro had dual roles at Jefferson and Rothman that Jefferson knew the terms of the Rothman contract. However, even if that inference were permissible, a defendant foreseeing or knowing that his action will cause plaintiff to breach contract with a third party is not sufficient to establish intent. <u>Valley Forge</u>, 28 F. Supp. 2d at 952.

The record is bare of any additional acts by Defendants to interfere with the Rothman contract. Jefferson did not circulate the sexual assault allegations to other hospitals or potential employers or report Plaintiff's termination to the National Practitioners Database for physician misconduct. Jefferson largely kept its investigation and findings in-house.

And Dr. Purtill and Dr. Vaccaro's overlapping responsibilities as dual agents of both Jefferson and Rothman does not support an intent to harm. At some point, Defendants gave Dr. Vaccaro and Dr. Purtill a copy of the Title IX Investigation Report. ECF 145, 37:14–37:22 (Dr. Purtill); ECF 138, 242:22–243:21 (Dr. Vaccaro). To the extent Dr. Vaccaro and Dr. Purtill were acting in their capacity as officers of Jefferson at the time, that action is benign. However, Plaintiff's contends that, considering Dr. Vaccaro and Dr. Purtill's dual roles, their actions could support a jury finding that Jefferson wished to harm Plaintiff's relationship with key Rothman personnel.

Ultimately, Defendants giving the Report to Dr. Vaccaro and Dr. Purtill cannot evince an intent to harm for five reasons. First, the record does not indicate <u>when</u> Jefferson showed them the Report. In fact, Plaintiff's counsel indicated Dr. Vaccaro had not reviewed the Report until 2023, well after Rothman terminated Plaintiff, and that Dr. Purtill did not substantively read the Report

until just before this trial. ECF 145, 37:14–37:20; ECF 138, 242:22–243:2. <u>Peoples Mortg.</u>, 856 F.

Supp. at 931 (no possibility for tortious interference because defendant's action occurred after

third party ended contract with plaintiff).

Second, Plaintiff's own testimony was that the Report was favorable to his version of

events. ECF 145, 113:15–13 (Plaintiff assessing the Report was "almost entirely favorable" to

him). Dr. Vaccaro similarly agreed that his assessment of the Report was that two adults engaged

in consensual sex. ECF 138, 242:22–243:21.

Third, the Report itself is no more than a compilation of forty-one witness accounts of the

party. The Pietragallo law firm pointedly refused to make any conclusions. As such, relaying

accounts of the incident, without commentary or editorial, belies any inference that Jefferson acted

with "malevolent purpose." <u>Valley Forge</u>, 28 F. Supp. 2d at 951.[26]

Fourth, no evidence shows that Defendants provided Dr. Purtill and Dr. Vaccaro the Report

in their capacities as Rothman, as opposed to high-ranking Jefferson, supervisors / managers. <u>See</u>

<u>Wells v. Thomas</u>, 569 F. Supp. 426, 435 (E.D. Pa. 1983) (an employer and his agents or officers

cannot tortiously interfere with each other) (Giles, J.); <u>Clinmicro Immunology Ctr., LLC v.</u>

<u>Primemed, P.C.</u>, 2016 WL 4107710, at \*12–13 (M.D. Pa. July 7, 2016), <u>report and</u>

<u>recommendation adopted</u>, 2016 WL 4119947 (M.D. Pa. July 29, 2016) (no tortious interference

against dual employee of two companies—the defendant and plaintiff—because "Hobson's

Choice" of remaining loyal to both parties was a shield for liability).[27] As noted above, questioning

---

[26] The "intent to harm" and acting "without justification or privilege" prong of tortious interference claims overlap when the truthfulness of the Report comes into play. Because these two prongs are "closely related," it is relevant to discern intent here. <u>Phillips v. Selig</u>, 959 A.2d 420, 430 (Pa. Super. 2008).

[27] For this same reason, Dr. Purtill's actions sharing his memorandum with Rothman shareholders was not improper. The relevant inquiry is not whether Dr. Purtill learned about Dr. Phillips's complaint in his capacity as a Jefferson or Rothman employee, but what he could relay to Rothman once he was aware of the allegations. As discussed, <u>supra</u>, Dr. Purtill, as a partner of Rothman, owed his fellow shareholders "[n]ot honesty alone, but the punctilio of an honor the most sensitive." <u>Clement v. Clement</u>, 260 A..2d 728, 729 (Pa. 1970) (quoting <u>Meinhard v. Salmon</u>, 164 N.E. 545,

of Dr. Vaccaro and Dr. Purtill failed to develop the record sufficiently regarding their dual capacities to permit an inference of Jefferson's intent to harm Plaintiff. In fact, Plaintiff's counsel stated that Dr. Purtill received a copy because of his role as <u>Jefferson's</u> Residency Director, not his relationship to Rothman. ECF 145, 39:13–19.

Finally, the record includes no evidence that Jefferson took <u>any</u> action against Plaintiff to harm his relationship with Rothman after he resigned from Jefferson. ECF 138, 19:12–20:13. Zoe Gingold testified without contradiction that Jefferson concluded the investigation and took no further disciplinary actions against Plaintiff after he resigned because his resignation constituted the greatest sanction Jefferson contemplated. <u>Id.</u> However, Plaintiff linked Defendants to one action after Plaintiff relinquished his privileges. According to Plaintiff's testimony, Dr. Vaccaro told Plaintiff that he could reinstate Plaintiff at Jefferson if Plaintiff dropped this lawsuit. ECF 138, 348:16–349:1; ECF 146, 174:22–175:10. Plaintiff did not know, let alone delineate in what capacity Dr. Vaccaro acted at that point. ECF 146, 174:22–175:10. Nonetheless, even if a reasonable jury could infer that Defendants used Dr. Vaccaro, as Chairman of Orthopedics at Jefferson, as an intermediary to relay the message, the ultimatum does not constitute tortious interference because it springs out of Defendants direct relationship with <u>Plaintiff</u>, not Plaintiff's relationship to Rothman. As with the rest of the record, Plaintiff did not produce any evidence of Defendants' intent to harm Plaintiff's employment with Rothman in constructively discharging Plaintiff; Defendants were concerned with Plaintiff working at their facilities.

Altogether, Plaintiff utterly failed to prove that Jefferson intended to harm his Rothman contract when he was "constructively terminated" from Jefferson.

---

546 (N.Y. 1928) (Cardozo, J.)). He was entitled, let alone mandated, to inform his fellow shareholders that one of their partners was accused of rape.

D. **Causation**

The following section discusses the causal relationship between Plaintiff's two key theories of tortious interference: did (1) Defendants telling Rothman to suspend Plaintiff and/or (2) Defendants constructively terminating Plaintiff's hospital privileges at Jefferson cause Plaintiff's eventual termination from Rothman. Under § 766 of the Restatement and as instructed to the jury, Plaintiff needed to prove that Defendants induced Rothman not to perform its contract.[28]

i. **Plaintiff Failed to Prove Any Facts to Allow the Jury to Conclude That His Initial Suspension from Rothman Caused His Eventual Termination from Rothman**

No Pennsylvania court has clearly articulated the requisite causation standard for tortious interference claims. That is, there is a question whether Pennsylvania would use a "but for" or "substantial factor" test, or both, to determine causation. Compare St. John's University, New York v. Bolton, 757 F. Supp. 2d 144, 173 (E.D.N.Y. 2010) (applying "but for" causation to plaintiff's tortious interference claims) with Wardlaw v. Inland Container Corp., 76 F.3d 1372, 1376 (5th Cir. 1996) (holding that causation under Texas's tortious law interference requires both "cause in fact" and "foreseeability") and Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1237 (10th Cir. 2006); see also Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 410 n.55 (3d Cir. 2016) (recognizing, without deciding, that New Jersey law is cloudy on whether "substantial factor" or "but for" causation applies to tortious interference claims).

However, Pennsylvania applies a more stringent "substantial factor" test for actions sounding in negligence. Whitner v. Von Hintz, 263 A.2d 889, 893–94 (Pa. 1970). The "substantial

---

[28] Plaintiff contended in oral argument that Defendants waived challenges on causation grounds, however, Defendants' counsel clearly invoked causation as one of its grounds for judgment as a matter of law. ECF 145, 271:21–272:5 ("Court: You mean no causation? Defense Counsel: Yes[.]).

factor" test is more exacting than "but for" causation because a jury must find not only that but for the defendant's actions the harm resulted, but also that it was "a substantial factor in bringing about the harm." Takach v. B. M. Root Co., 420 A.2d 1084, 1086 (Pa. Super. 1980). Three factors guide the "substantial factor" inquiry: "[1] the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; [2] whether the actor's conduct created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and 3] lapse of time." Brown v. Philadelphia College of Osteopathic Medicine, 760 A.2d 863, 869 (Pa. Super. 2002), appeal denied, 781 A.2d 137 (Pa. 2001) (quoting Restatement (Second) of Torts § 433 (1965)).

If Pennsylvania applies the "but for" causation, then a jury could find that Jefferson telling Rothman to suspend Plaintiff served as a but for cause in his eventual firing. Plaintiff and Dr. Vaccaro's testimony, combined, established that Plaintiff lost his position with Rothman because he could not meet his revenue obligations over the course of three years, excluding 2020, when every partner received a grace year due to COVID. ECF 138, 291:22–294:4; ECF 145, 106:4–20. Plaintiff lost his contract with Rothman in October 2022. Thus, including the COVID year, at latest, he stopped meeting his revenue obligation in October 2018. From June 2018 until December 2018, Plaintiff remained suspended from Rothman at Jefferson's suggestion. Thus, Jefferson's "suspension" request satisfies "but for" causation because if not for his suspension from Rothman, Plaintiff may have been able to meet his revenue obligations in 2018.

However, under the substantial factor test, Jefferson directing Rothman to suspend Plaintiff was not causally related to his eventual termination. Each factor weighs against Plaintiff. Applying the first factor, Plaintiff's temporary suspension from Rothman from late June 2018 until late

December 2018 was a minor factor in his eventual termination. The suspension caused him to fail his revenue obligations in 2018. However, he had three more chances to fulfill his numbers. He was not able to—but the suspension was the equivalent of receiving one strike, when three are needed to lose employment. The subsequent failures to meet revenue demands in 2019, 2021, and for ten months in 2022 played far greater roles in his termination. Second, the suspension did not create a "force or series of forces" which led to Plaintiff to losing his contract. Brown, 760 A.2d at 869. The suspension ended in December 2018, when Plaintiff returned to Rothman and continued performing surgeries at non-Jefferson hospitals. Plaintiff could not meet his revenue because his resignation from Jefferson, an independent event,, not his temporary suspension from Rothman, lowered his revenue capacity. Finally, almost four years lapsed between the end of Plaintiff's suspension and Rothman's termination of his contract. Such an extensive lapse of time, coupled with the superseding circumstance—Plaintiff relinquishing privileges at Jefferson— further diminish the suspension's causal relationship to Plaintiff losing the Rothman contract. See Id. at 870 (six years of elapsed time and superseding circumstance defeated causation).

As a matter of first impression, this Court applies the substantial factor test to tortious interference. Generally, "liability for intentional torts extends beyond foreseeability for the obvious reason 'that it is better for unexpected losses to fall upon the intentional wrongdoer than upon the innocent victim.'" Rowe v. Marder, 750 F. Supp. 718, 724 (W.D. Pa. 1990) (quoting Prosser & Keeton, THE LAW OF TORTS 40 (5th ed. 1984)). However, § 766 of the Restatement, which Pennsylvania has fully adopted, suggests proximate causation (i.e. "substantial factor" test) is an element of tortious interference. See Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94, 97 (Pa. Super. 2009), aff'd, 20 A.3d 468 (Pa. 2011).

Comment o of § 766 discusses the causation standard for tortious interference. The comment does not directly address the "but for" or "proximate cause" tests. Rather, § 766 cites to the common law causation standard for fraudulent misrepresentation, found in §§ 546–48 of the Restatement. Restatement (Second) of Torts § 766, cmt. o. Following that thread, § 546 states that liability only attaches when a misrepresentation "is a <u>substantial factor</u> in determining the course of conduct that results" in loss (emphasis added).

Furthermore, proximate cause is an essential element of fraudulent misrepresentation in Pennsylvania, the tort described in §§ 546–48 and favorably referenced in § 766. <u>Allegheny Gen. Hosp. v. Philip Morris, Inc.</u>, 228 F.3d 429, 445–46 (3d Cir. 2000). In other words, "substantial factor" causation is definitively an element for fraudulent misrepresentation in the Restatement and Pennsylvania, and § 766 of the Restatement implies tortious interference incorporates that same standard. <u>See</u> <u>Bouriez v. Carnegie Mellon University</u>, 585 F.3d 765, 771–73 (3d Cir. 2009) (applying three factor "substantial factor" test from <u>Brown</u> in fraudulent misrepresentation case).

Finally, the only Third Circuit decision to interpret § 766's causation standard held that the "substantial factor" test was the appropriate threshold. <u>Avins v. White</u>, 627 F.2d 637, 650 (3d Cir. 1980) (causation jury instruction under Delaware tortious interference law that the interferences needed to contribute "in a material and <u>substantial</u> way to the removal decisions made by [Defendant], and were a factor without which the removals would not have occurred" was proper under the Restatement) (emphasis added). <u>Avins</u> is not dispositive because Delaware, not Pennsylvania, law was at issue. However, its analysis broadly interpreted the same Restatement sections Pennsylvania has adopted for tortious interference claims.

Altogether then, this Court predicts Pennsylvania requires the interference was a "substantial factor," in addition to a "but for" cause, in the eventual dissolution of contract.

Applying that test, Plaintiff's temporary suspension from Rothman from June 2018 to December 2018, was not a "substantial factor" in his eventual termination from Rothman. The extended lapse in time (almost four years) between "cause" and "effect", and role the Jefferson termination independently played in Plaintiff's revenue shortfall attenuate the causal link beyond legal cognizance.

### ii.   Plaintiff's Loss of Privileges at Jefferson Fails as a Legal Cause to the Termination of The Rothman Contract

At first blush, the record appears quite robust to support a verdict that Defendants' decision to constructively terminate Plaintiff caused him—both as a "but for" and "substantial factor"—to lose his job with Rothman. As discussed, several witnesses testified that Plaintiff earned significantly less revenue for Rothman after he stopped working out of Jefferson facilities, and this diminished revenue made it more difficult for him to meet his partnership obligations with Rothman, leading to his eventual termination.

However, legal causation for tortious interference is more precisely defined. Under the governing law in Pennsylvania, which instructed the jury, Plaintiff needed to prove that Defendants "intentionally induced, or otherwise intentionally caused Rothman not to perform its Contract with Plaintiff . . . A person induces another when they cause that other . . . to choose one course of conduct rather than another course of conduct." ECF 146, 99:19–100:1. This causation instruction reflects § 766 of the Restatement, which Pennsylvania adopts as the substantive framework for tortious interference claims. Adler, 393 A.2d at 1181–83; Nathanson v. Medical College of Pa., 926 F.2d 1368, 1388 (3d Cir. 1991).

In oral argument on post-trial motions, Defendants elaborated that their causation challenge turns on the distinction between the causation element in § 766 and § 766A of the Restatement.

Defendants argued that Plaintiff's theory of causation flows through § 766A's causation rubric, not § 766, which is the prevailing law. ECF 173, 10:14–11:15.

### a. *Defendants Preserved Their § 766 and § 766A Arguments*

Before delving into the Defendants' substantive arguments regarding the Restatement, this Court first considers whether Defendants preserved this line of attack. A "post-trial Rule 50 motion can only be made on grounds specifically advanced in a motion for a directed verdict at the end of plaintiff's case." Kars 4 Kids Inc. v. Am. Can!, 8 F.4th 209, 220 (3d Cir. 2021) (quoting Kutner Buick, Inc. v. Am. Motors Corp., 868 F.2d 614, 617 (3d Cir. 1989)). The rule serves twin aims. First, "[a]bsent a motion in accordance with [Rule 50], judicial reexamination of the evidence abridges the plaintiff's Seventh Amendment right to a trial by jury." Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 183 (3d Cir. 1992). And second, the specificity requirement ensures that the party with the burden of proof has an opportunity to cure its evidentiary defects. Levinson v. Prentice-Hall, Inc., 868 F.2d 558, 562 (3d Cir. 1989).

A moving party need not crystallize the grounds in their clearest form, but rather preserves when the "the communicative content, specificity and notice-giving function of an assertion, [is] judged in context." Acosta v. Honda Motor Co., Ltd., 717 F.2d 828, 832 (3d Cir. 1983) (internal citations and quotations omitted). Several Third Circuit cases help flesh out this language. In Acosta, the Court held that defendants had not waived a Rule 50 ground even though their original motion simply asked for a "directed verdict" on the "remaining counts," without specifying the elements challenged. Id. Because the surrounding record showed that the plaintiff understood defendants' specific challenge, the Court found preservation. Id. Then in Fineman, the Court returned to the notice-seeking function of the rule. 980 F.2d at 184. Plaintiffs sued under both federal law and tortious interference. Id. In their Rule 50 motion, defendants asked for a directed

verdict as to the federal claims, but did not state, on the record, that they moved for a verdict on tortious interference. Id. Still, the Court held that defendants preserved their Rule 50 arguments with respect to tortious interference because, in generally arguing that plaintiffs did not prove "coercion" or that defendants were not engaged in "legitimate business activity," they placed plaintiffs on adequate notice. Id. Acosta and Fineman contrast with what the Third Circuit has held is inadequate under Rule 50, when a party changes the grounds of its motion post-trial. See Orlando v. Billcon Int'l, Inc., 822 F.2d 1294, 1298 (3d Cir. 1987) (holding that defendant did not preserve argument that tortious interference damages failed as a matter of law when defendant only asked for a directed verdict on tortious interference liability at trial); Kars 4 Kids, 8 F.4th at 220 (holding that defendant could not argue, post-trial, that "validity" element of trademark infringement claim failed when it only moved for directed verdict on distinct "ownership" element at trial).

Defendants preserved all arguments that challenge Plaintiff's claims as to how Jefferson's constructive discharge of Plaintiff caused his termination at Rothman. For one, Defendants specifically argued that Plaintiff's claims failed causation in their initial motion during trial. Defendants' counsel clearly invoked causation as one of its grounds for judgment as a matter of law. ECF 271:21–272:03 ("Court: You mean no causation? Defense Counsel: Yes[.]). This alone is sufficient under Acosta and Fineman, where the Court found preservation without specific recitation of the element, or even cause of action, under attack.

But more, considering the full context of the record, Defendants plainly put Plaintiff on notice of this line of attack. One of Defendants' main points, advanced through multiple witnesses' testimonies, was that Jefferson had nothing to do with, and no interest in, Rothman deciding to terminate Plaintiff's contract. In opening, Defense counsel previewed its argument that Jefferson had nothing to do with Rothman ending Plaintiff's relationship in 2022. ECF 137, 43:19–44:17

("So, like Counsel talks about, like, Jefferson tortiously interfered with his relationship with Rothman . . . But there's going to be no evidence. You're not going to hear any evidence from the witness stand that Jefferson had anything to do with that whatsoever.") Then, during the evidence phase, Defendants drew out testimony from Dr. Vaccaro that Plaintiff continued to work at Rothman for almost four years after he departed from Jefferson and that Rothman's termination of Plaintiff's contract had nothing to do with Jefferson. ECF 138, 287:12–289:10. In response, Plaintiff's counsel re-crossed Dr. Vaccaro about how the effect of losing Jefferson privileges made it more difficult for Plaintiff "make his numbers." ECF 138, 290:12–294:1. Moreover, Plaintiff further explained his theory that losing privileges at Jefferson lowered the number of surgeries he could perform and hampered his ability to meet revenue thresholds for Rothman. ECF 138, 344:17–345:25. And as discussed, <u>supra</u>, both parties emphasized how Rothman and Jefferson were distinct entities, including that Jefferson could not control Rothman's employment decisions.

The closing arguments show more of the same. Plaintiff's counsel articulated that "because of what Jefferson was doing," constructively discharging Plaintiff, "his ability to generate revenue [went] down. His ability to meet his contractual obligations is hampered." ECF 146, 61:16–20. Defense counsel, in its close, again contested that the Jefferson departure in December 2018 had any causal effect on Rothman's termination in October 2022. ECF 146, 83:3–20.

All of this shows that the mechanism of causation between the Jefferson departure and Rothman's termination of Plaintiff's contract was not only on the Plaintiff's radar, but hotly debated in every phase of the trial. As such, Defendants preserved arguments that stem out of causation.

    b. *Plaintiff's Main Causation Theory is Not Cognizable Under § 766 of the Restatement*

  The Second Restatement of Torts addresses tortious interference with existing relationships in two sections. Restatement (Second) of Torts §§ 766, 766A. The sections differ in a critical regard. Section 766 applies to interference actions "directed at a third party," while § 766A prohibits interference "directed at the Plaintiff." <u>Karpf v. Massachusetts Mut. Life Ins. Co.</u>, 2018 WL 1142189, at *12 (E.D. Pa. Mar. 1, 2018) (citing the Restatement) (Surrick, J.). Section 766 holds one liable who "intentionally and improperly interferes with the performance of a contract . . . between another and a third person <u>by inducing or otherwise causing the third person not to perform the contract</u>" in comparison to § 766A, which attaches liability to "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person, <u>by preventing the other from performing the contract or causing his performance to be more expensive or burdensome</u>." In other words, the causal mechanism of the interference changes. In § 766, the defendant causes or induces <u>the third party</u> (i.e. Rothman) not to perform a contract. In § 766A, the defendant causes or induces <u>the plaintiff</u> (i.e. Abraham) not to perform the contract or makes his performance harder.

  The Pennsylvania Supreme Court has adopted § 766, <u>but not</u> adopted § 766A, and the Third Circuit has predicted it will not do so. <u>Windsor Sec., Inc. v. Hartford Life Ins. Co.</u>, 986 F.2d 655 660–63 (3d Cir. 1993) ("The parties have not cited nor have we discovered any Pennsylvania cases recognizing a separate cause of action for preventing plaintiff's performance of his own contract."); <u>Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 40 F.3d 63, 66 (3d Cir. 1994) ("[C]ausing performance of a contract to be more costly 'as an element of proof is too speculative and subject to abuse to provide a meaningful basis for a cause of action.'") (internal citations omitted). Following the Third Circuit's wisdom, most Pennsylvania district

courts concur that tortious interference does not lie when the defendant only interferes with the plaintiff's, rather than the third party's, performance of the contract. See Karp, 2018 WL 1142189 at *13 n.6 (concluding the same and collecting in-circuit decisions finding that 766A is not a cause of action in Pennsylvania).

This Court has also faced this issue before. In Safa v. City of Philadelphia, this Court dismissed the Plaintiffs' tortious interference claim, at the pleadings stage, because they only alleged Defendant's interference affected the Plaintiffs', rather than the third party's performance of contract. 2014 WL 2011487 at *6 (E.D. Pa. May 16, 2014) (Baylson, J.). The Defendants had seized Plaintiffs' commercial merchandise. As a result, Plaintiffs alleged they lost "the business of several customers because [they] were unable to fulfill their contracts" without the product. Id. at *5. This Court followed the Third Circuit's predictions in Windsor and Gemini "that the Pennsylvania Supreme court would [not] adopt section 766A." Gemini, 40 F.3d at 66.

The distinction is not trivial or formalistic but stems from different rationales underlying the two causes of action. As the Third Circuit explained in Windsor, the "gist of the action" in the prototypical tortious interference cases "was not the plaintiff's performance, but the defendants' conduct in intentionally and wrongfully enticing away plaintiff's clients." Windsor, 986 F.2d at 661 (discussing seminal Pennsylvania Supreme Court tortious interference case, Adler, Barish). Liability under § 766 improves market efficiency by incentivizing direct negotiations between a defendant and the plaintiff. Id. at 661–62. Under § 766A, however, "this 'bargain-forcing' justification appears absent" because the claim turns on the defendant's conduct directed toward the plaintiff. Id. Additionally, because § 766A allows for recovery not only when a plaintiff is unable to perform his contract, but also when it is made merely more burdensome or costly, § 766A is "much more difficult to apply and conducive to disputes." Gemini, 40 F.3d at 66; see also

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 281 (3d Cir. 2010) (reaffirming prediction that Pennsylvania would not adopt § 766A).

The testimony during trial was unequivocal that Plaintiff lost his contract with Rothman because he was unable to meet his revenue obligations under his Rothman contract. ECF 138, 290:12–294:5. As discussed, supra, No evidence suggests that Jefferson took any action to encourage or induce Rothman to fire Plaintiff after he relinquished his privileges in December 2018. Rather, Dr. Vaccaro, the President of Rothman, was adamant that Jefferson had no power over him with respect to employment decisions, that he wanted Plaintiff to get back to work for Rothman, and that he proactively looked for other surgical placements for Plaintiff after the Jefferson firing. ECF 138, 261:9–262:7. The last discrete action Jefferson directed toward Rothman, according to Dr. Plaintiff's testimony, was his "understanding" that Jefferson instructed Dr. Vaccaro to convince Plaintiff to resign from Jefferson so he could return to Rothman. ECC 138, 229:25–230:17. For one, Plaintiff's "understanding" is highly speculative on its face. More importantly, Plaintiff's testimony does not allow an inference that Jefferson interfered with the Rothman contract. Even taking Plaintiff's "understanding" as true, Jefferson was trying to induce Plaintiff to resign from Jefferson, not Rothman. And under Pennsylvania law, any actions Jefferson took to interfere with its own contract cannot make out a tortious interference claim. Rutherford v. Presbyterian-University Hosp., 612 A.2d 500, 507–08 (Pa. Super. 1992); Salsberg, 2024 WL 696425 at *10–12, 19 n.9 (quoting majority opinion that a corporation, acting "only through its officers, agents, and employees . . . cannot interfere with a contract with itself.") (Wecht, J., concurring).

Altogether then, the termination of the Rothman contract claim relies on two simple premises. One, Plaintiff lost his operating privileges with Jefferson, which provided substantial

revenue for Rothman. Two, as a result of Plaintiff losing his Jefferson privileges, he could not meet obligations under his Rothman contract, and was subsequently terminated.

These facts smack of a § 766A claim. At most, Defendants, in inducing Plaintiff's resignation from <u>Jefferson</u>, made it more "burdensome" for him to perform his contract with Rothman. Eventually, because of his diminished revenue, he lost the Rothman contract. Uncontradicted testimony established that Rothman had partnership relationships with multiple other large medical systems within the tri-state area, including New York University and Hackensack Hospital, and Capital Health, where Plaintiff later worked. ECF 138, 265:25–266:2; 251:8–13. Plaintiff did not introduce any evidence that Defendants in any way prevented him from meeting his partnership obligations by acquiring privileges and performing procedures at NYU or Hackensack, let alone at Rothman's Orlando partners. While commuting to North Jersey or New York could be less convenient for Plaintiff than working in Philadelphia, merely making performance of a contract less convenient is not cognizable interference under Pennsylvania law.

Plaintiff's own framing of the case is helpful. During trial, Plaintiff described his positions with Rothman and Jefferson as akin to a racecar and the racetrack. ECF 138, 156:22–157:3. Rothman was the entity providing the racecar, and Jefferson offered the racetrack. <u>Id.</u> Translating Plaintiff's framework to this claim, Jefferson, in "constructively terminating" Plaintiff, took away a racetrack. But Jefferson did not prohibit, or otherwise influence, Plaintiff's ability to drive his racecar on other tracks, in other venues. All Jefferson did was prohibit Plaintiff from one track, so to speak. It did not care, let alone interfere, whether Plaintiff continued to drive elsewhere. That the racecar sponsor, Rothman, later severed its relationship with the driver, Plaintiff, is not legally attributable to one racetrack's, Jefferson's, decision.

In allegedly "constructively terminating" Plaintiff, Jefferson directed its conduct toward Plaintiff, not Rothman, which the record established was a separate entity. Under <u>Windsor</u>, <u>Gemini</u>, and our prior decision in <u>Safa</u>, conduct directed toward the plaintiff, rather than the third party, is not actionable in Pennsylvania.

## XII.    <u>DEFENDANTS' MOTION FOR NEW TRIAL</u>

### A.  <u>Parties' Contentions with Respect to the Motion for New Trial</u>[29]

Defendants filed a Motion for New Trial under Rule 59(a). ECF 153. With respect to the Title IX claim, Defendants argue that:

    (1) this Court erred in excluding critical evidence,

    (2) fundamental error in the jury instructions is grounds for a new trial, and

    (3) Plaintiff counsel's misconduct warrants a new trial.

First, Defendants argue that this Court erroneously excluded evidence in the form of Dr. Abraham's own admissions, including text messages that demonstrated Dr. Abraham was not a victim and that he simply made a "poor choice" to have sex with Dr. Phillips. Defendants assert that the excluded evidence spoke directly to Dr. Abraham's credibility because it contradicted Dr. Abraham's testimony from the witness stand, and many of the arguments made throughout the trial by his counsel. ECF 153-2 at 14-15.

Second, with respect to errors in the jury instructions, Defendants argued that this Court omitted a proposed jury instruction from Jefferson instructing that "Bias against Respondents to Title IX Complaints is Not Actionable Under Title IX." ECF 153-2 at 17. Defendants also argue that this Court erred by not giving jury instructions on "burden shifting," various frameworks by

---

[29] In view of the Judgment as a Matter of Law on Plaintiff's Tortious Interference claim, this discussion will be limited to issues relevant to Plaintiff's Title IX claim.

which Plaintiffs can bring a Title IX claim (erroneous outcome, selective enforcement), the defense of reasonableness, and that this Court's instruction regarding the 5th Amendment was prejudicial and improper.

Third, with respect to Plaintiff's counsel's alleged misconduct, Defendants argue that Abraham's counsel repeatedly argued with this Court in front of the jury, and made disparaging and inflammatory statements.  ECF 153-2 at 26.

In Response, Plaintiff argues that (1) this Court properly excluded certain irrelevant, confusing evidence, and there was no harm, in any event, (2) the jury instructions were proper and any claim otherwise was waived, (3) the Fifth Amendment instruction was appropriate, agreed to, and harmless, and (4) Defendants' request to "clarify" the Title IX "process claims" is waived and inconsistent with Third Circuit precedent.

In their Reply, Defendants argue that (1) the excluded evidence is highly relevant and should have been allowed at trial, (2) this Court's Title IX Instructions relieved Dr. Abraham of his Title IX burden because the Title IX liability instruction allowed the jury to erroneously conclude that any evidence of gender bias triggered liability and without instruction on the anti-respondent bias defense, the jury was allowed to infer anti-male bias from non-discriminatory actions, and (3) this Court's Fifth Amendment instruction failed to inform the jury that it could draw a negative inference from Abraham's decision not to participate in the Jefferson Investigation.  ECF 166.

### B.  <u>New Trial Legal Standard</u>

Federal Rule of Civil Procedure 59 permits a court to order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Courts have granted new trials when there have been prejudicial errors of law,

prejudicial statements made by counsel, or when the verdict is against the weight of the evidence. See Maylie v. Nat'l R.R. Passenger Corp., 791 F.Supp. 477, 480 (E.D.Pa. 1992), aff'd, 983 F.2d 1051 (3d Cir. 1992) (citations omitted).

The scope of the district court's discretion when deciding a Motion for New Trial under Rule 59 depends on whether the motion is based on (1) a prejudicial error of law/prejudicial statements made by counsel or (2) a verdict alleged to be against the weight of the evidence. See Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993). The Court has wide latitude in deciding the motion when it involves a matter within the trial court's sound discretion, such as the court's evidentiary rulings or points for charge to the jury. Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 921-22 (3d Cir. 1986). The Court must determine: (1) "whether an error was in fact made;" and (2) "whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600, 601 (E.D. Pa. 1989), aff'd, 922 F.2d 184 (3d Cir. 1990) (internal quotation marks and citation omitted).

By contrast, when the verdict is alleged to be against the weight of the evidence, the district court's discretion to grant a new trial is narrower. Klein, 992 F.2d at 1290. In such circumstances, the district court is cautioned not to "substitute its 'judgement of the facts and the credibility of the witness for that of the jury." Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 211 (3d Cir. 1992). A court may grant a motion under these circumstances "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consol Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991) (citation omitted). Furthermore, "[w]here the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations such as passing

109

upon the nature of an alleged newly discovered organic compound in an infringement action." Klein, 992 F.2d at 1290 (internal quotations omitted).

Here, Defendants' Motion for New Trial rests primarily on the grounds of improperly excluded evidence and jury instruction error, and thus, the Court has wide latitude in deciding whether to grant the new trial. Defendants' Renewed Motion for Judgment as a Matter included a motion, in the alternative, for new trial on the same grounds. "Where a party combines a motion for new trial under Rule 59 with a motion for judgment as a matter of law under Rule 50, the motion for new trial is tested by the same standards that would apply if the motion were independently asserted under Rule 59." Baker v. Advanced Mixer, Inc., 1994 WL 178106, at *4 (E.D.Pa. 1994). As has been made amply clear, the jury's verdict with respect to Plaintiff's Title IX Claim was not against the weight of the evidence in this case and neither "result[s] in a miscarriage of justice" nor "cries out to be overturned or shocks our conscience." For this reason, this Court will proceed below with an analysis of Defendants' Motion for New Trial arguments with respect to the Title IX Claim only.

### C. Text Messages and Arguments about the Party

An important error that this Court made was sustaining Plaintiff's objection to allowing cross-examination of Plaintiff on two text messages he sent, one prior to the party and one during the party, which reflected motive and intent that was inconsistent with his later claims about what happened at the party and his "innocence" concerning the events of the evening.

The first text message, the "Young Hot Single Female Text," is a text message from Plaintiff to his work colleague about the upcoming party, where Plaintiff writes, "Hopefully

everyone brings their young hot single female friends to the party…that will help pick me up…" followed by a laughing/crying emoji.[30]

The second text message exchange, which occurred at 10:49 p.m. during the evening of the party, is between Plaintiff and one of his non-work friends who attended the party.  The non-work friend wrote, "Dont [sic] do it?" to which Plaintiff responded, "Getting cock blocked anyway…one of my residents so I really can't anyway."  The non-work friend then responded, "Me?"  ECF 153-2 at 6.

Defendants assert in their Motion for New Trial that this Court improperly excluded these text messages from being used as impeaching evidence.  ECF 153-2 at 4.  Defendants argue that, despite this Court's pre-trial ruling and instruction to Plaintiff's counsel to cease eliciting testimony as to what happened at the party, Plaintiff's counsel repeatedly elicited testimony and argued about the party and Dr. Phillips's conduct throughout the trial.  Id. at 7.  Defendants further argue, in consideration of these two text messages and the third bucket of excluded information discussed below under "Fifth Amendment Issues":

> Had Jefferson been allowed to use this evidence to cross Abraham, the jury would have been informed of the other side of the story (and not just plaintiff's self-serving recitations), and would have been allowed to fairly consider that: (i) Abraham's party was not a professional party (as he testified on direct) but, rather, was a drunken bacchanalia where Abraham was hoping to have sex with a "young and hot" female—ultimately, Jefferson junior resident and student, Phillips—to "lift his spirits"; (ii) Abraham wanted to have sex with Phillips, but could not because he was being "cock blocked" (prevented from doing so) by someone else; (iii) Abraham was not intoxicated at the party and had not been forced to drink whiskey by Phillips to the point he could not consent to having sex; (iv) he initially claimed only that he made a "poor choice" of which he was "not proud," changing his tune to claim he did not consent only later; and (v) he could have provided information in Jefferson's investigation but chose not to. See Exs. 1, 2 and 3 (the wrongfully excluded evidence). Instead, after having heard only Abraham's side of the story, the jury apparently agreed with Abraham's counsel that Phillips was the "malignancy" to be cut out from Jefferson, see ECF No. 146, Day 4 Tr. at 64:16-21, and that Jefferson's investigation and actions were motivated by anti-male bias. The exclusion of the evidence was erroneous, deprived Jefferson of an effective defense, and warrants granting a new trial.

---

[30] The relevant text message exchange is included in Defendants' Motion for New Trial, ECF 153-2 at 5.

ECF 153-2 at 8-9.

The record is clear that Defendants' counsel objected to Plaintiff's testimony about what happened at the party:

- Dr. Abraham testified, "[t]here was no rape. There was no – I mean, literally the words were, 'I want you to F me.' And that is what I heard." (ECF 138, 188:8-11). Then Defendants' counsel objected, and this Court sustained the objection, saying "What happened there is – not the issue."[31]

Defendants' counsel reiterated its request to introduce two of the text messages at trial. Plaintiff's counsel objected and this Court sustained that objection on the grounds that the text messages are "inflammatory and they're not necessarily relevant." ECF 145, 190:9-11.

The relevant discussion from trial is included below:

MS. LORI: - anything that happened -- I think you said prior to the party. But I believe Dr. Abraham opened the door to bringing in various text messages before the party. There's two text messages in particular, Exhibits 6 and 7. Because he testified this party was a professional party to reward his Staff ....he sent a text message to Jeanette Domanico. It's Exhibit 6...And he says ..."Hopefully everyone brings their young, hot"..."single female" ..."friends to the party."

THE COURT: Do you object to that?

MR. JUBB: Of course.

THE COURT: Sustained. All right.

…

MS. LORI: And then, the next one, Your Honor, is Exhibit 7, which is the text message …exchange with his friend … Ali Debauge.

THE COURT: That is not being admitted.

MS. LORI: I'm sorry?

---

[31] This Court also made clear at the start of the trial that this case is not about what happened at the party: "Now, this trial is not about what took place at the party. Okay? I repeat that the trial is not about what took place at the party. The trial is about what happened after the party. And as you will hear, as a result of certain statements that were made to Jefferson, Jefferson started an investigation, [ ] which it's obliged to do under Title IX." (ECF 137. 23:21 – 24:2)

THE COURT: Do you object to that?

MR. JUBB: I do.

THE COURT: Both are sustained. They're inflammatory and they're not necessarily relevant. So I sustain the objection. Okay? That's the Ruling.

ECF 145, 188:24-190:11.

Rule 403 allows this Court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. R. 403. "Questions concerning the credibility of any witness—especially one whose credibility could have an important influence on the outcome of the trial—are relevant." <u>Reynolds v. Univ. of Penn.</u>, 684 F. Supp. 2d 621, 632 (E.D.Pa. 2010). "The Court of Appeals has emphasized that a jury must have sufficient information to make a discriminating appraisal of a witness's motives and bias." <u>Id.</u> (citing <u>Douglas v. Owens</u>, 50 F.3d 1226, 1230 (3d Cir. 1995)).

Here, the text messages were initially, pre-trial, appropriately excluded (during motions in limine) because they were not given to Jefferson during the investigation and therefore, they were not relevant to the question of whether Jefferson conducted a fair investigation, since Jefferson could not have considered documents it did not possess. However, Defendants' counsel is correct that Plaintiff's counsel ultimately "opened the door" by asking witnesses to testify about what happened at the party, despite this Court's ruling, and thus this Court should have permitted the text messages as impeachment evidence with respect to Plaintiff's account of what happened at the party.[32]

---

[32] Plaintiff's counsel asked several questions about events at the party, which this Court's pre-trial order had precluded. This is an additional reason for granting a new trial.

Furthermore, here, "the probative value of the excluded evidence—namely, providing information relevant to the jury's determination of [Dr. Abraham]'s credibility—is considerable" where the jury's verdict hinged on the question of Plaintiff's credibility. Id. at 632. The jury's verdict clearly indicates that the jury credited Plaintiff's version of the events. While these text messages are certainly unfavorable to Plaintiff, the harm to Plaintiff of allowing this evidence is insufficient to warrant exclusion under Rule 403. See Goodman v. Penn. Turnpike Comm'n, 293 F.3d 655, 670 (3d Cir. 2022) ("[P]rejudice does not simply mean damage to the opponent's cause," instead it must be unfair prejudice "of the sort which cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as found"). This Court finds, by contrast, that the erroneous ruling was highly prejudicial to Defendants because of the content of these text messages which contradicted Plaintiff's own testimony at trial.

Since the probative value of the text messages is not substantially outweighed by the danger of unfair prejudice to Plaintiff, and since this error affected the substantial rights of Defendants, this Court finds that it erred in excluding the text messages and accordingly grants the Motion for New Trial.

### D.  Rothman Investigation and Fifth Amendment Issues

This Court sustained Plaintiff's objection and excluded from evidence the August 15, 2018 letter on Conrad O'Brien stationary from Plaintiff's counsel Judson Aaron to Rothman attorney Thomas Bergstrom. See JX46. In this letter, Aaron writes,

> Below are my responses to the questions that you put in your letter dated August 10, 2018 to attorney Marc Steinberg [Plaintiff's attorney]. Please understand that because of the ongoing police investigation a complete and detailed explanation of the pertinent events cannot be provided now, either by Dr. Abraham or his counsel. Dr. Abraham looks forward to giving a complete and detailed statement once the criminal investigation has concluded.

114

JX46.  The letter lists twenty-one questions with responses in varying degrees of detail.  Most

relevant for our purposes, in response to the question, "Were you intoxicated/sober?  How much

alcohol did you consume?" the response reads, in pertinent part, "During the duration of the party

Dr. Abraham was not intoxicated."  JX46.  Defendants argue in their Motion for New Trial that

this court erred in excluding this document because it "shows that Abraham was not intoxicated at

the party," contrary to Plaintiff's assertions at trial, and also that "Abraham participated in

Rothman's investigation while refusing to participate in Jefferson's investigation."  ECF 153-2 at

6.

Plaintiff testified at trial that he could not participate in the Jefferson investigation because

of the ongoing criminal investigation into his conduct at the party.  ECF 145, 222:23-223:3. He

testified that he took the advice of his counsel, "and that advice was do not speak.  Do not make a

statement.  You cannot do anything or you will be risking giving up your liberty." ECF 145, 152:4-

13.  This Court upheld in an instruction to the jury Plaintiff's constitutional right to refuse to speak

to Jefferson.[33]

Defendants' Counsel provided an offer of proof for the August 15, 2018 letter, arguing that

Plaintiff testified repeatedly that he could not participate in the Jefferson Investigation, yet at the

same time, he provided answers to twenty-one questions from Rothman as part of Rothman's

investigation into the same allegations.   ECF 145, 170:10-173:10. Defendants' Counsel also

argued that Dr. Abraham testified in state court that he knew his Counsel was answering these

---

[33] This Court instructed the jury, '[U]nder the Constitution of the United States, which is, of course, binding upon me
and all other [ ] citizens, a person who is under investigation, or has been charged with a crime, has a right to invoke
the privilege against self-incrimination, if they want to.  And you've heard some testimony about that.  So, you may
consider that in your deliberations, as to the – what was testified about that, and when that happened, in connection
with all the other evidence that you heard in the case."  ECF 146, 110:5-13.

Rothman questions, and that he reviewed the questions and approved the answers.  ECF 145, 172:17-173:3.

This Court decided that it would not allow into evidence the August 15, 2018 letter and would not allow Defendants to cross-examine Dr. Abraham on the details of this letter:

> The Court: Probably neither of you are going to be happy with this, but here's what I think is proper at this time, which is the cross examination of the Plaintiff, that he can be asked that he had Counsel.  If you want to ask him this, Ms. Lori, you can ask that he had Counsel representing him.  And then, he can identify Jud[d] Aaron.  And that, on his – did he, on Mr. Aaron's recommendation, provide information?  Did he know that Mr. Aaron, on his behalf, was providing information to Mr. Bergstrom, who was representing Rothman, about what happened at the party?  All right?  Yes or no; I presume his answer to that will be yes…But that's it…But I'm not going to allow to go right now, to go into the details of what he said, even though I recognize that it is, to some extent, contrary to his direct testimony and it – the fact that he gave that – knew that information was going to Rothman may be considered contrary to his invitation of his right of – against self-incrimination regarding Jefferson.  And we may have argument about that in front of the jury.  But my belief and my conclusion is that we're not going to go into the details of what was said in the letters. And largely, that's because I don't know what was specifically said.  And none of us have the right to know what Dr. Abraham discussed with Mr. Aaron…And it's possible that Dr. Abraham told Mr. Aaron something – his own Lawyer, Jud[d] Aaron— something different than he told Dr. Vaccaro or anybody else that he talked to.  But his testimony is that he didn't talk to these other people on the advice of Counsel.  So, that's where it's left.  And I think both of you are probably think[ing] I'm wrong about that.  But I believe that is a fair and just result, so that we keep this case focused on what Jefferson did.  That's what Jefferson did.  So, there's some inconsistency here.  But I am not going to allow either of you to go into the details of it.  That's my Ruling.  Okay?  All right.

ECF 145, 202:1-202:22.

Prior to trial, this Court was not aware of the August 15, 2018 letter, which arguably should have been disclosed in a Motion in Limine to give this Court the opportunity to rule on its admissibility.  Plaintiff admitted in his testimony that he knew his attorney was giving Rothman information about the party that was not being given to anyone at Jefferson.  ECF 145, 227:10-228:3.  This August 15, 2018 letter provided a potentially important opportunity for cross examination of Plaintiff because he knew his counsel was giving facts about the party to Rothman, but he was refusing to give any facts to Jefferson.  This is more than a simple inconsistency.  It

116

may have allowed the jury to conclude that Plaintiff's refusal to give facts to Jefferson was strategic and not because of his concern about self-incrimination, and also would have been appropriate cross-examination because it may have impacted Plaintiff's credibility before the jury.

Similarly, the issue of whether Plaintiff was intoxicated during the party goes to the heart of his claim that he was incapable of providing consent to the sexual encounter that evening.  The August 15, 2018 letter provided a potentially important opportunity for cross examination of Plaintiff, who testified at trial that Dr. Phillips "went ahead and poured alcohol into my drinks, and even poured alcohol directly into—my mouth at one—point."  ECF No. 145, 125:9-22.

This Court seriously erred by not allowing Defendants to cross-examine Dr. Abraham on the details of his (or his counsel, acting on Plaintiff's behalf) knowingly providing information about the events at issue to Rothman, but denying Jefferson the same information. This Court agrees with Defendants that Plaintiff "opened the door" to his testimony, and that Defendants were denied the right to impeach Plaintiff with the evidence from the Conan O'Brien email that Plaintiff (1) was not intoxicated during the evening in question, and (2) was willing to participate in one investigation (the Rothman investigation) but not the other (the Jefferson investigation).

### E.  Improper Comments/Arguments by Plaintiff's Counsel

Where one party makes an improper statement, "[a] new trial may be granted only where the improper statements made it reasonably probable that the verdict was influenced by prejudicial statements."  Greenleaf v. Garlock, Inc., 174 F.3d 352, 363 (3d Cir. 1999).  "The number of improper remarks, whether they be of law or fact, is important in assessing whether counsel's conduct prejudiced a jury verdict."  Price v. Trans Union, L.L.C., 839 F. Supp. 2d 785, 806 (E.D.Pa. 2012) (citing Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 208 (3d Cir. 1992)).  Where there is no objection to the improper statement at trial, the moving party waives

his right to move for a new trial on this ground, and the Court will not grant a new trial unless the nonmoving party's conduct resulted in a miscarriage of justice.  Wilson v. Vt. Castings, Inc., 170 F.3d 391, 395-96 (3d Cir. 1999).

During closing rebuttal in this case, Plaintiff's counsel Lane Jubb improperly suggested that Defendants' counsel Lisa Lori was lying during her closing argument:

> Mr. Jubb: "I can think of 11.9 billion reasons that **her telling you they don't make money is a lie.**"
> Ms. Lori: **Objection**
> Jubb: That's the –
> The Court: All right.
> Mr. Jubb: - gross revenue.
> The Court: **Sustained; it's not a lie, ladies and gentlemen of the jury.  Strike that word. (ECF 140, 76:24 –77:7)**
> …[after conclusion of Mr. Jubb's rebuttal]…
> The Court: **Both Counsel are representing their Client.  They are vigorous Advocates for the Clients.  They are not lying.  It's not appropriate to say that Ms. Lori lied.  That comment will be stricken.**  (ECF 140, 81:17-20)

Here, Defendants' counsel promptly objected to Plaintiff counsel's statement that "her [Lisa Lori] telling you they don't make money is a lie."  (ECF 140, 81:17-20).  Therefore, Defendants preserved their right to object and the standard for granting a new trial is whether the improper statements made it "reasonably probable that the verdict was influenced by prejudicial statements."  Greenleaf, 174 F.3d at 364.

In Burlington v. News Corp., 2016 WL 1221426, at *9 (E.D.Pa. March 29, 2016), Plaintiff filed a Motion for New Trial, asserting that Defendants impermissibly attacked Plaintiff's counsel during their closing argument by suggesting that Plaintiff's counsel was untruthful.  Id. at *8.  The Burlington court's reasoning, though evaluated under the "manifest prejudice" standard rather than the "prejudicial impact" standard, is instructive. The Burlington court noted that, "[a]side from numerous ethical reasons, it is simply not a proper comment upon the evidence to attack opposing counsel."  Id. at *9 (citing Craig Lee Montz, Why Lawyers Continue to Cross the Line in Closing

Argument: An Examination of Federal and State Cases, 28 Ohio N.U. L. Rev. 67 105-06 (2001)). Nevertheless, the court in that case held that "Defendants' closing argument, particularly viewed in light of Plaintiff's closing argument, was not so manifestly prejudicial as to warrant a new trial." Id. at *10, citing Dunn v. HOVIC, 1 F.3d 1371, 1377 (3d Cir. 1993) (en banc), modified on other grounds, 13 F.3d 58 (3d Cir. 1993), cert. denied, 510 U.S. 1031 (1993) (noting that "our disapproval of portions of the closing is not enough to warrant reversal on that ground"). The Court noted,

> [T]here was no indication during trial that the jury would be incapable of setting aside all of the rhetorical noise, presented by both Plaintiff and Defendants during closing arguments, to properly weigh the facts and decide the issues. The jury was instructed that the arguments of counsel do not constitute evidence. Juries are presumed to follow the court's instructions. Id.

Here, this Court made clear to the jury that "[i]t's not appropriate to say that Ms. Lori lied" and "[t]hat comment will be stricken." ECF 140, 81:20. Moreover, as in Burlington, this Court instructed the jury that arguments of counsel do not constitute evidence.[34] This Court believes that its instructions were sufficient to expunge the prejudicial impact of Plaintiff counsel's remark. "In matters of trial procedure such as that involved here, the trial judge is entrusted with wide discretion because he is in a far better position than [the Circuit Court] to appraise the effect of the improper argument of counsel." Fineman, 980 F.2d at 207 (citing Reed v. Philadelphia, Bethlehem & New England R.R. Co., 939 F.2d 128, 133 (3d Cir. 1991)). In light of this Court's instructions, this Court finds that it is not reasonably probably that Plaintiff counsel's remark, though improper, influenced the verdict. Therefore, granting a new trial on this basis is not warranted.[35]

---

[34] This Court told the jury in its points for charge, "[t]he following things are not evidence. Statements, arguments, and questions by the Lawyers for the Parties is not evidence." (ECF 146, 101:4-6).

[35] Since this Court concludes that a new trial is warranted for the reasons discussed above, it need not address Defendants' remaining arguments, included in their Motion for New Trial (ECF 153), for granting a new trial.

**XIII.**     <u>**CONCLUSION**</u>

For the foregoing reasons, this Court:

1. Denies Defendants' Motion for Judgment as a Matter of Law on Plaintiff's Title IX Claim;

2. Grants Defendants' Motion for Judgment as a Matter of Law on Plaintiff's Tortious Interference with Contractual Relations Claim;

3. Grants Defendants' Motion for New Trial on Plaintiff's Title IX Claim.

An appropriate order follows.

O:\CIVIL 20\20-2967 Abraham v Thom Jeff Univ\20cv2967 Memorandum Op on Post-Trial Motions.docx